**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLAS AIR, INC. and POLAR AIR CARGO WORLDWIDE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224, <br><br> Defendants. | Civil Action No. |

## COMPLAINT FOR INJUNCTIVE RELIEF

Robert A. Siegel
Michael G. McGuinness (*pro hac vice* forthcoming)

O'MELVENY & MYERS LLP
1625 Eye Street, Northwest
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile:  (202) 383-5414
rsiegel@omm.com

400 South Hope Street
Los Angeles, California 90071
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
mmcguinness@omm.com

*Attorneys for Plaintiffs*

Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (collectively, "Atlas" or the "Company"), for their Complaint herein against the International Brotherhood of Teamsters ("IBT"), International Brotherhood of Teamsters, Airline Division (the "IBT Airline Division"), and the Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224") (collectively, "Defendants" or the "Union"), state as follows:

## **INTRODUCTION**

1.      Atlas files this lawsuit under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA"), against Defendants to prohibit them from engaging in an ongoing, unlawful pilot slowdown campaign.

2.      Atlas is the largest air cargo outsourcer in the world, serving principal customers such as DHL and Amazon, and is also the largest provider of commercial airlift for the U.S. military.  As such, Atlas plays a major role in the global supply chain on a daily basis by transporting tons of express and time-sensitive cargo for e-commerce companies, major international airlines, and freight forwarding and logistics companies.  It also transports urgently-required medical supplies and food to support U.S. troops in the Middle East and elsewhere, and flies U.S. troops home to their families.  Many thousands of people, therefore, depend on the stability, reliability, and viability of Atlas' day-to-day operations.

3.      Atlas' pilots, however, are engaging in an illegal concerted slowdown that is causing widespread and significant flight delays and a significant decline in Atlas' operational reliability.  This slowdown has been orchestrated and explicitly directed by the pilots' collective bargaining representative—Defendants IBT, IBT Airline Division, and Local Union No. 1224—in order to unlawfully create leverage on Atlas in current negotiations for a new collective bargaining agreement.

4.      Defendants' slowdown activity involves a concerted and statistically significant change in the pilots' normal behavior designed to substantially disrupt operations—for example, an increase in the amount of last-minute sick calls designed to prevent Atlas from re-staffing flights on a timely basis; an increase in refusals to fly on the basis of fatigue designed to substantially disrupt operations; an increase in refusals to volunteer for or accept open time (*i.e.*, overtime) flying; an increase in refusals to allow aircraft to depart timely; an increase in maintenance write-ups of aircraft that have the effect of unnecessarily delaying flights; and an increase in refusals to depart because of complaints about catered crew meals.  For example:

- Between October 1, 2015 and September 20, 2016, only 13.8% of sick calls occurred on short-notice.  Between October 1, 2016 and September 20, 2017, that figure jumped to 23.8%.  At the same time, the percentage of sick calls occurring with advanced notice declined by 12.9 percentage points.  Moreover, before the slowdown started, the highest monthly percentage of sick calls occurring on short-notice was 20.7% (November 2014).  But since the slowdown began, there have been 10 months reaching at least 20.7%.  The likelihood of that being random is less than one-in-one billion.

- Between July 2014 and January 2016, Atlas averaged only 5.7 fatigue calls per 1,000 active pilots on a monthly basis.  However, since early 2016, the rate of fatigue calls has nearly tripled to 16.3 fatigue calls per 1,000 active pilots.  Moreover, the monthly fatigue rate has exceeded 17.8 per 1,000 pilots (the highest observed monthly rate prior to early 2016) in eight of the last 18 months.  The likelihood of that being random is less than one-in-600,000.

- Prior to the start of the slowdown, nearly 80% of Atlas' flights blocked out prior to their estimated departure time when loaded and ready, and only 13% of Atlas flights departed at the estimated departure time.  Since February 16, 2016, the proportion of flights departing exactly at the estimated time of departure, while controlling for other factors such as weather, pilot utilization, and fleet age, has *increased* by 31.9 percentage points, while the proportion of flights departing after the estimated time of departure has increased by only 3.1 percentage points.  In addition, the proportion of Atlas' daily flights that blocked out exactly at the estimated time of departure has been well above the upper 99% confidence threshold on 93% of days since February 16, 2016, and every day since April 9, 2016.  The probability of this proportion of departures exactly at the estimated time of departure being random is a virtual impossibility (*i.e.*, far less than one-in-one-billion).

5.        *This illegal slowdown has caused, and is continuing to cause, an 83% increase in flight delays of six hours or more since December 2016, and military flights alone have experienced an over 200% increase in such prolonged flight delays.*  The average delay associated with these illegal pilot actions is eight hours, though many delays are significantly longer, with some lasting for several days.  These flight delays are highly disruptive and are causing Atlas to incur substantial economic costs and irreparable harm to its goodwill with customers, who themselves are suffering from the impact of these delays on their operations. Equally important, Atlas' customers' end-consumers are being adversely impacted by the delay of their time sensitive cargo, whether it be medications, birthday presents, legal documents, or wedding dresses.  Perhaps most significantly, these flight delays are also causing substantial harm to the national interests, given that Defendants' slowdown activities are negatively impacting flights for the military carrying troops and critical supplies.

6.        While the Union has claimed that disruptions in Atlas' operations are being primarily caused by a pilot staffing shortage, among other things, that is not true.  Atlas is, in fact, well-staffed to meet its customers' requirements, and indeed pilots are flying at lower levels of utilization than has historically been the case.  There would therefore be no operational disruption if the pilots were performing their duties in the regular manner.  Indeed, Atlas has been compelled to increase its normal staffing levels in order to reduce the adverse impact of the illegal pilot slowdown.  But the evidence shows that the operational disruptions have continued, and this is because the pilots are abiding by and effectively implementing the Union's repeated directions to engage in illegal slowdown behavior.

7.        The Union has demanded that pilots be "All In" in support of this illegal slowdown and has developed code words to use in communications with pilots, such as "SHOP"

(Stop Helping Out Purchase [the location of Atlas' headquarters]) and "BOOT" (Block Out On Time, instead of when loaded and ready, to delay flights), to tell pilots exactly how they should disrupt Atlas' operations. The Union's messages to the Atlas pilots to violate the status quo in an effort to influence collective bargaining negotiations have made clear that the ongoing, concerted disruptions will increase even more going forward during the upcoming holiday end-of-year "busy season," including the following recent call to action:

> Atlas Executives believe that if they delay a new CBA long enough, you will lose your interest and your resolve and start violating the CBA, cutting corners and resign yourselves to the status quo and abandon our quest for an industry-leading CBA. This cannot be allowed to be the case! YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire. We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY. YOU must not only honor the CBA every day and on every flight, but also hold management accountable.

8.      More recently, Defendants threatened to ramp up their actions even further, telling pilots that if Atlas does not put "real money" into the collective bargaining agreement during upcoming collective bargaining negotiations, "this will not be good for [Atlas'] fourth quarter."

9.      Defendants have issued more than 100 other communications that, like these messages, leave no doubt that Defendants are instigating this slowdown. Indeed, by telling pilots to "Stop Helping Out Purchase," the Union is directly telling pilots to change their behavior by *stopping* their status quo behavior of "helping out" Atlas. And while the ongoing slowdown is clearly already causing significant disruptions to Atlas' operations, Defendants' threat to increase the disruption to Atlas' operations going into this year's "busy season" is not an empty one. Atlas' pilots have done so before during the 2016 peak holiday shipping season, including engaging in a concerted sick-out affecting Atlas' entire B-767 fleet of aircraft.

10.     This Union-directed slowdown is in direct violation of the RLA, 45 U.S.C.

§ 151 *et seq.*, which prohibits alterations to the status quo—while the parties are engaged in

collective bargaining negotiations (known as a "major dispute")—including "those *actual,*

*objective working conditions and practices, broadly conceived*, which were in effect prior to the

time the pending dispute arose."  *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*,

396 U.S. 142, 153 (1969) (emphasis added).  As recognized by a series of court decisions, even

if the parties' collective bargaining agreement permits individual pilots to engage in certain

conduct, such as calling in sick or refusing to accept overtime flying, that conduct, when engaged

in on a concerted basis in an effort to exert economic leverage against a carrier during collective

bargaining negotiations, violates the RLA because the concerted use of such an individual

contract right constitutes a change to the status quo.  *See Allied Pilots Ass'n v. Am. Airlines, Inc.*,

643 F. Supp. 2d 123, 127-32 (D.D.C. 2009); *United Air Lines v. Int'l Ass'n of Machinists &*

*Aerospace Workers*, 243 F.3d 349, 362 (7th Cir. 2001); *Delta Air Lines, Inc. v. Air Line Pilots*

*Ass'n, Int'l*, 238 F.3d 1300, 1307-09 (11th Cir. 2001); *United Air Lines, Inc. v. Air Line Pilots*

*Ass'n, Int'l*, 2008 WL 4936847 at *40 (N.D. Ill. Nov. 17, 2008), *aff'd* 563 F.3d 257 (7th Cir.

2009).

11.     In such circumstances—where a union or its members affirmatively fail to

maintain the status quo in violation of the RLA—federal courts are empowered to issue an

injunction "in order to avoid any interruption to commerce or to the operation of any carrier

growing out of any dispute between the carrier and the employees thereof."  45 U.S.C. § 152,

First; *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577, 581 (1971).  The status

quo obligation in Section 2, First of the RLA not only prohibits Defendants and their members

from instigating, encouraging, or participating in a slowdown designed to disrupt operations and

influence collective bargaining, it also requires that Defendants and their officials affirmatively make all reasonable efforts to prevent or stop the concerted activity when it occurs. *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 273-74 (7th Cir. 2009); *Delta Air Lines*, 238 F.3d at 1309-10. Atlas has expressly requested that Defendants discontinue the concerted slowdown, but Defendants have refused to do so and are thus engaging in a major dispute status quo violation.

12.     The requirements for a preliminary injunction plainly are met here. Atlas will succeed on the merits of its claims under the RLA because the compelling evidence, including expert statistical data, leaves no doubt that the pilots are violating the status quo in an effort to disrupt the operation to gain leverage in collective bargaining.

13.     Although the irreparable injury showing that is typically required to obtain injunctive relief does not apply under the RLA, *see Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303-04 (1989), it is nevertheless certainly present here. Atlas has suffered, and will continue to suffer, irreparable injury, in the form of increased costs, significant damage to its brand and reputation with its customers given its inability to perform at historical and expected levels, and financial repercussions resulting from its inability to do so.

14.     The customers Atlas serves also are suffering tremendously as a result, damaging their brands and reputations as well. And the brunt of the damage is felt by the public, including the hundreds of thousands of commercial express freight customers who rely on the time-definite service of Atlas' customers like DHL and Amazon. In addition, the pilots' slowdown is adversely impacting the U.S. military and our national interests by significantly delaying flights carrying troops and supplies into battle and service members home to their families after lengthy tours of duty. At the same time, there can be no claim of harm to

Defendants or their members in issuing an injunction because it would simply prohibit them from engaging in illegal activity.

15.     The concerted slowdown is illegal and will continue to impose irreparable harm on Atlas, its customers, the military, and the public if not enjoined.  A preliminary injunction therefore should be issued prohibiting the Union and its members from instigating or engaging in, and to require them to make every reasonable effort to discourage and terminate, ongoing, unlawful concerted actions in order to return Atlas to normal operations.

16.     As demonstrated by the ever-increasing intensity of the Union's communications, Atlas can no longer patiently wait for Defendants voluntarily to comply with their statutory obligations.  Atlas therefore seeks a preliminary injunction requiring Defendants to meet their obligations to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce or to [Atlas'] operations."  45 U.S.C. § 152, First.

## JURISDICTION

17.     This action arises under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*  The Court has jurisdiction over this action under 28 U.S.C. § 1331.

## VENUE

18.     Venue is proper within the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1), (2).

## THE PARTIES

### Plaintiff Atlas

19.     The Company's two brands, Atlas and Polar, are commercial air carriers, headquartered in Purchase, New York, with domestic and international operations.  Both are

"common carriers by air" as defined in the Federal Aviation Act of 1958, and each is a "carrier" as defined by the RLA.  Atlas and Polar are owned by the same parent corporation, Atlas Air Worldwide Holdings, Inc. ("AAWW").  AAWW also owns two other entities, Southern Air, Inc. ("Southern") and Titan Aviation Holdings.

20.     Atlas is a leading provider of outsourced aircraft and aviation operating services, functioning primarily in the business of transporting its customers' cargo, including for DHL and Amazon.  Atlas also performs chartered passenger operations, primarily for the United States military, for which Atlas provides more lift than any other carrier.

21.     The majority of Atlas' customer cargo transportation services are provided on a contracted "ACMI" basis—Atlas provides the Aircraft, Crew, Maintenance, and Insurance for the transportation of time-sensitive products and equipment for customers worldwide, such as express and e-commerce products, technology and consumer goods, fresh fruit, vegetables, fish, flowers, and other perishables, drilling and excavation equipment, infrastructure equipment, pharmaceuticals, and livestock.

22.     Atlas' chartered cargo and passenger services, which are provided on a one-time, ad hoc or an extensive, longer-term charter basis, represent approximately one third of its business.  Half of Atlas' charter business is commercial, and includes, for instance, transport of equipment for concert tours, perishable goods, construction equipment, or other high-value goods.  Atlas also has been the largest provider of commercial airlift in the wide-body cargo segment for the United States Air Mobility Command for the last seven years, which airlift and military passenger service constitute the other half of Atlas' charter business.  Atlas also specializes in mobilizing and supporting humanitarian efforts at a moment's notice and in helping to transport college and professional teams to and from major sporting events.

23.     Since Atlas entered into the current collective bargaining agreement ("CBA") with its pilots in 2011, the Company's operations have grown significantly in both scale and scope.  Historically, the core of Atlas' business was focused on providing long-haul, intercontinental flights using B-747 aircraft for a variety of commercial customers and the U.S. military.  Atlas today operates both B-747 and B-767 aircraft types serving multiple markets in the passenger, express, and e-commerce space and operates long-haul wide-body intercontinental flights for customers such as Amazon, DHL, Qantas, Cathay Pacific, Panalpina, Nippon Cargo Airlines, Asiana Cargo, and Hong Kong Air Cargo Carrier Limited.

24.     Since 2011, Atlas also has developed a North American domestic market of highly-scheduled time-definite network flying centered on B-767 aircraft, which serves some of Atlas' most significant customers in their hub and point to point operations—including, DHL, an international transportation company that moves cargo (and provides a variety of other services), Amazon, one of the largest consumer products retailers and shippers in the world, UPS, and FedEx.  In 2016, Atlas began flying B-767-300 freighter aircraft for Amazon under the livery "Prime Air," to ensure timely delivery of Amazon's packages.  The business with Amazon is scheduled to grow significantly—from seven freighters currently to 20 by the end of 2018.

25.     Currently, over 70% of Atlas' aircraft serve the express and e-commerce markets.  As a result of the rapid growth of Atlas' operations in support of its e-commerce and express package customers, Atlas now operates—broadly speaking—two different "networks": (1) Atlas' traditional long-haul, intercontinental network, and (2) a shorter-haul domestic network centered around Atlas' B-767s, serving Amazon and DHL's point-to-point and hub operations, which now accounts for approximately 40% of Atlas' flights, compared to less than 20% a decade ago.

26.     Atlas must be, and always has been, flexible and responsive to its varied customers' ever-changing requirements.  Atlas maintains its expansive global network due to the diverse nature of Atlas' customers and their unique air transportation needs.  Over the last 12 months, Atlas operated flights to 427 different airports in over 100 different countries.  By way of comparison, in 2017, the largest U.S. passenger carrier—American Airlines—operated flights to approximately half as many (54) countries.  In fact, for the year ending August 2017, Atlas' more than 5,000 flights on behalf of the U.S. military alone went to 60 countries across the world, several of which went to critically-important U.S. military bases, such as Bagram Air Field in Afghanistan and Osan Air Base in South Korea.

27.     Unlike the long-haul international operations of passenger carriers such as American, Delta, and United, whose fleets of international aircraft (and crews) are routed from their hubs to a single international destination and then back to a hub, the unique nature of Atlas' business and customer base in the long-haul international segment of its operations mean that its aircraft and crew are often away from base for well over a week.

28.     As a result of this business model, Atlas cannot feasibly have reserve pilot crews stationed in every location.  If a pilot cannot fly his scheduled flight for any reason, the nearest replacement pilot may not be readily available, and in some instances, may be a continent away.  Often, Atlas is required to transport the replacement pilot to the departure location via commercial or charter transportation.  In some instances, Atlas needs to fly in a relief pilot from another part of the world, who must then rest, and then complete the originally scheduled flight several days later, causing substantial disruption (and potentially the spoilage of perishable cargo) for Atlas' customers.

29.     Atlas' customers depend on cargo arriving at the day, time, and place requested.  This is particularly true for Atlas' express and e-commerce customers, who require time-definite, highly reliable scheduled services to meet the expectations of their own customers. The time-definite nature of these customers' operations rely on Atlas' flights arriving on-time, either at their final destination airport, or to these customers' "hubs" so that packages onboard those flights can be quickly sorted and re-loaded onto another flight transporting them to their final destination.  Thus, any significant disruption in Atlas' operations, such as those being caused by the Atlas pilots at the direction of the Union, can cause an exponential domino effect that impacts a sequence of other flights and customers and end-use customers.

