**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLAS AIR, INC. and POLAR AIR CARGO WORLDWIDE, INC., | Civil Action No. |
| Plaintiffs, | |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ...................................................................... 7

    A.    The Parties To This Action ........................................................ 7

        1.    Plaintiffs ........................................................................ 7

        2.    Defendants .................................................................... 10

    B.    The Parties' Collective Bargaining Negotiations ................................ 11

    C.    Defendants And Their Members Have Engaged In Unlawful Concerted
        Activity To Pressure Atlas In Collective Bargaining. ........................... 12

        1.    Pilots Are Calling In Sick On Short Notice Significantly More
               Often. ............................................................................ 14

        2.    Pilots Are Calling In Fatigued Significantly More Often. ...................... 19

        3.    Pilots Are Refusing To Volunteer For Or Accept Open Time
               Flying. .......................................................................... 24

        4.    Pilots Are Engaged In A Campaign To Block Out On Time (Or
               "BOOT"). ..................................................................... 26

        5.    Pilots Have Significantly Increased The Number Of Maintenance
               Write-Ups On Atlas Aircraft. ............................................... 31

        6.    Pilots Are Delaying Flights Due To Rejected Crew Meals. .................. 32

        7.    The Cumulative Effect of Changes in Pilot Behavior Have Created
               A Statistically Significant Increase In Prolonged Delays Due to
               Crew Actions. ............................................................... 33

        8.    Atlas' Delays Are Not A Result Of Understaffing. ........................... 35

    D.    The Slowdown Has Been Orchestrated And Encouraged By Defendants. ......... 36

        1.    Defendants Encouraged Pilots To Change Their Status Quo
               Behavior On A Concerted Basis At The Time Defendants Served
               Their Section 6 Notice. ...................................................... 37

        2.    In February 2016, Defendants Began Releasing A Series Of
               Videos Encouraging Pilots To Slow Down. .............................. 37

        3.    Defendants Continued To Encourage Pilots To Slow Down
               Throughout The Summer Of 2016. ....................................... 41

         4.    In The Fall Of 2016, Defendants Intensified Their Slowdown
               Campaign By Falsely Claiming That The Operation Is In Trouble
               Due To Attrition And Remaining Pilots Should Not Help The
               Operation. ..................................................................... 43

## TABLE OF CONTENTS
### (continued)

Page

5. Defendants Acted On Their Threats, And In December 2016, During The Peak Holiday Season, They Intensified Their Campaign And Continued To Threaten Atlas' Customers. ...................... 45

6. Defendants Continued Their Slowdown Campaign Into 2017. ............... 46

7. Defendants Encouraged A Concerted Change To Status Quo Behavior In The Spring of 2017. ............................................. 47

8. Defendants Pushed Pilots To Increase The Slowdown Campaign's Intensity For The Second Half of 2017 ..................................... 49

9. Other Pilots Have Recognized And Communicated To Atlas That Defendants' Campaign Is An Illegal Slowdown. ................................... 57

E. Defendants' Illegal Slowdown Has Irreparably Harmed Atlas, Its Customers, And The Public. ................................................. 60

1. Defendants' Campaign Has Irreparably Harmed Atlas. ........................ 60

    a. Atlas Has Incurred Reputational Harm And Loss of Goodwill As A Result Of The Pilots' Changed Behavior. .......... 60

    b. Atlas Has Incurred Financial Harm As A Result Of The Pilots' Changed Behavior. ........................................... 65

2. Defendants' Campaign Has Harmed Atlas' Customers........................... 68

    a. The United States Military ........................................... 68

    b. Atlas' Other Customers .............................................. 72

3. Defendants' Campaign Has Harmed The Public. ................................... 73

F. Atlas Has Attempted To Resolve This Dispute Without Judicial Intervention. ............................................................ 73

ARGUMENT ........................................................................ 74

A. Defendants' Concerted Activity Violates Their Obligations Under Section 2, First, Of The RLA. ............................................. 75

1. Defendants And Their Pilot Members Have Violated Their Status Quo Obligations By Instigating And Participating In Slowdown Activities. .......................................................... 78

2. Defendants Have Violated The RLA's Status Quo Obligations By Failing To Make Every Reasonable Effort To Prevent And Discourage The Slowdown. .............................................. 81

# TABLE OF CONTENTS
## (continued)

Page

B.   This Court Should Issue A Preliminary Injunction Prohibiting Defendants' Unlawful Conduct And Compelling Defendants To Make Every Reasonable Effort To Stop The Work Action......................................................... 82

    1.   No Showing Of Irreparable Injury Is Required To Obtain A Preliminary Injunction Against A Status Quo Violation Under The RLA.................................................................................................................. 83

    2.   Even If A Showing Of Irreparable Injury Were Necessary, Atlas Has Suffered, And Will Continue To Suffer, Irreparable Injury As A Result Of Defendants' Illegal Slowdown. .......................................... 84

        a.   Defendants' Slowdown Has Cost Atlas Customer Goodwill. ............................................................................ 84

        b.   Defendants' Slowdown Is Causing Atlas Significant Financial Harm........................................................................... 85

    3.   A Preliminary Injunction Will Further The Public Interest.................... 85

    4.   The Defendants Will Suffer No Irreparable Harm If The Preliminary Injunction Is Issued. ............................................. 86

C.   This Action To Enjoin Defendants' Ongoing Illegal Slowdown Campaign Is Timely. ......................................................................................................... 87

D.   The NLGA Does Not Prohibit Injunctive Relief In This Case. .......................... 89

    1.   The Federal Courts Have Jurisdiction To Enjoin A Violation Of The RLA, Notwithstanding The NLGA. ................................................. 89

    2.   While The Requirement Of "Clear Proof" Under Section 6 Of The NLGA Is Inapplicable In This Case, That Requirement Has Nevertheless Been Satisfied.................................................................. 90

    3.   The Requirement Of "Clean Hands" Under Section 8 Of The NLGA Does Not Preclude A Preliminary Injunction. ............................ 91

CONCLUSION...................................................................................................................... 92

## TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*ABX Air, Inc. v. Airline Professionals Association of the International
    Brotherhood of Teamsters, Local Union No. 1224,*
    266 F.3d 392 (6th Cir. 2001) ............................................................................................. 77

*Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*,
    802 F.2d 886 (7th Cir. 1986) ............................................................................................. 77

*Aircraft Serv. Int'l, Inc. v. Int'l Bhd. Of Teamsters, Local 117*,
    779 F.3d 1069 (9th Cir. 2015) ........................................................................................... 89

*Allied Pilots Ass'n v. Am. Airlines, Inc.*,
    643 F. Supp. 2d 123 (D.D.C. 2009) ......................................................................... 5, 76, 77, 85

*Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.*,
    883 F. Supp. 755 (D.D.C. 1995) ........................................................................................ 83

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
    53 F. Supp. 2d 909 (N.D. Tex. 1999) ................................................................................ 77

*Ark. Dairy Coop. Ass'n, Inc. v. United States Dep't of Agric.*,
    573 F.3d 815 (D.C. Cir. 2009) ........................................................................................... 83

*Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*,
    976 F.2d 541 (9th Cir. 1992) ............................................................................................. 88

*Atl. Coast Line R.R. Co v. Bhd. of R.R. Trainmen*,
    262 F. Supp. 177 (D.D.C. 1967) ........................................................................................ 90

*Atlas Air, Inc. v. Air Line Pilots Ass'n, Int'l*,
    32 F.3d 218 (D.C. Cir. 2000) ........................................................................................ 87, 88

*Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*,
    353 U.S. 30 (1957) ............................................................................................................. 90

*Bhd. of R.R. Trainmen v. Howard*,
    343 U.S. 768 (1952) ........................................................................................................... 90

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
    394 U.S. 369 (1969) ................................................................................................. 75, 81, 89

*Charles D. Bonanno Linen Serv., Inc. v. McCarthy*,
    532 F.2d 189 (1st Cir. 1976) ............................................................................................. 90

*Chi. & N.W. Ry. Co. v. United Transp. Union*,
    402 U.S. 570 (1971) ................................................................................................... passim

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n,*
 491 U.S. 299 (1989)...................................................................................... 6, 83

*Davenport v. Int'l Bhd. of Teamsters,*
 166 F.3d 356 (D.C. Cir. 1999) ............................................................................. 83

*Del. & Hudson Ry. Co. v. United Transp. Union,*
 450 F.2d 603 (D.C. Cir. 1971) ....................................................................... 84, 85

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,*
 238 F.3d 1300 (11th Cir. 2001) ................................................................... passim

*Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,*
 396 U.S. 142 (1969)................................................................................. 4, 75, 76

*Emory v. United Air Lines, Inc.,*
 720 F.3d 915 (D.C. Cir. 2013) ............................................................................. 87

*Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Ry. Labor Conference,*
 310 F. Supp. 905 (D.D.C. 1970) ........................................................................... 83

*Long Island R.R. Co. v. Int'l Ass'n of Machinists,*
 874 F.2d 901 (2nd Cir. 1989)............................................................................... 77

*Long Island R.R. Co. v. Sys. Fed'n No. 156,*
 368 F.2d 50 (2d Cir. 1966).................................................................................. 77

*Mayo v. Dean,*
 82 F.2d 554 (5th Cir. 1936) ................................................................................. 90

*Melville Confections, Inc. v. N.L.R.B.,*
 327 F.2d 689 (7th Cir. 1964) ............................................................................... 87

*Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,*
 416 F.2d 998 (5th Cir. 1969) ............................................................................... 91

*Nat'l R.R. Passenger Corp. v. Am. Fed'n of R.R. Police, Inc.,*
 613 F. Supp. 602 (D.D.C. 1985)........................................................................... 86

*Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers,*
 1987 WL 18469 (D.D.C. 1987) ............................................................................ 84

*Nat'l R.R.. Passenger Corp. v. United Transp. Union,*
 832 F. Supp. 7 (D.D.C. 1993) .............................................................................. 85

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Nw. Airlines, Inc. v. Local 2000, Int'l Bhd. of Teamsters*,
No. 00-08, slip op. (D. Minn. Jan. 5, 2000) .................................................. 77, 86

*S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*,
337 F.2d 127 (D.C. Cir. 1964) ............................................................ 83

*Sottera, Inc. v. Food & Drug Admin.*,
627 F.3d 891 (D.C. Cir. 2010) ............................................................ 83

*Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*,
2017 WL 2271500 (S.D. Fla. May 9, 2017) ................................................ 75, 77

*Suffolk Constr. Co. v. Local 67, United Bhd. of Carpenters & Joiners*,
736 F. Supp. 1179, 1182 (D. Mass. 1990) .............................................. 90

*Tex. & New Orleans R.R. Co. v. Bhd. of Ry. & S.S. Clerks*,
281 U.S. 548 (1930) ...................................................................... 75

*Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l*,
518 F. Supp. 203 (S.D. Tex. 1981) ...................................................... 77

*United Air Lines v. Int'l Ass'n of Machinists & Aerospace Workers*,
243 F.3d 349 (7th Cir. 2001) ...................................................... passim

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
2008 WL 4936847 (N.D. Ill. Nov. 17, 2008) ...................................... passim

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
563 F.3d 257 (7th Cir. 2009) ...................................................... passim

*United Brotherhood of Carpenters & Joiners v. United States*,
330 U.S. 395 (1947) ...................................................................... 90

*US Airways, Inc. v. US Airline Pilot Ass'n*,
813 F. Supp. 2d 710 (W.D.N.C. 2011) ............................................ passim

*Wash. Metro. Area Transit Comm'n v. Holiday Tours Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ............................................................ 83

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*,
698 F.2d 862 (7th Cir. 1983) ............................................................ 84

*West v. Conrail*,
481 U.S. 35 (1987) ...................................................................... 87

**TABLE OF AUTHORITIES**
**(continued)**

Page

<u>**STATUTES**</u>

45 U.S.C. § 151a ................................................................................................................ 75

45 U.S.C. § 152, First .................................................................................................. 5, 7, 75, 89

## PRELIMINARY STATEMENT

Together, Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (collectively, "Atlas" or the "Company") are the largest air cargo outsourcers in the world, serving principal customers such as DHL and Amazon, and are also the largest provider of commercial airlift for the U.S. military.  As such, Atlas plays a major role in the global supply chain on a daily basis by transporting tons of express and time-sensitive cargo for e-commerce companies, major international airlines, and freight forwarding and logistics companies.  It also transports urgently-required medical supplies and food to support U.S. troops in the Middle East and elsewhere, and flies U.S. troops home to their families.  Many thousands of people, therefore, depend on the stability, reliability, and viability of Atlas' day-to-day operations.

Atlas' pilots, however, are engaging in an illegal concerted slowdown that is causing widespread and significant flight delays and a significant decline in Atlas' operational reliability. This slowdown has been orchestrated and explicitly directed by the pilots' collective bargaining representative—Defendants International Brotherhood of Teamsters ("IBT"), International Brotherhood of Teamsters, Airline Division ("IBT Airline Division"), and Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224") (collectively, the "Union" or "Defendants")—in order to unlawfully create leverage on Atlas in current negotiations for a new collective bargaining agreement.  Defendants' slowdown activity involves a concerted and statistically significant change in the pilots' normal behavior designed to substantially disrupt operations—for example, an increase in the amount of last-minute sick calls designed to prevent Atlas from re-staffing flights on a timely basis; an increase in refusals to fly on the basis of fatigue designed to substantially disrupt operations; an increase in refusals to volunteer for or accept open time (*i.e.*, overtime) flying; an increase in refusals to allow aircraft to depart timely; an increase in maintenance write-ups of aircraft that have the

1

effect of unnecessarily delaying flights; and an increase in refusals to depart because of

complaints about catered crew meals.  For example:

- Between October 1, 2015 and September 20, 2016, only 13.8% of sick calls occurred on short-notice.  Between October 1, 2016 and September 20, 2017, that figure jumped to 23.8%.  At the same time, the percentage of sick calls occurring with advanced notice declined by 12.9 percentage points.  Moreover, before the slowdown started, the highest monthly percentage of sick calls occurring on short-notice was 20.7% (November 2014).  But since the slowdown began, there have been 10 months reaching at least 20.7%.  The likelihood of that being random is less than one-in-one billion.

- Between July 2014 and January 2016, Atlas averaged only 5.7 fatigue calls per 1,000 active pilots on a monthly basis.  However, since early 2016, the rate of fatigue calls has nearly tripled to 16.3 fatigue calls per 1,000 active pilots.  Moreover, the monthly fatigue rate has exceeded 17.8 per 1,000 pilots (the highest observed monthly rate prior to early 2016) in eight of the last 18 months.  The likelihood of that being random is less than one-in-600,000.

- Prior to the start of the slowdown, nearly 80% of Atlas' flights blocked out prior to their estimated departure time when loaded and ready, and only 13% of Atlas flights departed at the estimated departure time.  Since February 16, 2016, the proportion of flights departing exactly at the estimated time of departure, while controlling for other factors such as weather, pilot utilization, and fleet age, has *increased* by 31.9 percentage points, while the proportion of flights departing after the estimated time of departure has increased by only 3.1 percentage points.  In addition, the proportion of Atlas' daily flights that blocked out exactly at the estimated time of departure has been well above the upper 99% confidence threshold on 93% of days since February 16, 2016, and every day since April 9, 2016.  The probability of this proportion of departures exactly at the estimated time of departure being random is a virtual impossibility (*i.e.*, far less than one-in-one-billion).

*This illegal slowdown has caused, and is continuing to cause, an 83% increase in flight delays of six hours or more since December 2016, and military flights alone have experienced an over 200% increase in such prolonged flight delays*.  The average delay associated with these illegal pilot actions is eight hours, though many delays are significantly longer, with some lasting for several days.  These flight delays are highly disruptive and are causing Atlas to incur substantial economic costs and irreparable harm to its goodwill with customers, who themselves are suffering from the impact of these delays on their operations.  Equally important, Atlas'

customers' end-consumers are being adversely impacted by the delay of their time sensitive

cargo, whether it be medications, birthday presents, legal documents, or wedding dresses.

Perhaps most significantly, these flight delays are also causing substantial harm to the national

interests, given that Defendants' slowdown activities are negatively impacting flights for the

military carrying troops and critical supplies.

While the Union has claimed that disruptions in Atlas' operations are being primarily

caused by a pilot staffing shortage, among other things, that is not true.  Atlas is, in fact, well-

staffed to meet its customers' requirements, and indeed pilots are flying at lower levels of

utilization than has historically been the case.  There would therefore be no operational

disruption if the pilots were performing their duties in the regular manner.  Indeed, Atlas has

been compelled to increase its normal staffing levels in order to reduce the adverse impact of the

illegal pilot slowdown.  But the evidence shows that the operational disruptions have continued,

and this is because the pilots are abiding by and effectively implementing the Union's repeated

directions to engage in illegal slowdown behavior.

The Union has demanded that pilots be "All In" in support of this illegal slowdown and

has developed code words to use in communications with pilots, such as "SHOP" (Stop Helping

Out Purchase [the location of Atlas' headquarters]) and "BOOT" (Block Out On Time, instead of

when loaded and ready, to delay flights), to tell pilots exactly how they should disrupt Atlas'

operations.  The Union's messages to the Atlas pilots to violate the status quo in an effort to

influence collective bargaining negotiations have made clear that the ongoing, concerted

disruptions will increase even more going forward during the upcoming holiday end-of-year

"busy season," including the following recent call to action:

> Atlas Executives believe that if they delay a new CBA long enough, you will lose
> your interest and your resolve and start violating the CBA, cutting corners and

> resign yourselves to the status quo and abandon our quest for an industry-leading CBA.  This cannot be allowed to be the case!  YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire.  We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY.  YOU must not only honor the CBA every day and on every flight, but also hold management accountable.

More recently, Defendants threatened to ramp up their actions even further, telling pilots that if Atlas does not put "real money" into the collective bargaining agreement during upcoming collective bargaining negotiations, "this will not be good for [Atlas'] fourth quarter."

Defendants have issued more than 100 other communications that, like these messages, leave no doubt that Defendants are instigating this slowdown.  Indeed, by telling pilots to "Stop Helping Out Purchase," the Union is directly telling pilots to change their behavior by *stopping* their status quo behavior of "helping out" Atlas.  And while the ongoing slowdown is clearly already causing significant disruptions to Atlas' operations, Defendants' threat to increase the disruption to Atlas' operations going into this year's "busy season" is not an empty one.  Atlas' pilots have done so before during the 2016 peak holiday shipping season, including engaging in a concerted sick-out affecting Atlas' entire B-767 fleet of aircraft.

This Union-directed slowdown is in direct violation of the Railway Labor Act, 45 U.S.C. § 151 *et seq*. (the "RLA"), which prohibits alterations to the status quo—while the parties are engaged in collective bargaining negotiations (known as a "major dispute")—including "those *actual, objective working conditions and practices, broadly conceived*, which were in effect prior to the time the pending dispute arose."  *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 153 (1969) (emphasis added).  As recognized by a series of court decisions, even if the parties' collective bargaining agreement permits individual pilots to engage in certain conduct, such as calling in sick or refusing to accept overtime flying, that conduct,

when engaged in on a concerted basis in an effort to exert economic leverage against a carrier

during collective bargaining negotiations, violates the RLA because the concerted use of such an

individual contract right constitutes a change to the status quo.  *See Allied Pilots Ass'n v. Am.*

*Airlines, Inc.*, 643 F. Supp. 2d 123, 127-32 (D.D.C. 2009); *United Air Lines v. Int'l Ass'n of*

*Machinists & Aerospace Workers*, 243 F.3d 349, 362 (7th Cir. 2001); *Delta Air Lines, Inc. v. Air*

*Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1307-09 (11th Cir. 2001); *United Air Lines, Inc. v. Air*

*Line Pilots Ass'n, Int'l*, 2008 WL 4936847 at *40 (N.D. Ill. Nov. 17, 2008), *aff'd* 563 F.3d 257

(7th Cir. 2009).  In such circumstances—where a union or its members affirmatively fail to

maintain the status quo in violation of the RLA—federal courts are empowered to issue an

injunction "in order to avoid any interruption to commerce or to the operation of any carrier

growing out of any dispute between the carrier and the employees thereof."  45 U.S.C. § 152,

First; *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577, 581 (1971).  The status

quo obligation in Section 2, First of the RLA not only prohibits Defendants and their members

from instigating, encouraging, or participating in a slowdown designed to disrupt operations and

influence collective bargaining, it also requires that Defendants and their officials affirmatively

make all reasonable efforts to prevent or stop the concerted activity when it occurs.  *See United*

*Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 273-74 (7th Cir. 2009); *Delta Air*

*Lines*, 238 F.3d at 1309-10.  Atlas has expressly requested that Defendants discontinue the

concerted slowdown, but Defendants have refused to do so and are thus engaging in a major

dispute status quo violation.

   The requirements for a preliminary injunction plainly are met here.  Atlas will succeed on

the merits of its claims under the RLA because the compelling evidence, including expert

statistical data, leaves no doubt that the pilots are violating the status quo in an effort to disrupt

the operation to gain leverage in collective bargaining.  Although the irreparable injury showing that is typically required to obtain injunctive relief does not apply under the RLA, *see Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303-04 (1989), it is nevertheless certainly present here.  Atlas has suffered, and will continue to suffer, irreparable injury, in the form of increased costs, significant damage to its brand and reputation with its customers given its inability to perform at historical and expected levels, and financial repercussions resulting from its inability to do so.  The customers Atlas serves also are suffering tremendously as a result, damaging their brands and reputations as well.  And the brunt of the damage is felt by the public, including the hundreds of thousands of commercial express freight customers who rely on the time-definite service of Atlas' customers like DHL and Amazon.  In addition, the pilots' slowdown is adversely impacting the U.S. military and our national interests by significantly delaying flights carrying troops and supplies into battle and service members home to their families after lengthy tours of duty.  At the same time, there can be no claim of harm to Defendants or their members in issuing an injunction because it would simply prohibit them from engaging in illegal activity.

The concerted slowdown is illegal and will continue to impose irreparable harm on Atlas, its customers, the military, and the public if not enjoined.  A preliminary injunction therefore should be issued prohibiting the Union and its members from instigating or engaging in, and to require them to make every reasonable effort to discourage and terminate, ongoing, unlawful concerted actions in order to return Atlas to normal operations.  As demonstrated by the ever-increasing intensity of the Union's communications, Atlas can no longer patiently wait for Defendants voluntarily to comply with their statutory obligations.  Atlas therefore seeks a preliminary injunction requiring Defendants to meet their obligations to "exert every reasonable

effort to make and maintain agreements concerning rates of pay, rules, and working

conditions . . . in order to avoid any interruption to commerce or to [Atlas'] operations."

