## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                )
ATLAS, INC., *et al.*,          )       Case No.: 1:17-cv-01953-RDM
                                )
        Plaintiffs,             )       Hon. Randolph D. Moss
                    v.          )
                                )
INTERNATIONAL BROTHERHOOD )
OF TEAMSTERS, AIRLINE           )
DIVISION, *et al.,*             )
                                )
        Defendants.             )
_____ )

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Edward M. Gleason, Jr.
(D.C. Bar No. 429325)
Chief Counsel, Teamsters Local 1224
Law Office of Edward Gleason, PLLC
910 17th Street, N.W., Suite 800
Washington, DC 20006
Ph: 202-800-0099
egleason@gleasonlawdc.com

James Petroff (Ohio Bar. No. 42476)
Trent R. Taylor (Ohio Bar. No. 91748)
BARKAN MEIZLISH, LLP
250 East Broad Street, 10th Floor
Columbus, Ohio 43215
Ph: (614) 221-4221
Fax: (614) 744-2300
jpetroff@barkanmeizlish.com
ttaylor@barkanmeizlish.com

Deirdre Hamilton
(D.C. Bar No. 472334)
Staff Attorney
International Brotherhood of
Teamsters
25 Louisiana Ave., NW
Washington, DC 20001-2198
Phone: (202) 624-6948
Fax: (202) 624-6884
dhamilton@teamster.org

*(Applications for Admission pending)*

*Counsel for Defendants International Brotherhood of Teamsters and Teamsters Local 1224*

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................ 3

III. ARGUMENT ................................................................................................ 19

    *A.   The Court Lacks Subject Matter Jurisdiction Because Plaintiffs'*
*Claims Present a "Minor Dispute" Concerning Interpretation of the*
*CBA*…… ............................................................................................................ 1920

        1.   The Carrier's Claim of a "Slowdown" is Cognizable Under the CBA ...................... 19

        2.   The Carriers Claim that the Pilots Discretionary Decisions not to Fly Fatigued,
Not to Volunteer for Open Time, and to Not to Waive Minimum Equipment List or
Other Contractual Shortcomings are Minor Disputes ................................................... 27

    *B.   The Court Lacks Subject Matter Jurisdiction over Plaintiffs' Claims*
*under Section 8 of the Norris LaGuardia Act* ....................................................... 31

    *C.   The Carrier Has Failed to Demonstrate the Essential Elements of*
*Injunctive Relief* ................................................................................................. 40

        1.   The Standard for RLA Preliminary Injunctive Relief ............................................... 40

        2.   The Carrier's Definition of the Status Quo is Erroneous .......................................... 42

        3.   The Carrier's Delay Militates Against Injunctive Relief .......................................... 50

        4.   The Carrier's Statistical Evidence of a Slowdown is Untrustworthy ....................... 52

        5.   There is No "Clear Proof" of a Violation Attributable to the Pilots Union under
NLGA Section 6 ............................................................................................................ 53

        6.   The Carrier's Anecdotal Evidence of a Slowdown is Suspect ................................. 55

        7.   The Balance of the Equities Militates Against Granting Preliminary Injunctive
Relief ............................................................................................................................. 57

    *D.   The Carrier's Request for Relief Sought is Fatally Overbroad* ............. 58

        1.   Plaintiffs' Request for an Injunction Should Be Denied Because They   Cannot
Substantiate Their Allegations as Required By NLGA Section 9 ................................. 59

i

2.   Plaintiffs' Requested Injunction is an Impermissible Prior Restraint Under the First Amendment..................................................................................................63

**IV. CONCLUSION** ............................................................................................. 68

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABX Air, Inc. v. Airline Professionals Ass'n of the Int'l Bhd. of Teamsters, Local No. 1224*, 266 F.3d 392 (6th Cir. 2001) ............................................................ 30, 32

*Air Line Pilots Ass'n v. United Air Lines, Inc.,* 802 F.2d 886 (7th Cir. 1986) ....... 53, 54

*Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069 (9th Cir. 2015) ... 38

*Aircraft Service Int'l. Inc. v. Int'l Bhd. of Teamsters AFL CIO Local 117,* 742 F.3d 1110 (9th Cir 2014) ............................................................................................ 67, 68

*Allied Pilots Ass'n v. Amer. Airlines, Inc.,* 121 F. Supp. 2d 1168 (D.D.C. 2000) ....... 42

*Alton & S. R. Co. v. BMWE*, 639 F. Supp. 220 (D. D.C. 1986) ...................................... 35

*Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006) ........................................................ 25, 26

*Ass'n of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432 (D.C. Cir. 1994) ................... 23

*Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*, 768 F.2d 914 (7th Cir. 1985) ............................................................................................................ 51

*Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33 (1963) .. 22, 24

*Bhd. of Maint. of Way Empls. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637 (8th Cir. 2001) ........................................................................................................................ 23

*Bhd. of Maint. of Way Employees Div./IBT v. Nat'l R.R. Passenger Corp.,* 217 F. Supp. 3d 249 (D. D.C. 2016) .............................................................................. 23, 24, 25

*Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R.,* 385 F.2d 581 (D.C. Cir. 1967) ........................................................................................................................ 36

*Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co.*, 353 U.S. 30 (1957) ...... 22, 34

*Bhd. of R.R. Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & W. R.R.*, 321 U.S. 50 (1944) ............................................................................................................ 36

*Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964) ............. 66

*Brown v. Illinois Central R.R. Co.*, 254 F.3d 654 (7th Cir. 2001) ................................ 24

*Burlington N. R.R. Co. v. Bhd. of Main.e of Way Employees,* 481 U.S. 429 (1987) .. 35, 48

*Central Vermont Ry. v. Bhd.. of Maint. of Way Employees,* 793 F.2d 1298 (D.C. Cir. 1986) ........................................................................................................... 33

*Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570 (1971).................... 47, 48

*Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299 (1989) .......... 22, 25, 27

*Consol. Rail Corp. v. RLEA*, 491 U.S. 299 (1989)................................................. 44

*CSX Transp., Inc. v. United Transp. Union,* 395 F.3d 365 (6th Cir. 2005)................ 28

*Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356 (D.C. Cir. 1999).......................... 42

*Delaware & Hudson Ry. Co. v. United Transportation Union,* 450 F.2d 603 (D.C. Cir. 1971) ............................................................................................................ 42

*Delmatoff, Greow, Morris Langhans, Inc. v. Children's Hosp. Nat'l Med. Ctr.,* 1989 WL 168856 (D.D.C. May 3, 1989)................................................................. 52

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001) . 31, 32

*Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142 (1969)("*Shore Line*") ................................................................................. 43, 49, 50

*Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711 (1945) .................................................. 22, 23

*Emswiler v. CSX Transportation, Inc.,* 691 F.3d 782 (6th Cir. 2012).......................... 26

*Everett v. USAirways*, 132 F. 3d 770 (D.C. Cir. 1998)........................................... 24

*Fund for Animals v. Frizzell,* 530 F.2d 982 (D.C. Cir. 1975) .......................................... 52

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994)............................................ 22

*In re Dist. No. 1—Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n (AFL–CIO)*, 723 F.2d 70 (D.C. Cir. 1983) ....................................................................................... 36

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013)............................................... 42

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Eastern Air Lines, Inc.*, 849 F.2d 1481 (D.C. Cir. 1988) .................................................................... 61

*Int'l Ass'n of Machinists v. Cent. Airlines, Inc.,* 372 U.S. 682 (1963) ........................... 24

*Int'l Bhd. of Teamsters, etc. Local 19 v. Southwest Airlines Co.*, 875 F.2d 1129 (5th Cir. 1989)(en banc) ........................................................................................ 28

*Karhani v. Meijer*, 270 F.Supp. 2d 926 (E.D. Mich. 2003)................................................ 65

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).................................. 25

*Local 553, Transport Workers Union v. Eastern Air Lines*, 695 F.2d 668 (2nd   Cir. 1982) .................................................................................................................................... 37

*Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365 (1960) .......................... 33

*Metropolitan Edison Co. v. N.L.R.B.,* 460 U.S. 693 (1983) ............................................. 28

*Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l. Union*, 239 F.3d 172 (2d Cir 2001) ............................................... 64, 65

*Miller v. United Food & Commercial Workers Union*, 708 F.2d 467 (9th Cir. 1983) 68

*Mylan Pharms., Inc. v. Shalala,* 81 F. Supp.2d 30 (D.D.C. 2000) ................................ 52

*NAACP v. Button*, 371 U.S. 415 (1963)............................................................................... 68

*NAACP v. Claiborne Hardware Co.*, 459 U.S. 898 (1982) ........................................ 66, 68

*Oakey v. U.S. Airways Pilots Disability Income Plan*, 839 F. Supp.2d 225 (D.D.C. 2012) ............................................................................................................................... 23, 26

*Office & Professional Employee Int'l Union v. PHI, Inc.*, 2012 WL 4471572 (W.D. La. 2012) .................................................................................................................................... 39

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014); *Newdow v. Bush,* 355 F. Supp.2d 265 (D.D.C. 2005). .................................... 51

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ................................... 65

*Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs,* 307 F.2d 21 (2d Cir. 1962)............. 38

*Ry. Labor Executives' Assn v. Soutger Ry. Co.,* 860 F.2d 1038 (11th Cir. 1988)......... 51

*S. Ry. Co. v. Locomotive Firemen*, 384 F.2d 323 (D.C. Cir. 1997)................................. 29

*Sherley v. Sebelius,* 644 F.3d 388 (D.C. Cir. 2011)........................................................... 41

*Union Pac. R.R. Co. v Local #1409, United Transp. Union*, No. Civ. A. 03-2600, 2004 WL 3106757 (D. Kan. Jan. 18, 2004) .......................................................................... 29

*Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89 (1978) ...................................................... 25

*United Air Lines, Inc. v. Air Line Pilots Ass'n*, 563 F.3d 257 (7th Cir. 2009).............. 31

*United Air Lines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349 (7th Cir. 2001) ....... 31

*United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)........................................................ 55

*United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.,* 434 F.2d 220 (8th Cir.1970),.............................................................................................................. 50

*Virginian Ry. v. System Fed'n No. 40*, 300 U.S. 515 (1937).......................................... 61

*Westmoreland Coal Co., Inc. v. Int'l Union, United Mine Workers of America*, 910 F.2d 130 (4th Cir. 1990) ................................................................................................. 61

*Winter v. Natural Resources Defense Council, ,*555 U.S. 7 (2008) ................................ 42

**Statutes**

29 U.S.C. § 101. .......................................................................................................... 2, 33

29 U.S.C. § 104 ................................................................................................................ 33

29 U.S.C. § 106 ................................................................................................................ 34

29 U.S.C. § 107 ................................................................................................................ 34

29 U.S.C. § 108 ................................................................................................................ 36

45 U.S.C. § 152 ................................................................................................................ 38

45 U.S.C. § 152, First,..................................................................................................... 47

45 U.S.C. § 152, Seventh................................................................................................. 43

45 U.S.C. § 153, First ................................................................................................. 25, 26

45 U.S.C. § 184 ........................................................................................................... 24, 26

45 U.S.C. § 156 ................................................................................................................ 43

**Other Authorities**

C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed.1995)..................................................................................................................... 41, 59

F. Frankfurter & N. Greene, *The Labor Injunction* 5-17 (1930)................................... 33

## I. INTRODUCTION

This is an action for preliminary injunctive relief under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA") brought by Plaintiffs Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (collectively "Atlas," the "Company," the "Carrier," or "Plaintiffs") against the International Brotherhood of Teamsters, Airline Division ("IBT" or "IBTAD") and the Airline Professionals Association of the International Brotherhood of Teamsters, Local No. 1224 ("IBT Local 1224") (collectively "the Pilots Union" or the "Union"). The IBT is the RLA exclusive collective bargaining representative of the combined craft or class of pilots at Atlas. Atlas is an air carrier under the RLA performing world-wide air cargo and military lift operations from its headquarters in Purchase, NY.