30.     September through December constitutes the peak season for Atlas and its customers.  During these four months, imports, new product releases, and holiday deliveries significantly increase the amount, volume, and time-sensitive nature of Atlas' cargo flying.  This is particularly true for 2017 as Atlas continues to grow in the ever-increasing express and e-commerce markets, where customers expect to receive their orders as quickly as possible.

**Defendants**

31.     Defendant IBT is an unincorporated labor organization, which, along with IBT Airline Division, has its principal offices in Washington, D.C.  Defendant Local 1224 is an unincorporated labor organization with its principal offices in Wilmington, Ohio.  IBT is the certified collective bargaining representative of the Atlas pilots under the RLA.  Local 1224 is the local collective bargaining agent designated by the IBT through IBT Airline Division to represent the Atlas pilots.  Defendants also represent pilots at ABX Air, another cargo carrier, which like Atlas, provides air cargo services for both DHL and Amazon.

32.      Local 1224, which manages day-to-day pilot labor relations with Atlas, is

governed by an Executive Board that consists of a President, Vice President, Secretary-

Treasurer, Recording Secretary, and three Trustees.  Local 1224 has an Atlas Executive Council

("ExCo").  The Atlas ExCo Chairman, Captain Robert Kirchner, serves as the leader of the Atlas

pilot group and represents that group on the Local 1224 Executive Board.  The Atlas ExCo

Communications Chairman is Captain Mike Griffith.

## BACKGROUND OF THE DISPUTE

**The Parties' Collective Bargaining Negotiations**

33.      Atlas and Defendants are parties to a CBA (the "Atlas CBA") governing the

rates of pay, rules, and working conditions of the Atlas pilots.  The Atlas CBA became effective

on September 8, 2011, and became amendable on September 8, 2016.  Under the RLA, a CBA

does not expire, but continues in effect until amended by agreement of the parties.  Either party

to a CBA may initiate bargaining for an amended CBA by issuing a written notice to the other,

pursuant to Section 6 of the RLA, 45 U.S.C. § 156, of its desired changes to the CBA.  Pursuant

to Section 34 of the Atlas CBA, which allows for an early commencement of negotiations for an

amended CBA, the parties began direct negotiations in January 2016.  Defendants also sent Atlas

a Section 6 notice on February 16, 2016.

34.      On January 19, 2016, AAWW announced its agreement to acquire Southern

Air Holdings, Inc., the corporate parent of Worldwide Air Logistics Group, Inc., which in turn

owned two subsidiary air carriers:  Southern and Florida West International Airways, Inc.

("Florida West").  The acquisition was completed on April 7, 2016, and Atlas and Southern are

in the process of being integrated.  Florida West was wound down following the acquisition.

35.      The crewmembers of Southern are represented by the same union as the Atlas

pilots—the Defendants in this case.  Southern and Defendants are parties to a CBA (the

"Southern CBA") governing the rates of pay, rules, and working conditions of the Southern

pilots.  The Southern CBA became effective on November 6, 2012, and became amendable on

November 6, 2016.  Defendants sent Southern a Section 6 notice in February 2016.  Because

pilot operational metrics have been within normal ranges for the Southern pilots (belying

Defendants' claims that the decline in Atlas' operation is due to Atlas' mismanagement and

operational factors), the concerted activity that Atlas seeks to enjoin relates only to the pilots of

Atlas and Polar.

36.     After the merger was announced, Atlas and Southern informed Defendants that

the carriers wished to bargain for a joint CBA to apply to the post-merger combined pilot group,

rather than amending the two separate CBAs.  Atlas and the Union eventually engaged in

discussions regarding the process the parties would use to formulate the post-merger joint CBA.

After months of negotiations, in June 2017, Atlas, the IBT Airline Division, and Local 1224

reached an agreement on a Negotiation Process to Facilitate Completion of Collective

Bargaining Negotiations (the "Protocol Agreement"), which, among other things, provides for

collective bargaining negotiations for a joint CBA.  These negotiations for a joint CBA began on

July 6, 2017, and have continued to the present time.

**Defendants And Their Members Have Engaged In Unlawful Concerted Activity To Pressure Atlas In Collective Bargaining.**

37.     Since February 2016, coinciding with Defendants' Section 6 notices to Atlas

and Southern, and soon after the announcement of the Southern acquisition, Atlas pilots began

engaging in unlawful concerted slowdown activities in violation of the RLA-mandated status

quo.  After this unlawful activity began, Atlas requested Defendants take effective action to stop

the slowdown.  But Defendants have refused, and continue to refuse, to stop the illegal

slowdown, and have in fact threatened to intensify the already significant slowdown as the busy holiday season approaches.

38.     This lawsuit and request for a preliminary injunction are based on the pattern of illegal activity that began in February 2016 and has continued during the past six months—the applicable statute of limitations.  This illegal conduct over the past 20 months since the slowdown began shows a probative pattern that has continued into the limitations period, as more fully described below.  This conduct includes:

- more frequently calling off sick on the day of scheduled flying,

- more frequently calling off flights because of fatigue,

- refusing to volunteer for or accept open time (*i.e.*, overtime) flying,

- delaying flight departures by "Blocking Out On Time,"

- writing up unusually high numbers of maintenance issues on aircraft, and

- refusing to depart due to rejected crew meals.

39.     Defendants have designed these concerted activities to cause maximum disruption to Atlas' operation and thereby exert pressure on Atlas to capitulate in collective bargaining.  Economists and statisticians routinely rely upon a variety of tests to determine the likelihood that an observed outcome (*e.g.*, the number of pilot fatigue calls Atlas experiences in a given month) lies within the range of random variation by comparing observed values of the data to the statistical distribution of a historical base period.  Each of the tactics adopted by the Atlas pilots on a concerted basis represent a significant change in behavior from the status quo, and all of those that can be quantified are considered "statistically significant."  In other words, such changes in behavior are all well in excess of what conventional statistical analysis would consider to be "random" occurrences.  And applying these techniques here confirms that these

behavioral changes are the result of collaborative pilot action.  Indeed, for most of these changes

described in more detail below, there is more than a 99% confidence level (*i.e.*, a statistician

would conclude that there is a less than 1% chance that the changes were random in nature rather

than the result of concerted activity).

Pilots Are Calling In Sick On Short-Notice Significantly More Often.

40.     Historically, most of the pilot sick calls occurred one, two, or three or more

days in advance of a pilot's next scheduled duty period.  Atlas pilots now have changed their

behavior and call in sick far more often on short-notice (*i.e.*, on the *same day* as, including *upon*

*wakeup* for, their next duty period).  A "duty-period" is the time when a pilot is on duty and

typically involves a flight or reserve assignment, but can also include a pilot traveling to his

flight assignment from his/her crew base (known as "dead-heading").

41.     Such short-notice sick calls have a larger adverse impact on the operation than

sick calls with longer advanced notice because of the reduced time for Atlas to assign an

available substitute pilot.  Accordingly, sick calls at crew wakeup (*i.e.*, when the crew is woken

for duty, generally three hours before a flight) place Atlas in a highly difficult position.  Short-

notice sick calls also reduce the number of pilots available for use on other assignments, and can

lead to significant delays, particularly when the nearest replacement pilot may be a continent

away.  While Atlas fully supports pilots calling in sick when they are sick and do not believe

they are safe to fly, the sick call system is subject to abuse—and it is clear that the abuse here is

concerted and coming at the Union's direction.

42.     On average, only 14.4% of pilot sick calls occurred on short-notice between

January 2013 and February 2016, with the highest monthly average during that time being 20.7%

(in November 2014).  Between October 1, 2016 and September 20, 2017, however, the

proportion of pilot sick calls occurring on short-notice increased to 23.8%.  Moreover, there have

been 10 months since the Union sent its Section 6 notice with at least 20.7% of sick calls

occurring on short-notice (*i.e.*, at or above the previous "high water" mark for short-notice sick

calls).  The probability of there being 10 such months with this "outlier" rate of short-notice sick

calls occurring randomly (as opposed to the result of a concerted change in pilot behavior aimed

at disrupting Atlas' operations) is ***less than one-in-one billion***.

43.     Another way of demonstrating this change in behavior is by comparing the

year-over-year periods of October 1, 2016-September 20, 2017 to October 1, 2015-September

20, 2016.  The percent of sick calls made on short-notice has increased almost 10 percentage

points—from 13.8% to 23.8%—year-over-year, while the percent of sick calls occurring at least

two days in advance has declined by 12.9 percentage points from 44.5% to 31.6%.

44.     Indeed, the number and circumstances of short-notice sick calls in recent

months, and the adverse impact they have imposed on the operation, are clearly traceable to a

change in the status quo behavior that is strategically designed to cause maximum disruption.  By

way of example:

- On June 7, 2017, three crewmembers consecutively called out sick for a single
  DHL flight from Cincinnati—DHL's hub of operations in North America—to
  Narita, Japan, causing a rolling delay of nearly nine hours.  A First Officer
  initially called out sick, forcing Atlas to find a replacement and adjust the
  departure time.  Then, the replacement pilot called out sick, forcing Atlas to
  find a second replacement and further adjust the departure time.  Finally, the
  second replacement pilot called out sick, forcing Atlas to find a third
  replacement and again adjust the departure time.  These consecutive sick calls
  also impacted the return flight from Narita to Cincinnati, which was a major
  transport of packages from Japan that experienced a corresponding delay of
  nearly nine hours due to the three sick calls in Cincinnati.  As a result, all of
  the packages missed the sort deadline into Cincinnati and could not be
  delivered until the day after they were promised by DHL to its customers.

- The same day, Atlas experienced another rolling delay of over 16 hours due to
  multiple sick calls on a DHL flight from Los Angeles to Incheon Airport in

South Korea, with subsequent/carry-on delays until June 9, 2017 (two days later). A First Officer called out sick, and no pilots accepted a call for open time volunteers put out by Atlas. Then another First Officer also assigned to the flight took bereavement leave. (While Atlas does not doubt this leave was legitimate, the pilots' slowdown actions leave Atlas with no coverage for legitimate pilot absences.) Accordingly, Atlas placed a reserve Captain on the trip. Atlas then determined it could improve its departure time with another Captain and assigned the reserve Captain to another flight. Then another First Officer from the original crew also called out sick at his scheduled wakeup time for his flight. The flight finally departed 16 hours late with a reduced crew and without a single member of the originally-scheduled crew on the flight. The subsequent flight for DHL from South Korea to Shanghai, China took a more than 12-hour delay as a result of the delay in Los Angeles. In order to reduce the delay of the next leg from Shanghai to Cincinnati, Atlas flew another aircraft on the route instead of the delayed aircraft. Therefore, the cargo coming from Shanghai was not flown on the aircraft to Cincinnati. In addition, the replacement aircraft was significantly smaller than the delayed aircraft, and therefore less cargo was transported to Cincinnati than planned.

- On July 16, 2017, a B-767 flight from Houston to Norfolk Naval Station in Norfolk, Virginia to pick up 213 military service members was delayed over 36 hours as a result of the Captain calling out sick at his scheduled wakeup time and Atlas being unable to assign a rested, available pilot who could get to Houston, which is not a crew base for B-767 aircraft. As a result, the Norfolk service members were picked up late and suffered a delayed arrival into Kuwait. Atlas spent $44,000 to house and feed the distressed passengers.

- On July 21, 2017, a specialized aircraft transporting aircraft parts for Boeing from JFK in New York, New York to Charleston was delayed approximately 15 hours as a result of a sick call by the Captain at the absolute latest possible time (*i.e.*, departure time), making it impossible for Atlas to operate on time. The lengthy delay was due, in part, to Atlas not being able to assign a replacement Captain as a result of six additional pilot sick calls and six pilot fatigue calls over the previous day and overnight. These calls caused a compounded domino effect of dozens and dozens of crew openings that Atlas was required to reassign.

- On the overnight shift starting on August 26, 2017, Atlas experienced a number of significant delays as a result of multiple sick calls. The following four short-notice sick call events occurred over the course of less than 12 hours:

    o For a DHL flight filled with express freight from Hong Kong to Anchorage, a crew member called in sick at his scheduled wakeup time. As a result, a crew member had to be removed from another DHL flight and assigned to cover for the sick crew

member, resulting in an 11.5-hour delay for that second flight from Hong Kong to Anchorage.  Subsequently, the delayed aircraft ferried to Dover Air Force Base in Dover, Delaware to transport needed supplies for the U.S. military to the Middle East.  Because of the delay caused by the sick call, the military flight was delayed over six hours.

   o   Another flight full of general cargo from Pudong International Airport in Shanghai to Anchorage was delayed 11 hours and 15 minutes due to a sick call by a pilot at his scheduled wakeup time and would continue to run late for three days as a result.

   o   Another flight for Nippon Cargo Airlines from Anchorage to Narita was delayed nearly 14 hours due to a pilot sick call.  No pilots were available at the base because of other crew call outs.

   o   A flight for the U.S. military transporting needed supplies from Hill Air Force Base near Ogden, Utah to Hahn, Germany (and then going to Qatar) was delayed approximately 20 hours due to a sick call by a First Officer.

- On September 16, 2017, a First Officer called in sick downline for a DHL express flight from Leipzig/Halle Airport in Germany to Incheon Airport in South Korea approximately 2.5 hours before crew wakeup.  A crew member was removed from his scheduled flying on another flight in order to reduce the delay, but the flight still took a delay of nine hours and 19 minutes.

45.     This abuse of sick leave represents the continuation of a campaign instituted by Defendants last December in an effort to disrupt Atlas' operation during a peak holiday flying season.  Starting on or around December 16, 2016, and continuing until December 24, 2016, Atlas experienced a dramatic increase in the proportion of B-767 pilots using sick days.  The B-767 fleet is the second largest at Atlas and is used for much of the Company's DHL flying, all of its flying for Amazon, and for military transport as well.

46.     These anomalies could not be explained by chance.  The elevated sick rate among Atlas' 767 pilots between December 16 and December 24, 2016 (and particularly between December 16 and December 20) was not due to random statistical variation or other factors and instead was the result of a concerted action by pilots to disrupt Atlas' operations in

the peak holiday shipping days in order to exert leverage over the Company during collective bargaining negotiations.

47.     The conclusion that this 2016 holiday-time sick-out was not random is also supported by a variety of Union actions warning Amazon and the public of potential delivery disruptions for purchases made at the online retailer during the peak holiday shopping season. Atlas pilots picketed Amazon's headquarters on December 7, 2016, carrying placards reading "Can Amazon Deliver?"  Defendants also ran online advertisements in December targeted at Amazon customers, including a link to the website http://canamazondeliver.com, which warned holiday shoppers that "Amazon customers may want to think twice before ordering last-minute deliveries" because "there may not be enough pilots to deliver for Amazon around the holidays."

48.     A December 18, 2016 segment on ABC's Good Morning America covered the online advertising campaign paid for by the Union and reported that "millions of Amazon customers who rely on the company's two day Prime delivery, getting a startling warning of what some claim is a possible holiday doomsday scenario," and included an interview with Captain Griffith who noted that Atlas did not have "an industry standard [pilot] contract."

49.     While this sickout ended once the 2016 holiday period ended, the threat of a further sickout during the 2017 holidays is evidenced in the Union's missive that "We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY.  YOU must not only honor the CBA every day and on every flight, but also hold management accountable."  Even more recently, Captain Griffith issued a message warning that if Atlas did not put "real money" into the CBA during upcoming contract negotiations, "as a pilot crew member, I can honestly say this will not be good for their fourth quarter [2017] . . . ."

<u>Pilots Are Calling In Fatigued Significantly More Often.</u>

50.      Since the Union sent its Section 6 notice, the frequency of pilot fatigue calls has risen sharply. Since October 2010, pursuant to Atlas' Fatigue Risk Management Plan required by the Federal Aviation Administration ("FAA"), each Atlas pilot has been obligated to advise the Company if, in his honest opinion, safety will be compromised due to fatigue if he flies as scheduled.  Like sick calls, fatigue calls are subject to abuse and can cause great harm to Atlas.  Fatigue is of course a serious matter, and Atlas fully supports pilots calling in fatigued when they honestly are not safe to fly.  But pilots are now using their right to call in fatigued as a weapon in the Union's campaign against Atlas.

51.      Between July 2014 and January 2016, Atlas averaged only 5.7 fatigue calls per 1,000 active pilots on a monthly basis.  However, since early 2016, the rate of fatigue calls has nearly tripled to 16.3 fatigue calls per 1,000 active pilots.  Moreover, the monthly fatigue rate has exceeded 17.8 per 1,000 pilots (the highest observed monthly rate prior to early 2016) in eight of the last 18 months.  As shown below, the relative increase in the number of weekly fatigue calls since collective bargaining began is striking:



Source: Analysis of Atlas data.
Note: Data through August 31, 2017. Pre section 6 average is the monthly average between July 2014 and January 2016. Post section 6 average is the monthly average between March 2016 and August 2017.

52.     The probability of observing such outlier rates in eight or more months since the Union sent its Section 6 notice is **_one-in-600,000_**, demonstrating the concerted nature of this change in behavior.  Moreover, pilot utilization at Atlas has actually *declined* since the Union sent its Section 6 notice.  Thus, while higher rates of pilot utilization (*i.e.*, greater block hours per month) could in some situations cause pilots to become more fatigued (and hence, call in fatigued more frequently), that is not occurring at Atlas.