45 U.S.C. § 152, First.

## STATEMENT OF FACTS

### A.    The Parties To This Action

#### 1.    Plaintiffs

The Company's two brands, Atlas and Polar, are commercial air carriers, headquartered

in Purchase, New York, with domestic and international operations.  (Declaration of Jeffrey

Carlson ("Carlson Decl.") ¶ 3.)[1]  Both are "common carriers by air" as defined in the Federal

Aviation Act of 1958, and each is a "carrier" as defined by the RLA.  (*Id.*)  Atlas is a leading

provider of outsourced aircraft and aviation operating services, functioning primarily in the

business of transporting its customers' cargo, including for DHL and Amazon.  (*Id.*)  Atlas also

performs chartered passenger operations, primarily for the United States military, for which

Atlas provides more lift than any other carrier.  (*Id.*)

The majority of Atlas' customer cargo transportation services are provided on a

contracted "ACMI" basis—Atlas provides the Aircraft, Crew, Maintenance, and Insurance for

the transportation of time-sensitive products and equipment for customers worldwide, such as

express and e-commerce products, technology and consumer goods, fresh fruit, vegetables, fish,

flowers, and other perishables, drilling and excavation equipment, infrastructure equipment,

pharmaceuticals, and livestock.  (*Id*. ¶ 4.)  Atlas' chartered cargo and passenger services, which

are provided on a one-time, ad hoc or an extensive, longer-term charter basis, represent

approximately one third of its business.  (*Id.*)  Half of Atlas' charter business is commercial, and

---

[1] Atlas and Polar are owned by the same parent corporation, Atlas Air Worldwide Holdings, Inc. ("AAWW").  (Carlson Decl. ¶ 3.)  AAWW also owns two other entities, Southern Air, Inc. ("Southern") and Titan Aviation Holdings.  (*Id.*)

includes, for instance, transport of equipment for concert tours, perishable goods, construction

equipment, or other high-value goods. (*Id.*) Atlas also has been the largest provider of

commercial airlift in the wide-body cargo segment for the United States Air Mobility Command

for the last seven years, which airlift and military passenger service constitute the other half of

Atlas' charter business. (*Id.*) Atlas also specializes in mobilizing and supporting humanitarian

efforts at a moment's notice and in helping to transport college and professional teams to and

from major sporting events. (*Id.*)

      Since Atlas entered into the current collective bargaining agreement ("CBA") with its

pilots in 2011, the Company's operations have grown significantly in both scale and scope. (*Id.*

¶ 5.) Historically, the core of Atlas' business was focused on providing long-haul,

intercontinental flights using B-747 aircraft for a variety of commercial customers and the U.S.

military. (*Id.*) Atlas today operates both B-747 and B-767 aircraft types serving multiple

markets in the passenger, express, and e-commerce space and operates long-haul wide-body

intercontinental flights for customers such as Amazon, DHL, Qantas, Cathay Pacific, Panalpina,

Nippon Cargo Airlines, Asiana Cargo, and Hong Kong Air Cargo Carrier Limited. (*Id.*)

      Since 2011, Atlas also has developed a North American domestic market of highly-

scheduled time-definite network flying centered on B-767 aircraft, which serves some of Atlas'

most significant customers in their hub and point to point operations—including, DHL, an

international transportation company that moves cargo (and provides a variety of other services),

Amazon, one of the largest consumer products retailers and shippers in the world, UPS, and

FedEx. (*Id.* ¶ 6; Lee Report ¶ 10, Ex. 2.) In 2016, Atlas began flying B-767-300 freighter

aircraft for Amazon under the livery "Prime Air," to ensure timely delivery of Amazon's

packages. (Carlson Decl. ¶ 6.) The business with Amazon is scheduled to grow significantly—

from seven freighters currently to 20 by the end of 2018.  (*Id.*)  Currently, over 70% of Atlas'

aircraft serve the express and e-commerce markets.  (*Id.*)  As a result of the rapid growth of

Atlas' operations in support of its e-commerce and express package customers, Atlas now

operates—broadly speaking—two different "networks":  (1) Atlas' traditional long-haul,

intercontinental network, and (2) a shorter-haul domestic network centered around Atlas' B-

767s, serving Amazon and DHL's point-to-point and hub operations, which now accounts for

approximately 40% of Atlas' flights, compared to less than 20% a decade ago.  (*Id.*)

      Atlas must be, and always has been, flexible and responsive to its varied customers' ever-

changing requirements.  (*Id.* ¶ 7.)  Atlas maintains its expansive global network due to the

diverse nature of Atlas' customers and their unique air transportation needs.  (*Id.*)  Over the last

12 months, Atlas operated flights to 427 different airports in over 100 different countries.  (*Id.*)

By way of comparison, in 2017, the largest U.S. passenger carrier—American Airlines—

operated flights to approximately half as many (54) countries.  (Lee Report ¶ 9.)  In fact, for the

year ending August 2017, Atlas' more than 5,000 flights on behalf of the U.S. military alone

went to 60 countries across the world, several of which went to critically-important U.S. military

bases, such as Bagram Air Field in Afghanistan and Osan Air Base in South Korea.  (*Id.* ¶ 13.)

Unlike the long-haul international operations of passenger carriers such as American, Delta, and

United, whose fleets of international aircraft (and crews) are routed from their hubs to a single

international destination and then back to a hub, the unique nature of Atlas' business and

customer base in the long-haul international segment of its operations mean that its aircraft and

crew are often away from base for well over a week.  (*Id.* ¶ 14.)

      As a result of this business model, Atlas cannot feasibly have reserve pilot crews

stationed in every location.  (Carlson Decl. ¶ 8.)  If a pilot cannot fly his scheduled flight for any

reason, the nearest replacement pilot may not be readily available, and in some instances, may be

a continent away.  (*Id.*)  Often, Atlas is required to transport the replacement pilot to the

departure location via commercial or charter transportation.  (*Id.*)  In some instances, Atlas needs

to fly in a relief pilot from another part of the world, who must then rest, and then complete the

originally scheduled flight several days later, causing substantial disruption (and potentially the

spoilage of perishable cargo) for Atlas' customers.  (*Id.*; Lee Report ¶ 15.)

Atlas' customers depend on cargo arriving at the day, time, and place requested.

(Carlson Decl. ¶ 9.)  This is particularly true for Atlas' express and e-commerce customers, who

require time-definite, highly reliable scheduled services to meet the expectations of their own

customers.  (*Id.*)  The time-definite nature of these customers' operations rely on Atlas' flights

arriving on-time, either at their final destination airport, or to these customers' "hubs" so that

packages onboard those flights can be quickly sorted and re-loaded onto another flight

transporting them to their final destination.  (*Id.*)  Thus, any significant disruption in Atlas'

operations, such as those being caused by the Atlas pilots at the direction of the Union, can cause

an exponential domino effect that impacts a sequence of other flights and customers and end-use

customers.  (*Id.*)

September through December constitutes the peak season for Atlas and its customers.

(*Id.* ¶ 10.)  During these four months, imports, new product releases, and holiday deliveries

significantly increase the amount, volume, and time-sensitive nature of Atlas' cargo flying.  (*Id.*)

This is particularly true for 2017 as Atlas continues to grow in the ever-increasing express and e-

commerce markets, where customers expect to receive their orders as quickly as possible.  (*Id.*)

2. <u>Defendants</u>

Defendant IBT is an unincorporated labor organization, which, along with IBT Airline

Division, has its principal offices in Washington, D.C.  (*Id.* ¶ 11.)  Defendant Local 1224 is an

unincorporated labor organization with its principal offices in Wilmington, Ohio.  (*Id.*)  IBT is

the certified collective bargaining representative of the Atlas pilots under the RLA.  (*Id.*)  Local

1224 is the local collective bargaining agent designated by the IBT through IBT Airline Division

to represent the Atlas pilots.[2]  (*Id.*)  Local 1224, which manages day-to-day pilot labor relations

with Atlas, is governed by an Executive Board that consists of a President, Vice President,

Secretary-Treasurer, Recording Secretary, and three Trustees.  (*Id.* ¶ 12.)  Local 1224 has an

Atlas Executive Council ("ExCo").  (*Id.*)  The Atlas ExCo Chairman, Captain Robert Kirchner,

serves as the leader of the Atlas pilot group and represents that group on the Local 1224

Executive Board.  (*Id.*)  The Atlas ExCo Communications Chairman is Captain Mike Griffith.

(*Id.*)

### B.    The Parties' Collective Bargaining Negotiations

Atlas and Defendants are parties to a CBA (the "Atlas CBA") governing the rates of pay,

rules, and working conditions of the Atlas pilots.  (*Id.* ¶ 13.)  The Atlas CBA became effective on

September 8, 2011, and became amendable on September 8, 2016.  (*Id.*)  Under the RLA, a CBA

does not expire, but continues in effect until amended by agreement of the parties.  Either party

to a CBA may initiate bargaining for an amended CBA by issuing a written notice to the other,

pursuant to Section 6 of the RLA, 45 U.S.C. § 156, of its desired changes to the CBA.  Pursuant

to Section 34 of the Atlas CBA, which allows for an early commencement of negotiations for an

amended CBA, the parties began direct negotiations in January 2016.  (*Id.*)  Defendants also sent

Atlas a Section 6 notice on February 16, 2016.  (*Id.*)

On January 19, 2016, AAWW announced its agreement to acquire Southern Air

Holdings, Inc., the corporate parent of Worldwide Air Logistics Group, Inc., which in turn

---

[2] Defendants also represent pilots at ABX Air, another cargo carrier, which, like Atlas, provides
air cargo services for both DHL and Amazon.  (Carlson Decl. ¶ 11.)

owned two subsidiary air carriers:  Southern and Florida West International Airways, Inc.

("Florida West").  (*Id.* ¶ 14.)  The acquisition was completed on April 7, 2016, and Atlas and

Southern are in the process of being integrated.  (*Id.*)[3]  The crewmembers of Southern are

represented by the same union as the Atlas pilots—the Defendants in this case.  (*Id.*)  Southern

and Defendants are parties to a CBA (the "Southern CBA") governing the rates of pay, rules, and

working conditions of the Southern pilots.  (*Id.*)  The Southern CBA became effective on

November 6, 2012, and became amendable on November 6, 2016.  (*Id.*)  Defendants sent

Southern a Section 6 notice in February 2016.[4]  (*Id.*)

     After the merger was announced, Atlas and Southern informed Defendants that the

carriers wished to bargain for a joint CBA to apply to the post-merger combined pilot group,

rather than amending the two separate CBAs.  (*Id.* ¶ 15.)  Atlas and the Union eventually

engaged in discussions regarding the process the parties would use to formulate the post-merger

joint CBA.  (*Id.*)  After months of negotiations, in June 2017, Atlas, the IBT Airline Division,

and Local 1224 reached an agreement on a Negotiation Process to Facilitate Completion of

Collective Bargaining Negotiations (the "Protocol Agreement"), which, among other things,

provides for collective bargaining negotiations for a joint CBA.  (*Id.*)  These negotiations for a

joint CBA began on July 6, 2017, and have continued to the present time.  (*Id.*)

### C.    Defendants And Their Members Have Engaged In Unlawful Concerted Activity To Pressure Atlas In Collective Bargaining.

     Since February 2016, coinciding with Defendants' Section 6 notices to Atlas and

Southern, and soon after the announcement of the Southern acquisition, Atlas pilots began

---

[3] Florida West was wound down following the acquisition.  (Carlson Decl. ¶ 14.)

[4] Because pilot operational metrics have been within normal ranges for the Southern pilots (belying Defendants' claims that the decline in Atlas' operation is due to Atlas' mismanagement and operational factors), the concerted activity that Atlas seeks to enjoin relates only to the pilots of Atlas and Polar.

engaging in unlawful concerted slowdown activities in violation of the RLA-mandated status quo.  After this unlawful activity began, Atlas requested Defendants take effective action to stop the slowdown.  (*Id.* ¶ 16.)  But Defendants have refused, and continue to refuse, to stop the illegal slowdown, and have in fact threatened to intensify the already significant slowdown as the busy holiday season approaches.  (*Id.*)

This lawsuit and request for a preliminary injunction are based on the pattern of illegal activity that began in February 2016 and has continued during the past six months—the applicable statute of limitations.  This illegal conduct over the past 20 months since the slowdown began shows a probative pattern that has continued into the limitations period, as more fully described below.  This conduct includes:

- more frequently calling off sick on the day of scheduled flying,

- more frequently calling off flights because of fatigue,

- refusing to volunteer for or accept open time (*i.e.*, overtime) flying,

- delaying flight departures by "Blocking Out On Time,"

- writing up unusually high numbers of maintenance issues on aircraft, and

- refusing to depart due to rejected crew meals.

(*Id.*)

Defendants have designed these concerted activities to cause maximum disruption to Atlas' operation and thereby exert pressure on Atlas to capitulate in collective bargaining.  (*Id.*)  As explained in the Expert Report of Dr. Darin N. Lee ("Lee Report"), economists and statisticians routinely rely upon a variety of tests to determine the likelihood that an observed outcome (*e.g.*, the number of pilot fatigue calls Atlas experiences in a given month) lies within the range of random variation by comparing observed values of the data to the statistical

13

distribution of a historical base period.  (Lee Report ¶ 6.)  Each of the tactics adopted by the

Atlas pilots on a concerted basis represent a significant change in behavior from the status quo,

and all of those that can be quantified are considered "statistically significant."  (*Id.*)  In other

words, such changes in behavior are all well in excess of what conventional statistical analysis

would consider to be "random" occurrences.  (*Id.*)  And applying these techniques here confirms

that these behavioral changes are the result of collaborative pilot action.  Indeed, for most of

these changes described in more detail below, there is more than a 99% confidence level (*i.e.*, a

statistician would conclude that there is a less than 1% chance that the changes were random in

nature rather than the result of concerted activity).  (*Id.*)

        1.    <u>Pilots Are Calling In Sick On Short-Notice Significantly More Often.</u>

Historically, most of the pilot sick calls occurred one, two, or three or more days in

advance of a pilot's next scheduled duty period.  (Lee Report ¶ 18.)  Atlas pilots now have

changed their behavior and call in sick far more often on short-notice (*i.e.*, on the *same day* as,

including *upon wakeup* for, their next duty period).[5]  (*Id.* ¶¶ 17-18.)  Such short-notice sick calls

have a larger adverse impact on the operation than sick calls with longer advanced notice

because of the reduced time for Atlas to assign an available substitute pilot.  (Carlson Decl. ¶

17.)  Accordingly, sick calls at crew wakeup (*i.e.*, when the crew is woken for duty, generally

three hours before a flight) place Atlas in a highly difficult position.  (*Id.*)  Short-notice sick calls

also reduce the number of pilots available for use on other assignments, and can lead to

significant delays, particularly when the nearest replacement pilot may be a continent away.

(*Id.*)  While Atlas fully supports pilots calling in sick when they are sick and do not believe they

---

[5] A "duty-period" is the time when a pilot is on duty and typically involves a flight or reserve
assignment, but can also include a pilot traveling to his flight assignment from his/her crew base
(known as "dead-heading").  (Lee Report ¶ 6 n.4.)

are safe to fly, the sick call system is subject to abuse—and it is clear that the abuse here is concerted and coming at the Union's direction.  (*Id.*)

On average, only 14.4% of pilot sick calls occurred on short-notice between January 2013 and February 2016, with the highest monthly average during that time being 20.7% (in November 2014).  (Lee Report ¶ 17, Ex. 5.)  Between October 1, 2016 and September 20, 2017, however, the proportion of pilot sick calls occurring on short-notice increased to 23.8%.  (*Id.*)  Moreover, there have been 10 months since the Union sent its Section 6 notice with at least 20.7% of sick calls occurring on short-notice (*i.e.*, at or above the previous "high water" mark for short-notice sick calls).  (*Id.*)  The probability of there being 10 such months with this "outlier" rate of short-notice sick calls occurring randomly (as opposed to the result of a concerted change in pilot behavior aimed at disrupting Atlas' operations) is *less than one-in-one billion*.  (*Id.* ¶ 19.)

Another way of demonstrating this change in behavior is by comparing the year-over-year periods of October 1, 2016-September 20, 2017 to October 1, 2015-September 20, 2016. (*Id.* ¶ 18, Ex. 6)  The percent of sick calls made on short-notice has increased almost 10 percentage points—from 13.8% to 23.8%—year-over-year, while the percent of sick calls occurring at least two days in advance has declined by 12.9 percentage points from 44.5% to 31.6%.  (*Id.*)

Indeed, the number and circumstances of short-notice sick calls in recent months, and the adverse impact they have imposed on the operation, are clearly traceable to a change in the status quo behavior that is strategically designed to cause maximum disruption.  (Carlson Decl. ¶ 18.) By way of example:

- On June 7, 2017, three crewmembers consecutively called out sick for a single DHL flight from Cincinnati—DHL's hub of operations in North America—to Narita,

Japan, causing a rolling delay of nearly nine hours. A First Officer initially called out sick, forcing Atlas to find a replacement and adjust the departure time. Then, the replacement pilot called out sick, forcing Atlas to find a second replacement and further adjust the departure time. Finally, the second replacement pilot called out sick, forcing Atlas to find a third replacement and again adjust the departure time. These consecutive sick calls also impacted the return flight from Narita to Cincinnati, which was a major transport of packages from Japan that experienced a corresponding delay of nearly nine hours due to the three sick calls in Cincinnati. As a result, all of the packages missed the sort deadline into Cincinnati and could not be delivered until the day after they were promised by DHL to its customers.

•       The same day, Atlas experienced another rolling delay of over 16 hours due to multiple sick calls on a DHL flight from Los Angeles to Incheon Airport in South Korea, with subsequent/carry-on delays until June 9, 2017 (two days later). A First Officer called out sick, and no pilots accepted a call for open time volunteers put out by Atlas. Then another First Officer also assigned to the flight took bereavement leave. (While Atlas does not doubt this leave was legitimate, the pilots' slowdown actions leave Atlas with no coverage for legitimate pilot absences.) Accordingly, Atlas placed a reserve Captain on the trip. Atlas then determined it could improve its departure time with another Captain and assigned the reserve Captain to another flight. Then another First Officer from the original crew also called out sick at his scheduled wakeup time for his flight. The flight finally departed 16 hours late with a reduced crew and without a single member of the originally-scheduled crew on the flight. The subsequent flight for DHL from South Korea to Shanghai, China took a more than 12-hour delay as a result of the delay in Los Angeles. In order to reduce the delay of the next leg from Shanghai to Cincinnati, Atlas flew another aircraft on the route instead of the delayed aircraft. Therefore, the cargo coming from Shanghai was not flown on the aircraft to Cincinnati. In addition, the replacement aircraft was significantly smaller than the delayed aircraft, and therefore less cargo was transported to Cincinnati than planned.

•       On July 16, 2017, a B-767 flight from Houston to Norfolk Naval Station in Norfolk, Virginia to pick up 213 military service members was delayed over 36 hours as a result of the Captain calling out sick at his scheduled wakeup time and Atlas being unable to assign a rested, available pilot who could get to Houston, which is not a crew base for B-767 aircraft. As a result, the Norfolk service members were picked up late and suffered a delayed arrival into Kuwait. Atlas spent $44,000 to house and feed the distressed passengers.

•       On July 21, 2017, a specialized aircraft transporting aircraft parts for Boeing from JFK in New York, New York to Charleston was delayed approximately 15 hours as a result of a sick call by the Captain at the absolute latest possible time (*i.e.*, departure time), making it impossible for Atlas to operate on time. The lengthy delay was due, in part, to Atlas not being able to assign a replacement Captain as a result of six additional pilot sick calls and six pilot fatigue calls over the previous day and overnight. These calls caused a compounded domino effect of dozens and dozens of crew openings that Atlas was required to reassign.

- On the overnight shift starting on August 26, 2017, Atlas experienced a number of significant delays as a result of multiple sick calls. The following four short-notice sick call events occurred over the course of less than 12 hours:

  o  For a DHL flight filled with express freight from Hong Kong to Anchorage, a crew member called in sick at his scheduled wakeup time. As a result, a crew member had to be removed from another DHL flight and assigned to cover for the sick crew member, resulting in an 11.5-hour delay for that second flight from Hong Kong to Anchorage. Subsequently, the delayed aircraft ferried to Dover Air Force Base in Dover, Delaware to transport needed supplies for the U.S. military to the Middle East. Because of the delay caused by the sick call, the military flight was delayed over six hours.

  o  Another flight full of general cargo from Pudong International Airport in Shanghai to Anchorage was delayed 11 hours and 15 minutes due to a sick call by a pilot at his scheduled wakeup time and would continue to run late for three days as a result.

  o  Another flight for Nippon Cargo Airlines from Anchorage to Narita was delayed nearly 14 hours due to a pilot sick call. No pilots were available at the base because of other crew call outs.

  o  A flight for the U.S. military transporting needed supplies from Hill Air Force Base near Ogden, Utah to Hahn, Germany (and then going to Qatar) was delayed approximately 20 hours due to a sick call by a First Officer.

- On September 16, 2017, a First Officer called in sick downline for a DHL express flight from Leipzig/Halle Airport in Germany to Incheon Airport in South Korea approximately 2.5 hours before crew wakeup. A crew member was removed from his scheduled flying on another flight in order to reduce the delay, but the flight still took a delay of nine hours and 19 minutes.

(*Id.*)

This abuse of sick leave represents the continuation of a campaign instituted by

Defendants last December in an effort to disrupt Atlas' operation during a peak holiday flying

season. (*Id.* ¶ 19.) Starting on or around December 16, 2016, and continuing until December 24,

2016, Atlas experienced a dramatic increase in the proportion of B-767 pilots using sick days.[6]

---

[6] The B-767 fleet is the second largest at Atlas and is used for much of the Company's DHL flying, all of its flying for Amazon, and for military transport as well. (Carlson Decl. ¶ 19.)

(*Id.*; Lee Report ¶ 66.)  These anomalies could not be explained by chance.[7]  (Lee Report ¶ 68.)

As Dr. Lee concludes, "the elevated sick rate among Atlas's 767 pilots between December 16

and December 24, 2016 (and particularly between December 16 and December 20) was not due

to random statistical variation or other factors and instead was the result of a concerted action by

pilots to disrupt [Atlas'] operations in the peak holiday shipping days in order to exert leverage

over the Company during collective bargaining negotiations." (*Id.*)

While this sickout ended once the 2016 holiday period ended, the threat of a further

sickout during the 2017 holidays is evidenced in the Union's missive that "We are getting into

the busy season during the second half of the year and it is now more important than ever to stay

strong with your SOLIDARITY.  YOU must not only honor the CBA every day and on every

flight, but also hold management accountable." (Carlson Decl. ¶ 21, Ex. 63.)  Even more

recently, Captain Griffith issued a message warning that if Atlas did not put "real money" into

the CBA during upcoming contract negotiations, "as a pilot crew member, I can honestly say this

will not be good for their fourth quarter [2017] . . . ." (*Id.*, Ex. 75.)

---

[7] The conclusion that this 2016 holiday-time sick-out was not random is also supported by a
variety of Union actions warning Amazon and the public of potential delivery disruptions for
purchases made at the online retailer during the peak holiday shopping season. (Carlson Decl. ¶
20.)  Atlas pilots picketed Amazon's headquarters on December 7, 2016, carrying placards
reading "Can Amazon Deliver?" (*Id.*)  Defendants also ran online advertisements in December
targeted at Amazon customers, including a link to the website http://canamazondeliver.com,
which warned holiday shoppers that "Amazon customers may want to think twice before
ordering last-minute deliveries" because "there may not be enough pilots to deliver for Amazon
around the holidays." (*Id.*, Ex. 67.)  A December 18, 2016 segment on ABC's Good Morning
America covered the online advertising campaign paid for by the Union and reported that
"millions of Amazon customers who rely on the company's two day Prime delivery, getting a
startling warning of what some claim is a possible holiday doomsday scenario," and included an
interview with Captain Griffith who noted that Atlas did not have "an industry standard [pilot]
contract." (*Id* ¶ 18.)