Atlas moves this Court pursuant to Fed. R. Civ. P. 65(a) for preliminary injunctive relief against the Pilots Union for allegedly engaging in unlawful self-help in breach of the RLA status quo by promoting a "slowdown" among Atlas pilots. Despite the lengthy briefing and voluminous documents presented by Plaintiffs to this Court, however, Plaintiffs have simply failed to demonstrate that any disruption of the statutory status quo has actually occurred, let alone one that has materially disrupted their operations. Rather, the instant ambush motion for injunctive relief is simply a strategic move to "leverage" the pilots in labor negotiations. Indeed, Plaintiffs' own evidence demonstrates that the new local union administration's lawful, general efforts commencing in 2015 to step up enforcement of the existing labor agreement *greatly predated labor negotiations commencing in*

1

*2016*. The Carrier fails to demonstrate that any current enforcement of the labor agreement is any different from the stricter approach taken by the new local union administration in the past. In other words, there has been no material change from that 2015 "status quo" - reducing the Carrier's claims here to a specious attempt to quell lawful union behavior.

Tellingly, rather than promptly making any claims about alteration of the status quo at the commencement of labor negotiations in 2016, the Carrier waited *twenty months* to institute this action on a disingenuous "emergency" basis, burdening this Court with its belated claims for expedited equitable relief and improperly attempting to embroil this Court in the labor relations between the parties.

At base, the Carrier presents an RLA "minor dispute" over whether an improper "slowdown" has occurred within the meaning of the labor agreement. As such, this Court has no subject matter jurisdiction to determine said minor dispute but rather it must be determined by the parties' System Board of Adjustment in arbitration. And, the Carrier has further failed to prove that the extraordinary labor injunction they seek is the sole, practical means available to them under the Norris LaGuardia Act ("NLGA"),[1] which fundamentally deprives federal courts of jurisdiction in "labor disputes" such as this one. Indeed, the Carrier's requested preliminary injunction as drafted is wholly overbroad under federal labor law and would violate the First Amendment.

---

[1] 29 U.S.C. §§101 *et seq.*

## II. STATEMENT OF FACTS

Defendants are submitting numerous declarations with this submission, all of which are comprehensive and incorporated herein by reference, and several of which are rather lengthy because they cover a lot of ground. We are doing so because Plaintiffs have alleged numerous claims against the Union and the Atlas pilots. Each of the declarants is prepared to testify at the hearing next week. For these reasons, we have declined not to burden the record with an even lengthier summary of those declarations and facts than what follows here.

1.     Plaintiffs Atlas Air, Inc. (Atlas) and Polar Air Worldwide Cargo, Inc. (Polar) are air carriers within the meaning of the RLA, 45 U.S.C. § 181 and function as a "single transportation system" under the RLA for purposes of labor relations involving their pilot group.  Plaintiffs engage in world-wide air cargo operations from their headquarters in Purchase, New York. Their corporate histories are set forth in the attached Declaration of Captain Daniel Wells, who worked first for Polar's predecessor, then Polar and now, Polar, as a B-747 captain since 1999. Captain Wells, who is also the current president of Defendant Airline Professions Association of the International Brother of Teamsters, Local Union No. 1224 ("Local 1224"), previously served in various management positions with Polar's predecessor. See Declaration of Daniel C. Wells, attached hereto as Exhibit 35 (Wells Dec.) ¶¶ 2-5.

2.     Defendant International Brotherhood of Teamsters and its Airline Division (the "IBT;" together with Local 1224, the "Union"), is a labor organization

3

and is the exclusive bargaining "representative," as such term is defined by Section 1, Sixth of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, Sixth, of the pilots employed by Defendants.  The National Mediation Board ("NMB") certified the IBT as the exclusive representative of the craft or class of Pilots in the employ of the Defendants as a single employer on December 22, 2008 in Case No. R-7174. The IBT has delegated to Local 1224 the exclusive responsibility of providing day-to-day representation to the IBT-represented pilots employed by Atlas.   Daily representative responsibilities for the Atlas pilots are managed by a five-person board known as the Atlas Pilots Executive Council (the "Atlas EXCO").  See Declaration of Captain Robert Kirchner, attached hereto as Exhibit 2 ("Kirchner Dec.") ¶¶ 5-6.

3.     As noted above the Union was certified as the exclusive bargaining representative of Plaintiffs' pilots in late 2008.  Since 2011, Atlas and Polar have continued to operate separately under their own operating certificates and authorities but the pilots who fly their aircraft work under one collective bargaining agreement (SCBA) and one seniority list.  The SCBA was imposed on the parties by a third-party arbitrator.  Moreover, despite the fact that both Atlas and Polar are collectively referred to as the "company" under the CBA, the pilots who operate their aircraft pursuant to the SCBA are all employees of Atlas. See Wells Dec. ¶¶ 6-8; Kirchner Dec. ¶¶ 6-11.

4.    Pertinent facts concerning the bargaining relationship are set for in the declarations of Captain Wells and Captain Kirchner. See Wells Dec. ¶¶ 9-10; Kirchner Dec. ¶¶ 6-21.

A.    Of particular note here, is that the bargaining relationship between the parties since the imposition of the SCBA in 2011 has been one in which Atlas incessantly ignores, bends and even violates the SCBA whenever it considers that it is in its interests to do so.  Shortly after the SCBA was imposed in 2011, the Union and the Atlas pilots sought to work collaboratively with Atlas management to help find contractual solutions to Atlas's increasingly complex and expanding flight operations issues.  As time went on, however, the Atlas pilots became increasingly frustrated with Atlas management and concluded that Atlas was more inclined to violate the SCBA than work with them.  By mid-2014, as an industry-wide pilot supply problem grew into a looming crisis, many Atlas pilots grew so frustrated with Atlas that they began to leave in large numbers to secure better employment opportunities with other carriers.  At the same time those Atlas pilots that remained began to clamor for more effective contract enforcement by the Union. See Wells Dec. ¶¶ 9-13; Kirchner Dec. ¶ 21.

B.    In the fall of 2014, shortly before Kirchner was elected chairman of the Atlas EXCO, Captain Jeffrey Carlson who is an executive employed by Plaintiffs and their parent company, Atlas Air Worldwide Holdings, Inc. (AAWW) invited Captain Kirchner to dinner.  At that dinner, Captain Carlson told Captain Kirchner that he felt that Captain Kirchner would be elected as the next chairman

5

of the Atlas EXCO and that he wanted to know how the two of them and the Union and Atlas could work together.  Captain Kirchner told Captain Carlson that the recipe for a cooperative and professional relationship between the Union and Atlas was simple, and that he and the Union would insist on strict contract compliance by both sides, meaning by both Atlas and the Union.  Captain Kirchner explained that strict contract compliance was his top priority if he was elected chairman of the Atlas EXCO for a term commencing on January 1, 2015.  Captain Kirchner also told Captain Carlson that he recognized that strict contract compliance was a "two-way street," and that it "works both ways," meaning that he fully understood that on occasion strict contract compliance could actually work against the individual needs of certain Atlas pilots in any particular instance.  Captain Kirchner insisted that both parties had to live by the terms of the SCBA and that his priority of ensuring strict contract compliance was based in no small part on the growing frustration and resentment by the pilots towards Atlas because of Atlas's failure to honor the SCBA, especially with the increasingly chaotic scheduling changes that were disrupting the pilots' lives.  In response, Captain Carlson told Captain Kirchner that strict, bi-lateral, contract compliance "should be no problem."   By his response, Captain Kirchner understood that Captain Carlson was indeed committing to ensuring that a cooperative and mutually beneficial relationship between Atlas and the Union and Atlas pilots Union would be based on strict bilateral contract compliance. See Kirchner Dec. ¶ 22.

C.     After Captain Kirchner was elected chairman of the Atlas EXCO and assumed office on January 1, 2015, it quickly became apparent that Atlas would not honor its commitment of strictly complying with the SCBA.  As a result, the Union, which has never deviated from it's the strict contract compliance stance that it had announced starting in late 2014, was forced to continue chasing down grievances and other pilot complaints involving Atlas's contract transgressions, particularly those relating to scheduling and scheduling related matters. See Kirchner Dec. ¶¶ 23, 25.

5.     When he assumed office as chairman of the Atlas EXCO, Captain Kirchner had to grapple with two other critical points, namely, the fact that Atlas's and Polar's operations were rapidly changing and indeed transforming into very different carries than they had traditionally been and that transformation was occurring while the worldwide supply of pilots dwindled significantly, such that Atlas's and Polar's prior scheduling and staffing models were neither adequate nor even appropriate for the carriers' fast changing business models. See Kirchner Dec. ¶ 24.

A.     With respect to the carriers' rapidly changing business models, Captain Kirchner and Captain Wells on several occasions met with Plaintiffs' and AWWW's executives to discuss the problems and impact those changes were having on the pilots.  The suggested and requested the parties negotiate changes to the SCBA to accommodate the carriers' transformation into different types of carriers

than the SCBA contemplated.  Plaintiffs repeatedly reject those suggestions and requests. See Kirchner Dec. ¶ 22; Wells Dec. ¶ 9.

   B. With respect to the pilot demographic issues pertaining to the Atlas pilots, Captain Kirchner recognized that, due to the grueling and usual nature of Atlas's scheduling requirements, the Atlas pilots have limited opportunity to congregate to discuss union business.  Moreover, he recognized that even while working and flying their lines, Atlas crews are rarely paired together for more than a single leg, as their schedules and constant subsequent schedule changes fracture crew unity upon landing at their first destination.  Thus, as the operations tempo has dramatically had steadily increase at Atlas and Polar, and as younger, newly hired domestic carrier pilots who are used to more traditional and personal means of union communications were joining the Atlas ranks, the pilots were complaining about not having enough information particularly when they are working around the globe.  As a result, when he took office in January 2015, Captain Kirchner directed that the Atlas pilots' Communications Committee prepare several new methods of communication with our crewmembers.  One of the methods of communication which was developed was a podcast called the Atlas Teamsters Action Message (ATAM).  The ATAM, is produced and narrated by Captain Michael Griffith, the chairman of the Atlas pilots' Communications Committee, is an audio-broadcast parodying radio talk radio shows. Its purpose is to educate and entertain the Atlas pilots, many of whom, as previously noted, were very new pilots at Atlas, about their rights and responsibilities under the SCBA.  Captain Kirchner told the

Atlas pilots in the ATAM inaugural message that all of the Atlas pilots had to dedicate themselves to enforcing and guarding the SCBA, and that they all had to defend the SCBA and fight back against a management that was abusing contractual rights and thereby making working conditions miserable.  From that point on, the Atlas EXCO made it a top priority to educate the Atlas pilots about the terms of the SCBA and to provide them with the knowledge to know when Atlas is violating the contract and what to do about it when Atlas does violate the contract. Captain Kirchner and the Atlas EXCO made no secret about their educational program and their insistence upon strict, bilateral contract compliance, and have on numerous occasions advised Atlas management that they would not tolerate Atlas's deliberate violations of the SCBA.  As descried in greater detail in Captain Kirchner's and Captain Well's declaration, the Atlas EXCO's related programs of strict contract compliance and pilot education have continued without interruption since January 2015. See Kirchner Dec. ¶¶ ; Wells Dec. ¶ 11.

6.   As further described in Captain Well's and Captain Kirchner's declarations, Plaintiffs are as uncomfortable with a union-educated workforce as they are operating under a union contract.  In late December, while its operational weakness had become apparent, and in response to unfavorable media attention regarding those weaknesses and its potential impact on its new E-commerce partner, Amazon, Atlas sent a letter to Local 1224 accusing the Atlas pilots of engaging in a slowdown consisting of sickouts and refusal accept voluntary open time in violation of a purported past practice.   Atlas not only neglected to

substantiate its accusation but it refused to provide Local 1224 with any substantiating details even after Captains Wells and Kirchner asked for such information immediately upon receiving Atlas's demand letter.  Atlas's Captain Carlson instead said only that his bosses were upset about the recent media attention concerning Atlas' operations and Amazon.  Atlas's president, John Dietrich said only that Atlas would provide Local 1224 details at some time in the future not as part of a meeting with Local 1224 but instead in "appropriate forum," which, based on the December 17, 2016 letter, was intended only as a threat of legal action.  Six months later, Atlas's counsel told Local 1224's counsel that Atlas "knew" that the Atlas pilots were engaged in a slowdown, and asked that Local 1224's counsel tell Local 1224 that Atlas knew this and wanted Local 1224 to tell the Atlas pilots to stop it. Atlas's counsel did not explain the basis of his client's knowledge, thereby recreating a scene reminiscent of Kafka's *The Trial*.  Whatever literary or cinematic value these unsubstantiated claims and not-so-veiled threats by Atlas and their counsel certainly not arise to the level of a serious, cooperative discussion as required by the RLA to ensure that bargaining parties resolve their differences without resort to the federal courts. See Wells Dec. ¶ 17.