53.     Indeed, the number and circumstances of fatigue calls, particularly those after lengthy rest periods, in recent months are contrary to the status quo and represent a calculated campaign to cause long delays and maximum harm.  By way of example:

- On April 23-25, 2017, crew actions (including multiple fatigue calls and maintenance write-ups) caused an aircraft flying approximately 120 service members home to their families in the United States to experience three consecutive delays of over 60 hours on each leg of a trip from Kuwait to Germany to New Hampshire to Texas.  The primary fatigue call was made, after the pilot had received 14.5 hours of rest, at Hahn Airport in Germany, where the aircraft stopped for cleaning and catering and a crew change that

should have taken approximately two hours.  Instead, the aircraft took a more than 14-hour delay as a result of the fatigue call.  Atlas spent $56,000 to house and feed the distressed passengers.

- On April 24, 2017, the Captain who caused the initial delay from Kuwait to Germany on April 23 was removed from that route and provided with a commercial business class flight from Kuwait to Germany, with the intent that he would have a restful flight, and fly another mission for the military.  He was assigned to a trip from Germany to Kuwait to Al Dhafra Air Base in the United Arab Emirates, where he would pick up 138 military service members to bring them back to their families in Baltimore.  The Captain, who had previously received 11.5 hours of rest, placed multiple fatigue calls in Germany, causing a 17.5-hour delay for the flight from Germany to Kuwait.  The delay then caused a compound delay of approximately eight hours for the flight from Kuwait to Al Dhafra.  The 138 military service members thus waited for their flight home for an additional 25.5 hours because of this Captain's multiple fatigue calls.

- On June 22, 2017, a First Officer, who had previously received more than 17 hours of rest, waited to call out fatigued until his 10 hours of additional rest would push the flight's delayed departure time into the airport's curfew period.  The timing of this fatigue call caused a flight carrying cargo for Nippon Cargo Airlines from Narita, Japan to Anchorage to incur a nearly 16-hour delay.

- On July 1, 2017, a Captain, who had previously received more than 25 hours of rest, called out fatigued on a flight carrying 340 military members from Pope Field in North Carolina to Hahn, Germany delaying the flight for over nine hours.  All 340 military members were through passengers, scheduled to travel on from Hahn to Kuwait.  As a result of the fatigue call, their second flight was delayed over nine hours as well.

- On July 30, 2017, a flight carrying military supplies from Dover Air Force Base in Dover, Delaware to Hahn was delayed approximately 13 hours due to two sequential fatigue calls by the Captain.  The aircraft flew from Miami to Dover after maintenance and was expected to be on the ground in Dover just long enough to be loaded.  But the Captain, after receiving over 54 hours of rest, called in fatigued, and then called in fatigued a second time after receiving his additional rest, such that he cumulatively received approximately 67 hours of rest.  Atlas was unable to assign a replacement Captain in order to expedite departure.

- On August 1, 2017, a flight carrying cargo for Qantas experienced disruptions on two separate legs due to a fatigue call after a long rest.  The Captain flew from Narita to Honolulu, and then had about 50 hours of rest.  He then flew from Honolulu to Sydney, Australia and had about 20 hours of rest.  He then

called in fatigued for his next flight from Sydney to Bangkok, Thailand. Fatigue calls in Sydney are especially challenging for Atlas because it generally takes a day and a half to two days to obtain a replacement crewmember since the crewmember must first fly all the way to Sydney and then get the required pre-duty rest. Due to Sydney curfew rules regulating when Atlas may fly in and out of the airport, and Atlas' inability to replace the Captain, the Captain was given over 15 hours of additional rest before finally flying the Sydney to Bangkok leg, causing a delay of approximately 14.5 hours. As a result of this delay, the crew was required to rest in Bangkok, and, as a result, the second leg from Bangkok to Shanghai was also delayed by over six hours.

- On August 11, 2017, after receiving nearly 28.5 hours of rest, a First Officer called out fatigued for a flight from San Juan to Campbell Army Airfield in Hopkinsville, Kentucky, carrying military service members. Accordingly, the flight flew with a reduced crew. Due to that reduced crew size, FAA regulations required the crew to rest in between the first and second legs of the trip, causing an approximately 11-hour delay to the second leg of the trip, which was to Seattle for significant deferred maintenance.

- On August 25, 2017, the Captain who caused multiple lengthy delays for the military in April 2017 (as described above) caused yet another delay by calling in fatigued and other actions. He was supposed to operate a flight from Greenville-Spartanburg International Airport in Greer, South Carolina to Biggs Army Airfield in El Paso, Texas to position an aircraft for a military mission (that he was not flying). Once the aircraft was at Biggs, another pilot would fly 256 members of the military to transport them into Kuwait (via Portsmouth, New Hampshire and Hahn). The Captain arrived late to Greenville-Spartanburg for a 5 a.m. departure, and so the airport manager told him that he must have his engines up and running by 5:15 a.m. because the airfield would be closing. The First Officer had already performed the pre-flight check, but the Captain insisted that they re-do it again together, even though nothing so requires. As a result, by the time the Captain was in his seat, the airport had closed. Since the airport was re-opening at 9 a.m., the Captain and First Officer were told to remain on board, at which point the Captain called out fatigued, despite the fact that he previously had 13 hours of rest. As a result, the flight was delayed 16 hours, and a return flight of the aircraft transporting an additional 230 service members home to their families from Kuwait was delayed 12 hours.

- On August 27, 2017, a flight carrying cargo from Sydney to Shanghai was delayed 18.5 hours due to crew actions. The crew was standing by while maintenance was repairing the aircraft. When the aircraft was fully loaded and ready, the crew said it would need time to do its checks. Approximately 40 minutes later, the crew, which had previously received over 40 hours of rest, called fatigued while they were within their legal duty day. Indeed, had

they operated the flight, they still would have had five hours of legal duty time left in their day.  After 12.5 hours of rest, the crew was informed of a new departure time outside of the Sydney curfew, but they said they were still fatigued, resulting in an additional six-hour delay, causing Atlas' schedule for this customer to run late for several days thereafter.  The customer requested that the crew no longer operate flights for the customer, complaining that "[t]he lack of customer focus provided by this operating crew to the [customer] Freight operation is exasperating and more than disappointing." Another manager at the customer called the delay "extremely disappointing," noting that "there are many questions being asked here in relation to how this could have occurred."  Days later, the customer complained that this incident and several other fatigue delays in the same week "result[ed] in one of our lines of flying now being delayed by 47 hours with no ability to operate on time until mid-next week" (*i.e.*, a week and a half later).

- On September 1 and 2, 2017, three pilots called in fatigued for their Hong Kong-Delhi-Hong Kong turn.  On September 1, a First Officer, who had previously received over 17 hours of rest, called in fatigued for the Hong Kong-Delhi-Hong Kong flight, causing a 7-hour and 35-minute delay in the initial leg of that flight.  The next day, Captain Griffith, who had previously received 36.5 hours of rest, called in fatigued for that day's Hong Kong-Delhi-Hong Kong flight.  Captain Griffith refused to accept an additional 10 hours of rest that would have allowed Atlas to set a new departure time, in accordance with the Company-Union agreed standard operating procedure, insisting instead that he would call in when fit to fly, leaving the flight schedule in flux.  Ultimately, Atlas found a replacement Captain and scheduled the flight for a two-hour delay.  After both of the First Officers scheduled for the flight were notified of that two-hour delay, one of the flight's First Officers, who had previously received 36.5 hours of rest, called in fatigued.  As a result, Atlas operated the flight with one less First Officer, which limited the crew's legal duty time and required an unscheduled crew rest in Delhi before the Delhi-Hong Kong leg could fly.

- On September 2, 2017, a Captain, who had previously received more than 10 hours of rest following a hotel reserve assignment, called in fatigued at 2:10 a.m. for a 6:30 a.m. departure, which caused an 8-hour and 40-minute delay of a Boeing flight from Paine Field in Washington State to Chubu Centrair International Airport in Japan.

- On September 9, 2017, a First Officer, who had previously received nearly 45 hours of rest, called in fatigued at his scheduled wakeup time, delaying a flight from Kuwait to Hong Kong by eight hours.  The aircraft was scheduled to fly from Hong Kong to Cincinnati transporting express cargo.  As a result of the pilot's fatigue call, the aircraft, which was already delayed due to maintenance and other issues, missed the customer's sort in Cincinnati, and the customer experienced a full service failure.  Had the pilot not called in

fatigued at his scheduled wakeup time, even with the maintenance and other delays, the aircraft would have arrived in Cincinnati in time for the customer's sort.

- On September 24, 2017, a First Officer called out fatigued "mid-pattern" for a DHL flight. Upon arrival from Sydney to Melbourne, Australia, where the aircraft was making a scheduled stop of less than two hours, the First Officer advised that he was too fatigued to fly the next leg of the trip from Melbourne to Shenzhen, China. Prior to the trip, the First Officer had over 36 hours of rest, including a full 24 hours when he was free-from-duty, and he would have received inflight rest on the trip from Australia to China as well. The Melbourne to Shenzhen flight took a delay of over 10 hours as a result of the fatigue call

54. Defendants have encouraged pilots to call out fatigued, even if they are not in fact fatigued, as one pilot expressly told Atlas on July 22, 2017. On that date, after a First Officer called out fatigued for a flight, Atlas' crew scheduling department called another First Officer who was scheduled to ride as a passenger on that flight to see if he would be able to pilot it instead. At first, the pilot agreed to fly the route, but later called back and said: "I was talking to the union and they wanted me to call and tell you that I needed 10 hours of pre-duty rest prior to my schedule change per the contract, and just to check if you guys are aware of that." Sections 12.E.1. and 12.F.3. of the CBA, however, do not require 10 hours of rest and permit pilots to choose to accept less than 10 hours of rest. As a result of this fatigue call, Atlas ultimately was forced to assign another pilot to fly the route and took a delay as a result.

Pilots Are Refusing To Volunteer For Or Accept Open Time Flying.

55. Atlas' staffing model and related staffing plan is built to accommodate forecasted flying so that nearly all of the Company's flight assignments are awarded each month through a pilot bid system based on seniority. Atlas also has a substantial complement of reserve pilots—pilots who do not have a scheduled line of flying, but are required to be available on their assigned reserve days—at key operational locations in anticipation of coverage needs. In addition to these regularly-awarded trips and usage of reserves, however, Atlas also offers a

number of "open time" flights each month that, for one reason or another, require replacement

crews.  Open time flying opportunities for pilots can arise for several reasons, such as to cover

for pilots who call in sick or fatigued, to crew a flight requested by a customer on short-notice, or

to recover from operational disruptions due to bad weather or mechanical problems.  Open time

volunteers are regularly sought in cases where reserve pilots have been deployed, are reserved

for other duty, or are not able to get to the required location in a timely fashion.  Pilots may

volunteer, and have historically volunteered, for these open time opportunities, which are

awarded on a seniority basis.

56.      Individual pilots are not required under the Atlas CBA to volunteer for or

accept open time flying.  But under the status quo period prior to this concerted slowdown, pilots

did in fact routinely volunteer to accept open time assignment because of the premium pay

associated with open time trips, at a rate that allowed Atlas to cover its scheduled flying.  Now,

as described below, Atlas pilots are making it much harder to fill open time trips as part of the

Defendants' "SHOP" campaign.

57.      Since January 2015, Atlas has recorded the number of calls that its crew

schedulers were required to make to pilots to find a volunteer to accept each open time trip.  In

2015, Atlas' crew schedulers averaged 1.5 calls to pilots per open time trip.  That average

increased to over two calls per open trip during the first eight months of 2016, and to over three

calls per open trip since September 2016.

58.      Notwithstanding the extra calls Atlas is making to cover open time, Atlas is

experiencing an increase in unfilled open time flying.  Between January 2015 and February

2016, there were no months where the monthly proportion of open trips left unfilled was over

5%.  Since February 2016, there have been *11 months* with over 5% of open time trips unfilled,

and that rate soared to 42% unfilled in December 2016.  Additionally, the percent of Atlas pilots who either placed themselves on the volunteer list for open time flying or elected to pick up open time flying on their days off started decreasing after February 16, 2016.  That percentage reached its lowest levels in several years—at a statistically significant rate that had a less than ***one-in-one billion*** chance of being random—between "Black Friday" (the day after Thanksgiving and a kick-off to the peak holiday shopping season) and Christmas 2016. (*i.e.*, when the Union picketed Amazon's headquarters and launched its advertising campaign aimed at the retailer, its customers, and Atlas).

59.     There has not, however, been a commensurate increase in the amount of available open time being offered.  Rather, when Atlas began to experience a reduced willingness among pilots to accept open time flying, it added additional pilots (at a substantial cost to the Company), which means the amount of open time available declined from an average of 132 trips per month between January 2015 and February 2016 to only 73 trips per month from March 2016 to August 2017.

60.     The concerted effort not to volunteer for and accept open flying has caused significant delays.  When pilots do not volunteer for open trips, Atlas must staff them with reserves who may be far away from the aircraft's location or wait for another pilot to become available.  Because Atlas' reserve and other pilot resources are already stretched because of a concerted sick-out and significant increases in fatigue calls, Atlas has not had the resources to cover all open trips.

Pilots Are Engaged In A Campaign To Block Out On Time (Or "BOOT").

61.     As evidenced by the Union's own words encouraging the BOOT campaign ("we're asking everybody—your EXCO is asking you to not block out early, ever, period.

Period, ever."), and the resulting pilot change in behavior, it cannot be disputed that pilots are slowing down by refusing to block out when the airplane is loaded and ready, as they did during normal operations before the illegal concerted activity began—thereby reducing the operational flexibility of Atlas and its customers.

62.     The BOOT campaign, which encourages pilots to "block out on time," is a misnomer because there is no "on time" at Atlas.  There is an estimated departure time, which is set to the minute (*e.g.*, 22:05) and is the latest a flight is expected to block out.  Since August 1, 2017, the estimated departure time for Atlas flights operated for Amazon has been set to 15 minutes prior to the estimated departure time in an effort to mitigate the harmful effects of the BOOT campaign.

63.     The estimated departure time is communicated to the flight's crew.  For instance, DHL will be aware that a flight carrying its express packages has an estimated departure time of 12:15 p.m., and therefore knows that the flight should depart no later than 12:15 p.m.  When a pilot blocks out (*i.e.*, releases the parking brake and begins push back or taxi) at the estimated departure time, the flight is not "on time" if it was loaded and ready to leave prior to the estimated departure time but failed to block out as soon as possible.

64.     Before the illegal slowdown began, Atlas pilots regularly exercised their authority and discretion to depart *prior to* the estimated departure time when the cargo was loaded and all safety checks were performed for the vast majority of flights.  Unlike scheduled flights carrying passengers who depend on the scheduled departure time for purposes of arriving at the airport and boarding their flights, there is no need for a cargo flight or charter passenger flight to wait once loaded and ready.  By blocking out at the exact estimated departure time, as opposed to when an aircraft is loaded and otherwise ready to depart, pilots have deprived Atlas

(and its customers) of substantial operational benefits from departures prior to estimated departure.  Atlas (and its customers) previously relied on these benefits as part of the status quo in order to keep the airline moving efficiently and to maximize the ability to recover from unavoidable delays.

66. The benefits from blocking out promptly, regardless of estimated departure time, and instead when the aircraft is loaded and ready, are significant:

- The faster the aircraft gets off the ground, the more time Atlas has to address any maintenance items that may arise upon arrival at the next station.

- Prompt departures prior to estimated departure time provide a buffer that helps to ensure a timely, smooth running operation and make it more likely that a flight will arrive at its destination early or on time even if it experiences unexpected delays en route due to weather, maintenance needs, or air- or ground-based congestion.

- Early arrivals at the destination give crew members time to make connections or otherwise move to their next assignment.

- Prompt departures reduce airport and hub congestion for Atlas' customers.

66. Indeed, these benefits are particularly important for Atlas' customers who base their package sort operations on a hub philosophy in which banks of aircraft fly in to unload at one location (up to 120 at a time), and then the same aircraft wait for the outbound freight to be loaded before departing back out to their respective spokes.  These operations have to be well-orchestrated because many aircraft are departing around the same time in order to arrive at their destinations to meet delivery commitments.

67. As part of this planning, manpower and ground equipment are allocated for the unloading/loading process.  These resources are shared between aircraft, such that when a loaded aircraft moves, the personnel and ground equipment are redeployed to the next departure that they are assigned.  If personnel and ground equipment are not able to push out an aircraft when it is loaded and move on to the next aircraft, the whole bank of aircraft is slowed down or backed

up waiting for the loaded aircraft to move.  Because Atlas pilots are refusing to depart when their

aircraft is fully loaded, it is now routine for aircraft to get backed up, causing pressure on the

customers' systems.