2.      Pilots Are Calling In Fatigued Significantly More Often.

Since the Union sent its Section 6 notice, the frequency of pilot fatigue calls has risen sharply.  (Lee Report ¶ 21.)  Since October 2010, pursuant to Atlas' Fatigue Risk Management Plan required by the Federal Aviation Administration ("FAA"), each Atlas pilot has been obligated to advise the Company if, in his honest opinion, safety will be compromised due to fatigue if he flies as scheduled.  (Carlson Decl. ¶ 22.)  Like sick calls, fatigue calls are subject to abuse and can cause great harm to Atlas.  (*Id.*)  Fatigue is of course a serious matter, and Atlas fully supports pilots calling in fatigued when they honestly are not safe to fly.  (*Id.*)  But pilots are now using their right to call in fatigued as a weapon in the Union's campaign against Atlas.  (*Id.*)

Between July 2014 and January 2016, Atlas averaged only 5.7 fatigue calls per 1,000 active pilots on a monthly basis.  (Lee Report ¶ 21).  However, since early 2016, the rate of fatigue calls has nearly tripled to 16.3 fatigue calls per 1,000 active pilots.  (*Id.*)  Moreover, the monthly fatigue rate has exceeded 17.8 per 1,000 pilots (the highest observed monthly rate prior to early 2016) in eight of the last 18 months.  (*Id.*)  As shown below, the relative increase in the number of weekly fatigue calls since collective bargaining began is striking:



Source: Analysis of Atlas data.
Note: Data through August 31, 2017. Pre section 6 average is the monthly average between July 2014 and January 2016. Post section 6 average is the monthly average between March 2016 and August 2017.

(*Id.*, Ex. 7.)  The probability of observing such outlier rates in eight or more months since the Union sent its Section 6 notice is **one-in-600,000**, demonstrating the concerted nature of this change in behavior.  (*Id.* ¶ 21.)  Moreover, pilot utilization at Atlas has actually *declined* since the Union sent its Section 6 notice.  (*Id.*)  Thus, while higher rates of pilot utilization (*i.e.*, greater block hours per month) could in some situations cause pilots to become more fatigued (and hence, call in fatigued more frequently), that is not occurring at Atlas.  (*Id.*)

Indeed, the number and circumstances of fatigue calls, particularly those after lengthy rest periods, in recent months are contrary to the status quo and represent a calculated campaign to cause long delays and maximum harm.  Carlson Decl. ¶ 23.)  By way of example:

- On April 23-25, 2017, crew actions (including multiple fatigue calls and maintenance write-ups) caused an aircraft flying approximately 120 service members home to their families in the United States to experience three consecutive delays of over 60 hours on each leg of a trip from Kuwait to Germany to New Hampshire to Texas.  The primary fatigue call was made, after the pilot had received 14.5 hours of rest, at Hahn Airport in Germany, where the aircraft stopped for cleaning and catering and a crew change that should have taken approximately two hours.  Instead, the aircraft took a more

than 14-hour delay as a result of the fatigue call.  Atlas spent $56,000 to house and feed the distressed passengers.

•        On April 24, 2017, the Captain who caused the initial delay from Kuwait to Germany on April 23 was removed from that route and provided with a commercial business class flight from Kuwait to Germany, with the intent that he would have a restful flight and fly another mission for the military.  He was assigned to a trip from Germany to Kuwait to Al Dhafra Air Base in the United Arab Emirates, where he would pick up 138 military service members to bring them back to their families in Baltimore.  The Captain, who had previously received 11.5 hours of rest, placed multiple fatigue calls in Germany, causing a 17.5-hour delay for the flight from Germany to Kuwait.  The delay then caused a compound delay of approximately eight hours for the flight from Kuwait to Al Dhafra.  The 138 military service members thus waited for their flight home for an additional 25.5 hours because of this Captain's multiple fatigue calls.

•        On June 22, 2017, a First Officer, who had previously received more than 17 hours of rest, waited to call out fatigued until his 10 hours of additional rest would push the flight's delayed departure time into the airport's curfew period.  The timing of this fatigue call caused a flight carrying cargo for Nippon Cargo Airlines from Narita, Japan to Anchorage to incur a nearly 16-hour delay.

•        On July 1, 2017, a Captain, who had previously received more than 25 hours of rest, called out fatigued on a flight carrying 340 military members from Pope Field in North Carolina to Hahn, Germany delaying the flight for over nine hours.  All 340 military members were through passengers, scheduled to travel on from Hahn to Kuwait. As a result of the fatigue call, their second flight was delayed over nine hours as well.

•        On July 30, 2017, a flight carrying military supplies from Dover Air Force Base in Dover, Delaware to Hahn was delayed approximately 13 hours due to two sequential fatigue calls by the Captain.  The aircraft flew from Miami to Dover after maintenance and was expected to be on the ground in Dover just long enough to be loaded.  But the Captain, after receiving over 54 hours of rest, called in fatigued, and then called in fatigued a second time after receiving his additional rest, such that he cumulatively received approximately 67 hours of rest.  Atlas was unable to assign a replacement Captain in order to expedite departure.

•        On August 1, 2017, a flight carrying cargo for Qantas experienced disruptions on two separate legs due to a fatigue call after a long rest.  The Captain flew from Narita to Honolulu, and then had about 50 hours of rest.  He then flew from Honolulu to Sydney, Australia and had about 20 hours of rest.  He then called in fatigued for his next flight from Sydney to Bangkok, Thailand.  Fatigue calls in Sydney are especially challenging for Atlas because it generally takes a day and a half to two days to obtain a replacement crewmember since the crewmember must first fly all the way to Sydney and then get the required pre-duty rest.  Due to Sydney curfew rules regulating when Atlas may fly in and out of the airport, and Atlas' inability to replace the Captain, the Captain was given over 15 hours of additional rest before finally flying the Sydney to Bangkok leg, causing a delay of approximately 14.5 hours.  As a result of this delay, the crew was required to rest

in Bangkok, and, as a result, the second leg from Bangkok to Shanghai was also delayed by over six hours.

- On August 11, 2017, after receiving nearly 28.5 hours of rest, a First Officer called out fatigued for a flight from San Juan to Campbell Army Airfield in Hopkinsville, Kentucky, carrying military service members.  Accordingly, the flight flew with a reduced crew.  Due to that reduced crew size, FAA regulations required the crew to rest in between the first and second legs of the trip, causing an approximately 11-hour delay to the second leg of the trip, which was to Seattle for significant deferred maintenance.

- On August 25, 2017, the Captain who caused multiple lengthy delays for the military in April 2017 (as described above) caused yet another delay by calling in fatigued and other actions.  He was supposed to operate a flight from Greenville-Spartanburg International Airport in Greer, South Carolina to Biggs Army Airfield in El Paso, Texas to position an aircraft for a military mission (that he was not flying).  Once the aircraft was at Biggs, another pilot would fly 256 members of the military to transport them into Kuwait (via Portsmouth, New Hampshire and Hahn).  The Captain arrived late to Greenville-Spartanburg for a 5 a.m. departure, and so the airport manager told him that he must have his engines up and running by 5:15 a.m. because the airfield would be closing.  The First Officer had already performed the pre-flight check, but the Captain insisted that they re-do it again together, even though nothing so requires.  As a result, by the time the Captain was in his seat, the airport had closed.  Since the airport was re-opening at 9 a.m., the Captain and First Officer were told to remain on board, at which point the Captain called out fatigued, despite the fact that he previously had 13 hours of rest.  As a result, the flight was delayed 16 hours, and a return flight of the aircraft transporting an additional 230 service members home to their families from Kuwait was delayed 12 hours.

- On August 27, 2017, a flight carrying cargo from Sydney to Shanghai was delayed 18.5 hours due to crew actions.  The crew was standing by while maintenance was repairing the aircraft.  When the aircraft was fully loaded and ready, the crew said it would need time to do its checks.  Approximately 40 minutes later, the crew, which had previously received over 40 hours of rest, called fatigued while they were within their legal duty day.  Indeed, had they operated the flight, they still would have had five hours of legal duty time left in their day.  After 12.5 hours of rest, the crew was informed of a new departure time outside of the Sydney curfew, but they said they were still fatigued, resulting in an additional six-hour delay, causing Atlas' schedule for this customer to run late for several days thereafter.  The customer requested that the crew no longer operate flights for the customer, complaining that "[t]he lack of customer focus provided by this operating crew to the [customer] Freight operation is exasperating and more than disappointing."  Another manager at the customer called the delay "extremely disappointing," noting that "there are many questions being asked here in relation to how this could have occurred."  Days later, the customer complained that this incident and several other fatigue delays in the same week "result[ed] in one of our lines of flying now being delayed by 47 hours with no ability to operate on time until mid-next week" (*i.e.*, a week and a half later).

- On September 1 and 2, 2017, three pilots called in fatigued for their Hong Kong-Delhi-Hong Kong turn.  On September 1, a First Officer, who had previously received over 17 hours of rest, called in fatigued for the Hong Kong-Delhi-Hong Kong flight, causing a 7-hour and 35-minute delay in the initial leg of that flight.  The next day, Captain Griffith, who had previously received 36.5 hours of rest, called in fatigued for that day's Hong Kong-Delhi-Hong Kong flight.  Captain Griffith refused to accept an additional 10 hours of rest that would have allowed Atlas to set a new departure time, in accordance with the Company-Union agreed standard operating procedure, insisting instead that he would call in when fit to fly, leaving the flight schedule in flux.  Ultimately, Atlas found a replacement Captain and scheduled the flight for a two-hour delay.  After both of the First Officers scheduled for the flight were notified of that two-hour delay, one of the flight's First Officers, who had previously received 36.5 hours of rest, called in fatigued.  As a result, Atlas operated the flight with one less First Officer, which limited the crew's legal duty time and required an unscheduled crew rest in Delhi before the Delhi-Hong Kong leg could fly.

- On September 2, 2017, a Captain, who had previously received more than 10 hours of rest following a hotel reserve assignment, called in fatigued at 2:10 a.m. for a 6:30 a.m. departure, which caused an 8-hour and 40-minute delay of a Boeing flight from Paine Field in Washington State to Chubu Centrair International Airport in Japan.

- On September 9, 2017, a First Officer, who had previously received nearly 45 hours of rest, called in fatigued at his scheduled wakeup time, delaying a flight from Kuwait to Hong Kong by eight hours.  The aircraft was scheduled to fly from Hong Kong to Cincinnati transporting express cargo.  As a result of the pilot's fatigue call, the aircraft, which was already delayed due to maintenance and other issues, missed the customer's sort in Cincinnati, and the customer experienced a full service failure.  Had the pilot not called in fatigued at his scheduled wakeup time, even with the maintenance and other delays, the aircraft would have arrived in Cincinnati in time for the customer's sort.

- On September 24, 2017, a First Officer called out fatigued "mid-pattern" for a DHL flight.  Upon arrival from Sydney to Melbourne, Australia, where the aircraft was making a scheduled stop of less than two hours, the First Officer advised that he was too fatigued to fly the next leg of the trip from Melbourne to Shenzhen, China.  Prior to the trip, the First Officer had over 36 hours of rest, including a full 24 hours when he was free-from-duty, and he would have received inflight rest on the trip from Australia to China as well.  The Melbourne to Shenzhen flight took a delay of over 10 hours as a result of the fatigue call

(*Id.*)

Defendants have encouraged pilots to call out fatigued, even if they are not in fact

fatigued, as one pilot expressly told Atlas on July 22, 2017.  (Carlson Decl. ¶ 24.)  On that date,

after a First Officer called out fatigued for a flight, Atlas' crew scheduling department called

another First Officer who was scheduled to ride as a passenger on that flight to see if he would

be able to pilot it instead.  (*Id.*, Ex. 1.)  At first, the pilot agreed to fly the route, but later called

back and said:  "I was talking to the union and they wanted me to call and tell you that I needed

10 hours of pre-duty rest prior to my schedule change per the contract, and just to check if you

guys are aware of that."  (*Id.*)  Sections 12.E.1. and 12.F.3. of the CBA, however, do not require

10 hours of rest and permit pilots to choose to accept less than 10 hours of rest.  (*Id.*, Ex. 2.)  As

a result of this fatigue call, Atlas ultimately was forced to assign another pilot to fly the route and

took a delay as a result.  (*Id.*)

### 3.      Pilots Are Refusing To Volunteer For Or Accept Open Time Flying.

Atlas' staffing model and related staffing plan is built to accommodate forecasted flying

so that nearly all of the Company's flight assignments are awarded each month through a pilot

bid system based on seniority.  (Carlson Decl. ¶ 25.)  Atlas also has a substantial complement of

reserve pilots—pilots who do not have a scheduled line of flying, but are required to be available

on their assigned reserve days—at key operational locations in anticipation of coverage needs.

(*Id.*)  In addition to these regularly-awarded trips and usage of reserves, however, Atlas also

offers a number of "open time" flights each month that, for one reason or another, require

replacement crews.  (*Id.*)  Open time flying opportunities for pilots can arise for several reasons,

such as to cover for pilots who call in sick or fatigued, to crew a flight requested by a customer

on short-notice, or to recover from operational disruptions due to bad weather or mechanical

problems.  (*Id.*)  Open time volunteers are regularly sought in cases where reserve pilots have

been deployed, are reserved for other duty, or are not able to get to the required location in a

timely fashion.  (*Id.*)  Pilots may volunteer, and have historically volunteered, for these open

time opportunities, which are awarded on a seniority basis.  (*Id.*)

Individual pilots are not required under the Atlas CBA to volunteer for or accept open time flying.  (*Id.* ¶ 26.)  But under the status quo period prior to this concerted slowdown, pilots did in fact routinely volunteer to accept open time assignment because of the premium pay associated with open time trips, at a rate that allowed Atlas to cover its scheduled flying.  (*Id.*)  Now, as described below, Atlas pilots are making it much harder to fill open time trips as part of the Defendants' "SHOP" campaign.  (*Id.*)

Since January 2015, Atlas has recorded the number of calls that its crew schedulers were required to make to pilots to find a volunteer to accept each open time trip.  (*Id.* ¶ 27.)  In 2015, Atlas' crew schedulers averaged 1.5 calls to pilots per open time trip.  (Lee Report ¶ 23, Ex. 8.)  That average increased to over two calls per open trip during the first eight months of 2016, and to over three calls per open trip since September 2016.  (*Id.*)

Notwithstanding the extra calls Atlas is making to cover open time, Atlas is experiencing an increase in unfilled open time flying.  (Carlson Decl. ¶ 27.)  Between January 2015 and February 2016, there were no months where the monthly proportion of open trips left unfilled was over 5%.  (Lee Report ¶ 24, Ex. 9.)  Since February 2016, there have been *11 months* with over 5% of open time trips unfilled, and that rate soared to 42% unfilled in December 2016.  (*Id.*)  Additionally, the percent of Atlas pilots who either placed themselves on the volunteer list for open time flying or elected to pick up open time flying on their days off started decreasing after February 16, 2016.  (*Id.* ¶ 69.)  That percentage reached its lowest levels in several years—at a statistically significant rate that had a less than ***one-in-one billion*** chance of being random— between "Black Friday" (the day after Thanksgiving and a kick-off to the peak holiday shopping

season) and Christmas 2016. (*i.e.*, when the Union picketed Amazon's headquarters and launched its advertising campaign aimed at the retailer, its customers, and Atlas).  (*Id.*)[8]

The concerted effort not to volunteer for and accept open flying has caused significant delays.  (Carlson Decl. ¶ 27.)  When pilots do not volunteer for open trips, Atlas must staff them with reserves who may be far away from the aircraft's location or wait for another pilot to become available.  (*Id.*)  Because Atlas' reserve and other pilot resources are already stretched because of a concerted sick-out and significant increases in fatigue calls, Atlas has not had the resources to cover all open trips.  (*Id.*)

4.    Pilots Are Engaged In A Campaign To Block Out On Time (Or "BOOT").

As evidenced by the Union's own words encouraging the BOOT campaign ("we're asking everybody—your EXCO is asking you to not block out early, ever, period.  Period, ever."), and the resulting pilot change in behavior, it cannot be disputed that pilots are slowing down by refusing to block out when the airplane is loaded and ready, as they did during normal operations before the illegal concerted activity began—thereby reducing the operational flexibility of Atlas and its customers.  (Carlson Decl. ¶ 28.)

The BOOT campaign, which encourages pilots to "block out on time," is a misnomer because there is no "on time" at Atlas.  (*Id.* ¶ 29.)  There is an estimated departure time, which is set to the minute (*e.g.*, 22:05) and is the latest a flight is expected to block out.[9]  (*Id.*)  The

---

[8] There has not, however, been a commensurate increase in the amount of available open time being offered.  (Lee Report ¶ 24.)  Rather, when Atlas began to experience a reduced willingness among pilots to accept open time flying, it added additional pilots (at a substantial cost to the Company), which means the amount of open time available declined from an average of 132 trips per month between January 2015 and February 2016 to only 73 trips per month from March 2016 to August 2017.  (*Id.*)

[9] Since August 1, 2017, the estimated departure times for Atlas flights operated for Amazon have been moved up by 15 minutes in an effort to mitigate the harmful effects of the BOOT campaign.  (Carlson Decl. ¶ 29.)

estimated departure time is communicated to the flight's crew. (*Id.*) For instance, DHL will be aware that a flight carrying its express packages has an estimated departure time of 12:15 p.m., and therefore knows that the flight should depart no later than 12:15 p.m. (*Id.*) When a pilot blocks out (*i.e.*, releases the parking brake and begins push back or taxi) at the estimated departure time, the flight is not "on time" if it was loaded and ready to leave prior to the estimated departure time but failed to block out as soon as possible. (*Id.*)

As shown in the Lee Report, before the illegal slowdown began, Atlas pilots regularly exercised their authority and discretion to depart *prior to* the estimated departure time when the cargo was loaded and all safety checks were performed for the vast majority of flights.[10] (Lee Report ¶¶ 30, 32.) By blocking out at the exact estimated departure time, as opposed to when an aircraft is loaded and otherwise ready to depart, pilots have deprived Atlas (and its customers) of substantial operational benefits from departures prior to estimated departure. (Carlson Decl. ¶ 30.) Atlas (and its customers) previously relied on these benefits as part of the status quo in order to keep the airline moving efficiently and to maximize the ability to recover from unavoidable delays. (*Id.*)

The benefits from blocking out promptly, regardless of estimated departure time, and instead when the aircraft is loaded and ready, are significant:

- The faster the aircraft gets off the ground, the more time Atlas has to address any maintenance items that may arise upon arrival at the next station.

- Prompt departures prior to estimated departure time provide a buffer that helps to ensure a timely, smooth running operation and make it more likely that a flight will arrive at its destination early or on time even if it experiences unexpected

---

[10] Unlike scheduled flights carrying passengers who depend on the scheduled departure time for purposes of arriving at the airport and boarding their flights, there is no need for a cargo flight or charter passenger flight to wait once loaded and ready. (Carlson Decl. ¶ 30.)

> delays en route due to weather, maintenance needs, or air- or ground-based congestion.

- • Early arrivals at the destination give crew members time to make connections or otherwise move to their next assignment.

- • Prompt departures reduce airport and hub congestion for Atlas' customers.

(*Id.* ¶ 31.)

Indeed, these benefits are particularly important for Atlas' customers who base their package sort operations on a hub philosophy in which banks of aircraft fly in to unload at one location (up to 120 at a time), and then the same aircraft wait for the outbound freight to be loaded before departing back out to their respective spokes. (*Id.* ¶ 32.) These operations have to be well-orchestrated because many aircraft are departing around the same time in order to arrive at their destinations to meet delivery commitments. (*Id.*) As part of this planning, manpower and ground equipment are allocated for the unloading/loading process. (*Id.*) These resources are shared between aircraft, such that when a loaded aircraft moves, the personnel and ground equipment are redeployed to the next departure that they are assigned. (*Id.*) If personnel and ground equipment are not able to push out an aircraft when it is loaded and move on to the next aircraft, the whole bank of aircraft is slowed down or backed up waiting for the loaded aircraft to move. (*Id.*) Because Atlas pilots are refusing to depart when their aircraft is fully loaded, it is now routine for aircraft to get backed up, causing pressure on the customers' systems. (*Id.*)

Given Atlas' track record of normally departing prior to the estimated departure time and the associated advantages, customers reasonably expect the Company's flights to be able to leave at the earliest practical time when loaded and ready. (Carlson Decl. ¶ 33.) For example, if an earlier leg of a flight was delayed due to maintenance, customers expect that Atlas will do everything that is within its power and safe to make up for that delay, including by blocking out at the earliest possible time for the next leg of the flight. (*Id.*) And customers expect that Atlas

will do everything that is within its power and safe to deliver cargo to its destination as early as possible—including earlier than scheduled—to alleviate the harm that could be caused by delays later in the shipping process.  (*Id.*)  Thus, when pilots intentionally wait until the estimated departure time to leave even though they were cleared to depart, it deprives Atlas and its customers of the aforementioned benefits, and Atlas' customers become dissatisfied with the Company's operational performance.  (*Id.*)

As detailed in the Lee Report, the data on the effectiveness of the BOOT campaign, which has impacted both the B-767 and B-747 fleets and has damaged all of Atlas' customers, including DHL, Amazon, and passenger charter flights flown for the U.S. military, is statistically significant at the 99% confidence level.[11]  (Lee Report ¶¶ 57-59.).

- • Prior to the Union sending its Section 6 notice, nearly 80% of Atlas' flights blocked out prior to their estimated departure time when loaded and ready, with the balance of the flights departing either after their estimated departure time or exactly at the estimated departure time.  Since February 16, 2016, only approximately 34% blocked out when loaded and ready prior to the estimated time of departure.  (Lee Report ¶ 30, Ex. 12.)

- • Controlling for other factors, such as weather, pilot utilization, and fleet age, the proportion of flights departing exactly at the estimated time of departure has ***increased*** by 31.9 percentage points since February 16, 2016, while the proportion of flights departing after the estimated time of departure has increased by only 3.1 percentage points.  (*Id.* ¶ 39, Ex. 14.)

- • Since February 16, 2016, as a result of the BOOT campaign, the average minutes of departure delay for the Atlas fleet has increased by 6.3 minutes, an increase that is statistically significant at the 99% level of confidence.  (*Id.* ¶ 58, Ex. 23.)

- • The proportion of Atlas' daily flights that blocked out exactly at the estimated time of departure has been well above the upper 99% confidence threshold on 93% of days since February 16, 2016 (*i.e.*, 543 of 582 days), and every day since April 9, 2016. (*Id.* ¶ 41, Ex. 15.)

---

[11] All figures discussed in this section apply only to flights with neither uncontrollable delays nor secondary delays.  (Lee Report ¶¶ 30-33, 38-39, 41.)