7.      Between June and the end of September, 2017, Atlas did not repeat its accusations of a pilot slowdown.  On September 25, 2017, however, Plaintiffs filed and served an 82-page complaint with well over a thousand pages of declarations and exhibits, including an 86-page declaration by Captain Carlson and a 95-page report by an economist with a PhD. claiming that the Union and Atlas pilots are

engaged in an illegal slowdown and seeking a preliminary injunction to stop it. As set forth in the Complaint and Motion for Preliminary Injunction, Plaintiffs claim that the alleged slowdown conduct includes: (1) more frequently calling off sick on the day of scheduling flying; (2) more frequently calling off flights because of fatigue; (3) refusing to volunteer for or accept open time (i.e., overtime) flying; (4) delaying flight departures by "Blocking Out On Time"; (5) writing up unusually high numbers of maintenance issues on aircraft; and (6) refusing to depart due to rejected crew meals.  Plaintiffs claim that the Union "designed these concerted activities to cause maximum disruption to Atlas' operation and thereby exert pressure on Atlas to capitulate in collective bargaining."  The Complaint contains numerous examples involving unnamed pilots from unidentified flights whose sick calls and fatigue calls Plaintiffs assert support their claim that the Union and the Atlas Pilots are engaged in a slowdown.  Plaintiffs also rely on their economist's report to support their claims regarding the sick and fatigue calls, as well as the four other items noted above.  See generally Complaint filed by Plaintiffs.

8.     Within the very abbreviated timeframe in which they have been afforded to defend themselves against a complaint and so-called emergency motion that clearly took many months to develop, the Union has tracked down nearly every pilot who is identified in the Complaint whose sick and fatigue calls Plaintiffs assert support their claim of a slowdown. The attached declarations from those pilots tell a very different story than Plaintiffs would have this Court believe.  The Union's research is described in the Declarations of Captain Kirchner, Captain James

11

Green, Captain Kevin McCabe and Captain Laurie Ruiz de Castilla.  The individual pilots' declarations are listed in the chart of declarations found at the end of this statement of facts. See Kirchner Dec. ¶¶ 26-27; Declaration of James Greene ("Greene Dec."), attached hereto as Ex. 24, ¶¶ 3-8; Declaration of Kevin McCabe ("McCabe Dec."), attached hereto as Exhibit 4, ¶ 26; Declaration of Lauri Ruiz de Castilla ("Ruiz Dec."), attached hereto as Exhibit 5, ¶ 8.

A.      With respect to Plaintiffs' sick call claims, a particularly memorable incident is described by an Atlas pilot, a First Officer whose declaration is attached, who explains that Plaintiffs incorrectly claimed that the Captain of the flight in question called off sick "at the absolute last possible time."  The First Officer explains that he is the one actually described in the Complaint.  He explains that the reason for his sick call was because he became nauseous while performing his pre-check duties in an un-air conditioned cockpit of the aircraft in which the temperature rose to well over 100 degrees.  The First Officer ended up violently sick and began projectile vomiting before the Captain was able to ensure that he was removed from the plane and received proper attention.   For her actions, the Captain, whose declaration is also attached, was wrongly accused by Plaintiffs in the Complaint and was "treated" the next day with the responsibility of operating the same aircraft even though Plaintiffs had not even bothered to clean up the mess.  See Declarations of Robert Molloy and Jennifer Metzler.

12

Another pilot, whose declaration is also attached, suffered from an acute attack of gout that left him hardly able to walk, let along operate the controls of an aircraft.  See Declaration of Daniel Pocock.

Another pilot, a probationary pilot who is therefore not yet able to secure full contractual protections should Plaintiffs now decide to terminate him for stepping forward in this case, explains that although he is one of the pilots identified in the Complaint accused of having improperly called off sick, he never called off sick at all on that flight. He forthrightly explains that he made a mistake reading the plane's departure time, not converting local time to "Zulu" or universal time.  His mistake caused the delay of his flight and he told Plaintiffs' scheduling department that he had made that mistake. Plaintiffs' scheduling department incorrectly marked him off, without his knowledge or consent, as "sick."   Plaintiffs are now seeking capitalize on their own mistake in this regard by using it and citing it as an example of untoward activity by the Atlas pilots and the Union.  See Declaration of Terry Glover.

Yet another pilot identified in the Complaint in support of Plaintiffs' sick call "evidence" and whose declaration is also attached, called off sick because he was distraught over recent news concerning his wife's medical condition.   See Declaration of Gonzalo Quiros-Callejon.

As the attached declarations from these pilots accused of improperly calling off sick as part of a concerted slowdown show, Plaintiffs' claims regarding an alleged concerted sick out by the pilots is patently absurd.  Captain Greene, an Atlas pilot

who is also a Union representative familiar with Plaintiffs' scheduling programs, has also submitted a declaration regarding the sick call claims set forth in the Complaint. He too describes a factual story that differs markedly from the tales spun by Plaintiffs.  The declarations by these pilots demonstrate that the sick call outs that Plaintiffs claim are evidence of a concerted sick call slowdown are in fact examples of individual pilots who simply were sick or were mischaracterized as sick by Plaintiffs. See Greene Dec.

   B. With respect to the Plaintiff's fatigue call out claims, again, the declarations filed by the pilots identified in the Complaint, as well by Captains McCabe and Ruiz de Castilla, two highly regarded and experienced Atlas captains who serve on and work with the Atlas's joint labor-management Fatigue Risk Management Committee ("FRMC"), all tell a very different story than Plaintiffs would have this Court believe. Like the declarations of pilots accused by Plaintiffs of improperly calling off sick, the pilots accused of falsely calling off fatigued did not engage in a concerted plot to disrupt Plaintiffs' operations: they each had their own, individual reasons for calling off fatigued, and all of them were legitimate. Moreover, all but two of them submitted Fatigue Reports to the FRMC and all of them were accepted as legitimate.  The two pilots who did not submit fatigue reports also explain the reasons why they called off fatigued from their flights. Their fatigue call outs, however, are no different than any of the hundreds of other fatigue call outs that have been addressed and accepted as legitimate by the FRMC. See McCabe Dec.; Ruiz Dec.; and Declarations of Amanda Kolaric, Antonio Santos,

Christopher Viertel, Conway Shaw IV, Daniel Lennox, Gerad Riester, Gregory Samson, Kristofer Lang, Mitchell Simon, Peter Baranko, Robert Bellman, Samuel Hoffman, Mike Nolting, Maria Montgomery, and Michael Griffith.

Likewise, Professor Terry von Thaden, a well-known fatigue risk expert in the aviation industry and whose report also accompanies this submission, explains the science of fatigue and its impact on real, live, human beings, not statistical data points. See Declaration of Terry L. Von Thaden, Ph.D, attached hereto as Exhibit 33.

C.     Plaintiffs rely on their economist, Dr. Lee, to prove all of their slowdown claims against the Union and accusations against the Atlas pilots.  As explained by highly regarded aviation labor economist and consultant Dan Akins's report, however, a copy of which also accompanies this submission, Dr. Lee's statistical analysis is significantly flawed.  In his report, Akins explains that "none of Dr. Lee's conclusions are logically sound, statistically valid or meaningfully impactful on the Atlas operation."  He addresses each of each of Dr. Lee's points in his detailed report, and exposes many of the flawed methods used by Dr. Lee.  See Declaration of Daniel Akins, attached hereto as Exhibit 3.

D.     Along with this submission, Defendants are also submitting a declaration from a Union representative, Captain Patrick Petersen, who explains the catering problems that have plagued Plaintiffs' operations for a very long time. He explains Plaintiffs' 2015 announcement to the Union that if any aircraft departed with improper catering, the company would not consider any follow-on

complaints about that catering to be a contractual grievance, thereby making it incumbent on the pilots who are presented with improper catering to resolve the issue before departing. Captain Petersen also describes in graphic detail several incidents over the last few years in which pilots have gotten received catered meals containing such tasty morsels as machine screws, hair and dirt on their meals. He also describes several incidents in which Atlas pilots have gotten ill from food poisoning after eating rancid meals provided by Plaintiffs catering vendors. As he explains, the catering problems at Plaintiff' airline are not new and the pilots' reactions, i.e., behavior, has not dramatically changed over the last six months, as alleged by Plaintiffs. See Declaration of Patrick Petersen, attached hereto as Exhibit 34.

E.    The Union addresses Plaintiffs' claims regarding the so-called "BOOT campaign" and the increase in the number of aircraft mechanical write-ups done by the pilots in Captain Kirchner's declaration as well as Daniel Akins' report. See Kirchner Dec. ¶ 27.D; Akins Dec. ¶ IV.E.3. Dispatcher Dennis Gerber provides background on the logistical complications raised by pilots blocking out early. See Declaration of Dennis Gerber, attached hereto as Exhibit 32. We also note that the declarations submitted by the pilots refuting Plaintiffs' sick and fatigue claims also highlight a significant number of mechanical problems with Plaintiffs' fleets, including the aircraft used by Plaintiffs to fly military passengers and cargo

F.     The Union also addresses Plaintiffs' open-time flying claims in Captain Kirchner's, Captain Wells's and Daniel Akins's report. See Akins Dec. ¶ IV.D.4-8; Kirchner Dec. ¶¶ 27.C.

G.     Finally, the Union addresses Plaintiffs' bootstrap allegations regarding various communications, some controlled by Local 1224 and other that are not, are addressed by Captain Kirchner and Captain Griffith. See Declaration of Michael Griffith, attached hereto as Exhibit 36; Kirchner Dec. ¶¶ 27.C.

The following is a list of declarants:

| Name | Ex # | Brief Description of Testimony |
|------|------|-------------------------------|
| Daniel W. Akins | 3 | Expert testimony regarding Company's statistical analysis, and airline industry. |
| Terry L. Von Thaden, Ph.D | 33 | Expert testimony regarding fatigue claims and FRMP. |
| Captain Robert Kirchner | 2 | Testimony regarding  company operations, bargaining relationship, CBA issues, slowdown allegations, communications, and Plaintiffs' failure to cooperate in attempting to resolve the current dispute prior to filing its complaint and motion |
| Captain Daniel Wells | 35 | Testimony regarding Plaintiffs' corporate background and operations, including Plaintiffs' operational changes and pilot demographic changes, bargaining relationship, Plaintiffs' slowdown claims, and Plaintiffs' failure to cooperate in attempting to resolve current |

| | | dispute without resort to federal litigation |
|---|---|---|
| Captain Kevin McCabe | 4 | FRMP and Fatigue callout claims |
| Captain Laurie Ruiz de Castilla | 5 | FRMP and Fatigue callout claims |
| Captain Patrick Petersen | 34 | Crew meals claims |
| Captain James Greene | 24 | Sick callout claims overview |
| Dennis Gerber | 32 | Dispatch and delayed departure claims |
| Captain Michael Griffiths | 36 | Fatigue callout claims and communications |
| Captain Peter Baranko | 6 | Fatigue callout claims |
| Captain Robert Bellman | 7 | Fatigue callout claims |
| First Officer Samuel Hoffman | 8 | Fatigue callout claims |
| First Officer Amanda Kolaric | 9 | Fatigue callout claims |
| Captain Kristofer Lang | 10 | Fatigue callout claims |
| Captain Daniel Lennox | 11 | Fatigue callout claims |
| First Officer Maria Montgomery | 12 | Fatigue callout claims |
| Captain Michael Nolting | 13 | Fatigue callout claims |
| First Officer Gerad Riester | 14 | Fatigue callout claims |
| Captain Gregory Samson | 15 | Fatigue callout claims |
| First Officer Antonio Santos | 16 | Fatigue callout claims |
| First Officer Conway Shaw, IV | 17 | Fatigue callout claims |
| Captain Mitchell Simon | 18 | Fatigue callout claims |
| First Officer Christopher Viertel | 19 | Fatigue callout claims |
| Captain Ian DePledge | 20 | Fatigue callout claims |
| First Officer Benjamin French | 21 | Fatigue callout claims |
| First Officer Edward Ojeda | 22 | Fatigue callout claims |
| First Officer Terry Glover | 23 | Sick callout claims |
| First Officer Tyson Howard | 25 | Sick callout claims |
| First Officer Robert Molloy | 26 | Sick callout claims |
| Captain Jennifer Metzler | 27 | Sick callout claims |

| First Officer Drue Overby | 28 | Sick callout claims |
|---|---|---|
| First Officer Daniel Pocock | 29 | Sick callout claims |
| First Officer Gonzalo Quiros-Callejon | 30 | Sick callout claims |
| First Officer Tai Sanchez | 31 | Sick callout claims |