68.     Given Atlas' track record of normally departing prior to the estimated

departure time and the associated advantages, customers reasonably expect the Company's

flights to be able to leave at the earliest practical time when loaded and ready.  For example, if an

earlier leg of a flight was delayed due to maintenance, customers expect that Atlas will do

everything that is within its power and safe to make up for that delay, including by blocking out

at the earliest possible time for the next leg of the flight.  And customers expect that Atlas will do

everything that is within its power and safe to deliver cargo to its destination as early as

possible—including earlier than scheduled—to alleviate the harm that could be caused by delays

later in the shipping process.  Thus, when pilots intentionally wait until the estimated departure

time to leave even though they were cleared to depart, it deprives Atlas and its customers of the

aforementioned benefits, and Atlas' customers become dissatisfied with the Company's

operational performance.

69.     The data on the effectiveness of the BOOT campaign, which has impacted both

the B-767 and B-747 fleets and has damaged all of Atlas' customers, including DHL, Amazon,

and passenger charter flights flown for the U.S. military, is statistically significant at the 99%

confidence level.  (All figures discussed in this section apply only to flights with neither

uncontrollable delays nor secondary delays.)

- Prior to the Union sending its Section 6 notice, nearly 80% of Atlas' flights
  blocked out prior to their estimated departure time when loaded and ready,
  with the balance of the flights departing either after their estimated departure
  time or exactly at the estimated departure time.  Since February 16, 2016, only
  approximately 34% blocked out when loaded and ready prior to the estimated
  time of departure.

- Controlling for other factors, such as weather, pilot utilization, and fleet age, the proportion of flights departing exactly at the estimated time of departure has *increased* by 31.9 percentage points since February 16, 2016, while the proportion of flights departing after the estimated time of departure has increased by only 3.1 percentage points.

- Since February 16, 2016, as a result of the BOOT campaign, the average minutes of departure delay for the Atlas fleet has increased by 6.3 minutes, an increase that is statistically significant at the 99% level of confidence.

- The proportion of Atlas' daily flights that blocked out exactly at the estimated time of departure has been well above the upper 99% confidence threshold on 93% of days since February 16, 2016 (i.e., 543 of 582 days), and every day since April 9, 2016.

70.     The probability of this proportion of departures exactly at the estimated time of departure being random is a virtual impossibility (i.e., far less than one-in-one-billion).  As such, the BOOT campaign is demonstrably the result of a concerted action by pilots to disrupt Atlas' operations in order to exert leverage over the Company during negotiations.

71.     In addition to this statistical analysis demonstrating concerted BOOT activity harming Atlas and its customers, further evidence shows that pilots are following the Union's call to refuse to block out until the estimated departure time.  For instance, Atlas received the following complaint from a senior representative of a customer about a July 23, 2017 flight: Following a number of delays, "[a]fter arrival at [Allentown airport], the aircraft was ready for departure to [Ontario airport] at 1955Z.  The expectation was set to depart ASAP upon quick-turn of the aircraft to ensure an on-time arrival . . . .  The aircrew refused to depart until the 'scheduled' time set by Atlas (2039Z).  The issue . . . was escalated to Atlas and the aircraft blocked out at 2023Z . . . ."

72.     On August 2, 2017, a crew similarly refused to block out before a flight's 5:30 p.m. estimated departure time.  The cargo was fully loaded at 4:34 p.m., but the Captain ignored

the ground staff handling the paperwork necessary for departure.  When finally asked if he was "good to go," by the station manager, the Captain responded that they were, but the flight was not scheduled to block out until 5:30 p.m.  When the manager then pressed that Captain to address the paperwork necessary for departure, the Captain finally did so at 5:17 p.m.  Despite finally completing the paperwork, closing the aircraft doors, and being ready for departure at 5:20 p.m., the aircraft did not block out until exactly the 5:30 p.m. estimated departure time.

73.     For an August 25, 2017 flight set to depart at 5:30 p.m., loading was completed an hour prior to departure and the doors closed seven minutes early, but the plane blocked out three minutes late.  The station manager did not know how to code the delay, so he sent a message to the crew asking what happened. Through the aircraft's notification system, the Captain wrote that he started the engines "on time," but "IF WE HAD PUSHED IT WOULD BE CONSIDERED EARLY."

74.     Pilots are also more slowly taxiing in and out of the airport.  Aircraft taxi time is the time between when a pilot releases the aircraft parking brake and takeoff ("taxi-out time") or the time between landing on the runway and applying the parking brake at the destination ("taxi-in time").  Pilots have the ability to exert considerable influence on the speed at which they taxi aircraft before take-off and after landing.  Slowing down taxi time is a tactic that the pilots have used to delay flight departures and cause increased costs to Atlas.

75.     Since February 2016, after controlling for other factors likely to affect taxi times, each Atlas flight has taken on average 0.62 minutes longer to taxi-out and 0.60 minutes longer to taxi-in.  Based on conventional statistical analysis, these changes in pilot behavior are statistically significant at the 95% and 99% confidence levels, respectively, and cannot be explained by chance.

Pilots Have Significantly Increased The Number Of Maintenance Write-Ups On Atlas Aircraft.

76.      Atlas has a comprehensive maintenance program to ensure the safe operation of all of its aircraft.  As part of this program, pilots are permitted to write-up any maintenance item of which they become aware, but FAA regulations allow an aircraft to operate with open maintenance issues that do not affect airworthiness—called Minimum Equipment List ("MEL") items.  By searching out and insisting on the immediate repair of minor items, such as worn seat cushions, missing linens, or inoperable coffee makers—particularly at stations where Atlas does not have a full maintenance operation or where the nearest station with a full maintenance operation is a continent away—pilots can significantly delay a flight.

77.      While Atlas, like most carriers, gives its captains discretion to require a MEL repair be made before departure, pilots ordinarily and historically exercise their authority to defer the maintenance of MEL items until such time as the maintenance would not cause a delay. Pilots therefore are not engaging in normal operations if they write up maintenance items other than those that affect airworthiness.

78.      Since February 16, 2016, the pilot write-up rate has increased by 43.4% on Atlas' B-767 fleet. This change in pilot behavior cannot be explained by other factors that would typically be expected to affect the rate at which pilots submit mechanical write-ups.

Pilots Are Delaying Flights Due To Rejected Crew Meals.

79.      Atlas provides its pilots with crew meals pursuant to Section 5.E. of the Atlas CBA.  All crew members receive sandwiches, fruit, and beverages on their flights, regardless of the length of the trip.  But the quantity and type of these items, and whether the crew also receives hot meals, is determined by the length of the flight and the time of day the flight is scheduled for departure.  Historically, when a pilot found a catering deficiency, he typically

would file a Flight Crew Report to alert Atlas of the deficiency and ask for meal vouchers to

purchase his own meals in the future.  Following receipt of such a Flight Crew Report and

addressing the issue with the catering vendor, Atlas typically would notify the crew member of

its findings.  Pilots very rarely—if ever—took a delay as a result of catering issues.

80.     The pilots' response to catering issues has changed dramatically over the last

six months.  In February 2017, the Atlas Catering Committee of Local 1224 issued a "reminder"

to Atlas pilots that they have "the right to insist upon a contractually-compliant crew meal,

including, if necessary, requesting that the company delay the departure of the flight until the

crew meal arrives.  We understand that a decision to delay a departure is not inconsequential.  In

some locations, it may be difficult to find catering.  Nonetheless, our contract applies to all

locations because the physiological effects of poor nutrition do not discriminate on the basis of

cities or continents."  Both before and since that "reminder," Atlas has seen a noticeable increase

in the number of crew meal-related flight delays beyond normal pilot behavior.

81.     These catering-related "SHOP" tactics involve similar behavior:  flight crews

refuse catering due to some complaint about temperature or taste, reject alternative options

provided (including meal vouchers or substitute meals), and cause the flight to take a delay as a

result.  These meritless actions by the crew have led to customer complaints (including customer

requests to have certain crew members removed from flying for that customer), and the loss of

business to competitors.

82.     This is exactly what happened on July 18, 2017.  A pilot refused both the

planned catering and alternative options for catering, which caused the flight to be grounded and

ultimately not fly to its originally-scheduled destination.  Not only did this leave Atlas without

sufficient coverage to operate the rest of its planned routes (since the aircraft and crew never

made it to the destination), but it also forced Atlas' customer to contract coverage with a different cargo carrier at an additional cost of $30,000, resulting in lost business and lost customer goodwill for Atlas.  The customer, having recognized the cause of the flight cancellation, requested that this crew never fly for it again.

<u>The Cumulative Effect of Changes in Pilot Behavior Have Created A Statistically Significant Increase In Prolonged Delays Due to Crew Actions.</u>

83.     Starting in December 2016 (*i.e.*, around the time that late sick calls began to increase and open time acceptances began to decrease), as shown below, the rate of prolonged delays of at least six hours increased from 1.4% to 2.4%.



Source: Analysis of Atlas data.
Notes:  Data through September 19, 2017. Flights with neither uncontrollable delays nor secondary delays. Percent of flights leaving at least 6 hours after the scheduled time of departure.

84.     Given that the average prolonged delay rate prior to February 16, 2016 was very small—only 1.4%—this represents an ***over 70% increase in the prolonged delay rate*** as a cumulative result of changes in pilot behavior at Atlas.  These delays average eight hours, but often last much longer—even days.  After controlling for other factors that are likely to affect the

prolonged delay rate, statistical analysis demonstrates that Atlas' flights have actually suffered an even greater overall increase in prolonged delays of 1.18 percentage points—***an 83% increase in the prolonged delay rate***.  Overall, the combined effect of changes in pilot behavior since December 2016 — including pilot fatigue calls, short-notice sick calls, an unwillingness to accept open time assignments, and unnecessary write-ups—have contributed to approximately 380 prolonged delays *over and above the number that would have been expected to occur*.

85.     The increase in prolonged delays due to crew actions has been particularly pronounced for flights for the U.S. military, where any delay can cause harm to military operations and service members as well as the national interests.  Between January 2012 and February 15, 2016, only 1.5% of Atlas flights operated for the U.S. military suffered delays of more than six hours.  Since December 2016, however, the rate of prolonged delays for Atlas' military flights has increased to 4%, with one month exceeding 10%, as shown below.



Source: Analysis of Atlas data.
Notes:  Data through September 19, 2017. Flights operated for the U.S. military with neither uncontrollable delays nor secondary delays. Percent of flights leaving at least 6 hours after the scheduled time of departure.

86.     Even after controlling for other factors that are likely to affect the prolonged delay rate, Atlas' flights for the U.S. military have suffered an increase in prolonged delays of 3.67 percentage points, an ***increase of over 200%.***

Atlas' Delays Are Not A Result Of Understaffing.

87.     Defendants have falsely claimed in messages to Atlas' pilots and the public (including Atlas' customers) that Atlas' decline in operational performance is because the airline is understaffed and suffering as a result of massive attrition.  This contention is belied by the evidence.  Atlas has been aggressively hiring pilots since 2014 in response to increased demand for its services, including its contract with Amazon to add 20 Prime Air B-767s to its fleet through 2018.  Thus, factoring in Atlas' pilot attrition, the number of active B-767 pilots at Atlas nonetheless has ***grown by 169%*** since January 2014, even though the number of B-767 aircraft in Atlas' fleet has expanded at a slower rate (155%) over the same period.

88.     As a result of Atlas' proactive hiring, Atlas' block hours per pilot are below prior periods of high operating activity and well within normal bounds, demonstrating that Atlas is more than adequately staffed for its current level of demand.  For example, in all but one month since February 2016 for B-767 and B-747 pilots, the average block hours per pilot at Atlas has been *below* the average from January 2013-January 2016.  Thus, contrary to the assertions by the Union that Atlas is understaffed, the level of pilot staffing at Atlas is at or above historical norms at Atlas. Thus, there is no reason to believe that absent a concerted slowdown by pilots, the Company would be experiencing a *simultaneous* increase in fatigue calls, short-notice sick calls, and a reduced willingness to volunteer for/pick up open time.

**The Slowdown Has Been Orchestrated And Encouraged By Defendants.**

89.     There is significant and compelling evidence that Defendants are encouraging pilots to engage in an illegal slowdown in order to put pressure on Atlas in the ongoing labor

negotiations.  Defendants have an extensive system of communications that they maintain among their members, including electronic messages, regular meetings, and internet sites available to union members.  Defendants also possess a large number of confidential communication mechanisms to which Atlas does not have access, including its password protected internet site.

90.       Through these communications, Defendants have made it clear to the pilots their belief that Atlas will accede to Defendants' bargaining demands—but only if the pilots change their status quo behavior in order to force Atlas to do so.  Indeed, the Union has expressly told pilots to "SHOP"—*i.e.*, "stop helping out Purchase [Atlas' headquarters]"—as they were doing prior to the Union's campaign.  These communications are detailed in full in the Declaration of Jeffrey Carlson in Support of Plaintiffs' Motion for a Preliminary Injunction filed simultaneously.

### *Background Regarding Defendants' Pattern of Behavior*

Defendants Encouraged Pilots To Change Their Status Quo Behavior On A Concerted Basis At The Time Defendants Served Their Section 6 Notice.

91.       Since January 2016, Defendants have been encouraging pilots to change their RLA status quo behavior on a concerted basis and not to do anything to help Atlas that is not expressly required by the parties' CBA as a means to gain leverage.  This is commonly known as "flying the contract" or "following the CBA."  For example, in the January 29, 2016 Atlas Teamsters Action Message" ("ATAM"), a bi-monthly podcast led by Captain Griffith, Communication Chair of Local 1224's Atlas ExCo, Defendants said:

> So that's what following the CBA looks like.  Know what your obligations are. Be prepared to wait for the Company to fulfill theirs.  It's not your job to do it. And it's not your job to be an on time take off.  It's theirs . . . And why do we care about following the CBA to the letter?  Because it helps us.  And what it doesn't do is help the people who refuse to help you and your family.  It helps us as a Union hold the line and help others by supporting the tough decisions on the line that each crew member has to make when they deal with the Company.

 In February 2016, Defendants Began Releasing A Series Of Videos Encouraging Pilots To Slow Down.

92.     In or around February 2016, Defendants began a series of communications to pilots regarding changing their status quo behavior on a concerted basis, including a series of videos addressing fatigue, SHOP, and BOOT.  These communications focus so heavily on the precise metrics that pilots are using to slow down the airline that they confirm Defendants' direct efforts to change pilot behavior unlawfully on a concerted basis in a manner that degrades the operation.

93.     The first video, released in mid-February, 2016, addressed fatigue.  The video begins with the host saying that he called in sick last night and looking at a thermometer that reads 105 degrees.  He then says "The subject of this CBA Chat is fatigue.  Now, a fatigue call is not necessarily to say that you're fatigued . . . It may be a call to say that you will be fatigued." At the same time, he pulls a hot water bottle out from his shirt and says he's "getting hot now." The video continues with express instructions about how to "prove fatigue."  The video ends with the instructions:  "So always be safe.  Don't fly or train fatigued.  Remember . . . it's your CBA.  They signed it.  You use it."

94.     Defendants followed up this video with further ATAMs emphasizing the theme of pilots changing their behavior so as to not help management.  In the February 15, 2016 ATAM, Defendants stated:  "Are you going to continue to sell your talents for a quick buck, or are you going to stop doing the Company favors and follow the CBA to the letter and give your EXCO and Negotiation Committee the leverage and power they need today?"  And in the context of discussing a slowdown campaign at another airline that "got their attention," Defendants said, "You know it did.  And we have Atlas' attention now"—admitting that the

Atlas pilots are engaged in the same slowdown activity.  Similarly, in the March 15, 2016

ATAM, Defendants said:

> So as we bring this episode of the ATAM to a close, I would like to give a hat tip
> to our very professional aviators, who decided not to go to the Women in
> Aviation's convention to help out Purchase in their recruitment of unsuspecting
> pilots in our industry.  These people know how to shop.  And shop stands for stop
> helping out Purchase.  It has kind of become a mantra on the line right now.  And
> it goes hand-in-hand with following the CBA.  You follow the CBA, as Gary
> [host of the CBA Chats] would say it, they signed it, you use it.  But in everything
> else that's outside of the CBA, like doing special favors and recruiting, stop
> helping out Purchase.  And these folks are highest on the list right now.  They are
> the master shoppers among us.  Their efforts basically shut down the recruiting
> availability for Atlas at this conference.

95.    The second CBA Chat video, released in late February or early March, 2016,

addressed open time flying.  The video tells pilots to strictly comply with the CBA, even if they

go against the Union's instructions not to accept voluntary flying:  "Now, what protection does

the lowly VXer [pilot flying on his day off] have?  The entire CBA.  Insist on your pre-duty rest.

Insist on your minimum rest, and every other provision of the CBA.  If their trip falls apart, so be

it."  The video ends with the CBA Chat catchphrase of "It's your CBA!  They signed it, you

use it."

96.    In a CBA Chat released on or about March 26, 2016, Defendants focused on

SHOP:

> Well, quite simply, it stands for Stop Helping Out Purchase.  And is defined as
> doing the job that we were hired to do safely, professionally, competently, and
> within the CBA.  It is not doing the jobs of others . . . When we 'SHOP,' we are
> then free to devote our duty time to promoting a safer operation, to adhering to
> CBA compliance, and to a more stress free, hence, safer operation.  And safety is
> everything.   As we go forward with these CBA Chats, I'll endeavor to
> 'amalgamate' [a reference to a joint CBA covering the Atlas and Southern Air
> pilots] shopping into the CBA issues of the day.