Dr. Lee concludes that the probability of this proportion of departures exactly at the estimated time of departure being random is a virtual impossibility (*i.e.*, ***far less than one-in-one-billion***).  (*Id.* ¶ 41.)  As such, the BOOT campaign is demonstrably the result of a concerted action by pilots to disrupt Atlas' operations in order to exert leverage over the Company during negotiations.  (*Id.*)

In addition to this statistical analysis demonstrating concerted BOOT activity harming Atlas and its customers, further evidence shows that pilots are following the Union's call to refuse to block out until the estimated departure time.  (Carlson Decl. ¶ 34.)  For instance, Atlas received the following complaint from a senior representative of a customer about a July 23, 2017 flight:  Following a number of delays, "[a]fter arrival at [Allentown airport], the aircraft was ready for departure to [Ontario airport] at 1955Z.  The expectation was set to depart ASAP upon quick-turn of the aircraft to ensure an on-time arrival . . . .  The aircrew refused to depart until the 'scheduled' time set by Atlas (2039Z).  The issue . . . was escalated to Atlas and the aircraft blocked out at 2023Z . . . ."  (*Id.*, Ex. 89)

On August 2, 2017, a crew similarly refused to block out before a flight's 5:30 p.m. estimated departure time.  (*Id.* ¶ 35.)  The cargo was fully loaded at 4:34 p.m., but the Captain ignored the ground staff handling the paperwork necessary for departure.  (*Id.*, Ex. 3.)  When finally asked if he was "good to go," by the station manager, the Captain responded that they were, but the flight was not scheduled to block out until 5:30 p.m.  (*Id.*)  When the manager then pressed that Captain to address the paperwork necessary for departure, the Captain finally did so at 5:17 p.m.  (*Id.*)  Despite finally completing the paperwork, closing the aircraft doors, and being ready for departure at 5:20 p.m., the aircraft did not block out until exactly the 5:30 p.m. estimated departure time.  (*Id.*)

For an August 25, 2017 flight set to depart at 5:30 p.m., loading was completed an hour prior to departure and the doors closed seven minutes early, but the plane blocked out three minutes late. (*Id.* ¶ 36.) The station manager did not know how to code the delay, so he sent a message to the crew asking what happened. (*Id.*) Through the aircraft's notification system, the Captain wrote that he started the engines "on time," but "IF WE HAD PUSHED IT WOULD BE CONSIDERED EARLY." (*Id.*)[12]

5.   Pilots Have Significantly Increased The Number Of Maintenance Write-Ups On Atlas Aircraft.

Atlas has a comprehensive maintenance program to ensure the safe operation of all of its aircraft. (Carlson Decl. ¶ 38.) As part of this program, pilots are permitted to write-up any maintenance item of which they become aware, but FAA regulations allow an aircraft to operate with open maintenance issues that do not affect airworthiness—called Minimum Equipment List ("MEL") items. (*Id.*) By searching out and insisting on the immediate repair of minor items, such as worn seat cushions, missing linens, or inoperable coffee makers—particularly at stations where Atlas does not have a full maintenance operation or where the nearest station with a full maintenance operation is a continent away—pilots can significantly delay a flight. (*Id.*) While Atlas, like most carriers, gives its captains discretion to require a MEL repair be made before departure, pilots ordinarily and historically exercise their authority to defer the maintenance of

---

[12] Pilots are also more slowly taxiing in and out of the airport. (Carlson Decl. ¶ 37.) Aircraft taxi time is the time between when a pilot releases the aircraft parking brake and takeoff ("taxi-out time") or the time between landing on the runway and applying the parking brake at the destination ("taxi-in time"). (*Id.*) Pilots have the ability to exert considerable influence on the speed at which they taxi aircraft before take-off and after landing. (*Id.*) Slowing down taxi time is a tactic that the pilots have used to delay flight departures and cause increased costs to Atlas. (*Id.*) Since February 2016, after controlling for other factors likely to affect taxi times, each Atlas flight has taken on average 0.62 minutes longer to taxi-out and 0.60 minutes longer to taxi-in. (Lee Report ¶ 50.) Based on conventional statistical analysis, these changes in pilot behavior are statistically significant at the 95% and 99% confidence levels, respectively, and cannot be explained by chance. (*Id.*)

MEL items until such time as the maintenance would not cause a delay. (*Id.*) Pilots therefore are not engaging in normal operations if they write up maintenance items other than those that affect airworthiness. (*Id.*)

Since February 16, 2016, the pilot write-up rate has increased by 43.4% on Atlas' B-767 fleet. (Lee Report ¶ 46, Ex. 17.) This change in pilot behavior cannot be explained by other factors that would typically be expected to affect the rate at which pilots submit mechanical write-ups. (*Id.* ¶¶ 45-46, Ex. 17.)

6.    Pilots Are Delaying Flights Due To Rejected Crew Meals.

Atlas provides its pilots with crew meals pursuant to Section 5.E. of the Atlas CBA. (Carlson Decl. ¶ 39.) All crew members receive sandwiches, fruit, and beverages on their flights, regardless of the length of the trip. (*Id.*) But the quantity and type of these items, and whether the crew also receives hot meals, is determined by the length of the flight and the time of day the flight is scheduled for departure. (*Id.*) Historically, when a pilot found a catering deficiency, he typically would file a Flight Crew Report to alert Atlas of the deficiency and ask for meal vouchers to purchase his own meals in the future. (*Id.* ¶ 40.) Following receipt of such a Flight Crew Report and addressing the issue with the catering vendor, Atlas typically would notify the crew member of its findings. (*Id.*) Pilots very rarely—if ever—took a delay as a result of catering issues. (*Id.*)

The pilots' response to catering issues has changed dramatically over the last six months. (*Id.* ¶ 41.) In February 2017, the Atlas Catering Committee of Local 1224 issued a "reminder" to Atlas pilots that they have "the right to insist upon a contractually-compliant crew meal, including, if necessary, requesting that the company delay the departure of the flight until the crew meal arrives. We understand that a decision to delay a departure is not inconsequential. In some locations, it may be difficult to find catering. Nonetheless, our contract applies to all

locations because the physiological effects of poor nutrition do not discriminate on the basis of cities or continents." (*Id.*, Ex. 43.)  Both before and since that "reminder," Atlas has seen a noticeable increase in the number of crew meal-related flight delays beyond normal pilot behavior.  (*Id.*)

These catering-related "SHOP" tactics involve similar behavior:  flight crews refuse catering due to some complaint about temperature or taste, reject alternative options provided (including meal vouchers or substitute meals), and cause the flight to take a delay as a result. (*Id.* ¶ 42.)  These meritless actions by the crew have led to customer complaints (including customer requests to have certain crew members removed from flying for that customer), and the loss of business to competitors.  (*Id.*)  This is exactly what happened on July 18, 2017.  (*Id.*, Ex. 85.)  A pilot refused both the planned catering and alternative options for catering, which caused the flight to be grounded and ultimately not fly to its originally-scheduled destination.  (*Id.*)  Not only did this leave Atlas without sufficient coverage to operate the rest of its planned routes (since the aircraft and crew never made it to the destination), but it also forced Atlas' customer to contract coverage with a different cargo carrier at an additional cost of $30,000, resulting in lost business and lost customer goodwill for Atlas.  (*Id.*)  The customer, having recognized the cause of the flight cancellation, requested that this crew never fly for it again.  (*Id.*)

       7.    <u>The Cumulative Effect of Changes in Pilot Behavior Have Created A Statistically Significant Increase In Prolonged Delays Due to Crew Actions.</u>

Starting in December 2016 (*i.e.*, around the time that late sick calls began to increase and open time acceptances began to decrease), as shown below, the rate of prolonged delays of at least six hours increased from 1.4% to 2.4%.  (Lee Report ¶ 52.)



Source: Analysis of Atlas data.
Notes:  Data through September 19, 2017. Flights with neither uncontrollable delays nor secondary delays. Percent of flights leaving at least 6 hours after the scheduled time of departure.

(*Id.*, Ex. 20.)  Given that the average prolonged delay rate prior to February 16, 2016 was very small—only 1.4%—this represents an over 70% increase in the prolonged delay rate as a cumulative result of changes in pilot behavior at Atlas.  (*Id.*; Ex. 20.)  These delays average eight hours, but often last much longer—even days.  (*Id.* ¶ 15.)  After controlling for other factors that are likely to affect the prolonged delay rate, statistical analysis demonstrates that Atlas' flights have actually suffered an even greater overall increase in prolonged delays of 1.18 percentage points—***an 83% increase in the prolonged delay rate***.  (*Id.* ¶ 56.)  Overall, the combined effect of changes in pilot behavior since December 2016 — including pilot fatigue calls, short-notice sick calls, an unwillingness to accept open time assignments, and unnecessary write-ups—have contributed to approximately 380 prolonged delays *over and above the number that would have been expected to occur*.  (*Id.* ¶¶ 52, 56.)

The increase in prolonged delays due to crew actions has been particularly pronounced for flights for the U.S. military, where any delay can cause harm to military operations and service members as well as the national interests.  (*Id.* ¶ 53.)  Between January 2012 and February 15, 2016, only 1.5% of Atlas flights operated for the U.S. military suffered delays of more than six hours.  (*Id.*, Ex. 21.)  Since December 2016, however, the rate of prolonged delays for Atlas' military flights has increased to 4%, with one month exceeding 10%, as shown below. (*Id.*)



Source: Analysis of Atlas data.
Notes:  Data through September 19, 2017. Flights operated for the U.S. military with neither uncontrollable delays nor secondary delays. Percent of flights leaving at least 6 hours after the scheduled time of departure.

Even after controlling for other factors that are likely to affect the prolonged delay rate, Atlas' flights for the U.S. military have suffered an increase in prolonged delays of 3.67 percentage points, an ***increase of over 200%***.  (*Id.* ¶ 56.)

> 8.    Atlas' Delays Are Not A Result Of Understaffing.

Defendants have falsely claimed in messages to Atlas' pilots and the public (including Atlas' customers) that Atlas' decline in operational performance is because the airline is

understaffed and suffering as a result of massive attrition.  (*Id.* ¶ 26.)  This contention is belied

by the evidence.  (*Id.*)  Atlas has been aggressively hiring pilots since 2014 in response to

increased demand for its services, including its contract with Amazon to add 20 Prime Air B-

767s to its fleet through 2018.  (*Id.*)  Thus, factoring in Atlas' pilot attrition, the number of active

B-767 pilots at Atlas nonetheless has ***grown by 169%*** since January 2014, even though the

number of B-767 aircraft in Atlas' fleet has expanded at a slower rate (155%) over the same

period.  (*Id.*, Ex. 10.)

As a result of Atlas' proactive hiring, Atlas' block hours per pilot are below prior periods

of high operating activity and well within normal bounds, demonstrating that Atlas is more than

adequately staffed for its current level of demand.  (*Id.* ¶ 27.)  For example, in all but one month

since February 2016 for B-767 and B-747 pilots, the average block hours per pilot at Atlas has

been *below* the average from January 2013-January 2016.  (*Id.*, Ex. 11.)  Thus, contrary to the

assertions by the Union that Atlas is understaffed, the level of pilot staffing at Atlas is at or

above historical norms at Atlas.  (*Id.*)  Thus, there is no reason to believe that absent a concerted

slowdown by pilots, the Company would be experiencing a *simultaneous* increase in fatigue

calls, short-notice sick calls, and a reduced willingness to volunteer for/pick up open time.  (*Id.*)

### D.    The Slowdown Has Been Orchestrated And Encouraged By Defendants.

There is significant and compelling evidence that Defendants are encouraging pilots to

engage in an illegal slowdown in order to put pressure on Atlas in the ongoing labor

negotiations.  (Carlson Decl. ¶ 44.)  Defendants have an extensive system of communications

that they maintain among their members, including electronic messages, regular meetings, and

internet sites available to union members.  (*Id.*)[13]  Through these communications, Defendants

---

[13] Defendants possess a large number of confidential communication mechanisms to which Atlas
does not have access, including its password protected internet site.  (Carlson Decl. ¶ 44.)

have made it clear to the pilots their belief that Atlas will accede to Defendants' bargaining demands—but only if the pilots change their status quo behavior in order to force Atlas to do so. Indeed, the Union has expressly told pilots to "SHOP"—*i.e.*, "stop helping out Purchase [Atlas' headquarters]"—as they were doing prior to the Union's campaign.  These communications are detailed in full in the accompanying Carlson Declaration, but because of the volume of the more than 100 communications from Defendants, they are summarized more briefly here.

> 1.  Defendants Encouraged Pilots To Change Their Status Quo Behavior On A Concerted Basis At The Time Defendants Served Their Section 6 Notice.

Since January 2016, Defendants have been encouraging pilots to change their RLA status quo behavior on a concerted basis and not to do anything to help Atlas that is not expressly required by the parties' CBA as a means to gain leverage.  (*Id.* ¶ 45.)  This is commonly known as "flying the contract" or "following the CBA."  For example, in the January 29, 2016 Atlas Teamsters Action Message" ("ATAM"), a bi-monthly podcast led by Captain Griffith, Communication Chair of Local 1224's Atlas ExCo, Defendants said:

> So that's what following the CBA looks like.  Know what your obligations are. Be prepared to wait for the Company to fulfill theirs.  It's not your job to do it. And it's not your job to be an on time take off.  It's theirs . . . And why do we care about following the CBA to the letter?  Because it helps us.  And what it doesn't do is help the people who refuse to help you and your family.  It helps us as a Union hold the line and help others by supporting the tough decisions on the line that each crew member has to make when they deal with the Company.

(*Id.* ¶ 46, Ex. 5 at 20:19-21:1, 21:9-16.)

> 2.  In February 2016, Defendants Began Releasing A Series Of Videos Encouraging Pilots To Slow Down.

In or around February 2016, Defendants began a series of communications to pilots regarding changing their status quo behavior on a concerted basis, including a series of videos addressing fatigue, SHOP, and BOOT.  (*Id.* ¶ 48.)  These communications focus so heavily on

37

the precise metrics that pilots are using to slow down the airline that they confirm Defendants' direct efforts to change pilot behavior unlawfully on a concerted basis in a manner that degrades the operation. (*Id.*)

The first video, released in mid-February, 2016, addressed fatigue. (*Id.*)  The video begins with the host saying that he called in sick last night and looking at a thermometer that reads 105 degrees. (*Id.*, Ex. 7 at 1:7-10.)  He then says "The subject of this CBA Chat is fatigue. Now, a fatigue call is not necessarily to say that you're fatigued . . . It may be a call to say that you will be fatigued." (*Id.* at 1:12-14, 1:17-18.)  At the same time, he pulls a hot water bottle out from his shirt and says he's "getting hot now." (*Id.* at 1:15-16.)  The video continues with express instructions about how to "prove fatigue." (*Id.* at 2:18-19.)  The video ends with the instructions:  "So always be safe.  Don't fly or train fatigued.  Remember . . . it's your CBA. They signed it.  You use it." (*Id.* at 3:21-4:4.)

Defendants followed up this video with further ATAMs emphasizing the theme of pilots changing their behavior so as to not help management. (*Id.* ¶ 49.)  In the February 15, 2016 ATAM, Defendants stated:  "Are you going to continue to sell your talents for a quick buck, or are you going to stop doing the Company favors and follow the CBA to the letter and give your EXCO and Negotiation Committee the leverage and power they need today?" (*Id.*, Ex. 8 at 1:17-21.)  And in the context of discussing a slowdown campaign at another airline that "got their attention," Defendants said, "You know it did.  And we have Atlas' attention now"—admitting that the Atlas pilots are engaged in the same slowdown activity. (*Id.* at 21:12-22.)  Similarly, in the March 15, 2016 ATAM, Defendants said:

> So as we bring this episode of the ATAM to a close, I would like to give a hat tip to our very professional aviators, who decided not to go to the Women in Aviation's convention to help out Purchase in their recruitment of unsuspecting pilots in our industry.  These people know how to shop.  And shop stands for stop

helping out Purchase.  It has kind of become a mantra on the line right now.  And it goes hand-in-hand with following the CBA.  You follow the CBA, as Gary [host of the CBA Chats] would say it, they signed it, you use it.  But in everything else that's outside of the CBA, like doing special favors and recruiting, stop helping out Purchase.  And these folks are highest on the list right now.  They are the master shoppers among us.  Their efforts basically shut down the recruiting availability for Atlas at this conference.

(*Id.* ¶ 50, Ex. 9 at 21:22-22:18.)

The second CBA Chat video, released in late February or early March, 2016, addressed open time flying.  (*Id.* ¶ 51.)  The video tells pilots to strictly comply with the CBA, even if they go against the Union's instructions not to accept voluntary flying:  "Now, what protection does the lowly VXer [pilot flying on his day off] have?  The entire CBA.  Insist on your pre-duty rest. Insist on your minimum rest, and every other provision of the CBA.  If their trip falls apart, so be it." (*Id.*, Ex. 10 at 3:17-22.)  The video ends with the CBA Chat catchphrase of "It's your CBA! They signed it, you use it."  (*Id.* at 4:9-10.)

In a CBA Chat released on or about March 26, 2016, Defendants focused on SHOP:

Well, quite simply, it stands for Stop Helping Out Purchase.  And is defined as doing the job that we were hired to do safely, professionally, competently, and within the CBA.  It is not doing the jobs of others . . . When we 'SHOP,' we are then free to devote our duty time to promoting a safer operation, to adhering to CBA compliance, and to a more stress free, hence, safer operation.  And safety is everything.  As we go forward with these CBA Chats, I'll endeavor to 'amalgamate' [a reference to a joint CBA covering the Atlas and Southern Air pilots] shopping into the CBA issues of the day.

(*Id.* ¶ 53, Ex. 11 at 1:16-20, 2:4-11.)  The video then launched into a very detailed explanation of the precise rules for pre-duty rest vis-à-vis schedule changes.  (*Id.* at 2:12-5:4.)  The host explains that if you do not comply with these rules "you are hopping.  You are helping out Purchase.  And more than that, you're doing so by shortening your CBA allowed pre-duty rest. And you are eroding safety.  And no one wants that . . . Be a shopper [*i.e.*, a person who <u>S</u>tops <u>H</u>elping <u>O</u>ut <u>P</u>urchase], not a hopper [*i.e.*, a person who <u>H</u>elps <u>O</u>ut <u>P</u>urchase]."  (*Id.* at 5:2-14.)

The chat ended with its catchphrase ("It's your CBA!  They signed it, you use it."), and the host

added, "Safe shopping."  (*Id.* at 5:19-21.)

In the March 31, 2016 ATAM, Defendants continued to encourage pilots to change their

status quo behavior by SHOPing and strictly complying with the Atlas CBA:

> To that end, we're going to be focusing on crews and individuals who rise above
> the daily incompetence of headquarters and score a win for the crew force by
> SHOPing.  ***What is SHOPing, you say?  Well, it stands for Stop Helping Out
> Purchase.  And when we do this one thing, requiring some judgment on your
> part, and strictly following the CBA, it emphasizes to management how
> important and valuable a well compensated and highly motivated crew force
> can be to enhancing their operations and customer satisfaction.***

(*Id.* ¶ 55, Ex. 12 at 10:9-19 (emphasis added).)  The very next day in the April 1, 2016

Chairman's Update, Captain Kirchner emphasized this same message:

> There are a lot of new people working in Purchase and unfortunately the company
> has not taken the time to train them properly or teach them the CBA.  You must
> be vigilant and guard your rights every day.  I also want to ask you all to redouble
> your efforts to help out and indeed take our probationary pilots 'under your wing'.
> These fine men and women need your guidance and protections as they weave
> their way through the many treacherous pitfalls here at Atlas . . . As we move into
> the busier part of the year, this is a good time to review your rights under the CBA
> . . . . Remember, your union stands 100% behind you with regard to CBA
> enforcement and adherence.  You will not be disciplined or harassed for strictly
> following the CBA.

(*Id.* ¶ 56, Ex. 13.)

The April 12, 2016 CBA Chat focused on rest periods for the express reason of being

able to "hold the Company down, keep within our CBA, and stop them using us as reserve

pilots."  (*Id.* ¶ 57, Ex. 14 at 1:7-15.)  Like the other CBA Chats, this video provided express

instructions for how to strictly comply with the Atlas CBA when it comes to rest.  The chat also

discussed the BOOT program in great detail:  "And this is all about shopping.  BOOT stands for

Block Out On Time.  And we are not doing this.  We are going early, left, right, and center."  (*Id.*

at 18:19-22.)  Even more expressly, Defendants said, "we're asking everybody—your EXCO is

asking you to not block out early, ever, period.  Period, ever." (*Id.* at 20:19-21.)  Defendants also said they would pressure those who block out early by publicly posting identifying information, including on Facebook, so others can see "exactly who is hopping," because "100 percent block out on time . . . sends the Company, sends Ford Harrison an excellent message back that says we are together.  No flights coming out early." (*Id.* at 41:20-43:6, 47:2-12.)

In discussing "other great shopping tips," Defendants advised "don't go fast." (*Id.* at 48:22-49:2.)  One chat participant said that his "taxi speed is a safe, very safe taxi speed," and he has "been seeing a lot of guys taxiing pretty fast" and he has been "wondering what the hell they're doing." (*Id.* at 52:10-16.)  The chat host added, "We are paid to be professional pilots. We're not paid enough, Lord knows, but we're not being professional pilots when we are hopping.  We're being professional pilots when we SHOP." (*Id.* at 52:18-22.)  The chat ended with a discussion of how pilots who do not slow down "have got hopper written on their forehead"—"or worse"—and that "most of these guys . . . don't want to be on the bad list." (*Id.* at 58:16-18, 59:19-21.)

Similarly, in the May 13, 2016 ATAM, the Union said:  "Airlines such as Lufthansa know full well, unhappy pilots can be very costly.  Merely stating that they will be happy to see Atlas expand is to miss or willfully ignore the point.  Atlas' customers will not be happy if the planes stop flying." (*Id.* ¶ 61, Ex. 16 at 14:11-16.)  They later added, "All we have to do is follow the CBA, shop, and boot.  And that's what your Union asks of you." (*Id.* at 17:3-4.)

3.   <u>Defendants Continued To Encourage Pilots To Slow Down Throughout The Summer Of 2016.</u>

The June 20, 2016 CBA Chat focused on BOOT:  "BOOT stands for Block Out On Time. And starting immediately, your EXCO are requesting that we all strive to block out on time, no early departures . . .  By blocking out on time, you are a shopper.  And you're promoting a safer

41

and CBA compliant operation."  (*Id.* ¶ 64, Ex. 19 at 1:7-11, 2:4-6.)  The host ended the chat by

advising pilots to "SHOP safely" and with the CBA Chat catchphrase ("It's your CBA!  They

signed it, you use it.").  (*Id.* at 3:6-10.)

The June 27, 2016 Chairman's Update stated:  "I ask you again to stick to the CBA and

enforce it strictly.  Remember, your union will stand behind you."  (*Id.* ¶ 65, Ex. 20.)  This was

echoed by Defendants in the June 30, 2016 ATAM:  "Time will tell, but we are in for a long

fight for a fair contract.  But believe me, it will be worth it.  Very worth it, indeed.  Your EXCO

also wishes to remind you that your adherence to the CBA and all the things each and every one

of you are doing daily are having a tremendous affect and it's working."  (*Id.* ¶ 66, Ex. 21 at 7:7-

13.)

> In the August 26, 2016 Chairman's Update, Captain Kirchner stated:
>
> Let me finish up by asking each and every one of you to show a new and more
> steadfast resolve toward contract compliance and ***adhering to some of our
> ongoing programs.***  We anticipate that the company will be stretched to the limit
> and beyond in the fourth quarter.  We all know what that means when they get in
> a jam.  This company may then attempt to throw out the CBA and any other rule
> that gets in the way, resorting to any means possible to make the flight go.
> Therefore, be vigilant, don't back down and hold on to your license and CBA
> tightly.   Use the QR pamphlet [a "quick reference" pamphlet issued by the
> Union], it's a great guide that was painstakingly put together to help all of us in
> CBA enforcement.  Use the union to back you up. We are anticipating a very
> chaotic fourth quarter.

(*Id.* ¶ 69, Ex. 23 (emphasis added).)

In the September 30, 2016 ATAM, Defendants made multiple comments encouraging

pilots not to volunteer to fly:  "The Company, you know, speaking of pilots, is now so short the

schedulers have been told to call pilots on their days off, at home, and solicit them to fly.  The

program, so far, is falling flat, as most are either not answering their phone or refusing to come

out on their days off, which is their right under the contract.  Scheduling is getting very

desperate.  And they're running out of options."  (*Id.* ¶ 73, Ex. 28 at 9:3-12.)  Captain Griffith

said, "I am not going to volunteer my time to help the Company until we have a signed CBA that helps me and all of us." (*Id.* at 11:14-16.) The ATAM also encouraged pilots to change their status quo behavior and strictly comply with the CBA to support the Union: "Knowing what the CBA says and letting folks search their own conscience for the right choice when it comes how to interpret their individual actions when they are part of a Union team are really good examples of effective solutions not involving overthinking or making something more complicated than it needs to be." (*Id.* at 15:18-16:2.)