## III. ARGUMENT

### A. The Court Lacks Subject Matter Jurisdiction Because Plaintiffs' Claims Present a "Minor Dispute" Concerning Interpretation of the CBA

#### 1. The Carrier's Claim of a "Slowdown" is Cognizable Under the CBA

In this action, the Carrier improperly invites this Court to hear and decide whether the Union engaged in a concerted "slowdown." The Pilots Union disputes that any such concerted "slowdown" exists. But in Section 26.X of the labor agreement, the following language expressly defines the rights of the parties on this subject as follows:

**X. PICKET LINES**

*The Union, through its Atlas Air, Inc. Executive Council, agrees that during the term of the Agreement there will not be any complete or partial strikes, picketing, slowdowns, unfair labor practice strikes, refusals to cross picket lines, sympathy strikes, work stoppages, secondary boycotts, withholding of services in whole or in part, concerted refusal to work normal overtime, or other cessation of work of disturbances economic or otherwise unless and until the parties' rights to self-help mature under the Railway Labor Act,* provided, however, that nothing herein shall be construed to limit the Union's right to engage in otherwise lawful informational picketing. This paragraph shall not alter or limit the Company's right, if any, to obtain a court order enjoining such conduct by the Union and or the Crewmembers both collectively and individually. Nothing in this paragraph shall be construed, however, to limit the rights of the Union or the Atlas Crewmembers to refuse to cross lawful strike picket lines established by or on behalf of pilots represented by any union lawfully certified or recognized pursuant to the Railway Labor Act.

(Emphasis added).

Moreover, to resolve this "slowdown" dispute, the Carrier has an express right to file a "Company grievance" under the CBA and arbitrate the matter before

the parties' System Board of Adjustment as provided in Section 20.D. That provision states as follows:

### D. COMPANY GRIEVANCES

*In the case of a grievance initiated by the Company (a "Company grievance"), the Company shall submit the Grievance to the Union in writing or by electronic mail. The Company grievance shall conform with the timeliness and formal requirements set forth in subsection 20.B.1.a, above. The Company may file a grievance only over the interpretation or application of the Agreement.* Within thirty (30) days of submission of a Company grievance, a Union official designated by the Union will meet with the Company's Vice President of Flight Operations and the Company's senior official responsible for Crewmember labor relations, or their designees, to discuss the matter. If the grievance cannot be resolved as a result of this meeting then within thirty (30) days following such meeting, the grievance may be appealed by the Company to the Board by filing a notice of appeal to the Board on or before the thirty-first (31) day following the meeting. Such appeals shall conform to the requirements set forth in 20.B.3.a., above, except the notice of appeal shall be filed with a Union official designated by the Union.

The Carrier's claims here thus fall under the express terms of the labor agreement in Section 26. The Carrier can file a grievance to resolve its claims under Section 20.D, and, by virtue of Section 21.B.3, such a "Company grievance" therefore lies within the jurisdiction of the parties' System Board of Arbitration for "final and binding" arbitration award. This Court accordingly lacks subject matter jurisdiction over this "minor" dispute. The Court is therefore precluded from reaching the merits herein.

For, under the RLA, disputes between employers and employees are characterized as either "major" or "minor" disputes. Major disputes are those that involve the formation or amendment of collective bargaining agreements. *See*

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994); *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302-03 (1989) (hereinafter "*Conrail*"); *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723-24 (1945). Minor disputes "'relate[] either to the meaning or proper application of a particular provision'" of a collective bargaining agreement, *Conrail*, 491 U.S. at 303 (quoting *Burley*, 325 U.S. at 723), "'in a particular fact situation.'" *Norris*, 512 U.S. at 252-53 (quoting *Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co.*, 353 U.S. 30, 33 (1957)).

All that is required for a dispute to be characterized as a "minor" dispute is that a party's conduct is "arguably justified" under the terms of the collective bargaining agreement. *See Conrail*, 491 U.S. at 307, 310; *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 36-39 (1963); *Ass'n of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432 (D.C. Cir. 1994) (minor dispute if "arguably justified," major only if "claims are frivolous or obviously insubstantial."). Indeed, under the RLA, "[t]here is a strong presumption in favor of finding a dispute to be minor." *Burley,* 325 U.S. at 723 (citation omitted); *Oakey v. U.S. Airways Pilots Disability Income Plan*, 839 F. Supp.2d 225, 231 (D.D.C. 2012), *aff'd*, 723 F.3d 227 (D.C. Cir. 2013), cert. denied, 134 S. Ct. 1513, 188 L. Ed. 2d 449 (2014).  "[I]f doubt arises about the classification of a dispute, the dispute is also considered to be minor." *Bhd. of Maintenance of Way Employes Div./IBT v. National R.R. Passenger Corp.,* 217 F. Supp. 3d 249 (D. D.C. 2016); *Bhd. of Maint. of Way Empls. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 639 (8th Cir. 2001).

Section 204 of the RLA, 45 U.S.C. §184, squarely places upon the parties "the

statutory duty of establishing and utilizing system, group, or regional boards of adjustment for the purpose of adjusting and deciding" minor disputes. *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.,* 372 U.S. 682, 686 (1963). The RLA requires that such boards hear and decide minor disputes to minimize "interruptions in the Nation's transportation services by strikes and labor disputes." *Id.* at 687. As a result, the courts have no jurisdiction over minor disputes, which must be submitted to a contractual grievance process, and, absent resolution, to binding arbitration before a system board of adjustment established pursuant to RLA Section 204. *Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R.*, 373 U.S. 33, 36-38 (1963); *Brown v. Illinois Central R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001); *Everett v. USAirways*, 132 F. 3d 770 (D.C. Cir. 1998) (ERISA claim preempted as minor dispute); *Bhd. of Maintenance of Way Employees Div./IBT v. National R.R. Passenger Corp.,* 217 F. Supp. 3d 249 (D.D.C. 2016); *see also Conrail*, 491 U.S. at 303-04.

As this Court recently held in *Brotherhood of Maintenance of Way Employees Division/IBT v. National Railroad Passenger Corporation*:

> "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute ...." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Congress has the "prerogative to restrict the subject-matter jurisdiction of federal district courts" based on the types of claims brought by particular plaintiffs. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 n.11, 126 S. Ct. 1235, 163 L.Ed.2d 1097 (2006). Congress has restricted the subject-matter jurisdiction of courts adjudicating certain cases under the RLA. *See* 45 U.S.C. § 153 First (q); *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978); *accord Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 304, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). When it comes to

"minor disputes" under the RLA—which concern the interpretation of contractual rights—the district courts have only limited review after the National Railroad Adjustment Board has issued an arbitral decision. *See Consol. Rail Corp.*, 491 U.S. at 302–04, 109 S.Ct. 2477.

*Id.* at 255.

The D.C. Circuit has squarely held that the RLA, in its provisions on mandatory arbitration in 45 U.S.C. § 184 and 45 U.S.C. § 153 pertaining to railroads and airlines, respectively, "clearly states" that the arbitration requirement is jurisdictional, expressly " 'speak[ing] in jurisdictional terms.' " *Oakey v. U.S. Airways Pilots Disability Income Plan,* 723 F.3d 227 (D.C. Cir. 2013)(applying *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006), and expressly rejecting the Sixth Circuit's opinion in *Emswiler v. CSX Transportation, Inc.,* 691 F.3d 782, 788 (6th Cir. 2012), the only circuit decision to hold that RLA Section 204's arbitration requirement is not jurisdictional).

Plainly, then, the issue of whether the Pilots Union engaged in any "slowdown," or "withholding of services in whole or in part," or "concerted refusal to work normal overtime," or "other cessation of work of disturbances economic or otherwise" under CBA Section 26.X is an issue expressly committed by the parties to arbitration before the System Board of Adjustment. Moreover, the Pilots Union's position that 1) no such slowdown occurred, 2) stricter enforcement of the agreement became the new status quo practice of enforcement under the CBA, 3) the Carrier acquiesced to this practice, 4) and that its members were privileged to do so, serve as an "arguably justified" bases under the terms of the collective bargaining agreement so as to render the dispute "minor." *Conrail*, 491 U.S. at

307.

Fundamentally, the System Board of Adjustment must also determine if CBA Section 26.X permits concerted activity *after* "the term of the Agreement" (which has concededly passed here) and, correlatively, whether by virtue of this prohibition on such activity predicated on the "duration"[2] of the agreement, the Carrier waived the statutory right to insist on maintenance of the status quo, or to an injunction, after this period. *See, Int'l Bhd. of Teamsters, etc. Local 19 v. Southwest Airlines Co.*, 875 F.2d 1129, 1133 (5th Cir. 1989)(en banc)(waiver of 45 U.S.C. § 152, First statutory right to mid-term bargaining subject to minor dispute

---

[2] The "term of the agreement" under Section 26.X is governed by the CBA duration clause which states:

> SECTION 34: DURATION
>
> *This Agreement shall become effective* [the date the arbitration award is signed by the arbitrator and received by the parties] *and shall continue in force and effect* until [five years from the date the effective date of the Agreement] and shall renew itself without change thereafter, *unless written notice by either party of intended change is served in accordance with Section 6*, Title I of the Railway Labor Act, as amended, no more than two hundred and seventy (270) days prior to or any time thereafter.

> (Emphasis added).

Arguably, the language proscribing self-help during the "term of the agreement" in CBA implies that self-help *after* the "term of the agreement" is permissible, as it is in the NLRA context. This is especially true because under the RLA, labor agreements do not have a "term" but are instead simply amendable. The Pilots Union negotiated a "term" which limits the duration of the prohibition on self-help. Here, since a Section 6 notice was concededly sent by the Pilots Union, the "duration" of the CBA ended. The System Board must determine if the Carrier waived its right to insist on no self-help after the "term of the agreement" ended. This is simply a matter of contract interpretation.

"arguably justified" test, and not to the NLRA "clear and unmistakable waiver" test of *Metropolitan Edison Co. v. N.L.R.B.,* 460 U.S. 693, 707–08 (1983)). *See also, CSX Transp., Inc. v. United Transp. Union,* 395 F.3d 365, 369 (6th Cir. 2005) (waiver of statutory right to RLA Section 6 bargaining a "minor" dispute).

Lastly, the System Board of Adjustment must also determine whether the Carrier's failure to file a timely grievance renders its claims time barred under the CBA as well. It is no wonder that having failed to advance it rights timely under the CBA, that the Carrier seeks another "bite of the apple" with this Court.

All of these arguably justified Pilots Union claims and defenses under the terms of the CBA are "minor disputes" that are confined to the exclusive jurisdiction of the parties' System Board of Adjustment. On this basis alone, the Court must dismiss the request for preliminary injunctive relief on jurisdictional grounds.