The video then launched into a very detailed explanation of the precise rules for pre-duty rest

vis-à-vis schedule changes.  The host explains that if you do not comply with these rules "you

are hopping.  You are helping out Purchase.  And more than that, you're doing so by shortening

your CBA allowed pre-duty rest.  And you are eroding safety.  And no one wants that . . . Be a

shopper [*i.e*., a person who <u>S</u>tops <u>H</u>elping <u>O</u>ut <u>P</u>urchase], not a hopper [*i.e*., a person who <u>H</u>elps

<u>O</u>ut <u>P</u>urchase]."  The chat ended with its catchphrase ("It's your CBA!  They signed it, you use

it."), and the host added, "Safe shopping."

97.        In the March 31, 2016 ATAM, Defendants continued to encourage pilots to

change their status quo behavior by SHOPing and strictly complying with the Atlas CBA:

> To that end, we're going to be focusing on crews and individuals who rise above
> the daily incompetence of headquarters and score a win for the crew force by
> SHOPing.   What is SHOPing, you say?   Well, it stands for Stop Helping Out
> Purchase.  And when we do this one thing, requiring some judgment on your part,
> and strictly following the CBA, it emphasizes to management how important and
> valuable a well compensated and highly motivated crew force can be to enhancing
> their operations and customer satisfaction.

98.        The very next day in the April 1, 2016 Chairman's Update, Captain Kirchner

emphasized this same message:

> There are a lot of new people working in Purchase and unfortunately the company
> has not taken the time to train them properly or teach them the CBA.  You must
> be vigilant and guard your rights every day.  I also want to ask you all to redouble
> your efforts to help out and indeed take our probationary pilots 'under your wing'.
> These fine men and women need your guidance and protections as they weave
> their way through the many treacherous pitfalls here at Atlas . . . As we move into
> the busier part of the year, this is a good time to review your rights under the CBA
> . . . .  Remember, your union stands 100% behind you with regard to CBA
> enforcement and adherence.  You will not be disciplined or harassed for strictly
> following the CBA.

99.        The April 12, 2016 CBA Chat focused on rest periods for the express reason of

being able to "hold the Company down, keep within our CBA, and stop them using us as reserve

pilots."  Like the other CBA Chats, this video provided express instructions for how to strictly

comply with the Atlas CBA when it comes to rest.  The chat also discussed the BOOT program

in great detail:  "And this is all about shopping.  BOOT stands for Block Out On Time.  And we are not doing this.  We are going early, left, right, and center."

100.     Even more expressly, Defendants said, "we're asking everybody—your EXCO is asking you to not block out early, ever, period.  Period, ever."  Defendants also said they would pressure those who block out early by publicly posting identifying information, including on Facebook, so others can see "exactly who is hopping," because "100 percent block out on time . . . sends the Company, sends Ford Harrison an excellent message back that says we are together.  No flights coming out early."

101.     In discussing "other great shopping tips," Defendants advised "don't go fast."  One chat participant said that his "taxi speed is a safe, very safe taxi speed," and he has "been seeing a lot of guys taxiing pretty fast" and he has been "wondering what the hell they're doing."  The chat host added, "We are paid to be professional pilots.  We're not paid enough, Lord knows, but we're not being professional pilots when we are hopping.  We're being professional pilots when we SHOP."  The chat ended with a discussion of how pilots who do not slow down "have got hopper written on their forehead"—"or worse"—and that "most of these guys . . . don't want to be on the bad list."

102.     Similarly, in the May 13, 2016 ATAM, the Union said:  "Airlines such as Lufthansa know full well, unhappy pilots can be very costly.  Merely stating that they will be happy to see Atlas expand is to miss or willfully ignore the point.  Atlas' customers will not be happy if the planes stop flying."  They later added, "All we have to do is follow the CBA, shop, and boot.  And that's what your Union asks of you."

**Defendants Continued To Encourage Pilots To Slow Down Throughout The Summer Of 2016.**

103.     The June 20, 2016 CBA Chat focused on BOOT: "BOOT stands for Block Out On Time.  And starting immediately, your EXCO are requesting that we all strive to block out on time, no early departures . . .  By blocking out on time, you are a shopper.  And you're promoting a safer and CBA compliant operation."  The host ended the chat by advising pilots to "SHOP safely" and with the CBA Chat catchphrase ("It's your CBA!  They signed it, you use it.").

104.     The June 27, 2016 Chairman's Update stated:  "I ask you again to stick to the CBA and enforce it strictly.  Remember, your union will stand behind you."  This was echoed by Defendants in the June 30, 2016 ATAM:  "Time will tell, but we are in for a long fight for a fair contract.  But believe me, it will be worth it.  Very worth it, indeed.  Your EXCO also wishes to remind you that your adherence to the CBA and all the things each and every one of you are doing daily are having a tremendous affect and it's working."

105.     In the August 26, 2016 Chairman's Update, Captain Kirchner stated:

> Let me finish up by asking each and every one of you to show a new and more steadfast resolve toward contract compliance and adhering to some of our ongoing programs.  We anticipate that the company will be stretched to the limit and beyond in the fourth quarter.  We all know what that means when they get in a jam.  This company may then attempt to throw out the CBA and any other rule that gets in the way, resorting to any means possible to make the flight go.  Therefore, be vigilant, don't back down and hold on to your license and CBA tightly.  Use the QR pamphlet [a "quick reference" pamphlet issued by the Union], it's a great guide that was painstakingly put together to help all of us in CBA enforcement.  Use the union to back you up. We are anticipating a very chaotic fourth quarter.

106.     In the September 30, 2016 ATAM, Defendants made multiple comments encouraging pilots not to volunteer to fly:  "The Company, you know, speaking of pilots, is now so short the schedulers have been told to call pilots on their days off, at home, and solicit them to

fly.  The program, so far, is falling flat, as most are either not answering their phone or refusing to come out on their days off, which is their right under the contract.  Scheduling is getting very desperate.  And they're running out of options."  Captain Griffith said, "I am not going to volunteer my time to help the Company until we have a signed CBA that helps me and all of us."

107.    The ATAM also encouraged pilots to change their status quo behavior and strictly comply with the CBA to support the Union:  "Knowing what the CBA says and letting folks search their own conscience for the right choice when it comes how to interpret their individual actions when they are part of a Union team are really good examples of effective solutions not involving overthinking or making something more complicated than it needs to be."

In The Fall Of 2016, Defendants Intensified Their Slowdown Campaign By Falsely Claiming That The Operation Is In Trouble Due To Attrition And Remaining Pilots Should Not Help The Operation.

108.    Around this time, Defendants began intensifying their slowdown efforts by tying pilot attrition rates to slowdown activities.  In the October 14, 2016 ATAM, for example, Defendants explained why changing status quo behavior and strictly complying with the Atlas CBA helps the union in negotiations given the alleged lack of sufficient pilot staffing:

Regardless of what any newly minted VP may have to say about it or may have sold to their supervisors in the past, no reserves are available because they have called them all out on day one.  People not willing to extend their trips, people choosing to spend time with their families, and the multitude of other reasons Purchase cannot contact crew members to plead for help makes their failure obvious.  And the system can and has, in the past, come crashing down on them like a house of cards.

Having individual crew members follow the CBA helps to educate each of us on our rights and our responsibility under this legally binding document, regardless of whether we love or hate it.  So what would you choose to follow?  Follow our Union that asks you to follow their guidance and the contract, or follow Purchase who can't seem to comply with this contract and constantly asks you for favors to shore up their shoddy planning and execution schemes.  The choice is actually simple.  And as always, it's completely yours.  So choose wisely.

Defendants then explained some of "those things in the CBA we're not required to do": "You are not required to bid or accept open time flying or VX.  You are not required to answer your phone when on days off.  You are not required to answer your phone when on vacation . . . ."

109.    The ATAM closed with the usual admonition:  "We have learned we have choices.  We have learned what some of those choices look like.  We have learned that following the CBA is a simple and extremely effective way to give our Union all the leverage it needs to score points during talks and negotiations with Purchase."

110.    In the October 31, 2016 Chairman's Update, Defendants heavily emphasized changing status quo behavior in the form of strict compliance with the Atlas CBA:

> On a much better note, your efforts, solidarity and adherence to the CBA has been remarkable.  As I have told many of my fellow union workers, this pilot group has far exceeded my expectations on unionism and standing up for our rights under the CBA . . . Remember, every time you enforce the CBA you not only make our union stronger you also improve your life and make things better for yourself in many more ways than a $50 voucher or a few overtaxed overtime hours could ever do.

> Do not allow the new untrained people in Purchase to put you or your fellow crew members in harm's way, by leading you into situations which violate basic safety, the CBA or the FARS . . .

> As always, our slogan is most important now.

> It's Up to ME, every day.

111.    On November 22, 2016, Giant Comms, a Twitter handle run by "a group of professional Pilots at Atlas & Southern Air," threatened Atlas via a tweet related to a strike Defendants called at ABX, one of Atlas' competitors, that very same day.  Giant Comms tweeted to Atlas that "a Q4 like ABX's will be yours without industry parity wages for @Teamsters pilots" and that Atlas' customers "@DHLUS, @amazon & @JeffBezos not amused."  Giant

Comms also tweeted: "@JeffBezos & @amazon really should cause heads to roll at ABX, because this could spread to other air carriers!"

112.     This reference is to the strike that Defendants conducted against ABX in 2016. Like Defendants and Atlas, Defendants and ABX are involved in collective bargaining negotiations.  In the early morning hours of November 22, 2016, two days before Thanksgiving and just three weeks after assuring a court that it did not intend to strike at ABX, Defendants called a strike.  The unlawful strike lasted for almost two days during the critical holiday peak period before it was enjoined by the federal district court.

113.     Although the strike was called against ABX, Defendants instructed pilots working for Atlas not to cross the ABX picket line erected in Cincinnati.  Because Atlas has a significant presence at the Cincinnati airport, its operations were severely disrupted and over 20 flights were cancelled as a result.  Businesses that were depending on Atlas at this make-it-or-break-it time of year, and individuals who were counting on Atlas to deliver their holiday packages were disappointed by the resulting delays in service.

Defendants Acted On Their Threats, And In December 2016, During The Peak Holiday Season, They Intensified Their Campaign And Continued To Threaten Atlas' Customers.

114.     Heading into December 2016 and leading up to the holidays, the threats towards Atlas' customers intensified.  On December 7, 2016, Giant Comms tweeted at Amazon's CEO:  "we hope Atlas Air management isn't telling you everything is under control, because it isn't"; "it's time to come to the table to settle this"; "This isn't just going to go away.  Let's settle this tomorrow before the real holiday crunch."

115.     Atlas attempted to persuade Defendants to stop their illegal campaign and abide by their statutory obligations by sending a letter on December 19, 2016, informing Defendants that the pilots' increased use of sick leave and the refusal of crew members to

volunteer for and accept open time flying in the ordinary course (as discussed above) were a

violation of the RLA and requesting that they take immediate actions to stop the slowdown.

116.     In response, Defendants sent a letter, dated December 21, 2016, denying that

they were engaged in an illegal slowdown, accusing Atlas of "posturing, bombast and bluster,"

and failing to provide any assurances that Defendants would take any action to stop the pilot

slowdown.  Instead, in their letter, Defendants continued to perpetuate the allegation that Atlas

has a problem with "attrition, scheduling, and staffing . . . ."  And in a further effort to rile and

mislead their members, in a Chairman's Update on December 22, 2016, Defendants sent Atlas'

letter to pilots and tied the letter to contract negotiations—Atlas' "quest to keep us at the low

'bargain rates' they currently enjoy for pilot labor."

Defendants Continued Their Slowdown Campaign Into 2017.

117.     In the January 6, 2017 Chairman's Update, Captain Kirchner started the year

with a very direct message to pilots that the slowdown is working and they should continue

slowing down:

> Our pilots are All In and will not fall victim to such management-sponsored
> treachery.  Our pilot group is firmly resolved in its determination to secure a fair
> contract.
>
> The good news for our union, and bad news for management, is that most of you
> are fighting back and calling them on their games.  Crew members are daily
> learning to defend themselves with the CBA to even the playing field to thwart
> the constant attacks on our CBA . . .
>
> Our combined resolve and all of the initiatives we began in 2015 were very
> effective.  In 2016, we were vastly stronger and became better as a group.  We
> have strong evidence of how effective we have been, and you should all be very
> proud of your individual supportive actions and those of our group as a
> whole.  However, we cannot rest on our laurels.  Now is the time to call on all our
> new strength and capabilities and step up the fight in 2017.  This will be a VERY
> pivotal year for us and it will depend on each and every one of YOU enforcing the
> CBA very strictly.  What you do every day will dictate whether the anti-union
> policies win our future or not.  We must not let them punish and harass us into

submission.  This is more than just a battle between labor and management; this is an attack on unionism in general and is an attack on the entire Teamster organization.

118.     Similarly, in the January 15, 2017 ATAM, Defendants repeatedly encouraged

pilots to strictly comply with the Atlas CBA even though inconsistent with the pilots' status quo

behavior:

- "Now is the time to call on all our new strength and capabilities and step up the fight in 2017.  This will be a very pivotal year for us.  And it will depend on each and every one of you enforcing the CBA very strictly."

- In the context of discussing individuals who are "unmotivated and likely planning to leave their current place of employment," Defendants said "Ever heard of SHOP, Stop Helping Out Purchase?" and "What about all those other things that aren't required in the CBA."

119.     In a February 7, 2017 communication called "Catering Reminders,"

Defendants encouraged pilots to blame catering as a basis for calling out fatigued:

The increasing number of crew reports have revealed sandwiches which tend to have varying degrees of edibility and hot meals that cannot even be identified, let alone consumed. . . A failure to provide crew meals in accordance with the CBA violates our labor agreement and may, in some cases, affect the safety of operations.   Crew meals are required so that crew members can satisfy their nutritional needs during the duty day, which is an essential part of maintaining fitness for duty.  As airline crew members YOU have the obligation per the FAA to be fit for duty.   PRIOR TO BLOCKING OUT, ensure that the meals are contract compliant. Those who operate long legs and long duty days without proper nourishment or sufficient caloric intake, are potentially subject to low blood sugar levels, a recognized cause of pilot fatigue . . .

A failure to provide crew meals in accordance with the CBA violates our labor agreement and may, in some cases, affect the safety of operations.  Poor nutrition, including insufficient caloric intake, which can lead to low blood sugar levels, is a recognized cause of pilot fatigue.  Under the FARs, pilots share responsibility for the safety of flight operations.  All crewmembers must refrain from engaging in any careless or reckless actions.

*__Defendants' Continuing Behavior During Most Recent Six Months__*

Defendants Encouraged A Concerted Change To Status Quo Behavior In The Spring of 2017.

120.    The March 31, 2017 ATAM encouraged pilots to invoke the Atlas CBA, *i.e.,* to change their status quo behavior, and repeatedly mentioned how Defendants' ongoing campaign was working:

- "Hold them accountable.  Don't give them a break or do them any favors. Hold them to their delineated responsibilities in the CBA and each LOA . . . Hold the line with solidarity in check with your Union, and even the most overwhelming enemy cannot hope to beat us.  The prosperity of the markets and the finite supply of qualified available pilots, who choose not to stay at this pathetic excuse for an airline, coupled with Purchase's own growth plans has put this timeline in our favor, not theirs.  So hang on, everybody, as this labor dispute comes to a head. We're seeing cracks in that finely polished veneer of businessmen and executives in Seattle; Florence, Kentucky; and yes, Purchase, New York.  And we have only had to SHOP and BOOT to make those cracks form and make our point."

- "This whole thing would come to a screeching halt if some of your guys didn't continue to help [Atlas] out."

- "But with the rest of us in solidarity with our Union, helping that person to come to the right decision that needs to be made because, let's face it, a lot of these decisions can go either way, holding the line on a contract, making sure the contract is fulfilled, making sure that all of the myriad of regulations are complied with takes a team.  And it takes a solidified force to make sure that we move safely and efficiently only when everything is ready and safe."

121.    On April 13, 2017, Defendants sent a play-by-play for how to change status quo behavior by strictly complying with the Atlas CBA, titled "April 2017 Steward News."  The communication outlined "several items of which you should be aware" and identified numerous contract provisions and how to strictly follow them, even if doing so would be contrary to the status quo required under the RLA.  For example:

Notification and schedule changes should be conducted in accordance with the CBA. The FCOM contains the only procedures you are required to follow, and you should follow them in their entirety.  Your logbook should contain NO open write ups prior to start.  Conduct a complete preflight.  Have a full crew, in the

seats.  Perform ALL checklists, and don't forget to check the catering.  If at any time you feel the safety of the flight is compromised, CBA Section 26.R. contains protections to cover you.  Don't forget to call the company after you get back to your hotel room to start your rest period.  Finally, if you experience any safety or FAA violations please use https://hotline.faa.gov or call 1-800-255-1111.

CBA Section 26.R. provides: "Nothing in this Agreement will be construed to require a

Crewmember to take any action if he reasonably believes that such action will result in

substantial and imminent risk of harm to the Crewmember or his equipment."

122.     In the May 15, 2017 ATAM, Defendants said:  "I'm not even going to go into

the favors some of you out there continue to do to make a buck now instead of pulling on the

rope with the rest of us to make even better money tomorrow via a new and industry standard

CBA . . . The group that votes to follow the CBA and not their individual wallets is a good one."