> 4. In The Fall Of 2016, Defendants Intensified Their Slowdown Campaign By Falsely Claiming That The Operation Is In Trouble Due To Attrition And Remaining Pilots Should Not Help The Operation.

Around this time, Defendants began intensifying their slowdown efforts by tying pilot attrition rates to slowdown activities. (*Id.* ¶ 74.) In the October 14, 2016 ATAM, for example, Defendants explained why changing status quo behavior and strictly complying with the Atlas CBA helps the union in negotiations given the alleged lack of sufficient pilot staffing:

> Regardless of what any newly minted VP may have to say about it or may have sold to their supervisors in the past, no reserves are available because they have called them all out on day one. People not willing to extend their trips, people choosing to spend time with their families, and the multitude of other reasons Purchase cannot contact crew members to plead for help makes their failure obvious. And the system can and has, in the past, come crashing down on them like a house of cards.
>
> Having individual crew members follow the CBA helps to educate each of us on our rights and our responsibility under this legally binding document, regardless of whether we love or hate it. So what would you choose to follow? Follow our Union that asks you to follow their guidance and the contract, or follow Purchase who can't seem to comply with this contract and constantly asks you for favors to shore up their shoddy planning and execution schemes. The choice is actually simple. And as always, it's completely yours. So choose wisely.

(*Id.* ¶ 76, Ex. 30 at 2:7-3:7.) Defendants then explained some of "those things in the CBA we're not required to do": "You are not required to bid or accept open time flying or VX. You are not

required to answer your phone when on days off.  You are not required to answer your phone when on vacation . . . ."  (*Id.* at 19:2-9.)

The ATAM closed with the usual admonition:  "We have learned we have choices.  We have learned what some of those choices look like.  ***We have learned that following the CBA is a simple and extremely effective way to give our Union all the leverage it needs to score points during talks and negotiations with Purchase.***"  (*Id.* at 20:1-6 (emphasis added).)

In the October 31, 2016 Chairman's Update, Defendants heavily emphasized changing status quo behavior in the form of strict compliance with the Atlas CBA:

> On a much better note, your efforts, solidarity and adherence to the CBA has been remarkable.  As I have told many of my fellow union workers, this pilot group has far exceeded my expectations on unionism and standing up for our rights under the CBA . . . ***Remember, every time you enforce the CBA you not only make our union stronger you also improve your life and make things better for yourself in many more ways than a $50 voucher or a few overtaxed overtime hours could ever do.***

> Do not allow the new untrained people in Purchase to put you or your fellow crew members in harm's way, by leading you into situations which violate basic safety, the CBA or the FARS . . .

> As always, our slogan is most important now.

> It's Up to ME, every day.

(*Id.* ¶ 78, Ex. 31 (emphasis added).)

On November 22, 2016, Giant Comms, a Twitter handle run by "a group of professional Pilots at Atlas & Southern Air," threatened Atlas via a tweet related to a strike Defendants called at ABX, one of Atlas' competitors, that very same day.[14]  (*Id.* ¶ 80, Ex. 4.)  Giant Comms

---

[14] This reference is to the strike that Defendants conducted against ABX in 2016.  Like Defendants and Atlas, Defendants and ABX are involved in collective bargaining negotiations.  *See ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, Case No. 1:16-cv-1039 (S.D. Ohio), Docket No. 16 at 4.  In the early morning hours of November 22, 2016, two days before Thanksgiving and just three weeks after assuring a court that it did not intend to strike at ABX, Defendants called a strike.  *See ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, Case No.

tweeted to Atlas that "a Q4 like ABX's will be yours without industry parity wages for

@Teamsters pilots" and that Atlas' customers "@DHLUS, @amazon & @JeffBezos not

amused." (*Id.*)  Giant Comms also tweeted:  "@JeffBezos & @amazon really should cause

heads to roll at ABX, because this could spread to other air carriers!" (*Id.*)

> 5.  Defendants Acted On Their Threats, And In December 2016, During The
> Peak Holiday Season, They Intensified Their Campaign And Continued
> To Threaten Atlas' Customers.

Heading into December 2016 and leading up to the holidays, the threats towards Atlas'

customers intensified. (*Id.* ¶ 83.)  On December 7, 2016, Giant Comms tweeted at Amazon's

CEO:  "we hope Atlas Air management isn't telling you everything is under control, because it

isn't"; "it's time to come to the table to settle this"; "This isn't just going to go away.  Let's settle

this tomorrow before the real holiday crunch." (*Id.*, Ex. 4.)

Atlas attempted to persuade Defendants to stop their illegal campaign and abide by their

statutory obligations by sending a letter on December 19, 2016, informing Defendants that the

pilots' increased use of sick leave and the refusal of crew members to volunteer for and accept

open time flying in the ordinary course (as discussed above) were a violation of the RLA and

requesting that they take immediate actions to stop the slowdown. (*Id.* ¶ 86, Ex. 36.)  In

response, Defendants sent a letter, dated December 21, 2016, denying that they were engaged in

an illegal slowdown, accusing Atlas of "posturing, bombast and bluster," and failing to provide

---

1:16-cv-1096 (S.D. Ohio), Docket No. 13 at 1, 6.  The unlawful strike lasted for almost two days during the critical holiday peak period before it was enjoined by the federal district court. *See id* at 14.

Although the strike was called against ABX, Defendants instructed pilots working for Atlas not to cross the ABX picket line erected in Cincinnati. (Carlson Decl. ¶ 80.)  Because Atlas has a significant presence at the Cincinnati airport, its operations were severely disrupted and over 20 flights were cancelled as a result. (*Id.*)  Businesses that were depending on Atlas at this make-it-or-break-it time of year, and individuals who were counting on Atlas to deliver their holiday packages were disappointed by the resulting delays in service. (*Id.*)

45

any assurances that Defendants would take any action to stop the pilot slowdown.  (*Id.*, Ex. 37.)

Instead, in their letter, Defendants continued to perpetuate the allegation that Atlas has a problem

with "attrition, scheduling, and staffing . . . ."  (*Id.*)  And in a further effort to rile and mislead

their members, in a Chairman's Update on December 22, 2016, Defendants sent Atlas' letter to

pilots and tied the letter to contract negotiations—Atlas' "quest to keep us at the low 'bargain

rates' they currently enjoy for pilot labor."  (*Id.*, Ex. 38.)

> ###### 6.  Defendants Continued Their Slowdown Campaign Into 2017.

In the January 6, 2017 Chairman's Update, Captain Kirchner started the year with a very

direct message to pilots that the slowdown is working and they should continue slowing down:

> Our pilots are All In and will not fall victim to such management-sponsored
> treachery.  Our pilot group is firmly resolved in its determination to secure a fair
> contract.
>
> The good news for our union, and bad news for management, is that most of you
> are fighting back and calling them on their games.  ***Crew members are daily
> learning to defend themselves with the CBA to even the playing field to thwart
> the constant attacks on our CBA . . .***
>
> Our combined resolve and all of the initiatives we began in 2015 were very
> effective.  In 2016, we were vastly stronger and became better as a group.  We
> have strong evidence of how effective we have been, and you should all be very
> proud of your individual supportive actions and those of our group as a whole.
> However, we cannot rest on our laurels.  Now is the time to call on all our new
> strength and capabilities and step up the fight in 2017.  This will be a VERY
> pivotal year for us and it will depend on each and every one of YOU enforcing the
> CBA very strictly.  What you do every day will dictate whether the anti-union
> policies win our future or not.  We must not let them punish and harass us into
> submission.  This is more than just a battle between labor and management; this is
> an attack on unionism in general and is an attack on the entire Teamster
> organization.

(*Id.* ¶ 89, Ex. 40 (emphasis added).)

Similarly, in the January 15, 2017 ATAM, Defendants repeatedly encouraged pilots to

strictly comply with the Atlas CBA even though inconsistent with the pilots' status quo behavior:

- "Now is the time to call on all our new strength and capabilities and step up the fight in 2017. This will be a very pivotal year for us. And it will depend on each and every one of you enforcing the CBA very strictly." (*Id.* ¶ 90, Ex. 41 at 5:13-17.)

- In the context of discussing individuals who are "unmotivated and likely planning to leave their current place of employment," Defendants said "Ever heard of SHOP, Stop Helping Out Purchase?" and "What about all those other things that aren't required in the CBA." (*Id.* at 12:12-14, 13:7-8, 15:4-5.)

In a February 7, 2017 communication called "Catering Reminders," Defendants

encouraged pilots to blame catering as a basis for calling out fatigued:

The increasing number of crew reports have revealed sandwiches which tend to have varying degrees of edibility and hot meals that cannot even be identified, let alone consumed. . . A failure to provide crew meals in accordance with the CBA violates our labor agreement and may, in some cases, affect the safety of operations. Crew meals are required so that crew members can satisfy their nutritional needs during the duty day, which is an essential part of maintaining fitness for duty. ***As airline crew members YOU have the obligation per the FAA to be fit for duty. PRIOR TO BLOCKING OUT, ensure that the meals are contract compliant. Those who operate long legs and long duty days without proper nourishment or sufficient caloric intake, are potentially subject to low blood sugar levels, a recognized cause of pilot fatigue* . . .**

A failure to provide crew meals in accordance with the CBA violates our labor agreement and may, in some cases, affect the safety of operations. Poor nutrition, including insufficient caloric intake, which can lead to low blood sugar levels, is a recognized cause of pilot fatigue. Under the FARs, pilots share responsibility for the safety of flight operations. All crewmembers must refrain from engaging in any careless or reckless actions.

(*Id.* ¶ 93, Ex. 43 (emphasis added).)

7.    Defendants Encouraged A Concerted Change To Status Quo Behavior In The Spring of 2017.

The March 31, 2017 ATAM encouraged pilots to invoke the Atlas CBA, *i.e.*, to change

their status quo behavior, and repeatedly mentioned how Defendants' ongoing campaign was

working:

- "Hold them accountable. Don't give them a break or do them any favors. Hold them to their delineated responsibilities in the CBA and each LOA . . . Hold the line with solidarity in check with your Union, and even the most overwhelming

47

enemy cannot hope to beat us.  The prosperity of the markets and the finite supply of qualified available pilots, who choose not to stay at this pathetic excuse for an airline, coupled with Purchase's own growth plans has put this timeline in our favor, not theirs.  So hang on, everybody, as this labor dispute comes to a head.  We're seeing cracks in that finely polished veneer of businessmen and executives in Seattle; Florence, Kentucky; and yes, Purchase, New York.  ***And we have only had to SHOP and BOOT to make those cracks form and make our point.***"  (*Id.* ¶ 107, Ex. 53 at 2:22-3:20 (emphasis added).)

- "This whole thing would come to a screeching halt if some of your guys didn't continue to help [Atlas] out." (*Id.* at 6:20-22.)

- "But with the rest of us in solidarity with our Union, helping that person to come to the right decision that needs to be made because, let's face it, a lot of these decisions can go either way, holding the line on a contract, making sure the contract is fulfilled, making sure that all of the myriad of regulations are complied with takes a team.  And it takes a solidified force to make sure that we move safely and efficiently only when everything is ready and safe." (*Id.* at 16:19-17:6.)

On April 13, 2017, Defendants sent a play-by-play for how to change status quo behavior by strictly complying with the Atlas CBA, titled "April 2017 Steward News."  (*Id.* ¶ 108, Ex. 54.)  The communication outlined "several items of which you should be aware" and identified numerous contract provisions and how to strictly follow them, even if doing so would be contrary to the status quo required under the RLA.  (*Id.*)  For example:

Notification and schedule changes should be conducted in accordance with the CBA. The FCOM contains the only procedures you are required to follow, and you should follow them in their entirety.  Your logbook should contain NO open write ups prior to start.  Conduct a complete preflight.  Have a full crew, in the seats.  Perform ALL checklists, and don't forget to check the catering.  If at any time you feel the safety of the flight is compromised, CBA Section 26.R. contains protections to cover you.  Don't forget to call the company after you get back to your hotel room to start your rest period.  Finally, if you experience any safety or FAA violations please use https://hotline.faa.gov or call 1-800-255-1111.[15]

(*Id.*)

---

[15] CBA Section 26.R provides: "Nothing in this Agreement will be construed to require a Crewmember to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crewmember or his equipment."  (Carlson Decl. ¶ 108, Ex. 2.)

In the May 15, 2017 ATAM, Defendants said: "I'm not even going to go into the favors some of you out there continue to do to make a buck now instead of pulling on the rope with the rest of us to make even better money tomorrow via a new and industry standard CBA . . . The group that votes to follow the CBA and not their individual wallets is a good one." (*Id.* ¶ 113, Ex. 58 at 17:15-19, 18:4-5.)

In the May 23, 2017 ExCo Update, Defendants expressly told pilots to call out fatigued: "At the heart of the problem is that Atlas simply can't retain pilots. As a result, they fall into a reoccurring pattern of always being short and having to add more flying to lines thus reducing needed rest. ***Meanwhile, management naively wonders why fatigue calls are up.*** Remember, your union stands behind you and we are your line of defense against any sort of harassment or intimidation relating to fatigue or any other issue. Do not endanger your life, the life of your fellow crew members or the public by allowing the company to push you into flying fatigued." (*Id.* ¶ 115, Ex. 59 (emphasis added).) The communication closed with the standard "Always - ALL IN." (*Id.*)

> 8. <u>Defendants Pushed Pilots To Increase The Slowdown Campaign's Intensity For The Second Half of 2017.</u>

In the June 23, 2017 Chairman's Update, Defendants were as explicit as they had ever been in encouraging a slowdown:

> Finally, let me talk about the company's strategy of trying to wear you out. Atlas Executives believe that if they delay a new CBA long enough, you will lose your interest and your resolve and start violating the CBA, cutting corners and resign yourselves to the status quo and abandon our quest for an industry-leading CBA. This cannot be allowed to be the case! ***YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire. We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY. YOU must not only honor the CBA every day and on every flight, but also hold management accountable.*** Be wary, as the company is more and more often cutting corners in all areas of their operation to make flights go. The shortage of pilots is increasingly creating serious safety, scheduling and rest issues. NEVER

risk yourselves, your crew, your passengers or a violation on your license due to their lack of planning or self-inflicted problems.

Be ALL-IN every day.

(*Id.* ¶ 119, Ex. 63 (emphasis added).)

In the June 30, 2017 ATAM, Defendants again called on all pilots to "SHOP, BOOT, and push back on all [of the Atlas'] tactics harder than ever, as [they] are starting to get the movement out of [Atlas] [they] desire." (*Id.* ¶ 121, Ex. 64 at 4:1-3.) The Union went on to say: "*We are getting into the busy season during the second half of the year. And it is now more important than ever to stay strong with your solidarity. You must not only honor the CBA every day and on every flight, but also hold management accountable.*" (*Id.* at 4:4-9 (emphasis added.)

On July 5, 2017, Giant Comms began a July Twitter campaign encouraging pilots to call out fatigued/sick and then not respond to Atlas' increased calls for open time flying and reporting on that campaign. (*Id.* ¶ 123.) Giant Coms tweeted: "@AtlasAirWW Open Time trip 25! Maintaining rate of 5 trips per day UNMANNED due to lack of PILOTS WHO ARE BEING SUED! CBA NOW! #1u #FUPM."[16] (*Id.*, Ex. 4.) The tweet included the image of a dumpster on fire labeled "2017." (*Id.*)

Shortly thereafter, in the July 14, 2017 ATAM, Defendants touted their success in slowing down Atlas' operations by saying these actions are what brought the Company to the negotiations table. (*Id.* ¶ 129, Ex. 68 at 1:11:15.) The ATAM said: "[Y]our participation in the BOOT and SHOP initiatives have shown that they're [sic] planning and execution is so poor that being held to following the CBA, which they agreed to, creates a complete debacle as an airline."

---

[16] FUPM means "F*** You, Pay Me." http://www.urbandictionary.com/define.php?term=fupm.

(*Id.* at 2:20-3:2.)  It goes on to call for picketing on the steps of one of Atlas' customers and ends by reminding pilots to "adher[e] to the FARS, the CBA, BOOT, [and] SHOP." (*Id.* at 17:1-2.)

From July 17 through July 29, 2017, Giant Comms issued a barrage of a dozen tweets as part of its July campaign. (*Id.* ¶ 130, Ex. 4.)  Giant Comms started by tweeting, "The @AtlasAirWW dumpster fire burning WHITE HOT now as Open Time trip number passes 70 for July.  Trips missing pilots:  4 PER DAY!  #1u  #FUPM" (with the image of the burning dumpster labeled "2017"), and closed by tweeting, "As @AtlasAirWW issues RECORD OPEN TIME TRIP 116, pilots are tired, aircraft are getting later and customers are becoming angered. #1u  #FUPM" (with an image of a fireman (labeled "BUSINESS MEN") spraying a burning dumpster (labeled "PURCHASE") with a hose (with the water labeled "JET FUEL")). (*Id.*)

In the July 28, 2017 Chairman's Update, the Union directed pilots not to go on "self-imposed" reserve and walked them through the process for ensuring they do not "unwittingly turn themselves into reserve crew members." (*Id.* ¶ 131, Ex. 69.)  The message reminded them to continue filling out maintenance reports, not accept inadequate or missing catering, and "[e]nforce the CBA in its totality and hold the company to it." (*Id.*)  The message ended by reminding the pilots to be "ALL-IN." (*Id.*)

In the July 31, 2017 ATAM, Defendants said:  "We're on a danger zone that could possibly cause us to not only continue to lose pilots, but now also to start to lose customers.  And are there competitors out there that have their operations clearly organized in one sock.  Oh yes, they do. ***They also have CBAs with their pilots.  Their pilots are more than happy to do the extra things it takes to make an airline run in the myriad of operational things that happen to make a flight go.***" (*Id.* ¶ 133, Ex. 70 at 4:10-19 (emphasis added).)

These communications continued to be effective.  On July 31, 2017, a reserve pilot was assigned an open time flight.  (*Id.* ¶ 134.)  The reserve pilot, copying stewards@apa1224, emailed Crew Scheduling to ask it to withdraw the message attached to the trip he was assigned because it made it look as if he had voluntarily accepted open time flying, which "ma[de] [him] out to be a scab to [his] union members by helping out the company and cheating [his] union brothers and sisters out of a new and fair contract."  (*Id.*, Ex. 71.)

In the August 4, 2017 Chairman's Update, Defendants pushed pilots to continue their slowdown campaign.  First, Defendants reminded pilots of the effectiveness of the campaign on Atlas' relationship with Amazon and alluded to the fact that the slowdown campaign would ramp up as the peak holiday season approached:  "More to come on this subject later this fall."  (*Id.* ¶ 136, Ex. 72.)

Second, Defendants encouraged pilots to call in fatigued:  "Rather than address the ever-growing serious maintenance issues, the fact remains that scheduling is constantly pushing crews into dangerous situations, including fatigue violations, and chief pilots are threatening and badgering crews to cut corners.  The stress pilots are under, due to constant CBA violations by flight operations and the safety situations that we are exposed to daily, is unacceptable."  (*Id.*)

Third, Defendants continued to encourage pilots to change their status quo behavior with respect to catering:

> Another safety issue which has recently cropped up is catering.  It is no secret that this company cannot manage its vendors, specifically catering vendors. Attempting to browbeat and harass crew members into going without CBA-required catering and ignoring the physiological needs of the flight crew members in general is not a solution.  Remember, your union leadership and our attorneys stand behind you.  Know and enforce the catering provisions of the CBA, you are on firm ground and we will back you.  Don't be bullied!

(*Id.*)  The Chairman's Update closed with an express directive to "fly the contract" (*i.e.*, change status quo behavior): "Remember your contractual contactibility rules and use them to the max to protect yourselves and to get a better quality of life . . . Now more than ever be 'ALL-IN.'"  (*Id.*)

Shortly thereafter, on August 15, 2017, the Union sent pilots a handbook for how to fly the contract, entitled "Your TOP 10 CBA References for August."  (*Id.* ¶ 137, Ex. 73.)  The communication expressly said that pilots should "improve [their] quality of life" as Atlas moves into its "busy season."  (*Id.*)  The communication stated, "Your leadership asks that in preparation for what's to come you take the time to build on your understanding of these areas of our contract.  It would go a long way towards improving your quality of life and supporting our ultimate goal of securing an industry-leading contract."  (*Id.*)  The communication stated that "CBA Sections 12, 25 and 31 are extremely important," and then went on to quote from these sections.  (*Id.*)  Not coincidentally, these sections, which cover issues like pilot rest/fatigue, contactability, and sick calls correspond precisely with the ways in which pilots are illegally slowing down.  (*Id.*)

On August 24, 2017, Giant Comms tweeted:  "ENFORCE THE CBA, SHOP & BOOT! IT'S WORKING!  #1U #FUPM."  (*Id.* ¶ 140, Ex. 4.)  The tweet included a photo of a stop sign that said "SHOP" instead of "STOP."  (*Id.*)  On August 31, 2017, Giant Comms tweeted a picture of a dumpster on fire and wrote:  "As @AtlasAirWW OPEN TIME PASSES 100 UNCOVERED TRIPS for the SECOND MONTH in a row, THE RAGING DUMPSTER FIRE OF DENIAL GOES ON! #1u #FUPM."  (*Id.* ¶ 141, Ex. 4.).  The next day, on September 1, 2017, Giant Comms launched its September count, tweeting:  "So the currently rate for September is 5 per day . . . should be an interesting month for @AtlasAirWW! #1u #FUPM." (*Id.*)

An August 31, 2017 ATAM encouraged ramping up various forms of job actions: "*You see how SHOP is working. You see how BOOT is working . . . Now is not the time to let up on the accelerator or pressure on them to follow the CBA.*" (*Id.* ¶ 142, Ex. 75 (emphasis added).) The communication directed pilots to increase maintenance writes ups ("Do not accept shoddy maintenance. Do not carry writeups from station to station. Be safe. Don't fly with inadequate or ill prepared equipment. And hold the line.") and reject catering ("Catering is continuing to deteriorate. Reject it if it's inadequate. Reject it if it's not fresh. Reject it if it's not enough. Order more.") (*Id.*) The Union also threatened that pilots would harm Atlas during the peak fourth quarter if rumors that the Company would not put "real money" into the CBA during upcoming contract negotiations are accurate. (*Id.*) Specifically, Captain Griffith said, "Well, as a pilot crew member, *I can honestly say this will not be good for their fourth quarter*, if this is true." (*Id.* (emphasis added).)

On September 7, 2017, the Union's "Stewards of Atlas" sent a communication encouraging pilots to call out sick or fatigued, stating: "As we find ourselves in the midst of a period of increased friction and hostility, we remind everyone to make absolutely certain that you are fit for duty each and every time you report to work. Please, do not fly sick or fatigued. All In, Every Day." (*Id.* ¶ 143, Ex. 76.) On the same day, as part of its September Twitter campaign, Giant Comms tweeted another photo of a dumpster on fire, stating: "Open Time Trip 35 for the first 7 days of September, makes 5 times per day @AtlasAirWW has no pilots to fly known trips. CBA NOW!  #1u #FUPM." (*Id.* ¶ 144, Ex. 4.)

The September 12, 2017 Chairman's Update explicitly informed pilots that their campaign was effective and encouraged them to further slow down:

> The delays on a daily basis are more the norm than the exception. Long gone are the days when Atlas was able to boast about its on-time performance. Operational

problems are becoming more and more commonplace. We see the company chartering corporate jets and using empty B-767s to position pilots. We see more maintenance delays. We see sub-standard maintenance incurring FAA violations. Seemingly, the only way the company can limp along is by daily violating our CBA, resulting in a mounting number of grievances being filed over contractual violations. Even the FARs are no longer held sacred. All of these problems contribute to low customer satisfaction and a loss of standing in the airline community. The crisis that Atlas Air has become is sad to watch. Moreover, it would have been preventable, had the company chosen to do business with the pilots in an honest and forthright manner, rather than inflaming anger among our crews by instituting a string of stall tactics.