### 2. The Carriers Claim that the Pilots Discretionary Decisions not to Fly Fatigued, Not to Volunteer for Open Time, and to Not to Waive Minimum Equipment List or Other Contractual Shortcomings are Minor Disputes

Moreover, courts have repeatedly recognized that under the "minor dispute" regime of the RLA, they lack subject matter jurisdiction to hear these types of Carrier claims. For instance, in *Union Pac. R.R. Co. v Local #1409, United Transp. Union*, No. Civ. A. 03-2600, 2004 WL 3106757 (D. Kan. Jan. 18, 2004), the court rejected a claim that Section 2, First of the Act had been violated and denied injunctive relief where the carrier sought to require the union to prevent its members from making "excessive use" of discretionary time off on weekends and holidays in violation of agreed upon "staffing requirements." *Id.* at *1 The court

found that the "requested relief goes directly to the merits of this 'minor dispute'" and that it "lack[ed] subject matter jurisdiction over such claims." *Id.* at *4 (citing *S. Ry. Co. v. Locomotive Firemen,* 384 F.2d 323, 329 (D.C. Cir. 1997)).  The court explained that this doctrine "elevates the concept of exhaustion of administrative remedies to a jurisdictional plane in requiring judicial abstention from labor disputes that may only involve interpretive questions reserved for the Adjustment Board." *Id.*

Here, Plaintiffs' Section 2, First claim rests heavily upon Plaintiffs' challenge to the Union's long-standing, educational efforts to inform the pilots it represents of their rights and responsibilities under the CBA and to oppose aviation safety and contractual waivers. As well, the Union has for years prior to the current Section 6 bargaining advised the Atlas pilots that the contract's voluntary open time provision is not intended to provide Atlas with a means to avoid proper scheduling and staffing.  In response, Atlas attempted to adjust its scheduling, hiring and manpower planning, apparently accepting the Union's interpretation rather than challenging it through the grievance process, which the Company has the right to do under Section 20.A. and D. of the CBA.  The Union has also repeatedly advised the Atlas pilots that individual pilot waivers can lead to erosion of the present contract and safety requirements, and Plaintiffs have never challenged that point through the grievance-arbitration process.

Moreover, in the present case, as in *ABX Air, Inc. v. Airline Professionals Ass'n of the Int'l Brotherhood of Teamsters, Local No. 1224*, 266 F.3d 392, 398 (6th

Cir. 2001), the Court should deny the carrier's injunction request because there has been no "concerted interruption of operations," but merely "higher operational costs incurred by the necessary exercise of contract provisions."  Plaintiffs rely on the supposed additional costs they have assertedly incurred rather than any actual disruption to Atlas operations that have resulted from the pilots' election not to volunteer for overtime flying and their refusal to fly sick or fatigued or to waive Minimum Equipment List and contractual shortcomings.  These safety, overtime flying and no-waiver issues present minor disputes, which fall within the exclusive jurisdiction of the grievance-arbitration process.

Plaintiffs rely heavily on decisions from the Seventh and Eleventh Circuits to support their claim for injunctive relief under Section 2, First. *United Air Lines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349 (7th Cir. 2001); *United Air Lines, Inc. v. Air Line Pilots Ass'n*, 563 F.3d 257 (7th Cir. 2009); and, *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001).  In the first case, however, the union made no  argument that it had a "write-up" policy that was a long-standing interpretation of the collective bargaining agreement left unchallenged by the carrier.  *IAM*, 243 F.3d 349.  And in the two cases against ALPA, the courts rejected that union's argument that concerted refusal to accept overtime gave rise to a minor dispute, finding an "implicit" understanding behind the contract that there would always be some number of pilots who would accept overtime.  *See, e.g., Delta*, 238 F.3d at 1302-03, 1307.  Here, by contrast, the Defendants' positions have been well   known   for   several   years,   and   Atlas   has   attempted,   albeit

unsuccessfully, to adjust its staffing, hiring and scheduling models accordingly. *Moreover, in none of the cases upon which the Carrier relies did the employer have an express provision of the labor agreement providing for arbitration over the contested union actions, as here.*[3]

Because the underlying disputes over voluntary overtime and the pilots' refusal to waive FAA safety standards and contractual requirements present minor disputes outside the Court's jurisdiction, the present disputes fail to support Plaintiffs' Section 2, First claim. *ABX Air*, 266 F. 3d at 398.

### B. The Court Lacks Subject Matter Jurisdiction over Plaintiffs' Claims under Section 8 of the Norris LaGuardia Act

NLGA, Section 1 provides:

### § 101. Issuance of restraining orders and injunctions; limitation; public policy

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101.

In *Central Vermont Ry. v. Broth. of Maintenance,* 793 F.2d 1298, 1299 (D.C. Cir. 1986), the D.C. Circuit chronicled the history and purpose of the NLGA, as follows:

In the early decades of this century, the federal courts undertook the task of abating labor unrest, using various federal and state law

---

[3] It is highly unusual in an RLA labor agreement in the airline industry to have a "no strike" clause.

doctrines to enjoin workers from participating in concerted activities viewed as wrongful. *See* F. Frankfurter & N. Greene, *The Labor Injunction* 5-17 (1930). The choices about desirable public policy that judges necessarily made in applying these legal doctrines to the world of labor relations, however, came to be widely viewed as an exercise in judicial activism. The Congress, "intent upon taking the federal courts out of the labor injunction business," *Marine Cooks & Stewards v. Panama S.S. Co.,* 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960), responded with the Norris-LaGuardia Act, Pub. L. No. 72-65, 47 Stat. 70 (1932) (current version at 29 U.S.C. §§ 101-115 (1982)). The Act, a singularly powerful instrument, withdrew the federal courts' jurisdiction to enjoin numerous forms of self-help "in any case involving or growing out of any labor dispute...." 29 U.S.C. § 104 (1982).

Thus, the NLGA prohibits courts from issuing injunctive relief in labor disputes. *Int'l Ass'n of Machinists v. Street,* 367 U.S. 740, 772 (1961) ("The [NLGA] expresses a basic policy against the injunction of activities of labor unions."). The NLGA also generally prohibits a court from holding a union responsible for illegal acts of the union members. 29 U.S.C. § 107(a) ("[N]o injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the ... organization making the threat or committing the unlawful act or actually ratifying the same after actual knowledge thereof."); 29 U.S.C. § 106 ("No ... organization shall be held responsible or liable ... for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."). The NLGA also prescribes procedural rules for civil proceedings in which an employer seeks an injunction or TRO against its employees. For an injunction, live testimony with opportunity for cross-examination is normally required after proper notice. 29 U.S.C. § 107.

Although the prescriptions of the NLGA are clear, the NLGA "cannot be read alone in matters dealing with railway disputes." *Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co. ("Chicago River"),* 353 U.S. 30, 40 (1957). Rather, "[t]here must be an accommodation of [the NLGA] and the [RLA] so that the obvious purpose in the enactment of each is preserved." *Id.* Thus, while the NLGA usually deprives federal courts of jurisdiction in general categories of labor disputes, federal courts retain jurisdiction "to enjoin compliance with various mandates of the [RLA]." *Int'l Ass'n of Machinists v. Street,* 367 U.S. 740, 772 (1961). However, this exception for the RLA is limited, and an injunction usually may lie only if, in addition to violation of a specific principle of the RLA, an injunction is the sole practical, effective means of enforcing the Act. *See Burlington N. R.R. Co. v. Bhd. of Maintenance of Way Employees,* 481 U.S. 429, 446 (1987); *Alton & S. R. Co. v. BMWE*, 639 F. Supp. 220 (D. D.C. 1986).

Thus, Section 8 of the NLGA, 29 U.S.C.A. § 108, provides:

### § 108. Noncompliance with obligations involved in labor disputes or failure to settle by negotiation or arbitration as preventing injunctive relief

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, *or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.*

The D.C. Circuit has recognized that strict enforcement of Section 8 does "not trammel, but ... rather further[s] the effectuation of that Railway Labor Act, for it ensures compliance by complainant carrier or union which cannot seek an

injunction until and unless it has discharged the obligations imposed by the Railway Labor Act." *Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R.,* 385 F.2d 581, 614 (D.C. Cir. 1967); see also *In re Dist. No. 1—Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n (AFL–CIO)*, 723 F.2d 70, 80 (D.C. Cir. 1983).

Section 8 of the NLGA thus places a heavy burden on parties seeking a court injunction in lieu of arbitration, mediation or agency action. It denies equitable relief to "any complainant who has failed to comply with any obligation imposed by law … or who has failed to make *every reasonable effort* to settle such dispute either by negotiation or with the aid of any available government machinery of mediation or voluntary arbitration." 29 U.S.C. § 108 (emphasis supplied). This section's burden is often referred to as the "clean hands" requirement, although it broadens the traditional equitable mandate; in addition to fulfilling its legal obligations, the moving party "must also go beyond them and make all reasonable effort" including trying to resolve the dispute through negotiation, mediation and arbitration.   *Bhd. of R.R. Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & W. R.R.*, 321 U.S. 50, 57 (1944).   Where they are available, in fact, all three methods must be attempted to resolve the dispute before an injunction may be sought. *Id.* at 58. (holding that the three resolution methods are to be employed "conjunctively or successively" not "singly or alternatively"); *see also Local 553, Transport Workers Union v. Eastern Air Lines*, 695 F.2d 668, 679 (2nd  Cir. 1982)(finding movant union met Section 8's requirements by "participat[ing] in every statutorily mandated step," including negotiation and requesting arbitration and, further, by proffering

other "creative proposals for resolving the problem").   Thus, Section 8 ensures that injunctions are to be used only as a last resort, where that "remedy alone can effectively guard the plaintiff's right." *Int'll Ass'n of Machinists v. Street*, 367 U.S. 740, 772 (1961).

Here, the Carrier as moving party has wholly failed to meet the showing that an injunction is the sole practical, effective means of enforcing the Act. Indeed, its lack of compliance with NLGA Section 8 wholly deprives this Court of jurisdiction.

First, Atlas has failed to take the "reasonable effort" of attempting to first resolve this dispute by discussing it with or even sharing information with the union.  Though the precise requirements of this "reasonable effort" obligation may vary from case to case, there are "certain minimum steps" that are usually required:

> Unfair surprise should be avoided whenever possible. The representatives of management should meet with those of labor. Each side should listen to the contentions of the other side and each side should explain its position clearly and honestly, but not for as long a time as is customary in full-scale bargaining. In short, men of good faith must in good faith get together in a sincere effort to resolve their differences.

*Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1077 (9th Cir. 2015)(citing *Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs,* 307 F.2d 21, 41 (2d Cir. 1962). Indeed, these basic requirements are consistent with the Supreme Court's broad construction of Section 8. *Aircraft Services Int'l,* at 1077. See *Toledo,* 321 U.S. at 57 ("One must not only discharge his legal obligations. He must also go beyond them and make all reasonable effort....").

33

It is plain that the Carrier here has filed an ambush motion for injunction against the Pilots Union. The Carrier never provided the detailed report of its expert or any other evidence to the Pilots Union prior to filing suit, though this was requested to be sure. The Carrier never sought to "conference" with the Pilots Union to at least try to discuss the matter as required by 45 U.S.C. § 152, Second.[4] Rather than meeting with the Pilots Union in "good faith" with a "sincere effort to resolve their differences," the Carrier spent months amassing evidence, drafting voluminous declarations and lengthy motion papers to file with this Court. Instead of avoiding "unfair surprise" the Carrier has maximized it here. It made no effort to resolve the dispute, let alone a "reasonable effort," which is a predicate for Court jurisdiction under NLGA Section 8.

Second, as aforesaid concerning the minor dispute analysis above, the Carrier has wholly failed to avail itself of mandatory arbitration with the parties' System Board of Adjustment as required by the RLA. *See Office & Professional Employee Int'l Union v. PHI, Inc.*, 2012 WL 4471572, at *7  (W.D. La. 2012)(barring unions from seeking injunctive relief after they had refused to resolve the dispute by

---

[4] 45 U.S.C. § 152, Second provides:

**Consideration of disputes by representatives**

All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

arbitration). The Carrier's claims are patent controversies which depend upon interpretation of the express terms of the labor agreement in Section 26.X over which the Carrier can file a grievance under CBA Section 20.D and arbitrate before the parties' System Board of Arbitration by virtue of Section 21.B.3. Having failed to avail itself the remedy of arbitration, the Carrier has violated NLGA Section 8 and this Court lacks jurisdiction to hear or decide the merits herein.