123.     In the May 23, 2017 ExCo Update, Defendants expressly told pilots to call out

fatigued:  "At the heart of the problem is that Atlas simply can't retain pilots.  As a result, they

fall into a reoccurring pattern of always being short and having to add more flying to lines thus

reducing needed rest.  Meanwhile, management naively wonders why fatigue calls are up.

Remember, your union stands behind you and we are your line of defense against any sort of

harassment or intimidation relating to fatigue or any other issue.  Do not endanger your life, the

life of your fellow crew members or the public by allowing the company to push you into flying

fatigued."  The communication closed with the standard "Always - ALL IN."

<u>Defendants Pushed Pilots To Increase The Slowdown Campaign's Intensity For The Second Half
of 2017.</u>

124.     In the June 23, 2017 Chairman's Update, Defendants were as explicit as they

had ever been in encouraging a slowdown:

Finally, let me talk about the company's strategy of trying to wear you out.  Atlas Executives believe that if they delay a new CBA long enough, you will lose your interest and your resolve and start violating the CBA, cutting corners and resign

yourselves to the status quo and abandon our quest for an industry-leading CBA. This cannot be allowed to be the case! YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire. We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY. YOU must not only honor the CBA every day and on every flight, but also hold management accountable. Be wary, as the company is more and more often cutting corners in all areas of their operation to make flights go. The shortage of pilots is increasingly creating serious safety, scheduling and rest issues. NEVER risk yourselves, your crew, your passengers or a violation on your license due to their lack of planning or self-inflicted problems.

Be ALL-IN every day.

125.    In the June 30, 2017 ATAM, Defendants again called on all pilots to "SHOP, BOOT, and push back on all [of the Atlas'] tactics harder than ever, as [they] are starting to get the movement out of [Atlas] [they] desire." The Union went on to say: "We are getting into the busy season during the second half of the year. And it is now more important than ever to stay strong with your solidarity. You must not only honor the CBA every day and on every flight, but also hold management accountable."

126.    On July 5, 2017, Giant Comms began a July Twitter campaign encouraging pilots to call out fatigued/sick and then not respond to Atlas' increased calls for open time flying and reporting on that campaign. Giant Coms tweeted: "@AtlasAirWW Open Time trip 25! Maintaining rate of 5 trips per day UNMANNED due to lack of PILOTS WHO ARE BEING SUED! CBA NOW! #1u #FUPM." The tweet included the image of a dumpster on fire labeled "2017." FUPM means "F*** You, Pay Me."

http://www.urbandictionary.com/define.php?term=fupm.

127.    Shortly thereafter, in the July 14, 2017 ATAM, Defendants touted their success in slowing down Atlas' operations by saying these actions are what brought the Company to the negotiations table. The ATAM said: "[Y]our participation in the BOOT and SHOP initiatives

have shown that they're [sic] planning and execution is so poor that being held to following the CBA, which they agreed to, creates a complete debacle as an airline." It goes on to call for picketing on the steps of one of Atlas' customers and ends by reminding pilots to "adher[e] to the FARS, the CBA, BOOT, [and] SHOP."

128.    From July 17 through July 29, 2017, Giant Comms issued a barrage of a dozen tweets as part of its July campaign. Giant Comms started by tweeting, "The @AtlasAirWW dumpster fire burning WHITE HOT now as Open Time trip number passes 70 for July. Trips missing pilots: 4 PER DAY! #1u #FUPM" (with the image of the burning dumpster labeled "2017"), and closed by tweeting, "As @AtlasAirWW issues RECORD OPEN TIME TRIP 116, pilots are tired, aircraft are getting later and customers are becoming angered. #1u #FUPM" (with an image of a fireman (labeled "BUSINESS MEN") spraying a burning dumpster (labeled "PURCHASE") with a hose (with the water labeled "JET FUEL")).

129.    In the July 28, 2017 Chairman's Update, the Union directed pilots not to go on "self-imposed" reserve and walked them through the process for ensuring they do not "unwittingly turn themselves into reserve crew members." The message reminded them to continue filling out maintenance reports, not accept inadequate or missing catering, and "[e]nforce the CBA in its totality and hold the company to it." The message ended by reminding the pilots to be "ALL-IN."

130.    In the July 31, 2017 ATAM, Defendants said: "We're on a danger zone that could possibly cause us to not only continue to lose pilots, but now also to start to lose customers. And are there competitors out there that have their operations clearly organized in one sock. Oh yes, they do. They also have CBAs with their pilots. Their pilots are more than

happy to do the extra things it takes to make an airline run in the myriad of operational things that happen to make a flight go."

131.     These communications continued to be effective.  On July 31, 2017, a reserve pilot was assigned an open time flight.  The reserve pilot, copying stewards@apa1224, emailed Crew Scheduling to ask it to withdraw the message attached to the trip he was assigned because it made it look as if he had voluntarily accepted open time flying, which "ma[de] [him] out to be a scab to [his] union members by helping out the company and cheating [his] union brothers and sisters out of a new and fair contract."

132.     In the August 4, 2017 Chairman's Update, Defendants pushed pilots to continue their slowdown campaign.  First, Defendants reminded pilots of the effectiveness of the campaign on Atlas' relationship with Amazon and alluded to the fact that the slowdown campaign would ramp up as the peak holiday season approached:  "More to come on this subject later this fall."

133.     Second, Defendants encouraged pilots to call in fatigued:  "Rather than address the ever-growing serious maintenance issues, the fact remains that scheduling is constantly pushing crews into dangerous situations, including fatigue violations, and chief pilots are threatening and badgering crews to cut corners.  The stress pilots are under, due to constant CBA violations by flight operations and the safety situations that we are exposed to daily, is unacceptable."

134.     Third, Defendants continued to encourage pilots to change their status quo behavior with respect to catering:

> Another safety issue which has recently cropped up is catering.  It is no secret that this company cannot manage its vendors, specifically catering vendors. Attempting to browbeat and harass crew members into going without CBA-required catering and ignoring the physiological needs of the flight crew members

in general is not a solution.  Remember, your union leadership and our attorneys stand behind you.  Know and enforce the catering provisions of the CBA, you are on firm ground and we will back you.  Don't be bullied!

135.     The Chairman's Update closed with an express directive to "fly the contract" (*i.e.*, change status quo behavior): "Remember your contractual contactibility rules and use them to the max to protect yourselves and to get a better quality of life . . . Now more than ever be 'ALL-IN.'"

136.     Shortly thereafter, on August 15, 2017, the Union sent pilots a handbook for how to fly the contract, entitled "Your TOP 10 CBA References for August."  The communication expressly said that pilots should "improve [their] quality of life" as Atlas moves into its "busy season."  The communication stated, "Your leadership asks that in preparation for what's to come you take the time to build on your understanding of these areas of our contract. It would go a long way towards improving your quality of life and supporting our ultimate goal of securing an industry-leading contract."  The communication stated that "CBA Sections 12, 25 and 31 are extremely important," and then went on to quote from these sections.  Not coincidentally, these sections, which cover issues like pilot rest/fatigue, contactability, and sick calls correspond precisely with the ways in which pilots are illegally slowing down.

137.     On August 24, 2017, Giant Comms tweeted:  "ENFORCE THE CBA, SHOP & BOOT!  IT'S WORKING!  #1U #FUPM."  The tweet included a photo of a stop sign that said "SHOP" instead of "STOP."

138.     On August 31, 2017, Giant Comms tweeted a picture of a dumpster on fire and wrote:  "As @AtlasAirWW OPEN TIME PASSES 100 UNCOVERED TRIPS for the SECOND MONTH in a row, THE RAGING DUMPSTER FIRE OF DENIAL GOES ON! #1u #FUPM."

139.     The next day, on September 1, 2017, Giant Comms launched its September

count, tweeting: "So the currently rate for September is 5 per day . . . should be an interesting

month for @AtlasAirWW! #1u #FUPM."

140.     An August 31, 2017 ATAM encouraged ramping up various forms of job

actions: "You see how SHOP is working.  You see how BOOT is working . . . Now is not the

time to let up on the accelerator or pressure on them to follow the CBA."  The communication

directed pilots to increase maintenance writes ups ("Do not accept shoddy maintenance.  Do not

carry writeups from station to station.  Be safe.  Don't fly with inadequate or ill prepared

equipment.  And hold the line.") and reject catering ("Catering is continuing to deteriorate.

Reject it if it's inadequate.  Reject it if it's not fresh.  Reject it if it's not enough.  Order more.")

The Union also threatened that pilots would harm Atlas during the peak fourth quarter if rumors

that the Company would not put "real money" into the CBA during upcoming contract

negotiations are accurate.  Specifically, Captain Griffith said, "Well, as a pilot crew member, I

can honestly say this will not be good for their fourth quarter, if this is true."

141.     On September 7, 2017, the Union's "Stewards of Atlas" sent a communication

encouraging pilots to call out sick or fatigued, stating:  "As we find ourselves in the midst of a

period of increased friction and hostility, we remind everyone to make absolutely certain that

you are fit for duty each and every time you report to work.  Please, do not fly sick or fatigued.

All In, Every Day."  On the same day, as part of its September Twitter campaign, Giant Comms

tweeted another photo of a dumpster on fire, stating:  "Open Time Trip 35 for the first 7 days of

September, makes 5 times per day @AtlasAirWW has no pilots to fly known trips.  CBA NOW!

#1u #FUPM."

142.     The September 12, 2017 Chairman's Update explicitly informed pilots that

their campaign was effective and encouraged them to further slow down:

> The delays on a daily basis are more the norm than the exception. Long gone are
> the days when Atlas was able to boast about its on-time performance. Operational
> problems are becoming more and more commonplace. We see the company
> chartering corporate jets and using empty B-767s to position pilots. We see more
> maintenance delays. We see sub-standard maintenance incurring FAA
> violations. Seemingly, the only way the company can limp along is by daily
> violating our CBA, resulting in a mounting number of grievances being filed over
> contractual violations. Even the FARs are no longer held sacred. All of these
> problems contribute to low customer satisfaction and a loss of standing in the
> airline community. The crisis that Atlas Air has become is sad to
> watch. Moreover, it would have been preventable, had the company chosen to do
> business with the pilots in an honest and forthright manner, rather than inflaming
> anger among our crews by instituting a string of stall tactics.
>
> Now for the good news. We are now one of the most cohesive and well-educated
> pilot groups in the airline industry and literally the envy of most of the
> players. We enforce our CBA in a manner that legacy Atlas or Polar management
> has never seen before and they are frankly stunned by it. Our unity, camaraderie
> and team spirit both within our pilot group and throughout our union's
> organization are unmatched. By working together, we provide leverage to our
> leaders that will win us this fight for industry wages and benefits! . . .
>
> I thank each of you and ask all of you, as usual, to keep it up and keep the
> pressure on as management struggles in the snare of their own making. Their
> self-induced attrition, combined with your enforcement of the CBA, are the keys
> in not letting this injustice continue; doing favors and cutting corners only enables
> the same pattern. The only way to effect change is to hold the line every day.
>
> Remember, "never waive any part of the CBA" and "never do them any
> favors". As you all too well know, they are not giving us any waivers and most
> certainly are not doing us any favors these days.

The message closed asking pilots to be "All-In."

143.     On September 15, 2017, Giant Comms continued its September Twitter

campaign, tweeting account a picture of a dumpster on fire and wrote "@AtlasAirWW OPEN

TIME #91 on Sept 15 = more than 6 trips per day WITHOUT PILOTS to fly them! . . . CBA

NOW! #1u #FUPM."  Captain Griffith retweeted this post, adding the Twitter handles of DHL,

Amazon, and Jeff Bezos, and writing "Reserves running low and your operations are in jeopardy.

@AtlasAirWW pilots need new CBA NOW! #1u #FUPM."  He then retweeted the message

again, noting "the [open time] rate was 3 per day over the last two months; nose dive

accelerating."

144.     In the September 15, 2017 ATAM, the Union directly and repeatedly

threatened Atlas' fourth quarter:

> The pilot shortage has left [Atlas] with very few options.  They can't [] now meet
> their reserve requirements with their customers and are planning on asking their
> customers for relief.  You know, the important ones, Amazon, DHL, FedEx are
> starting to get very worried about what is going to happen during the busy season
> . . .
>
> Well, it looks to me like [Atlas] should make negotiating a new CBA their first
> priority, and start to smooth things out for themselves and their customers . . . I
> just heard the top guys have told the Company negotiators they're not allowed to
> sign off on anything that involves money on anything related to the pilots.  They
> have been told to string things along to keep line pilots happy and, you know, just
> get them through the fourth quarter.  They think the pressure will be off after that,
> and then they can delay the pilots even further, until they get tired and, you know,
> eventually give in . . . [T]hat would be a bad strategy because, I'll tell you what,
> from what I have seen on the line and talking to the pilots, they're fed up.  And if
> a CBA doesn't come soon, fourth quarter is not going to be a happy time . . .
>
> Without a CBA for fourth quarter and with currently uncovered trip rate now at
> more than six flights per day in open time . . . I truly wonder how this Company
> will make it through fourth quarter with any customers left to support . . . .

145.     The September 18, 2017 Chairman's Update continued to push pilots to change

their status quo behavior:  "'No waivers and no favors' is the clear and unmistakable rule we

must adhere to now more than ever.  'SUCCESS' will come through hard work and the

perseverance to follow through.  As you strictly enforce our CBA, always remember, with us,

'You Never Walk Alone.'  The ExCo, Stewards and entire union stand ready to fight and protect

your rights and your determination to enforce the CBA.  It is ALL up to US to make it

Happen.  You Never Walk Alone in this Union!  ALL-IN."

146.     The next day, on September 19, 2017, Giant Comms launched a Twitter tirade,

tweeting:

- "ATTENTION @DHLUS @amazon #PrimeAir @JeffBezos: Check vendors @AtlasAirWW & @ATSGinc and ask about required reserve pilots, NOW. #1u #FUPM"

- "Secret's out, @AtlasAirWW @ATSGinc @DHLUS & @JeffBezos @amazon! Want to capitalize? CBA NOW TO STOP PILOT LOSSES AND SHORTAGE.#1u #FUPM"

- "@AtlasAirWW at Open Trip 116 on the 19th day of Sept. Two previous months were 3/day; NOW, 6 TRIPS/DAY WITHOUT PILOTS! CBA NOW! #1u #FUPM"

- "Now offering OPEN TIME TRIP 117 . . . we will keep all stations advised today."

- "Now offering OPEN TIME TRIP 118 missing TWO pilots. #1u #FUPM"

147.     Defendants continued their September campaign on September 22,

2017, tweeting:  "Open Time Trip #135 for a pilot needed ASAP! BUSINESSMEN

FAILING DAILY!"

Other Pilots Have Recognized And Communicated To Atlas That Defendants' Campaign Is An Illegal Slowdown.

148.     Many Atlas pilots have recognized Defendants' illegal campaign for exactly

what it is and have complained to Atlas—including about threats of intimidation and harassment

of those who refuse to acquiesce in the illegal activity.

149.     On May 9, 2016, for example, an Atlas pilot sent the following email to Atlas'

Chief Pilot:

> Captain Welty, I am sending you this email in response to our conversation yesterday. It has become increasingly difficult for me to do my job effectively and efficiently with the intimidation and threats from some of my union brothers and sisters. I am not sure if you are aware of the "BOOT" program that is being promoted by the union. BOOT stands for block out on time. We are being told that we should not release the brakes until scheduled block out time even if we are

ready to leave before. There is also the "SHOP" program (Stop helping out Purchase). We are being told that this is going to put pressure on the company to negotiate a contract quickly. I not only do not think that this is going to have any effect whatsoever on contract negotiations, but it is keeping me from getting my ship, crew and freight on the way as soon as I can. Both Captain's ███████ and ███████ are threatening to release names on the Atlas Air GC comms web site of those that leave before scheduled block time. Captain ███████ is intimidating crewmembers directly in the DHL facility in CVG with the same rhetoric. All I want to do is fly my trips and enjoy my time off. I came here to fly airplanes not play games like children in the playground.[1]

150.     A few weeks later, on January 29, 2017, another Atlas pilot sent the following email to Atlas' Senior Director Flying, System Chief Pilot:  "There is a lot of ignorance going on and it sucks all the fun out of the job.  I wanted to share what was on the plane today when I picked it up . . . A copy was left in the cockpit and another copy in the right crew bunk magazine holder . . . Hoping for better times here at Atlas."  The pilot attached a document entitled, "THIS IS THE US MASTER PILOT SCABLIST," which criticized check airmen for doing their jobs: "Check Airmen are notorious to be greedy and selfish . . . CHECK AIRMEN IS A VOLUNTEER POSITION."  The document encouraged others to "add to the list, so our Brothers and Sisters know which individuals are ALL IN."  The attached list again provided details of pilots who had taken outbase and voluntary assignments with a string of dollar signs next to their names.  CBA Section 25.Q provides that a pilot may "out-base" (*i.e.*, be stationed as a reserve for a month at the station of Atlas' choosing).

151.     On February 28, 2017, another Atlas pilot sent the list to a Chief Pilot again. This time, the list was dated January 1, 2017, and was a comprehensive list of pilots who had taken outbase and voluntary assignments for October, November, and December 2016.  The list was very detailed and included not only the pilots' names but what flying they did and when.

---

[1] Personal identifying information is redacted throughout this document.