Now for the good news. We are now one of the most cohesive and well-educated pilot groups in the airline industry and literally the envy of most of the players. We enforce our CBA in a manner that legacy Atlas or Polar management has never seen before and they are frankly stunned by it. Our unity, camaraderie and team spirit both within our pilot group and throughout our union's organization are unmatched. By working together, we provide leverage to our leaders that will win us this fight for industry wages and benefits! . . .

I thank each of you and ask all of you, as usual, to keep it up and keep the pressure on as management struggles in the snare of their own making. Their self-induced attrition, combined with your enforcement of the CBA, are the keys in not letting this injustice continue; doing favors and cutting corners only enables the same pattern. The only way to effect change is to hold the line every day.

Remember, "never waive any part of the CBA" and "never do them any favors". As you all too well know, they are not giving us any waivers and most certainly are not doing us any favors these days.

The message closed asking pilots to be "All-In." (*Id.* ¶ 147, Ex. 77.)

On September 15, 2017, Giant Comms continued its September Twitter campaign, tweeting account a picture of a dumpster on fire and wrote "@AtlasAirWW OPEN TIME #91 on Sept 15 = more than 6 trips per day WITHOUT PILOTS to fly them! . . . CBA NOW! #1u #FUPM." (*Id.* ¶ 149, Ex. 4.) Captain Griffith retweeted this post, adding the Twitter handles of DHL, Amazon, and Jeff Bezos, and writing "Reserves running low and your operations are in jeopardy. @AtlasAirWW pilots need new CBA NOW! #1u #FUPM." (*Id.*) He then retweeted the message again, noting "the [open time] rate was 3 per day over the last two months; nose

dive accelerating." (*Id.*)

In the September 15, 2017 ATAM, the Union directly and repeatedly threatened Atlas'

fourth quarter:

> The pilot shortage has left [Atlas] with very few options.  They can't [] now meet
> their reserve requirements with their customers and are planning on asking their
> customers for relief.  *You know, the important ones, Amazon, DHL, FedEx are
> starting to get very worried about what is going to happen during the busy
> season* . . .
>
> Well, it looks to me like [Atlas] should make negotiating a new CBA their first
> priority, and start to smooth things out for themselves and their customers . . . I
> just heard the top guys have told the Company negotiators they're not allowed to
> sign off on anything that involves money on anything related to the pilots.  They
> have been told to string things along to keep line pilots happy and, you know, just
> get them through the fourth quarter.  They think the pressure will be off after that,
> and then they can delay the pilots even further, until they get tired and, you know,
> eventually give in . . . [T]hat would be a bad strategy because, I'll tell you what,
> from what I have seen on the line and talking to the pilots, they're fed up.  *And if
> a CBA doesn't come soon, fourth quarter is not going to be a happy time* . . .
>
> Without a CBA for fourth quarter and with currently uncovered trip rate now at
> more than six flights per day in open time . . . *I truly wonder how this Company
> will make it through fourth quarter with any customers left to support* . . . .

(*Id.* ¶ 150, Ex. 78 at 7:8-14, 8:20-9:18, 19:19-20:6 (emphasis added).)

The September 18, 2017 Chairman's Update continued to push pilots to change their

status quo behavior:  "'No waivers and no favors' is the clear and unmistakable rule we must

adhere to now more than ever.  'SUCCESS' will come through hard work and the perseverance

to follow through.  As you strictly enforce our CBA, always remember, with us, 'You Never

Walk Alone.'  The ExCo, Stewards and entire union stand ready to fight and protect your rights

and your determination to enforce the CBA.  It is ALL up to US to make it Happen.  You Never

Walk Alone in this Union!  ALL-IN." (*Id.* ¶ 151, Ex. 79.)

The next day, on September 19, 2017, Giant Comms launched a Twitter tirade, tweeting:

- "ATTENTION @DHLUS @amazon #PrimeAir @JeffBezos: Check vendors @AtlasAirWW & @ATSGinc and ask about required reserve pilots, NOW. #1u #FUPM"

- "Secret's out, @AtlasAirWW @ATSGinc @DHLUS & @JeffBezos @amazon! Want to capitalize? CBA NOW TO STOP PILOT LOSSES AND SHORTAGE.#1u #FUPM"

- "@AtlasAirWW at Open Trip 116 on the 19th day of Sept. Two previous months were 3/day; NOW, 6 TRIPS/DAY WITHOUT PILOTS! CBA NOW! #1u #FUPM"

- "Now offering OPEN TIME TRIP 117 . . . we will keep all stations advised today."

- "Now offering OPEN TIME TRIP 118 missing TWO pilots. #1u #FUPM"

(*Id.* ¶ 152, Ex. 4.)  Defendants continued their September campaign on September 22, 2017, tweeting:  "Open Time Trip #135 for a pilot needed ASAP! BUSINESSMEN FAILING DAILY!"  (*Id.*)

> 9. <u>Other Pilots Have Recognized And Communicated To Atlas That Defendants' Campaign Is An Illegal Slowdown.</u>

Many Atlas pilots have recognized Defendants' illegal campaign for exactly what it is and have complained to Atlas—including about threats of intimidation and harassment of those who refuse to acquiesce in the illegal activity.  (*Id.* ¶ 153.)

On May 9, 2016, for example, an Atlas pilot sent the following email to Atlas' Chief Pilot:

> Captain Welty, I am sending you this email in response to our conversation yesterday. It has become increasingly difficult for me to do my job effectively and efficiently with the intimidation and threats from some of my union brothers and sisters. I am not sure if you are aware of the "BOOT" program that is being promoted by the union. BOOT stands for block out on time. We are being told that we should not release the brakes until scheduled block out time even if we are ready to leave before. There is also the "SHOP" program (Stop helping out Purchase). We are being told that this is going to put pressure on the company to negotiate a contract quickly. I not only do not think that this is going to have any

effect whatsoever on contract negotiations, but it is keeping me from getting my ship, crew and freight on the way as soon as I can. Both Captain's ███████ and ███████ are threatening to release names on the Atlas Air GC comms web site of those that leave before scheduled block time. Captain ███████ is intimidating crewmembers directly in the DHL facility in CVG with the same rhetoric. All I want to do is fly my trips and enjoy my time off. I came here to fly airplanes not play games like children in the playground.

(*Id.*, Ex. 80.)[17]

A few weeks later, on January 29, 2017, another Atlas pilot sent the following email to Atlas' Senior Director Flying, System Chief Pilot: "There is a lot of ignorance going on and it sucks all the fun out of the job. I wanted to share what was on the plane today when I picked it up . . . A copy was left in the cockpit and another copy in the right crew bunk magazine holder . . . Hoping for better times here at Atlas." (*Id.* ¶ 154, Ex. 81.) The pilot attached a document entitled, "THIS IS THE US MASTER PILOT SCABLIST," which criticized check airmen for doing their jobs: "Check Airmen are notorious to be greedy and selfish . . . CHECK AIRMEN IS A VOLUNTEER POSITION." (*Id.*) The document encouraged others to "add to the list, so our Brothers and Sisters know which individuals are ALL IN." (*Id.*) The attached list provided details of pilots who had taken outbase and voluntary assignments with a string of dollar signs next to their names. (*Id.*)[18]

On February 28, 2017, another Atlas pilot sent the list to a Chief Pilot again. (*Id.* ¶ 155, Ex. 82.) This time, the list was dated January 1, 2017, and was a comprehensive list of pilots who had taken outbase and voluntary assignments for October, November, and December 2016. (*Id.*) The list was very detailed and included not only the pilots' names but what flying they did

---

[17] Personal identifying information is redacted throughout this document.

[18] CBA Section 25.Q provides that a pilot may "out-base" (*i.e.*, be stationed as a reserve for a month at the station of Atlas' choosing). (Carlson Decl. ¶ 154, Ex. 2.)

and when.  (*Id.*)  Again, there were dollar signs next to their names that appear to correspond with how much work the pilot did.  (*Id.*)

On June 22, 2017, an Atlas pilot wrote an email to Atlas management about slowdown instructions that Defendants provided at a recent meeting:  "These were your pilots talking about creat[ing] strikes, shutting down terminals and the intentions of bring in the Teamsters to intimidate company management.  They talked in detail about the plot(s) to break arms, stalk houses and what all the teamsters would do, to accomplish the goals they wanted . . . The oldest of the group, talked [in] [d]etail how they could easily shutdown one of your terminals (deluging with small issues), then they discussed starting a phone list to prevent your company to reach out and get a pilot for coverage after one calls off."  (*Id.* ¶ 156, Ex. 83.)

Pilots also complained to Atlas that other pilots were sending them harassing text messages and asked the Company to stop the harassment.  (*Id.* ¶ 157.)  One pilot received a text from another pilot of an image of a list of pilots who took outbase and voluntary assignments with notations besides their names, including "SCAB!"  (*Id.*)  The text questioned the pilot's willingness to be a team player and comply with the CBA during negotiations.  (*Id.*)  The text also called the pilot a scab.  (*Id.*)  The pilot asked for Atlas' help in offering protection and anonymity.  Similarly, another text provided to Atlas asked why the pilot blocked his schedule and asked if he was "helping out," insinuating that the pilot was hiding his schedule from the Union so he could be a good performer without harassment.  (*Id.*)  And certain pilots who resigned have reported to Atlas in exit interviews that they are leaving in response to pressure from the Union to slow down.  (*Id.*)

E.   **Defendants' Illegal Slowdown Has Irreparably Harmed Atlas, Its Customers, And The Public.**

      1.   Defendants' Campaign Has Irreparably Harmed Atlas.

The pilots' dramatic changes in behavior directly translate into irreparable harm in the form of operational disruptions that tarnish Atlas' reputation in the marketplace and create lost customer goodwill as well as significant financial costs for the Company.  (*Id.* ¶ 158.)  The primary driver of this harm are operational delays caused by the cumulative effect of all of the pilots' tactics, including, as described above, causing statistically significant increases in extended delays of six hours or more.  (*Id.*; Lee Report ¶ 52.)

        a.   Atlas Has Incurred Reputational Harm And Loss of Goodwill As A Result Of The Pilots' Changed Behavior.

Atlas has built its strong brand and reputation for high quality service over the past 25 years, and its consistent and reliable operation has allowed it to obtain the business of major customers like Amazon, DHL, FedEx, and UPS.  (Carlson Decl. ¶ 159.)  Indeed, Atlas' entire business is dependent on its reputation for strong performance and reliability.  (*Id.*)  And Atlas' customers are well-aware when their flights are subject to extended delays due to sick or fatigue calls, or even those short, but highly prevalent "BOOT" delays.  (*Id.*)

For instance, Atlas offers a "visibility tool" to its customers so they can track their aircraft.  (*Id.* ¶ 160.)  As a result, Atlas' customers are able to see when their fully-loaded aircraft are sitting on the tarmac for no reason due to the BOOT campaign, for example.  (*Id.*)  As described in detail above, customers expect and depend on Atlas flights to depart as soon as they are loaded and ready, and themselves suffer from the lost benefits such prompt departures provide.  (*Id.*)  Because its customers are highly engaged, the deterioration in Atlas' operational performance caused by the Atlas pilots' changed behavior has therefore translated directly into

unhappy customers and lost customer goodwill, thereby irreparably harming Atlas' brand and reputation.  (*Id.*)

Atlas can suffer from such lost customer goodwill from several different customers as the result of any single extended flight delay.  (*Id.* ¶ 161.)  This is because not only does a significant extended delay result in missed customer deadlines for the delayed flight, the ripple effects of a single extended delay can, and often do, last for days and negatively impact multiple customers' flights and cargo.  (*Id.*)  For instance, most Atlas freight planes are configured with four or more extra seats designated to carry other Atlas crew members who are deadheading to be on location for their next scheduled duty period.  (*Id.*)  A delayed deadhead flight often means that the deadheading pilots will be late for their next scheduled duty period, causing each of their next scheduled flights to incur delays (and possibly require the use of replacement pilots) as well.  (*Id.*)  Similarly, a single extended delay can cause that flight's crew or aircraft to be unable to get into position for a subsequent flight for the same or a different customer, thereby causing a delay on that next flight as well.  (*Id.)*

This ripple effect is seen not only as a result of extended delays, but also as a result of pilot sick or fatigue calls themselves.  (*Id.* ¶ 162.)  As described above, a series of sick or fatigue calls can result in the depletion of reserve or replacement pilot resources that can last for days, and impact Atlas' ability to properly staff subsequent flights that may legitimately need replacement pilots.  (*Id.*)  As a result, even flights that were not directly touched by a pilots' illegitimate sick or fatigue call can suffer delays as a result of that very sick call.  (*Id.*)

This lost customer goodwill is difficult if not impossible to replace or to rectify with monetary compensation and is demonstrated by the near-daily complaints that Atlas receives from its myriad of customers regarding the decline in operational performance resulting from

pilots' change in behavior.  (*Id.* ¶ 163.)  For example, on June 27, 2017, after "the 4th event this week alone with another sick crew member," a senior representative of one customer complained:  "This latest caper by crews will generate a lot of heat."  (*Id.*, Ex. 84.)  He was forwarding a complaint from a senior representative of the customer that said, "Understand these things can happen, but have never seen this with such a frequency on any other operator."  (*Id.*)

On July 18, 2017, another representative of the customer complained to Atlas after a crew member refused the planned catering and also the alternative options for catering causing the aircraft not to depart and forcing the customer to have to charter an aircraft at a cost of $30,000. (*Id.* ¶ 164, Ex. 85.)  The complaint said:  "Due to the cost this created for [the customer], jeopardy to the [customer's] (customers) and as this crew members actions are clearly not customer oriented and appear on the surface to be without merit, I would respectfully request they be removed from any future [customer] routes if possible."  (*Id.*)  Another senior representative of the customer copied on the original July 18, 2017 complaint followed-up on the same day to highlight the $30,000 additional cost incurred by the customer and to complain about the occurrence of "two other major crew issues."  (*Id.*)  He asked, "The issues with flight crews continue to increase, when is Atlas planning to take the next steps in regards to flight crews?"  (*Id.*)

The very next day, on July 19, 2017, the same customer senior representative again complained after multiple crews called in fatigued and sick for their flights:  "This one is getting real ugly!!!!!  Any guess in regards to this crew situation?"  (*Id.* ¶ 165, Ex. 86.)  And the very next day, on July 20, 2017, as a result of multiple fatigue and sick calls and other crew-related issues, the customer was forced to take multiple delays, which a senior representative of the

customer described as "painful."  (*Id.*, Ex. 87.)  The same customer senior representative followed up, stating "not a good day for sure."  (*Id.*)

On July 20, 2017, another customer complained about a crew calling in fatigued:  "I am genuinely concerned about the rate at which Atlas pilots call fatigue compared to all other [] air carriers [serving the customer].  On a flight-normalized basis, Atlas' rate of fatigue calls is more than four times higher than other carriers, combined . . . ."  (*Id.* ¶ 166, Ex. 88.)  On July 26, 2017, the same senior customer representative complained about a crew calling in sick, which would have caused a four-hour delay and "missed package connections and missed customer promise." (*Id.*, Ex. 89.)  The customer opted to use another carrier "to satisfy customer promise."  (*Id.*)  She noted:  "Atlas has the highest number of fatigue calls (over 5x) versus non-Atlas operated flights."  (*Id.*)

On August 3, 2017, Atlas received a complaint from a senior representative of another customer about a fatigue call:  "It certainly is difficult to understand let alone explain to a customer why a Captain who has had 51 hours rest and a further 21+06 rest was suddenly fatigued a short time before scheduled departure and I view the entire delay still with a great deal of disbelief and a level of discomfort . . . Any level of mitigation that can be put into place to prevent a repeat situation would be greatly appreciated."  (*Id.* ¶ 167, Ex. 90.)

On August 9, 2017, a senior representative of another customer complained that "we had one sick call and one Fatigue call this morning . . . which delayed [] flexibility . . . as we had to wait for another crew from the Hotel."  (*Id.* ¶ 168, Ex. 91.)  The very next day, on August 10, 2017, the same senior representative complained, "Another FSF [Full Service Failure], crew fatigue issue" after all of the freight on an aircraft missed the sort where it was to be distributed throughout the customers' network.  (*Id.*, Ex. 92.)

As a result of the significant delay for another customer due to a fatigue call on August 27, 2017, described above, a manager at the customer wrote, "The lack of customer focus provided by this operating crew to the [customer] Freight operation is exasperating and more than disappointing, particularly when our OTP [on time performance] has been challenged by other ATLAS events in recent weeks.  As a follow up we request that the following crew no longer operate on the [customer] network in the future and be removed from any rotation in our network as soon as possible."  (*Id.* ¶ 169, Ex. 93.)  Another customer manager complained:

> The delay below is extremely disappointing.  The crew fatigue issue was hard for us to accept when we were already operating on a significant delay.  To make matters worse we have a further 6 hour delay due to a crew wake up issue.  We are now almost 40 hours behind schedule with no sign of recovery.  Could you please as a matter of urgency look into a recovery option to minimi[ze] this delay. We really need to get back on schedule as quickly as possible so we can deliver the type of service our customers expect.  As you can imagine there are many questions being asked here in relation to how this could have occurred and how we can get back on schedule.

(*Id.*, Ex. 94.)

Days later on August 30, 2017, a senior representative of the customer complained to Atlas' Executive Vice President and Chief Commercial Officer.  (*Id.* ¶ 170, Ex. 95.)  He wrote, "The team has asked me to raise this directly with you as we're quite concerned at the number of crew fatigue delays over the last week.  We've now had 3 separate crew fatigue delays in the last week, resulting in one of our lines of flying now being delayed by 47 hours with no ability to operate on time until mid-next week."  (*Id.*)  As a result, he stated, "[m]any of our customers have lost confidence in our ability to deliver a consistent service."  (*Id.*)

On September 9, 2017, a vice president for a customer complained about a flight delay due to fatigue call at wakeup that caused an aircraft full of express cargo to miss the daily sort: "This is a real ugly delay, this is a FSF [Full Service Failure] for Sunday sort . . . ."  (*Id.* ¶ 171, Ex. 96.)

As described in the Lee Report, Atlas competes in the highly competitive and largely commoditized market for providing outsourced cargo lift, whereby the Company's customers can and do source lift from multiple carriers. (Lee Report ¶¶ 6, 72.) If the contracted flight services provided by Atlas fail to meet customers' expectations with regards to reliability, the highly commoditized nature of offering outsourced cargo lift means that these customers can replace the services of poorly performing carriers with those of other carriers able to offer more reliable and dependable services. (*Id.*)

The risk of lost business is particularly high for Atlas with respect to the U.S. military because of the structure of its contract. (Carlson Decl. ¶ 172.) Atlas is committed to the Civil Reserve Air Fleet (CRAF), a military program through which airlines contractually pledge aircraft for activation when needed in times of war. (*Id.*) In exchange, the government makes peacetime Department of Defense airlift business available to Atlas and other airlines. (*Id.*) But if Atlas performs below a certain threshold, it could lose its entitlement to such peacetime work until its performance improves, and that work is given to competitors. (*Id.*)

> b.  Atlas Has Incurred Financial Harm As A Result Of The Pilots' Changed Behavior.

The Atlas pilots' concerted change in behavior, and in particular, their increase in same-day pilot sick and overall fatigue calls, has financially damaged Atlas. (Carlson Decl. ¶ 173.)

Each disruption and delay imposes operational costs on Atlas. (*Id.*) Often, following a sick or fatigue call, a replacement pilot must be transported from another location to the departure station. (*Id.* ¶ 174.) As a result of increased sick and fatigue calls, Atlas' costs for such transportation have increased. (*Id.*) In many instances, Atlas is able to find a commercial flight for a replacement pilot, and the volume of commercial flights amounts to a tremendous cost for the Company that has only increased with the increased number of call outs. (*Id.*) But

Atlas also may be forced to charter a plane to transport the pilot to the departure location, if a commercial solution is not available. (*Id.*) Any given charter flight can cost up to approximately $25,000 or more just to transport one pilot. (*Id.*) Chartering in pilots is of particular importance for flights going to military zones. (*Id.*) Atlas must abide by flying curfews in such zones, so if a pilot calls out sick or fatigued, Atlas has to charter in a new pilot as soon as possible to avoid missing the curfew. (*Id.*) Since February 2016, Atlas has paid $123,000 to charter flights for pilots, which compares to $0 the previous year. (*Id.*) Of that, $98,000 was for chartering crews to position them for military operation flying. (*Id.*)

Furthermore, as a result of increased same-day sick and overall fatigue calls, coupled with a decrease in the number of pilots accepting open time flying, Atlas' operations have not only declined due to resulting delays, but in an effort to prevent a decline, the Company increased hiring in anticipation of the 2016 peak season (October-December) at a significant cost to Atlas. (*Id.* ¶ 175.) Historically, Atlas plans to staff to accommodate non-peak scheduled flying with the ability to "flex" up by up to 3% and relies on overtime during peak season to cover the additional peak flying. (*Id.*) In 2016, in order to mitigate the adverse effect of the pilot slowdown and resultant inability to use overtime, rather than to flex up to 3%, Atlas increased its staffing by approximately 6.9% in an attempt to protect the operation. (*Id.*) Specifically, in 2016, Atlas hired and trained an additional 60 first officers and upgraded 25 first officers to the captain position. (*Id.*) The salaries, wages, and benefits of these pilots alone, taking into account the corresponding decrease resulting from attrition, cost Atlas over $1.5 million in 2016, and cost Atlas over $1 million through June 2017. (*Id.*) In addition, Atlas spent hundreds of thousands of dollars on recruiting, training, and traveling costs for these new hires and upgrades. (*Id.*)

The pilot slowdown also harms Atlas financially because the Company has had to compensate its customers for the decline in operations.  (*Id.* ¶ 176.)  Many of the Company's contracts with its customers require that Atlas perform at a certain level and pay a financial penalty if it fails to do so.  (*Id.*)  These contracts also often include provisions that require customers to make bonus payments to Atlas if the Company performs better than required.  (*Id.*)

Pursuant to Atlas' contracts with one of its major customers, prior to the recent change in pilot behavior, Atlas was entitled to an incentive payment in most months, but since the pilot campaign started, Atlas has either been forced to pay a penalty or performed at the minimum standards required by the contract, resulting in lost incentive payments for the Company.  (*Id.* ¶ 177.)  Based on Atlas' performance for one aircraft type for this customer, in the 476-day period between February 29, 2016 and June 18, 2017, there was an approximately 107.1% net decrease in incentive payments in contrast to the prior 476-day period between November 10, 2014 and February 28, 2016.[19]  (*Id.*)  Likewise, in the 504-day period between February 15, 2016 and July 2, 2017, there was an approximately 87.5% net decrease in incentive payments in contrast to the prior 504-day period between September 29, 2014 and February 14, 2016.  (*Id.*)  Similarly, the penalty payments made by Atlas to another customer for a particular type of flying has also increased significantly.  (*Id.*)  Specifically, from February to December 2016, Atlas paid 72.8% more in penalties than during the same time period in 2015.  (*Id.*)

As a result of poor performance, Atlas also has been compelled to make goodwill payments to certain customers.  (*Id.* ¶ 178.)  For example, in March 2017, Atlas made a significant goodwill payment to one customer, after a series of crew related delays.  (*Id.*)  One

---

[19] For the 28 days from November 10, 2014 through December 7, 2014, the incentive/penalty structure was inapplicable.  (Carlson Decl. ¶ 177.)

such flight was a "live stock charter" in which the animals that were on the aircraft had to be put back into quarantine at the customer's cost.  (*Id.*)

> 2.   Defendants' Campaign Has Harmed Atlas' Customers.