Third, Atlas has not taken any action available to it, such as counseling or discipline, in the cases of the pilots cited in the various anecdotes serving as examples of alleged "slowdown" conduct.  Although Atlas now claims that the pilots who called out fatigued did so as part of a "calculated campaign to cause long delays," the relevant fatigue reports submitted pursuant to the incidents cited by Atlas were accepted by the joint labor-management Fatigue Risk Management Program Committee and none of the pilots involved received counseling or discipline in relation to the fatigue incident. Kolaric Decl. ¶ 6; Santos Decl. ¶ 6; Viertel Decl. ¶ 6; Shaw Decl. ¶ 6; Lennox Decl. ¶ 6; Riester Decl. ¶ 6; Samson Decl. ¶ 6; Lang Decl. ¶ 6; Simon Decl. ¶ 6; Baranko Decl. ¶ 6; Bellman Decl. ¶ 6; Hoffman Decl. ¶ 6; Nolting Dec. ¶ 7; Montgomery ¶ 6.  Likewise, Atlas listed a number of incidents which it described as "short notice sick calls" constituting a change in status quo behavior "that is strategically designed to cause maximum disruption. ECF Doc. 5-2, 23-25.  Despite describing these incidents as "abuse of sick leave," Atlas has not counseled nor discipline the pilots involved, let alone even contemporaneously notify the Pilots Union of the alleged misconduct. See Pocock

Dec. ¶ 5; Oberby Dec. ¶ 5; Quiros-Callejon Dec. ¶ 5; Molloy Dec. ¶ 5; Howard Dec. ¶ 5; Metzger Dec. ¶ 5. Sanchez Dec. ¶ 5.

Because the Carrier has not made reasonable efforts to resolve the dispute by conference, discussion or administrative means, the Court lacks jurisdiction to hear and decide this case on the merits.

### C. The Carrier Has Failed to Demonstrate the Essential Elements of Injunctive Relief

#### 1. The Standard for RLA Preliminary Injunctive Relief

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.' " *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008)); see also *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.") (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed.1995)(emphasis original; quotations omitted).

Under the RLA in this circuit, a plaintiff's request for a preliminary injunction can only be granted if the plaintiff proves: (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction. *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360 (D.C. Cir. 1999); *Allied Pilots Ass'n v.*

*Amer. Airlines, Inc.,* 121 F. Supp. 2d 1168 (D.D.C. 2000); *Delaware & Hudson Ry. Co. v. United Transportation Union,* 450 F.2d 603 (D.C. Cir. 1971).

Further, the Supreme Court has held that a court may not issue "a preliminary injunction based only on a *possibility* of irreparable harm ... [since] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, ,*555 U.S. 7, 22 (2008) (emphasis added). *See also In re Navy Chaplaincy,* 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof that all four prongs of preliminary injunction standard be met before injunctive relief can be issued). Thus, the plaintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an "extraordinary remedy."

### 2. The Carrier's Definition of the Status Quo is Erroneous

Plaintiffs' submissions rest almost entirely on a proposition they assert repeatedly, but which is nevertheless in error. They contend that the Railway Labor Act, 45 U.S.C. Sections 151, *et seq.* ("the RLA"), imposes a duty on the employees in a class or craft during collective bargaining to continue their previous "behaviors" until the exhaustion of Section 6 of the RLA's processes, processes which the U.S. Supreme Court has infamously described as "almost interminable." *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 150 (1969)("*Shore Line*"). Plaintiffs' preliminary injunction brief, at 60, alleges that the

Atlas pilots have improperly engaged in status quo[5] "changes in behavior" after their bargaining agent served its RLA Section 6 notice initiating the process to modify the parties' collective bargaining agreement.

To be sure, courts have extended these RLA provisions to apply to unions to some extent. *See Consolidated Rail Corp. v. RLEA*, 491 U.S. 299 (1989). Plaintiffs have gone a bridge too far, however, in arguing that pilots must continue to waive Minimum Equipment List and contractual requirements, to fly fatigued and to volunteer for overtime flying because some did so years ago, even when management has more recently short-staffed the airline to the pilots' breaking point, dishonored its contractual obligations to the pilots and opted for litigation instead of good faith bargaining in the process for obtaining an updated collective bargaining contract.

Indeed, the gravamen of Plaintiffs' complaint is that union leaders and individual pilots are continuing an effort to strictly enforce their existing collective

---

[5]   It is noteworthy, at the outset, that the RLA does not contain the terms "major dispute," "minor dispute" or "status quo" anywhere in its text.  Instead, the distinction between "major" and "minor" disputes and the phrase "status quo" were adopted by the judiciary.   *See Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711 (1945). Significantly, the "status quo" phrase derives from RLA provisions, the actual terms of which apply only to carriers.

In reality, Section 6, 45 U.S.C. Section 156, states that during bargaining "rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon ...." Likewise, Section 2, Seventh, 45 U.S.C. Section 152, Seventh, similarly requires that during collective agreement negotiations for an amended contract, "[n]o carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements or in section 156 of this title."

bargaining agreement **that began prior to RLA negotiations with the full knowledge, consent and participation of Plaintiffs' senior management.** Exhibit 2 ("Kirchner Dec."). ¶22. As described in Captain Kirchner's Declaration, Mr. Carlson not only failed to object to the union's stated goal of strictly holding Plaintiffs to the terms of the 2011 labor contract, Plaintiffs, through Mr. Carlson, informed the union that it would do the same with respect to its dealings with pilots and the union.   Exhibit 2 ("Kirchner Dec."). ¶22.   There is nothing unfair about the understanding reached between Mr. Carlson and Captain Kirchner.   Collective bargaining agreements set forth all of the material terms and conditions of employment between an employer and employees. Those terms are meant to be followed by the parties.  By contrast, if the parties were free to pick and choose which provisions to ignore and which ones to follow when it suited their purposes, the long and arduous process of negotiating a collective bargaining agreement under the RLA would be a colossal waste of time and money.

Consistent with the above, terms like "SHOP," short-hand for "Stop Helping Out Purchase," and "BOOT," pilot-speak for blocking out on time as required by Plaintiffs' own policies and procedures (which pilots must follow under penalty of discipline) are nothing more than examples of pilot vernacular for refusing to allow the Plaintiffs to twist or violate the collective bargaining agreement just because the parties are now negotiating a new labor contract.  Exhibit 2 ("Kirchner Dec."). ¶¶, 22, 27D.   Use of such terms and similar language in communications with and between union members does not convert lawful activity into a violation of the

Railway Labor Act.  *Contra* the Plaintiffs, the suggestion that the union must cease and desist efforts to strictly enforce the labor agreement during contract negotiations is as absurd as the notion that Plaintiffs must forego their right to insist that pilots pay their share of insurance premiums simply because the parties have exchanged proposals over amendments to their existing labor agreement. Similarly, arguing that pilots must "help" the Plaintiffs by doing more than is required under their current labor contract before a new one is negotiated is no more defensible than the union demanding that management increase pilot pay now before the parties complete contract negotiations.  Given Plaintiffs' pre-contract negotiations pledge to operate according to the principle of strict contract compliance, one must conclude that Plaintiffs are engaged in an effort to use this Court's remedial authority for an improper purpose.As Mr. Kirchner explains in his Declaration, strict enforcement of the current contract,  refusing to grant the other party variances,  and opposing the cutting  of secretive, non-contract compliant deals in circumvention of the labor agreement, such as open time assignments that violate seniority rights, creates pressure and leverage **on both sides** of the bargaining table.  Exhibit 2 ("Kirchner Dec."). ¶25.   But that form or pressure and leverage is completely lawful and necessary to the good faith bargaining process process under the RLA.  If either party is free to ignore the terms of the existing contract in favor of lax enforcement or the unilateral establishment of new terms and conditions of employment through twisting the meaning  and application of existing language or toppling long standing practices, there is simply no reason to

commit to bargaining in good faith over a new labor contract.   A rational party would conclude that it is more expeditious to attempt to obtain changes away from the bargaining table.   By petitioning this Court to enjoin the Union's effort to strictly enforce the existing contract and by requesting that this Court effectively order pilots to "help" the Plaintiffs beyond what is required of them under their current, legally enforceable employment contract, the Plaintiffs are doing more than trying to trample on union and pilots' RLA-protected right to demand compliance with their current collective bargaining agreement – **Plaintiffs are  attempting to use the Court to obtain an unfair advantage in collective bargaining negotiations over a new contract.**

If the union is muzzled and prevented from encouraging its members to hold management to the bargain it struck in negotiations over the 2011 contract, then there is no reason to expect a new contract anytime soon.   Rather, management will have achieved the ultimate advantage in negotiations.   The union will be reduced to prioritizing the avoidance of contempt fines above all other considerations and Plaintiffs will be free to seek operational improvements and efficiencies by cutting the corners of the existing contract and exploiting pilot fear of retaliation for continuing to demand that management comply with the 2011 collective bargaining agreement that the entire pilot group seeks to improve. Injunctive relief in this case will not aid good faith negotiations; it will irrevocably and fundamentally alter the balance of bargaining power in favor of the Plaintiffs and, thereby, undermine the possibility of good faith negotiations going forward.

In ruling that the obligations imposed by Section 2, First, 45, U.S.C. § 152, First, were enforceable by injunction to prevent bad faith bargaining, *Chicago & North Western Ry. v. United Transp. Union*, 402 U.S. 570, 579, n. 11 (1971) (internal quotations and citations omitted), the court emphasized that "great circumspection should be used in going beyond cases involving desire not to reach an agreement for doing so risks infringement of the strong federal labor policy against interference with the substantive terms of collective bargaining agreements." For, "the vagueness of the obligation under Section 2, First could provide cover for a freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place." *Id.*, at 583. Plaintiffs' arguments pile vagueness upon vagueness, inviting this Court, contrary to the commands of the U.S. Supreme Court, to intervene in supervising the tiniest details of the parties' relations over the course of the last twenty months of bargaining.

Again, in *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 451-52, n. 15 (1987), the court reaffirmed its narrow interpretation of the judiciary's role in RLA bargaining disputes. There, the court rejected a carrier's contention that Section 2, First, implicitly authorized the issuance of an injunction to prohibit striking workers from engaging in secondary picketing. *Id*. Such conduct would have been unlawful under Section 8(b)(4)(B) of the Labor-Management Relations Act, 29 U.S.C. Section 158(b)(4)(B), if that law applied. However, the court nonetheless explained that the carrier's argument was faulty because it was asking the court not only to infer that a statutory duty to

42

refrain from secondary picketing was so vital to the RLA that the courts should enforce it by injunction, "but also that such a duty exists." *Id.*

Here, likewise, the carriers are seeking a judicial determination that a craft or class of airline employees must scrupulously maintain the entire range of "behaviors" in which they had engaged prior to initiating bargaining. And they are further contending that such a duty, if it exists, is so central to the Section 2, First, obligation to bargain in good faith that it justifies federal court intervention, by injunction, in the bargaining process. Plaintiffs argue that whatever can be characterized as a pre-bargaining "behavior" of an entire craft or class of a carrier's employees remains frozen throughout the "almost interminable" RLA process of achieving an amended CBA. *Detroit and Toledo Shore Line R.R.*, 496 U.S. at 150. And they further argue that this extensive and vague duty that they thus assert is so critical to the RLA that the judiciary should overcome the well-established presumption against intervention in labor-management bargaining to enforce by injunction the ill-defined and virtually boundless contours of their supposed RLA duty. We submit that Plaintiffs' contentions in this regard go beyond the reach of the RLA and should be rejected. There is nothing in the RLA that requires pilots to maintain peak performance, let alone the same performance of duties during the bargaining period. Indeed, in a case like this one where the Carrier has undertaken a period of massive expansion with chronicled staffing and scheduling issues, it is impossible for pilots to match the same performance as previously existed during prior periods of airline stability.

Rather, in *Shore Line*, the Supreme Court defined the "status quo" as the contract, objective working conditions and past practices between the parties, excluding any idea that there was a "behavioral status quo" which the employees had to maintain. The Court wrote:

> the mere fact that the collective agreement before us does not expressly prohibit [certain conduct] would not have barred the [employer from engaging in that conduct] if, apart from the agreement, such [conduct] had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions.

396 U.S. at 153-54, 90 S.Ct. at 301.

An "established practice" under the Act should demonstrate not only a pattern of conduct but also some kind of mutual understanding, either expressed or implied. Among the factors one might reasonably consider would be the mutual intent of the parties, their knowledge of and acquiescence in the prior acts, along with evidence of whether there was joint participation in the prior course of conduct, all to be weighed with the facts and circumstances in the perspective of the present dispute. *United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.,* 434 F.2d 220, 222-23 (8th Cir.1970), *cert. denied,* 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971).

Here, the Carrier has not established any binding "past practice" regarding any of the alleged pilot "behaviors" herein. There is no evidence of a "mutual understanding" that pilots were to maintain any certain level of sick time usage, fatigue leave usage, open time flying, acceptance of crew meals, block out time or any other of the complaints the Carrier lodges here.