Again, there were dollar signs next to their names that appear to correspond with how much work the pilot did.

152.     On June 22, 2017, an Atlas pilot wrote an email to Atlas management about slowdown instructions that Defendants provided at a recent meeting: "These were your pilots talking about creat[ing] strikes, shutting down terminals and the intentions of bring in the Teamsters to intimidate company management.  They talked in detail about the plot(s) to break arms, stalk houses and what all the teamsters would do, to accomplish the goals they wanted . . . The oldest of the group, talked [in] [d]etail how they could easily shutdown one of your terminals (deluging with small issues), then they discussed starting a phone list to prevent your company to reach out and get a pilot for coverage after one calls off."

153.     Pilots also complained to Atlas that other pilots were sending them harassing text messages and asked the Company to stop the harassment.  One pilot received a text from another pilot of an image of a list of pilots who took outbase and voluntary assignments with notations besides their names, including "SCAB!"  The text questioned the pilot's willingness to be a team player and comply with the CBA during negotiations.  The text also called the pilot a scab.  The pilot asked for Atlas' help in offering protection and anonymity.  Similarly, another text provided to Atlas asked why the pilot blocked his schedule and asked if he was "helping out," insinuating that the pilot was hiding his schedule from the Union so he could be a good performer without harassment.  And certain pilots who resigned have reported to Atlas in exit interviews that they are leaving in response to pressure from the Union to slow down.

**Defendants' Illegal Slowdown Has Irreparably Harmed Atlas, Its Customers, And The Public.**

Defendants' Campaign Has Irreparably Harmed Atlas.

154.    The pilots' dramatic changes in behavior directly translate into irreparable

harm in the form of operational disruptions that tarnish Atlas' reputation in the marketplace and

create lost customer goodwill as well as significant financial costs for the Company.  The

primary driver of this harm are operational delays caused by the cumulative effect of all of the

pilots' tactics, including, as described above, causing statistically significant increases in

extended delays of six hours or more.

Atlas Has Incurred Reputational Harm And Loss of Goodwill As A Result Of The Pilots'
Changed Behavior.

155.    Atlas has built its strong brand and reputation for high quality service over the

past 25 years, and its consistent and reliable operation has allowed it to obtain the business of

major customers like Amazon, DHL, FedEx, and UPS.  Indeed, Atlas' entire business is

dependent on its reputation for strong performance and reliability.  And Atlas' customers are

well-aware when their flights are subject to extended delays due to sick or fatigue calls, or even

those short, but highly prevalent "BOOT" delays.

156.    For instance, Atlas offers a "visibility tool" to its customers so they can track

their aircraft.  As a result, Atlas' customers are able to see when their fully-loaded aircraft are

sitting on the tarmac for no reason due to the BOOT campaign, for example.  As described in

detail above, customers expect and depend on Atlas flights to depart as soon as they are loaded

and ready, and themselves suffer from the lost benefits such prompt departures provide.  Because

its customers are highly engaged, the deterioration in Atlas' operational performance caused by

the Atlas pilots' changed behavior has therefore translated directly into unhappy customers and

lost customer goodwill, thereby irreparably harming Atlas' brand and reputation.

157.     Atlas can suffer from such lost customer goodwill from several different

customers as the result of any single extended flight delay.  This is because not only does a

significant extended delay result in missed customer deadlines for the delayed flight, the ripple

effects of a single extended delay can, and often do, last for days and negatively impact multiple

customers' flights and cargo.  For instance, most Atlas freight planes are configured with four or

more extra seats designated to carry other Atlas crew members who are deadheading to be on

location for their next scheduled duty period.  A delayed deadhead flight often means that the

deadheading pilots will be late for their next scheduled duty period, causing each of their next

scheduled flights to incur delays (and possibly require the use of replacement pilots) as well.

Similarly, a single extended delay can cause that flight's crew or aircraft to be unable to get into

position for a subsequent flight for the same or a different customer, thereby causing a delay on

that next flight as well.

158.     This ripple effect is seen not only as a result of extended delays, but also as a

result of pilot sick or fatigue calls themselves.  As described above, a series of sick or fatigue

calls can result in the depletion of reserve or replacement pilot resources that can last for days,

and impact Atlas' ability to properly staff subsequent flights that may legitimately need

replacement pilots.  As a result, even flights that were not directly touched by a pilots'

illegitimate sick or fatigue call can suffer delays as a result of that very sick call.

159.     This lost customer goodwill is difficult if not impossible to replace or to rectify

with monetary compensation and is demonstrated by the near-daily complaints that Atlas

receives from its myriad of customers regarding the decline in operational performance resulting

from pilots' change in behavior.  For example, on June 27, 2017, after "the 4th event this week alone with another sick crew member," a senior representative of one customer complained: "This latest caper by crews will generate a lot of heat."  He was forwarding a complaint from a senior representative of the customer that said, "Understand these things can happen, but have never seen this with such a frequency on any other operator."

160.     On July 18, 2017, another representative of the customer complained to Atlas after a crew member refused the planned catering and also the alternative options for catering causing the aircraft not to depart and forcing the customer to have to charter an aircraft at a cost of $30,000.  The complaint said:  "Due to the cost this created for [the customer], jeopardy to the [customer's] (customers) and as this crew members actions are clearly not customer oriented and appear on the surface to be without merit, I would respectfully request they be removed from any future [customer] routes if possible."

161.     Another senior representative of the customer copied on the original July 18, 2017 complaint followed-up on the same day to highlight the $30,000 additional cost incurred by the customer and to complain about the occurrence of "two other major crew issues."  He asked, "The issues with flight crews continue to increase, when is Atlas planning to take the next steps in regards to flight crews?"

162.     The very next day, on July 19, 2017, the same customer senior representative again complained after multiple crews called in fatigued and sick for their flights:  "This one is getting real ugly!!!!!  Any guess in regards to this crew situation?"  And the very next day, on July 20, 2017, as a result of multiple fatigue and sick calls and other crew-related issues, the customer was forced to take multiple delays, which a senior representative of the customer

described as "painful."  The same customer senior representative followed up, stating "not a good day for sure."

163.     On July 20, 2017, another customer complained about a crew calling in fatigued:  "I am genuinely concerned about the rate at which Atlas pilots call fatigue compared to all other [] air carriers [serving the customer].  On a flight-normalized basis, Atlas' rate of fatigue calls is more than four times higher than other carriers, combined . . . ."  On July 26, 2017, the same senior customer representative complained about a crew calling in sick, which would have caused a four-hour delay and "missed package connections and missed customer promise."  The customer opted to use another carrier "to satisfy customer promise."  She noted:  "Atlas has the highest number of fatigue calls (over 5x) versus non-Atlas operated flights."

164.     On August 3, 2017, Atlas received a complaint from a senior representative of another customer about a fatigue call:  "It certainly is difficult to understand let alone explain to a customer why a Captain who has had 51 hours rest and a further 21+06 rest was suddenly fatigued a short time before scheduled departure and I view the entire delay still with a great deal of disbelief and a level of discomfort . . .  Any level of mitigation that can be put into place to prevent a repeat situation would be greatly appreciated."

165.     On August 9, 2017, a senior representative of another customer complained that "we had one sick call and one Fatigue call this morning . . . which delayed [] flexibility . . . as we had to wait for another crew from the Hotel."  The very next day, on August 10, 2017, the same senior representative complained, "Another FSF [Full Service Failure], crew fatigue issue" after all of the freight on an aircraft missed the sort where it was to be distributed throughout the customers' network.

166.     As a result of the significant delay for another customer due to a fatigue call on August 27, 2017, described above, a manager at the customer wrote, "The lack of customer focus provided by this operating crew to the [customer] Freight operation is exasperating and more than disappointing, particularly when our OTP [on time performance] has been challenged by other ATLAS events in recent weeks.  As a follow up we request that the following crew no longer operate on the [customer] network in the future and be removed from any rotation in our network as soon as possible."  Another customer manager complained:

> The delay below is extremely disappointing.  The crew fatigue issue was hard for us to accept when we were already operating on a significant delay.  To make matters worse we have a further 6 hour delay due to a crew wake up issue.  We are now almost 40 hours behind schedule with no sign of recovery.  Could you please as a matter of urgency look into a recovery option to minimi[ze] this delay.  We really need to get back on schedule as quickly as possible so we can deliver the type of service our customers expect.  As you can imagine there are many questions being asked here in relation to how this could have occurred and how we can get back on schedule.

167.     Days later on August 30, 2017, a senior representative of the customer complained to Atlas' Executive Vice President and Chief Commercial Officer.  He wrote, "The team has asked me to raise this directly with you as we're quite concerned at the number of crew fatigue delays over the last week.  We've now had 3 separate crew fatigue delays in the last week, resulting in one of our lines of flying now being delayed by 47 hours with no ability to operate on time until mid-next week."  As a result, he stated, "[m]any of our customers have lost confidence in our ability to deliver a consistent service."

168.     On September 9, 2017, a vice president for a customer complained about a flight delay due to fatigue call at wakeup that caused an aircraft full of express cargo to miss the daily sort:  "This is a real ugly delay, this is a FSF [Full Service Failure] for Sunday sort . . . ."

169.     Atlas competes in the highly competitive and largely commoditized market for providing outsourced cargo lift, whereby the Company's customers can and do source lift from

multiple carriers.  If the contracted flight services provided by Atlas fail to meet customers'

expectations with regards to reliability, the highly commoditized nature of offering outsourced

cargo lift means that these customers can replace the services of poorly performing carriers with

those of other carriers able to offer more reliable and dependable services.

170.     The risk of lost business is particularly high for Atlas with respect to the U.S.

military because of the structure of its contract.  Atlas is committed to the Civil Reserve Air Fleet

(CRAF), a military program through which airlines contractually pledge aircraft for activation

when needed in times of war.  In exchange, the government makes peacetime Department of

Defense airlift business available to Atlas and other airlines.  But if Atlas performs below a

certain threshold, it could lose its entitlement to such peacetime work until its performance

improves, and that work is given to competitors.

<u>Atlas Has Incurred Financial Harm As A Result Of The Pilots' Changed Behavior.</u>

171.     The Atlas pilots' concerted change in behavior, and in particular, their increase

in same-day pilot sick and overall fatigue calls, has financially damaged Atlas.  Each disruption

and delay imposes operational costs on Atlas.  Often, following a sick or fatigue call, a

replacement pilot must be transported from another location to the departure station.  As a result

of increased sick and fatigue calls, Atlas' costs for such transportation have increased.  In many

instances, Atlas is able to find a commercial flight for a replacement pilot, and the volume of

commercial flights amounts to a tremendous cost for the Company that has only increased with

the increased number of call outs.

172.     But Atlas also may be forced to charter a plane to transport the pilot to the

departure location, if a commercial solution is not available.  Any given charter flight can cost up

to approximately $25,000 or more just to transport one pilot.  Chartering in pilots is of particular

importance for flights going to military zones.  Atlas must abide by flying curfews in such zones, so if a pilot calls out sick or fatigued, Atlas has to charter in a new pilot as soon as possible to avoid missing the curfew.  Since February 2016, Atlas has paid $123,000 to charter flights for pilots, which compares to $0 the previous year. Of that, $98,000 was for chartering crews to position them for military operation flying.

173.     Furthermore, as a result of increased same-day sick and overall fatigue calls, coupled with a decrease in the number of pilots accepting open time flying, Atlas' operations have not only declined due to resulting delays, but in an effort to prevent a decline, the Company increased hiring in anticipation of the 2016 peak season (October-December) at a significant cost to Atlas.  Historically, Atlas plans to staff to accommodate non-peak scheduled flying with the ability to "flex" up by up to 3% and relies on overtime during peak season to cover the additional peak flying.

174.     In 2016, in order to mitigate the adverse effect of the pilot slowdown and resultant inability to use overtime, rather than to flex up to 3%, Atlas increased its staffing by approximately 6.9% in an attempt to protect the operation.  Specifically, in 2016, Atlas hired and trained an additional 60 first officers and upgraded 25 first officers to the captain position.  The salaries, wages, and benefits of these pilots alone, taking into account the corresponding decrease resulting from attrition, cost Atlas over $1.5 million in 2016, and cost Atlas over $1 million through June 2017.  In addition, Atlas spent hundreds of thousands of dollars on recruiting, training, and traveling costs for these new hires and upgrades.

175.     The pilot slowdown also harms Atlas financially because the Company has had to compensate its customers for the decline in operations.  Many of the Company's contracts with its customers require that Atlas perform at a certain level and pay a financial penalty if it

fails to do so.  These contracts also often include provisions that require customers to make bonus payments to Atlas if the Company performs better than required.

176.    Pursuant to Atlas' contracts with one of its major customers, prior to the recent change in pilot behavior, Atlas was entitled to an incentive payment in most months, but since the pilot campaign started, Atlas has either been forced to pay a penalty or performed at the minimum standards required by the contract, resulting in lost incentive payments for the Company.  Based on Atlas' performance for one aircraft type for this customer, in the 476-day period between February 29, 2016 and June 18, 2017, there was an approximately 107.1% net decrease in incentive payments in contrast to the prior 476-day period between November 10, 2014 and February 28, 2016.  (For the 28 days from November 10, 2014 through December 7, 2014, the incentive/penalty structure was inapplicable.)

177.    Likewise, in the 504-day period between February 15, 2016 and July 2, 2017, there was an approximately 87.5% net decrease in incentive payments in contrast to the prior 504-day period between September 29, 2014 and February 14, 2016.  Similarly, the penalty payments made by Atlas to another customer for a particular type of flying has also increased significantly.  Specifically, from February to December 2016, Atlas paid 72.8% more in penalties than during the same time period in 2015.

178.    As a result of poor performance, Atlas also has been compelled to make goodwill payments to certain customers.  For example, in March 2017, Atlas made a significant goodwill payment to one customer, after a series of crew related delays.  One such flight was a "live stock charter" in which the animals that were on the aircraft had to be put back into quarantine at the customer's cost.

Defendants' Campaign Has Harmed Atlas' Customers.

179.    The pilots' campaign and resulting decline in Atlas' operations has harmed its customers.

The United States Military

180.    Atlas is the largest carrier of cargo and passengers for the U.S. military. Delays of Atlas' flights for the military can be disruptive to military operations, and as a result, the pilots, at the direction of Defendants, are intentionally disrupting such flights to inflict maximum harm.  Pilot actions have prevented service members from coming home to their families on time and have also delayed flights carrying troops and urgently-needed medical supplies and other critical provisions into the battlefields.  These actions are detrimental to the missions of the U.S. military and place the lives of our troops at risk.

181.    For example, as described in part above, in April 2017, crew actions (including multiple fatigue calls and maintenance write-ups) caused an aircraft flying approximately 120 service members home to their families in the United States to experience three consecutive delays of over 60 hours on each leg of a trip from Kuwait to Germany to New Hampshire to Texas

182.    The impact on the service members and their families of this incident can only be described by the families themselves.  Atlas received dozens of written complaints from families, a number of which are reproduced below.

> My husband is a Blackhawk helicopter Pilot with the South Carolina Air National Guard. His unit has been deployed in the Middle East for ██ and "should" be home with our ██ young children as I write this. However, due to the internal politics of Atlas Airlines, he, along with 120 SC Guardsmen and women are currently stranded in Portsmouth, NH. Before that, they were previously "stranded" in Germany for 36 hours as well. Apparently the Atlas Airline pilots were holding an "unofficial" strike, and continue to do so at each airport, forcing the service men and women to camp out for several days at a time in the

terminals. They have been sleeping on the floor and cots and should be on their way home from a ▇▇ month deployment in the Middle East to their families and children, not stuck in an airport terminal for days on end without proper food, clothing and supplies. Is this any way to treat our country's finest?

The men/women are on government orders and therefore, cannot simply purchase another ticket home. They are at the mercy of the contracted airline, your airline, an airline that has failed them for the last 5 days of their journey home. Some of these service man are coming home to children they have yet to meet. The flight attendants have been wonderful through this process, providing them with some food (donuts and coffee) and toiletries, however there is no excuse for the Atlas pilots behavior, especially to the service men and women defending their very liberties.

Each time the unit has asked why the plane could not complete the journey, they were informed that there was an "issue" with the airplane. The Atlas pilots were unaware that the service men and women they are transporting are pilots and mechanics, as well. All of the excuses are false. The Atlas pilots are holding a soft strike and the South Carolina Guardsmen and women are caught in their game. Unacceptable and disgraceful.

***

Our SC guardsmen (A Company; 1st of the 111th Aviation Brigade; South Carolina Air National Guard, Fort McEntire, SC) returning home are currently covered by a charter contract with Atlas Airlines. These guardsmen, who were deployed to the Middle East for ▇▇▇▇, left Kuwait for home in the US on Saturday, April 22nd and were scheduled to arrive in Fort Hood, TX on Sunday, April 23. However, as I write this on Monday, May 1st, due to internal politics (what we understand to be a "soft pilot strike") at Atlas Airlines, 85 of our SC Air National Guardsmen are STILL stranded in Texas, awaiting word of when they will be allotted a return flight home to their families. These men and women have spent days delayed including many days in the airports, sleeping on cots, without comfort or appropriate supplies. They are our country's finest—and your company's internal politics and reactions to resolve the issue have been despicable. Our men and women are on government orders, they cannot simply purchase another ticket home, they are at the mercy of Atlas. UNFORTUNATE!