The pilots' campaign and resulting decline in Atlas' operations has harmed its customers.

> a.   The United States Military

Atlas is the largest carrier of cargo and passengers for the U.S. military.  (*Id.* ¶ 179.) Delays of Atlas' flights for the military can be disruptive to military operations, and as a result, the pilots, at the direction of Defendants, are intentionally disrupting such flights to inflict maximum harm.  (*Id.*)  Pilot actions have prevented service members from coming home to their families on time and have also delayed flights carrying troops and urgently-needed medical supplies and other critical provisions into the battlefields.  (*Id.*)  These actions are detrimental to the missions of the U.S. military and place the lives of our troops at risk.  (*Id.*)

For example, as described in part above, in April 2017, crew actions (including multiple fatigue calls and maintenance write-ups) caused an aircraft flying approximately 120 service members home to their families in the United States to experience three consecutive delays of over 60 hours on each leg of a trip from Kuwait to Germany to New Hampshire to Texas.  (*Id.*)

The impact on the service members and their families of this incident can only be described by the families themselves.  (*Id.* ¶ 180.)  Atlas received dozens of written complaints from families, a number of which are reproduced below.  (*Id.*)

> My husband is a Blackhawk helicopter Pilot with the South Carolina Air National Guard. His unit has been deployed in the Middle East for ███ and "should" be home with our ██ young children as I write this. However, due to the internal politics of Atlas Airlines, he, along with 120 SC Guardsmen and women are currently stranded in Portsmouth, NH. Before that, they were previously "stranded" in Germany for 36 hours as well. ***Apparently the Atlas Airline pilots were holding an "unofficial" strike, and continue to do so at each airport, forcing the service men and women to camp out for several days at a time in the terminals.*** They have been sleeping on the floor and cots and should be on their

way home from a ▆ month deployment in the Middle East to their families and children, not stuck in an airport terminal for days on end without proper food, clothing and supplies. Is this any way to treat our country's finest?

The men/women are on government orders and therefore, cannot simply purchase another ticket home. They are at the mercy of the contracted airline, your airline, an airline that has failed them for the last 5 days of their journey home. Some of these service man are coming home to children they have yet to meet. The flight attendants have been wonderful through this process, providing them with some food (donuts and coffee) and toiletries, however there is no excuse for the Atlas pilots behavior, especially to the service men and women defending their very liberties.

*Each time the unit has asked why the plane could not complete the journey, they were informed that there was an "issue" with the airplane. The Atlas pilots were unaware that the service men and women they are transporting are pilots and mechanics, as well. All of the excuses are false. The Atlas pilots are holding a soft strike and the South Carolina Guardsmen and women are caught in their game. Unacceptable and disgraceful.*

***

Our SC guardsmen (A Company; 1st of the 111th Aviation Brigade; South Carolina Air National Guard, Fort McEntire, SC) returning home are currently covered by a charter contract with Atlas Airlines. These guardsmen, who were deployed to the Middle East for ▆▆▆, left Kuwait for home in the US on Saturday, April 22nd and were scheduled to arrive in Fort Hood, TX on Sunday, April 23. *However, as I write this on Monday, May 1st, due to internal politics (what we understand to be a "soft pilot strike") at Atlas Airlines, 85 of our SC Air National Guardsmen are STILL stranded in Texas,* awaiting word of when they will be allotted a return flight home to their families. These men and women have spent days delayed including many days in the airports, sleeping on cots, without comfort or appropriate supplies. They are our country's finest—and your company's internal politics and reactions to resolve the issue have been despicable. Our men and women are on government orders, they cannot simply purchase another ticket home, they are at the mercy of Atlas. UNFORTUNATE!

Please realize the waterfall affect your internal political failure is creating. In the specific case I write you about, (at best) my guardsman will get home on May 2nd or 3rd. *While he should have had approximately 10 days at home with his family, before returning to his full time job as a ▆▆▆▆▆▆, this will not be the case.* Because he has been away from his job for ▆ months, he will be required to be requalified ▆▆▆▆▆. That training lasts two weeks and he is scheduled to leave for this training on 5/7. *That will give him approximately 3 days with his children before leaving for another 2 weeks.* Would that be long enough for you to reintegrate into your family's life . . . or long enough to breathe in the smell of your young children?

Regarding the guardsman that I am motivated you to write about:  of the SC Air National Guard (█ years), formerly (█ years) is a Blackhawk pilot, a husband to █████ and a father to ████ and ██. He is an American Patriot if I have ever met one and a proud American. His parents immigrated ██████ . . . ████ was their █ year anniversary in America. You will never meet someone more proud to be an American. This proud patriot spent this special ████ anniversary—a reminder of how proud he is to be an American—sitting in a US airport, as a US Soldier feeling (in my words) FORGOTTEN. ████ proudly serves the United States and while he was away on this █ month deployment he missed many milestones, including holidays and birthdays (████ now █, now █, and his own ██) ; his son's first day of ████████, and *now he will miss his wedding anniversary for the* ████ *year in a row.*

Our men and women (and their families) sacrifice so much—too much—and ██████ story is just one of YOUR 85 stranded guardsmen's stories. I need to know, when will Atlas Airlines tell them, they're going home?

Please correct this injustice NOW—get them home NOW—and, frankly, the $500 voucher you've issued for their inconvenience does NOT fix the issue. Our men have served you as an American and, they are paying for your company's political infighting. Unacceptable and disgraceful. We DEMAND your solution.

\*\*\*

My full belief is that this should never happen to our military. NEVER. I understand that you are not responsible for delays related to out processing. What I am concerned with is your response in resolving the noise your inter office politics created. This "noise" delayed our military on their way home. I understand that you bid and won a government contract to provide the logistical support for getting our troops home safely and efficiently. If you are unable to live up to this contract, including putting our troops first, then I see a problem. I believe your company failed - you won the contract, recognized the revenue, but failed at the main goal - successfully moving our troops. This failure needs to be addressed so that our military never again experiences a feeling of being forgotten. The 4 days you refer to below may seem like nothing to you or me, but another 4 days to our military feels like a lifetime when they have been deployed to the Middle East in a high risk, combat zone. I will say it again, this is inexcusable and an Atlas Air failure. We are moving forward with our congressmen and State Senators. The Atlas Air contract needs to be reviewed.

\*\*\*

I do not have an opportunity to call you as I am currently between working full time and shuffling kids various places alone because my husband is deployed with the US Army. He has been in Kuwait, away from us for the past █ months. My kids and I have been so excited to see him. We have been checking off the days

for his return, which is now being held up by Atlas Air.  This day could be listed as one of the most emotionally draining since his leave. We have waited anxiously and with worry about their overall safety, and for details on their arrival to the states. I am so disappointed that an airline would make my husband, who has just served our country away from his children for so long, feel worthless and unimportant. I am disappointed that there have not been more positive actions taken to resolve this issue. I understand you do not have control over your employees, but if your employees are treated like my husband has been today I might not want to show up to work either. Please hear me in saying I do not mean this email to be a personal issue with you, but I'm hoping it will be read & relayed to the appropriate party and resolved for the next group of soldiers who are weary and ready to be home to their families.

***

You are an AMERICAN Contractor and it is your duty to get OUR American SOLIDERS home safely and ONTIME.  This is absolutely absurd they defend OUR COUNTRY and YOUR FREEDOM in overseas wars or missions and your duty is to get them home in a timely manner. AND YOU DID NOT DO THAT these past 5 DAYS!!!!!!!! What was supposed to be a day and half of travel now has turned into a week.

My husband and his unit have been held over many days overseas and now stateside and trying to get home to their families after being gone for ██████ ████████!!!

These soldiers give up a lot including their spouses, children, and families.  They give up every birthday, anniversaries, and HOLIDAYS so you can have your everyday FREEDOMS.  And you do not have the decency to ensure you have proper aircraft to carry OUR AMERCIAN SOLIDER back home to their families ***nor do you have the staff that is not willing to set aside their differences (union negations) and call in sick to make sure OUR AMERICAN SOLIDERS CAN GET HOME TO THEIR FAMILIES IN A TIMELY MANNER!!!!!***

I have called and left many messages with no return phone calls –NOT very good customer service!!!!  And many of the wives have called and still no responses back to them either.

We are already in contact with DOD about your current contract. We (the wives) have started contracting all the news stations about your poor services and lack of customer service.

(*Id.*, Ex. 97 (bold and italics emphasis added).)

Such a delay not only causes profound emotional suffering to families, as evident from

their messages, but also impacts them financially because they travel to meet their returning

service members.  (*Id.* ¶ 181.)  As a result of this incident, the families of these service members

complained to Congress about Atlas' contract with the military.  (*Id.*)  As a small gesture of its

regrets about this shameful situation, Atlas offered each service member $500 and paid any out

of pocket expenses incurred by the service members as a result of the delay.  (*Id.*)

b.   <u>Atlas' Other Customers</u>

More than two thirds of Atlas' aircraft serve the Company's express and e-commerce

customers, and these customers are in the business of providing reliable, express delivery

services to their own customers.  (*Id.* ¶ 182.)  The decline in Atlas' performance has also

damaged the operations of its customers, thereby harming their brands and reputations as well—

as evidenced by the customer complaints detailed above.  (*Id.*)

Furthermore, because customers like DHL have commitments to deliver packages to their

customers on time, they have been forced by crew delays to hire another cargo carrier (one of

Atlas' competitors), at their own expense of tens of thousands of dollars each time, in order to

obtain an aircraft and a crew to move their packages.  (*Id.* ¶ 183.)

The change in pilot behavior and resulting lengthy delays has also negatively impacted

the operating flexibility of Atlas and its customers.  (*Id.* ¶ 184.)  For example, when an aircraft

carrying freight is delayed such that it does not make the package sort at the customer's

distribution center in a timely fashion, the freight will be delayed a full day until the next sort.

(*Id.*)  Thus, even a short delay can cause a full service failure on the part of Atlas' customers,

which then impacts thousands of customers on the back end, and the magnitude of this

operational disruption is compounded with each aircraft that is delayed by the pilots.  (*Id.*)  For

example, a B-747 aircraft carries between 80 and 100 tons of express parcel, and thus tens of

thousands of customers are impacted when an aircraft misses the sort.  (*Id.*)

72

3.    Defendants' Campaign Has Harmed The Public.

Atlas transports many time-sensitive items, including medications, pharmaceutical and medical supplies, lab shipments, human organs, emergency equipment, legal documents, and items necessary for scheduled events, such as conferences, weddings, and funerals.  (*Id.* ¶ 185.) Customers use, and pay a premium price for, express carriers because they need quick service often on an urgent basis, and when items arrive late there can be significant consequences.  (*Id.*) Potentially hundreds of thousands of these end-use customers—members of the general public— have been damaged by the pilots' slowdown behavior because, unlike at a passenger carrier, the delay from even a single strategically-placed sick or fatigue call can impact a substantial portion of Atlas' network and thousands of end-customers who rely on express shipments—and not just the several hundred passengers whose flight is delayed or who need to be re-routed when a pilot calls out on a passenger carrier.  (*Id.*)

In addition, the harm to the U.S. military caused by the pilot slowdown equates to harm to the public by placing our national interests and security at risk.  (*Id.* ¶ 186.)  Pilot actions have caused our troops to arrive late to battle and without the critical supplies they need, putting their lives and missions in jeopardy.  (*Id.*)  Furthermore, unnecessary delays in returning our troops home to their families, particularly after lengthy tours in the Middle East and throughout the world, is a catastrophe that is inconsistent with our nation's goal of supporting those who serve our country.  (*Id.*)

F.    **Atlas Has Attempted To Resolve This Dispute Without Judicial Intervention.**

Atlas has attempted to convince Defendants to stop their slowdown campaign and abide by their statutory obligations.  For instance, during the December 2016 sickout, Atlas sent a letter on December 19, 2016, to Defendants informing them that the pilots' increased use of sick leave and the refusal of crew members to volunteer for and accept open time flying in the ordinary

73

course were a violation of the RLA and requesting that they take immediate actions to stop the slowdown. (*Id.* ¶ 187, Ex. 36.)  In response, Defendants sent a letter, dated December 21, 2016, denying that they were engaged in an illegal slowdown, accusing Atlas of "posturing, bombast and bluster," and failing to provide any assurances that Defendants would take any action to stop the pilot slowdown. (*Id.*, Ex. 37.)  Instead, in their letter, Defendants continued to perpetuate the untrue allegation that Atlas has a problem with "attrition, scheduling, and staffing . . . ." (*Id.*)

On at least two occasions during the summer of 2017, a senior executive of Atlas also communicated to Defendants that pilots were intentionally delaying military flights and requested that Defendants take action to stop such improper actions. (*Id.* ¶ 188.)  In addition, in June 2017, in the Protocol Agreement, the parties agreed to "conduct all negotiations based on mutual respect and trust." (*Id.* ¶ 189.)  Atlas specifically requested this provision, and conveyed to Defendants that it must be included in the Protocol Agreement because the Atlas pilots' concerted activities were unacceptable and the Union had an obligation to return the operations to the status quo. (*Id.*)  In that regard, on June 9, 2017, counsel for Atlas informed counsel for the Union that Atlas knew that pilots were engaged in a slowdown and that Atlas expected the slowdown to stop as the parties negotiated for a joint CBA. (Declaration of Jerrold A. Glass ¶ 6.)  Atlas asked that the Union's counsel so inform the Union, and the Union's counsel indicated that they would do so. (*Id.*)

## ARGUMENT

The attempt by Defendants and the pilots to put pressure on Atlas in ongoing contract negotiations by disrupting Atlas' normal operations is a blatant violation of their status quo obligations under Section 2, First, of the RLA. *See, e.g.*, *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009) ("*UAL v. ALPA II*"); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001); *United Air Lines v. Int'l Ass'n of Machinists*

*& Aerospace Workers*, 243 F.3d 349 (7th Cir. 2001) ("*UAL v. IAM*"); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 2017 WL 2271500 (S.D. Fla. May 9, 2017); *US Airways, Inc. v. US Airline Pilot Ass'n*, 813 F. Supp. 2d 710 (W.D.N.C. 2011). These cases all arise in the identical context as here—a union and its members attempting to put pressure on an airline in order to gain leverage in contract negotiations by disrupting operations—and all expressly confirm that in this situation, the RLA status quo requirement has been violated and an injunction must issue.

A.      **Defendants' Concerted Activity Violates Their Obligations Under Section 2, First, Of The RLA.**

The principal purpose of Congress in enacting the RLA was to prevent strikes or other interruptions to the nation's transportation systems. 45 U.S.C. § 151a; *Tex. & New Orleans R.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930). To this end, Section 2, First, which the Supreme Court has described as "[t]he heart of the Railway Labor Act," *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377 (1969), provides that "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First; *see also Detroit & Toledo Shore Line R.R v. United Transp. Union*, 396 U.S. 142, 151 (1969) (describing Section 2, First's obligation "'to exert every reasonable effort' to settle disputes without interruption to interstate Commerce" as an "implicit status quote requirement."). And the duty to make and maintain agreements without interruption to the carrier's operations, *i.e.*, to maintain the status quo, is not "a mere statement of policy or exhortation to the parties." *See Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971). It is an affirmative legal obligation that applies equally to individual members of the union as to the union itself, *see Delta Air Lines,* 238 F.3d at

1308-09 n.19, and is enforceable by injunction, without regard to the Norris-La Guardia Act, 29

U.S.C. § 101 *et seq.  See Chi. & N.W. Ry.*, 402 U.S. at 581.  During negotiation of a CBA (which

is ongoing, here), the parties are obligated to maintain the status quo.  *See, e.g., UAL v. IAM*, 243

F.3d at 362; *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 2008 WL 4936847 at *38 (N.D.

Ill. Nov. 17, 2008) ("*UAL v. ALPA I*"), *aff'd* 563 F.3d 257 (7th Cir. 2009).

The RLA's status quo obligations require the parties "to preserve and maintain

unchanged those *actual, objective working conditions and practices, broadly conceived*, which

were in effect prior to the time the pending dispute arose."  *Detroit & Toledo Shore Line R.R.*,

396 U.S. at 153 (emphasis added).  As such, even if certain changed behavior is *permitted* by the

parties' CBA when engaged in on an individual basis, it is a *violation* of Section 2, First of the

RLA to engage in such behavior on a concerted basis when doing so constitutes a change to past

practice.  *See id.* at 153-54; *Allied Pilots Ass'n. v. Am. Airlines, Inc.*, 643 F. Supp. 2d 123, 127-

32 (D.D.C. 2009) (relying on the conclusion of "numerous other courts[,] that . . . voluntary open

time avoidance campaigns . . . violate the RLA."); *Delta Air Lines,* 238 F.3d at 1307-09 ("We

reject ALPA's contention that the CBA 'arguably' allows *all* pilots to refuse to work overtime

when *it is clear industry practice to structure flight schedules with 'open time' built in . . . . [A]n*

*expectation that not all of the pilots will choose to refrain from working overtime at the same*

*time . . . is implicit in the CBA.*") (second emphasis added); *UAL v. ALPA I*, 2008 WL 4936847

at *40 (N.D. Ill. Nov. 17, 2008) ("Section 2, First prohibits employees from engaging in

concerted action to put economic pressure on the carrier *even where the employees have a right*

*under the existing collective bargaining agreement to take the action in question*.") (emphasis

added).

Accordingly under Section 2, First, courts are authorized to "enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns and sit-ins," even where the individual employees have a right under the existing collective bargaining agreement to take the action, or refuse the duty, in question. *UAL v. IAM*, 243 F.3d at 362 (quoting *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)).[20]   And federal courts have routinely invoked this principle to enjoin slowdowns. *See, e.g.*, *Allied Pilots Ass'n*, 643 F. Supp. 2d at 127-28; *UAL v. IAM*, 243 F.3d at 361; *Spirit Airlines,* 2017 WL 2271500 ; *US Airways*, 813 F. Supp. 2d 710; *UAL v. ALPA I*, 2008 WL 4936847; *Nw. Airlines, Inc. v. Local 2000, Int'l Bhd. of Teamsters*, No. 00-08, slip op. (D. Minn. Jan. 5, 2000); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909 (N.D. Tex. 1999); *Long Island R.R. Co. v. Sys. Fed'n No. 156*, 368 F.2d 50 (2d Cir. 1966); *Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 518 F. Supp. 203 (S.D. Tex. 1981).[21]

---

[20] Even if Defendants claimed that there was a contractual justification for the concerted refusal to accept overtime flying, for example, an injunction prohibiting any alteration of the status quo would still be appropriate.  *See Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 908-09 (2nd Cir. 1989) (union may not exercise self-help in a minor dispute even where its right to engage in the conduct in question raises an issue of contractual interpretation).

[21] In *ABX Air, Inc. v. Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224*, 266 F.3d 392 (6th Cir. 2001), the pilots engaged in a concerted refusal to accept overtime flying in order to pressure the carrier to resolve a dispute regarding the interpretation of scheduling provisions in the CBA.  *Id.* at 394.  The carrier sought an injunction against an alleged "illegal strike in aid of a minor dispute" in violation of the RLA. *Id.* at 395.  The court denied the injunction on the grounds that there was no "concerted interruption of operations" but rather only "higher operational costs incurred by the necessary exercise of contract provisions." *Id.* at 398.  In doing so, the court distinguished cases that enjoined illegal slowdowns over the negotiation of CBAs, noting that "those cases involved a major dispute, during which a union is required to maintain the status quo." *Id.*  Here, unlike in the *ABX* case, Defendants' slowdown is over a major dispute—the formation of a new CBA— and is thus an illegal violation of the status quo requirement of the RLA.

1.      <u>Defendants And Their Pilot Members Have Violated Their Status Quo Obligations By Instigating And Participating In Slowdown Activities.</u>

The evidence establishes that Defendants have been engaged in a campaign to gain leverage in collective bargaining negotiations through unlawful changes in the status quo.  The "All In" campaign initiated by Defendants has grown in intensity since February 2016, and has encouraged pilots to engage in concerted activities designed to slow down and disrupt normal operations and therefore force Atlas into contract concessions.  Defendants have not tried to hide their intentions—they have been clear that the goal of encouraging pilots to take the actions described above is to obtain leverage in collective bargaining negotiations:

- "So always be safe.  Don't fly or train fatigued.  Remember . . . it's your CBA.  They signed it.  You use it."

- "Are you going to continue to sell your talents for a quick buck, or are you going to stop doing the Company favors and follow the CBA to the letter and give your EXCO and Negotiation Committee the leverage and power they need today?"

- "What is SHOPing, you say?  Well, it stands for Stop Helping Out Purchase.  And when we do this one thing, requiring some judgment on your part, and strictly following the CBA, it emphasizes to management how important and valuable a well compensated and highly motivated crew force can be to enhancing their operations and customer satisfaction."

- "we're asking everybody -- your EXCO is asking you to not block out early, ever, period.  Period, ever."

- "Atlas' customers will not be happy if the planes stop flying. . . .  All we have to do is follow the CBA, shop, and boot.  And that's what your Union asks of you."

- "Time will tell, but we are in for a long fight for a fair contract.  But believe me, it will be worth it.  Very worth it, indeed.  Your EXCO also wishes to remind you that your adherence to the CBA and all the things each and every one of you are doing daily are having a tremendous affect and it's working."

- "I am not going to volunteer my time to help the Company until we have a signed CBA that helps me and all of us."  (statement of Atlas ExCo Chairman)

- "You are not required to bid or accept open time flying or VX.  You are not required to answer your phone when on days off.  You are not required to answer your phone when on vacation . . . .  We have learned that following the CBA is a

simple and extremely effective way to give our Union all the leverage it needs to score points during talks and negotiations with Purchase."

- "PRIOR TO BLOCKING OUT, ensure that the meals are contract compliant. Those who operate long legs and long duty days without proper nourishment or sufficient caloric intake, are potentially subject to low blood sugar levels, a recognized cause of pilot fatigue . . ."

- "That's where you, choosing as an individual to act as a group of individuals moving as one to create solidarity that gives your Union, our Union, the leverage it needs to go up against these people to either force their hand to do the right things, or to negotiate the right thing if they ever get in the mood to negotiate. So it's time to redouble our efforts as individuals . . . By following your contract, by doing what you're scheduled to do these things will make us successful and bring us victory at the end of this road."

- "I'm not even going to go into the favors some of you out there continue to do to make a buck now instead of pulling on the rope with the rest of us to make even better money tomorrow via a new and industry standard CBA . . . The group that votes to follow the CBA and not their individual wallets is a good one."

- "Remember, your union stands behind you and we are your line of defense against any sort of harassment or intimidation relating to fatigue or any other issue. Do not endanger your life, the life of your fellow crew members or the public by allowing the company to push you into flying fatigued. . . . Always - ALL IN."

- "Atlas Executives believe that if they delay a new CBA long enough, you will lose your interest and your resolve and start violating the CBA, cutting corners and resign yourselves to the status quo and abandon our quest for an industry-leading CBA. This cannot be allowed to be the case! YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire. We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY. YOU must not only honor the CBA every day and on every flight, but also hold management accountable."

(Carlson Decl. ¶ 48, Ex. 7; ¶ 49, Ex. 8; ¶ 55, Ex. 12; ¶ 57, Ex. 14; ¶ 61, Ex. 16; ¶ 66, Ex. 21; ¶ 73, Ex. 28; ¶ 76, Ex. 30; ¶ 93, Ex. 43; ¶ 103, Ex. 50; ¶ 113, Ex. 58; ¶ 115, Ex. 59; ¶ 119, Ex. 63.)