The Eleventh and Seventh Circuit *Delta* and *United* decisions, discussed above, are not binding upon this Court, and we respectfully submit that the Sixth Circuit's *ABX* decision should instead be followed in the case at bar.

### 3.  The Carrier's Delay Militates Against Injunctive Relief

A six-month statute of limitations applies to claims brought under Section 2, First of the RLA. *See Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*, 768 F.2d 914, 919 (7th Cir. 1985).  For example, in *Ry. Labor Executives' Assn v. Soutger Ry. Co.,* 860 F.2d 1038, 1045 (11th Cir. 1988), the union's failure for over six months to object to a carrier's implementation of a new urinalysis policy precluded its claim for a violation of the *status quo.*

Moreover, "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014); *Newdow v. Bush,* 355 F. Supp.2d 265, 292 (D.D.C. 2005). The D.C. Circuit has found that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm. *See Fund for Animals v. Frizzell,* 530 F.2d 982, 987 (D.C. Cir. 1975); *Mylan Pharms., Inc. v. Shalala,* 81 F. Supp.2d 30, 44 (D.D.C. 2000) (noting that delay of two months in bringing action for injunctive relief "militates against a finding of irreparable harm"); *Delmatoff, Greow, Morris Langhans, Inc. v. Children's Hosp. Nat'l Med.*

45

*Ctr.,* 1989 WL 168856, at *3 (D.D.C. May 3, 1989) (finding, in trademark action, that "a substantial delay in moving for a preliminary injunction indicates that no irreparable harm will result if such relief is denied").

Here, the Carrier's own expert evidence claims that there was a clear spike in pilot behavior evidencing a "slowdown" right after the Section 6 notice was filed at the beginning of 2016. That was more than twenty months ago! The Carrier has offered no excuse for the delay.

Accordingly, the Court should reject the Carrier's argument that it will suffer irreparable harm absent preliminary injunctive relief.

### 4. The Carrier's Statistical Evidence of a Slowdown is Untrustworthy

To be sure, under the RLA statistical evidence alone is insufficient to prove that unlawful self-help has occurred. *Air Line Pilots Ass'n v. United Air Lines, Inc.,* 802 F.2d 886, 906 (7th Cir. 1986). Here, the Carrier's expert evidence is simply neither trustworthy nor probative.

As chronicled in the detailed Declaration of Pilots Union expert Dan Akins, the Carrier's expert report by Dr. Darin Lee is fatally flawed. In it, Dr. Lee flagrantly fails to account for operational issues at Atlas that predate the Pilots Union's RLA Section 6 Notice including *admitted* dramatic growth and change in the very business of the Atlas operation. Dr. Lee's failure to adequately define a causal relationship between observed behaviors and observed effects wholly undermines his voluminous statistical work. His analysis is not an objective, but instead ignores impartial analytical practice and manicures the available data. He

invented non-existent measures, and employed a range of statistical analysis geared to support his assertion that the sole cause of changes in observed pilot behavior was Union orchestration commencing with Section 6 pilot contract negotiations on February 16, 2016." Akins Dec. ¶ . There is no reason to believe that operational issues at Atlas have been caused by pilot behavior or orchestrated in any way by the Union.  The company's poor on-time performance predates the Union's Section 6 notice, as do nearly all other behaviors "identified" by Dr. Lee.  Dr. Lee thus fails to establish a convincing relationship between alleged pilot behavior and operational impacts or customer goodwill.  In reality, the vast majority of operational problems at Atlas are the result of rapid growth, a changing route structure and operational profile, combined with a management failure to properly invest in adequate capacity to service customer requirements." Akins Dec. ¶ II.D.

Further, as explained in the Akins Report, Dr. Lee has not shown that Atlas' pilots have been declining to volunteer for open time, have been intentionally delaying departures, or have been increasing maintenance write-ups, as part of a concerted slowdown since February 2016. Akins Dec. ¶ III.

The Carrier has failed to prove that it is substantially likely to succeed on the merits and thus, this Court should deny its motion.

## 5. There is No "Clear Proof" of a Violation Attributable to the Pilots Union under NLGA Section 6

In order to establish that section 6 of the Norris-LaGuardia Act does not insulate the IBT, the Carrier was required to show by "clear proof" the IBT's involvement with alleged slowdown activities abuse. *Air Line Pilots Ass'n v. United*

*Air Lines, Inc.,* 802 F.2d 886, 900 (7th Cir. 1986). The clear proof standard requires the Carrier to prove by clear and convincing evidence, as opposed to a preponderance, the Pilots Union's involvement in an improper slowdown. *Id.* (citing *See United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)).

Here, while the Carrier has some evidence that union officials made stray comments to the pilot group about how strict enforcement of the CBA affects labor negotiations, such evidence is not conclusive, nor even probative of a slowdown here. First, the evidence is abundant that the Pilots Union's efforts to step up enforcement of the CBA commenced when the new local union administration came into office in 2014, twenty months before the RLA Section 6 notice was even sent. The Pilot's Unions innocuous references to negotiations were simply a continuation of its lawful status quo enforcement of the CBA. There is no evidence that such comments had any impact on the pilot group. Akins Dec. ¶ II.D. Second, such status quo enforcement of the CBA which went unchallenged by the Carrier before the statute of limitations period here, must be viewed if at all as the status quo, lest the Carrier be rewarded for slumbering on its rights in equity. Third, since the Carrier has failed to evidence any material change emanating from said stray comments, let alone that it suffered any harm from them, the Court must find that there is no causal connection to a violation. Id. Last, there is no evidence that the stricter enforcement objective of the Pilots Union was unlawful as it concededly was made to "make and maintain" an agreement with the Carrier under RLA Section 2, First;

not to avoid an agreement or to try to impose unlawful or non-mandatory terms under RLA Section 6.

The Court must conclude that the Carrier has not met its burden to show that it is substantially likely to succeed on the merits that the Pilots Union instigated and unlawful slowdown under the clear proof standard.

### 6. The Carrier's Anecdotal Evidence of a Slowdown is Suspect

Apart from the wholesale lack of competent, credible statistical evidence of a slowdown or any material impact from Pilot Union communications discussing the strict enforcement of contractual rights as impacting labor negotiations, the Carrier has also failed to establish a concerted slowdown from the anecdotal evidence it has provided to the Court, most notable through the self-serving declaration of it executive Jeffrey Carlson. First, the Pilots Union has investigated each instance of alleged "short notice" sick call. The Carrier's claims of abuse are patently unsupported. For instance, pilot Tyson Howard was ill and an Atlas scheduler transferred him to an on-call emergency medical service provider who advised him to rest and say hydrated. See Howard Dec. at 4. Pilot Terry Glover was incorrectly marked by the scheduling department as sick. See Glover Decl at 3. Pilot Gonzalo Quiros-Callejon was distraught over his wife's cancer condition and was awarded FMLA and not in condition to operate the flight to South Korea. See Quiros-Callejon Dec. at 4. Pilot Drue Overby called off sick due to a sinus head cold, which made him tired and not fit to fly.  See Overby Dec. at 4. Pilot Daniel Pocock called out sick due to unbearable pain in his ankle, leaving him unable to put weight on that foot.

His doctor diagnosed his condition as gout and assigned medication to relieve the pain and reduce the amount of uric acid levels. See. Pocock Dec. at 4.

In each instance alleged by the Carrier, the pilot had a valid medical reason for calling off sick. Indeed, many of these pilots have medical proof from Carrier and personal health care providers of the necessity of sick leave, documenting the need to call off as they did, sometimes on short notice. The Carrier has not identified any "bogus" sick calls designed to just harass the Carrier.

Second, the Pilots Union has investigated each instance of alleged fatigue call abuse. As explained more fully in their Declarations, the pilots were fatigued for legitimate reasons. To highlight, pilot Shaw called off fatigued from a ten hour flight from Sydney, Australia to Shanghai, China after an eight hour maintenance delay, which would have resulted in *24 hours without rest.* Shaw Dec. at 5. Pilot Simon was fatigued because after awaking fully rested, he learned that his flight had been rescheduled for 12 hours later. He was not able to reset his sleep so that he was rested in advance of his new duty period. Simon Dec. at 5. Similarly, pilot Samson was sleep prepared for duty pursuant to his original schedule, but upon waking, he learned that a series of scheduling changes resulted in him beginning a duty period at the opposite side of his sleep cycle (*ie.*, he was to begin duty at the very time he would naturally be going to sleep). He was not able to achieve the same amount of sleep for the delayed duty period. Samson Dec. at 5.

Further, Pilots decisions to call off fatigued sometimes took into account the fact that they would be operating as part of a two person crew with no in-flight

break. Riester Dec. at 5; Lang Dec. at 5.   For instance, pilot Daniel Lennox, operating on *three hours of sleep* and facing a delayed takeoff with a new first officer, decided it would not be safe to operate the flight. Lennox Dec. at 5.  And again he called off because he got no rest because his crew rest seat was broken.  He called off fatigued because poor sleep before a duty day of over eighteen hours. Lennox Dec. at 5.

While the Carrier has attempted to characterize these and other instance of clear and legitimate fatigue issues as suspect, in each instance provided in the record by the Pilots Union, that is simply not the case. Again, none of the alleged instances resulted in any action taken against the pilot or notice of impropriety to the Pilots Union.

Again, the Court should find that the Carrier is not likely to succeed on the merits.

7. **The Balance of the Equities Militates Against Granting Preliminary Injunctive Relie**f

As aforesaid, the Carrier has failed to demonstrate that any of the alleged "harms" to its financial performance or "customer good will" are attributable to any alleged Pilot Union slowdown. Rather, the Carrier is trying to characterize long-term performance problems as a "harm" emanating from the pilot group, rather than from a simple inability to manage the enterprise in a period of explosive growth into new markets. Akins Dec. § II.D.  No lawful injunction against the Pilots Union will cure those ills.  By contrast, the Pilots Union and pilots will suffer enormous harm if enjoined from enforcing their CBA - a right guaranteed by the

RLA. First, such an injunction will likely result in more pilots flying sick and fatigued and more aircraft flying with maintenance issues - all substantial safety issues for the pilots and the flying public as well. Second, such an injunction will damage the delicate balance of labor relations and collective bargaining, giving the Carrier the "hammer" of contempt against the Pilots Union and its members. Third, such an injunction will embroil the Court into the labor relations of the parties, though Congress and the courts have admonished judges to stay out of "the labor injunction business." *Central Vermont Ry. v. Broth. of Maintenance,* 793 F.2d at 1299. Indeed, granting the requested preliminary injunction does not serve the public interest because it undermines the collective bargaining policies of the RLA. Accordingly, the balance of the equities favor denial of Plaintiffs' motion.

### D. The Carrier's Request for Relief Sought is Fatally Overbroad

Plaintiffs seek exceptionally broad injunctive relief request is offensive to both Section 9 of the NLGA and the First Amendment of the United States Constitution.  Specifically, the Plaintiffs seek an injunction enjoining the Union "to cease and desist all exhortations or communications encouraging same," where "same" refers to "any concerted refusal to perform normal pilot operations, including, but not limited to, any strike, work stoppage, sick-out, slowdown, work to rule campaign, or any other concerted refusal to perform normal pilot operations consistent with the status quo." *See* ECF Doc. 1 at 80-81.  Plaintiffs further seek that the Union be enjoined

> "from including in such notices (or distributing contemporaneously with such notices) any statements that are intended, <u>or could be</u>

<u>interpreted to mean</u>, that pilots should continue to engage in the previously-described conduct notwithstanding the injunctive relief, including:

a. Any assertion that the injunctive relief does not prohibit individual pilots from making voluntary decisions to engage in such actions; and
b. Any explanation of circumstances in which it would be appropriate or necessary for pilots to engage in such actions prohibited by injunctive relief."

*See* ECF Doc. 1 at 80-81 (emphasis added).   Examples of the conduct of which Plaintiffs complain include instances of the Union educating members of contractual rights and rights contained in federal regulations, the Union urging members to exercise professional responsibility with regard to safety issues, and the Union providing updates about the progress of contract negotiations. It also encompasses conduct in practice prior to the status quo period.