Please realize the waterfall affect your internal political failure is creating. In the specific case I write you about, (at best) my guardsman will get home on May 2nd or 3rd. *While he should have had approximately 10 days at home with his family, before returning to his full time job as a* ▇▇▇▇▇*, this will not be the case.* Because he has been away from his job for ▇▇ months, he will be required to be requalified ▇▇▇▇▇. That training lasts two weeks and he is scheduled to leave for this training on 5/7. *That will give him approximately 3 days with his children before leaving for another 2 weeks.* Would that be long

enough for you to reintegrate into your family's life . . . or long enough to breathe in the smell of your young children?

Regarding the guardsman that I am motivated you to write about: ████████ ████████ of the SC Air National Guard (█ years), formerly ████████ (█ years) is a Blackhawk pilot, a husband to ████████ and a father to ████████ and ████. He is an American Patriot if I have ever met one and a proud American. His parents immigrated ████████████████████ . . . ████ was their █ year anniversary in America. You will never meet someone more proud to be an American. This proud patriot spent this special █ anniversary—a reminder of how proud he is to be an American—sitting in a US airport, as a US Soldier feeling (in my words) FORGOTTEN. ████ proudly serves the United States and while he was away on this █ month deployment he missed many milestones, including holidays and birthdays (████ now █, now █, and his own █) ; his son's first day of ████████, and *now he will miss his wedding anniversary for the* ████ *year in a row.*

Our men and women (and their families) sacrifice so much—too much—and ████ story is just one of YOUR 85 stranded guardsmen's stories. I need to know, when will Atlas Airlines tell them, they're going home?

Please correct this injustice NOW—get them home NOW—and, frankly, the $500 voucher you've issued for their inconvenience does NOT fix the issue. Our men have served you as an American and, they are paying for your company's political infighting. Unacceptable and disgraceful. We DEMAND your solution.

\*\*\*

My full belief is that this should never happen to our military. NEVER. I understand that you are not responsible for delays related to out processing. What I am concerned with is your response in resolving the noise your inter office politics created. This "noise" delayed our military on their way home. I understand that you bid and won a government contract to provide the logistical support for getting our troops home safely and efficiently. If you are unable to live up to this contract, including putting our troops first, then I see a problem. I believe your company failed - you won the contract, recognized the revenue, but failed at the main goal - successfully moving our troops. This failure needs to be addressed so that our military never again experiences a feeling of being forgotten. The 4 days you refer to below may seem like nothing to you or me, but another 4 days to our military feels like a lifetime when they have been deployed to the Middle East in a high risk, combat zone. I will say it again, this is inexcusable and an Atlas Air failure. We are moving forward with our congressmen and State Senators. The Atlas Air contract needs to be reviewed.

\*\*\*

I do not have an opportunity to call you as I am currently between working full time and shuffling kids various places alone because my husband is deployed with the US Army. He has been in Kuwait, away from us for the past █ months. My

kids and I have been so excited to see him. We have been checking off the days for his return, which is now being held up by Atlas Air.  This day could be listed as one of the most emotionally draining since his leave. We have waited anxiously and with worry about their overall safety, and for details on their arrival to the states. I am so disappointed that an airline would make my husband, who has just served our country away from his children for so long, feel worthless and unimportant. I am disappointed that there have not been more positive actions taken to resolve this issue. I understand you do not have control over your employees, but if your employees are treated like my husband has been today I might not want to show up to work either. Please hear me in saying I do not mean this email to be a personal issue with you, but I'm hoping it will be read & relayed to the appropriate party and resolved for the next group of soldiers who are weary and ready to be home to their families.

***

You are an AMERICAN Contractor and it is your duty to get OUR American SOLIDERS home safely and ONTIME.  This is absolutely absurd they defend OUR COUNTRY and YOUR FREEDOM in overseas wars or missions and your duty is to get them home in a timely manner. AND YOU DID NOT DO THAT these past 5 DAYS!!!!!!!! What was supposed to be a day and half of travel now has turned into a week.

My husband and his unit have been held over many days overseas and now stateside and trying to get home to their families after being gone for ██████ ██████!!!

These soldiers give up a lot including their spouses, children, and families.  They give up every birthday, anniversaries, and HOLIDAYS so you can have your everyday FREEDOMS.  And you do not have the decency to ensure you have proper aircraft to carry OUR AMERCIAN SOLIDER back home to their families nor do you have the staff that is not willing to set aside their differences (union negations) and call in sick to make sure OUR AMERICAN SOLIDERS CAN GET HOME TO THEIR FAMILIES IN A TIMELY MANNER!!!!!

I have called and left many messages with no return phone calls –NOT very good customer service!!!!  And many of the wives have called and still no responses back to them either.

We are already in contact with DOD about your current contract. We (the wives) have started contracting all the news stations about your poor services and lack of customer service.

183.     Such a delay not only causes profound emotional suffering to families, as

evident from their messages, but also impacts them financially because they travel to meet their

returning service members.  As a result of this incident, the families of these service members complained to Congress about Atlas' contract with the military.  As a small gesture of its regrets about this shameful situation, Atlas offered each service member $500 and paid any out of pocket expenses incurred by the service members as a result of the delay.

Atlas' Other Customers

184.     More than two thirds of Atlas' aircraft serve the Company's express and e-commerce customers, and these customers are in the business of providing reliable, express delivery services to their own customers.  The decline in Atlas' performance has also damaged the operations of its customers, thereby harming their brands and reputations as well—as evidenced by the customer complaints detailed above.

185.     Furthermore, because customers like DHL have commitments to deliver packages to their customers on time, they have been forced by crew delays to hire another cargo carrier (one of Atlas' competitors), at their own expense of tens of thousands of dollars each time, in order to obtain an aircraft and a crew to move their packages.

186.     The change in pilot behavior and resulting lengthy delays has also negatively impacted the operating flexibility of Atlas and its customers.  For example, when an aircraft carrying freight is delayed such that it does not make the package sort at the customer's distribution center in a timely fashion, the freight will be delayed a full day until the next sort. Thus, even a short delay can cause a full service failure on the part of Atlas' customers, which then impacts thousands of customers on the back end, and the magnitude of this operational disruption is compounded with each aircraft that is delayed by the pilots.  For example, a B-747 aircraft carries between 80 and 100 tons of express parcel, and thus tens of thousands of customers are impacted when an aircraft misses the sort.

Defendants' Campaign Has Harmed The Public.

187.     Atlas transports many time-sensitive items, including medications,

pharmaceutical and medical supplies, lab shipments, human organs, emergency equipment, legal

documents, and items necessary for scheduled events, such as conferences, weddings, and

funerals.  Customers use, and pay a premium price for, express carriers because they need quick

service often on an urgent basis, and when items arrive late there can be significant

consequences.

188.     Potentially hundreds of thousands of these end-use customers—members of the

general public—have been damaged by the pilots' slowdown behavior because, unlike at a

passenger carrier, the delay from even a single strategically-placed sick or fatigue call can impact

a substantial portion of Atlas' network and thousands of end-customers who rely on express

shipments—and not just the several hundred passengers whose flight is delayed or who need to

be re-routed when a pilot calls out on a passenger carrier.

189.     In addition, the harm to the U.S. military caused by the pilot slowdown equates

to harm to the public by placing our national interests and security at risk.  Pilot actions have

caused our troops to arrive late to battle and without the critical supplies they need, putting their

lives and missions in jeopardy.  Furthermore, unnecessary delays in returning our troops home to

their families, particularly after lengthy tours in the Middle East and throughout the world, is a

catastrophe that is inconsistent with our nation's goal of supporting those who serve our country.

**Atlas Has Attempted To Resolve This Dispute Without Judicial Intervention.**

190.     Atlas has attempted to convince Defendants to stop their slowdown campaign

and abide by their statutory obligations.  For instance, during the December 2016 sickout, Atlas

sent a letter on December 19, 2016, to Defendants informing them that the pilots' increased use

of sick leave and the refusal of crew members to volunteer for and accept open time flying in the ordinary course were a violation of the RLA and requesting that they take immediate actions to stop the slowdown.

191.    In response, Defendants sent a letter, dated December 21, 2016, denying that they were engaged in an illegal slowdown, accusing Atlas of "posturing, bombast and bluster," and failing to provide any assurances that Defendants would take any action to stop the pilot slowdown.  Instead, in their letter, Defendants continued to perpetuate the untrue allegation that Atlas has a problem with "attrition, scheduling, and staffing . . . ."

192.    On at least two occasions during the summer of 2017, a senior executive of Atlas also communicated to Defendants that pilots were intentionally delaying military flights and requested that Defendants take action to stop such improper actions.  In addition, in June 2017, in the Protocol Agreement, the parties agreed to "conduct all negotiations based on mutual respect and trust."  Atlas specifically requested this provision, and conveyed to Defendants that it must be included in the Protocol Agreement because the Atlas pilots' concerted activities were unacceptable and the Union had an obligation to return the operations to the status quo.

193.    In that regard, on June 9, 2017, counsel for Atlas informed counsel for the Union that Atlas knew that pilots were engaged in a slowdown and that Atlas expected the slowdown to stop as the parties negotiated for a joint CBA.  Atlas asked that the Union's counsel so inform the Union, and the Union's counsel indicated that they would do so.

## CAUSE OF ACTION - VIOLATION OF RAILWAY LABOR ACT

194.    Plaintiffs reallege and incorporate by reference the allegations set forth in Paragraphs 1-193, inclusive.

195.    Defendants' attempt to unlawfully create leverage on Atlas in current negotiations for a new collective bargaining agreement by substantially disrupting operations through a concerted and statistically significant change in the pilots' normal behavior is a blatant violation of their status quo obligations during the parties RLA "major dispute" under Section 2, First, of the RLA, as established by the applicable legal precedent.  *See, e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001); *United Air Lines v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349 (7th Cir. 2001); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 2017 WL 2271500 (S.D. Fla. May 9, 2017); *US Airways, Inc. v. US Airline Pilot Ass'n*, 813 F. Supp. 2d 710 (W.D.N.C. 2011).  These cases all arise in the identical context as here—a union attempting to put pressure on an airline in order to gain leverage in contract negotiations by disrupting operations—and all expressly confirm that in this situation, an injunction must issue.

196.    During negotiation of a CBA (which is ongoing, here), Section 2, First, imposes two obligations that are at issue here: (1) a union and its officers and members cannot instigate or encourage a slowdown (or any other change in the status quo); and (2) a union must make all reasonable efforts to prevent or stop a slowdown.  This has been repeatedly confirmed by the lead cases in this area.  *See, e.g.*, *United Air Lines, Inc.*, 563 F.3d at 257; *Delta Air Lines, Inc.*, 238 F.3d at 1300; *United Air Lines*, 243 F.3d at 349.  Defendants are violating both of these obligations.

197.    Section 2, First, of the RLA, 45 U.S.C. § 152, First, imposes an affirmative legal duty on employers, unions, and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid

any interruption to commerce." This provision obligates the parties to maintain the status quo during negotiation of a CBA.

198.     The obligation under Section 2, First, to refrain from engaging in slowdown activities is "a substantive legal duty 'enforceable by whatever appropriate means might be developed on a case-by-case basis.' An injunction is an appropriate remedy to compel the performance of this legal duty." *Delta Air Lines*, 238 F.3d at 1308-09 (quoting *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971)). Accordingly, federal courts are authorized under Section 2, First, "to enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns, and sit-ins." *See United Air Lines*, 243 F.3d at 362 (citing *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)). In addition to enjoining such status quo violations, courts may enjoin imminent threats of such violations. *See, e.g., Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998).

199.     Atlas and Defendants are currently engaged in negotiations for a CBA. Accordingly, the concerted campaign by Atlas' pilots, at the direction of Defendants, to slow down in their duties violates Section 2, First, of the RLA.

## PROPRIETY OF INJUNCTIVE RELIEF

200.     No showing of irreparable injury is required to obtain an injunction against an unlawful violation of the status quo obligations under the RLA. In *Conrail*, the Supreme Court held that "[t]he district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury." 491 U.S. at 303 (emphasis added); *see also United Air Lines*, 243 F.3d at 362-64. Thus, upon a showing that a union or its members have altered the status quo, a

preliminary injunction should issue as a matter of course.  The statistical evidence—paired with Defendants' express directives to the pilots to alter the status quo—justify such relief without further analysis.

201.    Even if a showing of irreparable injury to the Company were required, Atlas has suffered and will continue to suffer irreparable injury as a result of Defendants' unlawful job actions.  As a direct result of Defendants' illegal slowdown, Atlas has suffered irreparable harm in the form of lost customer goodwill and a loss of reputation.

202.    Atlas has no adequate remedy other than injunctive relief because of the irreparable harm it is suffering as a result of the illegal actions of Defendants, and it will continue to suffer irreparable harm without injunctive relief.

203.    Atlas' customers and the public are also suffering irreparable harm as a result of the illegal actions of Defendants, and they will continue to suffer irreparable harm without injunctive relief.   The public interest alone warrants an injunction.

204.    Defendants are engaged in an ongoing concerted effort to delay and interfere with Atlas' operations.  A preliminary injunction is necessary in order to prevent this disruption to Atlas' operations and the resultant damage to Atlas' goodwill, brand, reputation, and relationship with its customers.  Absent a preliminary injunction, Defendants' members will be free to continue to disrupt Atlas' operations.

205.    As to each item of relief sought, greater injury will be inflicted on the public, Atlas' customers, and Atlas if such relief is denied than will be inflicted upon Defendants by the granting of the relief sought.

WHEREFORE, Plaintiffs pray for relief as follows:

1.      That this Court issue a Preliminary Injunction and a Permanent Injunction, restraining and enjoining Defendants, and each of them, their members, agents, and employees, and all persons and organizations acting by, in concert with, through, or under them, or by and through its or their orders, from calling, permitting, instigating, authorizing, encouraging, participating in, approving, or continuing any form of interference with Plaintiffs' airline operations, including, but not limited to, any strike, work stoppage, sick-out, slowdown, work to rule campaign, or any other concerted refusal to perform normal pilot operations consistent with the status quo in violation of the RLA, 45 U.S.C. § 151 *et seq.*

2.      That this Court further order that Defendants shall take all reasonable steps within their power to prevent the aforesaid actions, and to refrain from continuing the aforesaid actions if commenced, including but not limited to the following:

   a.   Instructing all pilots represented by Defendants and employed by Plaintiffs to resume their normal working schedules and practices, and providing Plaintiffs a copy of all such instructions;

   b.   Notifying all pilots represented by Defendants and employed by Plaintiffs, by the most expeditious means possible, of the issuance, contents, and meaning of the injunctive relief ordered, and producing a copy of all such notices to Plaintiffs;

   c.   Including in such notice a directive from Defendants to Plaintiffs' pilots not to engage in any concerted refusal to perform normal pilot operations, including, but not limited to, any strike, work stoppage, sick-out, slowdown, work to rule campaign, or any other concerted refusal to perform normal pilot operations consistent with the status quo, to cease and desist all such activity, and to cease

and desist all exhortations or communications encouraging same upon pain of

fine, suspension, or other sanction by Defendants;

d.  Posting the notice described above on Defendants' internet websites and social

media accounts and providing Plaintiffs a copy of the notices;

e.  Including the contents of such notice on all recorded telephone hotlines under

control of Defendants, until such time as the Court has acted on Plaintiffs' Motion

for a Permanent Injunction, and providing Plaintiffs with a copy of all such

messages; and

f.  Distributing the contents of such notice through all non-public communication

systems maintained by Defendants, including any telephone trees, pilot-to-pilot

communication systems, or similar systems, and providing a copy of the notice to

Plaintiffs.

3.      That this Court further order that Defendants are prohibited from including in

such notices (or distributing contemporaneously with such notices) any statements that are

intended, or could reasonably be interpreted to mean, that pilots should continue to engage in the

previously-described conduct notwithstanding the injunctive relief, including:

a.  Any assertion that the injunctive relief does not prohibit individual pilots from

making voluntary decisions to engage in such actions; and

b.  Any explanation of circumstances in which it would be appropriate or necessary

for pilots to engage in such actions prohibited by the injunctive relief.

4.      That this Court further order that Defendants report to the Court by 5 p.m. on the

day following issuance of any injunctive relief, by sworn affidavit, the methods used by

Defendants to effect the notice described above to all pilots and furnish to the Court copies of all

notices required to be furnished to Plaintiffs by Defendants under the injunctive relief ordered; and

      5.      Such other and further relief as the Court deems proper.

Dated:    September 25, 2017         Respectfully submitted,
           Washington, D.C.

                                    By:       /s/ Robert A. Siegel
                                    Robert A. Siegel
                                    (D.C. Bar #1004474)
                                    Michael G. McGuinness
                                    (*pro hac vice forthcoming*)

                                    O'MELVENY & MYERS LLP

                                    1625 Eye Street, NW
                                    Washington, D.C. 20006
                                    Telephone:  (202) 383-5300
                                    Facsimile:  (202) 383-5414
                                    rsiegel@omm.com

                                    400 South Hope Street
                                    Los Angeles, California 90071
                                    Telephone:  (213) 430-6000
                                    Facsimile:  (213) 430-6407
                                    mmcguinness@omm.com

                                    *Attorneys for Plaintiffs*