These communications, and countless others, are clear: pilots must engage in concerted activity to disrupt the status quo in order to gain leverage in negotiations. *See UAL v. ALPA II*, 563 F.3d at 266-67, 272-73 (letter to pilots intended "to foster indignation and animosity towards

79

United, and to encourage the pilots to engage in more widespread job actions" constituted evidence that the union encouraged an unlawful sick out); *US Airways*, 813 F. Supp. 2d at 722 (union communication stating "The operational safety guidance is simply this: Don't fly fatigued!  If you are a reserve pilot, don't accept a trip if you are fatigued" encouraged pilots to call off their flights).

Moreover, federal courts have recognized the use of code words in coordinating illegal slowdowns.  *See, e.g.*, *UAL v. ALPA II*, 563 F.3d at 272 ("Phrases such as 'work safe,' 'work by the book,' 'adhere to strict contractual requirements,' 'not to neglect even the most minor write ups,' 'check every item on the checklists,' [are] all recognized as coded signals to engage in a slowdown.").  Here, Defendants have been using the terms "All In," "SHOP," "BOOT," and "It's your CBA.  They signed it.  You use it" in their numerous communications to pilots.  By telling pilots to strictly adhere to the contract, SHOP and BOOT, and be "All In," the Union has been telling pilots to unlawfully alter the status quo.  Numerous decisions have recognized "work to rule" pronouncements by unions, like "honor the CBA" or SHOP, as code for an unlawful change in the status quo.  And for good reason—SHOP is telling pilots to stop, and therefore change, their behavior.  Those decisions have held that even if the CBA permits individual pilots to decline open time flying or declare themselves too sick or fatigued for a flight, they may not exercise this right on a concerted basis in a manner that is different from their past status quo behavior.  *See, e.g.*, *id.*; *UAL v. IAM*, 243 F.3d at 366; *US Airways*, 813 F. Supp. 2d at 732.

And as set forth above, Defendants' communications have been effective.  The overwhelming statistical and anecdotal evidence demonstrates beyond dispute that Atlas' pilots are engaged in an illegal slowdown.  The fact that the December 2016 B-767 sickout occurred during the busy holiday period, and that Defendants are encouraging such peak time disruptions

again in 2017—now that Atlas is "into the busy season during the second half of the year"—

further demonstrates that the current slowdown activity is concerted and designed to influence

Atlas in collective bargaining.  In the *Delta Airlines* case, pilots similarly engaged in a concerted

refusal to work overtime during the holiday travel season, and the Eleventh Circuit concluded

that the timing of the change in behavior made it clear that it was designed to leverage collective

bargaining.  The Court ruled that "[t]his action by the pilots, viewed in the context of the holiday

travel season and the ongoing labor negotiations between ALPA and Delta, leads to the obvious

inference that the pilots are seeking to pressure Delta into making concessions in the negotiations

for a new CBA."  238 F.3d at 1303.  This principle applies here.  Defendants and its members

have blatantly violated the status quo in an effort to advance their position in collective

bargaining and, in so doing, have acted contrary to "[t]he heart of the Railway Labor Act."  *See*

*Jacksonville Terminal Co.*, 394 U.S. at 377-78.

2.      <u>Defendants Have Violated The RLA's Status Quo Obligations By Failing
To Make Every Reasonable Effort To Prevent And Discourage The
Slowdown.</u>

Even if a union does not directly instigate or encourage a slowdown, it "is statutorily

bound to do everything possible to 'maintain' the CBA so that commerce is not in any way

interrupted."  *Delta Air Lines*, 238 F.3d at 1310 & n.22 ("The duty of ALPA under the RLA is

sufficiently high that even if it has not sponsored or ratified the unlawful job action by the pilots,

it has a duty to end such unlawful action").  Similarly, in *UAL v. ALPA II*, the court issued

injunctive relief because, even assuming the union had not played a role in instigating the

slowdown, the record made clear that the union did not "exert every reasonable effort" to stop

the slowdown.  563 F.3d at 268.

In addition to starting this slowdown, Defendants have violated the RLA by failing to

stop it.  There is no evidence that Defendants have exerted any effort, much less "every

81

reasonable effort," to discourage pilots from engaging in the slowdown.  Indeed, in response to

one of Atlas' letters demanding that Defendants comply with their status quo obligations,

Defendants asserted that the allegations were "an unfair and desperate effort to convince Atlas'

customers that the pilots are to blame for Atlas' attrition, scheduling, and staffing . . . . [which]

problems are entirely and exclusively of Atlas' own making."  (Carlson Decl. ¶ 86, Ex. 37.)  In

recent months in 2017, when Atlas has asked the union to bring about a return to the status quo,

not only has Atlas seen no attempt by the Union to do so, it has seen no decrease, but rather a

continued pursuit of further concerted pilot activity.  (*Id.* ¶ 189.)  Any efforts that Defendants

have made to cover their tracks in communications advocating against illegal activity—and there

are very few—are wholly insufficient to comply with their obligations—as confirmed by the fact

that the slowdown continues unabated.  *See Delta Air Lines*, 238 F.3d at 1310-11; *UAL v. ALPA*

*I*, 2008 WL 4936847, at *33-35.

Thus, a preliminary injunction should be issued to force Defendants to undertake the

efforts that they are required to take under the RLA in order to stop their members from

engaging in illegal activity.  *See UAL v. IAM*, 243 F.3d at 363 ("Once a court determines that

such a concerted work action is occurring in violation of the RLA, an injunction can issue

ordering the union to observe its statutory duty by trying to stop it."); *see also Delta Air Lines*,

238 F.3d at 1309.

**B.     This Court Should Issue A Preliminary Injunction Prohibiting Defendants'
        Unlawful Conduct And Compelling Defendants To Make Every Reasonable
        Effort To Stop The Work Action.**

To obtain a preliminary injunction in the D.C. Circuit, the Court must determine

whether:  (1) there would be irreparable harm in the absence of the injunction; (2) the moving

party has a substantial likelihood of success on the merits; (3) an injunction would substantially

injure other interested parties; and (4) granting the injunction would further public interest.  *See*

*Sottera, Inc. v. Food & Drug Admin.*, 627 F.3d 891, 893 (D.C. Cir. 2010); *Ark. Dairy Coop. Ass'n, Inc. v. United States Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009); *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999); *Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 883 F. Supp. 755, 764 (D.D.C. 1995) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)); *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Ry. Labor Conference*, 310 F. Supp. 905, 910 (D.D.C. 1970).  For the reasons set forth above, Atlas has demonstrated that it is likely to succeed on the merits.  And for the reasons set forth below, Atlas has made more than the necessary showing on the other factors.

1. No Showing Of Irreparable Injury Is Required To Obtain A Preliminary Injunction Against A Status Quo Violation Under The RLA.

In *Consolidated Rail Corp. v. Railway Labor Executives' Association*, the Supreme Court held that "[t]he district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, *without the customary showing of irreparable injury*."  491 U.S. 299, 303 (1989) (emphasis added); *see also S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 337 F.2d 127, 133 (D.C. Cir. 1964) (finding "a showing of irreparable injury [was] not required before the [then] instant status quo injunction may issue"); *UAL v. IAM*, 243 F.3d at 362-64 (directing the district court to issue a preliminary injunction without any consideration of whether United had shown irreparable injury and rejecting the IAM's argument that the district court properly denied an injunction on the grounds that United could deal with the slowdown by disciplining the individuals involved); *US Airways*, 813 F. Supp. 2d at 736 (holding that a showing or irreparable injury is not required under Section 2, First); *UAL v. ALPA I*, 2008 WL 4936847, at *45.  Thus, upon a showing that a union or its members have altered the status quo, a preliminary injunction should issue as a matter of course.

2.   <u>Even If A Showing Of Irreparable Injury Were Necessary, Atlas Has Suffered, And Will Continue To Suffer, Irreparable Injury As A Result Of Defendants' Illegal Slowdown.</u>

Even assuming for the sake of argument that a showing of irreparable injury were required, that showing is easily met here.  The pilot slowdown has caused Atlas tremendous financial harm and the loss of customer goodwill and will continue to do so unless the conduct is enjoined.  *See Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) (continuing financial harm sufficient to justify preliminary injunction); *Del. & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 613 (D.C. Cir. 1971) (recognizing that harm results from customers who are forced to arrange other methods of transportation because they often do not resume using the struck railroad); *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers*, 1987 WL 18469, at *1-2 (D.D.C. 1987) (issuing preliminary injunction where Amtrak would "suffer a substantial loss of revenue, as well as the loss of public goodwill which it can never recover").

a.   <u>Defendants' Slowdown Has Cost Atlas Customer Goodwill.</u>

While Atlas has experienced—and will continue to experience—financial harm as a result of the Defendants' illegal slowdown, it is impossible to overestimate the harm it will continue to experience in its relationships with its customers, unless the slowdown is enjoined.  This harm will be exacerbated if Atlas is unable to deliver on its promises during the crucial peak holiday season.  Atlas already has received numerous complaints from its customers detailing their astonishment at the number of crew members that call in sick or fatigued and questioning their commitment to customer service.  (Carlson Decl. ¶¶ 163-71.)  Incredibly, Atlas has received many emails from its customers requesting that certain crews never fly for them again and chiding the Company for making it spend, for example, an extra $30,000 to charter a

separate aircraft because an Atlas pilot refused to fly due to a catering issue.  (*Id.* ¶ 164.)  Atlas is nothing without its name and reputation, neither of which can be remedied or valued monetarily.

> b.   Defendants' Slowdown Is Causing Atlas Significant Financial Harm.

The myriad of slowdown techniques employed by Defendants has resulted in the loss of millions of dollars.  For example, the drastic increase in fatigue and same-day sick calls has resulted in Atlas having to charter planes to transport pilots to departure locations.  (Carlson Decl. ¶ 174.)  Indeed, since February 2016, Atlas has paid $123,000 to charter flights for pilots, compared to $0 the previous year.  (*Id.*)  Similarly, to deal with the crew shortages due to the increase in fatigue and sick calls, Atlas has been forced to hire an additional 60 first officers and upgrade 25 first officers to captain, costing Atlas several million dollars in wages and benefits, during 2016 and 2017, taking into account the corresponding decrease resulting from attrition, not to mention the hundreds of thousands of dollars Atlas had to spend on recruiting, training, and traveling costs for these new hires and upgrades.  (*Id.* ¶ 175.)  Atlas also has penalty and incentive clauses built into contracts with customers and has lost millions of dollars in penalty payments and lost incentive payments due to underperformance.  (*Id.* ¶¶ 176-78.)

> 3.   A Preliminary Injunction Will Further The Public Interest.

The interests of the public demand that Defendants' illegal self-help actions be enjoined. *See Allied Pilots Ass'n*, 643 F. Supp. 2d at 129 (issuing a preliminary injunction, in part, because "any disruptions to American's operations would ultimately burden the American public"). Indeed, when considering whether to issue a preliminary injunction both the effect on Atlas and the effect on the public should be considered.  *See Del. & Hudson Ry. Co.*, 450 F.2d at 619; *Nat'l R.R. Passenger Corp. v. United Transp. Union*, 832 F. Supp. 7, 11 (D.D.C. 1993) (continuing to enjoin the union's slow-down efforts because otherwise "Amtrak and the general public [would]

suffer immediate, substantial, and irreparable injury if UTU engages in self-help in violation of the Railway Labor Act"); *Nat'l R.R. Passenger Corp. v. Am. Fed'n of R.R. Police, Inc.*, 613 F. Supp. 602, 606 (D.D.C. 1985) (finding that without a permanent injunction, the slowdown would "caus[e] immediate and irreparable injury, loss and damage, in the way of cancelled and delayed railroad service, to both Amtrak and the traveling public").

Atlas carries cargo that is time sensitive and critical to its recipients.  Military personnel, who already operate under difficult circumstances, will be late in arriving into battle and receiving urgently needed supplies, and other consumers who have urgent needs will not receive their medication or other essential materials.  Similarly, businesses could be without necessary supplies to meet the requirements of their customers.  And if this illegal campaign is not enjoined before the holiday season, the harm to the public will only be worse.  At the very least, families throughout the country will be disappointed on Christmas morning and during Chanukah celebrations because the pilots at Atlas unlawfully refused to fly airplanes.  The impact on the public of a disruption to commerce is boundless and requires the issuance of injunctive relief.

       4.      <u>The Defendants Will Suffer No Irreparable Harm If The Preliminary Injunction Is Issued.</u>

A preliminary injunction requiring Defendants and their members to refrain from violating the status quo, and to exert all reasonable efforts to discourage the slowdown, imposes no legally cognizable harm whatsoever because it merely requires them to satisfy their existing, and indisputable, legal obligations under the RLA.  *See UAL v. ALPA I*, 2008 WL 4936847, at *46 (injunction "merely requires them to satisfy their existing legal obligations under the RLA"); *US Airways*, 813 F. Supp. 2d at 733 ("USAPA will not experience any legitimate hardship as a result of being enjoined from violating the law."); *Nw. Airlines, Inc.*, slip op. at 9 (injunction "would simply prohibit the Defendants from engaging in illegal activity").

The relief sought in no way interferes with an individual pilot's discretion.  Atlas' pilots are highly trained professionals and do not need to be told that they should not fly sick or fatigued—they know that.  When Defendants repeatedly tell them not to do so—particularly where, as here, they do so in the context of discussing collective bargaining negotiations—pilots understand that what Defendants really mean is that pilots should slow down the operation.  Thus, any argument that safety would be impaired by ordering pilots to resume their normal operations is without merit.  *US Airways*, 813 F. Supp. 2d at 736-37 (issuance of injunction "would only require [the union] to satisfy its existing legal duty under the RLA" and does not "interfere with the duty of pilots in command to ensure the safety of their passengers and equipment").  Defendants simply have no protectable interest in encouraging an illegal slowdown or allowing it to continue in violation of the RLA.

### C.  This Action To Enjoin Defendants' Ongoing Illegal Slowdown Campaign Is Timely.

Defendants' illegal slowdown campaign started in February 2016 and has continued to the present day.  All such conduct is part of Defendants' "multi-faceted and ongoing slowdown campaign," a pattern of illegal conduct that effectively ended the status quo period in February 2016 and continued into the six-month statute of limitations period applicable here.  *See UAL v. ALPA II*, 563 F.3d at 269.  Accordingly, Atlas' claim to enjoin such conduct is timely.

The six-month statute of limitations under the RLA is borrowed from Section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b).  *See West v. Conrail*, 481 U.S. 35, 37–38 (1987); *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 931 (D.C. Cir. 2013).  Under Section 10(b), when a violation begins outside of the limitations period but continues into the limitations period, the claim is not time barred.  *See, e.g.*, *Atlas Air, Inc. v. Air Line Pilots Ass'n, Int'l*, 232 F.3d 218, 227 (D.C. Cir. 2000); *Melville Confections, Inc. v. N.L.R.B.*, 327 F.2d 689,

692 (7th Cir. 1964) ("Nor does the fact that the [petitioner's] violation antedated the Section 10(b) period applicable to the instant charge preclude a finding of a violation which occurred through a continuation of the proscribed conduct during and within the six-month period prior to the filing of the charge."). Because the RLA limitations period derives from that under the NLRA, courts have applied the same principles under the RLA. *Atlas Air*, 232 F.3d at 226–27 (continuing violations doctrine applies to RLA claims just as it does to claims under Section 10(b) of the NLRA); *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 547–48 (9th Cir. 1992) (RLA claim not barred where conduct at issue "was a continuation of earlier conduct" that continued into the statute of limitations period). As the Ninth Circuit noted in *Horizon Air*: "[E]vents occurring outside the limitations period may be proven 'to shed light on the true character of matters occurring within the limitations period,' if evidence exists that is 'reasonably substantial in its own right' that the violation of the RLA upon which the plaintiff relies occurred within the period." *Id.* at 547 (citations omitted).

In *UAL v. ALPA II*, a case directly on point, the court found that the union's illegal slowdown campaign constituted a continuing violation where "the full effect of actions that began before the limitations period was not felt until ALPA initiated additional actions during the limitations period." 563 F.3d at 270. The court recognized that "[n]either action [of the multi-faceted slowdown] would have produced the same magnitude of harm as those actions did together." *Id.* As such, the Seventh Circuit determined "[t]he earlier actions shed light on the actions within the limitations period" and were, therefore, a continuing violation and not time-barred by the six-month statute of limitations. *Id.*

And Atlas' efforts since the slowdown started to engage with the Union and return its operations to normal, rather than immediately to initiate litigation, are consistent with the RLA,

which requires carriers and unions to attempt to resolve their disputes through negotiation prior

to initiating litigation.  Indeed, Section 2, First of the RLA imposes a duty upon "all carriers,

their officers, agents, and employees to exert every reasonable effort to make and maintain

agreements . . . ."  45 U.S.C. § 152, First.  This duty is not "a mere statement of policy or

exhortation to the parties"; it is an affirmative legal obligation, "enforceable by whatever

appropriate means might be developed on a case-by-case basis," including injunction.  *Chi. &*

*N.W. Ry.*, 402 U.S. at 577.  As stated above, the Supreme Court has described this duty as the

"heart" of the RLA.  *Jacksonville Terminal Co.*, 394 U.S. at 377-78.  As courts have consistently

held, "the 'over-all policy' of the RLA . . . is to encourage use of the nonjudicial processes of

negotiation, mediation and arbitration for the adjustment of labor disputes."  *Aircraft Serv. Int'l,*

*Inc. v. Int'l Bhd. Of Teamsters, Local 117*, 779 F.3d 1069, 1079 (9th Cir. 2015) (quotations

omitted).

### D.      The NLGA Does Not Prohibit Injunctive Relief In This Case.

In response to efforts to enjoin slowdowns under the RLA, unions frequently seek to

divert attention from the requirements of the RLA to the requirements of the Norris LaGuardia

Act (the "NLGA").  The NLGA, however, in no way bars an injunction.

#### 1.      The Federal Courts Have Jurisdiction To Enjoin A Violation Of The RLA, Notwithstanding The NLGA.

It is well-established that in labor disputes governed by the RLA, the more specific

provisions of the RLA take precedence over the general provisions of the NLGA.  *See, e.g., Chi.*

*& N.W. Ry.*, 402 U.S. at 581-82 n.18.  "It is clear that the substantive legal duty of 45 U.S.C.

§ 152, First, is a 'specific provision' of the RLA and, moreover, is central to the purpose and

functioning of the RLA.  Therefore, the provision takes precedence over the more general

provisions of the NLGA."  *Delta Air Lines*, 238 F.3d at 1307; *UAL v. IAM*, 243 F.3d at 362; *Bhd.*

*of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 41-42 (1957); *Bhd. of R.R.*

*Trainmen v. Howard*, 343 U.S. 768, 774 (1952); *see also Atl. Coast Line R.R. Co v. Bhd. of R.R.*

*Trainmen*, 262 F. Supp. 177, 189 (D.D.C. 1967) (finding "[i]nsofar as the Norris-LaGuardia Act

is concerned . . . it has been held on numerous occasions that where the Railway Labor Act

conflicts with the Norris-LaGuardia Act, the former prevails").  The Supreme Court has

expressly held that the federal courts have subject matter jurisdiction to enjoin a violation of the

status quo obligations under the RLA, notwithstanding the NLGA.  *See Chi. & N.W. Ry.*, 402

U.S. at 582.  Thus, the anti-injunction provisions of the NLGA do not apply.

<blockquote>

2.     <u>While The Requirement Of "Clear Proof" Under Section 6 Of The NLGA
Is Inapplicable In This Case, That Requirement Has Nevertheless Been
Satisfied.</u>

</blockquote>

Unions also frequently specifically argue that Section 6 of the NLGA requires that there

be "clear proof" that there has been authorization or ratification of unlawful conduct to hold a

union or its officers "responsible or liable" for the acts of union members.  The purpose of

Section 6, as the Supreme Court noted in *United Brotherhood of Carpenters & Joiners v. United*

*States*, is to relieve unions "from liability for damages or imputation of guilt" for the

unauthorized acts of individual officers or members.  330 U.S. 395, 403 (1947).  Thus, "it is

readily apparent that [Section 6] applies only (by its own terms) to liability for damages or

criminal responsibility," and not to requests for injunctive relief.  *Charles D. Bonanno Linen*

*Serv., Inc. v. McCarthy*, 532 F.2d 189, 191 (1st Cir. 1976); *see also Mayo v. Dean*, 82 F.2d 554,

556 (5th Cir. 1936) (Section 6 "might prevent punishment for contempt or the recovery of

damages, but clearly was not intended to apply to the issuance of an injunction to prevent future

acts of coercion in a case where such relief would be proper"); *Suffolk Constr. Co. v. Local 67,*

*United Bhd. of Carpenters & Joiners*, 736 F. Supp. 1179, 1182 (D. Mass. 1990) ("the prohibition

of § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, does not apply to injunctions but only to

claims for damages"). If the rule were otherwise, a court could never enjoin a wildcat strike, but courts clearly have the authority to do so. *See, e.g.*, *Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 416 F.2d 998 (5th Cir. 1969).

Even if Section 6 required "clear proof," however, that standard is satisfied here. Defendants have issued numerous publications confirming they have encouraged this slowdown, including in recent communications urging that pilots "SHOP," "BOOT," and "honor the CBA," all code words similar to the type that have been repeatedly recognized by courts as code to interfere with operations. It is also clear that these publications are having their intended effect because Atlas pilots are abiding by those commands.

3. The Requirement Of "Clean Hands" Under Section 8 Of The NLGA Does Not Preclude A Preliminary Injunction.

A third section of the NLGA frequently cited by unions in an attempt to avoid injunctions against illegal work actions is Section 8, which prohibits injunctive relief where the complainant "failed to comply with any obligation imposed by law which is involved in the labor dispute" or has failed to make "every reasonable effort to settle such dispute" through negotiation, mediation, or arbitration. Any such argument by IBT is without merits for two reasons.

First, the obligation under Section 8 to make "every reasonable effort to settle such dispute" has no application where the "dispute" at issue is whether the union's actions violate the RLA. If a carrier was required under Section 8 to seek to settle a dispute over the union's violation of its status quo obligations, the union would be able to ask for concessions in exchange for ending an illegal slowdown. *See UAL v. IAM,* 243 F.3d at 364, 366-67. This would "render the union's duty under 45 U.S.C. § 152, First, a nullity, and would run directly contrary to the policy rationales of the RLA's status quo provisions." *Id.* at 365. Second, even if such an obligation applied, Atlas has exerted every reasonable effort to resolve the parties'

dispute consensually, including by negotiating a protocol agreement for negotiations, engaging in good faith negotiations, and notifying Defendants repeatedly that its members were engaged in an illegal slowdown, and only filed the current action as a last resort.

## **CONCLUSION**

For the reasons set forth above, this Court should issue a preliminary injunction in the form submitted barring Defendants from engaging in the current illegal work action.

Dated:    September 25, 2017        Respectfully submitted,
             Washington, D.C.

                                          By:  _____/s/ Robert A. Siegel_____
                                              Robert A. Siegel
                                              (D.C. Bar #1004474)
                                              Michael G. McGuinness
                                              (*pro hac vice forthcoming*)

                                              O'MELVENY & MYERS LLP

                                              1625 Eye Street, NW
                                              Washington, D.C. 20006
                                              Telephone:  (202) 383-5300
                                              Facsimile:  (202) 383-5414
                                              rsiegel@omm.com

                                              400 South Hope Street
                                              Los Angeles, California 90071
                                              Telephone:  (213) 430-6000
                                              Facsimile:  (213) 430-6407
                                              mmcguinness@omm.com

                                              *Attorneys for Plaintiffs*