> **1. Plaintiffs' Request for an Injunction Should Be Denied Because They Cannot Substantiate Their Allegations as Required By NLGA Section 9**

Plaintiffs have sought extremely broad relief which they have been unable to factually substantiate as required under NLGA Section 9. Under NLGA Section 9, "… every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and *as shall be expressly included in said findings of fact made and filed by the court* as provided in this chapter." 29 U.S.C.109 (emphasis added).   "The evident purpose of this section, as its history and context show, was not to preclude mandatory injunctions, but to forbid blanket injunctions against labor unions, which are

usually prohibitory in form, and to confine the injunction to the particular acts complained of and found by the court." *Virginian Ry. v. System Fed'n No. 40*, 300 U.S. 515, 563 (1937)(finding injunction ordering carrier to treat with labor organization valid under the NLGA); *see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Eastern Air Lines, Inc.*, 849 F.2d 1481, 1487 (D.C. Cir. 1988) (vacating injunction where district court did not weigh relevant criteria nor make sufficient factual findings to support issuance). "Section 9 serves to prevent district courts from issuing overbroad prospective injunctions." *Westmoreland Coal Co., Inc. v. Int'l Union, United Mine Workers of America*, 910 F.2d 130, 138 (4th Cir. 1990)(finding that under Section 109, employers seeking injunctive relief "must support their plea with allegations of specific acts, supported by the facts").

Although Plaintiffs have complained of a myriad of specific acts, they are unable to factually support those allegations as required by NLGA Section 9. The Plaintiffs' argument is that the Union is engaging in a slowdown that changes the status quo that existed prior to the commencement of RLA Section 6 negotiations in January 2016. However, Plaintiffs have not credibly shown that the status quo actually changed after January 2016.

Moreover, much of the conduct of which Plaintiffs complain was in effect prior to RLA Section 6 negotiations. For example, Chairman Kirchner's campaign to educate his members about their CBA rights and to encourage them to enforce the CBA began with his election to the office in 2014. Kirchner Dec. ¶24. As another example, the number of fatigue reports was steadily rising as part of an

upward trend that began when the Atlas Fatigue Risk Management Plan went into effect in 2013, following the FAA's 2012 issuance of new rules revising the pilot hours of service and rest and requiring fatigue reporting by pilots based on their own self-assessment.   Ruiz Dec. ¶ 7.   The upward trend is typical of the implementation of fatigue risk management reporting programs, as pilots have become better informed of and more comfortable using the program, and as Atlas has hired an increasingly number of younger pilots who are more comfortable reporting fatigue. See McCabe Dec. ¶16 and Ruiz de Castilla Dec.  ¶ 7.

Finally, where Plaintiffs have actually shown a change in pilot behavior since January 2016, such change is due to forces beyond the Union's control.  Plaintiffs are indeed experiencing a pilot staffing shortage.  Atlas and Polar, like the rest of the worldwide aviation industry, have experienced an increasing decline in pilot supply as a result of several structural factors and conditions, including mandatory retirements, retention and recruitment deficits, and operational decisions that place too heavy an emphasis on securing additional flying business without ensuring that it has an available supply of pilots to cover the additional flying. As Plaintiffs themselves acknowledge, their operations have grown significantly, both in scale and scope, since 2016 when Atlas began flying B0767-300 freighter aircraft as "Amazon Prime." Complaint at ¶¶ 24-25.  The nature of flying for Atlas has become more demanding, resulting in increased fatigue, illness, and reluctance to pick up additional flying from open time. Further, given the recent high turnover at Atlas, approximately twenty-five percent of the Atlas pilot workforce has less than two

years of seniority with Atlas. See McCabe Dec. ¶ 17.   Many of these new pilots are young and have little or no experience flying the complex international operations as conducted by Atlas and Polar. Id.   This is a factor many pilots take into account when calling out fatigued. See Nolting Dec. ¶ 5; Simon Dec. ¶ 5.   Many of these new pilots were previously employed by domestic commuter airlines where calling out fatigued was not considered and treated unfavorably, and are accordingly more comfortable participating within the industry's new fatigue and passenger hours of service rules. See McCabe Dec. ¶ 17.

Much of the broad injunctive relief sought by Plaintiffs would inappropriately impair the Union's communications and pilots' lawful and necessary conduct.   As discussed below, the requested relief would endanger Defendants' First Amendment rights.   Further, much of the conduct addressed in Plaintiff's complaint- including sharing information about fatigue, health, and maintenance- has profound implications for the safety of the pilots and the public.   The injunction sought by Plaintiffs would hinder the Union's ability to communicate with its members about their professional safety obligations and would impair individual pilots from exercising their professional judgment with regard to safety issues.

In sum, Plaintiffs cannot show the complained-of conduct is a change in the status quo and therefore such conduct should not be enjoined.   Even if Plaintiffs were to substantiate some of their allegations, where Plaintiffs have failed to show the complained-of conduct is a change in the status quo, such conduct should not be enjoined.   If Plaintiffs were to show that complained-of conduct is a change in the

status quo, any injunctive relief should be narrowly tailored to enjoin only conduct actually established by factual findings and to avoid violating Defendants' First Amendment rights or impairing pilots' exercise of professional judgment.

### 2. Plaintiffs' Requested Injunction is an Impermissible Prior Restraint Under the First Amendment.

The injunction sought by Atlas is also an impermissible prior restraint under the First Amendment of the United States Constitution, which strongly disfavors injunctions that impose a prior restraint on speech. *See Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Intern. Union*, 239 F.3d 172 (2d Cir 2001)(noting that injunction in labor dispute presented serious questions under the First Amendment and vacating injunction because it was impermissibly vague).  A prior restraint comes with "a heavy presumption against its constitutional validity," and when it takes the form of a court-issued injunction, "the risk of infringing on speech protected under the First Amendment increases." *See Metropolitan Opera,* 239 F.3d at 176; citing *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)(finding complainant had not met "heavy burden" of showing justification for imposition of injunction prohibiting distribution of leaflets critical of his business practices); *see also Karhani v. Meijer*, 270 F.Supp. 2d 926 (E.D. Mich. 2003)(finding that TRO prohibiting leafletting of business facing civil rights lawsuit would create an unconstitutional prior restraint of speech under the First Amendment, absent showing distribution of leaflets posed serious or imminent threat to defendants' right to a fair trial).

The injunction sought by Plaintiffs would violate Defendants' First Amendment rights by barring Defendants from engaging in communications with members about numerous subjects including their rights under the CBA and federal law, their professional responsibilities with regard to safety, and the state of contract negotiations. The Supreme Court has found that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." *Thornhill v. State of Alabama*, 310 U.S. 88, 102 (1940)(reversing conviction of the president of a local union for violating an Alabama statute that prohibited only labor picketing, where he was peaceably picketing his employer during an authorized strike). The Supreme Court also has found that workers have a "constitutionally guaranteed right to assist and advise each other." *See Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, at 5-6 (1964)(finding "the First Amendment's guarantees of free speech, petition and assembly give railroad workers the right to gather together for the lawful purpose of helping and advising one another in asserting the rights [under federal statutes] statutory rights which would be vain and futile if the workers could not talk together freely as to the best course to follow."); *see also NAACP v. Claiborne Hardware Co.*, 459 U.S. 898 (1982)(finding that boycott activity that was not itself violent was protected under the First Amendment). This right must surely extend to speech about the contents of a labor agreement and members' rights and responsibilities as regards safety issues.

The many Union communications complained of by Plaintiffs include education of members of their rights under both the CBA and federal law, reminders to members of their professional safety obligations, and updates concerning the progress of contract negotiations.  Plaintiffs request that the Union be enjoined from making any statements,

> "that are intended, or <u>could be interpreted to mean</u>, that pilots should continue to engage in the [alleged slowdown], including:
>
> a. Any assertion that the injunctive relief does not prohibit individual pilots from making voluntary decisions to engage in such actions; and
>
> b. Any explanation of circumstances in which it would be appropriate or necessary for pilots to engage in such actions prohibited by injunctive relief."

See ECF Doc. 1 at 80-81 (emphasis added).  Such injunction would easily encompass necessary and protected communications.

In the event an injunction is issued in this case, it should be narrowly and precisely tailored to avoid restricting the Union's First Amendment rights. Defendants recognize that the First Amendment does not protect advocacy of unlawful conduct, *See Aircraft Service Intern. Inc. v. Int'l Bhd. of Teamsters AFL CIO Local 117,* 742 F.3d 1110 (9th Cir 2014)(finding that actions inconsistent with national labor laws are generally not protected by the First Amendment). However, when such unlawful conduct occurs in the context of constitutionally protected activity, "'precision of regulation' is demanded." *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)(finding that statute proscribing any arrangement by which prospective

litigants are advised to seek assistance of particular attorneys and making it crime for person to advise another that his legal rights have been infringed and to refer him to particular attorney or group of attorneys for assistance violates First Amendment freedoms protected against state action by the Fourteenth Amendment); *see also Aircraft Service Intern. v. Local 117*, 742 F.3d at 1122, citing *Miller v. United Food & Commercial Workers Union*, 708 F.2d 467, 472 (9th Cir. 1983)(holding that a district court could enjoin informational picketing in the midst of a labor dispute as long as the injunction "furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.").

## IV. CONCLUSION

For the reasons stated above, the Court should dismiss Plaintiff's request for a preliminary injunction for lack of jurisdiction, or in the alternative, deny it on the merits on the facts and law presented.


Dated: October 24, 2017                    Respectfully submitted,


                                           /s/ *Edward M. Gleason, Jr.*
                                           Edward M. Gleason, Jr.
                                           (D.C. Bar No. 429325)
                                           Chief Counsel, Teamsters Local 1224
                                           Law Office of Edward Gleason, PLLC
                                           910 17th Street, N.W., Suite 800
                                           Washington, DC 20006
                                           Ph: 202-800-0099
                                           egleason@gleasonlawdc.com
                                           (Application for Admission pending)

/s/ *James Petroff*
James Petroff (Ohio Bar No. 42476)
Trent R. Taylor (Ohio Bar No. 91748)
BARKAN MEIZLISH, LLP
250 East Broad Street, 10th Floor
Columbus, Ohio 43215
Ph: (614) 221-4221
Fax: (614) 744-2300
jpetroff@barkanmeizlish.com
ttaylor@barkanmeizlish.com

*(Applications for Admission pending)*

/s/ *Deirdre Hamilton*
Deirdre Hamilton
D.C. Bar No. 472334
Staff Attorney
International Brotherhood of Teamsters
25 Louisiana Ave., NW
Washington, DC 20001-2198
Phone: (202) 624-6948
Fax: (202) 624-6884
dhamilton@teamster.org

*Counsel for Plaintiffs International
Brotherhood of Teamsters and Teamsters
Local 1224*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document with all attachments was filed with the Clerk of this Court this 24th day of October, 2017, and was served on all parties, electronically through the Courts ECF system with hard copies delivered to chambers by UPS Next Day Delivery.


_/s/ Deirdre Hamilton_
Deirdre Hamilton

# INDEX TO EXHIBITS

**Exhibit No.   Description**

| 1 | Atlas CBA |
|---|---|
| 2 | Kirchner Declaration |
| 3 | Akins Declaration |

| 4 | McCabe Declaration |
|---|---|
| 5 | Ruiz de Castilla Declaration |

| 6 | Baranko Declaration |
|---|---|
| 7 | Bellman Declaration |
| 8 | Hoffman Declaration |
| 9 | Kolaric Declaration |
| 10 | Lang Declaration |
| 11 | Lennox Declaration |
| 12 | Montgomery Declaration |
| 13 | Nolting Declaration |
| 14 | Riester Declaration |
| 15 | Samson Declaration |
| 16 | Santos Declaration |
| 17 | Shaw Declaration |
| 18 | Simon Declaration |
| 19 | Viertel Declaration |

| 20 | DePledge Declaration |
|---|---|
| 21 | French Declaration |
| 22 | Ojeda Declaration |

| 23 | Glover Declaration |
|---|---|
| 24 | Greene Declaration |
| 25 | Howard Declaration |
| 26 | Molloy Declaration |
| 27 | Metzler Declaration |
| 28 | Overby Declaration |
| 29 | Pocock Declaration |
| 30 | Quiros-Callejon Declaration |
| 31 | Sanchez Declaration |

| 32 | Gerber Declaration |
|----|-------------------|
| 33 | Von Thaden Declaration |
| 34 | Peterson Declaration |
| 35 | Wells Declaration |
| 36 | Griffiths Declaration |