**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| ATLAS, INC., *et al.*, | ) | Case No.: 1:17-cv-01953-RDM |
| | ) | |
| Plaintiffs, | ) | Hon. Randolph D. Moss |
| v. | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD | ) | |
| OF TEAMSTERS, AIRLINE | ) | |
| DIVISION, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**</u>

# Union Exhibit 1:

# Collective Bargaining Agreement

# COLLECTIVE BARGAINING AGREEMENT

between

# ATLAS AIR, INC.

and

# INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION

Representing

THE FLIGHT DECK CREWMEMBERS IN THE SERVICE OF

ATLAS AIR, INC.

# TABLE OF CONTENTS

**Section 1: Recognition, Scope, Successorship and Labor Protective Provisions ........................................................... 1**

**Section 2: Definitions ................................................................ 11**

**Section 3: Compensation .......................................................... 15**

**Section 4: Profit Sharing ........................................................... 25**

**Section 5: Travel Expenses ...................................................... 27**

**Section 6: Gateway Travel ........................................................ 33**

**Section 7: Vacation ................................................................... 39**

**Section 8: Deadheading ............................................................ 43**

**Section 9: Miscellaneous Flying ............................................... 47**

**Section 10: Management & Non-Flying Duty ............................. 49**

**Section 11: Training ................................................................... 52**

**Section 12: Hours of Service .................................................... 61**

**Section 13: Leaves of Absence ................................................ 71**

**Section 14: Sick Leave .............................................................. 83**

**Section 15: Physical Standards, Medical Examinations, Drug and Alcohol Testing, and Related Provisions ............................. 89**

**Section 16: Workers' Compensation Benefits ......................... 103**

**Section 17: Missing, Internment, Prisoner or Hostage Benefits ... 105**

**Section 18: Union Representation ............................................ 111**

**Section 19: Discipline, Discharge and Probation .................... 113**

**Section 20: Grievance Procedure ............................................ 119**

**Section 21: System Board of Adjustment ................................ 125**

**Section 22: Seniority ............................................................... 133**

**Section 23: Furlough & Recall ................................................. 155**

**Section 24: Filling of Vacancies .............................................. 161**

**Section 25: Scheduling ............................................................ 173**

**Section 26: General ................................................................. 193**

**Section 27: Insurance Benefits........................................................201**

**Section 28: Retirement ...................................................................257**

**Section 29: Union Security and Check-off .....................................259**

**Section 30: Uniforms .....................................................................263**

**Section 31: Reserve Crewmembers.................................................265**

**Section 32: New Equipment.............................................................269**

**Section 33: CRAF and Hostile Area Operations ............................273**

**Section 34: Duration ......................................................................277**

**Section 35: Letter of Agreement.....................................................279**

# SECTION 1: RECOGNITION, SCOPE, SUCCESSORSHIP AND LABOR PROTECTIVE PROVISIONS

A. Recognition

1. In accordance with the National Mediation Board's certification in Case No. R- 7174, issued on December 22, 2008, Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (a single Air Carrier collectively referred to as the "Company") recognizes the International Brotherhood of Teamsters, Airline Division as the collective bargaining representative of the flight deck crewmembers employed by the Company.

2. This Collective Bargaining Agreement and any formal Letters of Agreement between the Company and the Union may be collectively referred to as the "Agreement."

B. Scope

1. Except as may be provided otherwise in this Section or elsewhere in this Agreement or Letter of Agreement between the parties, all present or future flying that is performed by the Company, including flying performed by a Related Entity (as defined below), and whether or not the crewmembers doing such flying are based outside the United States, shall be performed by Crewmembers on the Atlas Air, Inc. Pilot or Flight Engineer seniority lists in accordance with the terms and conditions of this Agreement or any other applicable agreement between the Company and the Union.

2. Notwithstanding paragraph B.1, above, the provisions of this Agreement (and the Union's representation rights with respect thereto) shall not apply to the Company's or a Related Entity's flying or crewmembers if, and to the extent that: (a) the application of this Agreement or any provisions herein is impermissible in light of the applicable laws or regulations of a foreign country as those laws or regulations are presently in effect or may in the future be amended, interpreted, or supplemented, and whether those laws or regulations are administrative, regulatory, legislative, judicial or otherwise in nature, or (b) a foreign governmental authority denies or fails to provide the necessary immigration visas or work permits for Atlas Crewmembers to perform such work. The Company shall

use reasonable efforts to assist Crewmembers to obtain the necessary visas and permits. The Company shall promptly notify the Union of any local law or regulation as referred to in this paragraph.

3. Definitions

   a. The term "Related Entity" shall mean any air carrier that is: (a) wholly or majority owned (i.e., fifty percent (50%) or more of the equity) by the Company, and (b) that is effectively controlled by the Company.

   b. The term "flying" as used in this Section shall mean all revenue and non-revenue flying conducted on the Company's or a Related Entity's aircraft, including wet leases for other carriers or entities, or contracting for other carriers or entities (government, military or commercial), but shall not include flying of Company or a Related Entity's aircraft conducted by other entities pursuant to a dry lease.

   c. A "dry lease" shall refer to a situation wherein the Company or a Related Entity does not provide Crewmembers to fly the aircraft that it has leased to another entity.

   d. The term "effective control" shall mean that the Company or a Related Entity has the decisive right, privilege, or authority – by contract or otherwise – to direct, manage, or direct the management of all or a substantial portion of the air carrier joint venture or similar business arrangement.

## C. Affiliated Carriers

Should the Company elect to directly or indirectly sell, lease, or otherwise transfer any aircraft in its control to any airline that is owned controlled, or operated by the Company or Atlas Air World Wide Holdings, Inc. and such transfer would directly cause a reduction in force of the Crewmembers covered by this Agreement, the Company shall exercise reasonable efforts to obtain the agreement of the receiving airline to allow the flying of such aircraft to be performed by Crewmembers on the Atlas Air seniority list in accordance with the terms of this Agreement.

D. Subcontracted Revenue Flying

1. "Subcontracted Revenue Flying" shall include and be limited to transactions in which the Company pays a sum of money to another air carrier or third-party contractor pursuant to an agreement whereby (i) the other carrier or third-party contractor

transports cargo consigned to the Company using the carrier's or third-party contractor's aircraft and/or crewmembers, and (ii) the Company receives all of the revenue collected for the transport of cargo on the aircraft.

2. The Company may only engage in Subcontracted Revenue Flying under the following circumstances:

   a. When the Company determines that it does not have sufficient or appropriate aircraft to perform the Subcontracted Revenue Flying; or

   b. When the Company determines that it does not have a sufficient number of appropriately-trained Crewmembers on the B747-100 or –200 to perform the Subcontracted Revenue Flying, and the Company utilizes both the aircraft and crewmembers of the other carrier or third-party contractor; or

   c. When the Company determines that it does not have a sufficient number of appropriately-trained Crewmembers, on aircraft other than the B747-100 or –200, to perform the Subcontracted Revenue Flying, and the Company utilizes the crewmembers and/or aircraft of the other carrier or third-party contractor.

3. The Company shall provide prompt written (but not necessarily prior) notice to the Union of each episode of Subcontracted Revenue Flying.  Upon request, the Company shall furnish the Union with all information relevant to the subcontract, including reasons for the subcontract, the equipment to be utilized, the hours of flying, the duration, and the effect of the subcontract upon Crewmembers.  The Union shall also have the right to periodically review any subcontracts.

4. Each episode of Subcontracted Revenue Flying under Paragraphs 2.a or 2.c shall be limited in duration to one hundred eighty (180) days, and each episode of Subcontracted Revenue Flying under Paragraph 2.b shall be limited in duration to ninety (90) days.  The time limitations in this Paragraph are not applicable where the Company has exercised its best efforts to obtain sufficient appropriate aircraft or appropriately-trained Crewmembers, but has been unable to do so.  In situations arising under Paragraph 2.b or 2.c, the Company shall begin the training of Crewmembers to fill vacancies created by the addition of aircraft to the Company's fleet within thirty (30) days from the inception of the Subcontracted Revenue Flying.

5. The Company shall not implement a furlough of any Crewmember or reduce any Crewmember in status (i.e. reduced in job classification, position, type of aircraft, or relative seniority bid position) as a direct result of engaging in any such Subcontracted Revenue Flying.

6. In addition to the other restrictions on Subcontracted Revenue Flying set forth in this Section 1.D, the following provisions shall be applicable whenever there are Crewmembers on furlough:

   a.   The Company shall provide pay protection for each episode of Subcontracted Revenue Flying when Crewmembers are on furlough. The pay protection shall equal the Total Pay Hours (i.e., Flight Hours or Trip Hour Credit, whichever is greater) that would have been received by the senior crew on furlough (i.e., the two senior pilots and senior flight engineer) to fly the scheduled trip(s). Once the senior crew's pay protection in a month reaches the applicable minimum monthly guarantee, any additional pay protection for Subcontracted Revenue Flying in that month shall be paid to the next crew (on furlough) in seniority order, and so on.

   b.   The pay-protection requirement in Paragraph 6.a does not apply if the basis for the Subcontracted Revenue Flying is a shortage of aircraft caused by the termination of an aircraft lease. This exception to the pay-protection requirement is only applicable to the first ninety (90) days of the Subcontracted Revenue Flying and only if the Company has exercised its best efforts to obtain additional aircraft. After the first ninety (90) days of Subcontracted Revenue Flying, the Company shall always provide pay protection under Paragraph 6.a.

7. The provisions of paragraphs 2-6 herein are not applicable when the Company engages in Subcontracted Revenue Flying due to circumstances over which it does not have control. The Company may engage in Subcontracted Revenue Flying under such a scenario for a period not to exceed the duration of the circumstance beyond the Company's control. Circumstances beyond the Company's control shall be limited to: an act of nature; a labor dispute; grounding of any Company aircraft by a government agency or court after the effective date of this Agreement; loss or destruction of any Company aircraft; involuntary reduction in flying operations due to a decrease in available fuel supply or other materials critical to the company's

operation; revocation of the Company's operating certificate or route authorities; and war emergency.

8. Subcontracted Revenue Flying does not include flying performed by another air carrier whereby the other carrier transports cargo consigned to the Company pursuant to an interline agreement, a code-share agreement, a marketing agreement, a pro-rate agreement, or a blocked-space agreement. There shall be no contractual restrictions on such flying or any other flying performed pursuant to any other marketing or alliance arrangement, except that the Company shall not furlough any Crewmember or reduce any Crewmember in status (i.e. reduced in job classification, position, type of aircraft, or relative seniority bid position) as a direct result of the entry into or implementation of any such interline, code-share, marketing, pro-rate, blocked-space or alliance agreement or arrangement. It is understood and agreed, however, that nothing in this Paragraph D.8 shall prevent the Company from furloughing or reducing in status any Crewmember for economic reasons independent of the Company's entry into and implementation of such transactions.

## E. Successorship

1. The Company shall require any successor, including, without limitation, any assignee or purchaser, transferee, administrator, receiver, executor and/or trustee to cause the Company (i.e., the airline entity that was acquired) to continue to be bound by all the terms of this Agreement as a condition of any transaction that results in a successor, subject to applicable procedures under the Railway Labor Act. For the purposes of this paragraph, a successor shall be defined as an entity that acquires all or substantially all of the assets or equity of the Company through a single transaction or multi-step related transactions that close within a twelve (12) month period ("Successorship Transaction"). The Company shall provide the Union with written notice of any Successorship Transaction no later than thirty (30) days prior to the closing of the transaction, where practicable, such notice to be subject to any confidentiality restrictions that the Company in its discretion may impose on the Union or legal requirements that may apply.

2. The Company shall give written notice of the existence of this Agreement, and a copy of this Agreement, to any proposed Successor before the Company and the proposed Successor

enter into any arrangement or agreement with respect to a potential successor transaction.

**F. Labor Protections**

1. In the event the Company is acquired and thereafter the acquirer decides there will be a complete operational merger between (i) the Company and the acquirer, or the Company and another air carrier under the control of the acquirer, or (ii) if the acquirer notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and the acquirer, or the Company and another air carrier under the control of the acquirer, the following shall apply:

   a. If the Union represents the Crewmembers of the successor then the Union's Merger Policy shall be utilized to integrate the two seniority lists.

   b. If the Crewmembers of the successor are not represented by the Union then the Company shall use its reasonable efforts to cause the acquiring carrier to provide a seniority integration procedure pursuant to the Union's Merger Policy or Sections 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions, as applicable.

   c. The integrated list, including any restrictions or conditions attached thereto, shall not impose any retroactive monetary liability on the part of either pre-merger carrier, nor shall such integrated list require any upgrade or transition training of any crewmember from either carrier**.**

2. In the event (i) the Company acquires another air carrier and the Company decides there will be a complete operational merger between the Company and such other air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the respective carriers, or (ii) in the event the Company decides there will be a complete operational merger between the Company and an affiliated air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and an affiliated air carrier, the following shall apply:

   a. Seniority List Integration:

      i. If the Union represents the Crewmembers of the carrier to be merged with the Company then the Union's Merger Policy shall be utilized to integrate the two seniority lists.

ii. If the Crewmembers of the two pre-merger carriers are represented by different labor organizations then the two lists shall be merged using Allegheny-Mohawk Labor Protective Provisions, Sections 3 and 13 unless the two labor organizations mutually agree to utilize an alternative method.

iii. If the Crewmembers of the carrier to be merged with the Company are not represented by a labor organization, then the two lists shall be merged using Allegheny-Mohawk Labor Protective Provisions, Sections 3 and 13.

iv. The integrated list, including any restrictions or conditions attached thereto, shall not impose any retroactive monetary liability on the part of either pre-merger carrier, nor shall such integrated list require any upgrade or transition training of any crewmember from either carrier**.**

b. Collective Bargaining Agreements:

i. If the Crewmembers of the acquired carrier are not represented by a labor organization, then no later than ninety (90) days after the Union's presentation to the Company of a merged seniority list that complies with the provisions of this paragraph F.2, the Company shall cause the crewmembers of the acquired carrier to become subject to and covered by the terms and conditions of this Agreement.

ii. If the crewmembers of the acquired carrier are represented by a labor organization other than the Union, then no later than ninety (90) days after (1) the Union's presentation to the Company of a merged seniority list that complies with the provisions of this paragraph F.2, and (2) a designation by the National Mediation Board of the post-merger representative of the integrated crewmember class and craft, the collective bargaining agreement of the post-merger representative that was in effect immediately prior to the integration of the class and craft shall become applicable to all crewmembers on the merged seniority list.

iii. If the crewmembers of the acquired carrier are represented by the Union, then the parties shall on a timely basis begin negotiations to merge the two pre-integration collective bargaining agreements into one

agreement.   If a merged agreement has not been executed within nine (9) months from the date that the Union presents to the Company a merged seniority list that complies with the provisions of this paragraph F.2, the parties shall jointly submit the outstanding issues to binding interest arbitration, The interest arbitration shall commence within thirty (30) days from the conclusion of negotiations contemplated by this paragraph, and a final decision shall be issued within sixty (60) days after the commencement of the arbitration.

3. For the purposes of this paragraph F, "complete operational merger" shall mean the combination of all or substantially all of the assets of the two carriers.

4. Notwithstanding anything in this paragraph F to the contrary, in the absence of a complete operational merger as determined by the Company, neither the Company nor any successor shall be under any obligation to integrate the two work forces, and either may operate both workforces independently pursuant to their respective pre-existing collective bargaining agreements (if any).

## G.  Management Rights

1. Except as may be limited by the express provisions of this Agreement, the Company retains the sole and exclusive right to manage and operate its business, including, but not limited to, direct its Crewmember workforce; determine the appropriate number of Crewmembers; hire, promote, and discharge Crewmembers; establish and enforce rules of conduct; maintain discipline and efficiency; introduce new equipment; determine the location(s) of the work force, operations, and facilities; plan, direct and control operations; expand, limit or curtail operations when its deems advisable to do so; sell all or part of the business; sell or lease aircraft or facilities; determine when and where to operate scheduled or unscheduled flights; determine marketing methods and strategies; enter into code-sharing, affiliation or marketing arrangements with other air carriers; and invests (including equity investments) in other business entities, including other air carriers.

2. The Company's exercise of any retained right in a particular manner, or the non-exercise of such right in any particular manner, shall not operate as a waiver of the Company's rights

hereunder, or preclude the Company from exercising its right(s) in a different manner in the future.

3. The past practices, employment policies, interim agreements, or other understandings established prior to the effective date of this Agreement shall not create any precedent or contractual right(s) in favor of the Union or the Crewmembers it represents, nor shall such create any precedent, contractual, or legal obligation(s) on the part of the Company to continue such practices, policies, agreements, or understandings.

4. Notwithstanding the provisions of paragraphs G.1, G.2, and G.3, above, the Company agrees to engage in constructive dialog with the Union regarding any issue that the Union believes may or has materially impact(ed) the terms and conditions affecting the Crewmembers covered herein.

H. Expedited Adjustment Board Procedures

1. Any grievance filed by the Company or Union alleging a violation of Section 1 shall bypass the initial steps of the grievance process and shall be submitted, heard, and resolved through binding arbitration on an expedited basis directly before the Atlas Crewmembers' System Board of Adjustment sitting with a neutral arbitrator. The dispute shall be heard as soon as possible after submission to the System Board and decided no later than thirty (30) days after the close of the hearing, unless the parties agree otherwise in writing.

2. The neutral arbitrator shall be selected by the parties by mutual agreement, or by an alternate strike method, if necessary, from a standing panel of seven (7) arbitrators, each of whom shall belong to the National Academy of Arbitrators and be experienced in disputes arising under the Air Carrier collective bargaining agreements. The panel will be designated before this Agreement becomes effective.

I. Information Production

The Company agrees to provide the Union, upon request, with documents and information reasonably necessary to determine compliance with Section 1. Proprietary, sensitive or confidential information shall be subject to a standard confidentiality agreement, if required by the Company.

This Page Intentionally Blank

# SECTION 2: DEFINITIONS

**A. Active Service:** "Active Service" means all service with the Company that is compensated via wages, sick days and vacation.

**B. Administrative Duty:** "Administrative Duty" means Work for the Company other than Crewmember flight duties and duties related to flight duties (e.g., deadhead, layover, training).

**C. Affirmatively Accepts:** "Affirmatively Accepts" means an action taken by a Crewmember when in a Minimum Rest Period or Pre-Duty Rest Period evidencing his consent (e.g., checking a box on an electronic communication indicating the revision has been accepted, or informing the Company by telephone that the revision has been accepted). Merely reading or receiving an electronic communication or discussing a revision with Company personnel is not affirmative acceptance.

**D. Agreement:** "Agreement" means this Collective Bargaining Agreement and any side letters to the Agreement, memorandum of understanding and letters of agreement made contemporaneous with or expressly part of this Collective Bargaining Agreement.

**E. Base:** "Base" means a geographical location/airport to which Crewmembers are assigned for bidding purposes.

**F. Bid Line:** "Bid Line" means the Crewmember's awarded or assigned Trip Pairing(s) and Days Off for a Bid Month.

**G. Bid List:** "Bid List" means a Base-specific list ordered by seniority containing the names of Crewmember, their Position, and seniority number.

**H. Block Hours:** "Block Hours" means the period from the time the aircraft blocks out until the aircraft blocks in again. Block in shall be the moment that an aircraft comes to complete rest in the blocks. Block out shall be the time when an aircraft's brakes are released and push back or taxi begins.

**I. Captain:** "Captain" means a Crewmember who is in first command of the aircraft and its Crewmembers, and whose primary responsibilities include the manipulation of the controls of the aircraft while underway.

**J. Check Airman:** "Check Airman" means a Crewmember who is authorized and qualified to give FAA and/or Company required checks and initial operating experience.

**K. Contract Pilot:** "Contract Pilot" means a Pilot not on the Pilot System Seniority List, not covered by the Agreement, and not in the craft or class of Pilots.

**L. Crewmember:** "Crewmember" means a Pilot or Flight Engineer whose name appropriately appears on either (or both) the Pilot or the Flight Engineer seniority list(s).

**M. Day:** "Day" means a consecutive twenty-four (24) hour period 0000Z to 2359Z UTC.

**N. Day Off:** "Day Off" means a scheduled twenty-four (24) hour period free from all Company duty beginning at 0000Z through 2359Z UTC.

**P. Duty Day:** "Duty Day" means a twenty-four (24) hour period, or fraction thereof, commencing at the scheduled or actual report time, whichever is later, of the Crewmember and continuing until his release time upon completion of duty.

**Q. First Officer:** "First Officer" means a Crewmember who is second-in-command of the aircraft and its Crewmembers and whose primary responsibilities are to assist or relieve the Captain in navigation, communication and manipulation of aircraft controls while underway.

**R. Flight Engineer:** "Flight Engineer" means a Crewmember who is third-in-command of the aircraft and whose primary responsibilities are to assist the Captain and First Officer in the analysis, operation and monitoring of the aircraft systems and to inspect the aircraft before flight.

**S. GMT/UTC/Z/ZULU:** "GMT," "UTC," "Z" and "ZULU" means Coordinated Universal Time.

**T. Layover Period:** "Layover Period" means the period of time, if any, between the end of the Minimum Rest Period and the commencement of the Pre-Duty Rest Period.

**U. Longevity:** "Longevity" means the cumulative time a Crewmember has been in Active Service with the Company as a Crewmember, and shall begin accruing the day the Crewmember begins training and shall continue to accrue uninterrupted except as provided in the Agreement.

**V. Management Crewmember:** "Management Crewmember" means the Vice President of Flight Operations, Director of Flight Operations, Director of Training, Manager of Training, Chief Pilot, Assistant Chief Pilot or any other individual occupying a position listed in the Flight Operations Manual and who is on the Pilot or Flight Engineer System Seniority List and whose principal Work assignment consists of the supervision or management of Crewmembers on the Pilot or Flight Engineer System Seniority List.

**W. Minimum Rest:** "Minimum Rest" means a period of time free of all responsibility for Work or duty following completion of a duty period and during which time the Crewmember cannot be required to be contactable by the Company.

**X. New Hire:** "New Hire" means a Crewmember who is in his initial training period who has not completed his operating experience.

**Y. Originally Scheduled Departure/Report Time:** "Originally Scheduled Departure/Report Time" means the departure/report time that was last communicated and scheduled prior to the Crewmember entering the Minimum Rest Period or Pre-Duty Rest Period, whichever is applicable.

**Z. Pay Day:** "Pay Day" will be the 15th and the last day of each month. Should a Pay Day fall on Saturday or Sunday the pay will be issued on the previous Friday.  All pay above minimum guarantee, per diem and expense reimbursements for the previous Bid Month shall be on the second pay check of the month. Should a Pay Day fall on a holiday, the pay will be issued the day before the holiday.

**AA. Pilot:** "Pilot" means Captain or First Officer.

**BB. Position:** "Position" means a Crewmember's Status, equipment type and Base.

**CC. Position Vacancy:** "Position Vacancy" means a Position posted or to be posted for bidding in accordance with Section 24.

**DD. Pre-Duty Rest:** "Pre-Duty Rest" means a ten (10) hour period of time free of all responsibility for Work or duty prior to the commencement of a duty period and during which time the Crewmember cannot be required to be contactable by the Company.  Pre-Duty Rest may overlap in whole or in part with Minimum Rest.

**EE. Transportation Local In Nature:** "Transportation Local In Nature" means the rest accommodation is within thirty (30) minutes travel time of the location where duty begins or ends, except when the Company and Union agree on a different time(s) for a particular location(s) consistent with current practices.

**FF. Reserve Crewmember/Reserve Line Holder:** A "Reserve Crewmember/Reserve Line Holder" means a Crewmember who has been awarded or assigned a Reserve Line.

**GG. Status:** "Status" means Captain, First Officer or Flight Engineer.

**HH. Trip Pairing:** "Trip Pairing" means one or more consecutive Duty Days and the specific assignments associated with such Duty Days. Except as otherwise set forth in the Agreement, a "Trip Pairing" begins

when a Crewmember first reports for duty and ends when the Crewmember is released into a Day(s) Off.

**II. Work:** "Work" shall include a flight assignment, a deadhead assignment, reserve, layover or training (other than home-based training).

**JJ. Work Day:** "Work Day" shall be any day on which a Crewmember performs or is required to be available to perform Work.

# SECTION 3: COMPENSATION

## A. RATES OF PAY.

1. A Crewmember's hourly pay rate shall be based on his Longevity and Status in accordance with the following tables:

| B747 SERIES CAPTAIN | | | | | |
|---|---|---|---|---|---|
| Longevity | **DOS** | **DOS+1** | **DOS+2** | **DOS+3** | **DOS+4** |
| 1 | 145.21 | 146.66 | 149.59 | 151.09 | 154.11 |
| 2 | 149.56 | 151.06 | 154.08 | 155.62 | 158.73 |
| 3 | 154.05 | 155.59 | 158.70 | 160.29 | 163.49 |
| 4 | 158.67 | 160.26 | 163.46 | 165.10 | 168.40 |
| 5 | 163.43 | 165.07 | 168.37 | 170.05 | 173.45 |
| 6 | 168.33 | 170.02 | 173.42 | 175.15 | 178.66 |
| 7 | 173.38 | 175.12 | 178.62 | 180.41 | 184.01 |
| 8 | 178.59 | 180.37 | 183.98 | 185.82 | 189.54 |
| 9 | 183.94 | 185.78 | 189.50 | 191.39 | 195.22 |
| 10 | 189.46 | 191.36 | 195.18 | 197.14 | 201.08 |
| 11 | 195.15 | 197.10 | 201.04 | 203.05 | 207.11 |
| 12 | 201.00 | 203.01 | 207.07 | 209.14 | 213.32 |

| B747 SERIES F/O & F/E | | | | | |
|---|---|---|---|---|---|
| **Longevity** | **DOS** | **DOS+1** | **DOS+2** | **DOS+3** | **DOS+4** |
| 1 | 75.00 | 75.75 | 77.27 | 78.04 | 79.60 |
| 2 | 94.22 | 95.17 | 97.07 | 98.04 | 100.00 |
| 3 | 99.36 | 100.36 | 102.36 | 103.39 | 105.45 |
| 4 | 104.72 | 105.77 | 107.89 | 108.96 | 111.14 |
| 5 | 110.32 | 111.42 | 113.65 | 114.78 | 117.08 |
| 6 | 116.15 | 117.31 | 119.66 | 120.86 | 123.27 |
| 7 | 121.37 | 122.58 | 125.03 | 126.28 | 128.81 |
| 8 | 125.01 | 126.26 | 128.79 | 130.07 | 132.67 |
| 9 | 128.76 | 130.05 | 132.65 | 133.98 | 136.65 |
| 10 | 132.62 | 133.95 | 136.63 | 137.99 | 140.75 |
| 11 | 136.60 | 137.97 | 140.73 | 142.13 | 144.98 |
| 12 | 140.70 | 142.11 | 144.95 | 146.40 | 149.33 |

a. First Officer and Flight Engineer Hourly Rates for 0 to 12 months of Longevity apply regardless of MTOW unless the aircraft type is subject to Section 32.C.

b. Longevity Increases.  In a month in which a Crewmember changes Longevity steps (e.g., second year to third year), the higher hourly rate will be applicable for all Work performed in the month.

c. Changes in Rates of Pay

    i. In a month in which a Crewmember changes to a higher Status (e.g., upgrade from First Officer to Captain, or transition from Flight Engineer to Pilot), including promotion to a temporary Position, his hourly rate shall be the applicable pay rate for the Work he performs in each Status.  For purposes of this subsection 3.A.1.c.i., the Crewmember shall not be considered to have performed Work in the higher pay Status until he successfully completes training, including Operating Experience (OE), if applicable, for the higher Status.

    ii. In a month in which a Crewmember changes to a lower Status (e.g., downgrade from Captain to First Officer, or transition from Pilot to Flight Engineer) his hourly rate shall be the applicable pay rate for the Work he performs in each Status.  For the purposes of this subsection 3.A.1.c.ii., the time that a Crewmember begins any required training for the change in Status shall be considered Work in that Status.

d. Overrides.

    i. Standards Check Airman and Designated Examiner Pay.  A Standards Check Airman or Designated Examiner shall be compensated at a rate of one hundred and fifteen percent (115%) of his hourly rate for each Bid Month that he is listed by the Company as a Standards Check Airman or Designated Examiner for the Bid Month.

        (1) The Company shall determine the number of Standards Check Airmen and Designated Examiners needed in a Bid Month.  A list of the Standards Check Airmen and Designated Examiners scheduled to be utilized shall be published with the monthly bidding materials.  The most system senior Crewmember(s) in the Standards Check Airmen and Designated Examiners shall be included on the list.

(2) If the Company requires additional Standards Check Airmen or Designated Examiners in a given Bid Month, the Company shall utilize the most senior Crewmember(s) on the system seniority list who do not appear on the monthly list; *provided*, the Company may utilize a Standards Check Airmen or Designated Examiner out of system seniority order if necessary to maintain the Crewmember's currency as a Standards Check Airman or Designated Examiner.   An out of system seniority assignment may be made beginning two (2) months preceding the month in which the Crewmember's currency will expire.

(3) Nothing contained herein shall prohibit the Company from assigning flight duties to a Crewmember on an above-mentioned list.

ii. Line Check Airman, Simulator Check Airman and Crewmember Training Instructor.   A Line Check Airman, Simulator Check Airman or a Crewmember Training Instructor shall be compensated at a rate of one hundred and ten percent (110%) of his hourly rate for each Bid Month that he is listed by the Company as a Line Check Airman, Simulator Check Airmen or Training Instructor for the Bid Month.

(1) The Company shall determine the number of Crewmember Training Instructor, Line Check Airmen and Simulator Check Airmen needed in a Bid Month. The list shall be published with the monthly bidding materials.   The most senior Line Check Airmen, Simulator Check Airmen and Crewmember Training Instructor on the system seniority list shall be included on the list.

(2) If the Company requires additional Line Check Airmen and Simulator Check Airmen in a given Bid Month, the Company shall utilize the most senior Crewmember(s) on the system seniority list who does not appear on the applicable list; provided, the Company may utilize a Line Check Airmen and Simulator Check Airmen out of system seniority order if necessary to maintain the Crewmember's currency as a Line Check Airman and Simulator Check Airman. An out of system seniority assignments may be made beginning two (2) months

preceding the month in which the Crewmember's currency will expire.

e. Home-Base Training. A Crewmember shall be compensated at one hundred and fifty dollars ($150.00) for completion of any Company-directed home Base training up to four (4) hours and fifty ($50.00) for each additional hour or partial hour required as part of that same home-based training course. The Company, in consultation with the Union Training Committee (UTC), shall determine the time necessary for the completion of home-based training courses.  Home-based training shall not include any preparatory study that a Crewmember must accomplish in advance of and/or during recurrent training, upgrade training, transition training, and/or similar training.

f. New Hire Training Pay. A New Hire Crewmember as defined in Section 2 of this Agreement shall receive $1,600.00 per month in lieu of any other compensation set forth in this Section 3 from his date of hire to completion of OE or for four (4) months, whichever occurs first.   Thereafter, the Crewmember shall be compensated in accordance with this Section 3 in the same manner as other Crewmembers.

2. Pay and Credit Ratios:

   a. Pay and credit ratios shall be determined as follows:

      i. When a Crewmember performs flight duty as part of a Two Person Crew, Three Person Crew or Augmented Crew (as defined under Section 12), actual block time or scheduled block time for the segment on a one-for-one (1:1) basis, whichever is greater.

      ii. When a Crewmember Deadheads on a one-for-two and eighty-five one hundredths (1:2.85) basis (i.e., 2.85 hours of deadhead time equals one (1) hour of pay, or credit towards guarantee, as applicable), Commercial Deadhead shall be based on scheduled block time.   Deadhead on Company aircraft shall be based on scheduled block time or actual block time, whichever is greater.

      iii. When a Crewmember reports for an operating flight that is cancelled or experiences a block turn-back, or an air turn-back, for actual Block Hours, or as provided in subsection 3.A.2.a.iv., below, whichever is greater.

iv. When a Crewmember reports for an operating flight or deadhead duty at an airport and the flight does not operate, or any other duty assignment, not less than two (2) hours.

v. When a Crewmember is assigned to a training location other for training for sixteen (16) or more days in the Bid Month as a trainee, the Crewmember will receive 3.65 hours per day for each day in ground school training, simulator training/support/checking associated with recurrent training.

vi. When a Simulator Check Airmen, Crewmember Training Instructors or Designated Examiners performs required simulator training/support/checking/briefing and/or de-briefing, one (1) hour for each hour performed.

vii. When a Crewmember provides ground school instruction, five (5) hours for each day.

viii. When a Crewmember performs Administrative Duty, four (4) hours for each day of Administrative Duty. Crewmember may not be involuntarily assigned to Administrative Duty except as part of his regular duties.

ix. When a Crewmember is performing duties at an airport in conjunction with a scheduled flight and the Crewmember performs a taxi movement(s), either prior to or after a flight, the Crewmember shall be paid for the taxi movement on the basis of block time. However, if a Crewmember reports to the airport for the sole purpose of performing a taxi movement with no planned flight activities, he shall receive credit for actual block time or as provided in subsection 3.A.2.a.iv., above, whichever is greater.

x. When a Crewmember is assigned R-3, one (1) hour for each two (2) hours of R-3.

xi. When a Crewmember uses a sick day, 3.65 hours of pay in accordance with Section 14 of the Agreement.

xii. When a Crewmember uses a vacation day, 3.65 hours of pay.

b. Calculated Rig Time (CRT) shall be determined as follows:

i. Except as provided below, CRT commences when a Crewmember:

A. First reports for an Operating Flight,

B. Deadheads (excluding Deadhead travel between the Crewmember's Base and/or residence and a Company training facility)

C. Begins his first R-2 or R-3 period, whichever is applicable,

D. Reports for a trip that departs from a training location (including Deadhead).

ii. CRT continues until the Crewmember is released per his actual schedule to R1, to training, or to a block of Days Off.

iii. In a month in which a Crewmember participates in training or Administrative Duties, CRT shall not accrue while performing such duties or deadheading between the Work location and the Crewmember's Base.

iv. No CRT credit shall accrue on a calendar day in which a Crewmember becomes unavailable for flight duties (e.g., uses a sick day, a personal emergency), regardless of location.

v. All such CRT calculations shall be based on the Crewmember's actual schedule as posted in the Crew Management System.

vi. A Crewmember shall receive CRT credit equal to one (1) hour of credit for every 4.95 hours of CRT.

## B. MINIMUM MONTHLY GUARANTEE

1. Except as otherwise provided for in this subsection 3.B., a Crewmember who is available for Work on each day that he is scheduled for duty during the Bid Month shall be entitled to receive a Minimum Monthly Guarantee of sixty-two (62) hours of pay at his applicable hourly wage rate.

   a. A Crewmember with less than one (1) year of Longevity shall receive a monthly guarantee of fifty (50) hours, except as provided for and subject to the provisions of subsection 3.E, below.

2. If a Crewmember is not on pay status on any day(s) of his scheduled assignment for the Bid Month, his Minimum Monthly Guarantee shall be pro-rated to reflect the number of scheduled days missed, i.e., reduced by one-seventeenth (1/17) for each Work Day the Crewmember is not available.

3. The monthly guarantee for a Crewmember assigned to an Out-Base

shall be one hundred and five (105) hours.

4. For each day in a Bid Month in which a Crewmember returns to Work from a leave of absence or furlough, his Minimum Monthly Guarantee shall be pro-rated to reflect the number of scheduled days missed, i.e., reduced by one-seventeenth (1/17) for each day of the month the Crewmember was not available.

5. Each unassigned Crewmember who is eligible for flight duty shall receive pay under subsection 3.C., below.

## C. BID MONTHLY PAY

Bid Month Pay for a Crewmember (other than a Crewmember in training for 16 or more days in the Bid Month) shall be the sum of the following:

1. Pay for a Crewmember for Work performed on Duty Days that were included in his originally awarded or assigned schedule for the Bid Month (i.e., an originally scheduled day "on") shall be the greater of:

   a. The sum of pay credits described in subsection 3.A.2.a., above,;

   b. The sum of CRT described in subsection 3.A.2.b., above; or

   c. The Minimum Monthly Guarantee under subsection 3.B., above.

2. Pay for a Crewmember for Work performed, if any, on days that were not included in his originally awarded or assigned schedule for the Bid Month (i.e., an originally scheduled Day Off) shall be the greater of:

   a. The sum of pay credits described in subsection 3.A.2.a., above; or

   b. The sum of CRT described in subsection 3.A.2.b., above.

3. If a Crewmember performed Work on days that were not included in his originally awarded or assigned schedule for the Bid Month (i.e., an originally scheduled Day Off), exclusive of training and associated deadhead, then additional pay in accordance with the following:

   a. First day, or portion thereof, beyond schedule: two (2) hours

   b. Second day, or portion thereof, beyond schedule: four (4) hours

   c. Third day, or portion thereof, beyond schedule: six (6) hours

   d. If a Crewmember is involuntarily extended more than three (3) days beyond his originally awarded or assigned schedule, he shall receive twelve (12) hours of pay for each such day, or portion thereof, except in the case of a Crewmember who performs Open Time flying and is subsequently involuntarily

extended beyond a third day, in which case, subsection 3.C.3.c. applies to the days the Crewmember is involuntarily extended.

e. If a Crewmember volunteers (i.e., extends or Open Time flying) to Work more than three (3) days beyond his originally awarded or assigned schedule, he will receive extended duty pay under subsection 3.C.3.c., above.

### D. INITIAL, TRANSITION, AND UPGRADE TRAINING GUARANTEE

1. If a Crewmember is in initial, transition or upgrade training for an entire Bid Month, he shall be paid the Minimum Monthly Guarantee under subsection 3.B., above.

2. If a Crewmember is in initial, transition, or upgrade training for less than a full Bid Month, he shall be paid under subsections 3.C.1.a. and 3.C.1.c, above, except for New Hires who shall be paid pursuant to subsection 3.A.1.f.

3. Extended Duty Pay provisions of this Agreement do not apply to a Crewmember while attending initial, transition, or upgrade training.

### E. OUT-BASE ASSIGNMENTS

1. If an Out-Base assignment from the prior bid month carries over into the current bid month but the Crewmember does not Work an Out-Base assignment in the current bid month, any days of carry over shall count towards his required seventeen (17) days of regular Work in the current bid month and shall be credited against the Crewmember's guarantee for the current bid month.

2. If a Crewmember's Out-Base assignment is cancelled after it has commenced, the Crewmember shall be entitled to only his normal monthly guarantee for up to seventeen (17) days of the Out-Base assignment and three (3) hours additional guarantee for each day beyond seventeen (17) days, provided that the total guarantee for the Out-Base assignment shall not exceed one hundred and five (105) hours.

### F. GENERAL

1. A Crewmember's normal monthly pay shall be dispersed in two (2) payments, such disbursements to be made on the last day of each calendar month (to include one-half (1/2) of the Minimum Monthly Guarantee and overtime and per diem, if any, from the previous Bid Month) and on the fifteenth (15th) day of each calendar month (to include one-half (1/2) of the Minimum Monthly Guarantee). Should a

regularly scheduled payday fall on a weekend or bank holiday, the pay disbursement shall normally be made on the weekday immediately prior to such weekend day or holiday.

2. The Company, at its discretion, may make pay distributions by electronic direct deposit.

3. The Company shall provide each Crewmember with a pay disbursement record electronically by a secured means unless the Crewmember elects to have a hard copy mailed to the Crewmember's residence.   The salary disbursement record shall include, at a minimum, the following:

   a. Total amount of normal pay for the pay period.

   b. Total amount of overtime pay for the pay period.

   c. Per diem paid.

   d. All deductions or withholdings made, including but not limited to federal and state taxes, FICA, insurance premiums, Union dues, and 401(k) savings withholdings.

4. The Company shall make sick and vacation balance information available to Crewmembers on a monthly basis (e.g., on GlobalNet).

This Page Intentionally Blank

# SECTION 4:  PROFIT SHARING

A. Crewmembers shall be eligible to participate in the Atlas Air, Inc. Profit Sharing Plan (the "Plan") as such Plan is applicable to Crewmembers.   The Plan shall be amended, as necessary, to provide for the matters set forth in this Section 4.  The Company will provide any amended Plan documents to the Union in advance for review.

B. The Annual Profit Sharing Allocation (as defined in the Plan) for Crewmembers shall continue to be calculated from Pre-Tax Profits (as defined in the Plan) consistent with the terms of the Plan; however, for Plan years 2011, 2012, 2013, 2014 and 2015, Pre-Tax Profits will be reduced by $75 million, and for each Plan year thereafter, Pre-Tax Profits will be reduced by $50 million.

C. The Annual Profit Sharing Allocation for Crewmembers shall be based on the Company's Annual Profit Sharing Contribution (as defined in the Plan).  The percentage of the Company's annual Pre-Tax Profits to be used to determine the Company's Annual Profit Sharing Contribution for Crewmembers shall be ten percent (10%), as provided in the Plan**.**

D. Profit sharing, to the extent there are profits to be distributed, shall be paid no later than April 30th of the year following the year for which the profit sharing to be distributed is based.

E. Employment by Polar Air Cargo Worldwide, Inc. shall be considered employment by Atlas Air, Inc. for purposes of the Plan's Requirements for Participation; provided however, all employees (as defined in the Plan) who are hired subsequent to the effective date of this Agreement will be subject to the Plan's Requirements for Participation.

F. Crewmembers who are not actively employed on the date of payment, other than Pilots who resigned, were on furlough status or were discharged for just cause on or before the date of payment, shall receive payment pursuant to the terms of the Plan.

G. All terms not specifically defined in this Section 4 shall have the meaning ascribed to them in the Plan.

H. Except as provided herein, all terms and conditions of the Plan (including but not limited eligibility requirements or methods of allocation) shall remain in full force and effect and not be changed so as to materially reduce the level of participation by Crewmembers or

benefits provided to Crewmembers without the concurrence of the Union, except to the extent such changes are required by law.

# SECTION 5: TRAVEL EXPENSES

## A. PER DIEM

1. A Crewmember shall receive per diem, pursuant to subsection 5.A.3., below, while on Company assignment as follows:

   a. A Crewmember shall receive per diem from the scheduled or actual report time at the beginning of his assignment (whichever is later) at the Permanent Base until the actual release time at the end of his assignment at his Permanent Base.  If a Crewmember is released from his assignment at a location other than his Permanent Base pursuant to an agreement between the Crewmember and the Company, the Crewmember's per diem will be calculated as if he had been released at the completion of his scheduled return at his Permanent Base.

   b. When a Crewmember has been involuntarily assigned to a Temporary Base pursuant to subsection 24.G. he shall receive per diem for the entire period of assignment to the Temporary Base.

   c. When a Crewmember has bid for and been awarded a Position in a Temporary Base, he shall receive per diem in the same manner as if he were performing an assignment at the direction of the Company out of his Permanent Base as set forth in subsection 5.A.1.a., above.

   d. Except as provided for in subsection 11.A.7, a Crewmember shall receive per diem for his training assignment from the scheduled or actual report time (whichever is later) at his Permanent or Temporary Base until the actual release time at his Permanent or Temporary Base.

2. There shall be no pyramiding of per diem entitlements under subsections 5.A.1.a. through 5.A.1.d., above.

3. Per Diem Rate: $2.40 per hour or fraction thereof.

## B. REIMBURSEMENT OF ACTUAL EXPENSES

1. When a Crewmember receives per diem pursuant to the provisions of subsection 5.A., above, he may also request reimbursement for actual expenses incurred as a result of unusual circumstances.  Any such reimbursement shall be within the discretion of the Company.

2. The Company shall indemnify and hold Crewmembers harmless for

any legitimate business-expenses charged to the Company credit card in accordance with Company procedures referred to in subsection 5.F, below.

### C.  TRANSPORTATION TO HOTEL

1. The Company shall arrange for transportation between the aircraft and the hotel.

2. In the event the Company fails to arrange for transportation between the aircraft and the hotel, or the transportation does not arrive within thirty (30) minutes of the arrival of the Crewmember at the pick up location, a Crewmember may obtain such transportation by any reasonable means available.  The Crewmember may utilize the Company credit card for such transportation, or at his election, the Company shall reimburse the Crewmember for the actual cost of such transportation upon receipt of adequate documentation from the Crewmember.

### D.  HOTEL ACCOMMODATIONS

1. When the circumstances listed in subsection 5.D.3, below, apply, the Company shall provide Crewmembers, at no cost, with a single occupancy hotel room that meets the following minimum standards (any charges for services or requirements set forth below, if not paid directly by the Company, shall be paid for on the Company credit card):

   a. Adequate security;

   b. The Crewmember's safety is not known to be at risk by staying at the hotel;

   c. Satisfies basic standards of cleanliness;

   d. There are restaurants in the hotel, or in the immediate vicinity of the hotel;

   e. Equipped with telephone access;

   f. Equipped with private bathroom and shower; and

   g. Assigned to a non-smoking room unless the Crewmember requests a smoking room.

In addition to the standards listed in subsection 5.D.1., above, the Company will attempt to meet the following guidelines in subsection 5.D.1., below:

a. Free in-room broadband access (if free access has not been negotiated by the Company, any fees for access to be paid by the Company; *provided*, if broadband cost is on a per minute basis, the Company is not required to pay for fees in excess of (1) hour of usage per day but may do so upon request by a Crewmember). If in-room broadband access is not available, then the Company will attempt to secure free business center or hotel crew room broadband access.  Such access fees shall be on the same basis applicable to in-room broadband access as described herein.

b. Equipped with a microwave and refrigerator in the case of a training event scheduled to last ten (10) days or longer;

c. Access to exercise facilities on-site or in the immediate vicinity and arranged for by the hotel (any fees for exercise to be paid by the Crewmember).

2. The Company will make every reasonable effort to contract with hotels which provide breakfast at no cost to the Crewmember.  If the hotel offers free breakfast to other guests, the Company will not contract for a no-breakfast room rate.

3. The Company shall provide hotel accommodations for a Crewmember when he:

   a. Is on a scheduled layover and/or requires legal rest away from his Permanent or Temporary Base except as provided for in Section 11.A.7; or

   b. Is on an in-transit stop (e.g., maintenance delays, fueling, waiting to deadhead) scheduled for at least six hours and thirty minutes (6:30) from block-in to block-out; or

   c. Is in training in accordance with subsection 11.A.7.; or

   d. Is on R-2 ("Hotel Reserve") status at or away from his Permanent or Temporary Base; or

   e. Is performing non-flight assignments at a location more than fifty (50) miles from his residence; or

   f. Is on a layover, scheduled or otherwise, of less than seventy-two hours (72:00) at his Permanent or Temporary Base; or

   g. Is at his Permanent or Temporary Base at the end of his Duty Day, and his Duty Day has exceeded sixteen (16) hours (including any deadhead), and the Crewmember requests hotel accommodations.

4.  In the event the Company fails to arrange for hotel accommodations as required under this subsection 5.D., above, or fails to provide the Crewmember with confirmation no later than thirty (30) minutes after block-in that such accommodations have been made, or the Crewmembers' hotel room is not available within thirty (30) minutes after a Crewmember's arrival at the hotel, a Crewmember may obtain hotel accommodations that are consistent with the provisions of subsection 5.D.1.a-g.   Prior to obtaining other hotel accommodations, the Crewmember must contact the Travel Department to provide the Company with an opportunity to resolve the hotel issue.  If the Crewmember does not have access to his room within forty-five (45) minutes after contacting the Travel Department, the Crewmember may obtain other hotel accommodations.  A Crewmember may utilize the Company credit card when exercising rights pursuant to this subsection 5.D.4., including for transportation to the hotel, or at his election, the Company shall reimburse the Crewmember for the reasonable actual costs of such accommodations upon presentation of adequate documentation.

5.  The Company shall meet with the Union Hotel Committee no less than bi-weekly via telephone conferences, consistent with current practices, to review hotels utilized by Crewmembers relative to the criteria set forth in subsections 5.D.1. and 5.D.2., discuss improvements to the quality of hotels regularly utilized by Crewmembers, consider Committee recommendations before making additions and deletions to the group of hotels regularly utilized by Crewmembers, and to address related matters.

### E.  CREW MEALS

Crew Meals shall be provided in accordance with the Company's Ground Administration Manual and Appendix 5.A.  Appendix 5.A. shall remain in effect unless modified by mutual agreement of the Company and Union.

### F.  EXPENSE ACCOUNT

The Company shall provide Crewmembers with a Company credit-card which shall be used for all legitimate business-related expenses where direct bill arrangements have not been made by the Company.

### G.  GENERAL

1.  Hotel reservations shall be made in advance by the Company whenever possible.

2. When layover time is scheduled to exceed eighteen (18) hours, the Company shall book a hotel that is located "downtown" (i.e., located within a city's core business district) or away from downtown but within walking distance of non-fast food restaurants, shops and/or movie theaters, consistent with current practice. This subsection will not apply when the Company determines, for safety reasons it is unsafe to place Crewmembers at a location referred to herein or where the Company flies to a location on an infrequent basis (i.e., less than six (6) times per year).

3. The Company shall publish to all Crewmembers its Pilot and Flight Engineer Crew Travel Policy and Procedures ("Travel Policy), including any amendments the Company may make during the term of this Agreement.  The Travel Policy and amendments thereto will not conflict with the Agreement. Prior to publishing amendments, the Company shall send an advance copy of the amendments to the Union and will consider any changes proposed by the Union.

APPENDIX 5-A

| Crew Food Minimum Standards | | | |
|---|---|---|---|
| | **Block Time** | | |
| **Description** | 0 to 3:59 | 4 to 7:59 | 8 + Hours |
| Sandwich Tray (Equivalent Number of Sandwiches per CM) | 2* | 2 | 2 |
| Fresh Fruit (Equivalent of Whole Fruit per CM) | 2 | 2 | 2 |
| Soda-Assorted (12 ounce cans per CM) | 2 | 3 | 3 |
| Water (Liters per CM) | 1 | 2 | 3 |
| Hot Meals (per CM) | 0 | 1 | 2 |

| Hot Meal Type by Time | | | | | | |
|---|---|---|---|---|---|---|
| | Departure Time Local | | | | | |
| | 0000 to 0600 | | 0601 to 1400 | | 1401 to 2359 | |
| **Meal Type** | 1st Meal | 2nd Meal | 1st Meal | 2nd Meal | 1st Meal | 2nd Meal |
| Breakfast | X | | | | | X |
| Lunch | | X | X | | | |
| Dinner | | | | X | X | |

* If catering cannot deliver the sandwich tray to JFK without delaying the flight, the Company may provide power bars in lieu of a sandwich tray for flights that are two (2) hours or less.

# SECTION 6: GATEWAY TRAVEL

A. Company provided travel to and from an eligible Crewmember's residence and accommodations related to an assignment ("Gateway Travel") will be provided in accordance with and subject to the following:

1. Gateway Travel Airports

   a. The Company shall designate the airports from which and to which Gateway Travel will be provided to eligible Crewmembers. There shall be no minimum or maximum number of airports so designated.  To qualify for designation as a Gateway Travel airport, the airport must have sufficient commercial Part 121 air carrier service so as to provide competitive airfares.  The Company shall consider input provided by the Union regarding adding or deleting Gateway Travel airports, with the intent to be to provide airports that are convenient for the Crewmember while at the same time afford the Company the ability to minimize the cost of providing Gateway Travel.

   b. The following airports are currently designated as Gateway Travel airports.  The Company shall publish any additions or deletions to this list on a timely basis.

   | ABQ | CLE | DTW | IND | MCI | OGG | PVD | SMF |
   |-----|-----|-----|-----|-----|-----|-----|-----|
   | ANC | CLT | EWR | ISP | MCO | OKC | RDU | STL |
   | ATL | CMH | EUG | JAN | MDT | OMA | RSW | SYR |
   | AVL | COS | FAI | JAX | MDW | ORD | SAC | TLH |
   | BDL | CRP | FLL | JFK | MEM | ORF | SAN | TPA |
   | BHM | CVG | GEG | KOA | MGM | PBI | SAT | TUS |
   | BNA | DAB | HLN | LAS | MIA | PDX | SEA | TYS |
   | BOI | DAY | HNL | LAX | MKE | PHL | SFO | VPS |
   | BOS | DCA | HOU | LGA | MSP | PHX | SGF |     |
   | BWI | DEN | IAD | LIH | MSY | PIT | SHV |     |
   | CHS | DFW | IAH | LIT | OAK | PNS | SLC |     |

   No deletions shall be made to this or any future list of Gateway Travel Airports without the concurrence of the Union, provided, however, that such concurrence will not be withheld if an airport no longer meets the qualifications in subsection 6.A.1.a.  Any disputes regarding the deletion or addition of a Gateway Travel

Airport shall be resolved pursuant to the provisions of subsections 20.B. and 20.D.

c. Unless mutually agreed otherwise between the Company and the Crewmember, Gateway Travel will be provided to an eligible Crewmember from a Gateway Travel airport located within one hundred and thirty miles (130) from the Crewmember's residence. If more than one Gateway Travel airport is located within one hundred and thirty miles (130) from the Crewmember's residence, the Company shall designate the airport from which the travel is to be provided, which may vary from assignment to assignment.

d. Unless mutually agreed otherwise between the Company and the Crewmember, if an eligible Crewmember's residence is more than one hundred and thirty (130) miles from the nearest Gateway Travel airport, then the Company, at its discretion, shall provide Gateway Travel either from the Gateway Travel airport that is nearest the Crewmember's residence or from a Gateway Travel airport that is within fifty (50) miles of such nearest Gateway Travel airport.

e. Unless mutually agreed otherwise between the Company and the Crewmember a Crewmember being provided Gateway Travel shall be returned to the same Gateway Travel airport from which he departed.

2. Crewmember Eligibility for Gateway Travel

a. A Crewmember will not be eligible for Gateway Travel if his residence is within one hundred and thirty (130) miles of his Base.

b. A Crewmember who is based at a location within the United States but whose residence is outside the United States will not be eligible for Gateway Travel until he arrives in the United States at a Gateway Travel Airport of the Crewmember's choosing.

c. The application of the Gateway Travel Program to Crewmembers based at a location outside the United States, if any, shall be determined in accordance with Section 1 (Foreign Operations).

d. Nothing herein shall preclude the Company, in its sole discretion, from extending Gateway Travel benefits (either on a temporary or permanent basis) to an otherwise ineligible Crewmember in the event of extraordinary circumstances or

hardship.  If such benefits are extended the Company may set out the parameters of eligibility, including but not limited to duration.  The decision of the Company shall be final, and there shall be no right on the part of any Crewmember or the Union to utilize the provisions of Sections 20 or 21 to grieve or otherwise challenge the Company's decision to grant or deny Gateway Travel benefits to Crewmembers in such circumstances or the parameters of such eligibility.

3.  When Gateway Travel is to be provided

   a.  In order to timely position a Crewmember for his assignment, Gateway Travel to an assignment may be required of the Crewmember on an otherwise scheduled Day Off, and shall not entitle the Crewmember to any compensation for such.

   b.  Gateway Travel from an assignment will be scheduled to return the Crewmember to his Gateway Travel Airport no later than twenty-four (24) hours after the conclusion of the Crewmember's assignment, provided, however, that no Gateway Travel from an assignment will be provided if the Crewmember's next assignment is to commence within forty-eight (48) hours of the actual conclusion of his current assignment.

4.  Gateway Travel Hotel Accommodations and Per Diem

   a.  If a Crewmember is required to Gateway Travel on a Day Off he will be provided with hotel accommodations at his Base until the start of his assignment.

   b.  If an otherwise Gateway Travel eligible Crewmember is not eligible for Gateway Travel at the end of his assignment pursuant to subsection 6.A.3.b., above, the Crewmember shall be provided hotel accommodations at his Base between such assignments.

   c.  Except as provided in subsection 6.A.4.d., below, a Crewmember shall not be entitled to per diem or other expenses as a result of any time spent in Gateway Travel or between assignments.

   d.  A Crewmember who is eligible for Gateway Travel shall receive per diem and hotel accommodations while assigned to reserve at his Base if reserve status at his Base is permitted under Section 25 and Section 31.

5.  Alternative Travel

a. If a Crewmember eligible for Gateway Travel requests alternative travel (i.e., travel from other than a Gateway Travel airport within one hundred and thirty (130) miles of the Crewmember's residence, or travel to a location that is not a Gateway Travel airport within one hundred and thirty (130) miles of the Crewmember's residence) and the cost of providing such alternative travel is less than the cost of providing Gateway Travel, then, at the Company's discretion, the Crewmember may be provided with such alternative travel.

b. At the Company's discretion and direction, a Crewmember eligible for Gateway Travel may be provided Gateway Travel to other than his Base to begin an assignment in lieu of Gateway Travel to the Crewmember's Base followed by a deadhead to flight duty.  The provisions of this subsection 6.A.5.b. are not intended to cause the Crewmember to incur any loss of pay.

6. Expeditious Travel

   a. The Company shall arrange for Gateway Travel in accordance with the following (in descending order) and subject to subsections 6.A.6.b. and 6.A.6.c., below:

      (i) The Company shall arrange for non-stop travel when it is available.

      (ii) If non-stop travel is not available, the Company shall arrange for one-connection travel when it is available.  The Company shall select the shortest connection time available.

      (iii) If one-connection travel is not available, the Company shall arrange for two-connection travel.  The Company shall select the shortest connection times available.

      (iv) The connect times in subsections 6.A.6.a.(ii) and 6.A.6.a.(iii), above, shall be chosen after the cost triggers referenced in subsections 6.A.6.b. and 6.A.6.c., below, have been reviewed.

   b. Notwithstanding the above, the Company may in the first instance arrange for Gateway Travel under subsection 6.A.6.a.(ii), above, if the cost of Gateway Travel under subsection 6.A.6.a.(i), above, exceeds the cost of Gateway Travel under subsection 6.A.6.a.(ii), above by more than fifteen (15) percent of the Base Price and the scheduled connection time is less than two (2) hours.

    c.  Notwithstanding the above, the Company may arrange for Gateway Travel under subsection 6.A.6.a.(iii)., above, if the cost of Gateway Travel under subsection 6.A.6.a.(ii), above, exceeds the cost of Gateway Travel under subsection 6.A.6.a.(iii), above, by more than fifteen (15) of the Base Price and the scheduled connection times are less than two (2) hours for each connection.

    d.  The Base Price is defined by as the lowest price available to the Company's travel department by utilizing current airline contracts and the reservation system used by the Company.

    e.  When arranging travel under subsections 6.A.6.a.(ii). or 6.A.6.a.(iii)., above, the Company shall utilize the same carrier or a code sharing partner, unless it is not possible to do so.

    f.  If the Company cannot comply with subsection 6.A.6.a.(i). as a result of a labor dispute, weather or flight cancellations, or compliance would result in a Crewmember being illegal to perform a duty assignment, receiving less than twelve (12) hours of rest prior to an operating or deadhead segment or booked on the last flight of the day, the Company shall schedule Gateway Travel in accordance with the descending order provisions of subsection 6.A.6.a. unless one or more of the conditions referred to herein makes it impossible to do so.   In such a case, the Company remains obligated to arrange for Gateway Travel in accordance with subsection 6.A.3.b.

7.  General

    a.  Gateway Travel shall not be considered Work or duty for any purpose, including but not limited to pay, per diem, or duty time limitations.

    b.  Crewmember travel to and from a Gateway Travel airport, including but not limited to mileage expense, tolls, parking, and any other related expenses shall be the responsibility of the Crewmember.

    c.  Gateway Travel by air shall be coach class and shall be booked on a carrier of the Company's choosing.   Further, Gateway Travel may be provided on Company aircraft.   Nothing herein shall preclude the Company from providing Gateway Travel via other than air transportation.

    d.  The Company is not responsible for delays, cancellations or flights missed by the Crewmember.

e.   The references in this Section 6 to the one hundred and thirty (130) mile distance shall determined be by the most direct ground transportation routing as determined by a reputable source (e.g., Mapquest, AAA, Google Maps).

# SECTION 7: VACATION

### A. VACATION ACCRUAL

1. Each Crewmember shall accrue vacation in accordance with his years of service, pursuant to subsections 7.A.1.a. and 7.A.1.b., below, for each month in which he is on active status as a Crewmember for at least fifteen (15) days.

   a. From the date of hire through the conclusion of five (5) years of active Company service, a Crewmember shall accrue vacation at the rate of one and seventeen hundredths (1.17) days per month.

   b. A Crewmember with six (6) or more years of active Company service shall accrue vacation at the rate of one and three quarters (1.75) days per month.

2. A Crewmember shall begin to accrue vacation on his date of hire, but shall forfeit any accrued vacation if he does not successfully complete new-hire training.

3. There shall be no carryover of unused vacation. Vacations not bid in the preceding year for use in the current year, or otherwise used or paid out during the current year, shall be paid out on the second pay period after January 1st of the following year.

### B. VACATION PAY AND USAGE

1. Vacation accrued during one calendar year may not be taken until January 1st of the following calendar year without Company approval.

2. A Crewmember shall receive Vacation Pay at his then current hourly rate of pay as set forth in Section 3, and the Company shall make a corresponding deduction from the Crewmember's vacation accrual.

3. Each day of vacation shall be paid at 3.65 hours per day.

### C. VACATION SCHEDULING

1. On or before October 1st of each year the Company shall publish a system-wide vacation bid sheet containing the allocation of vacation periods for the following calendar year. The vacation bid sheet shall indicate the maximum number of Crewmembers, by Status and equipment type, who may be on vacation during each vacation period.

2. The Company shall post the vacation bid on the Company Website.

3. Each vacation period shall consist of a single block of seven (7) consecutive days.  The Company may permit Crewmembers to take additional vacation days that are consecutive with the seven (7) day vacation block.

4. Each Crewmember's bid may include multiple requests for vacation periods, which shall be ranked in order of preference.

5. The vacation bid shall close on November 1st of each year.

6. For each Status and equipment type, vacations shall be awarded on the basis of seniority.

7. Vacations shall be awarded by November 15th of each year.  Awards will be published on the Company Website.

8. After the vacations are awarded, any remaining available vacation periods may, subject to the operational needs of the Company, be awarded on a first come, first served basis; *provided,* the vacation is requested in writing prior to the date schedule lines are awarded for the bid month in which it will be taken.

9. Vacations, once awarded, may be changed at any time by mutual agreement between the Crewmember and the Company.

10. If a Crewmember voluntarily changes his Status and/or equipment type after the vacation bids have been awarded, he shall re-bid his vacation entitlement in the subsequent twelve (12) month period for his new Status and/or equipment type.  Any such re-bidding shall be awarded in seniority order amongst those Crewmembers then rebidding.  If there are less than four (4) vacation periods published as available for bidding for each Crewmember, the Company shall make additional vacation periods available so each Crewmember bidding has at least four (4) vacation period options.   In the case of an involuntary change in Status and/or equipment type, the provisions of subsection 7.D.3., below, shall apply.

   a. In lieu of re-bidding his vacation, the Crewmember shall have the option of being paid out for the lost vacation referenced in subsection 7.C.10., above.  This Vacation Pay shall be added to the greater of Bid Monthly Pay under subsection 3.C. or monthly guarantee.

**D.  GENERAL**

1. The Company shall make available each year a sufficient number of vacation periods to ensure that each Crewmember has an

opportunity to receive a vacation equal to the amount of vacation accrued in the prior calendar year.   There shall be no black out periods during the calendar year.   Prior to publishing vacation periods for bidding, the Company shall meet and confer with the Scheduling Committee to discuss the number of vacation periods to be made available in each calendar week.

2. The Company shall award Crewmembers their "buddy bid" vacation preference(s).  The senior Crewmember shall inform the Company that he wishes to be awarded the same vacation period(s) as a junior Crewmember.  The Company shall provide Crewmembers with a form for exercising rights under this subsection 7.D.2.

3. A Crewmember's vacation may only be cancelled by the Company based on an operational necessity that was not reasonably foreseeable at the time of the posting of the vacation bid sheet during the prior calendar year. In the event of a vacation cancellation, the Company shall provide the Crewmember with as much notice as reasonably possible. If the Company cancels a Crewmember's vacation, the following procedures shall apply:

   a. The Company shall reimburse the Crewmember, upon receipt of adequate documentation, for all non-refundable expenses directly associated with the cancellation of the Crewmember's vacation.  Nothing shall preclude the Company from attempting to recover any non-refundable expenses from third parties.

   b. The Crewmember may select, and the Company shall grant, a make-up vacation period during the subsequent twelve (12) months, notwithstanding any limitations expressed in Section 7.D.1., above.   In furtherance thereof, the Company shall make available at least one (1) vacation period in nine (9) of the twelve (12) months. A "remaining available vacation period(s)" within the meaning of subsection 7.C.8., above, shall count toward the Company's obligation in a particular month.  This re-scheduled vacation may not be cancelled by the Company.

   c. At the Crewmember's election, the Company shall pay the Crewmember for the cancelled vacation in the month cancelled. This Vacation Pay shall be added to the greater of Bid Monthly Pay under subsection 3.C or monthly guarantee.

4. The Company shall have the right, for any reason, to offer Crewmembers option of electing vacation pay in lieu of time off. This offer of vacation pay in lieu of time off may be extended for specific limited periods, and may be offered system wide or limited to one or more Bases, at the Company's discretion.

5. A Crewmember on Military Leave of Absence under Section 13 of this Agreement shall be permitted to use accrued vacation one day at time while on such leave.

6. If a Crewmember is on Military Leave of Absence during an awarded vacation period, the Crewmember may cancel the vacation period and choose from among vacation periods made available by the Company or exercise the rights afforded Crewmembers under subsection 7.D.3.c., above.

7. Upon separation from employment with the Company for any reason, the Company shall pay the Crewmember (or designated beneficiary in the event of a Crewmember's death) for:

    (i) all accrued unused vacation that was to be taken in the current calendar year; and

    (ii) for all accrued unused vacation to be taken in the next calendar year if the Crewmember provides at least two (2) weeks notice prior to separation (other than in the case of the Crewmember's death or retirement at age sixty-five (65) or older) and was not discharged for just cause; *provided*, that a probationary Crewmember is not entitled to a vacation payout.

    Payment shall be based on the Crewmember's Status and Longevity at the time of the termination of employment.

8. A Crewmember's vacation accrual on the date of signing of this Agreement shall be carried forward.

# SECTION 8: DEADHEADING

### A. DEADHEAD BY AIR

1. Deadhead by air shall include Company-directed travel:

   a. From a Crewmember's Permanent or Temporary Base to another location for the purpose of an assignment; or

   b. From a location other than a Crewmember's Permanent or Temporary Base back to the Crewmember's Permanent or Temporary Base at the end of an assignment; or

   c. Between any two locations away from the Crewmember's Permanent or Temporary Base.

2. Deadhead by air may be on Company aircraft, on commercial passenger carriers or by charter.

   a. The Company shall not deadhead a Crewmember on a U.S. carrier or charter operator that is not FAR 121 or 135 certified.

   b. When selecting foreign commercial passenger carriers or charter operators for deadhead travel, the Company shall make a reasonable effort, but is not required to exclusively select, carriers that have been determined by the FAA's International Aviation Safety Assessment (IASA) program to comply with the standards established by the International Civil Aviation Organization (ICAO). Should the Union have any concerns regarding a specific foreign carrier or charter operator, the parties will meet and discuss the matter. Nothing contained herein shall limit Crewmember rights under Section 26.R of the Agreement.

3. When deadheading on a commercial carrier the Company will provide "business-class" travel (or better) for all individual deadhead segments that depart from or arrive at an international location (a location outside the fifty States). If business-class travel is not available the Crewmember may be required to travel in "coach" class. For such an international deadhead segment that is scheduled for six (6) hours or more that the Crewmember is required to travel in coach class, he shall be entitled to compensation of three hundred dollars ($300.00). In no case may a Crewmember refuse commercial air travel in coach class if business class travel is unavailable.

   a. Business class travel (or better)" means business class or first class, not coach.

b. If the Company is unable to provide business class travel (or better) in accordance with subsection 8.A.3., but the Crewmember is able to locate business class travel (or better) from the same metropolitan area, he may contact the Travel Department, and provided such travel does not interfere with completion of assignments in any way, subject to the approval of Crew Scheduling, the Travel Department will either authorize purchase on the Crewmember's credit card or will book the travel identified by the Crewmember.   If business class is available, a Crewmember may not purchase first class travel. The Company shall not assign or change a Crewmember's departure location for the purpose of making business class travel (or better) unavailable.

c. The Company shall minimize excessive multiple segments between two (2) domestic locations.

4. When scheduling deadheading, the Company shall use reasonable efforts to minimize multiple segments and long airport layovers, and multiple carriers that do not code share and/or require separate check-in.

### B. SURFACE DEADHEAD

1. Surface deadhead shall be any Company directed non-local (scheduled one (1) hour or more) ground-travel between two airports, including ground travel from a hotel adjacent to an airport to another airport or vice-versa.

2. The following table reflects the airport pairs for which surface deadhead is currently required:

| From/To | To/From | Time | From/To | To/From | Time |
|---|---|---|---|---|---|
| AMS | DUS | 2:30 | DXB | FJR | 1:30 |
| AMS | FRA | 4:00 | EWR | JFK | 1:00 |
| AMS | HHN | 4:00 | FRA | DUS | 2:00 |
| AMS | LGG | 3:00 | FRA | HHN | 1:15 |
| AMS | LUX | 4:30 | FRA | LUX | 2:15 |
| AMS | RMS | 4:30 | FRA | RMS | 1:15 |
| BRU | OST | 1:30 | GLA | PIK | 1:00 |
| CPH | MMX | 1:00 | GRU | VCP | 2:00 |
| DXB | AUH | 2:00 | HHN | DUS | 2:00 |

| From/To | To/From | Time | From/To | To/From | Time |
|---------|---------|------|---------|---------|------|
| HKG | SZN | 3:00 | MXP | LIN | 1:00 |
| IGU | AGT | 1:00 | OKA | DNA | 1:00 |
| JFK | DOV | 3:15 | OKO | NRT | 2:00 |
| JFK | BDL | 3:00 | OSN | ICN | 2:00 |
| JFK | HPN | 1:00 | OST | AMS | 3:00 |
| JFK | WRI | 2:00 | PHL | DOV | 1:30 |
| LGG | BRU | 1:00 | RMS | DUS | 3:00 |
| LGG | HHN | 2:30 | RMS | HHN | 1:15 |
| LGG | RMS | 2:30 | RMS | LUX | 1:30 |
| LGW | STN | 1:15 | ICN | OSN | 2:00 |
| LHR | LGW | 1:00 | SFO | MHR | 2:00 |
| LHR | MHZ | 1:30 | SHJ | AUH | 2:30 |
| LHR | STN | 1:30 | SUU | OAK | 1:00 |
| LUX | AMS | 4:30 | SUU | SFO | 2:00 |
| LUX | DUS | 2:30 | WRI | DOV | 2:00 |
| LUX | HHN | 1:30 | WRI | PHL | 1:00 |
| MFM | HKG | 3:30 | YHM | YYZ | 1:00 |
| MXP | BGY | 1:15 | YUL | YMX | 1:00 |

3. If during the life of this Agreement the operation should require surface deadhead on a regular basis between additional airport pairs, the Company shall publish the scheduled deadhead time(s) for the new airport pair(s), which shall be based on an assessment of the actual time necessary to travel between the new airport pair(s) by the most expeditious route as determined by a reputable source (e.g., Mapquest, AAA, Google Maps). Nothing herein shall be construed to prohibit the Company from requiring surface deadhead between airports for which the scheduled surface deadhead time(s) have not yet been published. Should the Company require that a Crewmember surface deadhead between two airports for which no scheduled deadhead time has been published by the Company, and the actual time necessary to travel between such airports cannot be determined by using the above-mentioned reputable sources, the time in deadhead shall be based on a reasonable assessment of the normal surface transportation required for the most expeditious routing.

4. Transportation Local In Nature to and from a layover hotel shall not

be considered surface deadhead.

### C. ALTERNATIVE TRANSPORTATION

1. A Crewmember request for alternative travel must be made in a timely manner and as directed by the Company. The decision to allow or disallow an alternative travel request shall be at the Company's sole discretion.

2. Alternative deadhead transportation will be permitted if the cost of providing such is equal to or less than the cost of providing the scheduled deadhead transportation.

3. A Crewmember must be released by the Company before he can elect to waive a deadhead segment at the end of a Trip Pairing.

### D. DEADHEAD PAY

A Crewmember shall be entitled to pay for deadhead in accordance with the provisions of Section 3 of the Agreement.

### E. GENERAL

The Company shall provide the Crewmember's frequent flyer/rewards number (if the Crewmember provides it to the Company) to the airline at the time the reservation is made.  The Company shall not be responsible for any errors, omissions or credits made related to frequent flyer numbers or points.

# SECTION 9: MISCELLANEOUS FLYING

### A. ENGINE-OUT FERRY FLIGHTS

1. Engine-out ferry flights shall be performed by qualified Crewmembers, including Check Airmen, qualified Crewmembers not covered by this Agreement, or other qualified individuals who have received training to perform engine-out ferry flights.

2. A Crewmember who is not a Check Airmen may decline training for qualification to perform engine-out ferry flights.

3. A Crewmember who has received training to be qualified to perform engine-out ferry flights may not decline an assignment to perform an engine-out ferry flight.

4. A Crewmember who has received training to be qualified to perform engine-out ferry flights may resign such qualification at any time, provided, however, that once an assignment to perform an engine-out ferry flight has been made, the resignation of his qualification will not be effective until that assignment has been completed.

### B. MAINTENANCE ACCEPTANCE, NON-ROUTINE FLIGHT OPERATIONS AND FUNCTIONAL CHECK FLIGHTS

1. At the Company's discretion, flights for the purpose of verification or calibration and maintenance acceptance flights that occur during revenue flights, except as provided in subsection B.2, below, may be assigned to qualified Crewmembers, including Check Airmen, or a qualified Crewmember not covered by the Agreement.

2. Maintenance flights that do not occur during revenue flights and Non-Routine Flight Operations and Functional Check Flights, including but not limited to maintenance acceptance flights, where such operations and flights require the use of emergency, abnormal, or non-routine procedures or require any special training to verify performed maintenance shall be flown by:

   (a) qualified Crewmembers, Check Airmen or qualified Crewmembers not covered by this Agreement; or

   (b) when qualified Crewmembers, Check Airmen or other qualified Crewmembers not covered by the Agreement are not reasonably available, by qualified other individuals.

3. A positioning flight for the delivery of an aircraft to be purchased, sold or leased to or from the Company may be performed by:

    (a) qualified Crewmembers, including Check Airmen, qualified Crewmembers not covered by this Agreement; or

    (b) when qualified Crewmembers, Check Airmen or other qualified Crewmembers not covered by the Agreement are not reasonably available, by other qualified individuals.

# SECTION 10:
# MANAGEMENT & NON-FLYING DUTY

### A. TRANSFER TO MANAGEMENT OR NON-FLYING DUTY

1. A Crewmember transferred to a management or non-flying position shall retain and continue to accrue seniority and Longevity so long as he maintains at least a second class medical certificate and the requisite airman's certificate for his former Crewmember Position. If such a Crewmember's medical certificate lapses, he shall retain and continue to accrue seniority for a period of five (5) years after the initial lapse of his medical certificate. The Crewmember will be removed from the applicable Crewmember System Seniority List(s) on the fifth anniversary of the lapse of his medical certificate, unless he is reissued at least a second class medical certificate prior to the fifth anniversary.

2. A Crewmember transferred to a management or non-flying position whose seniority as a Crewmember is such that he would be on furlough if he were in a Crewmember Position will be placed on furlough at the time he returns to a Crewmember Position.

3. For purposes of this subsection 10.A.3., a Crewmember transferred to a management or non-flying position shall retain the Position he held prior to the transfer. A Crewmember transferred to a management or non-flying position shall participate in all system bids. Pursuant to Section 24, such Crewmember will be awarded a place-holder Position ("phantom award"), which will be designated as such on the published bid award. If such Crewmember elects to return to line duty, he will be assigned a Position based on his phantom award. The returning Crewmember will not displace another Crewmember. If the returning Crewmember has not completed the training required for the phantom award Position prior to returning to duty as a Crewmember, he shall be assigned to the Position he held prior to transferring to a management or non-flying position until the training is complete; *provided,* if the phantom award Position is at a higher rate of pay than the Position he held prior to transferring to a management or non-flying position and the Crewmember has not commenced training for the higher paying Position within one hundred twenty (120) days of his return to duty date, he shall be compensated at the higher rate of pay.

4. Except as specifically addressed in this Agreement, the terms and

conditions of employment for Crewmembers, including the right to appoint and remove Crewmembers who transfer to a management or non flying position, shall be within the discretion of the Company and shall not be subject to the terms of this Agreement. A Crewmember wishing to be released from a management or non-flying position may resign from such position. If feasible, a Crewmember wishing to resign will provide a minimum of thirty (30) days notice, but in all cases, as much notice as practicable.

### B. FLYING BY MANAGEMENT CREWMEMBERS

1. A Management Crewmember may perform revenue and non-revenue flying for the Company; however, such Management Crewmember is not eligible to bid for a line of flying, except for bidding in a month in which the Management Crewmember is to return to line duty as a Crewmember.

2. When a Management Crewmember performs awarded or assigned flying (except as described in subsection 10.C., below), the following provisions shall be applicable:

   a. Displacement of a Crewmember by a Management Crewmember

      (i) If a Management Crewmember displaces a Crewmember who is a Regular Line Holder from an awarded or assigned trip, the Crewmember shall be credited the greater of the scheduled or actual pay/credit hours of the trip(s) from which he was displaced.

      (ii) In the event of a displacement under subsection 10.B.2.a.i., above, the Company may require the Crewmember to fly any other trip in lieu of the trip from which he was displaced; *provided*:

         (a) the Crewmember is given the new trip at the time of notification of his displacement from the originally awarded or assigned trip; and

         (b) the newly-assigned trip is scheduled to depart no earlier than the originally-assigned trip is scheduled to begin; and

         (c) the newly assigned trip is scheduled to be completed no later than the last day of the original Trip Pairing.

         (d) the newly-assigned trip does not make the Crewmember illegal for his next scheduled trip assignment.

With the displaced Crewmember's concurrence, the displaced Crewmember may be assigned any other replacement trip offered by the Company.

(iii) A Crewmember who is a Reserve Line Holder who is assigned a trip, but was subsequently displaced from the assigned trip by a Management Crewmember, will revert to reserve status.

(iv) In the event a displaced Crewmember who is a Regular Line Holder receives a new assignment under subsection 10.B.2.a.(ii), above, the pay/credit guarantee in subsection 10.B.2.a.(i), above, will not apply.  Instead, the displaced Crewmember shall receive the greater of:

(a) actual or scheduled pay/credit hours for the originally assigned trip (whichever is greater); or

(b) actual or scheduled pay/credit hours for the newly assigned trip (whichever is greater).

b. Open Time Flying by a Management Crewmember.

(i) The Company may use Management Crewmembers to perform Open Time flying when required to maintain the Management Crewmember's currency and proficiency as a Crewmember and/or a Check Airman; *provided*, the Company first complies with subsection 25.M. and such procedures did not produce an available Crewmember within seventy-two (72) hours of the scheduled departure of the trip.

#### C. EXCEPTIONS TO RESTRICTIONS ON MANAGEMENT CREWMEMBERS

1. The provisions of subsection 10.B.2.b., above, do not apply to any flights operated by Management Crewmembers under  Section 9 or Section 33

This Page Intentionally Blank

# SECTION 11: TRAINING

### A. GENERAL

1. The Company shall establish and implement training and checking programs consistent with this Agreement.  Training and checking shall be in accordance with applicable FARs and Company policy, as set forth in the Flight Operations Training Manual, which may be amended from time to time by the Company. The Company will engage in prior consultation with the UTC as set forth in this Section 11 on significant or material amendments to the Flight Operations Manual. Nothing contained herein shall prohibit the Company from complying with FAA-mandated changes to the Flight Operations Training Manual. Such training programs will include but not be limited to initial New Hire training, upgrade training, transition/differences training, recurrent training, and requalification training.

2. Subject to subsections 24.L.2. and 24.M.3., the Company shall provide at its expense any training or checking required by the Company or FAA to qualify as a Crewmember or to obtain or maintain qualifications as a Crewmember. The Company shall not require payment for or reimbursement to the Company for any training or checking costs or expenses, or the execution of any training or checking bond, or other agreement with respect to the same.  Any such agreement to the contrary shall be null and void.

3. Subject to subsections 24.L.2. and 24.M.3., if the Company or FAA requires certification not in effect on the effective date of the Agreement, the Company shall afford Crewmembers the opportunity to secure such certification in a manner that will be applied equally and uniformly by the Company; *provided*, however, that the Company shall not be required to pay for the cost of a written examination (i.e., written ATP, FE wanting to be trained as a Pilot).

   a. If the Company requires prior operating experience of any kind, the Company shall enter into a mutually agreeable Letter of Agreement with the Union establishing the terms and conditions of such prior operating experience, and related issues that arise as a result thereof, before posting any vacancies or otherwise awarding or assigning Crewmembers to such Positions.

4. The Company will establish and publish the standards all Crewmembers are required to meet in order to successfully complete any training curriculum, including any oral examination or Checkride.

Such standards will be applied equally and uniformly by the Company recognizing that Instructors and Check Airmen have different styles of teaching and checking. The Company has the right to evaluate any Crewmember, based on the Company's published standards, requirements, and the FARs, to determine his progress in training and checking.

5. The Company may provide additional training beyond those required by this Section 11. Additional training referred to in this Section 11 shall, at a minimum, address a Crewmember's specific performance deficiencies. When Crewmembers require additional training, access to such additional training shall be applied equally and uniformly by the Company.

6. A Check Airman on the respective System Seniority List shall administer all Checkrides.

7. Other than for Home Study, the Company shall provide transportation to and from training, together with per diem and lodging, for all training away from the Crewmember's residence. However, the Company is not required to provide transportation between a Crewmember's residence and the training location if the Crewmember resides within seventy-five (75) miles of the training location based on the distance as determined by AAA. Upon request, the Company will provide Crewmembers who reside within seventy-five miles of the training center with lodging beginning the day prior to training and for any day(s) during training that the Crewmember does not return to his residence.

8. A Crewmember may be assigned to simulator support duty as needed to provide a complete flight crew for various training and checking.   Except when otherwise required by the FARs, a Crewmember assigned simulator support duty shall not be subject to training, oral examination or checking requirements solely as result of such assignment.  The Company may not assign a Crewmember simulator support duty if the assignment interferes with the Crewmember's own training, oral examination or Checkride or preparation for the same.

9. If a Crewmember does not pass a Checkride, the Company shall assign a different Check Airman for each subsequent Checkride until requalification has occurred or training has been terminated.

10. The Company will not schedule any two (2) Checkrides within forty-eight (48) hours without Crewmember concurrence.

11. Actual training within a training class shall be scheduled based on

the needs of the operation, taking into consideration, where possible, the seniority of the Crewmember to be trained.  A Crewmember may not select a simulator period that conflicts with a known trip scheduled to begin upon completion of the training session.  Training of Check Airmen takes precedence over all other simulator and flight training.

12. The Company is not required to provide simulator training or other flight training to any Crewmember who has not satisfactorily completed any required ground school training.

## B.  TRAINING COMMITTEE

1. The Union shall appoint two (2) Crewmembers to the Training Committee, both of whom, in the sole discretion of the Union, have sufficient qualifications to serve on the Training Committee.

2. The Company shall meet with the Training Committee on a semi-annual basis and when otherwise required by this Section 11.

3. The Company shall meet and confer with the Training Committee prior to making substantial modifications to the Flight Operations Training Manual or when the Training Committee has identified possible improvements.

4. The Company shall notify the Training Committee if a Crewmember invokes the change procedures set forth in subsection 11.C.2., below, requires additional training under subsection 11.D.2 or does not pass a Checkride pursuant to subsection 11.E., below. Notification shall be provided within twenty-four (24) hours.

5. The Union shall inform the Company of the Training Committee member(s), or designee(s), who shall be the Company's point of immediate contact in the event of a Training Conflict.

6. The Company shall make reasonable efforts to release members of the Training Committee, or their designees, from conflicting duty to carry out Training Committee duties as set forth in this Section 11, consistent with current practice. If a Training Committee member, or designee, cannot be released on a particular occasion, the Company shall contact the Training Committee, or their designees, by telephone and provide the relevant information.   Flight pay loss procedures shall be as set forth in the Flight Pay Loss Letter of Agreement.

## C.  TRAINING CONFLICTS

1. If a Crewmember has concerns about any aspect of training or a

checkride, the Crewmember shall attempt to resolve the matter with the Fleet Captain or his designee. Nothing contained herein shall prevent a Crewmember from raising training related issues with other training management individuals he deems appropriate. The Company and Crewmembers may also refer concerns to the Training Committee.

2. If, during any training event other than Recurrent Training, there is a personal conflict between the Crewmember and his training partner, or between the Crewmember and the Simulator Instructor or Check Airman, a Crewmember may request a change in training partner, Instructor or Check Airman, whichever is applicable. A Crewmember's request shall be honored one time per training curriculum, to include the Checkride.

   a. The ability to change Instructors or Check Airman shall be limited to those individuals currently available and qualified to administer the training curriculum, including the Checkride. "Currently available" means the Instructor or Check Airman is at the training location.   If an Instructor or Check Airman, whichever is applicable, is not available, the Company shall select an Instructor or Check Airman, after consultation with the Training Committee, who can be available within forty-eight (48) hours.

   b. A Crewmember's right to change training partners shall be limited to a Crewmember who is participating in the same training curriculum, including the Checkride.

3. To preserve the continuity of the training schedule, the Crewmember shall make the specific concern and/or personal conflict referred to in subsections 11.C.1. or 11.C.2., above, known to the Company as soon as the Crewmember becomes aware of the concern and/or conflict.

4. Upon referral or notification in accordance with subsection 11.B.4. or 11.C.1., above, whichever is applicable, the Training Committee, or designee shall meet with the Company in person or by telephone, as agreed upon by the parties, to discuss potential resolutions of the underlying issue(s).

5. At the request of the Company, Crewmember or the Training Committee, a member of the Training Committee, or a mutually agreeable designee, shall be assigned to observe the training and/or Checkride that is the subject of the referral or notification unless an FAA official in attendance prohibits such an observer.

### D. UNSATISFACTORY TRAINING PROGRESS

If a Crewmember is not making satisfactory progress in a training curriculum, including, when applicable, obtaining a recommendation for an oral examination, obtaining a recommendation for a Checkride, or failing an oral examination required by the FAA for a type-rating, the following procedures apply:

1. The Crewmember shall receive additional training.

2. If the Crewmember does not make satisfactory progress in a training curriculum following additional training referred to in subsection 11.D.1., above, the Crewmember shall receive additional training.

3. If the Crewmember does not make satisfactory progress in a training curriculum following the additional training referred to in subsection 11.D.2., above, the consequences shall be as set forth in subsection 11.D.4., below.

4. The Company may remove a Crewmember from the training curriculum after providing the additional training referred to in this subsection 11.D.  Upon removal, a Crewmember will be returned to his last Position after completing any required re-qualification training curriculum.     If the Company removes the Crewmember for unsatisfactory progress in the training curriculum, or the Crewmember removes himself (except for circumstances beyond the control of the Crewmember, *e.g.*, death of a family member, illness, divorce), the removal shall be considered an Unsuccessful Qualification Event (UQE) within the meaning of subsection 11.E., below.   The UQE will carry-forward to the Crewmember's next Checkride pursuant to subsection 11.E., below.

### E. CHECKRIDES

If a Crewmember attempts but does not pass a Checkride, the failure shall be considered the first UQE. Following the first UQE, the following procedures shall apply:

1. The Crewmember shall receive additional training.

   a. If the Crewmember receives a recommendation for a second Checkride, and does not pass the second Checkride, the failure shall be considered the second UQE.

   b. If the Crewmember does not receive a recommendation for a second Checkride, the Crewmember shall receive additional training (in addition the training provided pursuant to subsection 11.E.1., above).    If the Crewmember does not receive a

> recommendation for a second Checkride following the aforementioned additional training , the failure to obtain a recommendation for a second Checkride shall be considered the second UQE.

2. Following a second UQE pursuant to subsections 11.E.1.a. or 11.E.1.b., above, whichever is applicable, the following procedures shall apply:

   a. The Crewmember shall receive additional training.

   b. If the Crewmember receives a recommendation for a third Checkride, and does not pass the third Checkride, the failure shall be considered the third UQE.

   c. If the Crewmember does not receive a recommendation for a third Checkride, the failure to obtain a recommendation shall be considered the third UQE.  The consequences of a third UQE shall be as set forth in subsection 11.E.4., below.

3. UQE Carry-Forward.  When a Crewmember attempts to qualify for any Position, UQEs resulting from the procedures set forth subsection 11.D.4. and 11.E., above, shall be cumulative, up to and including three (3) UQEs.  Upon qualification in any Position, all previous UQEs  will no longer be applicable for the purpose of this Section 11.   However, the FAA mandated Proficiency Watch Program (PWP) will still be applicable.

4. Accumulation of Three UQEs

   a. Prior to accumulating three (3) UQEs, a Crewmember shall remain on active status unless the parties mutually agree otherwise.

   b. After accumulating three (3) UQEs, the Crewmember's employment status shall be determined by the Company.; *provided,* there is just cause (e.g., termination, downgrade).

#### F. CREWMEMBER TRAINING INSTRUCTORS

1. Staffing

   a. Crewmembers assigned each bid month as Ground School Instructors, Simulator Instructors, Proficiency Check Airmen, Aircrew Program Designees, and Designated Flight Engineer Examiners shall hereinafter be referred to as "Crewmember Training Instructors" ("CTIs").

b. The Company shall be obligated to staff in each Bid Month a sufficient number of CTIs to accomplish no less than fifty percent (50%) of the planned "instructional training periods" for the ground based flight training of Crewmembers (i.e. Pilots and Flight Engineers covered by this Agreement) to be accomplished in that Bid Month at the Company's training facilities; *provided*, if CTIs staffed less than fifty percent (50%) of the actual instructional training periods in a Bid Month, then the fifty percent (50%) requirement in the second Bid Month thereafter shall be increased by the percentage difference between fifty percent (50%) and the percentage of instructional training periods staffed by CTIs. The monthly number of CTIs to be staffed shall be determined as follows:

(1) A determination shall be made of the number of hours of Crewmember ground based flight training to be conducted in the bid month at the Company's training facilities. Included in the determination of Crewmember ground based flight training shall be:

   i. Initial training;

   ii. Recurrent training;

   iii. Transition training;

   iv. Upgrade training;

   v. Re-qualification training.

   Full motion simulator time and fixed base simulator (or similar device) time associated with subsections 11.F.1.b.(1) i.-v., above, shall be included in the determination referred to above. Planned instructional training periods are those built into the Company's crew management system (CMS) prior to the start of a Bid Month.

(2) In the event the name of the training programs identified in subsection 11.F.1.b.(1), above, change, the parties shall execute a letter of agreement substituting applicable the new name(s).

c. Nothing in this Agreement shall be construed to restrict in any way the Company's right to hire or otherwise employ "Professional Training Instructors," who shall not be covered by this Agreement; *provided,* Checkrides shall only be given by Check Airmen on the System Seniority List. The Company shall consider the application of any Crewmember interested in filling

a position as a Professional Training Instructor.   If a Crewmember is awarded a position as a Professional Training Instructor, he shall not be subject to the terms and conditions of this Agreement.

d. A Crewmember who is otherwise unable to perform duties as a Crewmember and is offered a position as a Professional Training Instructor shall be treated in accordance with subsection 11.F.1.c., above.

2. Compensation. A CTI shall be compensated as provided in Section 3.

3. Training Periods

   a. A CTI shall not be scheduled for more than one (1) training period per assigned Work Day without the CTI's consent.

   b. Training periods, which may include multiple events or classroom sessions, shall not be scheduled for more than ten (10) hours, including two (2) fifteen (15) minute breaks, but exclusive of a one (1) hour break for lunch/dinner, without the CTI's consent.

   A CTI shall be scheduled for a minimum of ten (10) hours of rest between training periods, which can be reduced with the CTI's concurrence.

4. Crewmember Training Instructor Scheduling.

5. Proficiency Flying. The Company shall permit a CTI to perform, at a minimum, one (1) month of regular line flying every three (3) months; *provided,* if operational considerations require, the four (4) months of regular line flying may be accomplished at any time over the course of a twelve (12) month period.

6. General

   a. Nothing herein shall preclude the Company from assigning a CTI to training support.

   b. The Company shall provide CTIs transportation to the location of the assignment and return, per diem and lodging in accordance with Section 5 for all training assignments, unless the CTI resides within seventy-five (75) miles of the training location.

   c. A CTI who is assigned training duty shall receive pay and credit for travel between his Base and the training location.

# SECTION 12: HOURS OF SERVICE

### A. GENERAL

1. Except as specifically set forth in this Section 12, Crewmembers are not required to exceed the flight time or duty period limitations contained in this Agreement.

2. Except for Company flight operations, a Crewmember shall not perform any flying that would count towards his FAR flight time or duty time limitations without prior permission by the Company. Nothing herein shall prevent a Crewmember from flying military aircraft as part of any military reserve obligation.

### B. DUTY PERIOD REPORT TIME AND RELEASE TIME

1. Except as provided in subsections 12.B.2. and 12.B.3., below, a Crewmember's duty period shall commence ("report time") and his duty period shall end ("release time") as provided in the following table:

| Crew | Report Time | Release Time |
|---|---|---|
| Operating Flight Crewmember | 1:30 prior to scheduled departure | 30 minutes after actual block in |
| Deadhead – Company Aircraft | 1:30 prior to scheduled departure | 30 minutes after actual block in time |
| Deadhead – Commercial Flight (International) | 1:30 prior to scheduled departure | 30 minutes after actual block in time |
| Deadhead – Commercial Flight (Domestic) | 1:00 prior to scheduled departure | 15 minutes after actual block in time |
| Ground Deadhead Transportation | Scheduled departure time for Limo | Scheduled arrival time |

2. Time spent in Transportation Local In Nature from the location where the Crewmember was released from duty to lodging and from the lodging to a duty assignment does not count toward duty period limitations set forth in this Section 12.

3. If the Crewmember fails to report as required for a flight or deadhead segment, his report time shall be the time the Crewmember actually

checks in for the flight or deadhead segment.

## C. DUTY TIME LIMITATIONS

A Crewmember is on duty in accordance with the provisions of this subsection 12.C.  Except when an applicable FAR requires a shorter duty period, the domestic and international flight and duty time limitations shall be as follows:

1. Two Person Crew

   a. When the duty period is scheduled to consist solely of an operating flight or flights (i.e., no deadhead), or of a deadhead followed by an operating flight or flights (i.e., deadhead to operating flight), the maximum scheduled duty period shall be fourteen (14) consecutive hours.  Once scheduled, a duty period may be extended on account of operating flight delays caused by weather, mechanical, air traffic control, late ground handling, late loading or curfew, or with Crewmember concurrence if he was delayed on a commercial deadhead that precedes an operating flight to which he is assigned as a flight crewmember, to no more than sixteen (16) consecutive hours. If the duty period is extended, the applicable Minimum Rest Period shall be extended in one (1) hour increments based on the duty extension (e.g., if the duty period is extended by fifteen (15) minutes, the Minimum Rest Period shall be extended by one (1) hour; if the duty period is extended by sixty-one (61) minutes, the Minimum Rest Period shall be extended by two (2) hours).

   b. When the duty period is scheduled to consist of an operating flight or flights followed by a deadhead (i.e., operating flight to deadhead), the maximum scheduled and actual duty period shall be eighteen (18) consecutive hours, of which no more than fourteen (14) consecutive hours (or no more than sixteen (16) consecutive hours if subsection 12.C.1.a., above, applies) of the duty period consists of the performance of operating flight crewmember duties.

2. Three Person Crew

   a. This subsection 12.C.2. applies to:

      (i) three (3) required Crewmember aircraft; and

      (ii) two (2) required Crewmember aircraft augmented with one (1) additional Crewmembers.

b. When the duty period is scheduled to consist solely of an operating flight or flights (i.e., no deadhead), or of a deadhead followed by an operating flight or flights (i.e., deadhead to operating flight), the maximum scheduled duty period shall be sixteen (16) consecutive hours. Once scheduled, a duty period may be extended on account of operating flight delays caused by weather, mechanical, air traffic control, late ground handling, late loading or curfew, or with Crewmember concurrence if he was delayed on a commercial deadhead that precedes an operating flight to which he is assigned as a flight crewmember, to no more than eighteen (18) consecutive hours. If the duty period is extended, the applicable Minimum Rest Period shall be extended in one (1) hour increments based on the duty extension (e.g., if the duty period is extended by fifteen (15) minutes, the Minimum Rest Period shall be extended by one (1) hour; if the duty period is extended by sixty-one (61) minutes, the Minimum Rest Period shall be extended by two (2) hours).

c. When the duty period is scheduled to consist of an operating flight or flights followed by a deadhead (i.e., operating flight to deadhead), the maximum scheduled and actual duty period shall be twenty (20) consecutive hours of which no more than sixteen (16) consecutive hours of the Duty Day may relate to the operation of a flight(s) (or no more than eighteen (18) consecutive hours if subsection 12.C.2.b., above, applies).

3. Augmented Crews: Four or More Crewmembers

a. This subsection 12.C.3. applies to:

(i) three (3) required Crewmember aircraft augmented to five (5) Crewmembers; and

(ii) two (2) required Crewmember aircraft augmented to four (4) or more Crewmembers.

b. The maximum scheduled duty period shall be twenty (20) consecutive hours. Once scheduled, a duty period may be extended on account of operating flight delays caused by weather, mechanical, air traffic control, late ground handling, late loading or curfew, or with Crewmember concurrence if he was delayed on a commercial deadhead that precedes an operating flight to which he is assigned as a flight crewmember, to no more than twenty-two (22) consecutive hours. If the duty period is extended, the applicable Minimum Rest Period shall be extended in one (1) hour increments based on the duty extension (e.g., if the duty period is extended by fifteen (15)

minutes, the Minimum Rest Period shall be extended by one (1) hour; if the duty period is extended by sixty-one (61) minutes, the Minimum Rest Period shall be extended by two (2) hours).

4. Deadhead

   a. Deadheading at the direction of the Company is duty.

   b. If a Crewmember is assigned to deadhead on Company aircraft, the Company shall assign the Crewmember a supernumerary seat unless a supernumerary seat is unavailable, in which case, the Crewmember may be assigned to the jumpseat for up to eight (8) hours in a single duty period. This provision shall not apply if the only available commercial travel interferes with the rest requirements set forth in this Section 12 or commercial travel is not available. An affected Crewmember may arrange for travel in accordance with subsection 8.A.3.b. of this Agreement.

   c. If a duty period is scheduled to exceed sixteen (16) consecutive hours and the Crewmember is assigned to deadhead on a commercial airline(s) during such duty period, the Company shall purchase business class or better tickets, if available, for deadheading during the duty period. If the Company is unable to provide business class travel (or better) in accordance with this subsection 12.C.4.c, an affected Crewmember may arrange for travel in accordance with subsection 8.A.3.b. of this Agreement.

   d. A duty period that consists solely of deadheading will not be scheduled to exceed twenty (20) consecutive hours; *provided*, when a Crewmember is released into a block of Days Off from a point other than their Base, the maximum deadhead will not be scheduled to exceed twenty-two (22) hours. As operations require and with the concurrence of the Crewmember and the Chief Pilot, the Director of Operations or another properly authorized Company official, the duty period may be extended.

   e. At the end of his Trip Pairing a Crewmember and subject to Company concurrence, a Crewmember may waive any applicable duty time limits in order to deadhead back to his Base/residence to begin a block of consecutive Days Off.

5. Inoperative Autopilot

   Notwithstanding the applicable duty time limitations set forth in this subsection 12.C., if the aircraft's automatic Pilot system is fully inoperative the crew shall not be scheduled to operate that aircraft for more than eight (8) hours or the period of time that is provided in

the Minimum Equipment List (MEL), whichever is less.

6. After the Originally Scheduled Departure, the applicable duty category (Two Person Crew, Three Person Crew, Augmented Crews, Deadhead) cannot be changed for the purpose of extending duty limits.

### D. MINIMUM REST PERIODS

1. A Crewmember shall receive a Minimum Rest Period after every duty period. The Company shall notify a Crewmember of his next report time prior to the commencement of the rest period.

2. The length of the Minimum Rest Period is as set forth in this subsection 12.D. or as required by an applicable FAR, whichever results in the longest rest period:

   a. For a duty period of up to and including eighteen (18) consecutive hours, the Minimum Rest Period shall be ten (10) consecutive hours. The Minimum Rest Period, including any increase thereto required by subsection 12.C., may be reduced by no more than two (2) hours with Crewmember concurrence.

   b. For a duty period in excess of eighteen (18) consecutive hours up to and including twenty (20) consecutive hours, the Minimum Rest Period shall be twelve (12) consecutive hours. The Minimum Rest Period, including any increase thereto required by subsection 12.C., may be reduced by no more than two (2) hours with Crewmember concurrence.

   c. For a duty period in excess of twenty (20) consecutive hours, the Minimum Rest Period shall be fourteen (14) consecutive hours. The Minimum Rest Period, including any increase thereto required by subsection 12.C., may be reduced by no more than two (2) hours with Crewmember concurrence.

3. If a Crewmember's entire Trip Pairing consists solely of domestic segments (either operating or deadheading, or a combination of operating or deadheading) Minimum Rest shall be in accordance with the applicable FARs.

4. It shall be the Crewmember's responsibility to notify the Company of any circumstances that have adversely affected his receiving the Minimum Rest Period required under this Section 12 (e.g., excessive time spent clearing customs/immigration, lost luggage, ground transportation or lodging issues).  Upon request of the Crewmember, the Company will adjust the Crewmember's rest period so that the Crewmember receives the Minimum Rest Period required by this

Section 12.

5. The Minimum Rest Period taken in accordance with subsection 12.D.2.a. through 12.D.2.c., above, shall immediately follow the Crewmember's duty period.

**E. CREWMEMBER CONTACT DURING A MINIMUM REST PERIOD, LAYOVER PERIOD AND PRE-DUTY REST PERIOD**

1. Minimum Rest Period and Pre-Duty Rest Period Contact

A Crewmember is not required to be contactable during a Minimum Rest Period or Pre-Duty Rest Period. Minimum Rest Periods are set forth in subsection 12.D.2. A Pre-Duty Rest Period is the ten (10) hour period immediately preceding a Crewmember's report time. The Pre-Duty Rest Period may overlap, in whole or part, the Minimum Rest Period. Crewmembers are not required to keep personal communications devices (PCD) (or any similar communications device, including any Company-issued telephone or Internet-based device) "on" during such rest periods. However, Crewmembers may be required to leave the device on solely for the purpose of receiving a wake up call if all other functions can be "silenced."

   a. The Company may attempt to contact a Crewmember during a Minimum Rest Period or Pre-Duty Rest Period as set forth below:

      (i) via a PCD or any similar Company-issued communications device, including a Company-issued telephone or Internet-based device for the purpose of changing the Crewmember's assignment or duty start time; *provided*, a change to the Crewmember's assignment or report time under this subsection 12.E.1.a. is not effective unless the Crewmember Affirmatively Accepts the change; or

      (ii) by any means for the purpose of notifying him of a personal or family emergency or a threat to his security. Such attempts to contact the Pilot during rest will not be deemed to break or interrupt his rest.

   b. The Company shall not attempt to contact a Crewmember during a Minimum Rest Period or Pre-Duty Rest Period by a method other than as permitted by subsection 12.E.1.a.(i), above, (e.g., not by hotel phone, another Crewmember or third parties, hotel employees), for the purpose attempting to change his assignment or report time unless the device referred to in subsection 12.E.1.a.(i) is not operating. A Crewmember shall

notify the Company if the device becomes inoperative or is not in the Crewmember's possession. If the Company contacts a Crewmember in violation of this subsection 12.E.1.b., the required Minimum Rest Period or Pre-Duty Rest Period begins anew unless waived by the Crewmember.

c. It shall not be a violation of Section 12 if the Company contacts a Crewmember by any method referred to in subsection 12.E.2.a. during the forty-five (45) minute period immediately following the Minimum Rest Period for the purpose of revising the Crewmember's next scheduled report time under subsection 12.B. The Company shall provide a revised report time when communicating the schedule change. This subsection 12.E.1.c applies only when there is no Layover Period between the Minimum Rest Period and the Pre-Duty Rest Period. The Company may contact a Crewmember during the Layover Period in accordance with 12.E.2.

2. Layover Period Contact

A Layover Period is the period of time, if any, between the end of the Minimum Rest Period and the commencement of the ten (10) hour Pre-Duty Rest Period. Crewmembers are not required to keep personal communications devices (PCD) (or any similar communications device, including any Company-issued telephone or Internet-based device) "on" during a Layover Period.

a. The Company may send a communication to a Crewmember by PCD, Company email, hotel phone, fax, personal cell phone number if the Crewmember has provided it to the Company or posting at the Crewmember's hotel. Any schedule change details shall be reflected in Company's CMS.

b. The Crewmember shall check for a Company communication using a PCD or personal computer or contact crew scheduling at the start of the Layover Period, if any, every ten (10) hours thereafter and at the end of the Layover Period. In the event the PCD or personal computer is not operating, or the Crewmember is unable to contact crew scheduling, then the Crewmember will check for messages at the layover hotel.

c. The Company may require a Crewmember to acknowledge the communication. The requirement to acknowledge a Company communication shall not be considered duty.

d. The Company shall not attempt to contact a Crewmember during a Layover Period by a method other than as permitted by

subsection 12.E.2.a., above, (e.g., not by another Crewmember or third parties, hotel employees) for the purpose of attempting to change his assignment or report time.

3. Prior to the Company establishing PCDs, similar electronic communications devices or email as the primary means of communication with Crewmembers, the Company and Union shall meet to discuss and resolve matters of mutual concern.

## F.   SCHEDULE CHANGE NOTICE

1. If the Company has not changed the assignment or report time in accordance with subsections 12.E, above, or 12.F.3., below, the duty period shall commence at the Originally Scheduled Report Time.

2. The Crewmember shall check for a Company communication using a PCD or personal computer or contact crew scheduling thirty (30) minutes prior to departing from the hotel.

3. Changes to a Crewmember's report time shall be in accordance with the following:

   a. Changes to Report Time 10 Hours or More Before the Originally Scheduled Departure time:

      If the Company notifies a Crewmember of a change in accordance with subsection 12.E.1. or 12.E.2., above, he may not be required to report for duty until ten (10) hours after the time he is required to acknowledge the Company communication under subsection 12.E.2.b. If an applicable FAR requires that the Crewmember report at a later time, the FAR shall control the actual report time. The Company shall provide a revised report time when communicating the schedule change. A Crewmember is not required to be contactable during the above-mentioned ten (10) hour period. The Company may attempt to contact a Crewmember during such period in accordance with subsections 12.E.1.a. and 12.E.1.b., above.

   b. Changes to Report Time within 10 Hours of the Originally Scheduled Departure

      (i) The Company shall send an electronic (i.e., silent) message (e.g., not by phone connected to the PCD, hotel phone, another Crewmember or third parties, hotel employees) to Crewmembers no later than thirty (30) minutes prior to departing the hotel for the purpose of revising the Crewmember's report time. The Crewmember's originally

schedule report time may be delayed for up to six (6) hours or, with the Crewmember(s) concurrence, to a later time.

(A) If the Originally Scheduled Report Time is delayed by up to six (6) hours, and the duty period has not commenced, the Company shall have the following options:

(1) Place the Crewmember in a Pre-Duty Rest Period of ten (10) hours, commencing six (6) hours after his Originally Scheduled Report Time; or with Crewmember concurrence, at the time the Company notifies the Crewmember that the trip has been cancelled; or

(2) Require the Crewmember to report in accordance with subsection 12.B.1. based on the delayed departure time, in which case, duty begins at the Originally Scheduled Report Time.

(B) If a Crewmember agreed to a report time after six (6) hours pursuant to 12.F.3.b.(i), above, and the duty period does not commence, the Crewmember shall be placed in a Pre-Duty Rest Period of ten (10) hours. The Pre-Duty Rest Period shall begin the later of six (6) hours after the Originally Scheduled Report Time or when the Company notifies the Crewmember that the trip has cancelled.

(ii) If the Crewmember has departed from the hotel before contact is made under subsection 12.F.2.b.(i), above, the duty period shall commence at the Originally Scheduled Report Time.

**G. GENERAL**

1. Upon request, the Company shall provide the Union on a quarterly basis with the following information:

   a. Date a duty period was extended;

   b. The flight segment(s) affected;

   c. Whether segment was crewed by a Two Person Crew, Three Person Crew or Augmented Crew

   d. Length of scheduled duty period;

   e. Length of actual duty period;

   f. Reason(s) for duty period extension

Upon request, the Company will meet with the Union to discuss scheduling concerns if certain duty periods are regularly extended on any particular segment.

2. Crewmembers shall not be responsible for initiating or coordinating crew wake up calls or otherwise notifying other Crewmembers of their report times or revisions thereto, unless extraordinary situations exist that limit or prevent the Company from contacting Crewmembers.

# SECTION 13: LEAVES OF ABSENCE

### A. PERSONAL LEAVE OF ABSENCE

1. When operational requirements permit, a Crewmember may be granted an unpaid leave of absence for a personal reason.

    a. Requests for an initial personal leave or an extension of a previously approved personal leave must contain:

        i. a statement of the reason(s) for the personal leave of absence;

        ii. be in writing to the Crewmember's Chief Pilot; and

        iii. if feasible, the Crewmember shall make the request for personal leave of absence no later than the fifteenth (15th) day of the bid month preceding the bid month in which the leave is to commence, but in any event, as soon as practicable.

2. The decision to grant or deny a request for personal leave of absence, and the length of any leave of absence that may be granted is in the sole discretion of the Company. The Chief Pilot will respond in writing to a request for leave within seven (7) days of receipt of the request. If the requested leave of absence is granted only in part, the Chief Pilot's response shall identify the limitations on the leave. If the leave granted differs from the leave requested, the Crewmember may rescind his request.

3. A personal leave may be granted for a minimum of one (1) complete bid month and a maximum of three (3) bid months. However, on a case-by-case basis, the Company may grant a shorter leave, a longer leave, or may grant an extension beyond three (3) bid months, upon written request by the Crewmember to the Chief Pilot.

4. Once a personal leave has been granted, the leave request may not be withdrawn nor may the granting of the leave be retracted without the mutual consent of both the Company and the Crewmember. Further, the Company may not require a Crewmember to return to Work before the expiration of a properly granted personal leave without the Crewmember's consent, nor can the Crewmember return to Work before the expiration of a properly granted personal leave without the Company's consent.

5. A personal leave of absence shall be unpaid, and the Crewmember's Monthly Minimum Guarantee shall be reduced by dividing the Monthly Minimum Guarantee by seventeen (17) multiplied by the

number of scheduled Duty Days in the Bid Month the Crewmember is on personal leave.

6. The Crewmember is required to return to the service of the Company after the scheduled expiration of a personal leave of absence (or any agreed extension thereof). A Crewmember who fails to do so will be deemed to have voluntarily resigned and the Crewmember's name shall be removed from the seniority list.

7. During a personal leave of absence, the Crewmember shall retain and continue to accrue seniority but will only accrue Longevity in the month in which the personal leave began.

8. Any personal leave of absence which may be granted by the Company shall run concurrently with any other leave of absence for which the Crewmember may be eligible under this Agreement, or under the federal Family and Medical Leave Act ("FMLA") and any other federal or state laws applicable to the Crewmember.

## B. MEDICAL LEAVE OF ABSENCE

1. A Crewmember shall be eligible to be placed on a medical leave of absence when the Crewmember is unable to hold a valid medical certificate from the Federal Aviation Administration required for his status, or the Crewmember is unable to perform his duties due to sickness, injury, or disability. A medical leave of absence will be utilized for long-term periods in excess of thirty (30) continuous days of inability to Work as a Crewmember.

2. Subject to the provisions of subsection 13.B.2.a., below, a Crewmember will be placed on a medical leave of absence whenever the medical information provided by the Crewmember's treating physician indicates that the total duration of the Crewmember's absence may be thirty (30) days or longer. A medical leave of absence shall begin on the thirty-first (31st) consecutive day following the Crewmember's inability to hold the applicable medical certificate.

   a. A Crewmember must provide his Chief Pilot documentation evidencing his initial or continuing inability to perform the duties of a Crewmember at the time he requests to go on medical leave. Failure to provide the required documentation in a timely fashion unless otherwise excused from doing so may result in a denial of a medical leave of absence for the Crewmember until he provides the required information. The Company will provide a form for the Crewmember to utilize for his doctor or doctors to provide the following information:

i. A diagnosis of the Crewmember's disabling condition;

ii. A statement of physical limitations, quantified where possible; and

iii. The prognosis for the Crewmember's recovery and an anticipated return to Work date; and

iv. A statement of treatment.

b. The Crewmember shall update the Company if there is a material change to his condition pursuant to subsection 13.B.2.a., above.   The Company shall maintain the above information in a confidential manner and not disclose such information to third-parties without the Crewmember's written consent except when such disclosure is required by law, in which case, the Company shall provide the Crewmember with written notice of the disclosure.  The Company shall limit intra-Company disclosure to management personnel who require such information.

3. If a Crewmember is unable to return to Work after five (5) years from the date his medical leave of absence commenced or twice his length of service with the Company, whichever is shorter, his employment with the Company shall be terminated.

a. The length of the medical leave of absence shall extend until the day the Crewmember actually returns to Work, is placed on furlough in accordance with the provisions of Section 23, has been found to be permanently unable to return to Work, or is terminated.   For the purpose of this subsection 13.B.3.a., "returns to Work" shall mean fit and available to accept a flight assignment, re-qualification training assignment, or training assignment, as applicable.

b. A Crewmember who does not return to Work within seven (7) days after he is no longer precluded from performing the duties of a Crewmember due to sickness, injury, or disability will lose all seniority and be considered to have resigned his employment with the Company.

4. In order to be eligible for a medical leave of absence, a Crewmember must have completed twelve (12) months of Active Service with the Company prior to the date of commencement of the medical leave of absence.

5. A medical leave of absence shall be unpaid, except as provided in subsection 13.B.5.a., below.  The Crewmember's Monthly Minimum

Guarantee shall be reduced by dividing the Monthly Minimum Guarantee by seventeen (17) multiplied by the number of scheduled Duty Days in the Bid Month the Crewmember is on medical leave.

   a. A Crewmember will be required to use any accrued sick leave while on a medical leave of absence in accordance with Section 14 until the Crewmember's accrued sick leave has been exhausted. A Crewmember may use any accrued vacation at his election after short-term sick leave has been exhausted in accordance with Section 7 and Section 14.

6. During a medical leave of absence, the Crewmember shall retain and continue to accrue seniority. The Crewmember shall retain and accrue Longevity during the first ninety (90) days of a medical leave of absence, and, thereafter, shall retain but not accrue Longevity.

7. A medical leave of absence shall run concurrently with any other leave of absence for which the Crewmember may be eligible under this Agreement, or under the FMLA and any other federal or state laws applicable to the Crewmember.

8. The Company has the right to obtain an additional medical opinion(s), from a physician designated by the Company, regarding the illness or injury of any Crewmember who has requested or been placed on medical leave of absence. In connection with obtaining such a second opinion(s), the Company has the right to require a Crewmember to authorize his treating physician to release relevant medical records to the physician designated by the Company. The Company shall pay all costs for obtaining the second opinion(s).

9. The Company may require a Crewmember to provide medical verification of his ability to resume all of a Crewmember's normal duties as a condition of releasing a Crewmember from medical leave of absence; *provided*, if the Crewmember claims he is able to resume all normal duties and the Company requires medical verification, the Crewmember shall not be required to use accrued sick leave, but instead, shall revert to regular pay status pending his return to Work.

## C. FAMILY AND MEDICAL LEAVE ACT AND STATE STATUTES

1. The Company shall grant leaves of absence in accordance with the Family and Medical Leave Act (FMLA) and this subsection 13.C.

2. The Company shall not apply any current or future eligibility rule or regulation related to the location of an employee's residence and/or work site to determine eligibility under the FMLA.

3. In the event the FMLA or the regulations thereto are amended with respect to flight crew eligibility for leave under the FMLA, the Company shall apply the eligibility provisions set forth in subsection 13.C.1., above, unless such amendments provide less restrictive eligibility provision(s), in which case, the less restrictive eligibility provision(s) shall apply.

4. A Crewmember on a leave of absence under the FMLA shall be required to use all accrued sick leave while on a FMLA leave of absence in accordance with Section 14 if the reasons for taking leave qualify the Crewmember for paid benefit(s). A Crewmember may use any accrued vacation at his election after sick leave has been exhausted, if applicable.

5. If a Crewmember is eligible for family or medical leave under an applicable state statute that provides greater benefits than under the FMLA, the Company shall grant leave under the state statute.   The Company shall apply the eligibility requirements set forth in subsection 13.C.1., above, unless the state statute or regulations contain less restrictive eligibility provision(s), in which case, the less restrictive eligibility provision(s) shall apply.

6. During a FMLA leave of absence, the Crewmember shall retain and continue to accrue seniority. The Crewmember shall retain and accrue Longevity during the first ninety (90) days of a medical leave of absence. Thereafter, he shall retain but not accrue Longevity.

7. To the extent not inconsistent with the express terms of this Agreement, the Company may apply to Crewmembers the same rules, regulations and policies regarding FMLA leaves of absence that are applicable to the Company's other employees as set forth in the Company Employee Handbook or related published policies. No such rule, regulation or policy shall operate to disqualify the craft or class from FMLA coverage.

### D. MILITARY LEAVE OF ABSENCE

1. The Company will grant military leaves of absence in accordance with the requirements of the federal Uniformed Services Employment and Reemployment Rights Act ("USERRA"), and any other federal or state laws that may be applicable to the Crewmembers. The Crewmember's retention and accrual of seniority and Longevity, right to continuation of health insurance, any 401(k) benefits, life insurance and similar benefits, vacation and sick leave accrual, and return from military leave or reemployment with the Company, including his entitlement to Status and Base assignments, shall be in

accordance with the applicable provisions of the USERRA, and any other federal or state laws that may be applicable to the Crewmembers.

2. The Crewmember shall notify the Chief Pilot of the dates of the anticipated leave as soon as they are known to the Crewmember. Such notice shall be in writing and, at the request of the Chief Pilot, shall include a copy of any Orders or Military Training Schedule.

3. No Crewmember shall bid for any schedule nor shall the Company award a schedule which includes a duty period conflicting with a period of military service where such service has already been scheduled at the time the Crewmember submits his bid.

4. A military leave of absence shall be unpaid. Pay for Crewmembers on military leave that perform Work in a Bid Month shall be determined in accordance with subsection 3.B.2.

5. For Crewmembers on Military Leave of Absence, the Crewmember and his eligible dependents (subject to TSA requirements or restrictions) shall remain eligible for non-revenue and reduced rate travel privileges, and Crewmember jumpseat privileges in accordance with Company policy and TSA regulations.

6. During a military leave of absence, a Crewmember shall retain and continue to accrue seniority and Longevity.

### E.  BEREAVEMENT LEAVE

1. In the event the Crewmember suffers a death in the Immediate Family that requires a release from duty, he shall immediately notify the Chief Pilot and shall be granted four (4) paid Days Off from any assigned duty for Bereavement Leave.

2. Immediate Family is defined as:
   a. Mother/Father/Step Parents;
   b. Grandmother/Grandfather/Grandchildren;
   c. Spouse;
   d. Children/Step Children/Adopted Children;
   e. Brother/Sister/Step Brother/Step Sister;
   f. Mother-in-Law/Father-in-Law.

3. If a Crewmember is assigned away from his Base when a death occurs and if requested by the Crewmember, the Company will provide travel by the most expeditious means to the Crewmember's

choice of any Base, the commercial airport nearest his residence, or, if less expensive, another location.

4. Bereavement Leave will commence on the day following the date of arrival at the Crewmember's requested location pursuant to subsection 13.E.3., above.   A Crewmember shall schedule Bereavement Leave as soon as practicable after the death of a member of his immediate family.

5. Upon the expiration of the Bereavement Leave, the Crewmember may request a Personal Leave of Absence in accordance with subsection 13.A., herein.

6. For any month in which Bereavement Leave is taken, a Crewmember shall be paid for trips flown, or Minimum Monthly Guarantee, whichever is greater.

7. A Crewmember displaced from his line by Bereavement Leave may be reassigned either reserve or flight duty. Any reassignment of duty will protect the Crewmember's originally awarded Days Off unless the Crewmember agrees otherwise.

8. At the sole discretion of the Chief Pilot, a Crewmember may be granted unpaid time off for the bereavement of other than an Immediate Family Member.

9. During a Bereavement Leave of absence, a Crewmember shall retain and continue to accrue seniority and Longevity.

**F.  JURY DUTY**

1. A Crewmember shall be excused from his regular duties on days when he is required to be present for jury duty.   When a Crewmember is summoned for jury duty he shall promptly notify Crew Scheduling of such and shall provide a copy of the summons or other documentation to his Chief Pilot.

2. When deemed operationally necessary by the Company, the Crewmember will fully cooperate in attempting to obtain a waiver or rescheduling of the jury duty assignment.

3. A Crewmember summoned for jury duty shall not be required to perform any duties with the Company from the time he reports for jury duty until all obligations under the summons are satisfied unless temporarily released from such obligations (other than weekends) for period(s) of time sufficient to meet scheduled duties with the Company. If the Company assigns the Crewmember duty pursuant to this subsection 13.F.3., he shall receive a minimum of ten (10)

hours of rest after temporary release from jury duty and prior to duty. The Company shall not assign duty that interferes with the Crewmember's jury duty obligation.

4. For any month in which jury duty is taken, a Crewmember shall be paid for trips flown, or Minimum Monthly Guarantee, whichever is greater.

5. While on jury duty a Crewmember shall remain responsible as if actively at Work for maintaining his system staffing standing bid and monthly schedules.

6. A Crewmember will retain and continue to accrue seniority and Longevity for all purposes while on jury duty.

7. If the Crewmember is released from jury duty earlier than the planned duration of such leave, he shall promptly notify the Chief Pilot so that the Crewmember will be available for assignments on scheduled Work Days.

8. If the Crewmember is assigned to a case that is expected to last longer than the original jury duty period, he shall promptly notify the Chief Pilot.

### G. UNION LEAVE OF ABSENCE

1. Upon request by the Union, the Company shall grant a leave of absence of up to three (3) Crewmembers for the purpose of accepting a full time elected or appointed Local Union position that is expected to last for a minimum of thirty (30) days. The duration of such leaves of absence shall be as requested by the Union; *provided*, the minimum time for such leaves of absence is one (1) complete calendar bid month. Subject to the needs of the service, the Company may grant additional leaves of absence pursuant to this subsection 13.G.1.

2. Upon request by the Union, the Company shall release up to two (2) Crewmembers from duty for the purpose of performing Local Union Committee duties, the duration of which shall be as requested by the Union. Any additional leaves of absence pursuant to this subsection 13.G.2. and the duration thereof shall be as requested by the Union, subject to the needs of the service.

3. When the Company requests meetings with a Local Union Committee, the Crewmember shall be paid by the Company. Such Crewmembers will be compensated in accordance with the Administrative Duty provision in Section 3, Compensation.

4. Upon request by the Union, the Company shall grant a leave of absence of up to two (2) Crewmembers who accept full-time elected or appointed positions with the International Union that is expected to last for thirty (30) days or more. The duration of such leaves of absence shall be as requested by the Union; *provided*, the minimum time for such leaves of absence is one (1) complete calendar bid month. Subject to the needs of the service, the Company may grant additional leaves of absence pursuant to this subsection 13.G.4.

5. Upon request by the Union, the Company shall release from duty up to three (3) Crewmembers to serve on the Union's collective bargaining negotiating committee.   The duration of such release from duty shall be as requested by the Union. Subject to agreement between the Company and the Union, Crewmembers granted a release from duty under this subsection 13.G.5 shall make themselves available for assignments when time between negotiating sessions and/or preparing for negotiations is sufficient to allow a Crewmember to complete such assignment. The Union shall not unreasonably withhold its agreement.  When applicable, the Company and an affected Crewmember shall cooperate to ensure that a Crewmember remains current.  Subject to the needs of the service, the Company may grant additional releases pursuant to this subsection 13.G.5.

6. When known in advance, the Union shall attempt to request Union leaves of absence prior to the 15th of the month prior to the bid month, but in all cases, as soon as practicable.

7. Pay, benefits, seniority, Longevity and bidding rights for a Crewmember(s) on a Union leave of absence pursuant to subsections 13.G.1. and 13.G.2., above, shall be in accordance with the parties' FPL LOA; *provided,* no reimbursement is required for the first thirty-five (35) hours of Union leave of absence per month.

8. Pay, benefits, seniority, Longevity and bidding rights for a Crewmember(s) on Administrative Duty pursuant to subsection 13.G.3., above, shall be as for all other active Crewmembers.  The Union shall have no reimbursement obligation for Crewmembers on administrative leave pursuant to subsection 13.G.3., above.

9. Crewmembers on a leave of absence pursuant to subsection 13.G.4 shall accrue seniority and Longevity for the duration of the leave of absence.  Benefits shall be in accordance with the parties' FPL LOA or, at the Union's election, through the Union at its expense.

10. Pay, benefits, seniority, Longevity and bidding rights for a Crewmember(s) on Union leave of absence pursuant to subsection

13.G.5., above, shall be in accordance with the parties' FPL LOA or as otherwise agreed upon by the parties on a case by case basis.

**H. GENERAL**

1. During the first six (6) months of a leave of absence under this Section 13, other than a Personal Leave of Absence, the Crewmember and his dependents may continue any Company-provided medical, dental and life insurance coverage so long as he reimburses the Company for the standard Crewmember contribution then in effect. For a leave of absence in excess of six (6) months, the Crewmember's right to continue any Company-provided medical, dental and life insurance coverage shall be governed by the provisions of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"); the Crewmember may be required to pay the full insurance premium then in effect and any applicable administrative fee.  In the case of a Personal Leave of Absence, the Crewmember and his dependents may continue any Company-provided medical, dental and life insurance coverage through the last day of the month in which the Personal Leave of Absence begins so long as he reimburses the Company for the standard Crewmember contribution then in effect.  Thereafter, the Crewmember may elect coverage under COBRA as set forth above.

2. Vacation and sick leave will not accrue for any bid month in which a Crewmember is on a leave of absence for more than one half of the bid month.

3. A Crewmember on a leave of absence may submit standing bids pursuant to the criteria applicable to active Crewmembers in Section 24 of this Agreement, and any vacancy awarded will be deemed a "phantom" Position. Upon return to duty from any leave of absence, and upon successful completion of any applicable upgrade or re-qualification training, the Crewmember's assignment will be based on his "phantom" award, or, if the Crewmember did not receive a "phantom" award, on the Crewmember's Position prior to the start of the leave of absence.

4. Except as provided for in subsection 13.B.3., failure to return to Work as required following a leave of absence shall be treated as a resignation of the Crewmember's employment with the Company.

5. A Crewmember returning from a leave of absence shall be considered in active status on the earlier of the first day he is available for flight duty (i.e., current and qualified) or the day he reports to begin any training necessary to return him to flight duty,

but in no case longer than sixty (60) calendar days after he is available to report for training, if required.

6  Unless specifically provided otherwise, all leaves of absence shall be unpaid.

7. For other than military leave of absence and subject to subsection 13.C, all leaves for a Crewmember who has not completed twelve (12) months of Active Service will be at the discretion of the Company.

8. A Crewmember on a leave of absence of any kind must obtain written permission from the Company before he engages in any employment with another airline and before he begins working in a job where the duties may be inconsistent with the medical condition that led to the issuance of a Medical Leave for the Crewmember or the recovery from that medical condition.   Failure to obtain the required written permission may result in the termination of the Crewmember's employment with the Company; *provided*, there is just cause.

This Page Intentionally Blank

# SECTION 14: SICK LEAVE

### A. SICK LEAVE ACCRUAL

A Crewmember shall begin to accrue sick leave on his date of hire, but shall forfeit any accrued sick leave if he does not successfully complete New Hire training, including operating experience (OE) requirements:

1. One (1) day of short-term sick leave for each month of Active Service. The maximum number of short-term sick leave days that a Crewmember shall accrue is twenty-four (24) days.

2. Two (2) days of catastrophic sick leave for each month of Active Service, together with one (1) additional day of catastrophic sick leave for each month of Active Service during which a Crewmember's short-term sick bank is at the maximum number of days allowed under subsection 14.A.1., above. There shall be no maximum number of catastrophic sick leave days that a Crewmember may accrue.

3. A Crewmember shall accrue sick leave for each month in which he is on Active Service as a Crewmember for at least fifteen (15) days (and the first ninety (90) days of military leave) or was available to Work at least fifty percent (50%) of his regularly scheduled Work Days.

### B. SICK LEAVE USAGE

1. When a Crewmember is unable to report for duty on a scheduled Duty Day, including any down line absences, due to sickness or injury, one (1) sick leave day shall be paid to the Crewmember and deducted from his short-term sick leave bank for each day of absence.

    a. If a Crewmember has exhausted his short-term sick leave bank, he may elect to receive (1) day of sick leave pay in accordance with subsection 14.C.2. for each day of absence due to sickness or injury by exhausting one (1) day of sick leave pay held in his catastrophic sick leave bank. The Company shall make the appropriate deductions from the Crewmember's catastrophic sick leave bank.

    b. A Crewmember shall not maintain a negative balance in his short-term sick leave bank.

2. If a Crewmember remains unable to report for duty on a scheduled Duty Day due to sickness or injury for more than thirty (30)

consecutive days and he has exhausted his short-term sick leave bank, he shall thereafter be entitled to utilize his catastrophic sick leave bank.

a. One (1) sick leave day shall be paid to the Crewmember and deducted from his catastrophic sick leave bank for each day he is unable to report for duty on a scheduled Duty Day or, if he has not been assigned a monthly schedule under Section 25, up to the maximum number of regular Work Days for a Bid Month under Section 25, (i.e., seventeen (17) days), prorated for the month the Crewmember returns to duty.

b. Subject to subsection 14.B.1.a., above, if a Crewmember has utilized his catastrophic sick leave bank and thereafter returned to duty, the requirements of subsection 14.B.2, above, must again be met before the Crewmember may utilize his catastrophic sick leave bank unless within thirty (30) days of his return to duty the Crewmember becomes unable to report for duty for the same sickness or injury which originally entitled him to utilize his catastrophic sick leave bank.

c. A Crewmember shall not maintain a negative balance in his catastrophic sick leave bank.

3. To end a period of sick leave, a Crewmember must notify Crew Scheduling of his ability to return to Work.

a. If the Company elects to assign the Crewmember to duty in accordance with subsection 25.P.2., or training, if applicable, on the day that the Crewmember notifies Crew Scheduling, the Crewmember shall not be charged with sick leave usage for that day.

b. If the Company does not assign the Crewmember to duty on the day that the Crewmember notifies Crew Scheduling, the Crewmember shall be charged with sick leave usage for that day and shall be considered off sick leave on the following day.

c. For the purposes of this subsection 14.B.3, "day" shall refer to a day measured using Universal Coordinated Time (UTC).

4. The Company is not required to return a Crewmember to any Trip Pairing that he may have originally been assigned and a portion of which the Crewmember missed due to sickness or injury.

## C. SICK LEAVE PAY

1. Short-term sick leave shall be paid at the rate of $3.65$ hours for each

day of short-term sick leave used.

2. Catastrophic sick leave shall be paid at the rate of fifty percent (50%) of the Crewmember's short-term sick leave pay rate for each day of catastrophic sick leave used.

3. Each Crewmember on sick leave shall receive sick leave pay, and the Company shall make a corresponding deduction from the Crewmember's sick leave bank, according to the following provisions:

   a. If a Crewmember's pay is otherwise above the applicable monthly guarantee, no sick leave pay is received or deducted from the Crewmember's leave bank.

   b. If a Crewmember's pay does not otherwise exceed the applicable monthly guarantee, the Crewmember will receive monthly guarantee but his sick leave bank will be charged no more than one (1) day for each scheduled day of duty, reserve assignment or training assignment missed by the Crewmember.

### D. GENERAL

1. A Crewmember who is unable to report for duty as scheduled due to sickness or injury must contact Crew Scheduling and advise them of such as soon as possible after the Crewmember becomes aware that he is unable to report to Work.  A Crewmember must contact Crew Scheduling and provide the date he will be able to report for Work, when known, and any changes thereto.

2. If the Company has a reasonable basis to believe that a Crewmember may be misusing or has misused sick leave, the Chief Pilot may require the Crewmember to provide a written medical statement from a licensed medical professional confirming that the Crewmember was, and, as appropriate, is unable to perform the duties due to sickness or injury.  Such confirmation shall include the diagnosis of the Crewmember's condition, a statement of the Crewmember's physical limitations (quantified where possible), a prognosis for the Crewmember's recovery, and a statement of treatment.  The Company shall maintain the above information in a confidential manner.  The Company shall limit intra-Company disclosure to management personnel who require such information to determine a Crewmember's satisfaction of requirements contained in this Agreement. The Crewmember shall use the Company credit card to cover any Out-of-pocket medical expenses associated with the appointment.

3.  If a Crewmember fails to provide the written medical statement described in subsection 14.D.2., above, the Crewmember's right to use his sick leave bank for the absence in question shall be revoked retroactive to the first day of absence.  If the Crewmember provides the required written medical statement, he shall not lose pay or be charged a sick day from the date the Crewmember informed Crew Scheduling he was able to return to duty. This subsection 14.D.3. shall not be construed to preclude the Company from additionally taking appropriate disciplinary action for any abuse or misuse of sick leave if there is just cause.

4.  Nothing in this Section 14 shall abrogate any of the rights or entitlements provided the Company and/or the Crewmember in Section 15 of this Agreement.

5.  Nothing in this Section shall be construed to preclude or affect the Company's right to discipline or discharge a Crewmember for fraudulent use or abuse of sick leave if there is just cause.

6.  If a Crewmember exhausts his short-term sick leave bank, he may utilize all accrued but unused vacation in lieu of using any catastrophic sick leave for the length of his vacation.   If a Crewmember exhausts his catastrophic sick leave bank, he may utilize all accrued but unused vacation.

7.  If a Crewmember accepts a position with the Company not covered by this Agreement, he shall continue to accrue sick leave under this Section 14 subject to appropriate adjustments for any time spent on sick leave or in a non-accruing status while working in such position. Such sick leave shall be available to the Crewmember upon his return to Work in a Position covered by this Agreement.

8.  A Crewmember will be charged a sick day only if he is unable to report for duty due to sickness or injury on a day that is a regularly scheduled Duty Day (*e.g.*, not an extension day, not a day associated with open-time flying).

9.  A Crewmember who has exhausted or is expected to exhaust his short term and catastrophic sick leave and vacation benefits before returning to Work or becoming eligible for other benefits shall be eligible for sick leave donations from other Crewmembers.  The donated sick leave will be credited to the Sick Leave Donation Bank and charged to the donating Crewmember on the basis of a day and paid to the receiving Crewmember on the basis of days.

10. The Company shall provide a Crewmember with a monthly record of his current sick leave balance.   The Company may provide the

information on a Crewmember's pay stub or Company Intranet.

This Page Intentionally Blank

# SECTION 15: PHYSICAL STANDARDS, MEDICAL EXAMINATIONS, DRUG AND ALCOHOL TESTING, AND RELATED PROVISIONS

### A.  PHYSICAL STANDARDS

1.  The physical standards required of a Crewmember shall be the standards required by the Federal Aviation Administration (as outlined in 14 CFR Part 67 and as may be amended), including its waiver policy, for the medical certificate that the Company requires for the Position that the Crewmember holds.

2.  Each Crewmember may select the Aviation Medical Examiner (AME) of his choice for meeting the requirements set forth in this Section. The Crewmember shall provide a copy of his Airman's Medical Certificate to the Company no later than the twentieth (20th) of the month in which his prior certificate is scheduled to expire unless the parties mutually agree to another date or time.  The cost of such examinations shall be borne by the Crewmember.

3.  If a Crewmember does not or cannot meet the standards for the medical certificate required by the Company for his Position, he must immediately notify the Chief Pilot and Crew Management. Thereafter, such a Crewmember, other than a probationary Crewmember, will be permitted to bid only vacancies in a Status that his seniority and medical certificate will permit him to hold until such time as he regains the class of medical certificate required for his former Position.

### B.  FITNESS FOR DUTY

1.  The Company may require a Crewmember to submit to a fitness for duty examination by a Company designated medical examiner, under the following circumstances:

    a.  Upon a finding by a Crewmember's  AME that the Crewmember does not meet the standards for the class of medical certificate required for the Position that the Crewmember holds to the extent necessary to determine the accuracy of the original AME's finding; or

    b.  When the Company has reliable information that raises a reasonable suspicion regarding a Crewmember's ability to safely perform all of his duties, or that the Crewmember's present medical condition has changed the status of his medical

certificate.  In such a case, the Company shall provide to the Crewmember the information it is relying on to require the fitness for duty examination; *provided*, it shall not be required to provide to the Crewmember any information regarding the source of that information; or

c. When the Crewmember has asserted to the Company that he is either physically or mentally unable to safely perform the duties of his job or otherwise has a medical condition that renders him unable to lawfully exercise the privileges of his Airman's Medical Certificate.

2. Any medical examination required under this subsection 15.B. shall be performed by a medical examiner with the appropriate specialty needed to evaluate the Crewmember's physical or mental condition, other physicians as directed by the AME.  The cost of the examination(s) shall be borne by the Company.

a. The location of all such examinations shall be within seventy-five (75) miles of the Crewmember's residence unless a different mutually agreeable location is selected.  If the examination is not to be conducted at a location within seventy-five (75) miles of the Crewmember's residence, the Company will provide the Crewmember transportation and any reasonably required hotel accommodations, together with per diem.  However, a Crewmember who fails to cooperate in the scheduling of any required examination under this subsection 15.B., or cancels a scheduled examination without the agreement of the Company, will be removed from pay status and, as may be applicable, shall be ineligible for the further use of any accrued sick leave.

b. Within ten (10) days of the Company's receipt of the Company designated medical examiner's report, a copy of the report shall be sent to the Crewmember via overnight mail, by electronic means (if acceptable to both the Company and the Crewmember) or by hand delivery.

3. A Crewmember required to undergo an examination by a Company designated medical examiner pursuant subsection 15.B.1.b or c, above, shall be withheld from service with pay until the Company designated medical examiner has submitted his report to the Company.

a. If as a result of such medical examination the Company's designated medical examiner determines that the Crewmember is not able to hold and/or exercise the medical certificate required by the Company for the Position that the Crewmember

holds, then the Crewmember shall be removed from pay status; *provided*, however, that he shall be entitled to use any accrued sick leave pay and accrued vacation after short-term sick leave pay has been exhausted, as provided for in Section 7 and Section 14 of this Agreement, and may invoke the provisions of subsection 15.C., below.

b. If as a result of such medical examination the Company's designated medical examiner determines that the Crewmember is able to hold and exercise the medical certificate required by the Company for the Position that the Crewmember holds then the Crewmember shall be returned to duty.

4. A Crewmember required to undergo an examination by a Company designated medical examiner pursuant to subsection 15.B.1.a, above, shall be withheld from service without pay, *provided*, however, that he shall be entitled to use any accrued sick leave pay and accrued vacation after short-term sick leave pay has been exhausted, as provided for in Sections 7 and 14 of this Agreement, until the Company designated medical examiner has submitted his report to the Company.

a. If as a result of such medical examination the Company's designated medical examiner determines that the Crewmember is able to hold and exercise the medical certificate required by the Company for the Position that the Crewmember holds, then the Crewmember shall no longer be entitled to use any accrued sick leave or accrued vacation and shall be returned to duty with pay; *provided*, however, that the Crewmember shall be entitled to invoke the provisions of subsection 15.C., below.

b. If, as a result of such medical examination the Company's designated medical examiner determines that the Crewmember is not able to hold or exercise the medical certificate by the Company for the Position that the Crewmember holds, then the Crewmember shall be entitled to use any accrued sick leave and accrued vacation after short-term sick leave has been exhausted, as provided for in Sections 7 and 14 of the Agreement until the earlier of:

i. His accrued sick leave and/or accrued vacation have been exhausted;

ii. He is able to hold and exercise the medical certificate required for his Position;

iii. He accepts another position with the Company.

## C. MEDICAL DISPUTE RESOLUTION PROCEDURES

In the case of a dispute arising from subsection 15.B.3.a. or 15.B.4.a., above, between the Crewmember's designated medical examiner and the Company's designated medical examiner regarding the Crewmember's mental or physical fitness for duty, the Crewmember may invoke the following procedures.

1. The Crewmember must within seven (7) days after receipt of the findings of the Company's designated medical examiner submit to the Chief Pilot a written request that the Company's designated medical examiner and the Crewmember's designated medical examiner select a third, impartial medical examiner to resolve the dispute.  Failure to request the selection of a third, impartial medical examiner within the seven (7) day time limit provided shall render the findings of the Company's designated medical examiner final and binding.

2. Following timely receipt of the Crewmember's request, the Company's designated medical examiner will be asked to contact the Crewmember's designated medical examiner for the purpose of selecting a third, impartial medical examiner.  If for any reason the Crewmember's designated medical examiner declines to participate in this process, the Crewmember may select another medical examiner to participate in the selection of the third, impartial medical examiner on the Crewmember's behalf.

3. Within three (3) days of the appointment of the third, impartial medical examiner, both the Company's and the Crewmember's designated medical examiners will submit their findings, together with the findings of any other medical examiners involved, to the third, impartial medical examiner.

4. All written communications by either the Company's or Crewmember's designated medical examiner made to the third, impartial medical examiner will be copied to the other party's designated medical examiner.  Further, no verbal or written communication regarding the merits of the Company's position or Crewmember's position in the dispute shall be made to the third, impartial medical examiner by either the Company or the Union.

5. After receipt of the medical records referenced above, the third, impartial medical examiner will, if he deems it necessary, examine the Crewmember and, if necessary refer the Crewmember to any medical specialist required in order for the third, impartial medical examiner to make a determination regarding the Crewmember's ability to hold or exercise the medical certificate required by the

Company for the Position that the Crewmember holds.

6. Within seven (7) days following his review of the records provided and any examination(s) of the Crewmember deemed necessary by the third, impartial medical examiner, he shall render a final and binding determination regarding the dispute. The Crewmember shall be provided with a copy of the decision within ten (10) days.

7. If the Crewmember has been withheld from service involuntarily by the Company and is found by the third, impartial medical examiner to be able to hold and exercise the medical certificate required by the Company for the Position that the Crewmember holds, then he will be pay protected by the Company for the period that he was withheld from service and his sick leave and accrued vacation account will be restored.

8. If the Crewmember has been withheld from service involuntarily by the Company and is found by the third, impartial medical examiner to be unable to hold or exercise the medical certificate required by the Company for the Position that the Crewmember holds then his sick leave accrual will be reduced to the extent that he was receiving pay.

9. If the Crewmember has withheld himself from service and is found by the third, impartial medical examiner to be able to hold and exercise the medical certificate required by the Company for the Position that the Crewmember holds, then he will be returned to duty and required to repay the Company for any sick leave and accrued vacation he received while the medical dispute was pending.

10. If the Crewmember has withheld himself from service and is found by the third, impartial medical examiner to be unable to hold or exercise the medical certificate required for the Position that the Crewmember holds, then he will be paid his accrued sick leave and accrued vacation on a retroactive basis to the extent he could have utilized such pursuant to Section 7 and 14 but for the dispute regarding his fitness for duty and he shall also be entitled thereafter to use his remaining accrued sick leave and accrued vacation if he so elects, as provided for in Section 7 and 14 of this Agreement.

11. The Company shall be responsible for the costs and, if the location of the examination is more than seventy-five (75) miles from the Crewmember's residence, Crewmember expenses associated with examination by its designated medical examiners. The Crewmember shall be responsible for the costs and expenses associated with examination by his designated medical examiners that are not covered by the Company's group insurance plan. Any costs and expenses incurred by the Crewmember in connection with

examinations by the third, impartial medical examiner not covered by the Company's group insurance plan shall be shared equally by the Company and the Crewmember.

12. Medical records and other information obtained as a the result of a Company-required medical examination or subsequent examinations pursuant to this subsection 15.C shall be subject to safeguards as to their confidentiality in accordance with applicable law.

13. Any unjustifiable delays in the completion of these procedures that are the result of the action or inaction of the Crewmember shall render the Crewmember ineligible for continued pay status or the use of any accrued sick leave, as applicable.

14. Forms to be utilized for the engagement of the third, impartial medical examiner and required release of medical information are included hereto as Appendices 15-A, 15-B, 15-C, 15-D and 15.E.

15. All correspondence and other written communications the Company is required to send to the Crewmember shall be sent to the Crewmember's designated address via certified mail, return receipt requested or by a commercially recognized courier service so as to insure delivery and confirmation of receipt. The Company and Union may mutually agree to substitute electronic mail delivery on a case-by-case basis or in all cases.

### D. DRUG AND ALCOHOL TESTING AND RELATED PROVISIONS

1. A Crewmember shall be subject to drug and alcohol testing as required by applicable Federal Aviation Regulations (FARs) and by Company policy in effect as of the effective date of this Agreement, which may be modified from time to time as required by such regulations and other applicable law.  No other changes to the policy applicable to Crewmembers shall be made without the consent of the Union.

2. At the request of either party, representatives of the Union and representatives of the Company will meet to discuss the Company's administration of its drug and alcohol testing programs.   The Company agrees to provide the Union with notice and an opportunity to consult prior to implementing any material changes to such program consistent with subsection 15.D.1., above.

3. A Crewmember who has been required to undergo "Reasonable Cause/Reasonable Suspicion" testing as set forth in the Company's Drug and Alcohol Policy will be provided the basis, including the date, time, and location of the observations relied on for the

determination to require such testing, no later than seven (7) days after the test has occurred.

4. No Crewmember shall be required to submit to a random drug or alcohol test unless he is notified within one and a half hours (1:30) prior to scheduled departure or within thirty minutes (0:30) after block in, or when performing safety-sensitive duties in the service of the Company within the meaning of the applicable FARs.

5. As set forth in the Company's Drug and Alcohol Policy, consumption of alcohol at any time while in uniform is prohibited.

6. Crewmembers may possess, but not consume, alcoholic beverages on Company aircraft, provided such alcoholic beverages remain concealed at all times in the Crewmember's personal luggage. Further, no personal luggage containing alcoholic beverages may be brought into the cockpit operating area of Company aircraft.

7. Crewmembers may consume alcoholic beverages while deadheading on commercial carriers only if the Crewmember is not in uniform, and is deadheading into a rest period or scheduled Day Off.

8. Crewmembers may consume alcoholic beverages during a Layover Period; *provided*, such consumption during the layover does not violate the applicable laws and regulations or Company policies relating to the consumption of alcohol.

Appendix 15-A

(applicable date)


To: (The Company's designated medical examiner) and: (The Crewmember's designated medical examiner)

Dear Dr. (The Company's designated medical examiner), and Dr. (The Crewmember's designated medical examiner):


Your respective findings differ regarding (Crewmember's) ability to hold or exercise the Airman Medical Certificate required for (his/her) Position as a flight deck crewmember.  In accordance with our established procedures for resolution of this dispute, you are requested to confer and jointly select a third, impartial medical examiner who will review your respective findings, examine (Crewmember), if he determines that such is necessary, engage any specialists as required, and render a final and binding determination regarding the dispute.

Please promptly:

1. Confer with each other and select the impartial medical examiner; and

2. Notify each of us as to whom you have selected.

After we receive that notification and as soon as the selected impartial medical examiner accepts the engagement, we will advise you of that acceptance so that you can then forward the specified medical information to that physician. An authorization for that purpose signed by (Crewmember) is enclosed.  Please complete the form by filling in the selected medical examiner's name and address.

To preserve the integrity of such impartial medical examiner's review, you are requested to refrain from any *ex parte* oral or written communication with such medical examiner regarding (Crewmember's) medical case.  Of course, you are free to converse with such designated medical examiner in each other's presence or together via telephone conference call.

Thank you for your cooperation in helping to resolve this matter expeditiously.


Sincerely,

X
_____
(for [insert Company name])


X
_____
(For: IBT)

Appendix 15-B

(applicable date)


To: Dr. (the third, impartial medical examiner)


You have been jointly selected by Dr. (Company's designated medical examiner) and Dr. (Crewmember's designated medical examiner) to resolve a dispute regarding (Crewmembers') ability to hold and exercise a (Class I or Class II, as appropriate) Airman Medical Certificate as required for (his/her) position as a flight deck crewmember.  You will be receiving a copy of the findings of Dr. (Company's designated medical examiner) and Dr. (Crewmember's designated medical examiner) regarding their examinations of (Crewmember).  Your task is to review those findings, examine (Crewmember) at your discretion, engage any specialist(s) as you deem appropriate and render an unequivocal determination regarding (Crewmember's) ability to hold and exercise a (Class I or Class II, as appropriate) Airman Medical Certificate for his position as a flight deck crewmember.

It is very important that your examination and determination be completely impartial.

We have cautioned Dr. (Company's designated medical examiner) and Dr. (Crewmember's designated medical examiner) against any *ex parte* communication with you regarding (Crewmember's) medical case.  Of course, joint telephone conference calls are perfectly acceptable. Likewise, you should have no *ex parte* communications, written or oral, regarding (Crewmember's) medical case with any official, employee or representative of either Atlas Air, Inc., or the International Brotherhood of Teamsters.  Again, joint telephone conference calls with representatives of both parties are acceptable.

This is not a Worker's Compensation Claim.  Nor is (Crewmember) applying for any Airman Medical Certificate.  The standards against which (Crewmember's) condition is to be judged are current FAA standards for his class of Airman Medical Certificate, as contained in 14 CFR Part 67, including the FAA's waiver policy.

Please provide a written report of your findings to (Crewmember), the International Brotherhood of Teamsters, and (designated Company recipient). Requisite Medical information release forms executed by (Crewmember) are enclosed.  Also enclosed is an executed medical

information release form authorizing any specialist(s) whom you would call upon to provide their records to you.

Time is of the essence as (insert Company name) and (Crewmember) desire to resolve this dispute as quickly as possible.

We recognize that you may have a question about some aspect of this process.  If you call either of the signatories to this letter, a telephone conference call will be arranged at your convenience and we can then jointly address your concern(s).

Your fees and expenses in connection with this engagement, including the fees and expenses of any specialist(s) you may determine to engage to assist you in making your determination, not covered by the Company's group insurance plan will be borne one-half each by the Company and (Crewmember).  Thus, you should send your bill to:

Group health insurance plan address:

Company address:

Crewmember address:

Thank you in advance for your acceptance of this engagement and your willingness to help resolve this dispute.

Sincerely,



(insert Company Name)
Address and Phone Number



IBT
Address and Phone Number

Enc:  Medical information release forms

Appendix 15-C

## **AUTHORIZATION TO RELEASE MEDICAL INFORMATION**

I, (Crewmember) hereby authorize Dr. (name and address of Company's designated medical examiner or Crewmember's designated medical examiner, as applicable) to release (his/her) findings regarding my current ability to hold and exercise a (Class I or Class II, as appropriate) Airman Medical Certificate to Dr. (name and address of third, impartial medical examiner).

This authorization expires thirty (30) days from the date which appears below.


X
_____

Crewmember / Date

Appendix 15-D

## **AUTHORIZATION TO RELEASE MEDICAL INFORMATION**

I, (Crewmember) hereby authorize Dr. (name(s) and address(es) of specialist(s)), to release (his/her) records/findings regarding my current ability to hold and exercise a (Class I or Class II, as appropriate) Airman Medical Certificate to (name and address the third, impartial medical examiner).

This authorization expires thirty (30) days from the date which appears below.

X _____

Crewmember / Date

Appendix 15-E

**AUTHORIZATION TO RELEASE MEDICAL INFORMATION**

I, (Crewmember) hereby authorize Dr. (name and address of the third, impartial medical examiner), to release (his/her) findings regarding my current ability to hold and exercise a (Class I or Class II, as appropriate) Airman Medical Certificate to (Crewmember), (insert Company name), and the International Brotherhood of Teamsters to the addresses which appear below.

This authorization expires thirty (30) days from the date which appears below.


X _____

Crewmember (Date)
(Address)


(insert Company name)                    IBT
(Address)                                (Address)

# SECTION 16: WORKERS' COMPENSATION BENEFITS

The Company presently maintains a Workers' Compensation insurance policy providing certain coverage and benefits for its employees. A Crewmember shall be covered under the policy and shall be eligible to submit a claim for benefits. After providing the Union with notice and an opportunity to respond, the Company shall have the right to self insure in whole or in part, to modify or to discontinue its Worker's Compensation insurance policy or to change its carriers. If the Company discontinues its policy, a Crewmember shall have the right to seek whatever alternative or different benefits that may be provided under applicable state and federal laws, or the laws of any United States territory or possession.

This Page Intentionally Blank

# SECTION 17:  MISSING, INTERNMENT, PRISONER OR HOSTAGE BENEFITS

A.  Any Crewmember who, while engaged in the Company's operations becomes involuntarily interned or held as a prisoner or hostage by any person, group or is held by a foreign government entity, or becomes involuntarily missing, shall be entitled to compensation and benefits continuation as if he had continued working, including but not limited to:

1.  Monthly compensation at the rate applicable to the Crewmember as if he was in fact working, based upon the applicable Minimum Monthly Guarantee (for the month in which the Crewmember became interned, held prisoner or missing, he shall receive the applicable monthly guarantee or actual compensation required by this Agreement, whichever is greater);

2.  Continuation of the insurance benefits applicable to the Crewmember (including those extended to the Crewmember's family), subject as before to the required employee contributions;

3.  Continuation of 401(k) deductions from the Crewmember's monthly compensation and the Company's matching contributions on behalf of the Crewmember;

4.  Continued sick leave and vacation accrual;

5.  Continued seniority and Longevity accrual.

B.  The compensation listed above shall be deposited to an interest bearing account (pass book savings interest rate or better) on behalf of the Crewmember unless he has completed and filed with the Company the form attached to this Section 17 as Appendix 17-A, in which case such compensation shall be paid as he has directed therein.  The Company shall provide to each Crewmember a copy of the aforementioned form at the time he is hired.  In furtherance thereof, the Company shall make the form available on its website so that Crewmembers may update the form as necessary.

C.  If it cannot be determined whether a Crewmember has been detained in a manner that would trigger the compensation and benefits provided for in this Section 17, such compensation and benefits shall be paid retroactively if eligibility is later confirmed.  Any dispute(s) regarding the application of this Section may bypass the grievance procedures set forth in Section 20 and be submitted directly to the System Board of Adjustment provided for in Section

21. Such dispute(s) shall be heard and resolved as expeditiously as possible.

D. If the death of the Crewmember is established by any means, or there is sufficient evidence that a reasonable person would conclude that the Crewmember has died, the compensation and benefits set forth in subsection 17.A., above, shall cease and any death benefits to which the Crewmember is entitled shall be concurrently paid.

E. If it cannot be determined that the Crewmember is alive but there is insufficient evidence for a reasonable person to conclude that the Crewmember has died, but there has been no legal finding of the Crewmember's death, the compensation and benefits listed in subsection 17.A., above, will be paid for the shorter of a period of twenty-four (24) months from the time the Crewmember was last known to be alive, or to when the Crewmember's death has been legally or otherwise confirmed.  If at the end of the twenty-four (24) month period the Crewmember's status still cannot be confirmed then any death benefits to which he may be entitled shall be paid.

F. At the time an eligible Crewmember's compensation and benefits are terminated pursuant to subsections 17.D. or 17.E., above, the vacation accruals to which he was entitled shall be paid as compensation as he has directed in Appendix 17-A to this Section.  If the Crewmember has not completed and filed Appendix 17-A with the Company, then the accruals will be paid to his estate.

G. In the case of a Crewmember who has not completed and filed Appendix 17-A with the Company and for whom compensation has been held in an interest bearing account pursuant to subsection 17.B., above, such compensation shall be paid to the estate of the Crewmember at the time death benefits, if any, are to be paid pursuant to this Section 17.

H. If a Crewmember for whom death benefits have been triggered pursuant to this Section 17 is later determined to be alive and eligible for the compensation and benefits listed in subsection 17.A., above, such compensation and benefits will be paid on a retroactive basis, less any death benefits already paid.  Further, such compensation and benefits will continue for the period that the Crewmember continues to qualify for such.   If the death benefits paid the Crewmember are greater than the compensation that would have been paid the Crewmember had no presumption or finding of death been made, then the Crewmember shall be obligated to refund the excess to the Company.

I. The compensation and benefits provided for in this Section shall not

apply to any Crewmember:

1. whose gross misconduct causes him to be missing, detained or interned and results in his unavailability for duty;

2. who engaged in activities that he knew or should have known were illegal under the laws of the country in which such activities took place;

3. who voluntarily entered an area that he was directed to avoid by the Company, the U.S. government, or the foreign government with jurisdiction over the area entered by the Crewmember if the Crewmember had prior notice of the directive;

4. who is held by law enforcement or governmental officials in the United States, its possessions, or territories, except as provided in subsection 17.J., below.

J. Notwithstanding anything to the contrary contained in this Section 17, the compensation and benefits specified in subsection 17.A., above, shall continue for any Crewmember who as a result of any action taken pursuant to and in accordance with Company instructions, policy and procedures becomes missing, interned or held as a prisoner by law enforcement or governmental officials of any foreign country or the United States, its possessions, or territories.

APPENDIX 17-A

To: _____,

You are hereby directed to pay all monthly compensation allowable to me pursuant to Section 17 of the collective bargaining agreement between _____ and the Crewmembers in the service of _____ as represented by the International Brotherhood of Teamsters, as follows:


A.    NAME/INSTITUTION: _____

Recipient's Address: _____

ACCOUNT NO. (as applicable):_____

PERCENTAGE OF MONTHLY COMPENSATION:_____

As long as living, or allowed by law, and thereafter to:

NAME/INSTITUTION:_____

Recipient's Address: _____

ACCOUNT NO. (as applicable): _____


B.    NAME/INSTITUTION: _____

Recipient's Address: _____

ACCOUNT NO. (as applicable):_____

PERCENTAGE OF MONTHLY COMPENSATION:_____

As long as living, or allowed by law, and thereafter to:

NAME/INSTITUTION:_____

Recipient's Address: _____

ACCOUNT NO. (as applicable): _____


C.    NAME/INSTITUTION: _____

Recipient's Address: _____

ACCOUNT NO. (as applicable):_____

PERCENTAGE OF MONTHLY COMPENSATION:_____

As long as living, or allowed by law, and thereafter to:

NAME/INSTITUTION:_____

Recipient's Address: _____

ACCOUNT NO. (as applicable): _____


D.      NAME/ INSTITUTION: _____

Recipient's Address: _____

ACCOUNT NO. (as applicable):_____

PERCENTAGE OF MONTHLY COMPENSATION:_____

As long as living, or allowed by law, and thereafter to:

NAME/INSTITUTION:_____

Recipient's Address: _____

ACCOUNT NO. (as applicable): _____


The balance, if any, and any amounts accruing after death of all persons named in the above designation shall be held for me, or in the event of my death before receipt thereof, shall be paid to the legal representative of my estate.

The foregoing direction may be modified from time to time by signed letter by the undersigned, and such modification shall become effective upon the Company's receipt of such letter.

Payments made by the Company pursuant to this direction will fully release the Company from the obligation of making any further payments with respect thereto.


X
_____
Crewmember's Signature / Date

This Page Intentionally Blank

# SECTION 18: UNION REPRESENTATION

A. The Company shall admit a reasonable number of officially designated representatives of the Union to those areas of its property where Crewmembers generally congregate and to the various offices of the Company for the purpose of attending meetings with management and administering the Agreement.

B. The Union shall notify the Company in writing and in a timely manner of the designation and/or election of its various representatives.

C. The rights of Crewmembers to a Union representative during investigatory, disciplinary and grievance meetings and hearings shall be specified in the Agreement.

D. Representatives of the Union shall be provided an opportunity (a minimum of two (2) hours) to meet with and address the Company's New Hire Crewmembers at a mutually agreed upon time during Company indoctrination training.  The Union will advise the Company in advance as to who its representative(s) will be at these meetings. Any costs for such meetings, other than the facility if the meeting is held in Company facilities, shall be the responsibility of the Union. Nothing contained herein shall prohibit a Union representative(s) from continuing a meeting beyond two (2) hours at the Company's facility outside of normal training hours with the Company's permission.

This Page Intentionally Blank

# SECTION 19:  DISCIPLINE, DISCHARGE AND PROBATION

**A.  JUST CAUSE, DISCIPLINE, DISCHARGE AND PROBATION**

1. A Crewmember who has successfully completed his probationary period as defined in subsection 19.A.2. shall not be disciplined or discharged except for just cause.

2. The duration of a Crewmember's probationary period shall be a total of twelve (12) months of Active Service beginning with the date on which the Crewmember first attended a session of successfully-completed, new-hire training as a Crewmember.

**B.  PROCEDURE FOR DISCIPLINE AND DISCHARGE OF CREWMEMBERS**

A Crewmember shall not be disciplined or discharged without previously having been issued a "notice of hearing letter" and afforded the opportunity to attend a hearing before his Chief Pilot, or his designees; *provided*, the Crewmember is reasonably available for the hearing or has not made himself unavailable for the hearing.

1. Notice of Hearing Letter

    a. The Company shall issue to the Crewmember a "notice of hearing letter" before conducting any discipline or discharge hearing. Such notice of hearing letter shall inform the Crewmember of the time and place of the hearing and the matter to be discussed, including the specific acts of misconduct or omission alleged and, as applicable, any Company rules, regulations, or policies alleged to have been violated. The notice of hearing letter must also specifically reference that discipline or discharge may be assessed and that the Crewmember is entitled to the presence of a Union representative.

    b. The notice of hearing letter must be issued within forty-five (45) days from the date the Company first had or should have had sufficient knowledge (i) of the events on which the discipline or discharge may be based, and (ii) that those events may constitute just cause for the discipline or discharge of the Crewmember involved.   However, should the Company's investigation of the matter be ongoing it may, upon written notice to the Crewmember and the Union, extend this forty-five (45) day period by an additional forty-five (45) days.  As part of its notice of extension of the time for issuing the notice of hearing letter, the Company shall also provide to the Crewmember a

statement regarding the acts of alleged misconduct or omission currently under investigation; *provided,* however, that if the events upon which discipline may be based involve actions by a Crewmember that are part of an ongoing criminal investigation or the subject of a filed criminal complaint or similar pleading these time limits for the issuance of a notice of hearing letter shall not apply.   Nothing in this paragraph shall be construed to limit the Company's authority to impose progressive discipline or discharge on the basis of prior events.

c. At the time the Company issues a notice of hearing letter to a Crewmember it shall at the same time issue a copy of the letter to the Union.

2. The Hearing

a. The hearing will be scheduled to begin no earlier than ten (10) days and no later than fifteen (15) days from the time of the Crewmember's receipt of the notice of hearing letter; *provided,* that in the case of a Crewmember suspended without pay as provided below, the hearing will commence no later than ten (10) days after the first day of the Crewmember's suspension from service in accordance with subsection 19.B.3.b. unless the Crewmember is unavailable.   If the hearing does not timely commence as required, then the suspended Crewmember will be returned to pay status; *provided,* that he will remain subject to disciplinary action for the offense in question.

b. To the extent reasonably possible and to the extent that doing so will not affect the Crewmember's legality for duty or otherwise disrupt the operation, at the request of the Crewmember the hearing will be scheduled to occur on a day that the Crewmember, if not held out of service, is otherwise scheduled to be at his Base.

c. If the Crewmember for whom a hearing is to be held cannot be contacted after reasonable efforts have been made or he is unavailable for the hearing, then the Company shall meet with the Union to discuss the matter before assessing any discipline to the Crewmember or discharging him from the Company.

d. If a Union representative is not reasonably available to attend the hearing after being released by the Company, a hearing pursuant to this subsection 19.B.2 shall be telephonic unless the parties mutually agree to reschedule the hearing.

      e. By mutual agreement of the parties, a hearing pursuant to this subsection 19.B.2 may be telephonic.  Company officials other than the official conducting the hearing may also participate.

      f. If the Company agrees, a Crewmember may waive his entitlement to the hearing provided for in this Section.

3. Crewmember's Status During an Investigation and Pending the Results of a Hearing

      a. A Crewmember may be held out of service during an investigation that may lead to the assessment of discipline or discharge.  Except as provided in subsection 19.B.3.b, below, the Crewmember's pay shall be what the Crewmember would have earned under Section 3 of the Agreement, based on his scheduled trip(s), if applicable.

      b. A Crewmember may be held out of service without pay during an investigation that may lead to the assessment of discipline or discharge only for acts of violence, intentional or other malicious destruction of Company property, suspected violation of the Company's drug and alcohol policy, theft, gross insubordination, or other gross misconduct.

      c. A Crewmember held out of service pending an investigation that may lead to discipline or discharge shall continue to participate in the normal Bid Line procedure for subsequent Bid Periods as if he were not subject to an investigatory suspension.  Any compensation that may be later determined to be due him shall be based on the presumed award of a Bid Line in accordance with normal procedures.

4. Results of the Hearing

      a. The Company will issue its decision within fourteen (14) days following the close of the hearing, except in the case of a Crewmember that has been held out of service without pay in which case the decision shall be rendered within seven (7) days following the close of the hearing.  If the Company fails to issue its decision within the specified time frame, the Crewmember shall be deemed exonerated.

      b. Any decision by the Company to discipline or discharge a Crewmember shall be in writing, with a copy to the Union.

      c. If a Crewmember has been withheld from service and/or notified that a hearing is to be held regarding any action or inaction on his part and the Crewmember is subsequently completely

cleared of all of the charge(s) against him the following shall apply:

   i. To the extent not prohibited by law or applicable regulations, all Company records regarding the Crewmember, including the Crewmember's personnel and training files, shall be purged of all references to the charge(s).

   ii. The Crewmember will receive back pay based on what the Crewmember would have earned under Section 3, based on his scheduled trip(s), if applicable.

   iii. For each day the Crewmember attended the hearing on what otherwise would have been a scheduled Day Off, the Crewmember shall receive the pay applicable to Work on a scheduled Day Off.

   iv. Seniority and Longevity shall be restored and the Crewmember shall otherwise be made whole.

d. If a Crewmember has been withheld from service and is subsequently assessed discipline intended to result in a monetary penalty less than the pay loss suffered in connection with the hearing process, the Crewmember shall be restored for the pay loss incurred that exceeds the intended monetary value, if any, of the discipline assessed.  To the extent permitted by law or applicable regulations, all Company records including the Crewmember's personnel and training files, shall be purged of all references to the original charge(s) and pay loss incurred that exceeds the intended monetary value, if any, of the final discipline imposed.

## C. RIGHT TO APPEAL

A Crewmember or the Union may appeal any adverse action taken under this Section 19, in accordance with the procedures set forth in Section 20.  The appeal rights set forth in this subsection 19.C. do not apply to Crewmembers who have not completed the probationary period.

## D. GENERAL

1. The number of witnesses or representatives that will be released from duty at the request of the Union to appear at a hearing under this Section 19 shall not unduly interfere with the operations of the Company.  A Crewmember or party's right to call a witness shall be satisfied where the witness is provided an opportunity to participate in-person or by telephone in the hearing.  As necessary, additional

meeting dates shall be scheduled.  A hearing under this Section 19 shall be concluded once all of the requested witnesses have been provided a reasonable opportunity to be heard in person or by telephone.

2. The Union will be responsible for the compensation, travel, and other expenses of their respective witnesses and Union representatives for hearings and any other meetings held under this Section 19 pursuant to flight pay loss procedures. To the extent permitted by law and as otherwise authorized by Company policy, the Company will provide witnesses and Union representatives who are employees of the Company no cost, round trip, space-available transportation on Company aircraft to attend a hearing or other meeting held under this Section.

3. The Company will furnish at no-cost to the Crewmember, round trip (from the Crewmember's residence to the location of the hearing) commercial transportation for a Crewmember who is the subject of a hearing pursuant to this Section 19 in the event transportation over the lines of the Company is not available.  In addition, the Company shall pay per diem and the cost of reasonable lodging expenses associated with the hearing.

4. In the event a witness who is a Crewmember is called by the Company and is released from duty for the purpose of presenting evidence at the hearing, in person or telephonically, the witness shall receive the pay the Crewmember would have earned under Section 3, based on his scheduled trip(s), if applicable, for each day he appears as a witness. In addition, when applicable, the Company shall pay per diem and the cost of reasonable lodging expenses associated with the hearing.

5. The time limits contained in this Section may be extended by written or oral agreement between the parties.  As soon as practicable oral agreements to extend a time limit shall be confirmed in writing by the party who requested the extension. In the event a time limit contained in this Section 19, or any mutually agreed extension thereof, expires on a weekend or Company holiday, the time limit shall be extended to the next business day.

6. All notices, decisions, correspondence and other written communications the Company is required to send to the Crewmember and Union shall be sent to the Crewmember's designated address via certified mail, return receipt requested or by a commercially recognized courier service so as to insure delivery and confirmation of receipt, with a copy to the Union.  The Company

and Union may mutually agree to substitute electronic mail delivery on a case-by-case basis or in all cases.

7. Hearings under this Section shall be held at mutually agreeable times and locations. If the Company and the Union are unable to agree on a time and/or location, hearings will be held at the general offices of the Company at a time directed by the Company after consultation with the Union regarding its availability.

8. A stenographic or other recording of the hearings or any other meeting provided for in this Section 19 shall not be made unless the parties mutually agree to do so, in which case the costs of such will be borne equally between the parties.

9. The issuance of advisory letters to all Crewmembers, or a class of Crewmembers, intended only to communicate policy, procedures or Work rules that if violated could lead to discipline, do not constitute the assessment of discipline and are not subject to the provisions of this Section 19.

10. Individual counseling sessions and the documentation of such counseling sessions do not constitute the assessment of discipline and are not subject to the provisions of this Section. Documentation of a counseling session will be treated as follows:

    a. Documentation of a counseling session shall include a specific notation that the counseling did not constitute the assessment of discipline.

    b. Documentation of a counseling session will not be placed in the Crewmember's personnel file and/or training file, but may be otherwise retained by the Company and considered as part of the Crewmember's Work record.

    c. Documentation of a counseling session shall not be divulged, communicated, or distributed outside of the Company without the written consent of the Crewmember, except as may be required by any governmental agency or authority, as required by the Pilots' Record Improvement Act of 1996, or as may be otherwise required by law.

11. The Company shall provide the Union with copies of any documents, including witness statements, if applicable, the Company intends to present or rely on at the hearing. Information shall be provided at the hearing unless mutually agreed otherwise.

# SECTION 20: GRIEVANCE PROCEDURE

### A. RIGHT TO UTILIZE GRIEVANCE PROCEDURE

Any Crewmember, or group of Crewmembers as provided in subsection 20.B.1.b., below, who has a grievance concerning the application or interpretation of this Agreement, or a grievance concerning a Company action which he believes violates this Agreement, or who believes he has been unjustly disciplined or discharged, or the Union on the same basis as Crewmembers, may use this grievance procedure to grieve such matter. Except in cases of discipline and discharge, prior to the filing of a grievance involving the application or interpretation of this Agreement, or an action of the Company purporting to violate this Agreement, the Crewmember(s) or a Union representative must first make an attempt to resolve the matter informally through discussions or other communications with appropriate Company personnel. Further, the Company may initiate a grievance as provided in subsection 20.D., below.

### B. GRIEVANCE STEPS

1. Step 1

    a. The grievance must be submitted on a form provided by the Union, signed by the affected Crewmember, or by a Union representative on behalf of the Crewmember, and shall state in reasonable detail the facts upon which the claim is based, the section(s) of the Agreement and/or Company work rule(s), policy(ies) or procedure(s) in question, and the relief sought. The grievance shall be submitted to the Chief Pilot. A grievance must be submitted no more than thirty (30) days after the date the Crewmember knew or should have known of the act(s) or omission(s) giving rise to the grievance. In the case of a grievance over discipline or discharge, the thirty (30) day time period for filing grievances begins the day after the Crewmember receives the decision referred to in subsection 19.B.4.b of this Agreement.

    b. If the grievance of two (2) or more Crewmembers involves the same facts or incidents and alleged violation of this Agreement and/or Company work rule(s), policy(ies) or procedure(s), then such grievance may be filed by the Union as a "group grievance" or "class action grievance" on behalf of the affected Crewmembers, subject to all other provisions of this Section 20.

c. A Step 1 meeting, if requested by the Company, the Union, or the grievant, will be held as soon as practicable but in no case later fifteen (15) days after the Chief Pilot receives the written grievance. The meeting will be conducted by the Chief Pilot or his designee. Within seven (7) days after the meeting, or if no meeting is to be held by mutual agreement, then within fifteen (15) days after receipt of the grievance, the management official hearing the grievance will issue a written decision to the grievant, with a copy to the Union.

d. In matters relating to discipline and discharge, the procedures set forth in Section 19 will serve as Step 1 of this grievance procedure.

2. Step 2

a. A grievance that has not been resolved at Step 1 may be appealed by the Union or Crewmember to the Vice President of Flight Operations. Such appeal must be in writing on a form provided by the Union and signed by the grievant or by a Union representative on his behalf. The appeal must be postmarked or received by the Company no later than fourteen (14) days after the Crewmember and Union's receipt of the Company's Step 1 written decision. A timely grievance filed over discipline or discharge shall be considered a timely written appeal and request for a Step 2 meeting.

b. A Step 2 meeting, if requested by the Company, the Union, or the grievant, will be held by the Vice President of Flight Operations, or his designee, within fourteen (14) days of receipt of the written appeal.

c. Within ten (10) days after the meeting, or if no meeting is to be held by mutual agreement then within fourteen (14) days after receipt of the grievance, the Vice President of Flight Operations, or his designee, will issue a written decision to the grievant, with a copy to the Union.

3. Step 3

a. In the event a grievance has not been resolved at either Steps 1 or 2, the Union, only, may appeal the grievance to the Atlas Air, Inc. System Board of Adjustment (hereinafter, "Board"), in the manner provided for in subsection 21.C.2.a. The appeal must be in writing, addressed to the office the Company's Human Resources Department, and postmarked (or similar identification in the case of commercial delivery) no later than thirty (30) days

after the date the Step 2 decision was received by Union. The Company shall make a land and email address available for filing.

b. The Board shall be constituted and shall function in accordance with the provisions of Section 21 of this Agreement.

## C. TIME LIMITS

1. Any time limits prescribed in this Section 20 may be waived by mutual agreement of the Company and the grievant or Union. As soon as practicable oral agreements to extend a time limit shall be confirmed in writing by the party who requested the extension.

2. In the event a time limit contained in this Section, or any mutually agreed extension thereof, expires on a weekend or Company holiday, the time limit shall be extended to the next business day.

3. The failure of a Crewmember, or the Union on behalf of the Crewmember, to grieve or to appeal any adverse decision (in whole or in part) within the prescribed time limits provided, including any mutually agreeable extensions to such time limits, or a refusal to attend a properly scheduled meeting (unless the grievant has waived his right to attend the meeting), shall cause the action or decision of the Company to become final and binding; provided, the Board shall have jurisdiction to resolve all disputes related to compliance with this subsection 20.C.3.

4. If any meeting or decision required of the Company under the provisions of this grievance procedure is not held or issued within the time limits provided, including any mutually agreed upon extensions to such time limits, the Crewmember and the Union may consider the grievance denied and appeal it to the next step of the procedure, and until such time as the Company has provided the meeting or decision required, the time limits for the grievant and/or the Union to file an appeal to the next step of this procedure, or to the Board, shall be tolled.

## D. COMPANY GRIEVANCES

In the case of a grievance initiated by the Company (a "Company grievance"), the Company shall submit the Grievance to the Union in writing or by electronic mail. The Company grievance shall conform with the timeliness and formal requirements set forth in subsection 20.B.1.a, above. The Company may file a grievance only over the interpretation or application of the Agreement. Within thirty (30) days of submission of a Company grievance, a Union official designated by the Union will meet

with the Company's Vice President of Flight Operations and the Company's senior official responsible for Crewmember labor relations, or their designees, to discuss the matter. If the grievance cannot be resolved as a result of this meeting then within thirty (30) days following such meeting, the grievance may be appealed by the Company to the Board by filing a notice of appeal to the Board on or before the thirty-first (31) day following the meeting. Such appeals shall conform to the requirements set forth in 20.B.3.a., above, except the notice of appeal shall be filed with a Union official designated by the Union.

**E. GENERAL**

1. A decision rendered pursuant to this Section 20 may not add to, subtract from, or alter in any way the Agreement.

2. The number of witnesses or Union representatives that will be released from duty to appear at a hearing under this Section 20 shall not unduly interfere with the operations of the Company. A Crewmember or party's right to call a witness shall be satisfied where the witness is provided an opportunity to participate in person or by telephone at the hearing. As necessary, additional meeting dates shall be scheduled. A hearing under this Section 20 shall be concluded once all of the requested witnesses have been provided a reasonable opportunity to be heard in person or by telephone.

3. A stenographic or other recording of the meetings provided for in this Section will not be made unless the parties mutually agree to do so, in which case the costs of such will be borne equally between the parties.

4. Unless the Company so agrees (or the Union in the case of a Company grievance), the grievant and the Union are precluded from raising in subsequent steps of the grievance procedure alleged unrelated violation(s) of the Agreement, unrelated issues involving the application of Company rules, policies or procedures or additional unrelated claims based on facts or incidents not raised as part of the grievance submitted at Step 1. Such issues may only be submitted as new grievances subject to all time limits, jurisdictional restrictions, and any other pertinent provisions of this Agreement. However, nothing herein shall preclude the grievant or the Union from raising at any step of this grievance procedure or before the Board any section or provision of this Agreement that either the grievant or the Union believes supports their position in the underlying grievance.

5. Unless the Union so agrees, the Company is precluded from raising new charges in disciplinary and discharge matters that were not

raised in Section 19 proceedings.

6. A Crewmember will have the right to be accompanied at each meeting held pursuant to this grievance procedure by a Union representative who may or may not be an employee of the Company.

7. All notices, decisions, correspondence and other written communications the Company is required to send to the Crewmember and Union shall be sent to the Crewmember's and Union's designated address via certified mail, return receipt requested or by a commercially recognized courier service so as to insure delivery and confirmation of receipt.  The Company and Union may mutually agree to substitute electronic mail delivery on a case-by-case basis or in all cases.

8. All meetings provided for in this Section 20 will be at mutually agreeable reasonable times and locations. If the Company and the Union are unable to mutually agree on a time and location, the meetings will be held at the general offices of the Company at a time directed by the Company after consultation with the Union regarding its availability. At the request of the Company or the Union, any meeting provided for herein to discuss a grievance not involving discipline or discharge may be held by telephone conference. For grievances involving discipline or discharge, the waiver of any meeting provided for herein in favor of a telephone conference must be by mutual agreement.

9. The Company and the Union will be responsible for the compensation, travel, and other expenses of their respective witnesses and Union representatives for meetings held at any step of this grievance procedure; provided, Union witnesses and representatives who are Crewmembers who attend hearings under this Section 20 shall be subject to flight pay loss procedures, upon request by the Union. To the extent permitted by law, and upon request by the Union, the Company will provide a Crewmember no cost, round trip space-available transportation on Company aircraft to attend meetings held under this Section 20.

10. Upon a specific, good faith, written request made at least seventy-two (72) hours prior to a hearing referenced in this Section 20, (unless another time frame is mutually agreed upon), the Company and the Union shall provide the other party with information reasonably necessary to determine the merits of a grievance. Information shall be provided at least twenty-four (24) hours before the hearing unless mutually agreed otherwise.

This Page Intentionally Blank

# SECTION 21: SYSTEM BOARD OF ADJUSTMENT

### A. SYSTEM BOARD OF ADJUSTMENT

In compliance with Section 204, Title II of the Railway Labor Act, as amended, there is hereby established a System Board of Adjustment, which shall be known as the Atlas Air, Inc. Crewmembers' System Board of Adjustment (the "Board").

### B. JURISDICTION OF THE BOARD

1. As provided by the Railway Labor Act, as amended, the Board shall have jurisdiction over all disputes between a Crewmember and the Company, or between the Company and the Union, growing out of the interpretation or application of any of the terms of this Agreement or amendments thereto.

2. The Board's jurisdiction shall not extend to any proposed changes in rates of pay, rules or working conditions. The Board shall not have any jurisdiction to add to, subtract from, modify or amend any of the terms of this Agreement.

3. In cases arising under Section 20, the Board's jurisdiction shall be limited to a consideration of the issue(s) addressed in the written grievance filed pursuant to Section 20 and any issues arising from the subsequent processing of the grievance.

4. The Board shall not have jurisdiction to consider any dispute in which the appealing party has not complied with the applicable provisions of Sections 19 or 20, or which has not been submitted to the Board in a timely manner; provided, all procedural arbitrability disputes shall be resolved by the Board.

5. The Board shall have no jurisdiction to consider any dispute involving the discharge of a probationary Crewmember.

6. As provided by the Railway Labor Act, as amended, the decisions of the Board shall be final and binding.

### C. PROCEEDINGS BEFORE THE BOARD

1. The Board shall consist of three (3) members. One member shall be designated by the Union, and one member shall be designated by the Company. The third member shall be selected from a panel of neutral arbitrators pursuant to the provisions of subsection 21.C.3., below.

2. Appeal/Submission

    a. Written appeals to the Board shall be submitted in accordance with subsections 20.B.3.a. and 20.D. of this Agreement. The submission shall specifically state:

        i. The question(s) at issue, including the specific Section(s) of the Agreement alleged to have been violated;

        ii. A statement of facts;

        iii. The position of the Crewmember or the Union;

        iv. The position of Company; and

        v. The relief sought.

3. Selection of Neutral Arbitrator

    a. The Company and the Union have established the following panel of potential arbitrators:

        1. Fred Horowitz

        2. Ira Jaffe

        3. George Nicolau

        4. Alan Symonette

        5. Gil Vernon

        6. Richard Kasher

        7. Edward Krinsky

        8. Josh Javits

    b. Upon ninety (90) days advance written notice, either party may remove an arbitrator from the panel set forth in subsection 21.C.3.a., above; provided, if a hearing on a particular matter has commenced but not concluded, the third member of the Board present when the hearing commenced shall serve until the hearing is concluded and a decision is rendered. If an arbitrator is removed from the panel, the parties shall attempt to mutually agree upon a replacement arbitrator within twenty-one (21) days of receipt of the written notice. If the parties are unable to agree upon a replacement, either party may request a panel of nine (9) arbitrators from the National Mediation Board, all of whom shall be members of the National Academy of Arbitrators with prior airline experience. The parties shall strike the panel within fourteen (14) days of receipt. The last name remaining shall be added to the panel. The initial strike shall be determined by a coin toss.

4. Administration of the Board

   a. Beginning ten (10) days after the appeal to the Board is sent, either the Union (in the case of a Union, Crewmember or Group/Class Grievances) or the Company (in the case of a Company Grievance) shall have the right to select a neutral arbitrator to serve as the third member of the Board. The arbitrator shall be selected by mutual agreement of the parties or by alternately striking names from the above panel. The first strike shall be determined by a coin toss. After the arbitrator is selected, the Union (in the case of a Union, Crewmember or Group/Class Grievances) or the Company (in the case of a Company Grievance) may initiate the scheduling of the grievance for arbitration by notifying the selected arbitrator in writing as set forth in subsection 21.C.4.(i)-(iv). A copy of the written submission to the arbitrator shall be sent to the other party at the same time that it is sent to the arbitrator:

     i. That the arbitrator has been selected on the basis of his name appearing on a standing panel inclusive to this Agreement.

     ii. The name and number of the grievance, and whether it is a contract dispute or a discipline/discharge matter.

     iii. The scheduling party's estimated number of days required to hear the grievance.

     iv. The city in which the hearing is likely to be held.

   b. The arbitrator will be asked to provide both parties his available dates for hearings for the next sixty (60) days. Upon receipt of the arbitrator's dates of availability, the parties will confer regarding a mutually agreeable date or dates for the hearing. If no date has been agreed upon within fourteen (14) days from the date the arbitrator's dates were received by the parties, then either party may request in writing, with a copy to the other party, that the arbitrator schedule the hearing. Upon receipt of such a request the arbitrator will schedule the hearing.

   c. If the arbitrator referred to in subsection 21.C.4.b. does not offer available dates for hearings within the next sixty (60) days, and one or both parties finds arbitrator's dates of availability unacceptable, then the parties shall within fourteen (14) days from the date the arbitrator's response was received select another arbitrator by mutual agreement or by alternately striking names from the above panel. The procedures set forth in

subsections 21.C.4.b. and 21.C.4.c. shall be repeated until the hearing is scheduled.

d. The above listed provisions providing for notifications and communications with the arbitrator shall not be construed to permit any unauthorized *ex parte* communication with the arbitrator regarding the nature or merits of the grievance to be heard.

5. Hearing

   a. The parties will endeavor to convene the Board for a particular grievance as soon as possible after it has been appealed to the Board.

   b. The Board will meet at a mutually agreeable facility in Westchester County, New York unless the parties agree to meet elsewhere.

   c. The number of employee witnesses and representatives summoned to appear at any one time shall not be greater than that which can be spared without interfering with the Company's operations. Additional hearing dates will be scheduled as necessary. However, upon receipt of at least fourteen (14) days advance notice the Company shall release the Union's Board member to the extent necessary to allow him to attend meetings of the Board.

   d. A stenographic or other recording of the hearing may be made at the request of either party or upon mutual agreement of the parties. Except in the case of mutual agreement, the cost of the stenographic or other recording shall be borne by the requesting party and such recording shall be for the exclusive benefit of such party. In the case of mutual agreement for recording of the hearing, costs of such shall be borne equally by the parties. Nothing shall preclude the arbitrator from making or requesting a recording of the hearing for the arbitrator's exclusive use.

   e. The Board will be asked to issue its decision in writing as soon as reasonably possible, but in no case more than sixty (60) days after the hearing(s) conclude. Further, by mutual agreement the parties may request that the Board issue its decision orally or with a brief written decision after the taking of evidence and the conclusion of oral arguments, with a comprehensive written decision to follow.

**D. GENERAL**

1. Time Limits

   a. The time limits contained in this Section may be extended by written or oral agreement between the parties. Oral agreements shall be confirmed in writing as soon as practicable by the party that requested the extension.

   b. In the event a time limit contained in this Section, or any mutually agreed extension thereof, expires on a weekend or Company holiday, the time limit shall be extended to the next business day.

2. Notice of Appeal

   a. A notice of appeal to the Board shall be filed in accordance with subsection 20.B.3.a. or 20.D. of the Agreement.

   b. Copies of the above documents shall be provided to the Union official designated by the Union and to the Company's Vice President of Flight Operations or designee.

3. Expenses

   a. The expenses and reasonable compensation of the neutral arbitrator selected in accordance with Paragraph C.3. shall be borne equally by the Company and the Union.

   b. Except as expressly provided otherwise, the Company and the Union shall respectively assume the compensation, travel expense and other expenses of the Board members designated by them; *provided,* the Union Board member who attends hearings under this Section 21 shall be subject to flight pay loss procedures.

   c. To the extent permitted by law and authorized by Company policy, the Union Board member shall be provided no cost, free space available transportation over the lines of the Company for the purpose of attendance at meetings of the Board.

   d. The Company and Union will be responsible for the compensation, travel, and other expenses of their respective witnesses and representatives; provided, Union witnesses and representatives who are Crewmembers who attend hearings under this Section 21 shall be subject to flight pay loss procedures.

      i. In the event the Company calls a Crewmember as a witness, the Company will furnish at no-cost to the Crewmember,

round trip (from the Crewmember's residence to the location of the hearing) commercial transportation in the event transportation over the lines of the Company is not available. In addition, the Company shall pay per diem and the cost of reasonable lodging expenses associated with the hearing.

ii. In the event the Company calls a Crewmember as a witness and the Crewmember is released from duty for the purpose of presenting evidence at the hearing, and the hearing is on a Work Day(s), the Crewmember shall receive the pay the Crewmember would have earned under Section 3, based on his scheduled trip(s), if applicable, for each day he appears as a witness. If the hearing is on the Crewmember's Day(s) Off, the Crewmember shall receive pay applicable to Work on a scheduled Day Off for each such day the Crewmember attended the hearing.

e. Upon mutual advance agreement of the Union and the Company in each particular instance, the Board may incur expenses necessary for its decision of a case and such expenses shall be borne equally by the Company and the Union.

4. Docket

If the Union appeals more than one (1) case to the Board, the Union shall choose the order of Union, Crewmember or Group/Class Grievances to be heard and decided by the Board. If the Company appeals more than (1) Company Grievance to the Board, the Company shall choose the order of Company Grievances to be heard and decided by the Board.

5. Information Requests

a. Upon a specific, good faith, written request made at least fourteen (14) days prior to a hearing referenced in this Section 21 (unless another time frame is mutually agreed upon), the Company and the Union shall provide the other party with information (that was not already provided pursuant to subsection 20.D.10) reasonably necessary to determine the merits of a grievance. The requested information shall be provided as soon as practicable before the Board hearing, but not later than seven (7) days prior to the Board hearing unless mutually agreed to otherwise.

b. The failure to provide required information, unless such information is withheld deliberately, shall not have an exclusionary effect. Rather, if additional pertinent requested

information is identified before the close of the hearing, it will be provided to the requesting party as soon as possible.

6. Subpoenas and Disclosure of Witnesses

The parties acknowledge the right to subpoena information and witnesses for Board hearings. The parties shall disclose to one another the names of witnesses they intend to call as part of their case in chief, if known, no less than three (3) days prior to the commencement of a Board hearing.

7. The Company and Union shall be the only parties to a Board proceeding.

8. The Company shall designate the person or persons who may present its arguments and evidence to the Board. The Union shall designate the person or persons who may present its arguments and evidence to the Board, and, at its discretion, who may present any arguments and evidence on behalf of the grievant.

9. Each Board member shall be free to discharge his duty in an independent manner, without fear that his individual relations with the Company, the Union or other employees may be affected in any manner by any action taken by him in good faith in his capacity as a Board member.

This Page Intentionally Blank

# SECTION 22:  SENIORITY

### A. GENERAL

1. Except as may otherwise be provided in this Agreement, seniority will govern with respect to upgrade and downgrade, filling of vacancies, displacements, reduction in force (furlough), recall from furlough, Base and aircraft assignments due to expansion or reduction in aircraft and Base staffing, monthly schedules, vacation bidding and when otherwise required by the Agreement.

2. There shall be two System Seniority Lists comprised of the "Flight Engineer" list and the "Pilot" list.

   a. Seniority as a Flight Engineer shall be based on the individual's length of service as a Flight Engineer, beginning with the date the individual commenced training with the Company as a Flight Engineer, and his relative position in that Flight Engineer training class.

   b. Seniority as a Pilot shall be based on the individual's length of service as a Pilot, beginning with the date the individual commenced training with the Company as a Pilot, and his relative position in that Pilot training class.

   c. For both the Flight Engineer and Pilot System Seniority Lists, if an individual is currently employed by the Company, he shall be placed on the applicable list first. When two or more individuals currently employed by the Company begin training on the same date, placement on the applicable list will be determined using the last four digits of their Social Security numbers, with the individual having the lower number placed on the list first. If two or more such individuals have the same four Social Security numbers, then the last six Social Security numbers shall be used to determine placement on the list, with the individual having the lower number placed on the list first. After individuals currently employed by the Company are placed on the list in accordance with the procedure above, the Social Security number rules above shall be used to determine the placement of all other individuals who begin training on the same date.

   d. An individual on the Flight Engineer System Seniority List who accepts a position with the Company as a Pilot will be placed on the Pilot System Seniority List in accordance with the provisions of subsections 22.A.2.b. and 22.A.2.c., above; *provided*,

however, that he shall also continue to accrue seniority as a Flight Engineer in accordance with this Section 22.

e.  An individual on the Pilot System Seniority List who accepts a position with the Company as a Flight Engineer will be placed on the Flight Engineer System Seniority List in accordance with the provisions of subsections 22.A.2.a. and 22.A.2.c., above; *provided*, however, that he shall also continue to accrue seniority as a Pilot in accordance with this Section 22.

3.  Except as may be otherwise provided in this Agreement, seniority as a Flight Engineer or a Pilot will continue to accrue during the individual's uninterrupted period of employment with the Company.

4.  The promotion of a junior Crewmember over a more senior Crewmember as may be allowed under this Agreement shall not effect either Crewmember's relative position on the applicable System Seniority List(s).

**B.  SENIORITY LIST**

1.  The Company shall maintain both the Flight Engineer and Pilot System Seniority Lists, which will include all Flight Engineers and Pilots employed by the Company as of the date the lists are published.  The Flight Engineer and Pilot System Seniority Lists as of the date of the signing of the Agreement are attached hereto as Appendix 22-A.

2.  The official Flight Engineer and Pilot System Seniority Lists will be published and posted by the Company on March 1st and September 1st of each year and at the time a Bid Award is published.  Each list will contain the names of all Crewmembers holding seniority on each list and, at a minimum, the following information for each Crewmember shown, current as of the February 15th for the March 1st posted lists and August 15th for the September 1st posted lists and as of the date used for a Bid Award:

a.  Date of hire as a Pilot or Flight Engineer, as applicable, and relative seniority number.

b.  Status.

c.  Position.

d.  Duty status (i.e., active, leave of absence, furlough, management).

### C. PROTESTS REGARDING SENIORITY

1. A Crewmember shall have a period of forty-five (45) days after the posting of the System Seniority Lists to protest to the Company his relative seniority position or other incorrect posting that affects his seniority on either list, as applicable; *provided*, however, that a Crewmember on vacation, leave of absence, or furlough shall be permitted fourteen (14) days after return to duty to submit a protest as allowed herein. A Crewmember failing to file a written protest within the time limits provided herein shall be bound by the list as posted and shall have no further recourse.

2. A Crewmember protesting his position on either or both System Seniority Lists shall submit the protest in writing to the Company's Vice President of Flight Operations or his designee, with a copy to the Union. Only protests relating to errors or changes occurring after the last required posting of the official System Seniority Lists shall be subject to this or any other protest procedure, including the grievance procedure set forth in Sections 20 of this Agreement.

3. The Company will present all properly submitted seniority protests to the Union for its review and position regarding how the protest should be resolved.

   a. If the Company agrees with the resolution of the seniority protest proposed by the Union then the System Seniority List(s) will be amended accordingly and the protest resolution will become final and binding on all parties and for all purposes.

   b. If the Company does not agree with the resolution of the seniority protest proposed by the Union then the Union may submit the matter directly to the Atlas Air, Inc. System Board of Adjustment ("Board") provided for in Section 21 of this Agreement. Should the protest be so submitted, the Board shall be asked to hear the matter as expeditiously as possible and its decision in the matter will be final and binding on all parties and for all purposes.

### D. LOSS OF SENIORITY

A Crewmember will forfeit all seniority rights and his name will be removed from the applicable System Seniority List(s) as may be specifically provided elsewhere in this Agreement when he:

1. Is discharged and the discharge is upheld or unchallenged;

2. Retires or dies;

3. Resigns his employment with the Company;

4. Does not return to work upon the expiration of a leave of absence;

5. Has been on continuous leave for a period in excess of that provided for the leave he was granted in Section 13; or

6. Has been on furlough for a period in excess of that provided in Section 23 of this Agreement; or

7. Forfeits his Crewmember seniority but remains an employee with the Company.

**E.  TRANSFER TO MANAGEMENT OR OTHER POSITION WITH THE COMPANY**

1. A Crewmember that has completed his probationary period as defined in subsection 19.A.2. of this Agreement and subsequently transfers to a management or any other position with the Company not covered by this Agreement shall retain and continue to accrue seniority on the Pilot and/or Flight Engineer System Seniority List(s), as applicable.  Such an individual shall exercise his seniority if and when he elects to return to a Position covered by this Agreement and subject to his meeting all qualifications for the Position to which he is attempting to return.

2. A Crewmember that transfers to a management or other position with the Company not covered by this Agreement before he has completed his probationary period will retain but not accrue any further seniority on either the Flight Engineer or Pilot System Seniority List(s), as applicable.  Further, such an individual will be required to complete his probationary period upon his return to a Position covered by this Agreement.

3. A Crewmember who is removed from his management or other position not covered by the Agreement, but retained by the Company, shall have a right to return to a Position covered by this Agreement in accordance with this subsection 22.E.

Appendix 22-A

| IBT Integrated Flight Engineer Seniority List as of 10/01/11 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sen # | P-Hire# | Emp # | DOH | Name | Position | Aircraft | Base | Status |
| 1 | 1 | 120 | 12/16/92 | Hulme, Richard | FE | 742 | JFK | |
| 2 | 2 | 132 | 01/07/93 | Nelson, Larry | FE | 742 | ANC | |
| 3 | 3 | 161 | 03/16/93 | Freeman, Charles | FE | 742 | JFK | LTM |
| 4 | 4 | 159 | 03/16/93 | Eberhart, Matthew | FO | 744 | MIA | Pilot |
| 5 | 5 | 184 | 03/29/93 | Duvall, John | CA | 744 | JFK | Pilot |
| 6 | 6 | 199 | 05/05/93 | Harper, Eric | CA | 744 | IAH | Pilot |
| 7 | 7 | 209 | 05/17/93 | Showalter, Floyd | FE | 742 | JFK | |
| 8 | 8 | 211 | 05/17/93 | McGee, William | CA | 744 | IAH | Pilot |
| 9 | 9 | 226 | 06/02/93 | Keeton, Aubrey | FE | 742 | JFK | |
| 10 | 10 | 227 | 06/02/93 | Phillips, David M. | FE | 742 | JFK | |
| 11 | 11 | 224 | 06/02/93 | Robson, Elena | CA | 744 | JFK | Pilot |
| 12 | 12 | 250 | 06/14/93 | Rubino, Steve | CA | 744 | JFK | Pilot |
| 13 | 13 | 242 | 06/14/93 | Kasischke, Grant | CA | 744 | IAH | Pilot |
| 14 | 14 | 170 | 03/21/94 | Bauer, Joseph | FE | 742 | JFK | LOA |
| 15 | 15 | 295 | 03/21/94 | Stagliano, Anthony (Chuck) | FE | 742 | ANC | LTM |
| 16 | 16 | 605 | 03/21/94 | Soderstrom, Alan | FE | 742 | JFK | |
| 17 | 17 | 404 | 03/21/94 | Provance, Ronald | CA | 744 | IAH | Pilot |
| 18 | 18 | 365 | 05/16/94 | Phillips, Richard | CA | 744 | MIA | Pilot |
| 19 | 19 | 107 | 05/16/94 | Jorgensen, Dean | FO | 742 | JFK | Pilot |
| 20 | 20 | 301075 | 06/13/94 | Redmond, Michael E. | FE | 742 | FUR | FUR |
| 21 | 21 | 300177 | 07/11/94 | Brown, Thomas, L. | FE | 742 | FUR | FUR |
| 22 | 22 | 300696 | 07/11/94 | Krause, Ralph | FE | 742 | FUR | FUR |
| 23 | 23 | 300910 | 07/25/94 | Morris, Brian | FE | 742 | FUR | FUR |
| 24 | 24 | 358 | 07/25/94 | Mattox, Lawrence | CA | 744 | JFK | Pilot |
| 25 | 25 | 339 | 07/25/94 | Kayne, Charles | FE | 742 | JFK | LTM |
| 26 | 26 | 300333 | 07/25/94 | Del Villar, Robert | FE | 742 | FUR | FUR |
| 27 | 27 | 342 | 07/25/94 | Smith, Taylor | CA | 742 | JFK | Pilot |
| 28 | 28 | 343 | 07/25/94 | Trotter, Robert | CA | 742 | JFK | Pilot |
| 29 | 29 | 300454 | 07/26/94 | Garcia, Gil | FE | 742 | FUR | FUR |
| 30 | 30 | 301420 | 08/09/94 | Wood, Don | FE | 742 | FUR | FUR |
| 31 | 31 | 408 | 09/06/94 | Angell, Steven | FE | 742 | JFK | |
| 32 | 32 | 300704 | 09/06/94 | Kurts, Dean R. | FE | 742 | FUR | FUR |
| 33 | 33 | 385 | 09/06/94 | Haskell, Jack | FE | 742 | JFK | |
| 34 | 34 | 384 | 09/06/94 | Phillips, David W. | FE | 742 | JFK | |
| 35 | 35 | 301287 | 09/06/94 | Szarko, Brian | FO | 744 | CVG | LOA/Pilot |
| 36 | 36 | 383 | 09/06/94 | Olson, Rodger | FE | 742 | JFK | |
| 37 | 37 | 381 | 09/06/94 | Cecil, Paul | FO | 744 | JFK | Pilot |
| 38 | 38 | 300091 | 09/19/94 | Becker, Max | FE | 742 | FUR | FUR |
| 39 | 39 | 300596 | 09/19/94 | Hunt, Dwayne | FE | 742 | FUR | FUR |
| 40 | 40 | 112 | 10/31/94 | Weber, Lawrence (Dale) | FE | 742 | JFK | LTM |
| 41 | 41 | 416 | 10/31/94 | DeRenzi, Mario | FE | 742 | ANC | |
| 42 | 42 | 418 | 10/31/94 | Heermans, David | FO | 744 | JFK | Pilot |
| 43 | 43 | 415 | 10/31/94 | Chung, Kee | FE | 742 | JFK | |
| 44 | 44 | 419 | 10/31/94 | Schoppaul, John | CA | 744 | JFK | Pilot |
| 45 | 45 | 437 | 11/14/94 | Willman, Joseph | FE | 742 | ANC | |
| 46 | 46 | 433 | 11/14/94 | Inlan, Claude | FE | 742 | JFK | LTM |
| 47 | 47 | 434 | 11/14/94 | Opsahl, Robert | FE | 742 | JFK | |
| 48 | 48 | 431 | 11/14/94 | Coppage, Sherman | FE | 742 | JFK | LTM |
| 49 | 49 | 432 | 11/14/94 | Dellinger, Christopher | CA | 744 | JFK | Pilot |
| 50 | 50 | 453 | 11/26/94 | Walker, Arthur | FE | 742 | ANC | |
| 51 | 51 | 452 | 11/26/94 | Becker, Martin | FE | 742 | JFK | |
| 52 | 52 | 449 | 11/26/94 | De Anda, Gilbert | FE | 742 | JFK | |
| 53 | 53 | 451 | 11/26/94 | Campbell, Jeffrey | CA | 763 | JFK | Pilot |

October 1, 2011

| Sen # | P-Hire# | Emp # | DOH | Name | Position | Aircraft | Base | Status |
|---|---|---|---|---|---|---|---|---|
| 54 | 54 | 472 | 01/09/95 | Meyers, John | FE | 742 | ANC | |
| 55 | 55 | 116 | 01/09/95 | Carl, Katherine | FE | 742 | JFK | |
| 56 | 56 | 486 | 01/23/95 | Enriquez, Henry | FE | 742 | JFK | |
| 57 | 57 | 487 | 01/25/95 | Freeman, Samuel | FE | 742 | JFK | |
| 58 | 58 | 485 | 01/23/95 | Rickert, Ross | FE | 742 | JFK | |
| 59 | 59 | 484 | 01/23/95 | Pioli, Walter | FE | 742 | ANC | |
| 60 | 60 | 300271 | 01/27/95 | Colon, Robert | FE | 742 | FUR | FUR |
| 61 | 61 | 300806 | 01/27/95 | Jaureguy, Michael | FE | 742 | FUR | FUR |
| 62 | 62 | 803 | 02/06/95 | Fisher, Philippe | FE | 742 | JFK | LTM |
| 63 | 63 | 300435 | 05/22/95 | Ford, Don | FE | 742 | FUR | MGT/FUR |
| 64 | 64 | 300401 | 06/12/95 | Ennis, Scott | FE | 742 | FUR | FUR |
| 65 | 65 | 300087 | 06/12/95 | Beall, Jack | FE | 742 | FUR | FUR |
| 66 | 66 | 686 | 10/02/95 | Aldrich, Steve | FE | 742 | JFK | |
| 67 | 67 | 665 | 10/02/95 | Buchner, Mark | FO | 744 | JFK | Pilot |
| 68 | 68 | 680 | 11/06/95 | Rice, Neil | FE | 742 | JFK | |
| 69 | 69 | 678 | 11/06/95 | Lozada, Luis | FE | 742 | JFK | |
| 70 | 70 | 692 | 12/11/95 | Tinga, Frank | FE | 742 | JFK | |
| 71 | 71 | 691 | 12/11/95 | Low, Thomas | FE | 742 | JFK | |
| 72 | 72 | 705 | 12/18/95 | Trebino, Charles T. | FE | 742 | FUR | LTM/FUR |
| 73 | 73 | 704 | 12/18/95 | Johnson, William | FE | 742 | JFK | |
| 74 | 74 | 702 | 12/18/95 | Willis, Vincent | FE | 742 | JFK | |
| 75 | 75 | 720 | 01/08/96 | Harris, Jerry | FE | 742 | JFK | |
| 76 | 76 | 718 | 01/08/96 | Chadwell, Letch | FE | 742 | ANC | |
| 77 | 77 | 719 | 01/08/96 | Aldershoff, John | FE | 742 | JFK | |
| 78 | 78 | 734 | 01/15/96 | Blackwell, Stephen | FE | 742 | JFK | |
| 79 | 79 | 732 | 01/15/96 | Derrick, Wendall | FE | 742 | FUR | LTM/FUR |
| 80 | 80 | 735 | 01/15/96 | Langford, Steven | FE | 742 | ANC | |
| 81 | 81 | 733 | 01/15/96 | Rivera, Anibal (Andy) | FE | 742 | JFK | |
| 82 | 82 | 757 | 02/19/96 | Macsery, Stephen | FE | 742 | JFK | |
| 83 | 83 | 755 | 02/19/96 | Yarrington, David | FE | 742 | JFK | |
| 84 | 84 | 756 | 02/19/96 | Fox, Richard | FO | 744 | JFK | Pilot |
| 85 | 85 | 766 | 03/04/96 | Houghton, Robert E. | FE | 742 | FUR | LTM/FUR |
| 86 | 86 | 767 | 03/04/96 | McGlashan, Patrick | FE | 742 | JFK | |
| 87 | 87 | 768 | 03/04/96 | Hardesty, Shawn | FO | 744 | JFK | Pilot |
| 88 | 88 | 781 | 03/11/96 | Shedd, Lewis | FE | 742 | ANC | |
| 89 | 89 | 779 | 03/11/96 | Wyman, Thomas | FE | 742 | ANC | |
| 90 | 90 | 808 | 04/29/96 | Traficante, Gene | FE | 742 | JFK | |
| 91 | 91 | 826 | 05/13/96 | Gelvin, Richard | FO | 742 | JFK | Pilot |
| 92 | 92 | 837 | 05/28/96 | Hancock, Robert | FE | 742 | ANC | |
| 93 | 93 | 836 | 05/28/96 | Kunes, Randy | FE | 742 | JFK | |
| 94 | 94 | 849 | 06/10/96 | Fields, Willem (Mike) | FE | 742 | JFK | |
| 95 | 95 | 850 | 06/10/96 | Peavley, Billy | CA | 763 | JFK | Pilot |
| 96 | 96 | 863 | 06/24/96 | Gajate, Pedro A. | FE | 742 | FUR | FUR |
| 97 | 97 | 862 | 06/24/96 | Larrmore, Darrell | FE | 742 | JFK | |
| 98 | 98 | 877 | 07/05/96 | Deel, Garland | FE | 742 | JFK | |
| 99 | 99 | 886 | 07/22/96 | Tess, Robert | FE | 742 | JFK | |
| 100 | 100 | 887 | 07/22/96 | Browning, Michael R. | FE | 742 | FUR | FUR |
| 101 | 101 | 901 | 08/12/96 | Nipper, William | FO | 742 | JFK | Pilot |
| 102 | 102 | 301987 | 04/07/97 | Walden, Melton | FE | 742 | FUR | FUR |
| 103 | 103 | 300519 | 04/07/97 | Haire, Donald | FE | 742 | FUR | FUR |
| 104 | 104 | 301059 | 04/07/97 | Raffer, Ahmad | FE | 742 | FUR | FUR |
| 105 | 105 | 300193 | 04/07/97 | Canegan, Errol | FE | 742 | FUR | FUR |
| 106 | 106 | 300500 | 04/07/97 | Grandone, Anthony | FE | 742 | FUR | FUR |
| 107 | 107 | 301158 | 06/09/97 | Ruiz, Sergio | FE | 742 | FUR | FUR |
| 108 | 108 | 300117 | 06/09/97 | Bermingham, James | FE | 742 | FUR | FUR |
| 109 | 109 | 300793 | 06/09/97 | Markovic, Joseph | FO | 744 | CVG | Pilot |

October 1, 2011

| Sen # | P-Hire# | Emp # | DOH | Name | Position | Aircraft | Base | Status |
|---|---|---|---|---|---|---|---|---|
| 110 | 110 | 300073 | 08/25/97 | Baldridge, Doug | FE | 742 | FUR | FUR |
| 111 | 111 | 301037 | 08/25/97 | Poorman, David | FE | 742 | FUR | FUR |
| 112 | 112 | 300257 | 08/25/97 | Close, Terrence | FE | 742 | FUR | FUR |
| 113 | 113 | 300818 | 08/25/97 | Johansen, David | FE | 742 | FUR | FUR |
| 114 | 114 | 301362 | 05/26/98 | Vines, Thomas | FO | 744 | CVG | Pilot |
| 115 | 115 | 301255 | 05/26/98 | Squires, Del | FE | 742 | FUR | FUR |
| 116 | 116 | 300966 | 05/26/98 | Pace, Walter III | FE | 742 | FUR | FUR |
| 117 | 117 | 300839 | 05/26/98 | McKitrick, Michael | FE | 742 | FUR | FUR |
| 118 | 118 | 300121 | 05/26/98 | Berry, Thomas | FE | 742 | FUR | FUR |
| 119 | 119 | 152 | 03/16/93 | Armstrong, Gary | FE | 742 | JFK | |
| 120 | 120 | 126 | 01/07/83 | Mobley, Edgar L. | FE | 742 | FUR | FUR |
| 121 | 121 | 1309 | 10/05/98 | McNutt, Teodoro R. | FE | 742 | FUR | FUR |
| 122 | 122 | 1311 | 10/05/98 | Mulcan, Mathis (Matt) | CA | 763 | JFK | Pilot |
| 123 | 123 | 1341 | 10/19/98 | Ghazzara, Moustapha | FE | 742 | JFK | |
| 124 | 124 | 1338 | 10/19/98 | Diaz, Frank | FE | 742 | JFK | |
| 125 | 125 | 1342 | 10/19/98 | Faraldo, Angel | FE | 742 | JFK | |
| 126 | 126 | 1362 | 11/02/98 | Maile, Frank | FO | 742 | JFK | Pilot |
| 127 | 127 | 940 | 12/09/96 | Bakshi, Jwalant | CA | 763 | JFK | Pilot |
| 128 | 128 | 1446 | 01/11/99 | Giacobello, Joseph | FE | 742 | JFK | |
| 129 | 129 | 1471 | 01/25/99 | Carroll, James | FE | 742 | FUR | FUR |
| 130 | 130 | 1487 | 01/25/99 | Bourgault, Gregory | FE | 742 | JFK | |
| 131 | 131 | 1468 | 01/25/99 | Joseph, Frantz | FE | 742 | JFK | |
| 132 | 132 | 1472 | 01/25/99 | Flores, Agustin | FO | 742 | JFK | Pilot |
| 133 | 133 | 1499 | 02/08/99 | Moffitt, Christopher | FE | 742 | FUR | FUR |
| 134 | 134 | 1500 | 02/08/99 | Outten, Tyler | FE | 742 | FUR | MIL/FUR |
| 135 | 135 | 1502 | 02/08/99 | Gregory, Norman | FO | 744 | MIA | Pilot |
| 136 | 136 | 1519 | 02/22/99 | Penny, William | FE | 742 | FUR | FUR |
| 137 | 137 | 1552 | 03/08/99 | Young, Charles | FE | 742 | FUR | FUR |
| 138 | 138 | 1550 | 03/08/99 | Thomas, David | FE | 742 | JFK | |
| 139 | 139 | 1569 | 03/21/99 | Korejwo, Leon | FE | 742 | JFK | |
| 140 | 140 | 1591 | 03/21/99 | Bianco, Frederick | FO | 742 | JFK | Pilot |
| 141 | 141 | 1588 | 03/21/99 | Samuels, Solwyn | FE | 742 | JFK | |
| 142 | 142 | 1590 | 03/21/99 | Gonzalez, Edgard Santiago | FE | 742 | JFK | |
| 143 | 143 | 1718 | 04/05/99 | Kline, Roger | FE | 742 | JFK | |
| 144 | 144 | 1747 | 04/19/99 | Moyer, Lynn | FE | 742 | FUR | FUR |
| 145 | 145 | 300261 | 01/17/00 | Cocchi, Dino | FE | 742 | FUR | FUR |
| 146 | 146 | 301062 | 01/17/00 | Ramaker, Ronald | FE | 742 | FUR | FUR |
| 147 | 147 | 300494 | 01/17/00 | Goodwin, Rich | FE | 742 | FUR | FUR |
| 148 | 148 | 300413 | 01/17/00 | Farrell, Tom | FE | 742 | FUR | FUR |
| 149 | 149 | 2160 | 01/24/00 | Rahrer, William | FO | 742 | JFK | Pilot |
| 150 | 150 | 2180 | 02/07/00 | Handy, Monte | FE | 742 | JFK | |
| 151 | 151 | 2183 | 02/07/00 | Grunwald, Benjamin | FE | 742 | FUR | FUR |
| 152 | 152 | 2182 | 02/07/00 | Schisler, Eric | FE | 742 | FUR | MIL/FUR |
| 153 | 153 | 300036 | 03/19/00 | Angel, Richard | FE | 742 | FUR | FUR |
| 154 | 154 | 300809 | 03/19/00 | Mathers, James | FE | 742 | FUR | FUR |
| 155 | 155 | 2227 | 03/20/00 | Rivera, Carlos | FE | 742 | FUR | FUR |
| 156 | 156 | 2245 | 04/03/00 | Detres, Carlos | FO | 744 | MIA | Pilot |
| 157 | 157 | 2243 | 04/03/00 | Delph, Timothy | FO | 742 | ANC | Pilot |
| 158 | 158 | 300211 | 04/10/00 | Carter, Richard | FE | 742 | FUR | FUR |
| 159 | 159 | 301318 | 04/10/00 | Thurston, William | FE | 742 | FUR | FUR |
| 160 | 160 | 2272 | 04/17/00 | Warren, Malcolm | FE | 742 | JFK | |
| 161 | 161 | 2271 | 04/17/00 | Zinno, Peter | FE | 742 | FUR | FUR/LOA |
| 162 | 162 | 2273 | 04/17/00 | Clancy, Michael | FO | 742 | JFK | Pilot |
| 163 | 163 | 300795 | 05/01/00 | Martin, Frank | FE | 742 | FUR | FUR |
| 164 | 164 | 300185 | 05/01/00 | Burnette, William | FE | 742 | FUR | FUR |
| 165 | 165 | 300574 | 05/01/00 | Hester, Robert | FO | 744 | LAX | Pilot |

October 1, 2011

Page 3 of 4

| Sen # | P-Hire# | Emp # | DOH | Name | Position | Aircraft | Base | Status |
|-------|---------|-------|-----|------|----------|----------|------|--------|
| 166 | 166 | 301208 | 05/31/00 | Sieb, Joe | FE | 742 | FUR | FUR |
| 167 | 167 | 300319 | 05/31/00 | Davis, Scott | FE | 742 | FUR | MGT/FUR |
| 168 | 168 | 130 | 06/05/00 | Bonaney, Dimitry | FE | 742 | JFK | |
| 169 | 169 | 2385 | 06/19/00 | Grotey, Floyd (Ben) | FO | 763 | JFK | |
| 170 | 170 | 300788 | 07/06/00 | Lynch, James | FE | 742 | FUR | FUR |
| 171 | 171 | 206 | 05/17/93 | Carl, George L | FE | 742 | FUR | LTM/FUR |
| 172 | 172 | 1039 | 10/27/97 | Davis, James | FE | 742 | FUR | FUR |
| 173 | 173 | 1711 | 04/05/99 | Kinsey, Aston Ray | FE | 742 | FUR | FUR |
| 174 | 174 | 870 | 07/08/96 | Williams, John | FE | 742 | FUR | FUR |
| 175 | 175 | 907 | 08/26/96 | Boudaghian, Izik | FE | 742 | FUR | LTM/FUR |
| 176 | 176 | 1277 | 09/08/98 | Towse, Colin | FE | 742 | FUR | LTM/FUR |
| 177 | 177 | 1444 | 01/11/99 | Gilkey, Michael | FE | 742 | FUR | FTI/FUR |
| 178 | 178 | 1050 | 11/21/97 | Fail, Charles | FE | 742 | FUR | FUR |
| 179 | 179 | 1929 | 08/02/99 | Springer, Edward | FE | 742 | FUR | FUR |
| 180 | 180 | 303398 | 01/04/01 | Jackson, David B. | FE | 742 | FUR | FUR |
| 181 | 181 | 303291 | 01/25/01 | Callaham, Richard L | FE | 742 | FUR | FUR |
| 182 | 182 | 302890 | 03/30/01 | Qureshi, Sonny | FE | 742 | FUR | FUR |
| 183 | 183 | 304873 | 03/30/01 | Workman, William | FE | 742 | FUR | FUR |
| 184 | 184 | 302194 | 06/14/04 | Kunkel, Joseph | FO | 744 | JFK | Pilot |
| 185 | 185 | 502236 | 06/28/04 | Crutchfield, Fredrick | FO | 742 | JFK | FUR |
| 186 | 186 | 302690 | 07/12/04 | Francis, Sam | FO | 742 | JFK | Pilot |
| 187 | 187 | 1880 | 07/12/04 | Mendoza, Victor | FO | 742 | JFK | Pilot |
| 188 | 188 | 1064 | 12/05/97 | Torpey, Paul | FE | 742 | FUR | FUR |
| 189 | 189 | 316 | 05/16/94 | Ziobro, Thomas | FE | 742 | FUR | FUR |
| 190 | 190 | 688 | 12/11/95 | Peterson, Robert | FE | 742 | FUR | LTM/FUR |
| 191 | 191 | 795 | 04/15/96 | Marchbanks, Karen R | FE | 742 | FUR | FUR |
| 192 | 192 | 882 | 07/22/96 | Coston, Clayton | FE | 742 | FUR | FUR |
| 193 | 193 | 1308 | 10/05/98 | Schuring, Gerrit | FE | 742 | FUR | FUR |
| 194 | 194 | 304323 | 03/29/05 | Burst, David | FO | 742 | JFK | Pilot |
| 195 | 195 | 582877 | 06/13/05 | Barry, Paul | FE | 742 | FUR | FUR |
| 196 | 196 | 382895 | 06/13/05 | Smith, Daryl | FE | 742 | FUR | FUR |
| 197 | 197 | 384602 | 07/11/05 | Ruigvoorn, Cornelius | FE | 742 | FUR | FUR |
| 198 | 198 | 384594 | 07/11/05 | DeSandro, Eric | FO | 742 | JFK | Pilot |
| 199 | 199 | 479 | 01/23/95 | Hall, Howard | FE | 742 | FUR | FUR |
| 200 | 200 | 1439 | 01/11/89 | Bieniek, Clarence | FE | 742 | FUR | FUR |
| 201 | 201 | 391565 | 09/12/05 | Czepiel, Ken | FE | 742 | FUR | FUR |
| 202 | 202 | 2219 | 09/20/00 | Arostegui, Jose | FE | 742 | FUR | FUR |

## IBT Integrated Pilot Seniority List as of 10/01/11

| Sen # | P-Hire# | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 213 | 06/02/93 | Rook, Christopher | CA | 742 | ANC | LMED | 06/22/13 |
| 2 | 2 | 218 | 06/02/93 | Butler, Thomas | CA | 744 | IAH | | 07/14/15 |
| 3 | 3 | 215 | 06/02/93 | Lawrence, Steven | CA | 744 | IAH | | 26/25/19 |
| 4 | 4 | 238 | 06/14/93 | Chisholm, Robert | CA | 744 | JFK | | 06/23/14 |
| 5 | 5 | 240 | 06/14/93 | Rohr, Terry | CA | 742 | JFK | | 18/08/15 |
| 6 | 6 | 199 | 05/05/93 | Harper, Eric | CA | 744 | IAH | | 11/02/18 |
| 7 | 7 | 224 | 06/02/93 | Robson, Elena | CA | 744 | JFK | | 06/03/23 |
| 8 | 8 | 250 | 06/14/93 | Rubino, Steve | CA | 744 | JFK | | 08/06/13 |
| 9 | 9 | 242 | 06/14/93 | Kasischke, Grant | CA | 744 | IAH | | 04/25/18 |
| 10 | 10 | 291 | 03/21/94 | Brady, William (Bob) | CA | 744 | ANC | | 03/03/13 |
| 11 | 11 | 290 | 03/21/94 | Cullverhouse, George | CA | 742 | JFK | | 09/08/15 |
| 12 | 12 | 283 | 03/21/94 | Blanchet, Richard | CA | 744 | IAH | | 08/15/16 |
| 13 | 13 | 313 | 05/16/94 | Pellett, Patrick | CA | 744 | JFK | | 10/02/17 |
| 14 | 14 | 314 | 05/16/94 | Wheatley, Richard | CA | 744 | JFK | | 09/02/19 |
| 15 | 15 | 404 | 03/21/94 | Provance, Ronald | CA | 744 | IAH | | 07/06/18 |
| 16 | 16 | 301389 | 05/30/94 | Welty, Scott | CA | 744 | CVG | MGT | 06/24/18 |
| 17 | 17 | 335 | 07/25/94 | Ryngala, Kenneth | CA | 742 | JFK | | 09/22/14 |
| 18 | 18 | 108 | 07/25/94 | Davis, William V. | CA | 744 | ANC | | 05/01/17 |
| 19 | 19 | 300123 | 05/30/94 | Bird, Peter | CA | 744 | CVG | | 03/20/22 |
| 20 | 20 | 393 | 07/25/94 | Samson, Gregory | CA | 744 | ANC | | 01/12/27 |
| 21 | 21 | 348 | 07/25/94 | Ulrich, Robert | CA | 744 | MIA | | 12/08/27 |
| 22 | 22 | 300097 | 06/13/94 | Ogden, Brent | CA | 744 | LAX | | 02/10/14 |
| 23 | 23 | 374 | 08/06/94 | Jackson, Thomas | CA | 742 | JFK | | 10/15/13 |
| 24 | 24 | 373 | 08/06/94 | Welter, James | CA | 744 | JFK | | 02/04/20 |
| 25 | 25 | 300699 | 07/25/94 | Mills, Charles | CA | 744 | CVG | | 04/27/16 |
| 26 | 26 | 110 | 08/06/94 | Swanson, Thomas | CA | 744 | JFK | | 03/30/25 |
| 27 | 27 | 111 | 08/06/94 | Holcomb, William | CA | 744 | HSV | | 08/29/27 |
| 28 | 28 | 358 | 07/25/94 | Mattox, Lawrence | CA | 744 | JFK | | 02/03/16 |
| 29 | 29 | 342 | 07/25/94 | Smith, Taylor | CA | 742 | JFK | | 10/21/21 |
| 30 | 30 | 300165 | 07/11/94 | Bramstedter, Larry | CA | 744 | LAX | | 04/18/15 |
| 31 | 31 | 424 | 11/14/94 | Fox, Joseph | CA | 744 | JFK | | 02/13/17 |
| 32 | 32 | 439 | 11/28/94 | Judd, David | CA | 744 | HSV | | 03/28/23 |
| 33 | 33 | 300602 | 07/11/94 | Inoue, Noriyuki | CA | 744 | LAX | | 05/22/23 |
| 34 | 34 | 444 | 11/28/94 | Baker, Richard | CA | 742 | JFK | | 07/03/24 |
| 35 | 35 | 468 | 01/09/95 | Lackowski, Richard | CA | 742 | JFK | | 02/21/14 |
| 36 | 36 | 438 | 02/06/95 | Pitzer, Thomas | CA | 744 | JFK | | 12/29/13 |
| 37 | 37 | 499 | 02/06/95 | Chedister, Robert | CA | 742 | ANC | LOA | 05/23/14 |
| 38 | 38 | 300085 | 07/11/94 | Mix, John | CA | 744 | LAX | | 06/08/15 |
| 39 | 39 | 495 | 02/06/95 | Shank, Timothy | CA | 744 | ANC | | 01/15/16 |
| 40 | 40 | 300527 | 07/11/94 | Hampton, William | CA | 744 | LAX | | 02/18/17 |
| 41 | 41 | 622 | 06/19/95 | Genet, Ronald | CA | 744 | ANC | | 12/08/13 |
| 42 | 42 | 625 | 06/19/95 | Townshend, Samuel | CA | 744 | JFK | LMED | 12/19/15 |
| 43 | 43 | 621 | 06/19/95 | Klemeyer, Frederick | CA | 742 | ANC | | 12/28/15 |
| 44 | 44 | 301379 | 07/25/94 | Watson, Stephen | CA | 744 | CVG | | 09/18/20 |
| 45 | 45 | 620 | 06/19/95 | Lewis, Dwight (Chip) | CA | 744 | ANC | | 10/11/18 |
| 46 | 46 | 626 | 06/19/95 | Koeller, Robert | CA | 744 | JFK | | 01/22/21 |
| 47 | 47 | 300636 | 07/25/94 | Kehmeier, Billy | CA | 744 | CVG | | 03/13/25 |
| 48 | 48 | 301409 | 08/08/94 | Willis, Robert | CA | 744 | CVG | | 04/04/13 |
| 49 | 49 | 638 | 07/24/95 | Gates, David | CA | 744 | ANC | | 09/13/13 |
| 50 | 50 | 211 | 05/17/93 | McGee, William | CA | 744 | IAH | | 03/27/26 |
| 51 | 51 | 300963 | 05/09/94 | Oliver, L. Rick | CA | 744 | CVG | | 03/26/14 |
| 52 | 52 | 649 | 08/21/95 | Thompson, Keith L. | CA | 744 | HSV | | 12/14/13 |
| 53 | 53 | 651 | 08/21/95 | Hollis, James | CA | 744 | HSV | | 07/06/16 |
| 54 | 54 | 300375 | 03/06/94 | Driver, Michael | CA | 744 | CVG | | 05/14/15 |
| 55 | 55 | 648 | 08/21/95 | Horton, William | CA | 742 | JFK | | 05/27/17 |
| 56 | 56 | 396 | 05/16/94 | Phillips, Richard | CA | 744 | MIA | | 02/18/17 |
| 57 | 57 | 658 | 10/02/95 | Minnich, Gerald | CA | 744 | JFK | | 01/22/15 |
| 58 | 58 | 659 | 10/02/95 | Pense, Jr Roy | CA | 744 | JFK | | 12/24/15 |
| 59 | 59 | 300699 | 01/27/95 | Michael, David | FO | 742 | JFK | LMED | 10/13/17 |
| 60 | 60 | 657 | 10/02/95 | Dapkus, Gerald | CA | 744 | JFK | | 08/01/18 |
| 61 | 61 | 674 | 11/06/95 | Furber, David | CA | 744 | ANC | | 12/04/17 |
| 62 | 62 | 300642 | 02/06/95 | Harness, Steve | CA | 744 | LAX | | 04/25/26 |
| 63 | 63 | 692 | 12/11/95 | Schlabaugh, Gary | CA | 744 | ANC | | 02/15/14 |

October 1, 2011

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 64 | 64 | 686 | 12/11/95 | Setzer, Royce | CA | 763 | JFK | | 07/18/16 |
| 65 | 65 | 684 | 12/11/95 | Dorsey, Brian | CA | 744 | HSV | | 12/12/22 |
| 66 | 66 | 301239 | 02/06/95 | Snaza, Todd | CA | 744 | LAX | | 04/25/07 |
| 67 | 67 | 725 | 01/15/96 | Nay, Blaine | CA | 742 | ANC | | 12/05/13 |
| 68 | 68 | 724 | 01/15/96 | Koskovich, Michael | CA | 764 | ANC | LMED | 04/13/14 |
| 69 | 69 | 300642 | 03/20/95 | Norgren, Dave | CA | 744 | CVG | | 09/02/21 |
| 70 | 70 | 728 | 01/15/96 | Allen, Lew | CA | 744 | ANC | MGT | 12/14/13 |
| 71 | 71 | 727 | 01/15/96 | Amussen, Gregory | CA | 764 | ANC | | 08/21/19 |
| 72 | 72 | 729 | 02/19/96 | Roberts, John | CA | 744 | ANC | | 05/06/19 |
| 73 | 73 | 749 | 02/19/96 | Wemmsen, Michael | CA | 744 | ANC | | 04/08/20 |
| 74 | 74 | 753 | 02/19/96 | Woodcock, Max | CA | 744 | ANC | | 06/11/20 |
| 75 | 75 | 300630 | 05/01/95 | Johnson, Stephen | CA | 744 | CVG | | 06/23/16 |
| 76 | 76 | 751 | 02/19/96 | Redford, Daniel | CA | 744 | ANC | | 01/15/27 |
| 77 | 77 | 300662 | 05/01/95 | Henderson, Bob | CA | 744 | CVG | | 10/07/26 |
| 78 | 78 | 762 | 03/04/96 | Danielson, David | CA | 744 | ANC | | 07/27/15 |
| 79 | 79 | 747 | 03/04/96 | Eason, William (Andy) | CA | 742 | JFK | | 09/12/17 |
| 80 | 80 | 761 | 03/04/96 | Graupmann, James | CA | 744 | ANC | LMED | 04/01/25 |
| 81 | 81 | 300617 | 05/01/95 | Hair, Robin | CA | 744 | LAX | | 10/17/20 |
| 82 | 82 | 776 | 03/11/96 | Wollman, Eric | FO | 742 | JFK | | 12/23/12 |
| 83 | 83 | 771 | 03/11/96 | Bryant, Michael B. | CA | 744 | JFK | | 03/31/13 |
| 84 | 84 | 301385 | 05/01/95 | Watts, Dan | CA | 744 | LAX | | 03/02/01 |
| 85 | 85 | 772 | 03/11/96 | Rohn, Alan | CA | 744 | JFK | | 01/28/14 |
| 86 | 86 | 775 | 03/11/96 | Nicolov, Alexei | CA | 744 | JFK | | 07/14/19 |
| 87 | 87 | 300642 | 05/22/95 | Keneston, R. William | CA | 744 | CVG | | 07/07/13 |
| 88 | 88 | 773 | 03/11/96 | Womack, William | CA | 744 | HSV | | 05/06/21 |
| 89 | 89 | 798 | 04/15/96 | Byrne, Barry | CA | 744 | ANC | | 04/10/19 |
| 90 | 90 | 792 | 04/15/96 | Faragallah, Jamille | CA | 744 | MIA | | 10/25/32 |
| 91 | 91 | 301035 | 05/22/95 | Pongin, John | CA | 744 | LAX | | 04/02/29 |
| 92 | 92 | 808 | 04/29/96 | Mondella, John | CA | 744 | JFK | LMED | 03/16/16 |
| 93 | 93 | 901 | 04/29/96 | Richards, Stephen | CA | 744 | MIA | | 12/24/18 |
| 94 | 94 | 301109 | 06/12/96 | Rivera, Fernando | CA | 744 | CVG | | 06/06/15 |
| 95 | 95 | 825 | 04/29/96 | Schultz, Mark | CA | 744 | JFK | | 06/16/19 |
| 96 | 96 | 807 | 04/29/96 | Snowden, James (Scott) | CA | 744 | JFK | | 08/27/25 |
| 97 | 97 | 802 | 04/29/96 | Thompson, Clifford | CA | 744 | JFK | | 03/01/23 |
| 98 | 98 | 818 | 05/13/96 | Adams, Gary | CA | 744 | JFK | | 06/06/16 |
| 99 | 99 | 820 | 05/13/96 | Mitchell, Larry | CA | 744 | JFK | | 06/22/16 |
| 100 | 100 | 301397 | 04/07/97 | White, Eugene | CA | 744 | LAX | | 03/27/24 |
| 101 | 101 | 824 | 05/13/96 | Lively, Brock | CA | 744 | MIA | | 04/14/22 |
| 102 | 102 | 300163 | 04/07/97 | Brannan, John | CA | 744 | CVG | | 04/22/30 |
| 103 | 103 | 825 | 05/13/96 | Durr, Frederick | CA | 744 | PVG | | 09/16/23 |
| 104 | 104 | 823 | 05/13/96 | Kearns, John | CA | 744 | LAX | | 03/29/26 |
| 105 | 105 | 835 | 05/28/96 | Bohannon, David | CA | 744 | JFK | | 12/03/19 |
| 106 | 106 | 301259 | 06/09/97 | Stathakis, Christ | CA | 744 | LAX | | 09/12/15 |
| 107 | 107 | 842 | 06/10/96 | Crews, Lawrence | CA | 744 | HSV | | 03/30/13 |
| 108 | 108 | 841 | 06/10/96 | Morris, Curtis | CA | 744 | JFK | | 03/16/20 |
| 109 | 109 | 300010 | 06/09/97 | Agnini, Chris | CA | 744 | CVG | MGT | 10/01/24 |
| 110 | 110 | 854 | 06/24/96 | Fatley, Richard (Tom) | CA | 744 | ANC | | 12/17/13 |
| 111 | 111 | 300032 | 06/09/97 | Nardiello, Chris | CA | 744 | LAX | | 10/14/26 |
| 112 | 112 | 855 | 06/24/96 | Tirado, Luis (Lou) | CA | 744 | JFK | | 12/11/14 |
| 113 | 113 | 859 | 06/24/96 | Schleiffer, Scott | CA | 744 | JFK | | 12/15/19 |
| 114 | 114 | 851 | 06/24/96 | Holman, Thomas | CA | 744 | IAH | | 10/05/29 |
| 115 | 115 | 872 | 07/08/96 | Courtney, Eddie | CA | 742 | JFK | | 10/05/15 |
| 116 | 116 | 871 | 07/08/96 | Rosenbaum, John | CA | 744 | JFK | | 01/25/17 |
| 117 | 117 | 300873 | 06/25/97 | Miner, Jim | CA | 744 | LAX | | 11/16/20 |
| 118 | 118 | 897 | 08/12/96 | Klein, Steven | CA | 744 | JFK | | 03/18/16 |
| 119 | 119 | 300851 | 08/25/97 | Mellish, Everett | CA | 744 | LAX | | 01/08/27 |
| 120 | 120 | 898 | 08/12/96 | Ray, Harlan | CA | 744 | IAH | | 04/02/16 |
| 121 | 121 | 898 | 08/12/96 | Planchon, Ben | CA | 744 | ANC | | 12/28/18 |
| 122 | 122 | 930 | 08/12/96 | Amicangioli, Frederick | CA | 744 | ANC | | 05/03/24 |
| 123 | 123 | 301262 | 05/26/98 | Vines, Thomas | FO | 744 | CVG | | 06/04/17 |
| 124 | 124 | 300891 | 03/01/00 | Molcany, John | CA | 744 | LAX | | 06/18/25 |
| 125 | 125 | 905 | 08/26/96 | Dudley, William | CA | 744 | HSV | | 05/15/14 |
| 126 | 126 | 904 | 08/26/96 | Klenke, Dwight | CA | 742 | JFK | | 05/08/18 |
| 127 | 127 | 908 | 08/26/96 | Hilburn, Benjamin | CA | 744 | JFK | | 12/16/18 |
| 128 | 128 | 419 | 10/31/94 | Schoppaul, John | CA | 744 | JFK | | 07/07/29 |
| 129 | 129 | 301079 | 05/17/99 | Raeh, Bryan | CA | 744 | CVG | | 06/19/22 |

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 130 | 130 | 1016 | 08/25/97 | Sawyer, Mark | CA | 742 | JFK | | 03/12/24 |
| 131 | 131 | 1015 | 08/25/97 | Nadeau, Remi (Bob) | CA | 744 | JFK | | 02/27/25 |
| 132 | 132 | 1040 | 10/20/97 | Narter, Detlef | CA | 744 | JFK | | 06/29/14 |
| 133 | 133 | 301213 | 05/17/98 | Silk, Robert | CA | 744 | CVG | | 03/22/26 |
| 134 | 134 | 1037 | 10/20/97 | McDonald, James | CA | 742 | JFK | | 06/13/16 |
| 135 | 135 | 1034 | 10/20/97 | Bourne, David | CA | 744 | MIA | LOA | 02/14/19 |
| 136 | 136 | 300930 | 05/17/98 | Nakamura, Doug | CA | 744 | LAX | | 02/01/05 |
| 137 | 137 | 1035 | 10/20/97 | Luck, Michael | CA | 744 | JFK | | 06/29/22 |
| 138 | 138 | 1051 | 11/21/97 | Walker, Roswell (Craig) | CA | 744 | ANC | LMED | 04/16/13 |
| 139 | 139 | 300247 | 05/17/98 | Clark, Jay | CA | 744 | LAX | | 11/15/21 |
| 140 | 140 | 1052 | 11/21/97 | Wright, Richard | CA | 744 | ANC | LMED | 05/22/13 |
| 141 | 141 | 1053 | 11/21/97 | Green, John | CA | 744 | JFK | | 01/21/14 |
| 142 | 142 | 1046 | 11/21/97 | Gronke, Jack | FO | 744 | JFK | | 02/12/15 |
| 143 | 143 | 300317 | 05/17/98 | Davis, Byron | CA | 744 | CVG | | 02/02/07 |
| 144 | 144 | 1047 | 11/21/97 | Melnick, Stephen | CA | 744 | MIA | | 07/19/22 |
| 145 | 145 | 1049 | 11/21/97 | Linn, Jay | CA | 744 | ANC | | 04/03/27 |
| 146 | 146 | 1063 | 12/05/97 | Ramos, Michael | CA | 744 | ANC | | 08/15/16 |
| 147 | 147 | 1057 | 12/05/97 | McFarlane, Kevin | CA | 744 | ANC | | 04/05/17 |
| 148 | 148 | 300169 | 07/19/98 | Brinkley, David | CA | 744 | CVG | | 05/05/04 |
| 149 | 149 | 1066 | 12/19/97 | Meyer, Frank | CA | 744 | MIA | | 10/12/19 |
| 150 | 150 | 1068 | 12/19/97 | Briody, John | CA | 744 | JFK | | 06/13/25 |
| 151 | 151 | 1065 | 01/05/98 | Rice, Carl | CA | 744 | ANC | | 01/11/21 |
| 152 | 152 | 300137 | 07/19/98 | Bokman, Charles | CA | 744 | LAX | | 11/07/25 |
| 153 | 153 | 1088 | 01/05/98 | Bisson, John | CA | 744 | ANC | MGT | 12/03/18 |
| 154 | 154 | 1062 | 01/05/98 | Gordon, Eric | CA | 744 | JFK | | 08/01/25 |
| 155 | 155 | 300766 | 07/19/98 | Lusa, David | CA | 744 | LAX | | 10/25/22 |
| 156 | 156 | 1084 | 01/05/98 | Peccabello, Lawrence (Arnie) | CA | 744 | JFK | LMED | 03/16/26 |
| 157 | 157 | 1068 | 01/19/98 | Bryce, Jr. Walter | CA | 744 | MIA | | 02/19/14 |
| 158 | 158 | 301348 | 07/19/98 | Van Zoest, Marc | CA | 744 | LAX | | 07/23/21 |
| 159 | 159 | 1089 | 01/19/98 | Martin, George | CA | 744 | MIA | LMED | 05/13/14 |
| 160 | 160 | 1000 | 01/19/98 | Dadwar, Michael | CA | 744 | JFK | | 10/07/14 |
| 161 | 161 | 1003 | 01/19/98 | Ogier, Charles | CA | 744 | ANC | | 02/13/18 |
| 162 | 162 | 300514 | 08/30/98 | Haaland, Jonny | CA | 744 | CVG | | 03/05/05 |
| 163 | 163 | 1095 | 01/19/98 | Blackwell, Julian (Scott) | CA | 744 | JFK | | 06/26/27 |
| 164 | 164 | 301087 | 08/30/98 | Meyers, Jose | CA | 744 | CVG | | 07/28/13 |
| 165 | 165 | 1100 | 02/03/98 | Hurdle, Jack | CA | 744 | JFK | | 06/14/17 |
| 166 | 166 | 301111 | 08/30/98 | Robinson, Jon | CA | 744 | LAX | | 03/08/31 |
| 167 | 167 | 1106 | 02/03/98 | Webb, Danny | CA | 744 | HSV | | 11/03/20 |
| 168 | 168 | 1118 | 03/02/98 | Dunnett, Warwick | CA | 744 | SYD | | 12/23/20 |
| 169 | 169 | 1129 | 03/16/98 | Mize, Jr. Charles | CA | 744 | JFK | | 12/29/17 |
| 170 | 170 | 1134 | 03/16/98 | Glasebrook, David | CA | 744 | ANC | | 06/02/19 |
| 171 | 171 | 301258 | 08/30/98 | Villano, James | CA | 744 | CVG | | 12/03/07 |
| 172 | 172 | 1131 | 03/16/98 | Deyon, Roger | CA | 742 | JFK | | 07/05/22 |
| 173 | 173 | 1140 | 03/30/98 | Arny, Ubiamo (Luis) | CA | 742 | JFK | | 03/21/20 |
| 174 | 174 | 1143 | 03/30/98 | Cullen, Stephen | CA | 744 | JFK | | 05/13/25 |
| 175 | 175 | 984 | 03/29/93 | Duvall, John | CA | 744 | JFK | | 10/28/30 |
| 176 | 176 | 300662 | 01/17/00 | Kirchner, Robert | CA | 744 | LAX | | 07/11/19 |
| 177 | 177 | 1547 | 01/17/00 | Ellis, S. Hale | FO | 744 | CVG | | 04/07/27 |
| 178 | 178 | 1157 | 04/13/98 | King, Brian | CA | 744 | JFK | | 09/30/33 |
| 179 | 179 | 1173 | 05/11/98 | Kennedy, Frank | CA | 744 | JFK | | 04/29/15 |
| 180 | 180 | 1169 | 05/11/98 | Nyberg, Roger | CA | 742 | JFK | | 06/02/16 |
| 181 | 181 | 300279 | 01/17/00 | Coonshead, Christopher | CA | 744 | LAX | | 01/09/31 |
| 182 | 182 | 1184 | 05/25/98 | Michaels, Randolph | CA | 744 | JFK | | 11/21/14 |
| 183 | 183 | 1185 | 05/25/98 | Converse, Terry | CA | 744 | MIA | | 09/15/23 |
| 184 | 184 | 300776 | 01/17/00 | Macomber, Donald | CA | 744 | LAX | | 11/03/32 |
| 185 | 185 | 1196 | 06/08/98 | Turner, Steve | CA | 744 | JFK | | 09/07/14 |
| 186 | 186 | 1202 | 06/08/98 | Fitzgerald, Mark | CA | 744 | HSV | | 02/25/23 |
| 187 | 187 | 300065 | 01/17/00 | Baird, William | CA | 744 | CVG | | 06/10/15 |
| 188 | 188 | 1193 | 06/08/98 | Urriphencour, Jess | CA | 744 | ANC | | 05/21/27 |
| 189 | 189 | 1214 | 07/06/98 | Cline, Richard | CA | 744 | ANC | | 11/18/15 |
| 190 | 190 | 1220 | 07/06/98 | May, Bobby | CA | 744 | ANC | | 03/09/21 |
| 191 | 191 | 1223 | 07/27/98 | Porter, Charles | CA | 744 | ANC | | 02/01/14 |
| 192 | 192 | 1226 | 07/27/98 | Reynolds, Don | CA | 744 | JFK | | 12/28/14 |
| 193 | 193 | 1229 | 07/27/98 | Drake, Thomas | CA | 744 | DXB | | 04/21/17 |
| 194 | 194 | 1234 | 07/27/98 | Drosos, Scott | CA | 744 | JFK | | 07/16/18 |
| 195 | 195 | 300633 | 01/17/00 | McDonald, Paul | CA | 744 | LAX | | 08/21/05 |

October 1, 2011

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 196 | 196 | 1235 | 07/27/98 | Fisher, Steven | CA | 744 | ANC | | 01/02/19 |
| 197 | 197 | 1236 | 07/27/98 | Rogali, Thomas | CA | 744 | JFK | | 05/21/33 |
| 198 | 198 | 300063 | 01/17/00 | Dixon, Steve | CA | 744 | CVG | | 04/09/24 |
| 199 | 199 | 1251 | 08/10/98 | Brayton, Scott | CA | 744 | JFK | | 10/01/19 |
| 200 | 200 | 1250 | 08/10/98 | Wagner, David | CA | 764 | JFK | | 03/03/24 |
| 201 | 201 | 1272 | 09/08/98 | Azadi, Morris | CA | 744 | JFK | | 08/25/20 |
| 202 | 202 | 1274 | 09/08/98 | Kuhn, George | CA | 744 | JFK | | 05/25/24 |
| 203 | 203 | 1286 | 09/21/98 | Broedt, Lee | CA | 744 | JFK | | 06/01/16 |
| 204 | 204 | 1292 | 09/21/98 | Weiss, John | CA | 744 | ANC | | 08/24/17 |
| 205 | 205 | 300419 | 03/13/00 | Fernandez, Jose | CA | 744 | CVG | | 03/21/13 |
| 206 | 206 | 1268 | 09/21/98 | Logsdail, Ronald | CA | 744 | HSV | | 07/26/19 |
| 207 | 207 | 1263 | 09/21/98 | Trimmer, Hubert | CA | 744 | JFK | | 08/20/26 |
| 208 | 208 | 1284 | 09/21/98 | Muratore, Steven | CA | 744 | JFK | | 03/03/27 |
| 209 | 209 | 432 | 11/14/94 | Dellinger, Christopher | CA | 744 | JFK | | 07/14/21 |
| 210 | 210 | 301017 | 03/13/00 | Reedy, Dennis | CA | 744 | LAX | | 01/24/23 |
| 211 | 211 | 1303 | 10/05/98 | Berre, John | CA | 742 | JFK | | 02/25/13 |
| 212 | 212 | 1306 | 10/05/98 | Ham, Robert M. | CA | 742 | JFK | | 03/04/14 |
| 213 | 213 | 1304 | 10/05/98 | Fitzsimmons, Kenneth | CA | 744 | HHN | | 04/15/15 |
| 214 | 214 | 301181 | 03/13/00 | Scott, David | CA | 744 | LAX | | 07/03/18 |
| 215 | 215 | 1307 | 10/05/98 | Jimenez, Oscar | CA | 742 | JFK | | 05/17/22 |
| 216 | 216 | 1297 | 10/05/98 | Essary, Gatlin | CA | 744 | JFK | | 08/02/31 |
| 217 | 217 | 300281 | 03/13/00 | Cocto, Michael | CA | 744 | CVG | | 08/22/13 |
| 218 | 218 | 1335 | 10/19/98 | Steiner, John | FO | 744 | IAH | | 11/25/19 |
| 219 | 219 | 1329 | 10/19/98 | Turner, James | CA | 744 | ANC | LMED | 02/13/25 |
| 220 | 220 | 1323 | 10/19/98 | Hill, Michael | CA | 744 | ANC | | 06/22/25 |
| 221 | 221 | 1333 | 10/19/98 | Gentry, Charles | CA | 744 | JFK | | 08/25/27 |
| 222 | 222 | 300620 | 03/13/00 | Johnson, Joseph | CA | 744 | CVG | | 12/04/19 |
| 223 | 223 | 1352 | 11/02/98 | Marble, Charles | CA | 742 | ANC | | 06/03/16 |
| 224 | 224 | 1357 | 11/02/98 | Peckham, Todd | CA | 742 | JFK | | 07/10/17 |
| 225 | 225 | 1369 | 11/02/98 | Retting, Harry | CA | 744 | MIA | | 08/26/19 |
| 226 | 226 | 300602 | 03/19/00 | Greene, Joe | CA | 744 | CVG | | 10/04/22 |
| 227 | 227 | 1348 | 11/02/98 | Klasek, David | CA | 744 | JFK | | 08/27/22 |
| 228 | 228 | 1360 | 11/02/98 | Fenwick, Steven | CA | 744 | JFK | | 10/22/23 |
| 229 | 229 | 1380 | 11/16/98 | Campanella, Benjamin | FO | 744 | JFK | | 08/05/19 |
| 230 | 230 | 301233 | 03/19/00 | Smith, Peter | CA | 744 | CVG | | 11/02/20 |
| 231 | 231 | 1379 | 11/16/98 | Saunders, Gary | CA | 744 | HSV | | 07/06/28 |
| 232 | 232 | 1440 | 01/11/99 | Mincey, Pamela | FO | 744 | JFK | | 11/27/20 |
| 233 | 233 | 1437 | 01/11/99 | Jordan, Marc | CA | 744 | ANC | | 05/18/22 |
| 234 | 234 | 300008 | 04/10/00 | Moricani, David | CA | 744 | CVG | | 06/02/23 |
| 235 | 235 | 1462 | 01/25/99 | Corrigan, Michael | CA | 744 | MIA | | 07/14/25 |
| 236 | 236 | 1459 | 01/25/99 | Cardwell, Vincent | CA | 742 | ANC | | 07/31/26 |
| 237 | 237 | 1457 | 01/25/99 | Hutchings, Kenneth | CA | 744 | MIA | | 08/13/27 |
| 238 | 238 | 301516 | 04/10/00 | Thu, Stig | CA | 744 | LAX | | 06/12/33 |
| 239 | 239 | 1469 | 02/08/99 | Lilyroth, Norman (Doug) | CA | 744 | ANC | | 10/02/14 |
| 240 | 240 | 301377 | 04/10/00 | Watson, Richard | FO | 742 | JFK | MIL | 09/10/32 |
| 241 | 241 | 1490 | 02/08/99 | Grue, Edward | CA | 744 | JFK | | 05/01/31 |
| 242 | 242 | 1405 | 02/08/99 | Pirsmo, Philip | CA | 744 | JFK | | 02/20/32 |
| 243 | 243 | 300007 | 04/10/00 | Baker, Craig | FO | 744 | CVG | | 02/23/35 |
| 244 | 244 | 1402 | 02/08/99 | Buhl, Gina | CA | 744 | ANC | | 05/21/32 |
| 245 | 245 | 1486 | 02/08/99 | Baca, Antonio | CA | 744 | JFK | | 06/24/33 |
| 246 | 246 | 1516 | 02/22/99 | Stuart, George | CA | 742 | JFK | | 04/13/14 |
| 247 | 247 | 301041 | 04/10/00 | Printup, Mark | CA | 744 | LAX | | 12/31/04 |
| 248 | 248 | 1513 | 02/22/99 | Korsgard, Soren (Peter) | CA | 744 | JFK | | 11/27/17 |
| 249 | 249 | 1511 | 02/22/99 | Conti Jr., Regis | CA | 742 | JFK | | 08/22/27 |
| 250 | 250 | 1546 | 03/08/99 | Samano, Rafael | CA | 744 | MIA | | 11/14/18 |
| 251 | 251 | 1543 | 03/08/99 | Shepard, Jimmy | CA | 744 | HSV | | 06/29/22 |
| 252 | 252 | 300673 | 04/10/00 | Milosavljevic, Nikola | CA | 744 | LAX | | 02/15/06 |
| 253 | 253 | 1540 | 03/08/99 | Mitry, Adel | CA | 744 | MIA | | 09/07/25 |
| 254 | 254 | 343 | 07/25/94 | Trotter, Robert | CA | 742 | JFK | | 12/02/25 |
| 255 | 255 | 300217 | 04/10/00 | Cervantes, Jesse | CA | 744 | CVG | | 05/24/29 |
| 256 | 256 | 1570 | 03/21/99 | Reynolds, Winston | CA | 742 | JFK | | 06/01/15 |
| 257 | 257 | 1501 | 03/21/99 | Burth, James | CA | 744 | HSV | | 09/08/15 |
| 258 | 258 | 300007 | 04/10/00 | Cushanick, Mike | CA | 744 | CVG | | 04/14/23 |
| 259 | 259 | 1562 | 03/21/99 | Mathiewson, Mick | CA | 744 | JFK | | 08/05/18 |
| 260 | 260 | 1676 | 03/21/99 | Christensen, Jack | CA | 744 | JFK | | 10/23/21 |
| 261 | 261 | 300748 | 04/10/00 | Littlepage, J. Larry | CA | 744 | LAX | | 08/31/02 |

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 262 | 262 | 1586 | 03/21/99 | Strepek, Randolph | CA | 744 | ANC | | 10/20/24 |
| 263 | 263 | 1568 | 03/21/99 | Romig, David | CA | 742 | JFK | | 08/25/27 |
| 264 | 264 | 1717 | 04/05/99 | Castillo, Carlos | CA | 742 | JFK | | 10/02/13 |
| 265 | 265 | 300835 | 04/10/00 | Cohabeer, Martin | CA | 744 | CVG | | 02/28/41 |
| 266 | 266 | 1716 | 04/05/99 | Atkinson, Daniel | CA | 742 | JFK | | 11/12/22 |
| 267 | 267 | 1712 | 04/05/99 | Lauwer, Terry | CA | 742 | JFK | | 09/07/27 |
| 268 | 268 | 300405 | 04/10/00 | Espejo, Dan | CA | 744 | LAX | | 04/27/26 |
| 269 | 269 | 1751 | 04/19/99 | Markoff, Robert | FO | 744 | ANC | LMED | 06/26/22 |
| 270 | 270 | 1743 | 04/19/99 | Rossi, Joseph | CA | 742 | JFK | | 11/28/24 |
| 271 | 271 | 1745 | 04/19/99 | Saulque, David | CA | 744 | ANC | | 02/03/25 |
| 272 | 272 | 1756 | 04/19/99 | Bly, Mark | CA | 744 | ANC | | 03/07/29 |
| 273 | 273 | 300805 | 05/01/00 | Masone, Joe | CA | 744 | LAX | | 07/24/29 |
| 274 | 274 | 1783 | 05/10/99 | Hughston, Thomas | CA | 744 | JFK | | 03/01/13 |
| 275 | 275 | 1767 | 05/10/99 | Blum, Carl | CA | 742 | ANC | | 10/01/18 |
| 276 | 276 | 300151 | 05/01/00 | Bowlin, George | CA | 744 | CVG | | 07/12/14 |
| 277 | 277 | 1778 | 05/10/99 | Andersen, David | CA | 744 | MIA | | 04/03/19 |
| 278 | 278 | 1773 | 05/10/99 | Greene, James | CA | 742 | ANC | | 06/29/22 |
| 279 | 279 | 1771 | 05/10/99 | Snowball, Peter | FO | 742 | ANC | | 05/12/24 |
| 280 | 280 | 1784 | 05/10/99 | Pires, Sylvio | CA | 744 | MIA | | 05/01/27 |
| 281 | 281 | 1768 | 05/10/99 | Wetzel, Larry | CA | 742 | JFK | | 05/10/29 |
| 282 | 282 | 159 | 03/16/83 | Eberhart, Matthew | FO | 744 | MIA | | 10/07/16 |
| 283 | 283 | 1813 | 05/24/99 | Philippsborn, Frank | CA | 744 | ANC | | 05/13/16 |
| 284 | 284 | 300249 | 05/01/00 | Clark, Larry | CA | 744 | LAX | | 10/27/13 |
| 285 | 285 | 1806 | 05/24/99 | Williams, Allen | FO | 744 | HSV | | 09/05/18 |
| 286 | 286 | 301021 | 05/01/00 | Pfeffer, Roger | FO | 742 | JFK | LMED | 01/27/13 |
| 287 | 287 | 1811 | 05/24/99 | Kim, Jean | CA | 744 | ANC | | 09/02/23 |
| 288 | 288 | 1809 | 05/24/99 | Germano, Thomas | CA | 744 | ANC | | 07/11/25 |
| 289 | 289 | 1799 | 05/24/99 | Griffith, Michael | CA | 744 | HSV | | 06/14/29 |
| 290 | 290 | 300699 | 05/01/00 | Moore, Gerry | CA | 744 | LAX | | 07/11/17 |
| 291 | 291 | 1810 | 05/24/99 | Norton, Jeffrey | CA | 742 | ANC | | 12/07/29 |
| 292 | 292 | 1830 | 06/07/99 | Hidy, Claude | CA | 742 | JFK | | 04/03/13 |
| 293 | 293 | 1823 | 06/07/99 | Jones, Michael A. | CA | 742 | JFK | | 01/18/17 |
| 294 | 294 | 1832 | 06/07/99 | Kipfer, Donald | CA | 744 | ANC | | 11/10/17 |
| 295 | 295 | 300127 | 05/01/00 | Blakely, John | CA | 744 | CVG | MGT | 07/12/22 |
| 296 | 296 | 1838 | 06/07/99 | Oberg, Kurtis | CA | 744 | ANC | | 10/02/24 |
| 297 | 297 | 1833 | 06/07/99 | Crocker, William | FO | 744 | IAH | | 04/12/20 |
| 298 | 298 | 1849 | 06/21/99 | Blackburn, Philip | CA | 742 | ANC | | 09/16/14 |
| 299 | 299 | 1851 | 06/21/99 | Felch, Steven | CA | 742 | ANC | | 01/06/18 |
| 300 | 300 | 300075 | 05/31/00 | Palmer, Tom | CA | 744 | CVG | | 02/02/17 |
| 301 | 301 | 1853 | 06/21/99 | Hofschild, Michael | CA | 742 | ANC | | 01/16/21 |
| 302 | 302 | 1852 | 06/21/99 | Carlson, Thomas | CA | 742 | ANC | | 04/18/23 |
| 303 | 303 | 301301 | 05/31/00 | Thomas, Terry | CA | 744 | ANC | LMED | 01/30/20 |
| 304 | 304 | 1848 | 06/21/99 | McCabe, Kevin | CA | 742 | ANC | | 06/10/23 |
| 305 | 305 | 300576 | 05/31/00 | Hille, Peter | CA | 744 | LAX | | 04/25/20 |
| 306 | 306 | 1873 | 07/06/99 | Vienz, Ernest | CA | 742 | JFK | | 09/25/13 |
| 307 | 307 | 300905 | 05/31/00 | Morales, Ralph | CA | 744 | LAX | | 01/31/25 |
| 308 | 308 | 1876 | 07/06/99 | Waggoner, Steve | CA | 742 | JFK | | 03/02/14 |
| 309 | 309 | 1870 | 07/06/99 | Matsreus, Andrew | CA | 744 | JFK | | 02/30/14 |
| 310 | 310 | 300673 | 05/31/00 | Klurt, David | CA | 744 | CVG | | 11/23/22 |
| 311 | 311 | 1878 | 07/06/99 | Hintz, William | CA | 744 | JFK | | 10/29/14 |
| 312 | 312 | 1874 | 07/06/99 | King, Donald | FO | 744 | ANC | LMED | 07/01/18 |
| 313 | 313 | 1884 | 07/06/99 | Utomo, Ignatius | CA | 744 | JFK | LOA | 12/31/19 |
| 314 | 314 | 1882 | 07/06/99 | Schafer, John | CA | 744 | JFK | | 08/13/21 |
| 315 | 315 | 1879 | 07/06/99 | Grass, Robert | CA | 744 | JFK | | 01/15/24 |
| 316 | 316 | 300252 | 05/31/00 | O'Reilly, Thomas | CA | 744 | CVG | | 07/21/22 |
| 317 | 317 | 1885 | 07/06/99 | Rubin, David | CA | 744 | ANC | | 09/28/26 |
| 318 | 318 | 1875 | 07/06/99 | Peldconen, Jyri | CA | 744 | ANC | | 02/25/28 |
| 319 | 319 | 300616 | 07/06/00 | Mouylalis, Philip | CA | 744 | CVG | | 11/01/28 |
| 320 | 320 | 1899 | 07/19/99 | Watson, Alan | CA | 742 | JFK | | 08/13/15 |
| 321 | 321 | 1905 | 07/19/99 | Klindt, Donald | CA | 744 | ANC | | 05/17/18 |
| 322 | 322 | 300544 | 07/06/00 | Harris, David | CA | 744 | LAX | | 08/18/26 |
| 323 | 323 | 1904 | 07/19/99 | Hales, Kenneth | CA | 744 | ANC | | 06/22/17 |
| 324 | 324 | 1900 | 07/19/99 | McChum, Richard | CA | 742 | JFK | | 11/03/17 |
| 325 | 325 | 300077 | 07/06/00 | Mines, Keith | CA | 744 | CVG | | 07/01/24 |
| 326 | 326 | 1895 | 07/19/99 | Callaway, Roy | CA | 742 | JFK | | 04/15/18 |
| 327 | 327 | 1911 | 07/19/99 | Downs, Greg | CA | 744 | HSV | | 01/24/21 |

October 1, 2011

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 328 | 328 | 1901 | 07/10/00 | Garcia, Federico (Fred) | CA | 763 | JFK | | 12/24/21 |
| 329 | 329 | 1910 | 07/10/00 | Crane, John | CA | 744 | ANC | | 10/08/27 |
| 330 | 330 | 1903 | 07/10/00 | Talmadge, Darren | CA | 742 | JFK | | 07/23/29 |
| 331 | 331 | 300291 | 07/06/00 | Clark, Paul | CA | 742 | JFK | LMED | 07/26/14 |
| 332 | 332 | 300806 | 07/06/00 | Meneghini, Roberto | CA | 764 | CVG | | 10/01/03 |
| 333 | 333 | 1925 | 08/02/00 | Smithberg, Fred | FO | 744 | JFK | | 10/31/14 |
| 334 | 334 | 1933 | 08/02/00 | Pak, Kelly | CA | 744 | JFK | | 11/06/24 |
| 335 | 335 | 300303 | 07/06/00 | Cunningham, Ken | CA | 744 | LAX | | 01/25/19 |
| 336 | 336 | 1936 | 08/02/99 | Covato, Christopher | CA | 744 | MIA | | 11/13/26 |
| 337 | 337 | 1928 | 08/02/99 | Lepre, Giovanni | CA | 744 | HKG | | 05/20/28 |
| 338 | 338 | 301364 | 07/06/00 | Vize, Tom | CA | 744 | LAX | | 05/02/08 |
| 339 | 339 | 1968 | 08/16/99 | Donizio, John (Pete) | CA | 744 | JFK | | 10/28/13 |
| 340 | 340 | 351269 | 07/06/00 | Stephen, Harmis | CA | 744 | LAX | | 09/27/17 |
| 341 | 341 | 1951 | 08/16/99 | Anderson, Darrell | CA | 742 | JFK | | 08/07/16 |
| 342 | 342 | 1953 | 08/16/99 | Wellins, Richard | CA | 742 | JFK | | 07/08/17 |
| 343 | 343 | 300339 | 07/24/00 | Delphia, Larry | FO | 744 | LAX | | 12/22/14 |
| 344 | 344 | 1954 | 08/16/99 | Vahey, James | CA | 742 | JFK | | 09/27/18 |
| 345 | 345 | 1948 | 08/16/99 | Wagner, Terry | CA | 742 | JFK | | 02/10/21 |
| 346 | 346 | 1956 | 08/16/99 | Matz'afti-Hansen, Peter | CA | 742 | JFK | | 04/03/22 |
| 347 | 347 | 300161 | 07/24/00 | Brandon, Fred | CA | 744 | LAX | | 07/16/21 |
| 348 | 348 | 1961 | 08/16/99 | Napula, Arthur | FO | 744 | IAH | | 08/20/27 |
| 349 | 349 | 1962 | 08/16/99 | Stoermer, Johnny | CA | 763 | JFK | | 08/26/27 |
| 350 | 350 | 351170 | 07/24/00 | Schetski, Henry | CA | 744 | LAX | | 09/16/31 |
| 351 | 351 | 1994 | 08/30/99 | Starr, Kenneth | FO | 742 | ANC | | 02/03/13 |
| 352 | 352 | 1964 | 08/30/99 | Alves, Paul | FO | 744 | JFK | LOA | 06/16/14 |
| 353 | 353 | 301538 | 07/24/00 | Umphenour, Roger | CA | 744 | LAX | | 08/03/21 |
| 354 | 354 | 1986 | 08/30/99 | Archdeacon, Francis | FO | 744 | JFK | LOA | 12/31/14 |
| 355 | 355 | 1900 | 08/30/99 | Richards, David | CA | 744 | JFK | | 07/23/20 |
| 356 | 356 | 1987 | 08/30/99 | Caputo, John | FO | 744 | JFK | LMED | 10/17/24 |
| 357 | 357 | 1992 | 08/30/99 | Velasco, Rolando | CA | 744 | MIA | | 03/30/25 |
| 358 | 358 | 1979 | 08/30/99 | McWhorter, James | CA | 744 | MIA | | 11/15/25 |
| 359 | 359 | 300612 | 07/27/00 | Morris, Julie | CA | 744 | LAX | | 04/29/58 |
| 360 | 360 | 1995 | 08/30/99 | Therp, Brian | CA | 744 | JFK | | 08/26/26 |
| 361 | 361 | 301046 | 09/05/00 | Profit, Travis | FO | 744 | LAX | | 08/31/08 |
| 362 | 362 | 1990 | 08/30/99 | Alexander, John | CA | 744 | HSV | | 04/17/28 |
| 363 | 363 | 1978 | 08/30/99 | McPhetres, David | FO | 744 | ANC | MIL | 02/09/31 |
| 364 | 364 | 2007 | 09/13/99 | Zambrano, Steven | CA | 744 | JFK | | 12/11/17 |
| 365 | 365 | 301293 | 09/05/00 | Tassa, Dan | FO | 744 | LAX | | 03/17/23 |
| 366 | 366 | 2009 | 09/13/00 | Reed, Jay | CA | 744 | JFK | | 08/03/18 |
| 367 | 367 | 2016 | 09/13/99 | Pacheco, Jonathan (Scott) | CA | 744 | JFK | | 04/18/27 |
| 368 | 368 | 2014 | 09/13/99 | Robles, Alfredo | CA | 744 | JFK | | 09/17/28 |
| 369 | 369 | 2035 | 09/27/99 | Moroney, Bruce | CA | 744 | ANC | | 11/25/13 |
| 370 | 370 | 300081 | 09/17/00 | Barko, Kevin | CA | 744 | LAX | | 09/17/22 |
| 371 | 371 | 2032 | 09/27/99 | Stern, Douglas | CA | 744 | ANC | | 07/29/14 |
| 372 | 372 | 2021 | 09/27/99 | Hoover, Donley (Ray) | CA | 744 | JFK | | 05/01/16 |
| 373 | 373 | 2026 | 09/27/99 | Grehn, Gary | CA | 744 | HSV | | 03/15/18 |
| 374 | 374 | 300061 | 09/17/00 | Dixon, John | CA | 744 | LAX | | 04/11/05 |
| 375 | 375 | 2027 | 09/27/99 | Tennesen, Raldar | CA | 744 | ANC | | 02/05/19 |
| 376 | 376 | 2028 | 09/27/99 | Gibson, David | CA | 744 | ANC | | 12/19/20 |
| 377 | 377 | 300048 | 10/04/00 | Atherton, Allan | CA | 744 | LAX | | 09/17/32 |
| 378 | 378 | 2022 | 09/27/99 | Willard, Raymond | CA | 744 | JFK | | 11/01/22 |
| 379 | 379 | 300498 | 10/04/00 | Graniff, Thomas | FO | 744 | LAX | | 10/05/31 |
| 380 | 380 | 2023 | 09/27/99 | Elliott, Nolan | FO | 744 | ANC | MIL | 06/24/26 |
| 381 | 381 | 2060 | 10/11/99 | Roths, Franklin | CA | 744 | JFK | | 05/13/17 |
| 382 | 382 | 2061 | 10/11/99 | Ruppert, Thomas | CA | 744 | JFK | | 07/08/18 |
| 383 | 383 | 301440 | 10/04/00 | Yaqub, Wais | FO | 744 | LAX | | 10/14/33 |
| 384 | 384 | 2057 | 10/11/99 | Gambina, Tony | CA | 742 | JFK | | 04/17/25 |
| 385 | 385 | 351027 | 10/04/00 | Pille, Jacques | FO | 744 | LAX | | 11/25/20 |
| 386 | 386 | 2065 | 10/11/99 | Britsch, Michael | FO | 744 | ANC | | 04/04/26 |
| 387 | 387 | 2050 | 10/11/99 | Ameson, Don | FO | 744 | MIA | LMED | 01/07/27 |
| 388 | 388 | 301023 | 10/04/00 | Phillips, Paul | FO | 744 | CVG | | 03/13/23 |
| 389 | 389 | 2067 | 10/11/99 | Brauer, Eric | FO | 744 | IAH | | 09/03/28 |
| 390 | 390 | 2056 | 10/11/99 | Roethger, Kurt | CA | 742 | JFK | | 12/09/28 |
| 391 | 391 | 2055 | 10/11/99 | Roth, Douglas | CA | 742 | JFK | | 08/14/32 |
| 392 | 392 | 301031 | 10/18/00 | Pittet, Siegfried | FO | 744 | LAX | | 09/09/31 |
| 393 | 393 | 2069 | 10/11/99 | Watson, Joseph | CA | 742 | JFK | | 10/05/30 |

October 1, 2011

| Sen # | P-Hire# | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 384 | 384 | 2089 | 11/08/99 | Gonici, James | FO | 744 | RSV | | 07/05/20 |
| 385 | 385 | 300039 | 10/18/00 | Beavers, Tom | FO | 744 | LAX | | 11/20/36 |
| 386 | 386 | 2087 | 11/06/99 | Catania, John | CA | 763 | JFK | | 03/08/22 |
| 387 | 387 | 2086 | 11/08/99 | Eberhardt, Michael | FO | 744 | JFK | | 12/02/27 |
| 388 | 388 | 301068 | 10/18/00 | Province, Robert | FO | 764 | LAX | | 06/29/18 |
| 389 | 388 | 2068 | 11/08/99 | Terrenzio, Stephen | FO | 744 | JFK | LOA | 04/03/34 |
| 400 | 400 | 1996 | 03/06/99 | Kelley, William | FO | 742 | JFK | MGT | 07/16/25 |
| 401 | 401 | 300508 | 10/18/00 | Hoover, Mark | FO | 744 | LAX | | 12/18/28 |
| 402 | 402 | 2121 | 12/06/99 | Kunz, Gene | CA | 742 | JFK | | 08/07/16 |
| 403 | 403 | 2106 | 12/06/99 | Hancock, Darrell | CA | 742 | JFK | | 05/12/19 |
| 404 | 404 | 300592 | 10/18/00 | Howson, Robert | FO | 744 | LAX | | 01/17/31 |
| 405 | 405 | 2115 | 12/06/99 | Melchionda, Robert | FO | 744 | IAH | | 06/15/22 |
| 406 | 406 | 300607 | 10/18/00 | Mladinov, Chris | FO | 744 | LAX | | 09/12/22 |
| 407 | 407 | 2120 | 12/06/99 | Armstrong, Dean | FO | 744 | JFK | | 11/02/25 |
| 408 | 408 | 2136 | 01/10/00 | Allen, David | FO | 744 | IAH | | 06/04/14 |
| 409 | 409 | 2140 | 01/10/00 | Arnold, John | FO | 744 | MIA | | 05/03/14 |
| 410 | 410 | 2139 | 01/10/00 | Thompson, Nathan | FO | 744 | ANC | | 05/05/19 |
| 411 | 411 | 2133 | 01/10/00 | Peterson, Patrick | CA | 742 | JFK | | 06/10/19 |
| 412 | 412 | 2139 | 01/10/00 | Kverriplassen, Paul | FO | 744 | ANC | | 03/23/22 |
| 413 | 413 | 2137 | 01/10/00 | Fink, Greg | FO | 744 | JFK | LMED | 06/26/28 |
| 414 | 414 | 301134 | 11/05/00 | Ruiz de Castilla, Laura | FO | 744 | LAX | | 04/11/39 |
| 415 | 415 | 2158 | 01/24/00 | Diaz, William | CA | 742 | JFK | | 02/19/13 |
| 416 | 416 | 2157 | 01/24/00 | Moorefield, Laurimar (Lori) | FO | 742 | JFK | | 04/25/13 |
| 417 | 417 | 2162 | 01/24/00 | Neal, III William | CA | 763 | JFK | | 01/28/19 |
| 418 | 418 | 300841 | 11/05/00 | McLaughlin, William | FO | 744 | LAX | | 01/08/07 |
| 419 | 419 | 2149 | 01/24/00 | Neal, David | FO | 744 | ANC | | 06/15/19 |
| 420 | 420 | 2150 | 01/24/00 | Turner, Randolph | FO | 744 | ANC | | 06/27/22 |
| 421 | 421 | 2161 | 01/24/00 | Grow, Michael | FO | 744 | ANC | | 12/11/28 |
| 422 | 422 | 2154 | 01/24/00 | Ely, Brewster | FO | 744 | MIA | | 03/18/30 |
| 423 | 423 | 2174 | 02/07/00 | Drews, Robert (Bob) | FO | 744 | MIA | | 01/01/20 |
| 424 | 424 | 2185 | 02/07/00 | Barney, III Paul | CA | 763 | JFK | | 01/27/21 |
| 425 | 425 | 2188 | 02/07/00 | Vihanek, William | FO | 744 | JFK | | 03/10/21 |
| 426 | 426 | 2177 | 02/07/00 | Kellogg, Lawrence | FO | 744 | IAH | | 08/07/24 |
| 427 | 427 | 2196 | 02/21/00 | Findley, Stuart | FO | 744 | JFK | | 03/26/15 |
| 428 | 428 | 2200 | 02/21/00 | Stahl, Paul | CA | 763 | JFK | | 08/27/17 |
| 429 | 429 | 302248 | 01/04/01 | Gurney, Tim | FO | 744 | CVG | | 10/29/15 |
| 430 | 430 | 2195 | 02/21/00 | Allgan, Mark | FO | 744 | JFK | | 04/25/23 |
| 431 | 431 | 2201 | 02/21/00 | Stephens, Grant | FO | 744 | ANC | | 02/28/25 |
| 432 | 432 | 2209 | 03/06/00 | Oneil, Raymond (Rusty) | FO | 744 | IAH | | 10/26/19 |
| 433 | 433 | 303421 | 01/04/01 | Presfyly, Michael | FO | 744 | CVG | | 05/29/21 |
| 434 | 434 | 2211 | 03/06/00 | Timberlake, Charles (Chuck) | FO | 744 | JFK | | 01/13/22 |
| 435 | 435 | 390 | 06/10/06 | Peavley, Billy | CA | 763 | JFK | | 05/12/23 |
| 436 | 436 | 303414 | 01/04/01 | Newlin, Doug | FO | 744 | CVG | | 01/31/22 |
| 437 | 437 | 1311 | 10/05/98 | Mulcan, Mathis (Matt) | CA | 763 | JFK | | 12/24/29 |
| 438 | 438 | 2220 | 03/20/00 | Kinnas, James | CA | 763 | JFK | | 03/17/23 |
| 439 | 439 | 302958 | 01/25/01 | Wittreich, Tim | FO | 744 | LAX | | 09/25/35 |
| 440 | 440 | 2225 | 03/20/00 | Sierfl, John | FO | 744 | JFK | | 04/28/30 |
| 441 | 441 | 2241 | 04/03/00 | Vazquez, Daniel | FO | 742 | JFK | | 10/31/13 |
| 442 | 442 | 2239 | 04/03/00 | McCain, Alec | FO | 744 | IAH | | 08/17/21 |
| 443 | 443 | 302645 | 01/25/01 | Bird, Mark | FO | 744 | LAX | | 05/21/34 |
| 444 | 444 | 2237 | 04/03/00 | Lacroix, Jr. Robert | CA | 763 | JFK | | 02/21/25 |
| 445 | 445 | 303010 | 01/25/01 | Anderson, Eric | FO | 744 | LAX | | 11/13/28 |
| 446 | 446 | 2254 | 04/17/00 | Beckerich, William | FO | 744 | JFK | | 12/17/15 |
| 447 | 447 | 2207 | 04/17/00 | Lindholm, Karl | CA | 763 | JFK | | 11/08/18 |
| 448 | 448 | 302657 | 01/25/01 | Newby, Adam | FO | 744 | LAX | | 08/01/30 |
| 449 | 449 | 2291 | 05/01/00 | Mullane, John | CA | 763 | JFK | | 10/07/13 |
| 450 | 450 | 2286 | 05/01/00 | Marla, George | CA | 763 | JFK | | 12/29/15 |
| 451 | 451 | 302939 | 01/25/01 | McMillan, Dean | FO | 744 | CVG | | 09/27/28 |
| 452 | 452 | 2292 | 05/01/00 | Routlam, Mikhall | FO | 744 | ANC | | 04/27/21 |
| 453 | 453 | 2263 | 05/01/00 | Adair, Steve | FO | 744 | AMG | | 08/22/25 |
| 454 | 454 | 303044 | 01/27/01 | Ligvani, Frank | FO | 744 | LAX | | 04/04/16 |
| 455 | 455 | 2290 | 05/01/00 | Morrream, Mark | FO | 742 | JFK | MIL | 01/09/29 |
| 456 | 456 | 2264 | 05/01/00 | Sams, Ivan | CA | 763 | JFK | | 11/28/01 |
| 457 | 457 | 2318 | 05/15/00 | Ragan, Lonny | FO | 744 | IXKG | | 01/11/13 |
| 458 | 458 | 2215 | 05/15/00 | Blauvelt, Whitney | FO | 744 | JFK | | 10/24/13 |
| 459 | 459 | 2311 | 05/16/00 | Despradel, Luis | CA | 763 | JFK | | 02/13/14 |

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 460 | 460 | 302934 | 01/29/01 | Stoker, Paul | FO | 744 | CVG | | 07/22/31 |
| 461 | 461 | 2314 | 05/15/00 | Dean, Mark | CA | 763 | JFK | | 06/18/21 |
| 462 | 462 | 304133 | 02/15/01 | Stephenson, Tim | FO | 744 | CVG | | 03/06/20 |
| 463 | 463 | 2325 | 05/15/00 | Lebow, Mark | FO | 744 | JFK | | 09/27/23 |
| 464 | 464 | 2316 | 05/15/00 | Gehr, Bradley | FO | 764 | JFK | | 02/21/26 |
| 465 | 465 | 303039 | 02/15/01 | Kottre, Timothy | FO | 744 | CVG | | 06/27/22 |
| 466 | 466 | 2313 | 05/15/00 | Friesen, Gregory | FO | 744 | JFK | | 02/10/28 |
| 467 | 467 | 2323 | 05/15/00 | Biehl, Robert | FO | 764 | ANC | | 02/14/31 |
| 468 | 468 | 2351 | 06/05/00 | Magnuson, Peter | CA | 763 | JFK | | 01/31/19 |
| 469 | 469 | 304016 | 02/15/01 | Warhus, Donn | FO | 744 | CVG | | 04/26/14 |
| 470 | 470 | 2368 | 06/05/00 | Johnson, Ronald | CA | 763 | JFK | | 08/29/23 |
| 471 | 471 | 941 | 12/09/96 | Sokshi, Jwarant | CA | 763 | JFK | | 02/13/29 |
| 472 | 472 | 304013 | 02/15/01 | Soares, Antonio | FO | 744 | CVG | | 05/14/33 |
| 473 | 473 | 2363 | 06/10/00 | Edwards, Cameron | CA | 763 | JFK | | 06/25/15 |
| 474 | 474 | 2402 | 07/02/00 | Atteberry, Charles | FO | 744 | MIA | | 06/16/16 |
| 475 | 475 | 304299 | 03/29/01 | Bergstedt, Jon | FO | 744 | CVG | | 12/02/17 |
| 476 | 476 | 2403 | 07/02/00 | Wintermute, Thomas | FO | 744 | JFK | | 03/03/18 |
| 477 | 477 | 304262 | 03/29/01 | Woelver, Stephen | FO | 744 | CVG | | 08/17/23 |
| 478 | 478 | 2448 | 07/31/00 | Wingertsahn, Lawrence | FO | 744 | ANC | | 08/18/15 |
| 479 | 479 | 2446 | 07/31/00 | Giacometto, John | FO | 744 | JFK | | 03/26/33 |
| 480 | 480 | 305187 | 03/30/01 | Childs, Dan | FO | 744 | CVG | | 01/03/22 |
| 481 | 481 | 2531 | 10/23/00 | Shipman, David | CA | 763 | JFK | | 06/18/25 |
| 482 | 482 | 2533 | 10/23/00 | DeBoer, Bryan | FO | 744 | ANC | | 03/08/26 |
| 483 | 483 | 2539 | 10/23/00 | Anderson, Gregory | FO | 744 | ANC | | 03/22/29 |
| 484 | 484 | 304338 | 03/30/01 | Datton, Raymond | FO | 744 | CVG | | 03/29/33 |
| 485 | 485 | 2538 | 10/23/00 | Harrichoohn, Peter | FO | 744 | ANC | | 11/09/29 |
| 486 | 486 | 303691 | 03/30/01 | Orewin, Robert | FO | 744 | CVG | | 04/05/30 |
| 487 | 487 | 2537 | 10/23/00 | Jepson, Thomas | FO | 744 | ANC | | 10/22/32 |
| 488 | 488 | 2589 | 11/27/00 | Emmens, Craig | CA | 763 | JFK | | 02/20/16 |
| 489 | 489 | 2587 | 11/27/00 | Urshalt, Christopher | FO | 744 | ANC | | 09/05/19 |
| 490 | 490 | 2584 | 11/27/00 | Detrick, John | FO | 744 | JFK | | 03/25/27 |
| 491 | 491 | 2583 | 11/27/00 | Boyd, Bobby | FO | 744 | JFK | | 12/29/34 |
| 492 | 492 | 305183 | 03/30/01 | Connor, John | FO | 744 | LAX | | 11/18/25 |
| 493 | 493 | 756 | 02/19/96 | Fox, Richard | FO | 744 | JFK | | 08/15/25 |
| 494 | 494 | 418 | 10/31/94 | Heamstra, David | FO | 744 | JFK | | 08/22/21 |
| 495 | 495 | 305490 | 04/12/01 | Bergeron, James | FO | 744 | LAX | | 10/30/28 |
| 496 | 496 | 451 | 11/26/94 | Campbell, Jeffrey | CA | 763 | JFK | | 10/22/22 |
| 497 | 497 | 381 | 09/06/94 | Cecil, Paul | FO | 744 | JFK | | 05/02/25 |
| 498 | 498 | 2243 | 04/03/00 | Delph, Timothy | FO | 742 | ANC | MIL | 03/23/30 |
| 499 | 499 | 314235 | 05/10/02 | Wiempa, Brad | FO | 744 | CVG | | 10/13/30 |
| 500 | 500 | 306020 | 05/10/02 | Campbell, Michael | FO | 744 | LAX | | 12/29/22 |
| 501 | 501 | 313888 | 05/10/02 | Meyer, Albert | FO | 744 | LAX | | 02/18/14 |
| 502 | 502 | 314633 | 05/29/02 | Adams, Albert | FO | 744 | CVG | | 06/06/31 |
| 503 | 503 | 315043 | 06/30/02 | Hospers, Robert | FO | 744 | LAX | | 05/20/26 |
| 504 | 504 | 315048 | 06/30/02 | Curtis, Scott | FO | 744 | CVG | | 08/10/27 |
| 505 | 505 | 315273 | 06/30/02 | Dodson, Teresa | FO | 744 | CVG | | 11/18/03 |
| 506 | 506 | 305979 | 06/30/02 | Gossar, Kevin | FO | 744 | CVG | | 02/04/25 |
| 507 | 507 | 315014 | 07/14/02 | Heffernan, Robert | FO | 744 | CVG | | 05/04/07 |
| 508 | 508 | 315489 | 07/14/02 | Van Grieken, Karel | FO | 744 | LAX | | 11/13/34 |
| 509 | 509 | 315274 | 07/14/02 | Phillips, Shawn | FO | 744 | CVG | | 05/05/34 |
| 510 | 510 | 2589 | 08/26/02 | Reed, Norm | FO | 742 | JFK | | 08/13/16 |
| 511 | 511 | 774 | 08/26/02 | McVey, Robert | FO | 742 | JFK | MIL | 09/05/20 |
| 512 | 512 | 2060 | 09/04/02 | Melton, Robert | CA | 763 | JFK | | 01/12/13 |
| 513 | 513 | 315694 | 09/04/02 | Stromberg, William | FO | 744 | LAX | | 04/25/21 |
| 514 | 514 | 2563 | 09/25/02 | Hedayat-Zadeh, Seper | FO | 744 | CVG | | 07/22/15 |
| 515 | 515 | 319012 | 11/30/02 | Laigmann, Lionel | FO | 744 | CVG | | 02/15/31 |
| 516 | 516 | 321330 | 03/24/03 | Bentley, Sean | FO | 744 | CVG | | 05/25/32 |
| 517 | 517 | 319290 | 03/24/03 | Knight, Tracy | FO | 744 | LAX | | 03/01/27 |
| 518 | 518 | 321413 | 06/23/03 | Cossitor, Christopher | FO | 744 | LAX | LOA | 01/17/02 |
| 519 | 519 | 316035 | 06/23/03 | Kilgore, E. (Mark) | FO | 744 | LAX | | 11/03/22 |
| 520 | 520 | 500073 | 06/23/03 | Sim-Merle, Robert | FO | 744 | LAX | MIL | 06/29/27 |
| 521 | 521 | 1362 | 11/02/98 | Malie, Frank | FO | 742 | JFK | MIL | 11/26/20 |
| 522 | 522 | 2660 | 07/08/03 | Dunham, Greggory | FO | 742 | JFK | | 04/21/19 |
| 523 | 523 | 2802 | 07/08/03 | Motte, Ernst-August | CA | 763 | JFK | | 03/24/22 |
| 524 | 524 | 302176 | 06/07/04 | Brookhuis, Jan | FO | 744 | ANC | | 07/08/03 |
| 525 | 525 | 302185 | 06/14/04 | Mandrell, Maureen | FO | 744 | ANC | | 10/08/15 |

October 1, 2011

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 526 | 526 | 302218 | 06/14/04 | Kadey, John | CA | 763 | JFK | | 04/18/19 |
| 527 | 527 | 302186 | 06/14/04 | Simon, Mitchell | FO | 744 | JFK | | 08/02/27 |
| 528 | 528 | 302233 | 06/26/04 | Watts, John | CA | 763 | JFK | | 06/12/24 |
| 529 | 529 | 302235 | 06/28/04 | Watkins, Aileen | FO | 744 | IAH | | 06/04/32 |
| 530 | 530 | 302246 | 06/28/04 | DuPont, Eric | FO | 764 | IAH | | 07/15/08 |
| 531 | 531 | 302311 | 06/28/04 | Konstpntgkis, Andreas | FO | 742 | JFK | | 06/24/08 |
| 532 | 532 | 302635 | 07/12/04 | Thomae, Bruce | FO | 744 | IAH | | 07/07/02 |
| 533 | 533 | 302698 | 07/12/04 | Villar, Aldo | FO | 744 | JFK | | 11/19/02 |
| 534 | 534 | 302691 | 07/12/04 | Taylor, Barry | FO | 744 | ANC | | 02/09/07 |
| 535 | 535 | 302903 | 07/21/04 | Koncel, Anthony | FO | 744 | LAX | | 01/05/17 |
| 536 | 536 | 302990 | 07/21/04 | Matson, Mitch | FO | 744 | CVG | | 01/14/09 |
| 537 | 537 | 147517 | 07/21/04 | Rivera, Carlos A | FO | 744 | CVG | | 05/22/29 |
| 538 | 538 | 302908 | 07/21/04 | Panjwani, Shoeib | FO | 744 | LAX | | 05/17/07 |
| 539 | 539 | 302078 | 07/21/04 | Karagiannis, George | FO | 744 | CVG | | 04/03/01 |
| 540 | 540 | 302994 | 07/26/04 | Elliott, John | FO | 744 | JFK | | 11/11/20 |
| 541 | 541 | 302997 | 07/26/04 | Johansson, Matts | FO | 744 | IAH | | 01/12/22 |
| 542 | 542 | 302989 | 07/26/04 | Russo, Michael | FO | 744 | ANC | | 05/09/03 |
| 543 | 543 | 303023 | 08/26/04 | Stanich, Todd | FO | 744 | CVG | | 09/16/25 |
| 544 | 544 | 303025 | 08/26/04 | Bertis, Randall | FO | 744 | CVG | | 07/13/03 |
| 545 | 545 | 303024 | 08/26/04 | Gaines, W. Brian | FO | 744 | LAX | MEL | 04/16/03 |
| 546 | 546 | 303681 | 02/07/05 | Barbosa, Jose | FO | 744 | CVG | | 05/27/25 |
| 547 | 547 | 768 | 03/04/86 | Hardesty, Shawn | FO | 744 | JFK | | 08/15/04 |
| 548 | 548 | 303702 | 02/21/05 | Franchella, David | FO | 742 | JFK | | 12/23/18 |
| 549 | 549 | 303703 | 02/21/05 | Mercado, David | FO | 744 | JFK | | 03/28/28 |
| 550 | 550 | 303704 | 02/21/05 | Paczan, Robert | FO | 744 | ANC | | 09/16/08 |
| 551 | 551 | 313402 | 02/21/05 | Mendoza, Oscar | FO | 744 | LAX | | 04/14/42 |
| 552 | 552 | 303726 | 03/14/05 | McClain, Jared | FO | 744 | CVG | | 06/17/33 |
| 553 | 553 | 303737 | 03/29/05 | Green, James | FO | 744 | JFK | | 04/25/26 |
| 554 | 554 | 303735 | 03/29/05 | Lopez, Edwin | FO | 744 | JFK | | 03/23/27 |
| 555 | 555 | 303738 | 03/29/05 | Parks, Douglas | FO | 744 | JFK | | 10/05/34 |
| 556 | 556 | 304329 | 03/29/05 | Server, Jeffrey | FO | 744 | CVG | | 06/20/34 |
| 557 | 557 | 305361 | 04/18/05 | Anderson, Michael | FO | 744 | JFK | | 12/18/12 |
| 558 | 558 | 304074 | 04/18/05 | Aaschiman, Jay | FO | 744 | JFK | | 12/17/18 |
| 559 | 559 | 305362 | 04/18/05 | Longo, Marcello | FO | 744 | ANC | | 06/08/33 |
| 560 | 560 | 305366 | 04/18/05 | Dridon, Darish | FO | 744 | CVG | | 02/22/06 |
| 561 | 561 | 305367 | 04/18/05 | Belknap, Parvin | FO | 744 | CVG | | 11/05/25 |
| 562 | 562 | 305385 | 04/18/05 | Ivarsson, Anna | FO | 744 | LAX | | 07/31/27 |
| 563 | 563 | 305374 | 04/20/05 | Marshall, James | FO | 744 | LAX | LMED | 01/19/18 |
| 564 | 564 | 370719 | 05/16/05 | Moughamian, Robert | FO | 744 | JFK | | 03/28/29 |
| 565 | 565 | 370715 | 05/16/05 | Metzler, Jennifer | FO | 744 | JFK | | 04/25/31 |
| 566 | 566 | 370717 | 05/16/05 | Whiteside, Roger | FO | 744 | HSV | | 12/13/03 |
| 567 | 567 | 370720 | 05/16/05 | VanVliet, Paul (Marco) | FO | 744 | IAH | | 08/28/35 |
| 568 | 568 | 370722 | 05/16/05 | Shroud, Derek | FO | 744 | MIA | | 11/05/40 |
| 569 | 569 | 380934 | 05/16/05 | Brouet, Bruno | FO | 744 | CVG | | 11/11/21 |
| 570 | 570 | 380996 | 05/16/05 | Sanchez, Tal | FO | 744 | LAX | | 12/05/23 |
| 571 | 571 | 380930 | 05/16/05 | Berry, Gregory | FO | 744 | CVG | | 02/26/06 |
| 572 | 572 | 382879 | 06/13/05 | Erickson, Wayne | FO | 744 | HSV | | 10/10/16 |
| 573 | 573 | 382883 | 06/13/05 | Vargas, Jose | FO | 744 | IAH | | 09/06/20 |
| 574 | 574 | 382898 | 06/13/05 | McMullen, Brad | FO | 744 | JFK | | 01/13/02 |
| 575 | 575 | 382878 | 06/13/05 | Frazier, Michael | FO | 744 | JFK | | 07/08/04 |
| 576 | 576 | 382907 | 06/13/05 | Yabsko, Michael | FO | 744 | LAX | LMED | 04/05/05 |
| 577 | 577 | 665 | 10/02/05 | Buchner, Mark | FO | 744 | JFK | | 03/61/20 |
| 578 | 578 | 384619 | 07/11/05 | Forbes, Frank | FO | 744 | IAH | | 05/02/26 |
| 579 | 579 | 384611 | 07/11/05 | Ridgway, James (Scot) | FO | 744 | ANC | MGT | 06/22/27 |
| 580 | 580 | 384616 | 07/11/05 | Tanner, Peter | FO | 744 | MIA | | 03/22/30 |
| 581 | 581 | 384615 | 07/11/05 | Clark, Janine Paschke | FO | 744 | JFK | | 10/23/32 |
| 582 | 582 | 384606 | 07/11/05 | Kinzel, Marc | FO | 744 | JFK | | 05/18/04 |
| 583 | 583 | 384607 | 07/11/05 | Sellers, Paul | FO | 744 | HSV | | 03/19/06 |
| 584 | 584 | 384609 | 07/11/05 | Baranko, Peter | FO | 744 | JFK | | 07/04/06 |
| 585 | 585 | 384587 | 07/11/05 | Pietromonaco, G. Anthony | FO | 744 | CVG | | 10/14/18 |
| 586 | 586 | 384589 | 07/11/05 | Gilbert, Benjamin | FO | 742 | JFK | LMED | 02/17/13 |
| 587 | 587 | 387636 | 08/08/05 | Peterson, Douglas | FO | 744 | IAH | | 10/05/13 |
| 588 | 588 | 387638 | 08/08/05 | Wytvik, Fredrik | FO | 744 | ANC | | 04/05/02 |
| 589 | 589 | 387637 | 08/08/05 | Stauffer, Chad | FO | 744 | JFK | | 07/18/45 |
| 590 | 590 | 302690 | 07/12/04 | Francis, Sam | FO | 742 | JFK | | 12/12/19 |
| 591 | 591 | 302194 | 06/14/04 | Kunkel, Joseph | FO | 744 | JFK | | 03/20/42 |

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 502 | 502 | 381569 | 08/12/05 | Devally, Colin | FO | 744 | JFK | | 09/18/31 |
| 503 | 503 | 391573 | 08/12/05 | Macy, Chadd | FO | 744 | JFK | | 09/30/38 |
| 504 | 504 | 1860 | 07/12/04 | Mendoza, Victor | FO | 742 | JFK | | 04/13/29 |
| 505 | 505 | 107 | 05/16/94 | Jorgensen, Dean | FO | 742 | JFK | | 11/28/17 |
| 506 | 506 | 304323 | 03/29/05 | Burst, David | FO | 742 | JFK | | 11/04/41 |
| 507 | 507 | 300793 | 06/09/97 | Markovic, Joseph | FO | 744 | CVG | | 52/07/22 |
| 508 | 508 | 320674 | 05/01/00 | Hester, Robert | FO | 744 | LAX | | 04/16/24 |
| 509 | 509 | 420378 | 04/02/07 | Hewison, David | FO | 744 | JFK | | 08/03/26 |
| 600 | 600 | 442440 | 05/21/07 | Adeeb, Jeffrey | FO | 744 | PVG | | 10/01/29 |
| 601 | 601 | 442433 | 05/21/07 | Aliu, Abdul | FO | 744 | JFK | | 10/15/31 |
| 602 | 602 | 442436 | 05/21/07 | Chidgey, Paul | FO | 744 | JFK | | 02/24/33 |
| 603 | 603 | 442439 | 05/21/07 | Parnicky, Richard | FO | 744 | JFK | | 06/15/33 |
| 604 | 604 | 442434 | 05/21/07 | Forrest, Scott | FO | 744 | JFK | | 07/26/38 |
| 605 | 605 | 442435 | 05/21/07 | Cabianca, Manuel | FO | 744 | MIA | | 12/13/38 |
| 606 | 606 | 442438 | 05/21/07 | Justus, Jody | FO | 744 | JFK | | 07/01/39 |
| 607 | 607 | 442437 | 05/21/07 | Manuel, Tom | FO | 744 | JFK | | 08/27/40 |
| 608 | 608 | 2245 | 04/03/05 | DeTreo, Carlos | FO | 744 | MIA | | 10/14/21 |
| 609 | 609 | 826 | 05/13/96 | Gelvin, Richard | FO | 742 | JFK | | 11/03/21 |
| 610 | 610 | 444139 | 06/18/07 | Smith, Todd | FO | 744 | JFK | | 07/21/24 |
| 611 | 611 | 444144 | 06/18/07 | Inayoshi, Takehisa | FO | 744 | JFK | | 09/15/31 |
| 612 | 612 | 1502 | 02/08/99 | Gregory, Norman | FO | 744 | MIA | | 11/16/33 |
| 613 | 613 | 444137 | 06/18/07 | Werner, Karsten | FO | 744 | JFK | | 01/03/34 |
| 614 | 614 | 444141 | 06/18/07 | Abramovici, Barry | FO | 744 | JFK | | 07/24/38 |
| 615 | 615 | 444143 | 06/18/07 | Johansson, Eric | FO | 744 | JFK | | 09/02/38 |
| 616 | 616 | 444140 | 06/18/07 | Mitaritonna, Vito | FO | 744 | JFK | | 05/07/40 |
| 617 | 617 | 448223 | 09/10/07 | Lawrence IV, L. Grant | FO | 744 | CVG | | 05/05/33 |
| 618 | 618 | 448226 | 09/10/07 | Lalis, Spiro | FO | 744 | LAX | | 04/23/38 |
| 619 | 619 | 448222 | 09/10/07 | Hibek, Shawn | FO | 744 | LAX | | 07/16/07 |
| 620 | 620 | 448228 | 09/10/07 | Kim, Shawn | FO | 744 | LAX | | 05/07/31 |
| 621 | 621 | 448229 | 09/10/07 | Maggio, Martin | FO | 744 | LAX | | 01/14/41 |
| 622 | 622 | 448528 | 09/18/07 | Hong, Hyung-Pyo (Steve) | FO | 744 | LAX | | 10/24/22 |
| 623 | 623 | 448526 | 09/18/07 | Robbins, Robbie | FO | 744 | LAX | | 09/28/41 |
| 624 | 624 | 448524 | 09/18/07 | Cobb, Dennis | FO | 744 | LAX | | 07/15/41 |
| 625 | 625 | 448656 | 09/19/07 | Mason, David | FO | 744 | LAX | | 11/23/43 |
| 626 | 626 | 449435 | 10/22/07 | Villamizar, Gabriel | FO | 744 | LAX | | 02/06/40 |
| 627 | 627 | 449436 | 10/22/07 | Camera, Leopoldo | FO | 744 | LAX | | 09/26/38 |
| 628 | 628 | 449433 | 10/22/07 | Solorenssen, Christopher | FO | 744 | LAX | | 02/10/40 |
| 629 | 629 | 449437 | 10/22/07 | Ryan, Robert | FO | 744 | LAX | | 10/01/34 |
| 630 | 630 | 449438 | 10/24/07 | Lennox, Daniel | FO | 744 | LAX | | 06/03/33 |
| 631 | 631 | 382904 | 11/26/07 | Wielenga, Julie | FO | 744 | LAX | | 06/13/38 |
| 632 | 632 | 449472 | 01/07/08 | Campbell, Jeffrey D. | FO | 744 | HSV | | 07/21/23 |
| 633 | 633 | 449468 | 01/07/08 | Bates, Edward (Avery) | FO | 744 | JFK | | 05/17/25 |
| 634 | 634 | 449467 | 01/07/08 | Schrink, Robert | FO | 744 | IAH | | 10/23/29 |
| 635 | 635 | 449470 | 01/07/08 | Hamm, Daniel | FO | 744 | ANC | | 01/16/35 |
| 636 | 636 | 449469 | 01/07/08 | Hunt, Carl | FO | 744 | JFK | | 01/20/38 |
| 637 | 637 | 449481 | 01/28/08 | Carver, Jonathon | FO | 744 | LAX | | 01/03/38 |
| 638 | 638 | 449482 | 01/28/08 | Hossiang, Anthony | FO | 744 | LAX | | 04/28/34 |
| 639 | 639 | 449484 | 01/28/08 | Hall, Charles | FO | 744 | LAX | | 12/03/29 |
| 640 | 640 | 449494 | 02/11/08 | McMillan, Douglas | FO | 744 | JFK | | 05/26/15 |
| 641 | 641 | 901 | 08/12/95 | Nipper, William | FO | 742 | JFK | | 04/22/23 |
| 642 | 642 | 449496 | 02/11/08 | DeMoya, Wilbert | FO | 744 | PVG | | 04/26/26 |
| 643 | 643 | 449487 | 02/11/08 | Zamora, Daniel | FO | 744 | MIA | | 01/31/28 |
| 644 | 644 | 449489 | 02/11/08 | Sable, Michael | FO | 744 | ANC | | 02/23/33 |
| 645 | 645 | 449492 | 02/11/08 | Engineer, Rehan | FO | 744 | JFK | | 11/12/09 |
| 646 | 646 | 449499 | 02/25/08 | Milaszewicz, Michael | FO | 744 | LAX | | 03/03/42 |
| 647 | 647 | 449500 | 02/25/08 | Gottshall, Benjamin | FO | 744 | LAX | | 05/08/40 |
| 648 | 648 | 449497 | 02/25/08 | Stein, Asher | FO | 744 | LAX | | 09/05/35 |
| 649 | 649 | 449511 | 03/10/08 | Nichak, Michael | FO | 744 | JFK | | 10/28/14 |
| 650 | 650 | 449508 | 03/10/08 | Myers, Gregory | FO | 744 | JFK | | 06/18/24 |
| 651 | 651 | 449503 | 03/10/08 | Cortes, Adolfo | FO | 744 | MIA | | 04/18/27 |
| 652 | 652 | 322963 | 03/10/08 | Naesu, Fernando | FO | 744 | FUR | FUR | 08/13/28 |
| 653 | 653 | 449507 | 03/10/08 | Dawson, Robert | FO | 744 | HSV | | 07/25/33 |
| 654 | 654 | 1186 | 03/26/08 | Adams, Harold (Randy) | FO | 742 | JFK | | 02/29/12 |
| 655 | 655 | 2408 | 03/26/08 | Wojnar, Raymond | FO | 744 | JFK | | 02/22/12 |
| 656 | 656 | 879 | 03/26/08 | Mazar, Ronald | FO | 742 | JFK | | 05/02/12 |
| 657 | 657 | 824 | 03/26/08 | Marotz, Wayne | FO | 744 | HSV | | 05/17/12 |

October 1, 2011

| Sen # | P-Hired# | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 658 | 658 | 701 | 03/28/08 | Evans, Kenneth | FO | 742 | JFK | | 08/11/12 |
| 659 | 659 | 1472 | 01/28/08 | Flores, Agustin | FO | 742 | HSV | | 06/03/02 |
| 660 | 660 | 449651 | 06/07/08 | Albrecht, Kurt | FO | 744 | HSV | | 01/30/18 |
| 661 | 661 | 449654 | 06/07/08 | Barron, Tommy | FO | 744 | ANC | | 11/21/22 |
| 662 | 662 | 449650 | 06/07/08 | Acher, Charles | FO | 764 | JFK | | 11/26/25 |
| 663 | 663 | 449655 | 06/07/08 | Maye, Leonard (Leo) | FO | 764 | HSV | | 08/03/29 |
| 664 | 664 | 449650 | 06/07/08 | Chand, Peter | FO | 744 | ANC | MIL | 11/15/08 |
| 665 | 665 | 449652 | 06/07/08 | Veth, Scott | FO | 764 | FUR | FUR | 03/10/45 |
| 666 | 666 | 2273 | 04/17/00 | Clancy, Michael | FO | 742 | JFK | | 10/18/27 |
| 667 | 667 | 449669 | 07/14/08 | Grimm, Robert | FO | 744 | JFK | | 01/14/21 |
| 668 | 668 | 449672 | 07/14/08 | Poynton, Arzhang | FO | 744 | DXB | | 09/25/02 |
| 669 | 669 | 449670 | 07/14/08 | Rex, Christopher | FO | 744 | HKG | | 12/06/03 |
| 670 | 670 | 449671 | 07/14/08 | Fast, Cameron | FO | 764 | JFK | | 07/05/09 |
| 671 | 671 | 449667 | 07/14/08 | Belmonti, Brian | FO | 744 | JFK | | 02/14/40 |
| 672 | 572 | 803 | 07/24/08 | Reisig, Rowland | FO | 744 | JFK | | 01/06/12 |
| 673 | 573 | 894 | 07/24/08 | McCloud, Gary | FO | 764 | JFK | | 06/24/12 |
| 674 | 574 | 449675 | 07/30/08 | Clark, George | FO | 764 | HSV | | 02/27/17 |
| 675 | 575 | 449679 | 07/30/08 | Hammond, Robert | FO | 744 | FUR | FUR | 10/23/17 |
| 676 | 576 | 449674 | 07/30/08 | Coyle, Robert | FO | 744 | HSV | | 03/06/19 |
| 677 | 577 | 449678 | 07/30/08 | Ryan, Dennis | FO | 744 | ANC | | 12/17/23 |
| 678 | 578 | 449676 | 07/30/08 | Dapledge, Ian | FO | 744 | ANC | | 12/11/28 |
| 679 | 579 | 449677 | 07/30/08 | Lane, Matthew | FO | 744 | JFK | | 08/05/39 |
| 680 | 580 | 2257 | 10/21/06 | Martin, Charles | FO | 744 | MIA | | 10/15/11 |
| 681 | 581 | 301287 | 09/06/94 | Sparks, Brian | FO | 744 | CVG | LOA | 05/15/24 |
| 682 | 582 | 1591 | 03/22/99 | Blanco, Frederick | FO | 742 | JFK | | 10/16/21 |
| 683 | 583 | 2160 | 01/24/00 | Ruhoser, William | FO | 742 | JFK | | 03/17/28 |
| 684 | 584 | 384594 | 07/11/05 | DeSandro, Eric | FO | 742 | JFK | | 12/01/31 |
| 685 | 585 | 836 | 04/26/10 | Moir, Van | FO | 744 | ANC | | 05/21/17 |
| 686 | 586 | 440716 | 04/26/10 | Union, James (Jim) | FO | 744 | JFK | | 08/03/19 |
| 687 | 587 | 440715 | 04/26/10 | Ryan, Kevin | FO | 744 | HSV | | 10/18/21 |
| 688 | 588 | 500972 | 04/26/10 | Evans, Todd | FO | 744 | ANC | | 11/04/24 |
| 689 | 589 | 440712 | 04/26/10 | Goldschlager, Matthew | FO | 744 | JFK | | 08/22/32 |
| 690 | 590 | 440711 | 04/26/10 | Gerald, Jason | FO | 744 | JFK | MIL | 08/04/34 |
| 691 | 591 | 440713 | 04/26/10 | Hensley, Lewis (Lew) | FO | 744 | ANC | | 04/08/35 |
| 692 | 592 | 449714 | 04/26/10 | Mathews, Debra (Debbie) | FO | 744 | JFK | | 07/24/36 |
| 693 | 593 | 449710 | 04/26/10 | Blevins, John | FO | 744 | JFK | | 10/01/37 |
| 694 | 594 | 449726 | 05/17/10 | Sheipman, John | FO | 744 | HSV | | 10/15/24 |
| 695 | 595 | 449722 | 05/17/10 | Liebman, David | FO | 744 | JFK | | 03/30/28 |
| 696 | 596 | 440724 | 05/17/10 | Linden, Daniel | FO | 742 | ANC | | 04/05/28 |
| 697 | 597 | 440725 | 05/17/10 | Hulalin, John | FO | 744 | MIA | | 07/26/29 |
| 698 | 598 | 440721 | 05/17/10 | Murphy, Jamison | FO | 744 | HSV | | 05/02/32 |
| 699 | 599 | 440727 | 05/17/10 | Hawkins, Danielle | FO | 744 | HSV | | 06/20/37 |
| 700 | 700 | 440723 | 05/17/10 | Ferguson, James | FO | 744 | JFK | | 12/19/42 |
| 701 | 701 | 440740 | 06/07/10 | Cramer, Gordon | FO | 744 | HSV | | 10/05/24 |
| 702 | 702 | 440736 | 06/07/10 | Williams, James (Mitch) | FO | 742 | JFK | | 01/15/27 |
| 703 | 703 | 440738 | 06/07/10 | McBeth, Mark | FO | 744 | JFK | | 03/02/28 |
| 704 | 704 | 440737 | 06/07/10 | Guerin, Eric | FO | 744 | JFK | | 03/18/28 |
| 705 | 705 | 440742 | 06/07/10 | LaCroix, Kevin | FO | 744 | MIA | | 04/20/30 |
| 706 | 706 | 440741 | 06/07/10 | Musekamp, Niels | FO | 744 | HSV | | 06/24/30 |
| 707 | 707 | 449735 | 06/07/10 | Gonsalves, Sean | FO | 742 | ANC | MIL | 10/23/32 |
| 708 | 708 | 440743 | 06/07/10 | Ferrari, Matt | FO | 744 | HSV | | 07/02/33 |
| 709 | 709 | 440734 | 06/07/10 | Wisemann, Christopher | FO | 742 | ANC | | 04/03/36 |
| 710 | 710 | 440744 | 06/07/10 | Cartier, Chad | FO | 744 | JFK | | 06/25/42 |
| 711 | 711 | 440772 | 06/28/10 | Camelli, Charles (Chuck) | FO | 744 | JFK | | 01/25/17 |
| 712 | 712 | 440771 | 06/28/10 | Mommey, Diana | FO | 744 | ANC | | 12/03/20 |
| 713 | 713 | 440763 | 06/28/10 | Mackay, Bruce | FO | 744 | JFK | | 05/31/24 |
| 714 | 714 | 440765 | 06/28/10 | Weymar, Michael | FO | 744 | MIA | | 07/18/28 |
| 715 | 715 | 440770 | 06/28/10 | Rosen, Matthew | FO | 744 | JFK | | 01/28/31 |
| 716 | 716 | 449764 | 06/28/10 | Palermo, Nicholas | FO | 744 | HSV | | 03/01/33 |
| 717 | 717 | 449769 | 06/28/10 | Patterson, Andrew | FO | 744 | MIA | | 05/16/37 |
| 718 | 718 | 440766 | 07/19/10 | Canter, Jeffrey | FO | 744 | ANC | | 07/16/23 |
| 719 | 719 | 440779 | 07/19/10 | Sanzo, John | FO | 744 | ANC | | 09/16/23 |
| 720 | 720 | 449783 | 07/19/10 | Penner, Gordon | FO | 744 | HSV | | 01/18/25 |
| 721 | 721 | 440785 | 07/19/10 | Knudsen, Kenneth | FO | 744 | MIA | | 07/06/28 |
| 722 | 722 | 440784 | 07/19/10 | Morey, Todd | FO | 744 | JFK | | 03/03/32 |
| 723 | 723 | 440782 | 07/19/10 | Caldwell II, Carl | FO | 744 | JFK | | 05/19/32 |

October 1, 2011

| Sen # | P-Hired# | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 724 | 724 | 440780 | 07/19/10 | Hocking, Earl | FO | 744 | MIA | | 04/07/35 |
| 725 | 725 | 440778 | 07/19/10 | Swift, Michael | FO | 744 | MIA | MIL | 02/21/40 |
| 726 | 726 | 440787 | 07/19/10 | Wetherin, Sebastian | FO | 744 | HSV | | 12/18/42 |
| 727 | 727 | 440813 | 08/09/10 | Ziadie-Haddad, Marta | FO | 744 | JFK | | 10/16/22 |
| 728 | 728 | 440812 | 08/09/10 | Lapp, Clifford | FO | 744 | JFK | | 08/01/27 |
| 729 | 729 | 440814 | 08/09/10 | Leach, Michael | FO | 744 | HSV | | 10/15/27 |
| 730 | 730 | 440815 | 08/09/10 | Prideaux, John | FO | 744 | JFK | | 10/22/28 |
| 731 | 731 | 440821 | 08/09/10 | Flynn, Dennis | FO | 744 | MIA | | 04/01/32 |
| 732 | 732 | 440822 | 08/09/10 | Vanderwiden, Ramon | FO | 744 | MIA | | 08/18/32 |
| 733 | 733 | 440818 | 08/09/10 | Hooper, Jeffrey | FO | 744 | JFK | | 05/02/35 |
| 734 | 734 | 440817 | 08/09/10 | Notting, Michael | FO | 744 | MIA | | 11/22/38 |
| 735 | 735 | 440811 | 08/09/10 | Lofts, William | FO | 744 | JFK | | 12/02/08 |
| 736 | 736 | 440837 | 08/30/10 | McCormick, William (Bill) | FO | 744 | HSV | | 07/08/23 |
| 737 | 737 | 440842 | 08/30/10 | Hamelt, Michael | FO | 744 | JFK | | 06/25/26 |
| 738 | 738 | 440833 | 08/30/10 | Reyihani, John | FO | 744 | MIA | | 08/06/31 |
| 739 | 739 | 440841 | 08/30/10 | Montermoto, Rafael | FO | 744 | MIA | | 09/28/31 |
| 740 | 740 | 440843 | 08/30/10 | Mazahreh, Muhsel | FO | 744 | JFK | | 09/14/32 |
| 741 | 741 | 440839 | 08/30/10 | Darbyshire, William | FO | 744 | JFK | | 04/20/37 |
| 742 | 742 | 440834 | 08/30/10 | McCormick, Sergio | FO | 744 | MIA | | 10/15/08 |
| 743 | 743 | 440835 | 08/30/10 | Ives, John | FO | 744 | ANC | | 10/04/41 |
| 744 | 744 | 440891 | 12/01/10 | Heggenberger, Timothy | FO | 744 | ANC | | 01/31/28 |
| 745 | 745 | 440890 | 12/01/10 | Konfer, Daniel | FO | 744 | JFK | | 09/28/30 |
| 746 | 746 | 440882 | 12/01/10 | Youssef, Maged | FO | 742 | JFK | | 07/07/32 |
| 747 | 747 | 440883 | 12/01/10 | Jackson, Timothy | FO | 742 | ANC | | 04/07/35 |
| 748 | 748 | 440896 | 12/01/10 | Waters, Susan | FO | 744 | JFK | | 05/22/05 |
| 749 | 749 | 440630 | 12/01/10 | Puyear, Adam | FO | 744 | MIA | MST | 05/19/06 |
| 750 | 750 | 440881 | 12/01/10 | Halsey, Jenna | FO | 742 | JFK | | 11/22/41 |
| 751 | 751 | 440684 | 12/01/10 | Bartow, Eric | FO | 742 | ANC | | 09/05/42 |
| 752 | 752 | 440887 | 12/01/10 | Conrad, Jacob | FO | 744 | JFK | | 08/05/45 |
| 753 | 753 | 440889 | 12/01/10 | Vasquez, Aaron | FO | 742 | JFK | | 10/21/45 |
| 754 | 754 | 440889 | 12/01/10 | Lochab, Hardeep | FO | 744 | JFK | | 01/01/48 |
| 755 | 755 | 440888 | 12/01/10 | Plumeau, Ryan | FO | 744 | MIA | | 05/15/50 |
| 756 | 756 | 440908 | 01/31/11 | Hutchings, Paul | FO | 744 | JFK | | 11/18/22 |
| 757 | 757 | 440911 | 01/31/11 | Groeschen, Daniel | FO | 742 | JFK | | 05/28/24 |
| 758 | 758 | 440909 | 01/31/11 | North, Anthony | FO | 744 | JFK | | 06/19/25 |
| 759 | 759 | 440914 | 01/31/11 | Scott, Kevin | FO | 742 | JFK | | 06/22/31 |
| 760 | 760 | 302236 | 01/31/11 | Crutchfield, Fredrick | FO | 742 | JFK | LOA | 06/15/59 |
| 761 | 761 | 440913 | 01/31/11 | Langus, William (Bill) | FO | 742 | ANC | | 10/07/05 |
| 762 | 762 | 440910 | 01/31/11 | Talshaw, David | FO | 744 | SYD | | 11/25/33 |
| 763 | 763 | 440907 | 01/31/11 | Sears, Floyd | FO | 744 | JFK | | 01/15/06 |
| 764 | 764 | 440916 | 01/31/11 | Karteson, Augtemur | FO | 744 | MIA | | 08/05/41 |
| 765 | 765 | 440906 | 01/31/11 | Erickson, Kevin | FO | 744 | ANC | | 10/18/41 |
| 766 | 766 | 440902 | 01/31/11 | Hash, Geoffrey | FO | 744 | JFK | | 06/11/42 |
| 767 | 767 | 440915 | 01/31/11 | Merritt, Bret | FO | 742 | JFK | | 01/25/43 |
| 768 | 768 | 440905 | 01/31/11 | Van Wagner, Craig | FO | 744 | JFK | | 04/08/45 |
| 769 | 769 | 440904 | 01/31/11 | Mills, Christopher | FO | 744 | JFK | | 04/18/46 |
| 770 | 770 | 440903 | 01/31/11 | Massey, Eric | FO | 744 | JFK | | 11/15/47 |
| 771 | 771 | 440936 | 02/28/11 | Thoreson, Brian | FO | 742 | ANC | | 02/06/23 |
| 772 | 772 | 440935 | 02/28/11 | Pham, Daniel | FO | 742 | JFK | | 07/18/27 |
| 773 | 773 | 440939 | 02/28/11 | D'Amour, James | FO | 742 | JFK | | 09/19/28 |
| 774 | 774 | 440927 | 02/28/11 | Hughes, David | FO | 744 | ANC | | 05/12/31 |
| 775 | 775 | 440930 | 02/28/11 | Matovich, John | FO | 744 | JFK | | 11/05/33 |
| 776 | 776 | 440933 | 02/28/11 | Lee, Charles | FO | 742 | JFK | | 05/19/34 |
| 777 | 777 | 440926 | 02/28/11 | Bolce, Brian | FO | 744 | JFK | | 07/15/35 |
| 778 | 778 | 440937 | 02/28/11 | Karkman, Susan | FO | 742 | JFK | | 10/25/38 |
| 779 | 779 | 440934 | 02/28/11 | Ostmeyer, John | FO | 742 | ANC | | 03/25/41 |
| 780 | 780 | 440929 | 02/28/11 | Doolin, Richard | FO | 744 | MIA | | 08/15/41 |
| 781 | 781 | 440932 | 02/28/11 | Gregory, James | FO | 742 | JFK | | 02/26/42 |
| 782 | 782 | 440928 | 02/28/11 | Capodicasa, Michael | FO | 744 | JFK | | 11/23/42 |
| 783 | 783 | 440928 | 02/28/11 | Buesing, Aaron | FO | 744 | MIA | | 01/02/43 |
| 784 | 784 | 440031 | 02/28/11 | Underwood, James | FO | 744 | JFK | | 09/24/48 |
| 785 | 785 | 440049 | 03/21/11 | Johnson, Anatoly (A.J.) | FO | 744 | JFK | | 03/28/08 |
| 786 | 786 | 440946 | 03/21/11 | Cavanagh, Christopher | FO | 744 | JFK | | 11/01/06 |
| 787 | 787 | 440950 | 03/21/11 | Maryan, Ilya | FO | 744 | MIA | | 06/12/07 |
| 788 | 788 | 440945 | 03/21/11 | Birman, Pablo | FO | 744 | JFK | | 07/05/07 |
| 789 | 789 | 440947 | 03/21/11 | Guffman, Jason | FO | 744 | MIA | | 02/02/41 |

October 1, 2011

| Sen # | P-Hired# | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 790 | 790 | 449948 | 03/21/11 | Hoekstra, Alexander | FO | 744 | MIA | | 08/25/42 |
| 791 | 791 | 449952 | 03/21/11 | Troedisir, Bradley | FO | 744 | JFK | | 11/25/42 |
| 792 | 792 | 449901 | 03/21/11 | Rivera, Christopher | FO | 744 | MIA | | 06/24/55 |
| 793 | 793 | 449965 | 04/18/11 | Karis, Stephen | FO | 744 | ANC | | 01/11/29 |
| 794 | 794 | 449964 | 04/18/11 | Johnson, Paul | FO | 744 | MIA | | 11/25/03 |
| 795 | 795 | 449962 | 04/18/11 | Lang, Kristofer | FO | 744 | MIA | | 07/24/05 |
| 796 | 796 | 449966 | 04/18/11 | Iomar, Chad | FO | 744 | ANC | | 10/16/39 |
| 797 | 797 | 449959 | 04/18/11 | Goussin, Chris | FO | 744 | JFK | | 05/04/41 |
| 798 | 798 | 449961 | 04/18/11 | Mendoza, Federico (Freddy) | FO | 744 | JFK | | 12/28/41 |
| 799 | 799 | 449960 | 04/18/11 | Codrone, Francois | FO | 744 | MIA | | 02/14/42 |
| 800 | 800 | 449963 | 04/18/11 | Knox, Christopher | FO | 744 | MIA | | 03/12/44 |
| 801 | 801 | 449977 | 05/09/11 | Taylor, Robert | FO | 744 | MIA | | 01/26/00 |
| 802 | 802 | 449975 | 05/09/11 | Boden, Carl | FO | 744 | JFK | | 07/31/02 |
| 803 | 803 | 449972 | 05/09/11 | Kayser, Michael | FO | 744 | JFK | | 01/04/03 |
| 804 | 804 | 449973 | 05/09/11 | Jacques, Jeffrey | FO | 744 | ANC | | 08/27/03 |
| 805 | 805 | 449970 | 05/09/11 | White, Shawn | FO | 744 | MIA | | 03/12/08 |
| 806 | 806 | 449978 | 05/09/11 | Schenck, William | FO | 744 | JFK | | 12/22/09 |
| 807 | 807 | 449974 | 05/09/11 | Candido, Robert | FO | 744 | JFK | | 04/24/43 |
| 808 | 808 | 449976 | 05/09/11 | Bowlin, Lance | FO | 744 | HSV | | 11/04/43 |
| 809 | 809 | 449990 | 05/30/11 | Brown, Alton | FO | 744 | HSV | | 09/21/25 |
| 810 | 810 | 449985 | 05/30/11 | Mead, Dudley | FO | 744 | JFK | | 08/22/23 |
| 811 | 811 | 449984 | 05/30/11 | Rutter, Mark | FO | 744 | HSV | | 10/05/25 |
| 812 | 812 | 449989 | 05/30/11 | Rutherford, Danny | FO | 744 | JFK | | 08/07/33 |
| 813 | 813 | 449982 | 05/30/11 | Trulley, Richard | FO | 744 | JFK | | 11/23/35 |
| 814 | 814 | 449986 | 05/30/11 | Flynn, Russell | FO | 744 | ANC | | 06/03/06 |
| 815 | 815 | 449988 | 05/30/11 | Serrato, Juan | FO | 744 | JFK | | 03/11/48 |
| 816 | 816 | 449983 | 05/30/11 | Morey, David | FO | 744 | JFK | | 02/25/41 |
| 817 | 817 | 449991 | 05/30/11 | Mazza, Roman | FO | 744 | JFK | | 06/10/41 |
| 818 | 818 | 449987 | 05/30/11 | Lewis, Michelle | FO | 744 | JFK | | 02/03/42 |
| 819 | 819 | 450019 | 06/20/11 | Reed, Gregory | FO | 744 | JFK | | 07/21/21 |
| 820 | 820 | 450020 | 06/20/11 | Wanner, Scott | FO | 744 | ANC | | 10/22/34 |
| 821 | 821 | 450019 | 06/20/11 | Wolford, Scott | FO | 744 | ANC | | 07/04/38 |
| 822 | 822 | 450018 | 06/20/11 | Wildinger, Evan | FO | 744 | HSV | | 08/11/41 |
| 823 | 823 | 450016 | 06/20/11 | Tudela, John | FO | 744 | MIA | | 03/11/44 |
| 824 | 824 | 450017 | 06/20/11 | Potts, William | FO | 744 | JFK | | 05/10/44 |
| 825 | 825 | 450014 | 06/20/11 | John, Nicholas | FO | 744 | MIA | | 08/13/44 |
| 826 | 826 | 450012 | 06/20/11 | Millar, Angela | FO | 744 | JFK | | 08/18/46 |
| 827 | 827 | 450029 | 08/01/11 | Taylor, John | FO | 744 | HSV | | 05/25/01 |
| 828 | 828 | 450032 | 08/01/11 | Gomez, Harold | FO | 744 | HSV | | 02/17/02 |
| 829 | 829 | 450026 | 08/01/11 | Hegy, Todd | FO | 744 | HSV | | 11/25/33 |
| 830 | 830 | 450033 | 08/01/11 | Bates, Eric | FO | 744 | HSV | | 05/24/34 |
| 831 | 831 | 450034 | 08/01/11 | Britt, Christopher | FO | 744 | HSV | | 06/23/36 |
| 832 | 832 | 450030 | 08/01/11 | Pakiz, Michael | FO | 744 | HSV | | 08/11/36 |
| 833 | 833 | 450035 | 08/01/11 | Bartell, Jeffrey | FO | 744 | HSV | | 10/28/39 |
| 834 | 834 | 450028 | 08/01/11 | Thompson, Len | FO | 744 | HSV | | 12/08/09 |
| 835 | 835 | 450031 | 08/01/11 | Haselbacher, Dieter | FO | 744 | HSV | | 08/02/43 |
| 836 | 836 | 450027 | 08/01/11 | Schumacher, John | FO | 744 | HSV | | 11/01/48 |
| 837 | 837 | 450051 | 08/22/11 | Van der Walt, Barend | FO | 744 | HSV | | 05/07/27 |
| 838 | 838 | 450048 | 08/22/11 | Nicloson, Philip (Phil) | FO | 744 | HSV | | 06/30/35 |
| 839 | 839 | 450046 | 08/22/11 | Pelegrin, Gregory | FO | 744 | HSV | | 12/27/07 |
| 840 | 840 | 450053 | 08/22/11 | Lowe, Brent | FO | 744 | HSV | | 01/01/49 |
| 841 | 841 | 450090 | 08/22/11 | Brown, James D. | FO | 744 | HSV | | 12/07/49 |
| 842 | 842 | 450044 | 08/22/11 | Howard, Mason | FO | 744 | HSV | | 09/28/41 |
| 843 | 843 | 450047 | 08/22/11 | Hansen, James | FO | 744 | HSV | | 08/02/42 |
| 844 | 844 | 450064 | 08/22/11 | Macartney, Ryan | FO | 763 | JFK | | 08/10/42 |
| 845 | 845 | 450052 | 08/22/11 | Hegarty, Geoffrey | FO | 744 | HSV | | 01/13/43 |
| 846 | 846 | 450049 | 08/22/11 | Butler, Theodore | FO | 744 | HSV | | 12/06/43 |
| 847 | 847 | 450045 | 08/22/11 | Nobol, Benjamin | FO | 744 | HSV | | 10/23/44 |
| 848 | 848 | 450062 | 09/12/11 | Markho, Bassam | FO | 744 | HSV | | 06/23/04 |
| 849 | 849 | 450055 | 09/12/11 | Schlang, Stephen | FO | 744 | HSV | | 02/15/04 |
| 850 | 850 | 450050 | 09/12/11 | Connor, Mark | FO | 744 | HSV | | 02/03/42 |
| 851 | 851 | 450050 | 09/12/11 | Woolery, Tracy | FO | 744 | HSV | | 09/16/03 |
| 852 | 852 | 450063 | 09/12/11 | Bellman, Robert | FO | 744 | HSV | | 07/09/03 |
| 853 | 853 | 450058 | 09/12/11 | Deane, Thomas | FO | 744 | HSV | | 03/11/02 |
| 854 | 854 | 450054 | 09/12/11 | Fenske, Kirobel | FO | 744 | HSV | | 07/24/01 |
| 855 | 855 | 450061 | 09/12/11 | Schwartz, Gabriel | FO | 744 | HSV | | 08/01/46 |

| Sen # | P-Hired | Emp # | DOH | Name | Position | Aircraft | Base | Status | Retirement Date |
|---|---|---|---|---|---|---|---|---|---|
| 856 | 856 | 450059 | 09/12/11 | Hanna, Robert | FO | 744 | HSV | | 0205/38 |
| 857 | 857 | 450057 | 09/12/11 | Krebs, Daniel | FO | 744 | HSV | | 1215/39 |
| 858 | 858 | 450077 | 09/19/11 | Smith, Mark | FO | 763 | JFK | | 1115/23 |
| 859 | 859 | 450073 | 09/19/11 | Woodcock, Tanner | FO | 763 | JFK | | 0617/48 |
| 860 | 860 | 450070 | 09/19/11 | Cabrera, Jesus | FO | 763 | JFK | | 0717/08 |
| 861 | 861 | 450076 | 09/19/11 | Gordon, Greg | FO | 763 | JFK | | 0617/31 |
| 862 | 862 | 450075 | 09/19/11 | Hasley, Jason | FO | 763 | JFK | | 0402/40 |
| 863 | 863 | 450071 | 09/19/11 | Schmeling, Jeffrey | FO | 763 | JFK | | 0613/29 |
| 864 | 864 | 450072 | 09/19/11 | Cameron, David | FO | 763 | JFK | | 1006/27 |
| 865 | 865 | 450074 | 09/19/11 | Honore, Cyprian | FO | 763 | JFK | | 0951/24 |

# SECTION 23: FURLOUGH & RECALL

### A. SYSTEM FURLOUGH

1. A Pilot will be furloughed in reverse order of placement on the Pilot System Seniority List. A Flight Engineer will be furloughed in reverse order of placement on the Flight Engineer System Seniority List.

   a. Nothing in this Agreement shall be construed to limit the Company's right to terminate the employment of a probationary Crewmember in lieu of furlough.

2. Furlough Notification Procedure.

   a. A Crewmember will be given thirty (30) days notice of furlough or one (1) month of his monthly guarantee in lieu thereof, in addition to any other furlough pay and benefits for which the Crewmember is eligible under Section 23.D., below.

   b. A Crewmember to be furloughed will be notified by the Chief Pilot's office in writing by facsimile, certified mail, personal delivery, or overnight delivery by a commercially recognized courier service. A signed and dated receipt, or confirmation of successful facsimile transmission, is required for proof of delivery; *provided*, however, the first attempt of delivery of either certified mail or overnight delivery will be considered proof of delivery. The furlough notice must contain the effective date of furlough.

### B. RECALL FROM FURLOUGH

1. Furloughed Crewmembers shall be required to keep a standing bid on file as provided for in Section 24. A furloughed Crewmember may change his standing bid at any time and such change will be effective the day after it is received by Crew Staffing. The Company shall notify those Crewmembers in a furlough status of the opening or closing of any Base at the same time such notice is provided to active Crewmembers.

2. All Pilots on furlough shall be offered recall prior to the Company hiring new Pilots or Flight Engineers as set forth in subsection 23.B.2.a., below and except as provided for in subsection 23.B.3, below. All Flight Engineers on furlough shall be offered recall prior to hiring new Flight Engineers or Pilots as set forth in subsection 23.B.2.b., below and except as provided for in subsection 23.B.3.

a. Prior to recalling furloughed Pilots, the Company shall award Position Vacancies to non-furloughed Pilots in accordance with Section 24.

b. A Pilot who is furloughed will be recalled in seniority order by his placement on the Pilot System Seniority List and the Pilot's Position preferences as set forth on his standing bid. A Pilot may also preference a Flight Engineer Position on his standing bid. A Pilot may be recalled to a Flight Engineer Position if all Flight Engineers have been offered recall or no longer have recall rights pursuant to subsection 23.B.4., below, and the Pilot meets the Company's qualifications specified in subsection 24.H. of this Agreement.

c. A Flight Engineer who is furloughed will be recalled in seniority order by his placement on the Flight Engineer System Seniority List and the Flight Engineer's Position preferences as set forth on his standing bid. A Flight Engineer may also preference a Pilot Position on his standing bid. A Flight Engineer may be recalled to a First Officer Position if all Pilots have been offered recall or no longer have recall rights pursuant to subsection 23.B.4, below, and the Flight Engineer meets the Company's qualifications specified in subsection 24.H. of this Agreement.

d. If a Pilot or Flight Engineer has not listed a particular recall preference Position on his standing bid, he will not be recalled to that Position Vacancy and he will be bypassed in favor of a more junior Crewmember who has indicated a willingness to be recalled to that Position on his standing bid, or, if none, a New Hire, as applicable.

3. A Pilot or Flight Engineer may by-pass his recall from furlough; *provided*, the Company may fill the vacancy with a more junior Crewmember, or a New Hire Crewmember, in accordance with this subsection 23.C. By-pass rights shall be exercised on a Position Vacancy-by-Position Vacancy basis. Crewmembers who exercise by-pass rights shall be offered recall to future Position Vacancies as they occur.

4. All recall rights shall expire after five (5) years from the effective date of the furlough, at which time his name will be removed from the Pilot and/or Flight Engineer seniority list(s), as applicable. The Company may at its discretion extend this time period with notice to the Union.

5. A Crewmember who is recalled from furlough shall be guaranteed one (1) month of continuous employment, or pay in lieu thereof.

6.  At the time a furloughed Crewmember accepts recall, he shall mail or otherwise send to the Company a copy of his current Airman's Medical Certificate that is required for the Position to which the Crewmember has been recalled.  If the Crewmember does not have a current required Airman's Medical Certificate, he shall not be eligible for recall and shall remain in furlough status until such time as he regains the required Airman's Medical Certificate and is again recalled.

## C.  RECALL NOTIFICATION PROCEDURE

1.  A Crewmember to be recalled will be notified by the Chief Pilot's office in writing by facsimile, certified mail, personal delivery, or overnight delivery by a commercially recognized courier service.  A signed and dated receipt, or confirmation of successful facsimile transmission, is required for proof of delivery; *provided*, however, the first attempt of delivery of either certified mail or overnight delivery will be considered proof of delivery.  On the date the Company sends written notice as described above, the Company shall also send an email to the Crewmember's personal email address if one has been provided by the Crewmember and call/leave a message for the Crewmember at the number on file with the Company.

2.  For the purposes of any notice or other communications required of the Company in this Section, it will be sufficient for the Company to direct such to the Crewmember's most recent address on file with Crew Staffing.  It shall be the Crewmember's responsibility to inform Crew Staffing of his current address and telephone number, and any changes to such during the term of his furlough.

3.  Within seven (7) days of receipt of a notice of recall, a Crewmember on furlough must inform the Company in writing whether he accepts, or (if applicable) by-passes, the recall.

4.  In order to accept recall, a Crewmember on furlough must be able to report for duty by the anticipated date of return in the recall notice.  This date of return may not be earlier than twenty-one (21) days after the date of the Crewmember's receipt of the recall notice, unless the Company and Crewmember mutually agree to a different earlier date.

5.  A Crewmember will be deemed to have resigned his employment with the Company, and his name will be removed from the applicable System Seniority List, under the following circumstances:

a. A Crewmember fails to inform the Company whether he will accept or by-pass a recall within seven (7) days of his receipt of a notice of recall; or

b. A Crewmember who accepted recall in a timely manner but fails to report for duty on his scheduled date of return.

## D. FURLOUGH BENEFITS

1. A Crewmember will retain and accrue seniority while on furlough until his recall rights expire. A Crewmember will accrue Longevity during the first thirty (30) days of a furlough. A Crewmember will retain Longevity while on furlough.

2. A Crewmember may continue any Company-provided medical, dental and life insurance coverage for the first two (2) full calendar months after the date of furlough so long as he reimburses the Company for the standard Crewmember contribution then in effect. Thereafter, the Crewmember may continue benefits at his cost pursuant to COBRA.

3. A furloughed Crewmember in pay status at the time of furlough who has more than one (1) year of Longevity shall receive a payment equal to one-half of his monthly guarantee. A furloughed Crewmember in pay status at the time of furlough who has more than two (2) years of Longevity shall receive a payment equal to his monthly guarantee. A Crewmember who is not in pay status at the time of furlough will not be eligible for furlough pay.

4. At the time a Crewmember is furloughed, he shall be paid any unused vacation to which he was entitled in the current calendar year.

## E. GENERAL

1. A furloughed Crewmember may be entitled to on-line space-available transportation, and jump-seat privileges, on the Company's aircraft on the same basis as active Crewmembers for a period of two (2) years from the effective date of furlough in accordance with TSA requirements.

2. A furloughed Crewmember shall not perform any line Crewmember duties.

3. For purposes of providing notices of furlough and recall pursuant to this Section, it will be sufficient for the Company to direct such notices to the Crewmember's most recent address on file with the Company. It is the Crewmember's obligation to inform the Company

of any changes in his residence address.

4. Crewmembers on furlough will be allowed to update their standing bids pursuant to the applicable provisions of Section 24.B. of this Agreement.

#### F.  GENERAL

1. The provisions of subsection 23.A.2.a., 23.D.2., and 23.D.3. shall not apply if the need to reduce staffing at a Base or to furlough a Crewmember is caused, in major part, by an event or circumstance beyond the control of the Company.   The term "event or circumstance beyond the control of the Company" means:

   a. a natural disaster,

   b. a labor dispute,

   c. grounding of a substantial number of the Company's aircraft by government agency or voluntary action by the Company for safety reasons in lieu thereof, which in either case could not be avoided or cured by the Company,

   d. reduction in flying operations because of a decrease in available fuel supply or suppliers being unable to provide sufficient critical materials for the Company's operations,

   e. revocation of the Company's operating certificate(s),

   f. war emergency,

   g. acts of terrorism,

   h. owner's delay in delivery of aircraft scheduled for delivery,

   i. manufacturer's delay in delivery of new aircraft.

This Page Intentionally Blank

# SECTION 24: FILLING OF VACANCIES

### A. POSITIONS

Each Crewmember shall hold a Position in the Company's system.

### B. STANDING BIDS

1. The Company will establish and maintain a "standing bid system." The Company shall use the standing bid system to fill vacancies, to process reductions in force, and to process recalls. The standing bid shall be used by a Crewmember to:

   a. Advise the Company of his desire to maintain or change Position,

   b. In the case of a furloughed Crewmember, to advise the Company of his recall preferences as provided for in Section 23.

2. Each Crewmember shall file with Crew Resources a standing bid, which will indicate the Crewmember's desired order of preference for Positions. The standing bid may contain any number of combinations of Positions. It is the Crewmember's responsibility to ensure that his standing bid is actually received by Crew Resources. The Company shall make available a means for electronic filing.

3. If a Crewmember has not submitted a standing bid, or his standing bid reflects insufficient choices to accommodate his seniority, his first bid preference shall be considered his existing Position. If his current Position is eliminated or his seniority no longer entitles him to hold the Position, then he shall be considered to have bid the following order:

   a. His current Status on his current aircraft type, regardless of Base; then

   b. The highest paying Status for which he is qualified on his current aircraft type at his current Base; then

   c. The highest paying Status for which he is qualified on his current aircraft type at any Base; then

   d. To the highest paying Status he can hold on any aircraft type, regardless of Base.

4. A Crewmember may submit a new standing bid at any time. When a Crewmember submits a new standing bid, his prior standing bid shall automatically be cancelled.

5. Standing bids are effective immediately upon receipt by Crew

Resources, but will not be considered for a Position that has been filled.

## C. PROCEDURE FOR FILLING POSITION VACANCIES

1. Position Vacancies shall be filled, if at all, on the fifteenth (15th) day of each Month. A Position Vacancy award shall include the effective date of the award. A Position Vacancy award or assignment shall not become effective any sooner than the start of next Bid Month unless the Company and Crewmember agree to another time.

2. If the Company elects to fill Position Vacancies at Permanent Bases, the following procedures shall apply:

   a. The Company shall use the standing bids on file from eligible, incumbent Crewmembers before filling any such vacancies with newly hired Crewmembers. The Company is not required to award or assign a Position Vacancy to an incumbent Crewmember who has no standing bid on file. Therefore, it is the responsibility of each Crewmember to maintain a complete and up-to-date standing bid on file at all times.

   b. In order to be eligible for Position Vacancies at Permanent Bases in a given Month, a Crewmember's standing bid (or revised standing bid) must be received by Crew Resources by not later than 2359Z on the last day of the Month prior to the date Position Vacancies are filled.

   c. Position Vacancies at Permanent Bases will be awarded, in seniority order, to those Crewmembers who possess the required qualifications, who will be on active status on the effective date of the award, and are not subject to bidding freezes as provided for in subsection 24.K. The provisions of subsection 24.H., below, shall also be applicable to the awarding of such vacancies.

   d. Additional Position Vacancies, which are created by the filling of Position Vacancies, will be awarded according to the criteria in subsection 24.C.2.c., above. All Position Vacancies referred to in this subsection 24.C.2.d. will be filled concurrently.

   e. If any Position Vacancies remain unfilled after the process set forth in subsections 24.C.2.c. and 24.C.2.d., above, and the Company elects to fill the Position Vacancies, the Company shall fill such Position Vacancies through any of the following:

      i. Waive any freeze that makes the most senior Crewmember(s) bidding the vacancy ineligible for such Position Vacancy.

      ii. If waiving freezes does not result in filling the Position Vacancy, reverse seniority order assign a Crewmember(s) who possess the required qualifications. However, a Pilot may not be reverse seniority assigned to Flight Engineer Status nor may a Flight Engineer be reverse seniority assigned to a Pilot Status.

      iii. Fill the Position Vacancy with a New Hire Crewmember.

3. Vacancies created as the result of a Crewmember being awarded a vacancy ("secondary" vacancy) shall be filled at the Company's discretion, in accordance with the provisions of this Section 24.

4. Vacancies awarded to any of the following listed Crewmembers will be treated as a "phantom" bid award. In such a case, the vacancy may, at the Company's discretion, also be awarded to the next most senior eligible bidder and qualified Crewmember with a standing bid on file for the Position Vacancy.

    a. A Crewmember working in a position not covered by this Agreement as provided for in Section 10.

    b. A Crewmember on a leave of absence as provided for in Section 13 that is not expected to return to active duty on or before the effective date of the bid award.

#### D. PROCEDURE FOR OPENING A NEW PERMANENT BASE

1. If the Company elects to establish a new Permanent Base, it will provide notice no later than thirty (30) days before the closing of the bid. The notice shall include:

    a. The number of Position Vacancies;

    b. The effective date of each Position Vacancy;

    c. The location of the Permanent Base; and

    d. The bid closing date and time.

2. Position Vacancies at the new Permanent Base will be awarded in seniority order, to those Crewmembers who bid, possess the required qualifications, will be on active status on the effective date of the award and are not subject to bidding freezes provided in subsection 24.K, below. The provisions of subsection 24.H., below, shall be applicable to the awarding of such Position Vacancies.

3. Additional Position Vacancies, which are created by the filling of Position Vacancies at the new Base, will be awarded according to the criteria in subsection 24.D.2., above. All Position Vacancies referred to in this subsection 24.D.3. will be filled concurrently.

4. If any Position Vacancies at the new Permanent Base (or additional Position Vacancies related thereto) remain unfilled after the process set forth in subsections 24.D.2. and 24.D.3., above, and the Company elects to fill the Position Vacancies at the new Permanent Bases, the Company may fill such Position Vacancies through any of the following:

   a   Waive any freeze that makes the most senior Crewmember(s) bidding the vacancy ineligible for such Position Vacancy.

   b.   If waiving freezes does not result in filling the Position Vacancy, reverse seniority order assign a Crewmember(s) who possess the required qualifications. However, a Pilot may not be reverse seniority assigned to Flight Engineer Status nor may a Flight Engineer be reverse seniority assigned to a Pilot Status.

   c.   Fill the Position Vacancy with a New Hire Crewmember.

### E.   PROCEDURE FOR REDUCTION IN POSITIONS

If the Company elects to reduce the number of Positions at a permanent Base, the following procedures apply:

1. The Pilot or Flight Engineer, whichever is applicable, with the least seniority shall be displaced from his Position at the Permanent Base.

2. The Crewmember so displaced shall have "bumping" rights throughout the Company's system in accordance with seniority, his standing bid on file (if any), and subsection 24.B.3., above. In order for a Pilot to "bump" a Flight Engineer, or a Flight Engineer to "bump" a Pilot, the individual exercising "bumping" rights must have a seniority number on both the Pilot and the Flight Engineer System Seniority Lists.

3. Any furlough as a result of a reduction in Positions shall be made in accordance with system-wide seniority pursuant to subsection 23.A.

### F.   TEMPORARY BASES

1. The Company has the right to establish Temporary Bases at locations other than the Company's Permanent Bases. The Position Vacancies allocated to a Temporary Base shall have a duration of no more than nine (9) Bid Months.

2. The following procedures apply to the filling of Position Vacancies at Temporary Bases:

   a   Standing bids will not be considered by the Company in awarding or assigning such vacancies.

   b.  The Company shall issue a notice pursuant to subsection 24.D.1., above.

   c.  Position Vacancies at Temporary Bases will be awarded, in seniority order, to those Crewmembers who possess the required qualifications and are on active status on the effective date of the award. The provisions of subsection 24.H., below, shall be applicable to the awarding of such Position Vacancies.

   d.  If any Position Vacancies remain unfilled after the process set forth in subsection 24.F.2.c., above, the Company may fill such Position Vacancies through assignment, in reverse seniority order, of Crewmembers who possess the required qualifications and who will be on active status on the effective date of the award; *provided,* such an assignment may not exceed three (3) Bid Months in any twelve (12) month period. A Pilot may not be reverse seniority assigned to be a Flight Engineer nor may a Flight Engineer be reverse seniority assigned to be a Pilot.

3. A Crewmember holding a Position at a Temporary Base must bid flight schedules at the Temporary Base.

4. Upon termination of the Position at the Temporary Base, the Crewmember shall automatically revert to his Position at his Permanent Base. If the Crewmember's Position at his Permanent Base has been terminated, the Crewmember shall have "bumping" rights throughout the Company's system in accordance with his seniority.

5. The Company shall provide lodging and per diem for each Crewmember awarded or assigned a Position Vacancy in accordance with subsection 24.F.2.d., above, at a Temporary Base.

6. While assigned to a Temporary Base, a Crewmember's standing bid shall remain effective and he shall remain eligible for an award pursuant to his standing bid.

### G.  OPENING AND CLOSING PERMANENT BASES

1. The Company shall have the right, in its sole discretion, to open or close a Crewmember Base, to determine the location for all Bases, and to determine the number of positions staffed at each Base.

2. The Company shall provide advance written notice to the Union of its intention to open or close a Permanent Base. The Company shall provide such notice at least thirty (30) days prior to the anticipated opening date and at least sixty (60) days prior to the anticipated closing date unless it impossible for the Company to provide such advance notice, in which case, the Company shall provide as much notice as practicable. The Company shall meet with the Union upon request to discuss any issues the Union may wish to raise with the Company.

3. Crewmembers affected by a Base closing shall have displacement rights as set forth in subsection 24.E., above.

#### H. QUALIFICATIONS

1. In order to exercise seniority rights under this Section 24, a Crewmember must have sufficient qualifications, as established unilaterally by the Company and published and disseminated to the Crewmembers, for the applicable Position. The Crewmember also must be available to assume the Position, within any applicable time limits in this Agreement, and, if none, within reasonable time limits established by the Company.

#### I. INITIAL ASSIGNMENT OF NEW HIRES

The Company shall permit members of a New Hire class to bid in seniority order on Position Vacancies identified by the Company. New hires shall prepare and submit an initial assignment bid form. If an insufficient number of members of a New Hire class bid for a Position Vacancy(ies), the Company shall make assignments within the New Hire class in reverse seniority order. Nothing contained herein shall permit the Company to award or assign a New Hire to a Position prior to exhausting the procedures contained in subsections 24.C. and 24.D., above. The Company shall notify New Hires of Position awards and assignments prior to the completion of New Hire training. Such Position awards and assignments shall become effective upon completion of the initial line check.

#### J. CREWMEMBERS WITHIN ONE YEAR OF RETIREMENT

1. A Crewmember who is within one (1) year of mandatory retirement age may maintain a standing bid without any additional restrictions, but will be awarded only vacancies in his current equipment type and Status. The Company may, in its sole discretion, offer the benefit set forth in subsection 24.J.2., below, to Crewmember who are more than one (1) year away from mandatory retirement age, with the

Crewmember's concurrence.

2. A Crewmember who, but for the provisions of subsection 24.J.1, above, would have been awarded a vacancy in a higher Status than his current will be paid at the higher rate of pay to which he would have been entitled had his bid to the higher Status been awarded.

## K. BIDDING FREEZES

1. A Captain shall be ineligible to bid to any Status on a different equipment type, or to change Status on his current aircraft type, for a period of three (3) years.

2. No bidding freeze shall apply to a First Officer or Flight Engineer who bids for a higher Status on the same or a different aircraft type.

3. A First Officer shall be ineligible to bid First Officer Status on a different aircraft type for a period of three (3) years.

4. A Flight Engineer shall be ineligible to bid to a Flight Engineer Status on a different aircraft type for a period of three (3) years.

5. A Crewmember who is (a) awarded a bid to another Status on his current aircraft type or (b) awarded a bid in any Status on another aircraft type, and who, after commencing the required training for any reason fails to complete such training, shall be returned, seniority permitting, to his original Status and aircraft type and shall be ineligible to bid to different Status or aircraft type for a period of one (1) year.

6. A probationary Crewmember shall be ineligible to bid to a different Status on his current equipment type or to any Status on a different equipment type.

7. All bidding freezes become effective on the first day a Crewmember has commenced any initial, upgrade or transition training on his current awarded equipment.

8. During the twelve (12) month period following the delivery of the first aircraft that is New Equipment as defined herein, a Bidding Freeze shall not prevent a non probationary Crewmember from being awarded a higher paying Position Vacancy in the New Equipment. The Company shall provide no less than fifteen (15) days advance notice prior to making such Position Vacancies available for bidding under subsection 24.C. For purposes of this subsection 24.K.8, New Equipment means (a) aircraft that is not on the Company's operating certificate and is not a derivative of aircraft in the Company's fleet; and (b) aircraft that is not on the Company's operating certificate and

is a derivative of aircraft in the Company's fleet but the Company treats the aircraft as a separate fleet. For purposes of this subsection 24.K.8, an aircraft is derivative if a Crewmember with a type rating in another aircraft in the Company's fleet could be assigned to the aircraft after successfully completing differences training.

## L.  TRANSITION FROM FLIGHT ENGINEER TO PILOT

A Flight Engineer may bid for First Officer Position Vacancy as provided for in this subsection 24.L.

1. In order to be awarded a First Officer Position Vacancy, the Flight Engineer must possess the minimum qualifications for the First Officer Position Vacancy, as established by the Company, and successfully complete the simulator evaluation required by the Company of Flight Engineers desiring to transition to First Officer. Minimum qualifications shall be published and disseminated to Crewmembers as required by subsection 24.H., above.

2. It is the Flight Engineer's sole responsibility to obtain the minimum qualifications for the First Officer Position Vacancy and to complete the required simulator evaluation. The Flight Engineer will not receive any compensation for time spent, or reimbursement of any expenses incurred, in obtaining such minimum qualifications or completing such simulator evaluation.

3. A Flight Engineer who is qualified for a First Officer Position Vacancy award may exercise his seniority to bid for a First Officer Position Vacancy that otherwise would be filled by the Company through the hiring of a new Crewmember, but does not have the right to displace any incumbent First Officer. Nothing herein shall be deemed to require the Company to fill a First Officer Position Vacancy.

4. A Flight Engineer who is awarded a First Officer Position Vacancy pursuant to this subsection 24.L. shall be placed on the Pilot System Seniority List in accordance with subsection 22.A.2. However, if the upgrading Flight Engineer does not successfully complete the required First Officer training for any reason, his name will be removed from the Pilot System Seniority List.

5. A Flight Engineer who is awarded a First Officer Position Vacancy pursuant to this subsection 24.L. and who does not successfully complete all required training, or who declines an opportunity to participate in the necessary training, shall retain his Position as a Flight Engineer. However, such Flight Engineer's right to bid in the future for First Officer a Position Vacancy(ies) will be governed by the following provisions:

a   The Flight Engineer shall be ineligible to bid for a First Officer Position Vacancy for a period of one (1) year after the date on which he returns to Active Service as a Flight Engineer following re-qualification training for the Flight Engineer Position, if any.

b.   After the expiration of the one (1) year period referenced in subsection 24.L.5.a, above, the Flight Engineer will again be eligible to bid for a First Officer Position Vacancy(ies) consistent with the provisions of this subsection 24.L. If the Flight Engineer is again awarded a First Officer Position Vacancy, his position on the Pilot System Seniority List will be in accordance with the provisions of subsection 24.L.4., above; provided, however, that the date he shall be considered to have commenced training as a Pilot shall be considered this attempt at First Officer training, not his earlier attempt.

c.   If the upgrading Flight Engineer again does not successfully complete all required training he will retain his Position as a Flight Engineer, but shall be ineligible to ever bid again or otherwise be awarded a First Officer Position Vacancy. Further, his name shall again be removed from the Pilot System Seniority List.

6.   A Flight Engineer that is awarded a First Officer Position Vacancy shall be ineligible to bid for a Captain Position Vacancy until he has satisfied the minimum qualifications for the Captain Position Vacancy as established by the Company.

#### M. TRANSITION FROM PILOT TO FLIGHT ENGINEER

A Pilot may bid for a Flight Engineer Position Vacancy as provided for in this paragraph.

1.   In order to be awarded a Flight Engineer Position Vacancy, the Pilot must possess the minimum qualifications for the Flight Engineer Position, as established by the Company. Minimum qualifications shall be published and disseminated to Crewmembers as required by subsection 24.H., above.

2.   Any Pilot desiring to bid to a Flight Engineer vacancy must so advise the Company in writing no less than one hundred-eighty (180) days before he reaches any mandatory Pilot retirement age.

3.   It is the Pilot's sole responsibility to obtain the minimum qualifications for the Flight Engineer Position. The Pilot will not receive any compensation for time spent, or reimbursement of any expenses incurred, in obtaining such minimum qualifications.

4.  A Pilot who is qualified for a Flight Engineer award may exercise his seniority to bid a Flight Engineer Position Vacancy that otherwise would be filled by the Company through the hiring of a new Crewmember, but does not have the right to displace any incumbent Flight Engineer. Nothing herein shall be deemed to require the Company to fill a Flight Engineer Position Vacancy.

5.  A Pilot who is awarded a Flight Engineer Position Vacancy pursuant to this subsection 24.M. shall be placed on the Flight Engineer System Seniority List in accordance with subsection 22.A.2. However, if the downgrading Pilot does not successfully complete the required Flight Engineer training for any reason, his name will be removed from the Flight Engineer System Seniority List.

6.  A Pilot who meets all requirements and submits a valid bid for a Flight Engineer Position Vacancy under this subsection 24.M and who is not awarded a Flight Engineer vacancy prior to reaching the mandatory retirement age shall have the right to be placed on a transition leave of absence for the purpose of enabling the Pilot to bid for a Flight Engineer Position Vacancy(ies) in the future that otherwise would be filled by the Company through the hiring of new Crewmembers. This transition leave of absence is governed by the following provisions:

    a.  Prior to the date on which he reaches any mandatory Pilot retirement age, the Pilot must submit to the Chief Pilot a written request to be placed on a transition leave of absence.

    b.  The transition leave of absence will begin on the date of the Pilot's attainment of the mandatory retirement age, and will have a maximum duration of twenty-four (24) months. The transition leave of absence will terminate on the earlier of: (i) the date on which the Pilot begins or declines to begin the required training for the Flight Engineer Position if he is awarded any such Position Vacancy, or (ii) twenty-four (24) months from the start of the transition leave of absence if the Pilot is not awarded a Flight Engineer Position Vacancy during said period.

    c.  The transition leave of absence will be unpaid. During the month in which the transition leave of absence begins, the Pilot's Minimum Monthly Guarantee shall be reduced by one-thirtieth (1/30) for each day of the month on which the Pilot is on the transition leave of absence. The same pro-ration shall be applicable to any month in which a Pilot on transition leave of absence returns to duty as a Flight Engineer.

d. A Pilot on transition leave of absence may continue Company provided medical insurance, but only pursuant to the requirements of the Consolidated Omnibus Budget and Reconciliation Act (COBRA) and only so long as he pays the required monthly premiums and administrative fees charged by the Company.

e. If two (2) or more Pilots are in a transition leave status at the time that a Flight Engineer Position Vacancy becomes available, the Position Vacancy shall be awarded as follows:

   i. First to the Pilot with the most Flight Engineer seniority, if any.

   ii. If no Pilot in a transition leave status has any Flight Engineer seniority, then the Position Vacancy shall be awarded to the Pilot with the most Pilot seniority, regardless of how long the Pilot has been in the transition leave.

7. A Pilot who loses the required medical certificate to continue as a Pilot but who is otherwise medically qualified to fill a Flight Engineer Position Vacancy shall be entitled to bid a Flight Engineer Position Vacancy, subject to all provisions of this subsection 24.M.

8. A Pilot working as a Flight Engineer shall remain on the Pilot System Seniority List unless he has reached the mandatory retirement age for Pilots, in which case his name shall be removed from the Pilot System Seniority List.

9. A Pilot who is awarded a Flight Engineer Position Vacancy under this subsection 24.M. and who does not successfully complete all required training or who declines a Flight Engineer Position Vacancy award for which he has bid will not be eligible to bid again for a Flight Engineer Position Vacancy. If the Pilot had already reached the mandatory Pilot retirement age, he will be deemed to have retired and his name will be removed from the Pilot System Seniority List and the Flight Engineer System Seniority List, as applicable.

## N. CHECK AIRMAN SELECTION PROCEDURES

1. The bidding procedures set forth in Section 24 do not apply to the selection of Check Airman positions. The Company shall permit Crewmembers to indicate their desire to serve as a Check Airman on the Standing Bid Form.

2. The Company shall, at its sole discretion, determine the number of Check Airmen that it requires at any time.

3.  Prior to filling Check Airman positions, the Company shall consult with the UTC and consider the UTC's views on the qualifications of the Check Airman applicants or incumbent Check Airman.

4.  All Check Airmen must have held a Captain position in the aircraft by operation of Section 24.C. for at least one (1) year prior to being selected as a Check Airman and continue to have the seniority to hold a Captain position in the aircraft while serving as a Check Airman. This subsection 24.N.4. shall not operate to displace any Check Airman holding such position prior to the effective date of the Agreement.

    a.  The initial cadre of Check Airmen in New Equipment must be awarded a Captain position in the New Equipment by operation of Section 24.C but need not have held a Captain position in the aircraft for at least one (1) year prior to being selected as a Check Airmen. For purposes of this subsection 24.N.4.a., New Equipment shall be as defined in subsection 24.K.8. This subsection 24.N.4.a. shall apply during the eighteen (18) month period following the delivery of the first aircraft that is New Equipment as defined herein.

## O. GENERAL

1.  The minimum qualifications established by the Company for a Flight Engineer to be eligible to transition to a First Officer Position shall be no more stringent than the Company requires for a new-hire First Officer.

2.  The minimum qualifications established by the Company for a Pilot to be eligible to transition to a Flight Engineer Position shall be no more stringent than the Company requires for a new-hire Flight Engineer.

3.  When the Company fills a Position Vacancy, it shall issue a notice identifying the Crewmember(s) who have changed Position(s).

4.  The Company shall update Bid Lists when it fills a Position Vacancy. Updated Bid Lists shall be made available with the next monthly bid package.

# SECTION 25: SCHEDULING

### A. MAXIMUM SCHEDULED DUTY DAYS IN A BID MONTH

1. Crewmembers shall be awarded or assigned a monthly Bid Line ("Bid Line") in accordance with the bid process set forth in this Section 25. The maximum number of Duty Days, including any days of reserve duty, associated with a Bid Line shall not exceed seventeen (17) days.

2. A Crewmember shall not be required to exceed his Bid Line by more than three (3) Duty Days or a maximum of twenty (20) Duty Days in a Bid Month, whichever comes first.

3. A Crewmember who volunteers and is awarded additional Open Time flying under subsection 25.M., below, may exceed the maximum number of Duty Days in subsection 25.A.2., above, by the number of Duty Days for which he volunteers and any applicable extension days to such Open Time trips as provided for in subsection 25.M.

4. No Crewmember shall be required to report for duty on a scheduled Day Off except as provided in subsection 25.L.2.a. and 25.P.4, below.

### B. MAXIMUM CONSECUTIVE DUTY DAYS

A Crewmember shall not be involuntarily assigned to any schedule that would require any duty in excess of seventeen (17) consecutive Duty Days without an intervening seven (7) consecutive scheduled Days Off, except as specifically provided for in subsection 25.L.2.a., below. The Company may adjust an affected Crewmember's Bid Line in the second month in order to provide the minimum number of consecutive Days Off (or fewer if agreed upon by the Crewmember) or assign the Crewmember a Reserve Line for the second Bid Month.

### C. BLOCKS OF DAYS OFF TO BE USED IN BID LINE CONSTRUCTION

1. Bid Lines shall include blocks of Days Off. A block of Days Off shall consist of no less than five (5) consecutive days, except as set forth in subsection 25.C.2., below.

2. A Bid Line may include blocks of Days Off that are less than five (5) consecutive days in duration if such block(s) of Days Off are at the beginning or the end of a Bid Period. The remaining required number of Days Off shall be in a single block.

**D. BID LINE AND BID PACKAGE CONSTRUCTION**

1. Bid Months will be based on calendar months, with the following exceptions:

   a. The January Bid Month shall be from January 1st through January 30;

   b. The February Bid Month shall be from January 31st through March 1st;

   c. The March Bid Month shall be from March 2nd through March 31st.

2. A Bid Period may consist of one (1) Bid Month or two (2) Bid Months combined.

3. At least ninety (90) percent of all known flying for the next Bid Month which is unassigned at the time the Bid Package is constructed shall be included in Regular Lines and Hybrid Lines. The Company, in consultation with the Union Scheduling Committee, shall publish a Bid Package by Position with Bid Lines constructed as follows:

   a. Regular Lines.

      (i) Regular Lines must comply with Section 12, this Section 25 and the FARs.

      (ii) Regular Lines shall not include reserve days or reserve duty.

      (iii) Regular Lines shall consist of blocks of days on, Trip Pairings associated with days on and blocks of Days Off in accordance with this Section 25.

   b. Reserve Lines.

      (i) Reserve Lines shall include blocks of days on, reserve duty associated with days on, and blocks of Days Off. Blocks of Days Off shall be constructed in the same manner as Regular Lines.

      (ii) Reserve Lines must comply with Section 12, this Section 25, Section 31 and the FARs.

   c. VTO Lines.

      (i) At the time of initial bid-package publication, VTO Lines shall be blank lines with no scheduled Work Days, Days Off, Trip Pairings, etc.

      (ii) VTO Lines will be constructed from trips that are dropped from Regular Lines as a result of training and/or vacation

conflicts, trips not known at the time Regular Lines were constructed, trips that become open as a result of Crewmember illness/LOA, trips not awarded in the bid process for Regular Lines and other trips.

(iii) VTO Lines shall consist of blocks of days on, trips associated with days on and/or reserve duty and blocks of Days Off.

(iv) VTO Lines must comply with Section 12, this Section 25 and the FARs.

(v) VTO Lines may include reserve days only to the extent necessary to bring the number of Duty Days in the Bid Period up to the maximum number of scheduled days under subsection 25.A.1., above.

d.  Hybrid Lines

(i) Hybrid Lines must comply with Section 12, this Section 25 and the FARs.

(ii) Hybrid Lines may include up to four (4) reserve days or days of reserve duty.  Reserve days or days of reserve duty shall be limited to the specific reserve days or days of reserve duty that were published with the Bid Materials.

(iii) Hybrid Lines shall consist of blocks of days on, Trip Pairings and/or reserve duty associated with days on and blocks of Days Off in accordance with this Section 25.

(iv) The number of Hybrid Lines shall not exceed the number of Regular Lines available for bidding in a Bid Month by Position.

4.  All Trip Pairings will begin and end at the Crewmember's Base.

5.  The Company shall publish at least as many Bid Lines (i.e., Regular, Hybrid, Reserve, VTO) per Position as Crewmembers eligible to bid in the Position.

### E. OPERATING EXPERIENCE (OE), ANNUAL LINE CHECKS, AND OTHER TRAINING RELATED FLIGHT DUTIES

Check Airmen shall bid for Bid Lines in the same manner as all other eligible Crewmembers.  Crewmembers who require OE, Annual Line Check, or other training related flight duties shall be assigned to fly with a Check Airman.  If a Crewmember is displaced from a trip because the Company assigns OE, Annual Line Check, or other training related flight

duties to another Crewmember, the displaced Crewmember will be reassigned in accordance with subsection 25.L.1, below.

### F. BID PACKAGE CONTENTS

The Bid Package shall contain the following information:

    a. A cover letter of instructions with bid process time tables;

    b. Current bid list for the Base by Position;

    c. Crewmember training (i.e., name, type, date and location);

    d. Medical renewal dates;

    e. All Regular, Hybrid, Reserve and VTO Lines, including the number of VTO Lines by Position;

    f. Vacations and LOAs; and

    g. A list of Crewmembers ineligible to bid.

### G. BID PACKAGE DISTRIBUTION

1. The Company shall distribute the bid package in the following manner:

    a. The Company shall distribute a Bid Package to each Crewmember in accordance with the following:

        (i) To the e-mail account (maximum of two (2) email accounts, one (1) of which must be a Company email account) specified by the Crewmember, by no later than 1700Z on the 18th of the month preceding the Bid Period; and

        (ii) Posting to the Company's web site by no later than 1700Z on the 18th of the month preceding the Bid Period.

    b. Upon request by a Crewmember, the Company shall make the Bid Package available to those Crewmembers who are away from their residence in connection with Company duties during the period for review of the Bid Package by one of the following methods chosen by the Company:

        (i) A Bid Package available for electronic receipt by the Crewmember at an airport where the Crewmember is scheduled to depart or arrive on a flight assignment.

        (ii) A Bid Package available for electronic receipt by the Crewmember at a layover hotel which has facilities for guests to receive e-mail transmissions or download

documents from the Company's web site and to print hard copies of same.

(iii) Send a Bid Package by facsimile to the Crewmember at his layover hotel.

#### H. CREWMEMBER BIDDING

1. A Crewmember will be ineligible to bid if one or more of the following apply:

   a. He is on Leave of Absence and fails to notify the Company that he will return to Active Service on or before the first day of the Bid Month;

   b. He is furloughed and will not be recalled to Active Service on or before the first day of the Bid Month;

   c. He is not projected to be current or qualified in his Position on or before the first day of the Bid Month;

   d. He has not provided a copy of a valid medical certificate to the Company prior to closing of the bid window (unless he provides the Company with a projected date for delivery of the medical certificate which is prior to the first day of the Bid Month);

   e. He is scheduled for training consisting of sixteen (16) or more days in a Bid Month;

   f. He is not projected to possess certain required visas designated by the Company prior to the first day of the Bid Month; or

   g. He has previously been awarded or assigned a 60-day Bid Line for the Bid Period; provided, an affected Crewmember shall not be ineligible to bid for a Bid Period that occurs after expiration of his 60-day Bid Line.

2. A Crewmember shall submit his bid via a Company-designated web site, or other means as directed by the Company should the web site not be available or is inaccessible to the Crewmember. A Crewmember may provide written proxy for another Crewmember to submit a bid on his behalf.

3. Except as specifically provided in this Section 25, all published Bid Lines will be awarded in seniority order to Crewmembers who bid for such lines.

4. Crewmembers who are awarded or are assigned a "blank" VTO Line in conjunction with the initial bid award shall bid for the constructed VTO Lines in accordance with subsection 25.K., below.

5. An eligible bidder will not be awarded his Bid Line preference if one or more of the following conditions exist:

   a. A Crewmember cannot complete his Bid Line preference(s) due to FAR limitations or other limitations in this Agreement.

   b. A Crewmember cannot complete his Bid Line preference(s) due to military leave or other known leaves of absence during the Bid Period.

   c. A Crewmember may identify on his monthly bid those specific Crewmembers with whom he does not wish to fly, i.e., "No Fly List." If a Crewmember's Bid Award results in the Crewmember being paired with a designated "No Fly List Crewmember," he shall be awarded his next preference. If two Crewmembers' respective Bid Awards result in the Crewmembers being paired and each had designated the other as a "No fly List Crewmember," the junior Crewmember shall be awarded his next preference.

   In such cases, an eligible bidder will be awarded his next Bid Line preference(s) unless a condition listed above prevents awarding him his next preference(s).

6. A Crewmember who has failed to bid, is ineligible to bid but becomes available for duty, has not bid enough lines to be awarded a Bid Line, or is unable to be awarded any Bid Line pursuant to subsection 25.H.5., above, shall be assigned a schedule in accordance with Section 25 at the Company's discretion.

### I. BID MONTHS IN WHICH A CREWMEMBER IS SCHEDULED FOR TRAINING

1. 16 or More Days of Training in a Bid Month

   If the Crewmember is scheduled for training consisting of sixteen (16) or more consecutive days in a Bid Month:

   a. He will not be required to perform any duty, other than training and deadhead associated with training, on any day in the Bid Month;

   b. The maximum number of monthly Duty Days and maximum number of consecutive Duty Days specified in subsections 25.A. and 25.B., above, respectively, may be exceeded by a number of days equal to the number of day(s) of the training assignment, which may include any deadhead associated with training; and

   c. If the training event is subsequently cancelled, the Crewmember may be scheduled to Work the maximum number of days

specified in subsections 25.A. and 25.B., above, respectively. Said days may include trips and/or reserve duty. Days off shall be in accordance with subsection 25.C. The Crewmember shall inform the Company where to place the Days Off.   The Company may change the Crewmember's duty assignment in accordance with subsection 25.L.1.a. or 25.L.1.c., below, whichever is applicable.

2.   15 Days of Training or Less in a Bid Month

    a.   If the Crewmember is scheduled for training consisting of fifteen (15) days or less and the Crewmember's Bid Line does not conflict with, *i.e.,* overlap, any day of his training assignment:

        i.   The Crewmember's schedule for the Bid Month shall be the scheduled training and his Bid Line; and

        ii.   The maximum number of monthly Duty Days and/or the maximum number of consecutive Duty Days specified in subsections 25.A. and 25.B., above, respectively, may be exceeded by a number of days equal to the number of days of training, which may include any deadhead associated with training; and

        iii.   If the training event is subsequently cancelled, the Crewmember's Bid Line, exclusive of the training assignment, becomes his schedule for that Bid Month; *provided*, the Company may change the Crewmember's duty assignment in accordance with subsection 25.L.1.a. or 25.L.1.c., below, whichever is applicable.

    b.   If the Crewmember is scheduled for training consisting of fifteen (15) days or less and the Crewmember's Bid Line conflicts with, *i.e.*, overlaps, any day of his training assignment:

        i.   The portion of the Trip Pairing(s) which conflict with his training assignment will be removed from his Bid Line; and

        ii.   The Crewmember's adjusted Bid Line shall consist of remaining scheduled Days Off, the remaining trip(s), if any, trips and/or reserve duty on remaining days associated with the Trip Pairing(s) referred to in subsection 25.I.2.a., above, and the training assignment, which may include any deadhead associated with training; and

        iii.   The maximum number of monthly Duty Days and/or maximum number of consecutive Duty Days specified in subsections 25.A. and 25.B., above, respectively, may be

exceeded by a number of days equal to the number of day(s) the training assignment, which may include any deadhead associated with training, that overlapped Day(s) Off on his Bid Line.

iv. If the training event is subsequently cancelled, the Crewmember's Bid Line, exclusive of the training assignment, becomes his schedule for that Bid Month; *provided*, the Company may change the Crewmember's duty assignment in accordance with subsection 25.L.1.a. or 25.L.1.c., below, whichever is applicable.

3. Days Off Prior To and After Training:

   a. Crewmembers scheduled to attend upgrade, transition or re-qualification training shall receive seven (7) scheduled Days Off at his residence or alternate location free of duty prior the start of the training assignment (three (3) Days Off at his residence or alternate location free of duty in the case of re-qualification where the Crewmember was current in the aircraft within eleven (11) months of the start of the training assignment). The Company shall remove days from a Crewmember's Bid Line as necessary in order to provide the minimum Days Off referred to herein. A Crewmember may waive some or all of the Days Off referred to herein.

   b. Crewmembers who successfully complete upgrade, transition or re-qualification training shall receive five (5) scheduled Days Off at his residence or alternate location free of duty prior to his next duty assignment. The Company shall remove days from a Crewmember's Bid Line as necessary in order to provide the Crewmember with the minimum Days Off referred to herein. A Crewmember may waive some or all of the Days Off referred to herein. This subsection 25.I.3.b. shall have no application to Crewmembers who successfully complete re-qualification where the Crewmember was current in the aircraft within eleven (11) months of the start of the training assignment.

## J. BID AWARD IN A BID PERIOD A CREWMEMBER IS SCHEDULED FOR VACATION

1. If the Crewmember is scheduled for vacation and the Crewmember's Bid Line does not conflict, *i.e.*, overlap, any day of his vacation, the Crewmember's schedule for the Bid Month shall be his vacation and Bid Line.

2. If the Crewmember is scheduled for vacation and his Bid Line

conflicts, *i.e.*, overlaps, with any day of his vacation:

a. The portion of any Trip Pairing(s) which conflict with his vacation will be removed from his Bid Line; and

b. The Crewmember's adjusted Bid Line shall be the remaining scheduled Days Off, the remaining trip(s), if any, trips and/or reserve duty on remaining days associated with the Trip Pairing(s) referred to in subsection 25.J.2.a, above, and the vacation.

## K. BID AWARD SCHEDULE

1. Unless the parties agree otherwise, the bid award schedule contained in this subsection 25.K shall apply to Crewmembers bidding lines. The Company will publish and distribute the initial Bid Package for each Base no later than 1700Z of the 18th of the month preceding the Bid Period.

2. Initial Bidding will close at 1700Z of the 21st of the month preceding the Bid Period. The Company shall post the initial bid awards by 1700Z of the 23rd of the month preceding the Bid Period unless the parties mutually agree otherwise.

3. The Company will distribute VTO bid package, if any, for each Base no later than 1700Z of the 24th of the month preceding the Bid Period.

4. For those Crewmembers awarded or assigned a blank VTO Line in subsection 25.H.4, above, bidding for the above VTO Lines will close at 1700Z on the 25th of the month preceding the Bid Period.

5. All Bid Lines shall be published no later than 2359Z on the 27th of the month preceding the Bid Period. Upon request from an affected Crewmember, the Company shall also make the VTO bid awards available according to the procedures listed in subsection 25.G., above.

## L. CHANGES TO TRIP PAIRINGS AND EXTENSIONS INTO DAYS OFF

1. Changes to Trip Pairings.

a. Regular, Hybrid and VTO Line Holders. The Company may change the Trip Pairing(s) on the Bid Line if:

(i) The Company informs the Crewmember of the new trip through the Crew Management System or other permissible means at the time of the change; *provided*, if the Crewmember is at his residence, the Company may place

the Crewmember on R1 in lieu of informing the Crewmember of a new trip; and *provided*, further, if the Crewmember is not at his residence, the Company may inform the Crewmember of the new trip no later than the end of the Minimum Rest period.

(ii) The new trip will comply with Section 12.

(iii) The new Trip Pairing is scheduled to depart from the Crewmember's Base no earlier than the scheduled departure of the original Trip Pairing based on his Bid Line, unless the Crewmember agrees otherwise; *provided*, if the new Trip Pairing commences immediately after Gateway Travel that has been accepted by the Crewmember, the Trip Pairing may be scheduled to depart from the Crewmember's Base up to four (4) hours earlier than the scheduled departure of the original Trip Pairing based on his Bid Line; *provided further*, the Crewmember receives Minimum Rest after Gateway Travel as required by Section 12 of this Agreement and the Crewmember is informed of the change prior to the commencement of the Minimum Rest period; and

(iv) The new Trip Pairing is scheduled to block in at the Crewmember's Base at or before 2359Z of the day he was originally scheduled to return to his Base based on his Bid Line, unless the Crewmember agrees otherwise;

The Company may not assign reserve duty to a Regular Line holder or a Hybrid Line Holder (except as permitted by subsection 25.D.3.d.(ii)) unless the Crewmember is returned to his residence (or other mutually agreeable location), in which case, the Crewmember may be assigned to R1. A Crewmember assigned R1 may be assigned another trip that complies with 25.L.1.a., above.

b. If the Company removes a Regular, Hybrid or VTO Line holder from a Trip Pairing, the Company shall select one of the following two options:

(i) Option A.

(1) Assign the Crewmember a different Trip Pairing that complies with the requirements of subsection 25.L.1.a., above.

(2) The Crewmember's new Trip Pairing shall be deemed his "assigned Trip Pairing" for purposes of the Extension Days provision in subsection 25.L.2.a., below.

      (ii) Option B.

         (1) With the Crewmember's consent, the Company may give the Crewmember a different Trip Pairing that does not comply with subsection 25.L.1.a. (iii) and (iv), above.

         (2) Once a new Trip Pairing has been accepted by a Regular, Hybrid or VTO lineholder in accordance with Option B, the Company may remove the Crewmember from the Trip Pairing and assign him a new Trip Pairing that returns the Crewmember to his Base at or before 2359Z on the date associated with the Trip Pairing agreed to by the Crewmember under 25.L.1.b.(ii)(1), above.

         (3) If the Crewmember accepts the schedule change in accordance with subsection 25.L.1.b.(ii)(1), above, he shall be deemed to have volunteered to Work on each scheduled Day Off covered by the new Trip Pairing and shall receive the compensation for volunteers prescribed in subsection 3.C of the Agreement.

         (4) The Crewmember's new Trip Pairing under subsection 25.L.1.b.(ii)(1) or (2), above, whichever is applicable, shall be deemed his "assigned Trip Pairing" for purposes of the Extension Days provision in Section 25.L.2.a., below.

        The Company shall provide Crewmembers with a revised schedule which shows all of the new Trip Pairing(s), including a specific plan (via deadhead transportation or otherwise) for returning the Crewmember to his Base. The revised schedule must be provided to the Crewmember in accordance with subsection 25.L.1.a.(i), above.

   c. Reserve Line Holders. The Company may require a Reserve Line Holder to complete any Trip Pairing or reserve duty that is scheduled to block in (in the case of operating flights or deadhead) or end (in the case of reserve duty) by 2359Z of the last day of reserve assignment in the Crewmember's Bid Line.

2. Extension of an Assigned Trip Pairing Into Scheduled Days Off

   a. The Company may extend a Crewmember into scheduled Day(s) Off if necessary to protect the operation, subject to the following:

(i) The Company shall attempt to provide at least twenty-four (24) hours notice prior to extending a Crewmember under subsection 25.L.2.a., above.

(ii) A Crewmember is entitled to four (4) guaranteed Days Off (GDO) for use during the first nine (9) Bid Months every year. Crewmembers may not be extended into a scheduled Day Off that has been designated by the Crewmember as a GDO in accordance with this subsection 25.L.2.a. or any of the consecutive Days Off following the GDO.

(iii) A Crewmember may place a GDO on a Day Off corresponding to his awarded or assigned schedule for the Bid Month.

(iv) A Crewmember may not use more than one (1) GDO in any Bid Month.

(v) When a Crewmember intends to use a GDO, he shall notify the Company no less than seventy-hours (72) prior to the commencement of the Trip Pairing that immediately precedes the Day Off selected by the Crewmember as a GDO, but in no case shall a Crewmember be required to notify the Company prior to the first day of a Bid Month. The GDO scheduling form used by Crewmembers shall be mutually agreeable to the Company and Scheduling Committee.

(vi) If weather, maintenance or an air traffic control event associated with the Crewmember's flight to his Base prevents the Company from returning a Crewmember to his Base prior to his scheduled GDO, the GDO may be rescheduled by the Crewmember for use at any time other than the last three (3) months of the calendar year. The GDO rescheduling form used to be used by Crewmembers shall be mutually agreeable to the Company and Scheduling Committee.

b. If an extension into Days Off (as determined by the Crewmember's original Bid Line) is required in accordance with 25.L.2.a., above, the following rules apply:

(i) For Regular, Hybrid or VTO Line holders.

If the amount of time required to complete the delayed Trip Pairing exceeds the available extension days:

(a) The Crewmember may Affirmatively Accept the revised trip in accordance with Option B, above.

(b) The Crewmember may decline the revised trip. If the Crewmember declines the revised trip, the Crewmember will be provided commercial and/or deadhead transportation to Base prior to 2359Z of the last available extension day. If the Crewmember is not returned to Base by the end of the available extension days, he will be deemed to have been involuntarily assigned by the Company.

(c) The Crewmember must advise the Company if he accepts or declines the revised trip at the time the Crewmember is contacted by the Company, unless the Crewmember and the Company agree to a different time.

(ii) Reserve Line Holders.

(a) The Company may require a Reserve Line Holder to complete a Trip Pairing that is scheduled to, and actually does, begin by no later than 2359Z of the last day of reserve assignment (i.e. in the Crewmember's original Bid Line), and is scheduled to return the Crewmember to his Base by not later than 2359Z of the last extension day available to the Company.

(b) If a Reserve Line Holder is extended into a scheduled Day(s) Off under subsection 25.L.2.b.(ii)(a), above, such trip shall be his "assigned trip" for purposes of subsection 25.L.2.a., above.

c. For purposes of the monthly limitation on the number of extension days, and the applicable rate of pay associated with the extension, extension days count towards the month in which the extension occurs.  A Crewmember does not receive additional Days Off in the Bid Month as result of extension days.

## M. OPEN TIME FLYING

1. Open Time are trip(s) which are uncovered for any reason and assigned to Open Time by the Company.

2. There are three (3) methods for assigning Open Time as described below. The Company will determine which method(s) will be utilized to assign Open Time trips.

a. Assignment of Open Time Trip(s) To R-1(Home) or R-2 (Hotel) Reserve Crewmembers More Than 168 Hours Prior To Scheduled Report Time.

   (i) In addition to scheduled flight segment(s), an assignment of Open Time may include periods of R-1 and/or R-2 reserve duty as well as hot airport standby.

   (ii) The maximum number of scheduled Duty Days in a month for such an assignment shall be seventeen (17). Such assignments shall not conflict with scheduled Days Off on the Crewmember's originally-awarded Reserve Line, and must begin and end at the Crewmember's Base.

   (iii) A Reserve Crewmember who is given a flight assignment more than 168 hours prior to scheduled report time (including where the Crewmember receives such a flight assignment when contacting Crew Scheduling pursuant to subsection 31.E.2.), will for the purpose of Changes to Trip Pairings and Extensions into Days Off be considered a VTO Line holder for the remainder of the month; provided, the Crewmember's "original awarded/assigned line" shall be his originally-awarded Reserve Line.

   (iv) Upon request from the affected Crewmember, when flight duty is assigned more than 168 hours prior to scheduled report time, Crew Scheduling will send, via fax or e-mail, written confirmation of the change from Reserve to VTO status. This written confirmation shall show the Crewmember's new schedule for the month, including all scheduled flight assignments and periods of R-1 and/or R-2 reserve duty and hot airport standby.

b. Assignment of Open Time Trip(s) to R-1 or R-2 Reserve Crewmember within 168 Hours of Scheduled Report Time. In accordance with Section 31, the Company may assign an Open Time trip to a Reserve Crewmember. Any such assignment shall be in accordance with 25.L.1.c., above.

c. Assignment of Open Time Trip(s) To A Crewmember On The Days Off Volunteer List.

   (i) The Company will establish an Open Time "Days Off Volunteer List" for each Bid Period. Any Crewmember, whether a Regular, Hybrid, VTO or Reserve Line holder, may add his name to the List at any time after the bid award is published. When the Crewmember adds his name to the

Days Off Volunteer List, he will also be required to identify the date(s) on which he will be available to perform Open Time trip(s) and make certain that his contact information is kept current in the Crew Management System.

(ii) When staffing an Open Time trip(s) that includes operating flight(s) that begin or end at the Base from the Days Off Volunteer List, Crew Scheduling will first contact, in Base seniority order, those Crewmembers then on the List who are available for the trip. All other Open Time trips shall be offered and awarded on the basis of system seniority; provided, the Company is not obligated to choose a Crewmember on the basis of system seniority if the Company can select the next available Crewmember which does not incur a substantial cost to the Company. In order for a Crewmember to be available, the scheduled Open Time trip must fall within the range of available dates identified by the Crewmember pursuant to subsection 25.M.2.c.(i), above, and

(a) must not overlap the Crewmember's scheduled Duty Days;

(b) must not create an illegality for any previously assigned trip(s) or reserve duties; and

(c) the Crewmember must be physically able to move into position for the assigned duty.

If a Crewmember is assigned an Open Time trip but there is a conflict between an extension of the Crewmember's Bid Line and the Open Time trip, the Company may remove the Crewmember from the Open Time trip.

(iii) Each Crewmember contacted may accept or decline the Open Time assignment.  A Crewmember shall be deemed contacted when Crew Scheduling first leaves a message at the telephone, telephone answering machine, or pager number identified by the Crewmember pursuant to subsection 25.M.2.c.(i), above.  A Crewmember will have one (1) hour from the time of initial contact by Crew Scheduling to accept or decline the assignment. If the Crewmember does not affirmatively respond within the aforementioned time limit, he shall be considered to have declined the assignment. By mutual agreement, the parties may substitute an electronic notification and response system for the procedures set forth herein.

(a) The one (1) hour requirement under subsection 25.M.2.c.(iii), above, will not apply in circumstances where the Company determines that utilizing such process will result in the risk of delay to the flight schedule.

(iv) A Crewmember's acceptance of an Open Time trip through the Days Off Volunteer List will be binding on the Crewmember, and will be subject to all applicable provisions of this Section 25.

    (a) If there are any changes to the accepted Open Time assignment, Crew Scheduling must contact the Crewmember and inform him of the details of the change. The changed Open Time assignment may not include an earlier report time or a later block-in at Base than the Trip Pairing agreed to by the Crewmember under 25.M.2.c.(iii), above.

    (b) Unless the Crewmember agrees otherwise, a Crewmember may not be placed on Reserve Duty or hot airport standby during an Open Time assignment.

(v) Each Open Time trip staffed through the Days Off Volunteer List shall begin and end at the Crewmember's Base.

(vi) If the Company assigns an Open Time trip with less than thirty (30) hours notice between initial contact by Crew Scheduling and scheduled report time, the Company shall provide transportation for the Crewmember from his residence to his Base in order to position him for the assignment.

(vii) Upon acceptance, an Open Time trip shall be treated as a separate and distinct line of flying from the Crewmember's originally-awarded line for the month. As such, the Company shall have the right to utilize up to three extension days relative to the Open Time trip accepted by the Crewmember without regard to the number of extension days that may have been utilized in the month in connection with the Crewmember's originally-awarded line, and the utilization of extension days relative to an Open Time trip shall have no affect on the Company's right to use extension days in connection with the Crewmember's originally-awarded line.

> (viii) All pay and credit for performing an Open Time assignment shall be in addition to the minimum pay for the bid month calculated pursuant to Section 3.

## N. TRIP TRADES.

If Crewmembers wish to trade trips, Crewmembers must obtain the Company's approval by contacting Crew Scheduling, including an electronic request from all affected Crewmembers. Management may grant or deny trade requests at its discretion based on the needs of the service.    If a Crewmember's request is granted, the Crewmember's eligibility for extension day pay is based on the number of Work Days associated his originally awarded Bid Line.

## O. TRIP DROPS.

If a Crewmember wishes to drop a trip, a Crewmember must obtain the Company's approval by contacting Crew Scheduling.  Management may grant or deny drop requests at its discretion based on the needs of the service.  If a Crewmember drops a trip and, for any reason, completes the bid month below the Monthly Guarantee set forth in Section 3, his guarantee will be reduced to whatever the Crewmember's actual pay hours are for the bid month.

## P. SCHEDULING RULES.

1. Monthly bids may be re-bid with concurrence of the President of the Executive Committee or his designee.

2. A Crewmember who misses a trip as a result of his own acts or omissions may be placed on Reserve duty during the scheduled period of the trip missed.  A Crewmember who misses a trip as a result of sick leave usage may be placed on R1 or R2 status or assigned any other trip in accordance with subsection 25.L.

3. A Crewmember will not be required to keep the Company advised of his whereabouts while on vacation or on actual Days Off. This provision does not diminish a Reserve Crewmember's obligations to communicate with the Company as set forth in Section 31 of this Agreement.

4. A Crewmember may be required to report for training on a Day Off if the awarded or assigned training occurs on a Day(s) Off and is published in the Monthly Bid Package.

### Q. OUT-BASING

1. At the Company's discretion, it may offer Out-Basing assignments which generally may last up to thirty-three (33) consecutive days, inclusive of travel to and from the Out-Base location(s), generally commencing with the first day of a bid month. However, nothing herein shall preclude the Company from offering Out-Base assignments with a duration of longer than thirty-three (33) consecutive days.

2. An Out-Base assignment will have no scheduled or required Days Off except as may be required by applicable FARs.

3. The Company shall offer Out-Basing assignments by system-wide seniority to qualified Crewmembers (including but not limited to qualifications relating to equipment type, seat, visa requirements and other necessary qualifications for the Out-Base assignment to be filled) unless it determines that such method of assignment would result in a staffing shortage or other operational issues at one or more Bases. In this event the award of an Out-Base assignment may be limited to Crewmembers staffed at a Base where the award of an Out-Base assignment will not create such staffing shortage or other operational issues.

4. The Company may post Out-Basing assignments at any time, and shall not be required to include Out-Basing assignments as part of the assignment of monthly Bid Lines.

5. Out-Base assignments shall generally be posted for a minimum of five (5) days, and the posting shall include the date that the bid will close. The posting shall specify the initial location of the Out-Base assignment, which may be moved as operations require during the duration of the Out-Base assignment.

6. Out-Base assignment shall be voluntary, provided, however, that once the Bid Period has closed a Crewmember may not withdraw his bid for the Out-Base assignment.

7. The Company may decline a Crewmember's bid for an Out-Base assignment for any bid month in which the Crewmember may be required to attend training, is scheduled for vacation, or is subject to any other conflict.

8. A Crewmember who has already been awarded a Bid Line of time for the month shall not be precluded from thereafter bidding an Out-Base assignment that is subsequently posted for the same month which, if awarded, will supersede his Bid Line for the month.

9. The Company shall have the right to cancel an Out-Base assignment. In such a case the following shall apply:

   a. If the Out-Base assignment is cancelled prior to the award of the monthly Bid Lines the Crewmember will be awarded a regular Bid Line in accordance with the bidding procedures set forth in this Section.

   b. If the Out-Base assignment is cancelled after the monthly Bid Lines have been awarded but before the Out-Basing assignment has begun, the Crewmember shall be assigned his monthly flying at the Company's discretion, in compliance with all the pertinent provisions of this Section.

   c. If the Out-Base assignment has been cancelled after it has commenced, the Crewmember shall be given a new assignment or returned to his Base. If the Out-Base assignment has lasted for more than the maximum required number of regular Work Days in the bid month as provided in subsection 25.A.1, above, the Crewmember shall be considered to have completed his regular Work for the month, and the Out-Base compensation that he is due pursuant to the terms of Section 3 shall be appropriately prorated. If the Out-Base assignment has lasted less than the maximum required number of regular Work Days in the bid month as provided in subsection 25.A.1, above, he shall be assigned further Work at the Company's discretion but not to exceed the maximum required days of regular Work for the month, including the time while Out-based.

10. A Crewmember who has already been awarded an Out-Basing assignment shall not bid for a line of flying for the month in which his Out-Basing assignment is to occur. The Out-based Crewmember shall be assigned his flying at the discretion of the Company for the duration of his Out-Base assignment.

11. This subsection may be modified by mutual agreement of the Company and Union.

### R. SCHEDULING COMMITTEE

The Company recognizes a Union Scheduling Committee (USC). The USC shall meet with appropriate management in-person at least quarterly unless the parties mutually agree otherwise. Costs associated with USC duties shall be recoverable by the Company pursuant to the parties Flight Pay Loss Letter of Agreement (FPL LOA). The Company shall provide the USC with monthly bid materials as soon as practical prior to publication in order to provide the USC with an opportunity for

review and comment. The Company shall provide the USC with a copy of a monthly payroll report, copies of electronic requests for volunteers to Work on Days Off and announcements of Crewmember awards.   USC members shall continue to have Crew Management System access consistent with current practices.

# SECTION 26: GENERAL

### A. NEW HIRE INFORMATION

The Company will provide the Union with each New Hire's name, date of hire, date of birth, home address, employee number, seniority number, social security number and Position for which hired. The information shall be provided within seven (7) days of hire.

### B. DAMAGE TO EQUIPMENT

A Crewmember shall not be required to pay for the cost of aircraft lost or damaged, Company equipment lost or damaged, or other property lost or damaged while performing his duties as a Crewmember. It is expressly understood that this exemption does not apply to damage or loss as a result of a Crewmember's willful misconduct.

### C. COMPANY INDEMNIFICATION AND REPRESENTATION OF CREWMEMBERS

The Company shall indemnify, hold harmless and defend a Crewmember, and his estate, as applicable, who, as a result of the performance of his duties within the scope of his employment, is named as a defendant, is subject to a claim, or is subpoenaed as a witness, in any legal proceeding relating to the performance of those duties. This provision shall apply to both civil actions for money damages and to criminal complaints. It is expressly understood and agreed that these obligations on the part of the Company do not apply to claims or proceedings arising from a Crewmember's willful misconduct.

### D. SAVINGS CLAUSE

Should any part of this Agreement be rendered invalid by legislation or court decision, or if compliance with or enforcement of any provision should be restrained by such court pending a final determination as to its validity, the remainder of the Agreement, or the application of such provision as to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, will not be affected thereby. If legislation or a final determination by a court results in the invalidation of provision of this Agreement, the parties shall within ten (10) days of such final determination meet and confer in an attempt to mutually agree on a replacement provision. If a replacement provision is not agreed upon within thirty (30) days after the parties' first meeting, the parties shall within ten (10) days thereafter choose an arbitrator from the panel of arbitrators under subsection 21.C.3.a. of the Agreement by alternate

strikes. The order of striking arbitrators shall be determined by a coin toss. The parties shall promptly schedule the hearing. The parties' last proposals on a replacement provision shall be submitted to final and binding interest arbitration.

### E. JUMP SEAT

The jumpseat will be provided in accordance with the provisions of the Flight Operations Manual; *provided,* the Captain of a Company flight may grant or deny any request to occupy the cockpit jumpseat(s) consistent with his authority under the FARs.

### F. REFERENCES IN THE AGREEMENT

Any reference in this Agreement to Crewmembers in the male gender, including but not limited to the use of masculine pronouns, is intended to include both male and female Crewmembers, unless specifically specified otherwise.

### G. COPIES OF THE AGREEMENT

The Company shall make available to each Crewmember an electronic copy of this Agreement within thirty (30) days after signing.   The Company shall also make electronic copies of this Agreement available to New Hire Crewmembers during their Company indoctrination training.

### H. CURRENT ADDRESS AND TELEPHONE NUMBERS

Each Crewmember must maintain and provide to the Company a current address, a telephone number where the Crewmember can be reached (e.g., regular place of residence, cell phone), and an emergency contact number.

### I. COCKPIT VOICE AND FLIGHT DATA RECORDER AND OTHER RECORDING DEVICES

1. The Company may not use information from a cockpit voice recorder (CVR), flight data recorder (FDR) or any other recording device, including devices that transmit data from the aircraft to the ground by any means, as a basis for individualized training, checkrides, disciplinary investigation, discipline or discharge. Information contained on a CVR, FDR or other recording device shall be inadmissible in any grievance or arbitration proceeding. However, a Crewmember who sends offensive or inappropriate messages via ACARS in violation of Company policy may be subject to discipline; *provided*, there is just cause. Relevant ACARS messages are

admissible in any subsequent grievance or arbitration proceeding.

2. The Company shall not install cockpit video/imaging recording devices in aircraft operated by Crewmembers unless required by applicable law.

3. The Company shall notify the Union of any new data acquisition and/or recording devices installations no less than sixty (60) days in advance. Notification is not required on an individual aircraft basis. The Company shall meet with the Union upon request to discuss such installations. Information derived from a newly installed device(s) shall not be used in manner prohibited by subsection 26.I.1.or 26.I.2., above.

## J.  PERSONNEL AND TRAINING FILES

After giving reasonable notice of his desire to do so, a Crewmember, and/or a Union representative with written authorization from the Crewmember, may review the Crewmember's personnel file and training records during the normal business hours of the Company and in the presence of a Company representative. Copies of any requested documents from either the personnel file or training records will be provided upon request. The Company may require the Crewmember to pay a reasonable fee for such copies. Disciplinary and investigatory documents, records and papers will be kept in the personnel file. Negative information that has not been the subject of counseling or discipline shall not be placed in the personnel file.

## K.  PASSPORTS AND VISAS

1. Each Crewmember shall be required to maintain and carry with him a current and valid United States passport or approved foreign passport and alien registration card. No Crewmember shall be required to depart the United States for a foreign destination without a valid passport in his possession. Should the Company require that a Crewmember maintain two (2) valid passports, the Company shall pay the cost of the second passport.

2. It is the responsibility of the Company to obtain and maintain current visas as may be required for each destination or transit country. The Crewmember will share in the responsibility to assist the Company in obtaining such visas upon presentation to the Crewmember by the Company of any and all required forms and other paperwork, when available in advance. Further, the Company will reimburse the Crewmember for the reasonable mail and/or overnight delivery charges and visa fees that the Crewmember incurs in obtaining the

required visas.

3. The Company may require a Crewmember to obtain a visa upon arrival at a destination or transit country and/or directly from the local embassy or other offices of a foreign country if the Director of Operations or his designee has made arrangements to have the visas available upon the Crewmember's arrival at the point of destination and has provided the Crewmember with confirmation of the visa's availability from the person responsible for making the visa arrangements.

4. In the event a Crewmember is delayed at the destination airport or other location under subsection 26.K.3., above, because a visa is not available, additional crew rest will be provided so as to ensure compliance with the Minimum Rest requirements in Section 12.

### L. NON-REVENUE TRAVEL

1. To the extent the Company is able to provide non-revenue travel privileges on its aircraft, Crewmembers and their eligible dependents and spouses shall be eligible for such in accordance with Company policy, as such policy may from time to time be amended. The Company will confer with the Union in advance of implementing such policy changes. Eligibility for such travel privileges shall commence with the Crewmember's completion of his New Hire training.

2. Should the Company extend non-revenue travel privileges on its aircraft to retired employees on a general basis, such non-revenue travel privileges shall be extended on the same basis to qualifying retired Crewmembers.

3. If the Company is able to obtain reduced rate travel privileges from other air carriers, such reduced rate travel privileges will be extended to Crewmembers and qualifying retired Crewmembers, together with their respective dependents and spouses, to the extent the carrier providing such allows.

4. Unless otherwise assigned for Company business use, Crewmembers shall have priority claim to the cockpit jumpseat(s) for personal travel.

### M. PARKING

The Company shall designate and provide at no cost to the Crewmember automobile parking at his Permanent or Temporary Base. If the parking facility is not within walking distance from the location where the Crewmember is required to report, the Crewmember shall

utilize Company provided transportation. The Company will instruct Crewmembers on the type of ground transportation to be utilized in the event the Company does not provide transportation.

## N. LAWSUITS AND HEARINGS

A Crewmember requested by the Company or by an entity related to the Company to be a witness on behalf of the Company in a lawsuit or otherwise appear and/or testify on behalf of the Company at a legal proceeding or other hearing shall receive travel lodging/ground transport/per diem/pay/credit extended duty pay for scheduled Days Off.

## O. CREWMEMBER LOUNGE

The Company shall provide a Crewmember lounge, consistent with its practice as of the date of signing of this Agreement, at each Crewmember Base.

## P. COMPANY-REQUIRED ELECTRONIC COMMUNICATION DEVICES

If the Company requires Crewmembers to use a specific Electronic Communication Device (ECD) *(e.g.,* Blackberry, laptop, PCD) as a condition of employment, the Company shall provide the device at no cost to Crewmembers. The Company shall provide replacement devices at no cost to Crewmembers in the event of a malfunction, upgrade, theft, or other circumstance which the Company determines are reasonable for replacing such device. The Crewmember shall be responsible for the proper maintenance and care of the ECD. ECDs shall be used for the purposes set forth in this Agreement.

## Q. TIME LIMITS IN THE AGREEMENT

All time limits contained in this Agreement that are expressed in "days" shall mean calendar days unless otherwise stated in this Agreement.

## R. UNSAFE CONDITIONS

Nothing in this Agreement will be construed to require a Crewmember to take any action if he reasonably believes that such action will result in substantial and imminent risk of harm to the Crewmember or his equipment.

## S. FLIGHT PAY LOSS DONATIONS

Crewmembers shall be allowed to donate a portion of their pay to the Union for the purpose of off-setting the Union's Flight Pay Loss obligation

to the Company. Any such donation will be implemented by a deduction from the Crewmember's paycheck or electronic direct deposit, as agreed upon by the Company and Union. The Company is not required to make such a deduction unless, at least ten (10) business days prior to the applicable Pay Day, the Company's payroll department has received from the Crewmember a written authorization, executed by the Crewmember, in a form acceptable to the Company. The provisions of this subsection 26.S. shall not be construed in a manner that would restrict the Company's ability to comply with applicable state and federal law.

## T.  AIR TRAVEL

When transporting Crewmembers via air, the Company shall use reasonable efforts to position Crewmembers via turbine-powered, pressurized aircraft.

## U.  NAVIGATION PUBLICATIONS

If the Company requires individual Crewmembers to have in their possession Jeppesen Sanderson or other navigation publications, it shall be the Company's responsibility to provide any such publications to the Crewmembers.

## V.  RESIGNATION

A Crewmember who intends to voluntarily leave the service of the Company shall make every reasonable effort to provide the Company with a minimum of fourteen (14) days advance notice. The notice shall be in writing and directed to the Chief Pilot.

## W.  ACCIDENT INVESTIGATION TEAM ("AIT") TRAINING AND ACTIVATION

The Company will release from duty, upon request by the Union, up to three (3) Union AIT members for up to three (3) days per year for training to participate in accident investigations. In the event of a Company aircraft accident or incident in which the Union is a named party to a related investigation, the Company will release from duty, upon request by the Union, up to three (3) AIT member(s) identified by the Union. Should the NTSB Investigator-In-Charge ("IIC") not allow a particular Union AIT member to participate, the Company will release a replacement member upon notification by and at the request of the Union.

### X. PICKET LINES

The Union, through its Atlas Air, Inc. Executive Council, agrees that during the term of the Agreement there will not be any complete or partial strikes, picketing, slowdowns, unfair labor practice strikes, refusals to cross picket lines, sympathy strikes, work stoppages, secondary boycotts, withholding of services in whole or in part, concerted refusal to work normal overtime, or other cessation of work of disturbances economic or otherwise unless and until the parties' rights to self-help mature under the Railway Labor Act, provided, however, that nothing herein shall be construed to limit the Union's right to engage in otherwise lawful informational picketing.  This paragraph shall not alter or limit the Company's right, if any, to obtain a court order enjoining such conduct by the Union and or the Crewmembers both collectively and individually. Nothing in this paragraph shall be construed, however, to limit the rights of the Union or the Atlas Crewmembers to refuse to cross lawful strike picket lines established by or on behalf of pilots represented by any union lawfully certified or recognized pursuant to the Railway Labor Act.

### Y. NON-DISCRIMINATION

There shall be no discrimination by the Company against any Crewmember because of race, color, national origin, religion, creed, sex, age, disability, veteran status, marital status, or sexual orientation.

This Page Intentionally Blank

# SECTION 27:  INSURANCE BENEFITS

A.  All Crewmembers who are on the Pilot System Seniority List or Flight Engineer System Seniority List on the effective date of this Agreement shall be eligible to participate in health, dental and vision insurance programs in accordance with this Section 27. Such benefit programs are set forth in Appendix 27-B through F. The terms and conditions of such benefit programs shall not be materially altered for Crewmembers without the concurrence of the Union; *provided*, the Company may change its insurance carrier(s), self-insure, and change plan administrator(s).   Should the Company elect to implement a change to an existing insurance benefit plan consistent with this Section 27.A, it will first notify the Union and provide it with an opportunity to discuss the change with representatives of the Company.

   1.  In the event the cost of providing the insurance benefits under Section 27.A. should increase or decrease, the Company shall pass such costs or savings through to the Crewmembers' contribution to monthly/annual premiums. Crewmembers' contribution to monthly/annual premiums shall be in accordance with the percentages applicable to benefit programs as set forth in Appendix 27-B through F; *provided*, if the cost of providing an insurance benefit under Section 27.A. increases, Crewmembers' actual contribution to the monthly/annual premium for such insurance benefit and level of coverage shall not increase by more nine percent (9%) over the contribution amount for the same insurance benefit and level of coverage in effect during the previous year or the contribution amount determined by application of the applicable percentage set forth in Appendix 27-A, whichever is less.

B.  The Company shall provide each Crewmember eligible for benefits with a life insurance benefit of $200,000.00 and an accidental death and dismemberment insurance benefit in the amount $300,000.00. The Company shall pay for the entire cost of the benefits referred to in this subsection 27.B.  If the Company increases the amount of life insurance coverage or AD&D coverage for employees not covered by the Agreement, the Company shall extend the improvement to Crewmembers.

C.  The Company shall provide each Crewmember eligible for benefits with a long term disability benefit and loss of license benefit based on the terms and conditions of eligibility and participation in effect on the

effective date of this Agreement (Life Insurance Company of North America, Plan Number LK-970013, Effective Date: April 1, 2002 and the Basic and Optional Long Term Disability Summary Plan Description in effect on March 17, 2010). A Crewmember's loss of the ability to obtain a first-class medical certificate shall qualify a Crewmember for benefits under said plan. The Company shall pay for entire cost of the benefits referred to in this subsection 27.C; *provided*, a Crewmember shall be responsible for the cost of optional coverage described in the summary plan description on March 17, 2010.

D. The Company will secure an Agent that pays for any required medical, dental or vision emergency when a Crewmember becomes sick or injured while on duty for the Company outside the United States. A Crewmember who requires such treatment shall contact the Agent in accordance with current practices. A Crewmember will be returned to his Base or other mutually agreeable location if medically necessary.   A required medical, dental or vision emergency is defined as an illness or injury which requiring immediate medical, dental or vision treatment.

E. Crewmembers receiving short term or catastrophic sick leave benefits shall remain eligible to receive benefits referred to in this Section 27 on the same basis as active Crewmembers. Crewmembers on a leave absence shall be eligible to receive benefits referred to in this Section 27 in accordance with Section 13 of the Agreement.

F. The Company shall provide, at no cost to Crewmembers, an immunization plan that includes, at a minimum, the following vaccinations in accordance with the appropriate maintenance schedules:

1. Yellow fever.

2. Hepatitis A.

3. Hepatitis B.

4. Typhoid.

5. Tetanus.

6. Smallpox.

7. Meningococcal.

8. Annual flu vaccine.

9. TB tine test.

10. Any other recommended immunizations recommended by the current United States Center for Disease Control "Advice for International Travel" document.

G. The Company shall continue to make Flexible Spending Accounts (FSAs) available to Crewmembers on the same basis as employees of the Company not covered by the Agreement.

H. The Company shall continue to make an Employee Assistance Program available to Crewmembers according to the terms and conditions of eligibility in effect on the effective date of this Agreement.

I. No insurance policies required by this Section 27 shall contain any exclusion or limitation for an illness, injury, death or other loss connected in any way with war, acts of war, terrorism, acts of terrorism, insurrection, riot, travel flight or operation in any type aircraft or for any period while outside the United States.

J. The Company shall provide the Union Retirement and Insurance Committee with full access to records that are reasonably necessary to verify the cost of the plan, the amount of any cost increase and the methodology used to calculate the Crewmember's monthly premium contributions.

**ATLAS AIR, INC.**
**and**
**THE PILOTS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**THEREFORE, BE IT RESOLVED:**

1. The effective dates for the insurance benefits referred to in subsection 27.A of the Agreement shall be as follows:

   a. Health Insurance – the day after the open enrollment period ends.

   b. Dental Insurance – the day after the open enrollment period ends.

   c. Vision Insurance – the day after the open enrollment period ends.

2. Open enrollment for the insurance benefits referred to in subsection 27.A of the Agreement shall begin thirty (30) days after the effective date of the Agreement and end one hundred and twenty (120) days thereafter.   Crewmembers' dependents may be enrolled in the insurance benefit programs on the same basis as active Crewmembers.   The Company will have the option of deferring implementation of the health, dental and vision insurance benefits referred to in subsection 27.A. until 2012.  During the deferral period, Crewmembers and their dependents shall remain eligible for health, dental and vision insurance benefits in accordance with the Atlas or Polar CBA, whichever is applicable.  If the Company exercises its right to defer implementation until 2012, Crewmember contributions to premium in 2012 shall be determined in accordance with subsection 27.A.1 using 2011 premium and Crewmember contribution rates set forth in Appendix 27-B as the Baseline.

3. All claims arising prior to the effective date of the insurance benefits

referred to in Paragraph 1 of this LOA shall be subject to the terms and conditions of the insurance benefit plans in effect prior to the effective date(s) of the new insurance benefits. With respect to such claims, the Company shall indemnify Crewmembers against any costs over and above what the Crewmember would have been responsible for under the benefit plans in effect prior to the effective date of the new insurance benefit(s).

4. There shall be no pre-existing condition limitations applicable to Crewmembers on the seniority list on the effective date of the Agreement (or dependents) who enroll in a benefit plan(s) under subsection 27.A. of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle
President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

Appendix 27-A

| | 2011 Monthly Premium Equivalent Rates | 2011 Monthly Crew Contribution | % of Premium Equivalent |
|---|---|---|---|
| **Medical Open Access Plus (PPO)** | | | |
| Single | $618.45 | $154.61 | 25.0% |
| Employee +1 | $1,236.91 | $309.23 | 25.0% |
| Family | $1,855.37 | $463.84 | 25.0% |
| **Medical Open Access Plus In Network (EPO)** | | | |
| Single | $661.07 | $125.60 | 19.0% |
| Employee +1 | $1322.13 | $251.20 | 19.0% |
| Family | $1983.20 | $376.81 | 19.0% |
| **Medical HMO (EPP)** | | | |
| Single | $588.95 | $111.90 | 19.0% |
| Employee +1 | $1,177.90 | $223.80 | 19.0% |
| Family | $1,766.95 | $335.72 | 19.0% |
| **Medical – Out of Area (OOA)** | | | |
| Single | $630.83 | $88.32 | 14% |
| Employee +1 | $1,261.65 | $176.63 | 14% |
| Family | $1,892.47 | $264.95 | 14% |
| **Medical – Safety Net (Catastrophic)** | | | |
| Single | $562.08 | N/A | N/A |
| Employee +1 | $1,124.16 | N/A | N/A |
| Family | $1,686.22 | N/A | N/A |
| **Dental PPO** | | | |
| Single | $38.29 | $11.49 | 30.0% |
| Employee +1 | $76.58 | $22.97 | 30.0% |
| Family | $114.87 | $34.48 | 30.0% |
| **Dental HMO** | | | |
| Single | $24.02 | $4.80 | 20.0% |
| Employee +1 | $41.85 | $8.37 | 20.0% |
| Family | $70.76 | $14.15 | 20.0% |
| **Vision** | | | |
| Single | $7.96 | $5.54 | 69.6% |

| Employee +1 | $11.47 | $8.78 | 76.5% |
| Family | $20.57 | $15.72 | 76.4% |

Appendix 27-B

| PPO Medical Benefits | |
|---|---|
| **Benefit** | **New Plan** |
| Eligibility | Class of Eligible employees, full time, etc. |
| Waiting Period | 1st of the month after hire |
| Dependent Eligibility | The day you become eligible yourself or the day you acquire your first dependent |
| Eligibility Effective Date | 1st of the month after hire |
| Effective Date of Dependent Insurance | the day you sign the election |
| Lifetime Maximum | Unlimited |
| Co-Insurance In-network | 90% (D) |
| Co-Insurance Out-of-network | 70% (D) |
| Maximum Reimburseable Charge In-network | $1000 per person $3000 per family |
| Maximum Reimburseable Charge Out-of-network | $3000 per person $9000 per family |
| Calendar Year Deductible In-network | $300 per person $900 per family |
| Calendar Year Deductible Out-of-network | $500 per person $1500 per family |
| **Physician Services** | |
| Copay office visit in-network | $20 |
| Co-insurance office visit out of network | 70% (D) |
| **Specialist Services** | |
| Copay office visit in-network | $30 |
| Co-insurance out of network | 70% (D) |
| Surgery performed in office In network | $20 PCP $30 Spec |
| Surgery performed in office out network | 70% (D) |
| Second Opinion In network | $20 PCP $30 Spec |
| Second Opinion Out of network | 70% (D) |
| **Allergy Treatment/Injections Co-pay** | $20 PCP $30 Spec |
| Allergy Serum | No Charge |
| Allergy Out of Network Co-insurance | 70% (D) |
| **Preventative Care** | |
| Physicians Office Visit | $20 PCP $30 Spec |

| PPO Medical Benefits | |
|---|---|
| **Benefit** | **New Plan** |
| Physician Office Visit out of network co-insurance | 70% (D) |
| Immunizations | No Charge |
| Imm. Out of Network co-insurance | 70% (D) |
| Mammograms | No Charge |
| Mammograms out of network co-insurance | 70% (D) |
| Pap Smear | No Charge |
| **In patient Hospital facility - in-network** | $75 copay 90% (D) |
| In patient Hospital - out of network | $75 copay 70% (D) |
| Outpatient facility services | $75 copay 90% (D) |
| Outpatient facility services Out of Network | $75 copay 70% (D) |
| In patient hospital physicians visits | 90% (D) in network 70% (D) out of network |
| In patient hospital professional services | 90% (D) in network 70%(D) out of network |
| Outpatient professional services | 90% (D) in network 70%(D) out of network |
| **Emergency and Urgent Care** | |
| Physicians office visit in-network | $20 PCP $30 Spec |
| Physicians office visit out of network | $20 PCP $30 Spec |
| ER Room | $75 copay 90% (D) |
| ER Room out of network | $75 copay 90% (D) |
| Urgent Care Facility | $75 copay 90% (D) |
| Urgent Care Fac Out of Network | $75 copay 90% (D) |
| X-ray performed at ER | No Charge |
| Independent X-ray in conjunction with ER in network and out of network | 90% (D) |
| **In patient services at other health care facility** | 90% (D) in network 70% (D) out of network |
| **Lab and Radiology including pre-admission testing** | 90% (D) in network 70% (D) out of network |
| Other labs and rads | $20 PCP $30 Spec 90% (D) in network or 70% (D) out of network |

| PPO Medical Benefits | |
|---|---|
| **Benefit** | **New Plan** |
| **Outpatient short term rehab therapy and chiropractice services** | $20 PCP $30 Spec 70% (D) out of network |
| **Home health care** | 90% (D) in network 70% (D) out of network |
| **Hospice** | 90% (D) in network 70% (D) out of network |
| **Bereavement counseling** | 90% (D) in network 70% (D) out of network |
| **Maternity care services and physicians office visits** | $20 PCP $30 Spec 70% out of network |
| Delivery Facility | 75 copay 90% (D) |
| Delivery Fac Out of network | 75 copay 70% (D) |
| **Abortion** | $20 PCP $30 Spec 70% out of network |
| Inpatient Facility In network | $75 copay 90% (D) |
| Inpatient Facility out of network | $75 copay 70% (D) |
| Outpatient Facility In network | $75 copay 90% (D) |
| Outpatient Facility Out of network | $75 copay 70% (D) |
| **Family Planning Services** | $20 PCP $30 Spec 70% out of network |
| Sterilization In patient facility in network | $75 copay 90% (D) |
| Sterilization In patient facility out of network | $75 copay 70% (D) |
| Sterilization Outpatient Facility In network | $75 copay 90% (D) |
| Sterilization Outpatient Facility Out of network | $75 copay 70% (D) |
| Sterilization Physicians Office Visit In network | $20 PCP $30 Spec 70% (D) out of network |
| **Infertility Treatment Physician Office Visit In Network** | $20 PCP $30 Spec 70% (D) out of network |
| Infertility Facility In patient | $75 copay 90% (D) |
| Infertility Facil Out of network | $75 copay 70% (D) |
| Infert Outpatient Facility | $75 copay 90% (D) |
| Infer Outpatient Fac Out of network | $75 copay 70% (D) |
| **Organ Transplant Physicians Office Visit In network** | $20 PCP $30 Spec 70% (D) out of network |

| PPO Medical Benefits | |
|---|---|
| **Benefit** | **New Plan** |
| Organ Transplant Inpatient Facility Physician's Office Visit | $75 copay or $ 75 copay 90% (D) |
| Organ Transplant Inpatient Facility Out of network | $75 copay 70% (D) |
| **Durable Medical Equipment** | 90% (D) in network 70% (D) out of network |
| **External Prosthetic Appliances** | 90% (D) Calendar Year max = 1000  70% (D) out of network |
| **Nutritional Eval Physician office** | $20 PCP $30 Spec       70% (D) out of network |
| NE Inpatient Fac | $75 copay 90% (D) |
| NE Inpatient Fac Out of network | $75 copay 70% (D) |
| NE Outpatient Fac | $75 copay 90% (D) |
| NE Outpatient Fac Out of network | $75 copay 70% (D) |
| **Dental Plan** | $20 PCP $30 Spec       70% (D) out of network |
| Dental Inpatient Facility | $75 copay 90% (D) |
| Dental Outpatient Facility | $75 copay 70% (D) |
| Dental physicians services | 90% (D)           70% (D) |
| **Bariatric surgery in-network only** | $20 PCP/$30 Spec |
| In patient facility charges | $75 copay 90% (D) |
| Outpatient facility charges | $75 copay 90% (D) |
| Physician's services | 90% (D) |
| **Routine Food Disorders** | Not covered |
| **Mental Health** | Will conform to mental health parity |
| **Substance Abuse** | |
| In patient | $75 copay 90% (D)      $75 copay 70% (D) |
| SA Outpatient  office visits | $30 copay |
| **Prescription Drug** | |
| Generic | $7 in network 30% out of network |
| Formulary | $25 in network 30% out of network |
| Non-Formulary | $40 in network 30% out of network |
| Mail Order Generic | $14 in network coverage only |
| Mail Order Formulary | $50 in network coverage only |
| Mail Order Non-Formulary | $80 in network coverage only |

| PPO Medical Benefits | |
|---|---|
| **Benefit** | **New Plan** |
| Covered expenses | See SPD |
| Limitations | See SPD |
| Exclusions | See SPD |
| Expenses not covered in general limitations | See SPD |
| Pre-existing conditions limitations | Will conform to mental health parity |
| Pre-existing condition | Will conform to mental health parity |
| Exceptions to pre-existing condition limitations. | Will conform to mental health parity |

| EPO MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| Eligibility | Class of Eligible employees, full time, etc. |
| Waiting Period | 1st of the month after hire |
| Dependent Eligibility | The day you become eligible yourself or the day you acquire your first dependent |
| Eligibility Effective Date | 1st of the month after hire |
| Effective Date of Dependent Insurance | the day you sign the election |
| Lifetime Maximum | Unlimited |
| Co-Insurance In-network | 95% (D) |
| Out of Pocket Maximums | 1500/4500 |
| Calendar Year Deductible In-network | 300/900 |
| **Physician Services** | |
| PCP office visit | $20 copay |
| Specialist | $30 copay |
| Surgery performed in office In network | $20 PCP $30 Spec |
| Second Opinion In | $20 PCP $30 Spec |
| **Allergy Treatment/Injections** | $20 PCP $30 Spec |
| Allergy Serum | No Charge |
| **Preventative Care** | $20 PCP $30 Spec |
| Immunizations | No Charge |
| Mammo/Pap | 95% (D) |
| **In patient Hospital facility** | $75 copay 95% (D) |
| Outpatient facility services | $75 copay 95% (D) |
| Inpatient hospital physicians visits | No Charge |
| Outpatient professional services | No Charge |
| **Emergency and urgent care** | $20 PCP $30 Spec |
| ER Room | $75 copay 95% (D) |
| Outpatient Professional services | 95% (D) |
| Urgent Care Facility | $50 copay (D) |

| EPO MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| Lab and radiology services with ER | 95% (D) |
| Independent X-ray with ER | 95 % (D) |
| In patient services | 95% (D) |
| **Lab and Radiology including pre-admission testing** | $75 copay 95% (D) |
| Phys Office Visit Labs & Rad | $20 PCP $30 Spec |
| **Outpatient short term rehab therapy and chiropractice services** | $20 PCP $30 Spec |
| **Home Health Care** | 95% (D) |
| **Hospice** | 95% (D) |
| **Bereavement counsel** | 95% (D) |
| **Maternity care services and physicians office visits** | $20 PCP $30 Spec |
| Delivery Facility | $75 copay 95% (D) |
| **Abortion** | $20 PCP $30 Spec |
| Inpatient facility | $75 copay 95% (D) |
| Outpatient Facility | $75 copay 95% (D) |
| Family Planning Services | $20 PCP $30 Spec |
| **Sterilization** | |
| Inpatient Facility | $75 copay 95% (D) |
| Outpatient Facility | $75 copay 95% (D) |
| Phys. Office Visit | $20 PCP $30 Spec |
| Infertility Phys Office Visit | $20 PCP $30 Spec |
| Infertility Facility IN patient | $75 copay 95% (D) |
| Infert Outpatient Facility | $75 copay 95% (D) |
| **Organ Trans Physic Office Visit** | $20 PCP $30 Spec |
| Organ Trans Inpatient Facility | $75 copay 95% (D) |
| **Durable medical equipment** | 95% (D) |
| **External prosthetic appliances** | 95% (D) |
| **Nutritional Evaluation Physician office** | $20 PCP $30 Spec |
| NE Inpatient Fac | $75 copay 95% (D) |
| NE Outpatient Fac | $75 copay 95% (D) |

| EPO MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| **Dental Office Visit** | $20 PCP $30 Spec |
| **Inpatient Facility** | $75 copay 95% (D) |
| **Outpatient Facility** | $75 copay 95% (D) |
| **Bariatric Surgery** | $20 PCP $30 Spec Phys. Services |
| Inpatient Facility | $75 copay 95% (D) |
| Outpatient Facility | $75 copay 95% (D) |
| **Mental Health** | Mental Health Parity |
| **Substance Abuse Inpatient** | $75 copay 95% (D) |
| SA Outpatient | $30 copay 60 visits |
| Intensive outpatient | $75 copay 95% (D) |
| **Prescription Drug** | |
| Generic | $7 |
| Formulary | $25 |
| Non-Formulary | $40 |
| Mail Order Generic | $14 |
| Mail Order Formulary | $50 |
| Mail Order Non-Formulary | $80 |
| **Covered expenses** | See SPD |
| **Limitations** | See SPD |
| **Exclusions** | See SPD |
| **Expenses not covered in general limitations** | See SPD |
| **Pre-existing conditions limitations** | Will conform to Health Care Reform |
| **Pre-existing condition** | Will conform to Health Care Reform |
| **Exceptions to pre-existing condition limitations.** | Will conform to Health Care Reform |

| EPP MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| **Eligibility** | Class of Eligible employees, full time, etc. |
| **Waiting Period** | 90 days |
| **Dependent Eligibility** | The day you become eligible yourself or the day you acquire your first dependent |
| **Eligibility Effective Date** | 90 day waiting period |
| **Effective Date of Dependent Insurance** | 90 day waiting period |
| **Lifetime Maximum** | Unlimited |
| **Co-Insurance In-network** | 100% |
| **Out of Pocket Maximums** | 1500/3000 |
| **Calendar Year Deductible In-network** | NA |
| **Physician Services:** | |
| PCP office visit | 10 |
| Specialist | 10 |
| Surgery performed in office In network | 10 PCP 10 SPEC |
| Second Opinion In Network | 10 PCP 10 SPEC |
| Allergy Treatment/Injections | 10 PCP 10 SPEC |
| Allergy Serum | Same |
| **Preventative Care** | 10 PCP 10 SPEC |
| Immunizations | 10 |
| Imm. Out of Network | NA |
| Mammo/Pap | No Charge |
| **Facility Services:** | |
| In patient Hospital facility | No Charge |
| Outpatient facility services | No Charge |
| Inpatient hospital physicians visits | No Charge |
| Outpatient professional services | No Charge |
| emergency and urgent care | 10 PCP 10 Spec |
| ER Room | 50 copay |
| Outpatient Professional services | No Charge |
| Urgent Care Facility | 50 copay |

| EPP MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| **Lab and radiology services:** | |
| Independent X-ray | No Charge |
| In patient services | No Charge |
| Lab and Radiology including pre-admission testing | No Charge |
| Phys Office Visit Labs & Rad | No Charge |
| **Other Services:** | **Subject to coverage limits** |
| Outpatient short term rehab therapy and chiropractice services | 10 PCP 10 Spec |
| home health care | No Charge |
| hospice | No Charge |
| bereavement counsel | No Charge |
| maternity care services and phsicians office visits | 10 PCP 10 Spec |
| Delivery Facility | No Charge |
| Abortion | 10 PCP 10 Spec |
| Inpatient facility | No Charge |
| Outpatient Facility | No Charge |
| | |
| **Family Planning Services** | **Subject to coverage limits** |
| Phys. Office Visit | 11 PCP 10 Spec |
| Sterilization: | Subject to coverage limits |
| Inpatient Facility | No Charge |
| Outpatient Facility | No Charge |
| Phys. Office Visit | 10 PCP 10 Spec |
| Infertility Phys Office Visit | 10 PCP 10 Spec |
| Infertility Facility In patient | No Charge |
| Infertility Outpatient Facility | No Charge |
| **Organ Transplant:** | **Subject to coverage limits** |
| Organ Trans Physic Office Visit | 10 PCP 10 Spec |
| Organ Trans Inpatient Facility | No Charge |
| **Other** | **Subject to coverage limits** |
| Durable medical equipment | No Charge (subject to calendar year maximum) |

| EPP MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| External prosthetic appliances | No Charge (subject to calendar year maximum) |
| External breast prothesis | No Charge (subject to calendar year maximum) |
| Nutritional Eval Physician office | 10 PCP 10 Spec |
| NE Inpatient Fac | No Charge |
| NE Outpatient Fac | No Charge |
| Dental Office Visit | 10 PCP 10 Spec |
| Inpatient Facility | No Charge |
| Outpatient Facility | No Charge |
| **Bariatric Surgery** | Subject to coverage limits |
| Inpatient Facility | No Charge |
| Outpatient Facility | No Charge |
| Phys. Svcs. | 10 PCP; 10 Spec |
| **Other:** | |
| Acupuncture | 10 PCP 10 Spec |
| Mental Health | Subject to Mental Health Parity |
| Substance Abuse Inpatient | Subject to Mental Health Parity |
| SA Outpatient | Subject to Mental Health Parity |
| Intensive outpatient | Subject to Mental Health Parity |
| Detox | Subject to Mental Health Parity |
| **Prescription Drug:** | |
| Generic | 5 |
| Formulary | 15 |
| Non-Formulary | 15 |
| Mail Order Generic | 10 |
| Mail Order Formulary | 30 |
| Mail Order Non-Formulary | 30 |
| **Covered expenses** | See SPD |
| **Limitations** | See SPD |

| EPP MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| **Exclusions** | See SPD |
| **Expenses not covered in general limitations** | See SPD |
| **Pre-existing conditions limitations** | Subject to Health Care Reform |
| **Pre-existing condition** | Subject to Health Care Reform |
| **Exceptions to pre-existing condition limitations.** | Subject to Health Care Reform |

| OOA MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| Eligibility | Class of Eligible employees, full time, etc. |
| Waiting Period | 1st of the month after hire |
| Dependent Eligibility | The day you become eligible yourself or the day you acquire your first dependent |
| Eligibility Effective Date | 1st of the month after hire |
| Effective Date of Dependent Insurance | the day you sign the election |
| **Lifetime Maximum** | Unlimited |
| **Co-Insurance** | 80% |
| **Out of Pocket Maximums** | 1000/3000 |
| **Calendar Year Deductible** | 300/900 |
| **Physician Services** | |
| PCP office visit | 80% (D) |
| Specialist | 80% (D) |
| Surgery performed in office In network | 80% (D) |
| Second Opinion In | 80% (D) |
| **Allergy Treatment/Injections** | 80% (D) |
| Allergy Serum | 80% (D) |
| **Preventative Care** | 80% (D) |
| Immunizations | 80% (D) |
| Mammo/Pap | 80% (D) |
| **In patient Hospital facility** | 80% (D) |
| Outpatient facility services | 80% (D) |
| In patient hospital physicians visits | 80% (D) |
| Outpatient professional services | 80% (D) |
| **Emergency and Urgent Care** | 80% (D) |
| ER Room | 80% (D) |
| Outpatient Professional | 80% (D) |

| OOA MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| services | |
| Urgent Care Facility | 80% (D) |
| lab and radiology services | 80% (D) |
| Independent X-ray | 80% (D) |
| In patient services | 80% (D) |
| **Lab and Radiology including pre-admission testing** | 80% (D) |
| Phys Office Visit Labs & Rad | 80% (D) |
| **Outpatient short term rehab therapy and chiropractice services** | 80% (D) |
| **Home Health Care** | 80% (D) |
| **Hospice** | 80% (D) |
| **Bereavement Counseling** | 80% (D) |
| **Maternity care services and physicians office visits** | 80% (D) |
| Delivery Facility | 80% (D) |
| **Abortion** | 80% (D) |
| Inpatient facility | 80% (D) |
| Outpatient Facility | 80% (D) |
| Family Planning Services | 80% (D) |
| **Sterilization** | 80% (D) |
| Inpatient Facility | 80% (D) |
| Outpatient Facility | 80% (D) |
| Phys. Office Visit | 80% (D) |
| Infertility Phys Office Visit | 80% (D) |
| Infertility Facility IN patient | 80% (D) |
| Infert Outpatient Facility | 80% (D) |
| **Organ Trans Physic Office Visit** | 80% (D) |
| Organ Trans Inpatient Facility | 80% (D) |
| **Durable medical equipment** | 80% (D) |
| **External prosthetic appliances** | 80% (D) |

| OOA MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| **Nutritional Eval Physician office** | 80% (D) |
| NE Inpatient Fac | 80% (D) |
| NE Outpatient Fac | 80% (D) |
| **Dental Office Visit** | 80% (D) |
| Inpatient Facility | 80% (D) |
| Outpatient Facility | 80% (D) |
| **Bariatric Surgery** | 80% (D) |
| Acupuncture | 80% (D) |
| **Mental Health** | Mental Health Parity |
| **Substance Abuse Inpatient** | 80% (D) |
| SA Outpatient | 80% (D) |
| Intesive outpatient | 80% (D) |
| **Prescription Drug** | 80% (D) |
| Generic | $10 in network; 20% coinsurance out of network |
| Formulary | $20 in network; 20% coinsurance out of network |
| Non-Formulary | $20 in network; 20% coinsurance out of network |
| Mail Order Generic | $20 |
| Mail Order Formulary | $40 |
| Mail Order Non-Formulary | $40 |
| **Covered expenses** | See SPD |
| **Limitations** | See SPD |
| **Exclusions** | See SPD |
| **Expenses not covered in general limitations** | See SPD |
| **Pre-existing conditions limitations** | Will comply to Health Care Reform |
| **Pre-existing condition** | Will comply to Health Care Reform |
| **Exceptions to pre-existing condition limitations.** | Will comply to Health Care Reform |

| CAT MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| Eligibility | Class of Eligible employees, full time, etc. |
| Waiting Period | 1st of the month after hire |
| Dependent Eligibility | The day you become eligible yourself or the day you acquire your first dependent |
| Eligibility Effective Date | 1st of the month after hire |
| Effective Date of Dependent Insurance | the day you sign the election |
| **Lifetime Maximum** | Unlimited |
| **Co-Insurance** | 100% |
| **Out of Pocket Maximums** | NA |
| **Calendar Year Deductible** | 3500/10000 |
| **Physician Services** | |
| PCP office visit | 100% (D) |
| Specialist | 100% (D) |
| Surgery performed in office In network | 100% (D) |
| Second Opinion In | 100% (D) |
| **Allergy Treatment/Injections** | 100% (D) |
| Allergy Serum | 100% (D) |
| **Preventative Care** | 100% (D) |
| Immunizations | 100% (D) |
| Mammo/Pap | 100% (D) |
| **In patient Hospital facility** | 100% (D) |
| Outpatient facility services | 100% (D) |
| In patient hospital physicians visits | 100% (D) |
| outpatient professional services | 100% (D) |
| **Emergency and Urgent Care** | 100% (D) |
| ER Room | 100% (D) |
| Outpatient Professional services | 100% (D) |
| Urgent Care Facility | 100% (D) |
| lab and radiology services | 100% (D) |
| Independent X-ray | 100% (D) |
| In patient services | 100% (D) |

| CAT MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| **Lab and Radiology inculding pre-admission testing** | 100% (D) |
| Phys Office Visit Labs & Rad | 100% (D) |
| **Out patient short term rehab therapy and chiropractice services** | 100% (D) |
| **Home Health Care** | 100% (D) |
| **Hospice** | 100% (D) |
| **Bereavement Counseling** | 100% (D) |
| **Maternity care services and phsicians office visits** | 100% (D) |
| Delivery Facility | 100% (D) |
| **Abortion** | 100% (D) |
| Inpatient facility | 100% (D) |
| Outpatient Facility | 100% (D) |
| Family Planning Services | 100% (D) |
| **Sterilization** | 100% (D) |
| Inpatient Facility | 100% (D) |
| Outpatient Facility | 100% (D) |
| Phys. Office Visist | 100% (D) |
| Infertility Phys Office Visit | 100% (D) |
| Infertility Facility IN patient | 100% (D) |
| Infert Outpatient Facility | 100% (D) |
| **Organ Trans Physic Office Visit** | 100% (D) |
| Organ Trans Inpatient Facility | 100% (D) |
| **Durable medical equipment** | 100% (D) |
| **External prosthetic appliances** | 100% (D) |
| **Nutritional Eval Physician office** | 100% (D) |
| NE Inpatient Fac | 100% (D) |
| NE Outpatient Fac | 100% (D) |
| **Dental Office Visit** | 100% (D) |
| Inpatient Facility | 100% (D) |
| Outpatient Facility | 100% (D) |
| **Bariatric Surgery** | 100% (D) |

| CAT MEDICAL BENEFITS | |
|---|---|
| **Benefit** | **New Plan** |
| Acupuncture | 100% (D) |
| **Mental Health** | Will comply with Mental Health Parity |
| **Substance Abuse Inpatient** | 100% (D) |
| SA Outpatient | 100% (D) |
| Intesive outpatient | 100% (D) |
| Detox | 100% (D) |
| **Prescription Drug** | 100% (D) |
| Generic | $10 in network |
| Formulary | $20 in network |
| Non-Formulary | $20 in network |
| Mail Order Generic | $20 in network |
| Mail Order Formulary | $40 in network |
| Mail Order Non-Formulary | $40 in network |
| **Covered expenses** | See SPD |
| **Limitations** | See SPD |
| **Exclusions** | See SPD |
| **Expenses not covered in general limitations** | See SPD |
| **Pre-existing conditions limitations** | Will comply with Health Care Reform |
| **Pre-existing condition** | Will comply with Health Care Reform |
| **Exceptions to pre-existing condition limitations.** | Will comply with Health Care Reform |

Appendix 27-C

LIFE INSURANCE COMPANY OF NORTH AMERICA
1601 CHESTNUT STREET                                      GROUP POLICY
PHILADELPHIA, PA 19192-2235
(800) 732-1603 TDD (800) 552-5744
**A STOCK INSURANCE COMPANY**

| | |
|---|---|
| **POLICYHOLDER:** | TRUSTEE OF THE GROUP INSURANCE TRUST FOR EMPLOYERS IN THE TRANSPORTATION AND PUBLIC UTILITIES INDUSTRY |
| **SUBSCRIBER:** | Polar Air Cargo |
| **POLICY NUMBER:** | LK-970013 |
| **POLICY EFFECTIVE DATE:** | April 1, 2002 |
| **POLICY ANNIVERSARY DATE:** | April 1 |

This Policy describes the terms and conditions of coverage. It is issued in Delaware and shall be governed by its laws. The Policy goes into effect on the Policy Effective Date, 12:01 a.m. at the Policyholder's address.

In return for the required premium, the Insurance Company and the Policyholder have agreed to all the terms of this Policy.

*Robert J. Upton*

Robert J. Upton, Secretary

*Michael W. Bell*

Michael W. Bell, President

TL-004710                                                          97 s-2

## TABLE OF CONTENTS

SCHEDULE OF BENEFITS .......................................................... 3

SCHEDULE OF BENEFITS FOR CLASS 1 ............................................ 4

ELIGIBILITY FOR INSURANCE ..................................................... 7

EFFECTIVE DATE OF INSURANCE ................................................. 7

TERMINATION OF INSURANCE .................................................... 7

CONTINUATION OF INSURANCE ................................................... 8

DESCRIPTION OF BENEFITS ....................................................... 8

EXCLUSIONS ................................................................... 14

CLAIM PROVISIONS ............................................................. 14

ADMINISTRATIVE PROVISIONS ................................................... 17

GENERAL PROVISIONS .......................................................... 18

DEFINITIONS ................................................................... 19

## SCHEDULE OF BENEFITS

**Premium Due Date**        Premiums are due in advance on the date coinciding with the day of the
Policy Anniversary Date or the last day of the month, if earlier.

**Classes of Eligible Employees**

Class 1  All active, Full-time Pilots in Command, First Officers and Flight Engineers of Polar Air Cargo.

3

## SCHEDULE OF BENEFITS FOR CLASS 1

**Eligibility Waiting Period**

| | |
|---|---|
| For Employees hired on or before the Policy Effective Date: | The first of the month on or after 90 days of Active Service |
| For Employees hired after the Policy Effective Date: | The first of the month on or after 90 days of Active Service |

**Definition of Disability/Disabled**

An Employee is Disabled if, solely because of Injury or Sickness, the following conditions are met.

1. An Employee's license, permit or certification necessary to perform the duties of his or her regular occupation is revoked, restricted or involuntarily not renewed; and

2. An Employee is earning 80% or less of his or her Indexed Covered Earnings.

Or, an Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties of his or her regular occupation, and solely due to Injury or Sickness is unable to earn more than 60% of his or her Indexed Covered Earnings.

**Definition of Covered Earnings**

Covered Earnings means the monthly equivalent of an Employee's prior year's W-2 wages or his or her hourly rate multiplied by the minimum number of annual hours under the applicable Airline Pilots Association (ALPA) agreement, whichever is greater. It includes any salary reduction or deferral amounts contributed to a qualified 401 (k) plan or Section 125 cafeteria plan (such as flexible spending accounts or health plan premium contributions). A change in the amount of Covered Earnings is effective on March 1 each year, if the Employer gives us written notice of the change and the required premium is paid.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

**Definition of Basic Coverage**

Basic Coverage is the basic insurance coverage provided to eligible Employees by the Employer at no cost to the Employee. Basic Coverage provides Disability Benefits for a period of 24 months.

**Definition of Optional Coverage - Effective June 1, 2002**

Optional Coverage is the option to purchase additional coverage beyond the Basic Coverage. If the Employee elects this option, his or her Disability Benefits will be extended by an additional 12 months.

**Benefit Waiting Period**

| | |
|---|---|
| Basic Coverage: | 120 days |
| Optional Coverage: | 120 days |

A period of Disability is continuous even if the Employee can return to Active Service for up to 20 days during the Benefit Waiting Period. The length of the Benefit Waiting Period will not be extended by the number of days the Employee can return to Active Service.

4

**Disability Benefit**

| | |
|---|---|
| Basic Coverage: | 60% |
| Optional Coverage: | 60% |

The lesser of the percent of an Employee's monthly Covered Earnings listed above, rounded to the nearest dollar, or the Maximum Disability Benefit, reduced by any Other Income Benefits.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for dependents, or which the Employee's dependents receive because of the Employee's entitlement to Other Income Benefits.

**Maximum Disability Benefit**

| | |
|---|---|
| Basic Coverage: | $10,000 per month |
| Optional Coverage: | $10,000 per month |

**Minimum Disability Benefit**

| | |
|---|---|
| Basic Coverage: | $100 per month |
| Optional Coverage: | $100 per month |

*Work Incentive Benefits*

For the first 12 months the Employee is eligible for a Disability Benefit, the Disability Benefit is as figured above. If for any month during this period, the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 100% of his or her Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount.

After the first 12 months, the Disability Benefit is as figured above, reduced by 50% of his or her current earnings received during any month he or she returns to work. If the sum of the Employee's Disability Benefit, current earnings and any additional Other Income Benefits exceeds 80% of his or her monthly Indexed Covered Earnings, the Disability Benefit will be reduced by the excess amount figured above.

No Disability Benefits will be paid if the Insurance Company determines the Employee is able to work under a Transitional Work Arrangement or other modified work arrangement and he or she refuses to do so.

Current earnings include any wage or salary for work performed while Disability Benefits are payable. If an Employee is working for another employer on a regular basis when Disability begins, current earnings will include any increase in the amount he or she earns from this work during the period for which Disability Benefits are payable.

**Additional Benefits**

*Survivor Benefit*

| | |
|---|---|
| Benefit Waiting Period: | After 6 Monthly Benefits are payable. |
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus any current earnings by which the Disability Benefit was reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 6 monthly Survivor Benefits. |

5

**Maximum Benefit Period - Basic Coverage**

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 65 or under | 2 years |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 | The date the 12th Monthly Benefit is payable. |
| Age 70 or older | The date the 12th Monthly Benefit is payable. |

**Maximum Benefit Period - Optional Coverage**

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 65 or under | 3 years |
| Age 66 | The date the 33rd Monthly Benefit is payable. |
| Age 67 | The date the 30th Monthly Benefit is payable. |
| Age 68 | The date the 27th Monthly Benefit is payable. |
| Age 69 | The date the 24th Monthly Benefit is payable. |
| Age 70 or older | The date the 18th Monthly Benefit is payable. |

**Initial Premium Rates**

**Basic Coverage**      $1.22 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $16,667.

**Optional Coverage**

The Monthly Premium for each Employee is based on the Employee's Age and amount of Covered Payroll. The Monthly Rates per $100 of Covered Payroll are listed below.

| AGE | RATE | AGE | RATE |
|---|---|---|---|
| Under age 35 | $.13 | 50-54 | $.50 |
| 35-39 | $.18 | 55-59 | $.92 |
| 40-44 | $.26 | 60-64 | $1.52 |
| 45-49 | $.40 | 65 and over | $1.77 |

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $16,667.

TL-004771.0 (078012)

6

## ELIGIBILITY FOR INSURANCE

An Employee in one of the Classes of Eligible Employees shown in the Schedule of Benefits is eligible to be insured on the Policy Effective Date, or the day after he or she completes the Eligibility Waiting Period, if later. The Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage. It will be extended by the number of days the Employee is not in Active Service.

Except as noted in the Reinstatement Provision, if an Employee terminates coverage and later wishes to reapply, or if a former Employee is rehired after 6 months, or if a furloughed Employee is rehired after 4 years, a new Eligibility Waiting Period must be satisfied. A former Employee is not required to satisfy a new Eligibility Waiting Period if he or she is rehired within 6 months or if an Employee's insurance ends because he or she is no longer in a Class of Eligible Employees, but continues to be employed and within one year becomes a member of an eligible class.

TL-004710 (FFR013)

## EFFECTIVE DATE OF INSURANCE

An Employee will be insured on the date he or she becomes eligible, if the Employee is not required to contribute to the cost of this insurance.

An Employee who is required to contribute to the cost of this insurance may elect to be insured only by authorizing payroll deduction in a form approved by the Employer and the Insurance Company. The effective date of this insurance depends on the date coverage is elected.

Insurance for an Employee who applies for coverage within 31 days after he or she becomes eligible or within 31 days after a Life Status Change, is effective on the latest of the following dates.
1.   The Policy Effective Date.
2.   The date payroll deduction is authorized.
3.   The date the Employer or Insurance Company receives the completed enrollment form.

If an Employee's enrollment form is received more than 31 days after he or she is eligible for this insurance, the Insurability Requirement must be satisfied before this insurance is effective. If approved, this insurance is effective on the date the Insurance Company agrees in writing to insure the Employee.

If an Employee is not in Active Service on the date insurance would otherwise be effective, it will be effective on the date he or she returns to any occupation for the Employer on a Full-time basis.

TL-004712

## TERMINATION OF INSURANCE

The insurance on an Employee will end on the earliest date below.
1.   The date the Employee is eligible for coverage under a plan intended to replace this coverage.
2.   The date the Policy is terminated.
3.   The date the Employee is no longer in an eligible class.
4.   The day after the period for which premiums are paid.
5.   The date the Employee is no longer in Active Service.

TL-004714

7

## CONTINUATION OF INSURANCE

Disability Insurance continues if an Employee's Active Service ends due to a Disability for which benefits under the Policy are or may become payable. Premiums for the Employee will be waived while Disability Benefits are payable. If the Employee does not return to Active Service, this insurance ends when the Disability ends or when benefits are no longer payable, whichever occurs first.

If an Employee's Active Service ends due to an Employer approved unpaid leave of absence, insurance for that Employee will continue as follows if the required premium is paid.
1.   for medical leave or family medical leave, up to 6 months*;
2.   for medical/workers' compensation, unlimited;
3.   for pregnancy (CA), up to 4 months;
4.   for military leave of absence, up to 180 days;
5.   for personal leave of absence, up to 60 days;
6.   for Furlough, up to 3 months*.

*Coverage to the end of the first day of the month coincident with or next following the end of the specified leave; otherwise, coverage terminates immediately on the date the Employee is not an active, full-time Employee.

If an Employee's insurance is continued and he or she becomes Disabled during the leave of absence, Disability Benefits will not begin until the later of the following dates.
1.   the date the Benefit Waiting Period is satisfied
2.   the date the Employee was scheduled to return to Active Service

TL-004753 (070012)

## DESCRIPTION OF BENEFITS

The following provisions explain the benefits available under the Policy. Please see the Schedule of Benefits for the applicability of these benefits to each class of Insureds.

### Disability Benefits
The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. A Disabled Employee must satisfy the Benefit Waiting Period and be under the Appropriate Care of a Physician. Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.

The Insurance Company will require continued proof of the Employee's Disability for benefits to continue.

### Benefit Waiting Period
The Benefit Waiting Period is the period of time an Employee must be continuously Disabled before Disability Benefits may be payable. The Benefit Waiting Period is shown in the Schedule of Benefits.

The Insurance Company will waive the Benefit Waiting Period for an Employee if benefits under a Prior Plan were payable on the Policy Effective Date and the Employee returns to Active Service within 6 months after that date. The return to Active Service must be for more than 14 consecutive days but less than 6 months. The later Disability must be caused by the same or related causes for the Benefit Waiting Period to be waived.

8

**Termination of Disability Benefits**

Disability Benefits will end on the earliest of the following dates.

1.  The date an Employee earns more than the percentage of his or her Indexed Covered Earnings which is used to determine if an Employee is Disabled
2.  The date the Insurance Company determines an Employee is not Disabled
3.  The end of the Maximum Benefit Period
4.  The date an Employee dies
5.  The date the Employee refuses to participate in rehabilitation efforts as required by the Insurance Company
6.  The date the Employee is no longer receiving Appropriate Care

**Successive Periods of Disability**

Once an Employee is eligible to receive Disability Benefits under the Policy, separate periods of Disability resulting from the same or related causes are a continuous period of Disability unless the Employee returns to Active Service for more than 6 consecutive months.

A period of Disability is not continuous if separate periods of Disability result from unrelated causes or the later Disability occurs after coverage under the Policy ends.

The Successive Periods of Disability provision will not apply if an Employee is eligible for coverage under a plan that replaces this Policy.

**Mental Illness, Alcoholism and Drug Abuse Limitation**

The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.

1.  Alcoholism
2.  Anxiety disorders
3.  Delusional (paranoid) disorders
4.  Depressive disorders
5.  Drug addiction or abuse
6.  Eating disorders
7.  Mental illness
8.  Somatoform disorders (psychosomatic illness)

If, before reaching the lifetime maximum benefit, an Employee is confined in a hospital for more than 14 consecutive days, that period of confinement will not count against the lifetime limit. The confinement must be for the Appropriate Care of any of the conditions listed above.

**Pre-Existing Condition Limitation**

The Insurance Company will not pay Disability Benefits for any period of Disability caused by or contributed to by, or resulting from, a Pre-Existing Condition. A "pre-existing condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a physician within 3 months before his or her most recent effective date of insurance.

The Pre-Existing Condition Limitation will apply to any added benefits or increases in benefits under this plan. If an Employee is now covered for benefits in excess of a Prior Plan's coverage, the Pre-Existing Condition Limitation will apply to the excess amount. It will not apply to a period of Disability that begins after an Employee is in Active Service for at least 12 months after his or her most recent effective date of insurance or the effective date of any added or increased benefits.

9

This Pre-Existing Condition Limitation may be applied differently to an Employee's Basic Coverage and Optional Coverage.

Basic Coverage: If an Employee was covered under a Prior Plan for 12 months or more on March 31, 2002, he or she has satisfied the 12 month Pre-Existing Condition Limitation. If an Employee was covered under a Prior Plan for less than 12 months, the amount of time he or she was covered will be credited towards satisfying the 12 month Pre-Existing Condition Limitation under this plan.

Optional Coverage: If an Employee purchased Optional Coverage under a Prior Plan and enrolls for Optional Coverage under this plan as of June 1, 2002, an Employee will receive credit for the amount of time he or she satisfied while covered under a Prior Plan before April 1, 2002. This means the amount of time an Employee was covered for Optional Coverage under a Prior Plan (except for April 1, 2002 through May 31, 2002) will count toward satisfying the 12 month Pre-Existing Condition Limitation for Optional Coverage under this plan.

Time will not be credited for any day an Employee is not actively at work due to his or her Injury or Sickness. The Pre-Existing Condition Limitation will be extended by the number of days the Employee is not actively at work due to his or her Injury or Sickness.

**Disability Benefit Calculation**
The Disability Benefit for any month Disability Benefits are payable is shown in the Schedule of Benefits. Disability Benefits are based on a 30 day period. They will be prorated if payable for any period less than a month.

**Work Incentive Benefit**
If an Employee is covered for Work Incentive Benefits, he or she may return to work while Disabled and Disability Benefits will continue. The conditions under which an Employee may return to work and the amount of this benefit are shown in the Schedule of Benefits.

The Insurance Company will review the Employee's status and will require satisfactory proof of earnings and continued Disability.

**Other Income Benefits**
While an Employee is Disabled, he or she may be eligible for benefits from other income sources. If so, the Insurance Company may reduce the Disability Benefits payable by the amount of such Other Income Benefits. The extent to which Other Income Benefits will reduce any Disability Benefits payable under the Policy is shown in the Schedule of Benefits.

Other Income Benefits include:
1. any amounts which the Employee or any dependents, if applicable, receive (or are assumed to receive*) under:
   a. the Canada and Quebec Pension Plans;
   b. the Railroad Retirement Act;
   c. any local, state, provincial or federal government disability or retirement plan or law as it pertains to the Employer, excluding income received on account of an Employee's disability from military retirement plan or law;
   d. any sick leave plan of the Employer;
   e. any work loss provision in mandatory "No-Fault" auto insurance;

10

f.  any Workers' Compensation, occupational disease, unemployment compensation law or similar state or federal law, including all permanent as well as temporary disability benefits. This includes any damages, compromises or settlement paid in place of such benefits, whether or not liability is admitted.

2.  any Social Security disability benefits the Employee or any third party receives (or is assumed to receive*) on the Employee's behalf or for his or her dependents; or, if applicable, which his or her dependents receive (or are assumed to receive*) because of the Employee's entitlement to such benefits.

3.  any retirement plan benefits funded by the Employer. "Retirement plan" means any defined benefit or defined contribution plan sponsored or funded by an employer. It does not include an individual deferred compensation agreement; a profit sharing or any other retirement or savings plan maintained in addition to a defined benefit or other defined contribution pension plan, or any Employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(k) plan.

4.  any proceeds payable under any franchise or group insurance or similar plan. If there is other insurance that applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies.

5.  any amounts paid on account of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined.

Dependents include any person who receives (or is assumed to receive*) benefits under any applicable law on account of an Employee's entitlement to benefits.

* See the Assumed Receipt of Benefits provision.

*Increases in Other Income Benefits*

After the first deduction for any Other Income Benefit (except wage or salary) is made, benefits will not be further reduced during that period of Disability due to any cost of living increase in that Other Income Benefit.

*Lump Sum Payments*

Other Income Benefits or earnings that are paid in a lump sum will be prorated over the period for which the sum is given. If no time is stated the lump sum will be prorated monthly over a five year period.

If no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit.

11

*Assumed Receipt of Benefits*

The Insurance Company will assume the Employee (or his or her dependents, if applicable) are receiving Other Income Benefits if they may be eligible for them. These assumed benefits will be the amount the Insurance Company estimates the Employee (or his or her dependents, if applicable) may be eligible to receive. Disability Benefits will be reduced by the amount of any assumed benefits as if they were actually received.

Except for any wage or salary for work performed while Disability Benefits are payable, this assumption will not be made if the Employee gives the Insurance Company proof of the following events.
1.     Application was made for these benefits
2.     A Reimbursement Agreement is signed
3.     Any and all appeals were made for these benefits or the Insurance Company determines further appeals will not be successful
4.     Payments were denied

The Insurance Company will not assume receipt of, nor reduce benefits by, any elective, actuarially reduced, or early retirement benefits under such laws until the Employee actually receives them.

*Social Security Assistance*

The Insurance Company will, at its discretion, assist the Employee in applying for Social Security Disability Income (SSDI) benefits. Disability Benefits will not be reduced by the assumed receipt of SSDI benefits while the Employee participates in the Social Security Assistance Program.

The Insurance Company may require the Employee to file an appeal if it believes a reversal of a prior decision is possible. If the Employee refuses to participate in, or cooperate with, the Social Security Assistance Program, the Insurance Company will assume receipt of SSDI benefits until the Employee gives as proof that all administrative remedies are exhausted.

### Minimum Benefit
The Insurance Company will pay the Minimum Benefit regardless of any reductions made for Other Income Benefits. However, if there is an overpayment due, this benefit may be reduced to recover the overpayment.

### Recovery of Overpayment
If benefits are overpaid, the Insurance Company has the right to recover the amount overpaid by either of the following methods.
1.     A request for lump sum payment of the overpaid amount
2.     A reduction of any amounts payable under the Policy

If there is an overpayment due when an Employee dies, any benefits payable under the Policy will be reduced to recover the overpayment.

TL-004771 (970013)

12

## ADDITIONAL BENEFITS

**Rehabilitation During A Period of Disability**
If, while an Employee is Disabled, the Insurance Company determines that he or she is a suitable candidate for rehabilitation he or she may participate in a Rehabilitation Plan. The terms and conditions of the Rehabilitation Plan must be mutually agreed upon by the Employee and the Insurance Company.

The Insurance Company may require an Employee to participate in a rehabilitation assessment or a Rehabilitative Plan at our expense. The Insurance Company will work with the Employee, the Employer and the Employee's Physician and others, as appropriate, to develop a Rehabilitation Plan. If the Employee refuses to participate in the rehabilitation efforts, Disability Benefits will not be payable.

The Rehabilitation Plan may, at the Insurance Company's discretion, allow for payment of the Employee's medical expense, education expense, moving expense, accommodation expense or family care expense while he or she participates in the program.

A "Rehabilitation Plan" is a written agreement between the Employee and the Insurance Company in which the Insurance Company agrees to provide, arrange or authorize vocational or physical rehabilitation services.

TL.BENEF

**Survivor Benefit**
The Insurance Company will pay a Survivor Benefit if an Employee dies while Monthly Benefits are payable. The Employee must have been continuously Disabled for the Survivor Benefit Waiting Period before the first benefit is payable. These benefits will be payable for the Maximum Benefit Period for Survivor Benefits.

Benefits will be paid to the Employee's Spouse. If there is no Spouse, benefits will be paid in equal shares to the Employee's surviving Children. If there are no Spouse and no Children, benefits will be paid to the Employee's estate.

"Spouse" means an Employee's lawful spouse. "Children" means an Employee's unmarried children under age 21 who are chiefly dependent upon the Employee for support and maintenance. The term includes a stepchild living with the Employee at the time of his or her death.

TL.SURVET

13

## EXCLUSIONS

The Insurance Company will not pay Disability Benefits for a Disability that results, directly or indirectly, from:

1. suicide, attempted suicide, or whenever an Employee injures himself or herself on purpose.
2. war or any act of war, whether or not declared.
3. serving on full-time active duty in any armed forces. If the Employee sends proof of military service, the Insurance Company will refund the portion of the premium paid to cover the Employee during a period of such service.
4. terrorism or active participation in a riot.
5. commission of a felony.
6. revocation, restriction or non-renewal of an Employee's license, permit or certification necessary to perform the duties of his or her occupation unless due solely to Injury or Sickness otherwise covered by the Policy.

The Insurance Company will not pay Disability Benefits for any period of Disability during which the Employee:

7. is incarcerated in a penal or corrections institution.
8. is not receiving Appropriate Care.
9. fails to cooperate with the Insurance Company in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.
10. refuses to participate in rehabilitation efforts as required by the Insurance Company.
11. refuses to participate in a Transitional Work Arrangement or other modified work arrangement.

"Transitional Work Arrangement" means any work offered to the Employee by the Employer or an affiliated company while the Employee is Disabled and which may be his or her own or any occupation. The term includes but is not limited to reassigned duties, work site modification, flexible work arrangements, job adaptation or special equipment.

TL-004732

## CLAIM PROVISIONS

### Notice of Claim

Written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 31 days after a covered loss occurs or begins or as soon as reasonably possible. If written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, is not given in that time, the claim will not be invalidated or reduced if it is shown that notice was given as soon as was reasonably possible. Notice can be given at our home office in Philadelphia, Pennsylvania or to our agent. Notice should include the Employer's Name, the Policy Number and the claimant's name and address.

14

**Claim Forms**

When the Insurance Company receives notice of claim, the Insurance Company will send claim forms for filing proof of loss. If claim forms are not sent within 15 days after notice is received by the Insurance Company, the proof requirements will be met by submitting, within the time required under the "Proof of Loss" section, written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, of the nature and extent of the loss.

**Claimant Cooperation Provision**

Failure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**Insurance Data**

The Employer is required to cooperate with the Insurance Company in the review of claims and applications for coverage. Any information the Insurance Company provides in these areas is confidential and may not be used or released by the Employer if not permitted by applicable privacy laws.

**Proof of Loss**

Written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 90 days after the date of the loss for which a claim is made. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is not given in that 90 day period, the claim will not be invalidated nor reduced if it is shown that it was given as soon as was reasonably possible. In any case, written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given not more than one year after that 90 day period. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is provided outside of these time limits, the claim will be denied. These time limits will not apply while the person making the claim lacks legal capacity.

Written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, that the loss continues must be furnished to the Insurance Company at intervals required by us. Within 30 days of a request, written proof of continued Disability and Appropriate Care by a Physician must be given to the Insurance Company.

**Time of Payment**

Disability Benefits will be paid at regular intervals of not less frequently than once a month. Any balance, unpaid at the end of any period for which the Insurance Company is liable, will be paid at that time.

**To Whom Payable**

Disability Benefits will be paid to the Employee. If any person to whom benefits are payable is a minor or, in the opinion of the Insurance Company, is not able to give a valid receipt, such payment will be made to his or her legal guardian. However, if no request for payment has been made by the legal guardian, the Insurance Company may, at its option, make payment to the person or institution appearing to have assumed custody and support.

15

If an Employee dies while any Disability Benefits remain unpaid, the Insurance Company may, at its option, make direct payment to any of the following living relatives of the Employee: spouse, mother, father, children, brothers or sisters; or to the executors or administrators of the Employee's estate. The Insurance Company may reduce the amount payable by any indebtedness due.

Payment in the manner described above will release the Insurance Company from all liability for any payment made.

For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

The Insurance Company has no fiduciary responsibility with respect to the administration of The Plan except as described above. It is understood that the Insurance Company's sole liability to the Plan and to Participants and Beneficiaries under The Plan shall be for the payment of benefits provided under this Policy.

### Physical Examination and Autopsy
The Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require. The Insurance Company may, at its expense, require an autopsy unless prohibited by law.

### Legal Actions
No action at law or in equity may be brought to recover benefits under the Policy less than 60 days after written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, has been furnished as required by the Policy. No such action shall be brought more than 3 years after the time satisfactory proof of loss is required to be furnished.

### Time Limitations
If any time limit stated in the Policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity, is less than that permitted by the law of the state in which the Employee lives when the Policy is issued, then the time limit provided in the Policy is extended to agree with the minimum permitted by the law of that state.

### Physician/Patient Relationship
The Insured will have the right to choose any Physician who is practicing legally. The Insurance Company will in no way disturb the Physician/patient relationship.

TL-004724

16

## ADMINISTRATIVE PROVISIONS

### Premiums

The premiums for this Policy will be based on the rates currently in force, the plan and the amount of insurance in effect.

### Changes in Premium Rates

The premium rates may be changed by the Insurance Company from time to time with at least 31 days advance written notice. No change in rates will be made until 24 months after the Policy Effective Date. An increase in rates will not be made more often than once in a 12 month period. However, the Insurance Company reserves the right to change the rates even during a period for which the rate is guaranteed if any of the following events take place.

1. The terms of the Policy change.
2. A division, subsidiary, affiliated company or eligible class is added or deleted from the Policy.
3. There is a change in the factors bearing on the risk assumed.
4. Any federal or state law or regulation is amended to the extent it affects the Insurance Company's benefit obligation.
5. The Insurance Company determines that the Employer has failed to promptly furnish any necessary information requested by the Insurance Company, or has failed to perform any other obligations in relation to the Policy.

If an increase or decrease in rates takes place on a date that is not a Premium Due Date, a pro rata adjustment will apply from the date of the change to the next Premium Due Date.

### Reporting Requirements

The Employer must, upon request, give the Insurance Company any information required to determine who is insured, the amount of insurance in force and any other information needed to administer the plan of insurance.

### Payment of Premium

The first premium is due on the Policy Effective Date. After that, premiums will be due monthly unless the Employer and the Insurance Company agree on some other method of premium payment.

If any premium is not paid when due, the plan will be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

### Notice of Cancellation

The Employer or the Insurance Company may cancel the Policy as of any Premium Due Date by giving 31 days advance written notice. If a premium is not paid when due, the Policy will automatically be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

### Policy Grace Period

A Policy Grace Period of 31 days will be granted for the payment of the required premiums under the Policy. The Policy will be in force during the Policy Grace Period. If the required premiums are not paid during the Policy Grace Period, insurance will end on the last Premium Due Date. The Employer will be liable to the Insurance Company for any unpaid premium for the time the Policy was in force.

17

**Grace Period for the Insured**

If the required premium is not paid on the Premium Due Date, there is a 31 day grace period after each premium due date after the first. If the required premium is not paid during the grace period, insurance will end on the last day for which premium was paid.

**Reinstatement of Insurance**

An Employee's insurance may be reinstated if it ends because the Employee is on an unpaid leave of absence.

An Employee's insurance may be reinstated only if reinstatement occurs within 6 months from the date insurance ends due to an Employer approved unpaid leave of absence. For insurance to be reinstated the following conditions must be met.

1. An Employee must be in a Class of Eligible Employees.
2. The required premium must be paid.
3. A written request for reinstatement must be received by the Insurance Company within 31 days from the date an Employee returns to Active Service.

Reinstated insurance will be effective on the date the Employee returns to Active Service. If an Employee did not fully satisfy the Eligibility Waiting Period or the Pre-Existing Condition Limitation (if any) before insurance ended due to an unpaid leave of absence, credit will be given for any time that was satisfied.

TL-004720

## GENERAL PROVISIONS

**Entire Contract**

The entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds.

**Incontestability**

All statements made by the Employer or by an Insured are representations not warranties. No statement will be used to deny or reduce benefits or as a defense to a claim, unless a copy of the instrument containing the statement has been furnished to the claimant. In the event of death or legal incapacity, the beneficiary or representative must receive the copy.

After two years from an Insured's effective date of insurance, or from the effective date of any added or increased benefits, no such statement will cause insurance to be contested except for fraud or eligibility for coverage.

**Misstatement of Age**

If an Insured's age has been misstated, the Insurance Company will adjust all benefits to the amounts that would have been purchased for the correct age.

**Policy Changes**

No change in the Policy will be valid until approved by an executive officer of the Insurance Company. This approval must be endorsed on, or attached to, the Policy. No agent may change the Policy or waive any of its provisions.

18

**Workers' Compensation Insurance**
The Policy is not in lieu of and does not affect any requirements for insurance under any Workers' Compensation Insurance Law.

**Certificates**
A certificate of insurance will be delivered to the Employer for delivery to Insureds. Each certificate will list the benefits, conditions and limits of the Policy. It will state to whom benefits will be paid.

**Assignment of Benefits**
The Insurance Company will not be affected by the assignment of an Insured's certificate until the original assignment or a certified copy of the assignment is filed with the Insurance Company. The Insurance Company will not be responsible for the validity or sufficiency of an assignment. An assignment of benefits will operate so long as the assignment remains in force provided insurance under the Policy is in effect. This insurance may not be levied on, attached, garnisheed, or otherwise taken for a person's debts. This prohibition does not apply where contrary to law.

**Clerical Error**
A person's insurance will not be affected by error or delay in keeping records of insurance under the Policy. If such an error is found, the premium will be adjusted fairly.

**Agency**
The Employer and Plan Administrator are agents of the Employee for transactions relating to insurance under the Policy. The Insurance Company is not liable for any of their acts or omissions.

n-ooroo

## DEFINITIONS

Please note, certain words used in this document have specific meanings. These terms will be capitalized throughout this document. The definition of any word, if not defined in the text where it is used, may be found either in this Definitions section or in the Schedule of Benefits.

**Active Service**
An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if either of the following conditions are met.
1.  He or she is actively at work. This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel.
2.  The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

An Employee is considered in Active Service on a day which is not one of the Employer's scheduled work days only if he or she was in Active Service on the preceding scheduled work day.

19

**Appropriate Care**
Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability by a Physician, or a plan established by a Physician of ongoing medical treatment and care of the Disability that conforms to generally accepted medical standards, including frequency of treatment and care.

**Consumer Price Index (CPI-W)**
The Consumer Price Index for Urban Wage Earners and Clerical Workers published by the U.S. Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

**Employee**
For eligibility purposes, an Employee is an employee of the Employer in one of the "Classes of Eligible Employees." Otherwise, Employee means an employee of the Employer who is insured under the Policy.

**Employer**
The Employer who has subscribed to the Policyholder and for the benefit of whose Employees this policy has been issued. The Employer, named as the Subscriber on the front of this Policy, includes any affiliates or subsidiaries covered under the Policy. The Employer is acting as an agent of the Insured for transactions relating to this insurance. The actions of the Employer shall not be considered the actions of the Insurance Company.

**Full-time**
Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class.

**Indexed Covered Earnings**
For the first 12 months Monthly Benefits are payable, Indexed Covered Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable, Indexed Covered Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of:
1.   10% of the Employee's Indexed Covered Earnings during the preceding year of Disability; or
2.   the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

**Injury**
Any accidental loss or bodily harm which results directly and independently of all other causes from an Accident.

**Insurability Requirement**
An eligible person will satisfy the Insurability Requirement for an amount of coverage on the day the Insurance Company agrees in writing to accept him or her as insured for that amount. To determine a person's acceptability for coverage, the Insurance Company will require evidence of good health and may require it be provided at the Employee's expense.

**Insurance Company**
The Insurance Company underwriting the Policy is named on the Policy cover page.

20

**Insured**
A person who is eligible for insurance under the Policy, for whom insurance is elected, the required premium is paid and coverage is in force under the Policy.

**Life Status Change**
A Life Status Change is an event recognized by the Employer's Flexible Benefits Plan as qualifying an Employee to make changes in benefit selections at a time other than an Annual Enrollment Period.

If there is no Employer sponsored Flexible Benefits Plan, or if it is no longer in effect, the following events are Life Status Changes.
1.   Marriage
2.   Divorce, annulment or legal separation
3.   Birth or adoption of a child
4.   Death of a spouse
5.   Termination of a spouse's employment
6.   A change in the benefit plan available to the Employee's spouse
7.   A change in the Employee's or spouse's employment status that affects either's eligibility for benefits

**Physician**
Physician means a licensed doctor practicing within the scope of his or her license and rendering care and treatment to an Insured that is appropriate for the condition and locality. The term does not include an Employee, an Employee's spouse, the immediate family (including parents, children, siblings or spouses of any of the foregoing, whether the relationship derives from blood or marriage), of an Employee or spouse, or a person living in an Employee's household.

**Prior Plan**
The Prior Plan refers to the plan of insurance providing similar benefits sponsored by the Employer in effect directly prior to the Policy Effective Date.

**Sickness**
Any physical or mental illness.

IL-0070

21

**LIFE INSURANCE COMPANY OF NORTH AMERICA**
**PHILADELPHIA, PA 19192-2235**

We, TRUSTEE OF THE GROUP INSURANCE TRUST FOR EMPLOYERS IN THE TRANSPORTATION AND PUBLIC UTILITIES INDUSTRY, whose main office address is Wilmington, Delaware hereby apply on behalf of Polar Air Cargo to the LIFE INSURANCE COMPANY OF NORTH AMERICA for Group Policy No. LK-970013.

We approve and accept the terms of this Group Policy.

This application is to be signed in duplicate. One part is to be attached to the Group Policy; the other part is to be returned to the LIFE INSURANCE COMPANY OF NORTH AMERICA.

This application supersedes any previous application for this Group Policy.

TRUSTEE OF THE GROUP INSURANCE TRUST
FOR EMPLOYERS IN THE TRANSPORTATION AND PUBLIC UTILITIES INDUSTRY
(Full or Corporate Name of Applicant)

Signed at _____  By _____

(Signature and Title)

On _____  Witness _____

(To be signed by Licensed Resident Agent where required by law)
(This Copy Is To Remain Attached To The Policy)

---

**LIFE INSURANCE COMPANY OF NORTH AMERICA**
**PHILADELPHIA, PA 19192-2235**

We, TRUSTEE OF THE GROUP INSURANCE TRUST FOR EMPLOYERS IN THE TRANSPORTATION AND PUBLIC UTILITIES INDUSTRY, whose main office address is Wilmington, Delaware hereby apply on behalf of Polar Air Cargo to the LIFE INSURANCE COMPANY OF NORTH AMERICA for Group Policy No. LK-970013.

We approve and accept the terms of this Group Policy.

This application is to be signed in duplicate. One part is to be attached to the Group Policy; the other part is to be returned to the LIFE INSURANCE COMPANY OF NORTH AMERICA.

This application supersedes any previous application for this Group Policy.

TRUSTEE OF THE GROUP INSURANCE TRUST
FOR EMPLOYERS IN THE TRANSPORTATION AND PUBLIC UTILITIES INDUSTRY
(Full or Corporate Name of Applicant)

Signed at _____  By _____

(Signature and Title)

On _____  Witness _____

(To be signed by Licensed Resident Agent where required by law)
(This Copy Is To Be Returned To Us)

# Basic & Optional Long-Term Disability Insurance



Developed for the Employees of
*Polar Air Cargo*

## Protecting Your Family
## Securing Your Future

"As long as you've got your health ...."

If you're physically healthy, you can work, play, take care of your family and enjoy life.

But, if something were to happen to you, all your hard work — and everything you have — could be lost unless you take steps to protect your income.

If asked to name your most valuable assets, you might list your home, your furnishings or your automobiles.

**But what about your paycheck?**

You insure your home and your auto. Shouldn't you insure your income as well?

After all, it's your income that enables you to buy — and enjoy — all of your other assets.

Having adequate insurance coverage is not only the basis for a sound financial blueprint, it helps to provide the protection you need to ensure that your family, your home and your finances will be protected.

By purchasing this disability insurance through your employer, you also benefit from:

- Affordable group rates
- Convenient payroll deduction

## How This Program Protects You

If you suffer a covered disability while insured by this plan, you'll receive monetary benefits designed to help you maintain your normal lifestyle.

This program covers disabling injuries or sicknesses that last beyond the benefit waiting period, whether they occur on or off the job.

Please take a few minutes now to read this program description and learn how this valuable program helps protect your income and your lifestyle.

## Eligibility For Coverage

You must be an active, full-time Pilot in Command, First Officer, or Flight Engineer of Polar Air Cargo. Full-time employment means you work at least 30 hours per week.

### Eligibility Waiting Period

Basic Coverage — You are automatically enrolled for basic coverage. This is paid for by your employer.

Optional Coverage — Is paid 100% by you and requires completing an enrollment form and your authorization for payroll deductions.

All employees who meet the eligibility requirements are eligible to participate in this program on the first of the month on or after 90 days of Active Service.

You can enroll any time within 31 days following the date you become eligible for coverage. If you decide to enroll later, you will have to provide acceptable evidence of good health. This may require a medical examination, at your cost.

You will be asked to complete an enrollment form, indicating your wish to participate and your authorization for payroll deductions.

## When Coverage Takes Effect

If you meet these eligibility requirements, your coverage takes effect on the later of the program's effective date, the date you become eligible, the date we receive your completed enrollment form, or the date you authorize any necessary payroll deductions.

If you have to submit evidence of good health, your coverage takes effect on the date we agree, in writing, to cover you. If you're not actively at work on the date your coverage would otherwise take effect, you'll be covered on the date you return to work.

- 1 -

## How Disability is Defined

Injury means any accidental loss or bodily harm that results directly and independently of all other causes from an accident.

Sickness means any physical or mental illness.

Appropriate Care means the determination of an accurate and medically supported diagnosis of your disability, or ongoing medical treatment, conforming to generally accepted medical standards regarding care and frequency of treatments, by a licensed physician.

Physician means a licensed doctor practicing within the scope of his/her license and rendering care and treatment to an employee that is appropriate for the condition and locality. A physician cannot be the employee, his/her spouse, the immediate family of either the employee or spouse, or a person living in the employee's household.

## Benefit Waiting Period

Before collecting benefits, you must satisfy the benefit waiting period following your date of disability. For your plan, this period is 120 days of continuous disability.

## Benefits

This plan offers two levels of coverage:

The basic level, for which your employer pays, provides a monthly benefit up to 60% of your covered monthly earnings to the program maximum of $10,000 per month for a maximum of 24 months.

The optional level allows you to purchase an additional 12 months of coverage for a total of 36 months.

Your benefit amount will be reduced by any amounts payable to you by any of the sources listed under the "Effects of Other Income Benefits" section.

Covered earnings means the monthly equivalent of the greater of your prior year's W-2 wages or your hourly rate times the minimum annual hours under the applicable ALPA agreement, up to a monthly maximum salary of $16,667 per month. The prior year's W-2 wages will be a combination of the total amount in Box 1 of your W-2 plus any salary reduction or deferral amounts you make to a qualified 401(k) or Section 125 cafeteria plan, as determined by the Internal Revenue Code.

### Family Survivor Benefit

The plan also includes a Family Survivor Benefit feature. With this feature, if you die after collecting disability benefits for 6 or more consecutive months, we will pay a survivor benefit based on 100% of the total of your last month's benefit plus the amount of any disability earnings by which this benefit had been reduced for that month. This plan pays a single lump sum equal to 6 months of benefits.

We pay this benefit directly to your lawful spouse*, or to your children in equal shares, if there is no lawful spouse.

If you have no lawful spouse or children, we pay this benefit to your estate.

*Wherever the term Spouse appears in the Family Survivor Benefit section it shall also include Domestic Partner. Domestic Partner means the person is registered with the California Secretary of State as your Domestic Partner. Additional information is available from your Benefit Services Representative.

- 2 -

## Return-To-Work Incentives

This plan includes benefits to encourage you to return to work as soon as medically feasible. These return-to-work incentives offer you both the opportunity and the encouragement to successfully return to productive employment – without risking your eligibility for income replacement benefits under this plan.

### Residual Disability "Work Incentive" Benefits

If you can work part-time at your regular occupation, or perform some work at any occupation (including limited or modified job duties or schedules) on a full- or part-time basis for less pay, you may qualify for residual disability benefits under this plan – even if you attempt to return to work before you have fulfilled the benefit waiting period. (Benefit payments, however, do not begin until the full benefit waiting period has been satisfied.)

For the first 24 months of residual disability, you may earn up to the same level you earned before becoming disabled, through a combination of your work earnings during any month you return to work, plus the benefit amount this plan pays. We reduce the plan benefit paid to the extent necessary to ensure that your benefits and other incomes combined do not exceed 100% of your pre-disability covered earnings amount.

After you have received residual disability benefits for 24 months, your benefit is reduced by 50% of any earnings you receive, and we may reduce it further, if necessary, to keep your combined benefits plus earnings to no more than 80% of your indexed covered earnings amount.

### Recurrent Disability Feature

If you return to work after receiving benefits under this plan, then again become disabled from the same or a related cause, you will *not* have to fulfill another benefit waiting period, if you have worked less than 6 consecutive months. The disability would be considered a continuation of your initial claim. (Of course, if the second disability recurs after 6 months, or results from a cause unrelated to the first, you must file a new claim and fulfill a new benefit waiting period.)

### Rehabilitation Services

If you are offered a rehabilitative assistance program agreed to by us and your employer during the course of your benefit waiting period or while benefits are payable, you will be expected to cooperate with the implementation of that assistance program. Disability benefits, if payable, may be suspended during any period in which you refuse to cooperate in such assistance, if offered. (Refer to the Exclusions section.)

Indexed Covered Earnings are the same as covered earnings for the first 12 months of benefit payments. After the 12th month of benefit payments, we apply an increase to your covered earnings amount, and refer to this as "indexed covered earnings," in order to calculate the maximum benefit payable under this plan when combined with other income benefits you may be eligible to receive. The amount of the increase we apply is the lesser of either 10% or the rate specified in the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPIW) for the preceding calendar year. We do not reduce indexed covered earnings if the CPIW drops. If the CPIW is ever discontinued, we will use a comparable national index to calculate indexed covered earnings.

- 3 -

## Effects of Other Income Benefits

Disability insurance is designed to help you meet your financial obligations if you cannot work as a result of a covered injury or sickness. However, this plan is structured to prevent your total benefits and post-disability earnings from equaling or exceeding pre-disability earnings. Therefore, we reduce this plan's benefits by an amount equal to any Social Security retirement and/or disability benefits payable to you, your dependents, or a qualified third party on behalf of you or your dependents.

Other income sources that WILL reduce your benefits under this plan include:

- Employer-paid portion of company retirement plan benefits.
- Amounts payable under local, state, provincial or federal government disability or retirement plan or law as it pertains to the employer.
- Amounts payable by any franchise or group insurance or similar plan.
- Amounts payable by company sponsored sick leave or salary continuation plans.
- Benefits payable by a Canadian and/or Quebec provincial pension plan.
- Benefits payable under work-loss provisions of any "no fault" auto insurance.
- Amounts payable under the Railroad Retirement Act.
- Amounts of any wage or salary earned for work performed.
- Any amounts paid on account of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined.
- Amounts payable under any workers' compensation (including temporary or permanent disability benefits), occupational disease, and unemployment compensation. This includes damages, compromises or settlements paid in place of such benefits, whether or not liability is admitted.

Income sources that WILL NOT reduce your benefits under this plan are:

- Benefits paid by personal, individual disability income policies.
- Individual deferred compensation agreements.
- Employee savings plans, including thrift plans, stock options or stock bonuses.
- Individual retirement funds, such as IRA or 401(k) plans.
- Profit-sharing, investment or other retirement or savings plans maintained in addition to an employer-sponsored pension plan.

## Minimum Disability Benefit

Your benefit from this plan will never be less than $100 per month. However, if there is an overpayment due, the minimum benefit may be reduced or not apply in order to recover the overpayment.

## Benefit Period

Once you qualify for benefits under this plan, you continue to receive them until the end of the benefit period, or until you no longer qualify for benefits, whichever occurs first. (We will ask you to periodically furnish proof of your continuing disability.)

This plan pays long-term disability benefits monthly.

Your benefit period begins on the first day after you complete your benefit waiting period. An, should you remain disabled, your benefits continue according to the following schedule, depending on your age at the time you become disabled.

### Basic Coverage

| Age at Commencement of Disability | Duration of Benefit Period |
|---|---|
| Age 65 or younger | 2 years |
| 66 years | 21 monthly payments |
| 67 years | 18 monthly payments |
| 68 years | 15 monthly payments |
| 69 years | 12 monthly payments |

### Optional Coverage

| Age at Commencement of Disability | Duration of Benefit Period |
|---|---|
| Age 65 or younger | 3 years |
| 66 years | 33 monthly payments |
| 67 years | 30 monthly payments |
| 68 years | 27 monthly payments |
| 69 years | 24 monthly payments |
| 70 years or older | 15 monthly payments |

Benefits payable under this plan will terminate on the earliest of any date indicated below:

- The date we determine you are no longer disabled.
- The date you earn more than the percentage of your indexed covered earnings used when determining your disability.
- The date the maximum benefit period ends (see above schedule).
- The date you refuse to participate in rehabilitation services.
- The date you cease to get appropriate care.
- The date you die.

- 4 -

## Limitations

This plan provides only limited benefits for some conditions and excludes others from coverage, as listed below.

### Pre-Existing Conditions

Pre-existing conditions are those for which you have incurred expenses, taken prescription drugs or medicines, received medical treatment, care or services (including diagnostic measures,) or for which a reasonable person would have consulted a physician during the 3 months immediately prior to the most recent effective date of insurance.

This plan does not pay benefits for any disability resulting from a pre-existing condition unless the disability occurs after you have been insured under this plan for 12 consecutive months. If you were insured under the employer-sponsored disability plan with a pre-existing condition limitation immediately prior to the effective date of this plan, we will credit you for all time served toward that limitation period, for similar or lower benefit amounts. If benefits under this plan are higher than under your prior plan, you do not receive credit for the higher benefit levels. This limitation also applies to newly added or increased benefits.

### Limitation to Mental/Nervous Conditions

This plan limits benefits for disabilities caused by or contributed to by any one or more of the following conditions:

- Alcoholism
- Anxiety disorders
- Delusional (paranoid) or depressive disorders
- Drug addiction or abuse
- Eating disorders
- Mental illness
- Somatoform disorders (including psychosomatic illnesses).

Benefits for these conditions have a lifetime limit of 24 months for outpatient treatment. The plan also pays benefits during periods of hospital confinement for these conditions, as long as hospitalization lasts for more than 14 consecutive days and occurs before the 24-month lifetime outpatient limit is exhausted. Once the 24-month outpatient benefits are exhausted, the plan pays no further benefits for these conditions.

## Exclusions

This plan does not pay benefits for a disability which results, directly or indirectly, from any of the following:

- Suicide, attempted suicide, or whenever you injure yourself on purpose
- Active participation in a riot
- Commission of a felony
- The revocation, restriction or non-renewal of your license, permit or certification necessary for you to perform the duties of your occupation, unless solely due to injury or sickness otherwise covered by the policy.

Further no benefits will be payable for any periods during which you:

- Are incarcerated in a penal or corrections institution
- Are engaged in the activities of active duty service in the military, navy or air force of any country or international organization. An injury or sickness that occurs while engaged in Reserve or National Guard training is not excluded until training extends beyond 31 days.
- refuse to participate in rehabilitation efforts as required by us
- Are not receiving appropriate care
- Refuse to participate in a transitional work arrangement or other modified work arrangement. (These work arrangements may be offered to you by your employer, or an affiliated company while you are disabled; they may be of the same or any other occupation as once held by you prior to the disability; and they may include, but are not limited to: reassigned duties, work site modification, flexible work arrangements, job adaptation or specialized equipment.)
- Fail to cooperate with us in the administration of the claim. (Such cooperation includes, but is not limited to providing information or documents needed to determine whether benefits are payable or the actual benefit amount due.)

- 5 -

## Termination of Coverage

Your coverage will end on the earliest of any of the following dates:

- the date you are no longer an employee of the employer sponsoring the plan.

- the date you are no longer a member of an eligible class of employees

- the date the plan is terminated by the insurer or the employer

- the day after the last date for which premium has been paid by you or the employer.

- the date you become eligible for a plan of benefits intended to replace this coverage.

If you are disabled and receiving benefits under this plan, your benefits and coverage will continue until the expiration of your benefit period, or until you no longer qualify for benefits under the plan, whichever comes first.

## How Much Your Coverage Will Cost

The cost of the basic insurance plan is paid for your employer. However, you can supplement your basic coverage with the additional benefit option offered below.

This optional plan offers you the opportunity to continue your coverage for an additional 12 months of coverage for a total of 36 months.

The cost of the optional plan is paid for by you. Use the chart below to help you calculate the amount for your age group. You must authorize payroll deduction for premium payments.

| If you are between these ages: | Your cost per $100 of Monthly Covered Earnings |
|---|---|
| Under 35 | 0.13 |
| 35 - 39 | 0.18 |
| 40 - 44 | 0.26 |
| 45 - 49 | 0.40 |
| 50 - 54 | 0.50 |
| 55 - 59 | 0.92 |
| 60 - 64 | 1.52 |
| 65 & Over | 1.77 |

*Costs are subject to change.*

To calculate the cost of your coverage, follow these steps:

**Step 1.** Enter your gross or pre-tax monthly pay (not counting commissions, bonus or overtime). Please note this amount cannot exceed $16,667.   $_____

**Step 2.** Enter the cost for your age group (see chart above).   $_____

**Step 3.** Multiply gross pay (line 1) by the cost for your age group (line 2).   $_____

**Step 4.** Divide by 100 to determine the amount of premium that will be deducted from your paycheck each month.   $_____

*(Please Note: All benefits in this plan are paid on a monthly basis, regardless of your regular pay period.)*

- 6 -

LIFE INSURANCE COMPANY OF NORTH AMERICA

**POLICYHOLDER**
Polar Air Cargo

**POLICY NUMBER**
LK 970013

### Long-Term Disability (LTD)
### Enrollment Form

Name _____  Sex: ☐ Male ☐ Female
       _Last_          _First_         _M I_

Date of Birth _____  Social Security No. __/__/__ - __/__ - __/__/__/__

Address _____  Home Phone ( _____ ) _____
     _Number and Street_     _City_     _State_     _Zip Code_

Date Hired _____  Title or Occupation _____  Annual Salary $ _____

**❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋❋**

*Please check the appropriate box.*

☐ I understand that basic LTD insurance is provided by my employer.

☐ I accept the optional LTD insurance provided by the Company's Group Insurance Plan and authorize the deduction from my earnings of the required contribution toward the cost of the insurance.

☐ I have been offered optional LTD insurance and decline to purchase it at this time. I understand that if I wish to participate at a later date, I may be required to furnish evidence of insurability at my own expense and that coverage is subject to the Insurance Company's approval.

Late entrants must complete an Evidence of Insurability Form. Coverage for late entrants is subject to the Insurance Company's approval. A late entrant is an Insured who enrolls more than 31 days after becoming eligible for insurance.

If you are not in active service on the date your coverage would otherwise take effect, you will be covered on the date you return to active service.

**Pre-Existing Condition Limitation:** A pre-existing condition is any injury or illness for which you have consulted a physician (or for which a reasonable person would have consulted a physician), received medical treatment, care or services (including diagnostic measures), taken prescribed drugs or medicines, or incurred expenses during the 3 months prior to the effective date of your insurance. If you become disabled due to a pre-existing condition, you will not receive benefits unless your disability begins more than 12 months after the effective date of your coverage.

Signature of Applicant _____  Date _____

TL-007311 (Cant Emp opt)

**CIGNA Group Insurance**
Life • Accident • Disability

*Return original to your employer and make a copy for your records.*



This information is a brief description of the important features of this plan. It is not a contract. Terms and conditions of the coverage are set forth in Group Policy No. LK-970013, on Policy Form TL-004700, issued in Delaware to the Group Insurance Trust for Employers in the Transportation and Public Utilities industry. The group policy is subject to the laws or jurisdiction in which it is issued. The availability of this offer may change. Please keep this material as a reference, and file it with your certificate, should you become insured.

*Coverage is underwritten by*
*Life Insurance Company of North America*
*1601 Chestnut Street*
*Philadelphia, PA 19192*

**CIGNA Group Insurance**
Life • Accident • Disability

01/10
Class 1

# SECTION 28: RETIREMENT

### A. 401(K) PLAN

Crewmembers shall be eligible to participate in the Atlas Air, Inc. Retirement Plan ("401(k) Plan") based on the terms and conditions applicable to Atlas Air, Inc. Crewmembers in effect on the effective date of the Agreement.

1. The Company shall contribute annually to each participating Crewmember's account an amount equal to fifty percent (50%) of the Crewmember's contribution (such Crewmember contribution for the purpose of the Company matching to be limited to no more than ten percent (10%) of gross pay), which shall vest as set forth in subsection 28.A.2.

2. Vesting for purposes of Employer Matching Contributions and Employer Profit Sharing Contributions shall be in accordance with the following schedule:

| Completed Years of Service | Vesting Percentage |
|---|---|
| Less than 1 year | 0 |
| 1 year | 20 |
| 2 years | 40 |
| 3 years and thereafter | 100 |

3. The Company shall not make any change to the 401(k) Plan that reduces the level of participation available to Crewmembers or Company matching contributions provided to Crewmembers without the concurrence of the Union, except to the extent that such changes are required by law.  The Company shall have the right to change Plan administrators, third party administrators and/or make changes to the investment options offered participants in the Plan after consultation with the Union Retirement and Insurance Committee.

### B. 401(M) CREWMEMBER CONTRIBUTIONS

Crewmembers shall be eligible to make (401)(m) Crewmember contributions on the same terms and conditions applicable to other employees of the Company.

## C. STOCK PURCHASE PLAN

If the Company establishes a stock purchase plan for employees (other than officers) not covered by this Agreement, Crewmembers shall be eligible to participate in the stock purchase plan on the same basis as all other employees.

## D. RETIREMENT IMPROVEMENTS AND ADDITIONS

Upon request by the Union, retirement benefit improvements, including any newly created retirement benefits, the Company offers to employees (other than officers) who are not covered by this Agreement shall be made available to Crewmembers on the same basis.

## E. COMMITTEES

The Company recognizes a Retirement and Insurance Committee (R&I Committee).   The R&I Committee shall consist of two (2) Union representatives.   Without limiting the Company's discretion as 401(k) Plan administrator, the R&I Committee shall meet at least semi-annually to discuss changes to 401(k) Plan investment options, plan administrators and third party administrators, the Profit Sharing Plan, and other retirement and insurance issues.

# SECTION 29:
# UNION SECURITY AND CHECK-OFF

A. Within sixty (60) days following the beginning of employment, or the effective date of this Agreement, whichever is the later, each Crewmember shall become a member of the Union in good standing as a condition of employment.  All Crewmembers who are members of the Union in good standing on the effective date of this Agreement or who become members in good standing shall remain members in good standing as a condition of continued employment; *provided*, that Crewmembers to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to Crewmembers to whom membership was denied or terminated for any reason other than the failure of the Crewmember to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership, shall be excluded from the requirements of this Section 29.

B. Each Crewmember who fails to voluntarily acquire or maintain membership in the Union shall be required, as a condition of employment, beginning sixty (60) days after his employment to pay the Union each month a service charge as a contribution for the administration of the Agreement and the representation of such Crewmember.  The service charge for the first month shall be in an amount equal to the Union's regular and usual initiation fees and monthly dues, and for each month thereafter in an amount equal to the regular and usual monthly dues and periodic assessments (not including fines and penalties), including Union assessments (not including fines and penalties), uniformly required as a condition of acquiring or retaining membership.

C. If any Crewmember becomes delinquent in the payment of this service charge or any Union member becomes delinquent in payment of his initiation fees and/or dues, and/or periodic assessments, the Union shall notify such Crewmember by certified mail, return receipt requested, copy to the Company's Vice President of Flight Operations, that he is delinquent in the payment of such service charge, initiation fee and/or membership dues and/or periodic assessments as specified herein and is subject to discharge as a Crewmember.  Such letter shall also notify the Crewmember that he must remit the required payment within a period of fifteen (15) days or be discharged.

D. If, upon the expiration of the fifteen (15) day period, the Crewmember still remains delinquent, the Union shall certify in writing to the Vice President of Flight Operations, with a copy to the Crewmember, that the Crewmember has failed to remit payment within the grace period allowed and is therefore to be discharged. The Vice President of Flight Operations shall notify the Crewmember by certified mail, return receipt requested, that he is to be discharged.

E. A grievance by a Crewmember who is to be discharged as the result of an interpretation or application of the provisions of this Section shall be subject to the following procedures:

   1. A Crewmember who believes that the provisions of this Section have not been properly interpreted or applied as it pertains to him, may submit his request for review in writing within five (5) days from the date of his notification by the Vice President of Flight Operations as provided in subsection 29.D. above. The request must be submitted to the Vice President of Flight Operations or his designee, who will review the grievance and render his decision in writing no later than five (5) days following receipt of the grievance.

   2. The Vice President of Flight Operations or his designee shall forward his decision to the Crewmember, with a copy to the Union. Said decision shall be final and binding on all interested parties unless appealed as hereinafter provided. If the decision is not satisfactory to either the Crewmember or the Union, then either may appeal the decision within ten (10) days from the date of the decision directly to a neutral referee who may be agreed upon by the Crewmember and the Union within ten (10) days thereafter. In the event the parties fail to agree upon a neutral referee within the specified period, either the Crewmember or the Union may request the National Mediation Board to name such neutral referee. The decision of the Neutral referee shall be final and binding on all parties to the dispute. The fees of such neutral referee shall be borne equally by the Crewmember and the Union.

F. During the period a grievance is being handled under the provisions of this Section, and until final award by the Vice President of Flight Operations, his designee or the neutral referee, the Crewmember shall not be discharged from the Company nor lose any seniority rights because of noncompliance with the terms and provisions of this Section 29.

1. A Crewmember discharged by the Company under the provisions of Section 29 shall be deemed to have been "discharged for just cause" within the meaning of the terms and provisions of this Agreement.

2. The Company shall not be liable for any time or wage claim of any Crewmember discharged by the Company pursuant to a written order by any authorized Union representative under the terms of this Section 29.

G. Dues Check-Off.

During the life of this Agreement, the Company agrees to deduct from the pay of each member of the International Brotherhood of Teamsters, and remit to the designated Union, membership dues uniformly required as a condition of acquiring or retaining membership and in accordance with the provisions of the Railway Labor Act, as amended, provided such member of the International Brotherhood of Teamsters voluntarily executes an authorization form. This form, also to be known as "Check-Off Form", shall be prepared and furnished by the Union.  The payment of service charges, in accordance with subsection 29.B. above, may be made by check-off upon the voluntary execution of authorization forms by service fee payers.

This Page Intentionally Blank

# SECTION 30: UNIFORMS

### A. REQUIRED UNIFORM

1. Crewmembers shall wear the uniform prescribed by the Company, and in accordance with the appearance standards published by the Company.

2. The Company shall provide new Crewmembers with their first uniform, wings, epaulets, and other required insignia. That uniform shall include one (1) leather jacket, two (2) trousers, four (4) shirts and two (2) ties. All other required or optional uniform items (e.g., shoes, socks, sweaters as allowed) are to be provided by the Crewmember. New Captains shall be provided with their first set of wings and epaulets.

### B. REPLACEMENT UNIFORMS

1. The wings, epaulets and other such insignia will be replaced at the Company's expense when sufficiently worn or damaged. If they are lost or stolen replacement may, at the discretion of the System Chief Pilot, be at the Crewmember's expense.

2. Every January 1, Crewmembers shall receive an annual required uniform replacement credit equal to the cost of one (1) pair of trousers, two (2) shirts and one (1) tie. A Crewmember shall purchase the aforementioned required uniform replacement items with the Company-issued credit card. The Crewmember shall purchase the required uniform replacement items from the Company-designated vendor. Upon notice to the Union, the Company may establish a program whereby the vendor is paid by the Company in lieu of Crewmembers using the Company-issued credit card.

3. If in the course of performing his duties a Crewmember damages a uniform item provided by the Company, that item will be either repaired or replaced (at the Company's discretion) at no cost to the Crewmember. All other worn or damaged uniform items must be replaced at the Crewmember's expense, except as provided in subsection 30.B.2. above. The Company may require that a Crewmember replace a worn or damaged uniform item if it is not in compliance with the Company's appearance standards.

### C. CHANGES IN THE UNIFORM

1. The Company shall have the unilateral right to change the uniform at any time. At least thirty (30) days before making any major change

to the style or color of the uniform, the Company shall notify the Union and, if requested, meet with representatives of the Union to discuss and consider any of its recommendations regarding the uniform, including changes in vendor.

2. Any uniform item provided by the Company that the Company requires be replaced as the result of a uniform style or color change shall be replaced at no cost to the Crewmember, except in the case of a phase-in of the new uniform item, in which case the Company may require that the new item be paid for by the Crewmember as part of the replacement uniform program provided for in subsection 30.B. above.

### D. GENERAL

1. Wings shall remain the property of the Company and must be returned at the end of a Crewmember's employment except in the following cases:

   a. The Crewmember has completed five (5) or more years of Active Service with the Company and the reason for the termination of his employment with the Company is not a discharge for cause; or

   b. The Crewmember has reached age sixty-five (65); or

   c. The Crewmember has completed two (2) years of Active Service with the Company and has lost his required medical certificate.

2. If a Crewmember leaves the employment of the Company for any reason other than furlough within one (1) year after the Company has provided him with his first leather jacket, the Crewmember shall be required, at his option, to either return the jacket or repay the Company for its cost.  The Company shall have the right to withhold the cost of the leather jacket from such Crewmember's last pay check if the jacket has not been timely returned.

# SECTION 31: RESERVE CREWMEMBERS

**A. THERE SHALL BE THREE (3) CATEGORIES OF CREWMEMBER RESERVE STATUS:**

R-1 ("Home Reserve") R-2 ("Hotel Reserve") and R-3 ("Hot Airport Standby"). The Company shall determine the number of and type of Reserve Lines, i.e., R-1 and R-2, and when a Crewmember is assigned to R-3, in accordance with this Section 31. A Regular Line Holder may not be assigned R-1, R-2 or R-3 status except in accordance with Section 25.

**B. RESERVE STATUS 1 (R-1) ("HOME RESERVE")**

1. A Crewmember on R-1 status must be contactable by Crew Scheduling by one of the following methods:

   a. a personal telephone number/telephone answering machine/voicemail provided by the Crewmember; or

   b. Personal Communications Device (PCD).

   The Crewmember shall designate subsection 31.B.1.a. or b., above, as the method of contact that shall be used by Crew Scheduling.

2. A Crewmember on R-1 status must contact Crew Scheduling within thirty (30) minutes of initial contact by Crew Scheduling.

3. After the Company contacts a Crewmember on R-1, the Crewmember's must be able to depart on a flight as follows:

   a. at the commercial airport nearest his residence (including, if closer to his residence, from the Crewmember's Base, or another location if mutually agreeable) five (5) hours from contact when the Company contacts the Crewmember between 0700 and 1200 local time and the Crewmember is deadheading into the applicable Minimum Rest period required by Section 12. The length of the duty period shall be in accordance with Section 12.

   b. at the commercial airport nearest his residence (including, if closer to his residence, from the Crewmember's Base, or another location if mutually agreeable) ten (10) hours from contact when the Crewmember is:

      (i) deadheading into the applicable Minimum Rest period required by Section 12 but the Company did not contact the

> Crewmember within the timeframe set forth in subsection B.3.a., above;

(ii) deadheading from the reporting location to an operating flight;

(iii) assigned an operating flight departing from the reporting location; or

(iv) assigned R-2 or R-3 at the reporting location. The length of the duty period shall be in accordance with Section 12.

c. The contact times in subsection B.3.a. and subsection B.3.b., above, may be waived with Crewmember concurrence.

4. When the Company assigns a Crewmember on R-1 status an operating trip with less than thirty (30) hours notice between initial contact by Crew Scheduling and scheduled report time, the Company shall provide transportation for the Crewmember from his residence to his Base in order to position him for the assignment.

5. When the Company assigns a Crewmember on R-1 status to a trip whose point of origin is other than the Crewmember's Base, the Company shall provide transportation for the Crewmember from his residence to the point of origin of the assignment.

## C. RESERVE STATUS 2 (R-2) ("HOTEL RESERVE")

1. R-2 status shall be assigned at any hotel location designated by the Company or another location that is mutually agreeable.

2. R-2 status begins when the Company notifies a Crewmember that R-2 status has commenced.

3. A Crewmember on R-2 status must be contactable by Crew Scheduling by one of the following:

   a. a personal telephone number/telephone answering machine/voicemail provided by the Crewmember;

   b. a hotel telephone number;

   c. Personal Communications Device (PCD).

   The Crewmember shall designate subsection 31.C.3.a., b., or c., above, as the method of contact that shall be used by Crew Scheduling.

4. A Crewmember on R-2 status must speak with Crew Scheduling within fifteen (15) minutes of initial contact by Crew Scheduling.

5. A Crewmember on R-2 status must be able to report for duty within ninety (90) minutes of initial contact by Crew Scheduling.

6. If the designated location for R-2 status is the Crewmember's Base, lodging will be provided. The Company will provide lodging and per diem at locations other than the Crewmember's Base.

7. A period of R-2 status shall contain a twenty-four (24) hour period free of reserve duty within each seven (7) day period.

8. A Crewmember shall not be assigned to more than sixteen (16) consecutive hours of R-2 status.

   a. A Crewmember, who is notified by Crew Scheduling of a trip at any time during the first fourteen (14) consecutive hours of R-2 status, may be assigned to Work the maximum number of duty hours in a Duty Day under subsection 12.C., including any permissible applicable extension provided therein.

   b. A Crewmember, who is notified by Crew Scheduling of a trip at any time after the first fourteen (14) consecutive hours of R-2 status, may be assigned a trip with a maximum scheduled duty period of fourteen (14) consecutive hours regardless of whether a longer duty period would otherwise be permissible under subsection 12.C. The aforementioned fourteen (14) consecutive hour duty period may be extended in accordance with an applicable extension provision under Section 12.C.

9. A Crewmember on R-2 status shall have a Rest Period of eight (8) consecutive hours designated within each twenty-four (24) hour period. The Crewmember shall be notified of the designated Rest Period no later than eight (8) hours before commencement of the Rest Period.

## D. RESERVE STATUS 3 (R-3) ("HOT AIRPORT STANDBY")

"Hot Airport Standby" means reserve duty at an airport.

1. A Crewmember on R-3 status must be contactable by Crew Scheduling by one of the following methods:

   a. a personal telephone number/telephone answering machine/voicemail provided by the Crewmember;

   b. Personal Communications Device (PCD); or

   c. Airport operations office.

   The Crewmember shall designate subsection 31.D.1.a., b., or c. above, as the method of contact that shall be used by Crew Scheduling.

2. A Crewmember on R-3 status must be in position to block out within

one and one-half hours (1:30) of contact by the Company.

3. R-3 status begins when the Crewmember reports to the airport.

4. All time spent on R-3 status shall count as duty.

5. A Crewmember assigned R-3 status shall not be required to remain at the airport location for more than four (4) hours during a single duty period.   The four (4) hour period may be extended to a maximum of six (6) hours if there is a Company aircraft with available crew rest facilities or a crew lounge at the location.

6. A Crewmember assigned R-3 status shall be limited to the total number of duty hours permitted by subsection 12.C.

7. An R-3 assignment may not be preceded or followed by an R-1 assignment during the same duty period.

   a. If an R-2 assignment follows an R-3 assignment during the same duty period, then reserve duty begins when the Crewmember reports for R-3 and continues during the R-2 assignment up to maximum of sixteen (16) consecutive hours of cumulative reserve duty.

   b. If an R-2 assignment precedes an R-3 assignment during the same duty period, then reserve duty begins when the Crewmember begins R-2 and continues during the R-3 assignment up to maximum of sixteen (16) consecutive hours of cumulative reserve duty.

   c. If subsection 31.D.7.a. or 31.D.7.b., above, applies, an affected Crewmember may be assigned a trip with a maximum scheduled duty period of fourteen (14) consecutive hours regardless of whether a longer duty period would otherwise be permissible under subsection 12.C. The aforementioned fourteen (14) consecutive hour duty period may be extended in accordance with an applicable extension provision under Section 12.C.

**E.  GENERAL**

1. For purposes of Reserve Line construction, every day begins at 0001Z and ends at 2359Z.

2. A Reserve Line Holder who is on Days Off must contact Crew Scheduling between thirty-five (35) and thirty (30) hours prior to the scheduled start of his next assignment to confirm his initial assignment.

# SECTION 32:  NEW EQUIPMENT

### A.  THE COMPANY MAY INTRODUCE NEW EQUIPMENT.

Rates of pay for such New Equipment shall be as specified in Section 3, subsection 32.B. or subsection 32.C, below, whichever is applicable. Except as set forth in the parties' Express Operation Letter of Agreement and subsection 32.C., below, rules and working conditions for New Equipment shall be as set forth in the Agreement.

### B.  RATES OF PAY FOR NEW EQUIPMENT:

1.  The Hourly Rate for Captains and First Officers (F/O) and Flight Engineers (F/E) (if applicable) on New Equipment at Company Longevity of two (2) to twelve (12) years, or more, for aircraft with a normal cruise speed less than ninety-five, one hundredths (0.95) MACH and a certified gross maximum takeoff weight (MTOW) less than six hundred twenty-five thousand (625,000) kilograms shall be determined pursuant to this Section 32, as set forth below.  The hourly rate for new-hire F/O and F/E in their first (1st) year of Company Longevity, regardless of the MTOW of equipment to which they are assigned, shall be as provided in Section 3, unless subsection 32.C applies.  Subsection 32.B. shall not be applicable to such new-hires until they reach their second (2nd) year of Company Longevity; provided, Crewmembers in their second year of Company Longevity and assigned to Light Lift Aircraft as defined below shall remain at their first year rate of pay until they reach their third (3rd) year of Company Longevity.

    a.  Super Jumbo Lift Aircraft

    For any aircraft with a MTOW of five hundred thousand (500,000) kilograms or more, but less than six hundred twenty-five thousand (625,000) kilograms, one hundred eight and three, one hundredths percent (108.03%) of the rates of pay set forth in Section 3, rounded to the nearest whole cent, shall be applicable.

    b.  Jumbo Lift Aircraft

    For any aircraft with a MTOW of three hundred seventy-five thousand (375,000) kilograms or more, but less than five hundred thousand (500,000) kilograms, one hundred percent (100%) of the rates of pay set forth in Section 3, shall be applicable.

c. Heavy Lift Equipment

For any aircraft with a MTOW of two hundred fifty thousand (250,000) kilograms or more, but less than three-hundred seventy-five thousand (375,000) kilograms, ninety-one and ninety-seven, one hundredths percent (91.97%) of the rates of pay set forth in Section 3, rounded to the nearest whole cent, shall be applicable.

d. Medium Lift Aircraft

For any aircraft with a MTOW of one hundred twenty-five thousand (125,000) kilograms or more, but less than two hundred fifty thousand (250,000) kilograms, eighty-three and ninety-four, one hundredths percent (83.94%) of the rates of pay set forth in Section 3, rounded to the nearest whole cent, shall be applicable.

e. Light Lift Equipment

For any aircraft with a MTOW of less than one hundred twenty-five thousand (125,000) kilograms, seventy-five and ninety-one, one hundredths percent (75.91%) of the rates of pay set forth in Section 3, rounded to the nearest whole cent, shall be applicable.

2. In the event any Company equipment type(s) is re-certified resulting in an increased MTOW, the MTOW categories, as specified in subsections 32.B.1.a-e, above, will be applied at the increased MTOW to determine a new hourly rate of pay in that equipment type for Captains, First Officers and Flight Engineers (if applicable). The new hourly rate of pay shall become effective on the first day of the month following re-certification of the equipment type at the increased MTOW.

3. In the event the Company operates an equipment type fleet with varying MTOW between aircraft in that equipment type fleet, the applicable hourly rate of pay for Captains, First Officers and Flight Engineers (if applicable) in that equipment type fleet shall be determined using a Blended MTOW for that equipment type fleet.

a. The Blended MTOW shall be calculated by totaling the MTOW of all individual aircraft in that equipment type fleet to obtain the Total Fleet MTOW, then dividing the Total Fleet MTOW by the total number of aircraft in that equipment type fleet.

b. The Blended MTOW shall be used to calculate hourly rate of pay for Captains, First Officers and Flight Engineers (if applicable) in

that equipment type fleet pursuant to the MTOW categories, as specified in subsections 32.B.1.a-e., above; *provided,* the hourly rate of pay for Captains, First Officers and Flight Engineers (if applicable) so determined shall not be less than the applicable hourly rate of pay then in effect for any aircraft and applicable Status in that equipment type fleet.

## C. NEW EQUIPMENT NEGOTIATIONS:

If the Company intends to introduce New Equipment with a MTOW of six hundred twenty-five thousand (625,000) kilograms or more, or with a normal cruise speed greater than ninety-five, one hundredths (0.95) MACH, the Company will provide at least one-hundred and eighty (180) days advance written notice to the Union prior to placing the New Equipment into service. Upon request by either party after the written notice has been provided, the parties shall meet to discuss whether either party intends to propose rates of pay, rules and/or working conditions applicable to the New Equipment that differ from those contained in subsection 3.A.1.a. of the Agreement, Section 12 of the Agreement, and any other subsections of the Agreement mutually agreed to by the parties.

1. If, within ninety (90) days of receipt of the written notice referred to subsection 32.C., above, unless the parties mutually agree to extend the aforementioned deadline, either party makes a proposal to change rates of pay, rules or working conditions applicable to the New Equipment as described in subsection 32.C, then bargaining shall commence between the parties. If the parties are unable to reach agreement on the issues bargained by the sixtieth (60th) day prior to the date of the introduction of the new equipment, unless the parties mutually agree to extend the aforementioned deadline, the parties will submit their respective last offers on disputed matters to interest arbitration. The arbitrator's resolution of the disputed issues will be on an issue-by-issue basis, rather than a "total package" basis, and will be binding on the parties with respect to the particular dispute, but will have no precedential or binding effect on other or future disputes arising under this Section 32. Rates of pay, rules and/or working conditions will be retroactive to the first day the New Equipment was placed into service. The arbitrator shall have no jurisdiction to issue a decision or award affecting rates of pay, rules or working conditions rates of pay, rules or working conditions for existing equipment.

2. The parties shall attempt to mutually agree upon an arbitrator for proceedings arising under this Section 32. If the parties are unable

to mutually agree upon an arbitrator, the arbitrator shall be chosen by striking names from the panel set forth in subsection 21.C.3.a.  The first strike shall be decided by a coin toss.

# SECTION 33:
# CRAF AND HOSTILE AREA OPERATIONS

### A. APPLICATION

1. This Section 33 applies to all operations into a designated "Hostile Area" pursuant to any Civil Reserve Air Fleet (CRAF) agreement between the Company and the United States Department of Defense, or pursuant to a teaming arrangement with one or more other airlines to provide such operations in a designated "Hostile Area" to the United States Department of Defense.   Unless specifically provided otherwise, all other provisions of this Agreement and any amendments or side letters thereto shall be applicable to such CRAF activated operations.

2. "Hostile Area Operations" means a flight segment, any portion of which, in origin or destination, including a flight segment where the intent is to land or depart, in a Hostile Area as defined in subsection 33.B. A flight segment that involves overflight or transiting over a Hostile Area is not considered a Hostile Area Operation.

3. This Section 33 applies to "Hostile Area Operations" regardless of whether the flight is conducted pursuant to a CRAF agreement or Air Mobility Command (AMC) contract.

### B. HOSTILE AREA

1. The term "Hostile Area" means a geographic area outside the United States in which acts of war, insurrection or terrorism are presently being committed or imminently threatened and where there are materially higher risks and imminent threats of physical harm or danger to commercial aircraft and airline personnel as designated by the U.S. Department of Defense or by agreement of the parties.

   a. If the parties disagree whether an area is "Hostile" pursuant to subsection 33.B.1., above, such dispute may be submitted by the Union to the System Board of Adjustment for final and binding resolution pursuant to expedited interest arbitration. The Board shall base its decision on the criteria set forth in subsection 33.B.1, above. The parties agree to cooperate in expediting such resolution.  Pending the outcome of the System Board of Adjustment proceeding, an area shall not be designated as "Hostile;" *provided,* the compensation and benefit provisions in this Section 33 shall apply retroactively if the area is designated as "Hostile."

b. A Hostile Area designation shall remain effective until the Company rescinds the designation. If the Union disagrees with the Company's decision, such dispute may be submitted by the Union to the System Board of Adjustment for final and binding resolution pursuant to expedited interest arbitration. The Board shall base its decision on the criteria set forth in subsection 33.B.1, above.  The parties agree to cooperate in expediting such resolution.  Pending the outcome of the System Board of Adjustment proceeding, an area shall not be designated as "Hostile;" *provided,* the compensation and benefit provisions in this Section 33 shall apply retroactively if the area is re-designated as "Hostile."

## C. ASSIGNMENTS TO CRAF AND HOSTILE AREA OPERATIONS

1. Assignments to participate in CRAF operations that do not involve the Hostile Area Operations shall not be affected by this Section 33, except as provided in subsection 33.G., below.

2. Hostile Area Operations shall be assigned in the following manner:

   a. The Company shall establish a Hostile Area Operations Pool. Current and qualified Crewmembers may opt into the Pool at any time for one or more periods of three (3) Bid Months ("Pool Crewmember"). A Pool Crewmember shall be subject to Hostile Area Assignments for the entire time he is a Pool Crewmember.

   b. The Company shall first seek to assign Hostile Area Operations to Pool Crewmembers in seniority order to the extent doing so does not disrupt regular operations consistent with current practice;

   c. If such the Hostile Area Operation cannot be assigned pursuant to subsection 33.C.2.b., above, then the Company shall seek to assign such Hostile Area Operation to current and qualified volunteers not in the Pool in seniority order to the extent doing so does not disrupt regular operations consistent with current practice;

   d. If the Hostile Area Operation cannot be assigned pursuant to subsection 33.C.2.b. or subsection 33.C.2.c., above, then it shall be assigned to Management Crewmembers, Contract Pilots or on an involuntary basis in reverse seniority order to the extent doing so does not disrupt regular operations consistent with current practice. If a Crewmember designated for an involuntary assignment objects to the assignment, the Company shall make a reasonable effort to assign the trip to a Management

Crewmember, Contract Pilot or another Crewmember before making the involuntary assignment.

e. The employment and/or utilization of a Contract Pilot shall be limited to the duration of the particular flight(s) to and from the Hostile Area and up to five (5) days thereafter.

## D. COMPENSATION FOR HOSTILE AREA OPERATIONS

1. In addition to any other applicable pay and credit, Hostile Area Operation(s) (actual block to block) will be paid at one hundred and fifty percent (150%) of the Crewmember's hourly rate. The fifty percent (50%) premium paid above the applicable hourly rate shall not be used to offset the Crewmember's monthly guarantee.

2. Compensation for all other CRAF flying shall be paid according to the Agreement.

## E. ADDITIONAL BENEFITS APPLICABLE TO HOSTILE AREA OPERATIONS

1. In addition to any other life insurance for which a Crewmember may be entitled under this Agreement, a Crewmember participating in a Hostile Area Operations shall be provided with life insurance in the amount of five hundred thousand dollars ($500,000.00).

2. A Crewmember who, as a direct result of his participation in an operation in or out of a Hostile Area, suffers a disability that is attributable to hostile activities, that precludes him from continuing his duties shall suffer no loss of income for a period of forty-two (42) months or the length of disability, whichever is less. The Crewmember shall receive sufficient compensation after adding Worker's Compensation, Social Security and any other renumeration to which he may be entitled under governmental or Company programs to sustain the Crewmember's monthly income at the level of the monthly guarantee provided for in this Agreement.

## F. EXPENSES

A Crewmember participating in CRAF and Hostile Area Operations shall be eligible for per diem as specified in this Agreement.

## G. CRAF DUTY LIMITATIONS

Notwithstanding the provisions of subsection 33.A, above, the Company's performance of CRAF operations, whether or not into or out of a designated hostile area, shall, without regard to the level of activation, be governed solely by the limitations on duty time, flight time

and rest time contained in the Special Federal Aviation Regulations (SFARs) issued in conjunction with a CRAF activation, or, if no SFARs have been issued then by such limitations, if any, contained in the Federal Aviation Regulations.  The SFARs or FARs, as applicable shall supersede any conflicting provisions contained elsewhere in this Agreement.

## H.  OTHER HIGH RISK AREAS

The Company shall be responsible for ensuring that adequate security precautions have been taken to ensure the security of a Crewmember required to operate a flight into or out of any area that the United States Department of State or United States Department of Defense has designated as an area of "high threat or risk" or designated as an "area of imminent danger."

# SECTION 34: DURATION

This Agreement shall become effective [the date the arbitration award is signed by the arbitrator and received by the parties] and shall continue in force and effect until [five years from the date the effective date of the Agreement] and shall renew itself without change thereafter, unless written notice by either party of intended change is served in accordance with Section 6, Title I of the Railway Labor Act, as amended, no more than two hundred and seventy (270) days prior to or any time thereafter.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____

William J. Flynn,
President and Chief Executive Officer

_____

David Bourne,
Director,
Teamsters Airline Division

_____

John W. Dietrich,
Executive Vice President and Chief Operator Officer

_____

Joe Muckle,
President
APA Teamsters Local 1224

_____

Jeffrey D. Carlson,
Vice President of Flight Operations

_____

Robert Kirchner,
TEC Co-Chairman

_____

Scott K. Lindsay,
Senior Director, Crew Resources & Contract Administration

_____

Stephen Richards,
TEC Co-Chairman

_____

Robert Ulrich,
Negotiating Committee Chairman

_____

Daniel Wells,
Negotiating Committee

_____

William Holcomb,
Negotiating Committee

                    _____

Paul Kvernplassen,
Negotiating Committee

# SECTION 35: LETTER OF AGREEMENT

**POLAR TRAVEL BANK LOA** ...................................................................

**MATERNITY LEAVE LOA** .......................................................................

**UNION EXPRESS OPERATION LOA** .........................................................

**FLIGHT PAY LOSS LOA** ..........................................................................

**MANAGEMENT CREWMEMBERS LOA** ...................................................

**IMPLEMENTATION LOA** .......................................................................

**APPENDIX A: DAY OFF HOURS PAY FOR OCTOBER 2010** .........................

**ATLAS LAX CLOSURE LOA** .....................................................................

**POLAR ANC CLOSURE LOA** ...................................................................

**FLIGHT ENGINEER REINSTATEMENT SETTLEMENT AGREEMENT LOA** ......

**ATTACHMENT A** ..................................................................................

**RECALL FROM FURLOUGH LOA** .............................................................

**SECTION 11 LOA** .................................................................................

**SECTION 14 LOA** .................................................................................

**SIGNING BONUS LOA** ..........................................................................

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERSin the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

## THEREFORE, BE IT RESOLVED:

### POLAR TRAVEL BANK LOA

1. Beginning on effective date of the Agreement, Polar Crewmembers' unused travel bank credits shall be used in accordance this Letter of Agreement (LOA).

2. Beginning on the effective date of the Agreement, Polar Crewmembers shall not accrue additional travel bank credits.

3. Beginning on the effective date of the Agreement, when the Company is required to purchase a commercial ticket for travel, a Polar Crewmember may use his unused travel bank credits for the following:

   A. To upgrade his class of travel (i.e., purchase business or first class when coach travel is required or first class when business class travel is required).

   B. For beginning or end of Trip Pairing travel to purchase ticket to or from a different location than required by the Agreement (i.e., different air carrier, different routing, different destination).

   C. For required commercial travel within a Trip Pairing, with the approval of Crew Scheduling, the Crewmember may use Travel Bank credits to purchase travel on a different air carrier or routing.

4. When a Crewmember elects to utilize his travel bank for a change in required commercial travel, his bank will be debited the difference between the Company selected travel and the Crewmember selected

travel. Usage of Travel Bank credits must be pre-authorized by the Company and Crewmembers shall advise the Company as early as practicable of their desire to use Travel Bank credits in order to avoid double-bookings.

5. Under no circumstances will a Crewmember's Travel Bank be allowed to become negative.

6. Travel Bank balances shall have no cash value.

This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle
President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,

Negotiating Committee

_____

Paul Kvernplassen,
Negotiating Committee

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

### MATERNITY LEAVE LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the parties reached agreement on the application of Section 13.B of the Collective Bargaining Agreement ("Agreement") to Crewmembers who are or become pregnant;

**WHEREAS,** the parties intend for this LOA to become effective upon effective date of the Agreement;

### THEREFORE, BE IT RESOLVED:

1. A Crewmember who becomes pregnant shall upon her request be placed on a Medical Leave of Absence (MLOA) under Section 13.B. of the Agreement. The MLOA referred to in this LOA shall be for up to nine (9) months as determined by the Crewmember, subject to Paragraph 2 of this LOA.

2. The MLOA referred to in Paragraph 1 of this LOA may begin at any time during the pregnancy through the eighty-ninth (89th) day following termination of the pregnancy. The MLOA referred to herein ends no later than ninety (90) days after termination of the pregnancy.

3. The Company may require an affected Crewmember to provide medical verification of pregnancy from her physician. Providing such verification shall satisfy the requirements of Sections 13.B.1., 13.B.2. and 13.B.8. of the Agreement.

4. An affected Crewmember shall provide the Chief Pilot with written notice of the date of termination of her pregnancy. Notice shall be provided within fifteen (15) days of the date of termination.

5. Subject to Paragraph 2 of this Letter of Agreement, subsection 13.B.3. of the Agreement shall apply to a MLOA referred to herein except the duration of such leave shall be nine (9) months.

6. Sections 13.B.4., 13.B.5., 13.B.6, 13.B.7 and 13.B.9 shall apply to a MLOA referred to herein.

7. An affected Crewmember shall be eligible for insurance benefits while on MLOA on the same basis as other Crewmembers who take an MLOA.

This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,

Negotiating Committee

_____
Paul Kvernplassen,
Negotiating Committee

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

**UNION EXPRESS OPERATION LOA**

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the Company informed the Union that it may commence a new Express Operation; and

**WHEREAS,** the parties have developed a procedure for negotiations and arbitration of specific matters related to commencement of new Express Operations;

**THEREFORE, BE IT RESOLVED:**

A. The Company may introduce a new express operation. Rates of pay for such new equipment shall be determined in accordance with Section 32 of the Agreement. Rules and working conditions covering the Express Operation may differ from those contained in the Agreement as described in Paragraph B. of this LOA.

B. If the Company intends to start an Express Operation, the Company will provide at least one-hundred and eighty (180) days advance written notice to the Union prior to the commencement of the Express Operation. Upon request by either party after the written notice has been provided, the parties shall meet to discuss whether either party intends to propose rules and working conditions applicable to the Express Operation that differ from subsections 25.A.1 (provided, the arbitrator referred to in Paragraph C. of this LOA shall have no authority to award a schedule that includes more than seventeen (17) Duty Days); 25.A.2 (provided, the arbitrator referred to in Paragraph C of this LOA shall have no authority to award a schedule that permits more than three (3) extension days) and 25.C. of the Agreement and any other subsections of the

Agreement mutually agreed to by the parties.

C. Within thirty (30) days of receipt of the written notice referred to Paragraph B. of this LOA, above, unless the parties mutually agree to extend the aforementioned deadline, either party may make a proposal(s) to change rules and working conditions applicable to the Express Operation as described in Paragraph B of this LOA. If the parties are unable to reach agreement on the issues bargained within ninety (90) days from the date of the first bargaining session, unless the parties mutually agree to extend the aforementioned deadline, the parties will submit their respective last offers on disputed matters to interest arbitration. The arbitrator's resolution of the disputed issues will be on an issue-by-issue basis, rather than a "total package" basis, and will be binding on the parties with respect to the particular dispute, but will have no precedential or binding effect on other or future disputes arising under this LOA. Rules and working conditions will be retroactive to the commencement of the Express Operation. The arbitrator shall have no jurisdiction to issue a decision or award affecting rates of pay for the new equipment or rates of pay, rules or working conditions affecting existing equipment.

D. The parties shall attempt to mutually agree upon an arbitrator for proceedings arising under this LOA after either side submits the open issues to arbitration. If the parties are unable to mutually agree upon an arbitrator, the arbitrator shall be chosen by striking names from the panel set forth in subsection 21.C.3.a no later than ten (10) days following expiration of the ninety (90) day period (or any applicable extension) referred to in Paragraph C. of this LOA unless the parties mutually agree to extend the aforementioned deadline. The first strike shall be decided by a coin toss.

E. The arbitration hearing shall commence thirty (30) days after the arbitrator's selection or as soon possible thereafter based upon the arbitrator's availability, unless the parties mutually agree to extend the aforementioned deadline. The hearing shall close and an award shall be issued by the arbitrator no later than sixty (60) days after the close of the hearing. However, if the arbitration hearing and decision is delayed beyond such date and the result thereof is that the commencement of the Express Operation is at risk, the Company may start the Express Operation and implement on a temporary basis rules and working conditions contained in the proposals it submitted to the arbitrator. Temporary rules and working conditions that differ from the arbitrator's award shall be immediately rescinded upon receipt of the arbitrator's award.

Definition: "Express Operation" means a scheduled operation utilizing one (1) or more hubs in the United States of America for flight operations conducted within and between the United States, Canada, Mexico, the Caribbean, Central America and South America. Aircraft used in such operation are aircraft not on the Company's operating certificates as of August 31, 2010 and must have a maximum takeoff weight (MTOW) that is less then 368,300 kilograms.

This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,
Negotiating Committee

_____

Paul Kvernplassen,
Negotiating Committee

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

## FLIGHT PAY LOSS LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the administration of the Collective Bargaining Agreement ("Agreement"), the performance of Union duties related to the representation of Crewmembers, and ongoing labor-management cooperation requires the release of Crewmember from conflicting duty;

**WHEREAS,** the parties have agreed upon procedures related to flight pay loss and benefit reimbursement related to the release of Crewmembers who perform Union duties;

**THEREFORE, BE IT RESOLVED:**

1. Requests for release from duty for Crewmembers performing Union duties shall be made to the Vice President-Flight Operations or his designee. Such requests shall be signed by the President of IBT Local 1224, or his designee. Requests shall be transmitted to the Company in writing as far in advance as practicable. The request will indicate names, dates and duration for which release is requested.

2. Unless otherwise agreed, the Vice President-Flight Operations, or his designee, shall respond in writing and transmit such response in writing to the Union office as soon as practicable, but not later than seven (7) business days following receipt of a request.

3. Union leave to perform Union duties specified in the Agreement shall be granted in accordance with the Agreement. Any response denying or limiting additional leave requests shall include a statement of the grounds upon which such request was denied or limited. If a request for Union leave is denied or limited on account of staffing shortages, the Crewmember may, on his own, attempt to arrange for another

Crewmember to fly his trip(s). However, the Company must approve such an arrangement in advance to ensure that both Crewmembers will be legal and otherwise available to fly their remaining assignments during their Bid Period. Requests for the removal of Crewmembers from flying pursuant to this LOA shall not be unreasonably requested or denied.

4. The Union shall notify the Company promptly when leaves are canceled or terminated before the requested date.

5. Each Crewmember, upon returning from Union duty, shall contact Crew Scheduling immediately to advise the Company of his return and availability for duty.

6. A Crewmember approved for release from flight duty for an entire Bid-Month shall not be eligible to bid for the Bid Month in which leave is taken.

7. A Crewmember shall receive five (5) hours of pay and credit for each day of approved Union leave. A Crewmember shall continue to receive, earn and accrue seniority and Longevity and remain eligible for all benefits of employment as if he had not been released.

8. A Crewmember released from Company duty to perform Union duty may submit standing bids pursuant to the criteria applicable to active Crewmembers in Section 24 ("Filling of Vacancies"), and any vacancy awarded will be deemed a "phantom" Position and awarded pursuant to the procedure set forth in Section 13.H.3. ("Leaves of Absence") if the effective date of the award conflicts with the performance of Union duty.

9. The Company shall invoice the Union each month for reimbursement of the value of all days of release for Union business, together with a fringe benefits override to offset payroll taxes and the Company's contribution to the Crewmember's benefits. The fringe benefits override shall be twenty-five and one-half percent (25.5%). Invoices shall be submitted directly to the [Union official to be designated]. Reimbursement shall be made to the Company no later than thirty (30) days after the invoice is received by the Union.

10. When a Crewmember(s) returns from Union Leave of Absence, the Union's obligation to repay the Company for any pay and benefits will cease when the Crewmember is again qualified on the aircraft to which he will be regularly assigned.

This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources & Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,
Negotiating Committee

_____
Paul Kvernplassen,
Negotiating Committee

### **MANAGEMENT CREWMEMBERS LOA**

October 20, 2009
Captain David Bourne, Director
Airline Division
International Brotherhood of Teamsters
25 Louisiana Ave., N.W.
Washington, DC 20001

Re: Subsection 9.B.2., subsection 9.B.3. and 10.B

Dear David:

This letter sets forth our agreement related to the above-referenced provisions of the Basic Agreement. Qualified management individuals holding the following titles may perform flights referred to in subsection 9.B.2., subsection 9.B.3. and 10.B. pursuant to subsection 9.B.2.(i), subsection 9.B.3.(i) and 10.B, respectively, even if such individuals are not on the System Seniority List(s).

Senior Vice President/Vice President-Flight Operations

Senior Director/Director/Manager-Flight Operations

Senior Director/Director-Training/Flight Standards

Senior Director/Director-Flight Operations Service Group

Manager-Training

Chief Pilot

Fleet Captain/Manager

If the titles referred to herein change, the parties shall amend this letter to include the new titles.  The parties may add additional titles by mutual agreement.

This letter shall not apply to any other Section of the Basic Agreement.

Sincerely,

John W. Dietrich

Executive Vice President & Chief Operating Officer

Agreed Date: _____. 2010

David Bourne, Director

Airline Division

International Brotherhood of Teamsters

**ATLAS AIR, INC.**
**and**
**POLAR AIR CARGO WORLDWIDE, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**ATLAS AIR, INC. and Polar Air Cargo Worldwide Inc. as represented by**
**International Brotherhood of Teamsters, Airline Division**

### IMPLEMENTATION **LOA**

This Letter of Agreement ("LOA") is made and entered in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company" and the Pilots in the service of Atlas Air Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the parties have entered into a single collective bargaining agreement (SCBA) in accordance with the terms of the Negotiations FrameWork Letter of Agreement;

**WHEREAS,** the parties have reached agreement on implementation and related procedures for the SCBA.

### THEREFORE, BE IT RESOLVED:

1. Within sixty (60) days of the effective date of the SCBA, the Company will make four (4) Position Vacancies available for bidding. Within ninety (90) days of the effective date of the SCBA, the Company shall make an additional (4) Position Vacancies available for bidding.  Within one hundred and twenty (120) days of the effective date of the SCBA the Company will make an additional five (5) Position Vacancies available for bidding. All Position Vacancies referred to herein, including any Position Vacancy resulting from another Position Vacancy being filled, will be filled in accordance with Section 24 of the SCBA; provided, there shall be no involuntary assignments in connection with such vacancies. Holding a prior or current Position at Atlas Air, Inc. or Polar Air Cargo Worldwide, Inc., is not necessary to establish "sufficient qualifications" under Section 24.H. of the SCBA.

2. Within sixty (60) days from of the effective date of the SCBA, the Company will make nine (9) First Officer and (4) Captain Position Vacancies available for bidding at the ANC Base.  All Position Vacancies referred to herein, including any Position Vacancy resulting from another Position Vacancy being filled, will be filled in accordance with Section 24 of the SCBA; provided, there shall be no

involuntary assignments in connection with such vacancies. Holding a prior or current Position at Atlas Air, Inc. or Polar Air Cargo Worldwide, Inc., is not necessary to establish "sufficient qualifications" under Section 24.H. of the SCBA

3. If the Company opens a new Base on or after the effective date of the SCBA, Position Vacancies at the new Base will be filled in accordance with Section 24.D.2 of SCBA. A prior or current Position at Atlas Air, Inc. or Polar Air Cargo Worldwide, Inc. is not a "required qualification" under subsection 24.D.2 of the SCBA.

4. On a quarterly basis, the Company will permit Crewmembers in the same Status and equipment at different Bases to "swap" Bases; provided, (1) at least one Crewmember that is assigned to CVG or LAX   Base (or any other Polar-specific Base) swaps with a Crewmember at another Base; and (2) the total number of training events resulting from a swap, regardless of the number of Crewmembers involved (which may be more than two (2) Crewmembers), does not exceed two (2) training events.

The parties shall mutually agree on administrative examples.

   a. Swaps will be awarded in system seniority order based on a Crewmember's standing bid preferences after all Position Vacancies have been filled in accordance with Section 24 of the SCBA.   There will be no involuntary swaps.   Awards will be published by the 10th day of the month.   Swap awards will become effective on the date the Crewmember commences training. If no training is required for a Crewmember involved in a swap, the swap award shall become effective on the first day of the following bid month.   The Company will schedule training as soon as practicable following a swap award.

   b. If the Crewmember is awarded or assigned a Position Vacancy in accordance with Section 24 of the SCBA prior to the effective date of the swap, the Position Vacancy award or assignment will supersede the Crewmember's swap award.

   c. The total number of Crewmember swaps per quarter shall be limited as follows:

      i. no limitation on swaps that do not require training (Home Base Training is not considered training for purposes of this Paragraph 4.c.i.) ; provided, the swap complies with Paragraph 4 of this LOA;

      ii. no more than eight (8) swaps that require training that is equal to or less than the number of days associated with

> recurrent training, including any portion thereof assigned as Home Base Training and deadhead to and from training;

iii. no more than four (4) swaps that require training that exceeds the number of days associated with recurrent training, including any portion thereof assigned as Home Base Training and deadhead to and from training;

Nothing contained in Paragraph 4.c. shall affect Crewmembers' rights to be awarded a Position Vacancy under this LOA or Section 24 of the single CBA.

5. The Company will post Position Vacancies in accordance with Section 24.C on a quarterly basis, even if there is only a single Position available for posting.

6. All Position Vacancies after the effective date of the SCBA will be filled in accordance with Section 24 of the SCBA. Holding a prior or current Position at Atlas Air, Inc. or Polar Air Cargo Worldwide, Inc., is not necessary to establish "sufficient qualifications" under Section 24.H of the SCBA.

7. The Company will administer the following provision set forth in subsection 25.M.2.c.(ii) of the single SCBA, "All other Open Time trips shall be offered and awarded on the basis of system seniority; provided, the Company is not obligated to choose a Crewmember on the basis of system seniority if the Company can select the next available Crewmember which does not incur a substantial cost to the Company" on a certificate specific basis until an MOCTP or its equivalent or a comparable structure is approved by the FAA and fully implemented.

8. Beginning August 1, 2011 or the first day of the first Bid Month following the effective date of the Agreement, whichever occurs later, pay protection payments will be made monthly using the information set forth in this Paragraph 8. Pay protection will be applied on a Position-by-Position basis to those common-type aircraft fleets operated by Crewmembers at both carriers based on the following sequential steps on a monthly basis:

a. Determine the specific percentage (rounded to the nearest one-hundredth percent (0.01%)) of Crewmembers in Active Service in a Position at Atlas and Polar by dividing the number of Crewmembers in Active Service in that Position at Atlas and Polar by the sum of Crewmembers in Active Service in that same Position at both carriers;

b. Determine the specific percentage (rounded to the nearest one-hundredth percent (0.01%)) of Day Off Hours ("DOH") paid (DOH paid equals the sum of hours paid, as set forth in Section 3.C.2. and Section 3.C.3.) to a Position at each carrier by dividing the DOH paid to that Position at Atlas and Polar by the sum of DOH paid to that same Position at both carriers;

c. Determine if there is a shortfall in DOH paid to a Position at either Atlas or Polar, as applicable, by comparing the specific percentage of Crewmembers in Active Service in that Position at either Atlas or Polar, as applicable, as determined in subparagraph a) above, to the specific percentage of DOH paid, as determined by subparagraph b), above, to that same Position at either Atlas or Polar, as applicable;

d. Determine the pay protection hours (rounded to the nearest one-hundredth (0.01) hour) to be paid to a Position at either Atlas or Polar, as applicable, that experiences a shortfall by multiplying the percentage of shortfall of DOH, as determined by subparagraph c), above, by the sum of the DOH paid to that same Position at Atlas and Polar to determine the number of hours of shortfall that occurred;

e. Determine the pay protection hours (rounded to the nearest one-hundredth (0.01) hour) due each individual by dividing the shortfall hours calculated in paragraph d), above, by the number of individuals in the same Position at Atlas or Polar that experienced the shortfall.  If the result of this calculation is less than one-hundredth (0.01) hour per individual, no pay protection payment shall be due.

f. Payments due, if any, shall be made at the applicable First Officer's and/or Captain's hourly pay rate.

g. The parties have agreed on a Day Off Compensation Calculator (Appendix A) which shall be used to administer this Paragraph 8.

h. If the Total Day Off Compensation Distribution Amount paid to Crewmembers is less than $1.5 million dollars when payments cease pursuant to Paragraph 8.i., below, the remainder shall be distributed to Crewmembers in a method determined by the Union.

i. Payments will be made on the second check of each month, when payments are made for extra day compensation.

9. The Company will apply for an MOCTP or its equivalent or a

comparable structure on or before November 30, 2010.   The Company will provide the Union with copies of all related FAA filings. The Company and Union shall use their best efforts to facilitate FAA approval of the MOCTP or its equivalent or a comparable structure, including jointly attending meetings with FAA, as appropriate, and sharing information related to the Company's application and subsequent submissions.  Upon approval of FAA, the Company will fully implement an approved MOCTP or its equivalent or a comparable structure.

10. If the Company expands an existing operation or commences new operation on or after the effective date of the SCBA, the Company will make available and fill Position Vacancies in accordance with Section 24 of the SCBA.  Section 3 of the SCBA shall become effective on the first day of the first Bid Month following the effective date of the SCBA.

11. Other implementation items are as follows:

### Section 2

The effective date of a definition in Section 2 shall be the effective date of the Section(s) of the SCBA that contain the definition.

### Section 3

The lists referred in Section 3.A.1.d.i. and Section 3.A.1.d.ii. shall become effective the first day of second Bid Month following the effective date of the SCBA.

Section 3.F.4. shall become effective the  first Bid Period  following ninety (90) days from the effective date of the SCBA.

Compensation earned prior to effective date of the SCBA shall be paid at the rates in effect prior to the effective date of the SCBA.

Section 3 of the SCBA shall become effective on the first day of the first Bid Month following the effective date of the SCBA

In the event computer programming work required to implement the new pay hour scheme (for example, CRT rig) are not completed prior to the effective date of the Agreement, the Company shall have 90 days to complete such programming and make Crewmembers whole for any additional pay.

### Section 4

Polar Air Cargo Worldwide, Inc. Crewmembers shall receive Profit Sharing Allocation payments beginning in the calendar year following the year in which the Agreement becomes effective for profits in the

preceding year on the same basis as Atlas Air, Inc. Crewmembers, consistent with the terms of the Plan.

### Section 7

Previously awarded vacation under the current Atlas and Polar CBAs shall not be changed as a result of Section 7 of the SCBA.

Any Crewmember hired on or before February 25, 2008 who is on the Pilot or Flight Engineer Seniority List on the effective date of the SCBA shall be grandfathered to allow accrued vacation at the rate of one and three quarters (1.75) days per month after the completion of five (5) years of Active Service with the Company.  Such provision shall begin January 1 of the year in which the SCBA becomes effective.

Subject to subsection 7.D.8, existing accrued but not used, paid or awarded vacation shall be paid out at the rates in effect prior to the effective date of the SCBA.   Payment shall be made no later than two (2) pay periods following the effective date of the SCBA.

Accrual rates set forth in Section 7.A. and Section 7.B. are effective on the first day of the first Bid Month following the effective date of the SCBA.

If the SCBA is not in effect by August 1, 2011, the parties shall meet to discuss implementation procedures related to Section 7.C.1.

### Section 8

Deadhead travel resulting from tickets that were purchased prior to effective date of the SCBA may be completed as scheduled.

Section 8.E. shall become effective seventy-two (72) hours after the effective date of the SCBA.

### Section 9

Section 9 shall become effective seventy-two (72) hours after the effective date of the SCBA.

### Section 10

Section 10 shall become effective seventy-two (72) hours after the effective date of the SCBA.

### Section 12

Section 12 shall become effective on the first day of the second Bid Month following the effective date of the SCBA; provided, (1) Polar Crewmembers who were awarded a sixty (60) day line prior to the effective of the SCBA may complete their line as published even if

such line conflicts with terms of Section 12; and (2) Atlas Crewmembers who are were assigned "carry over" Trip Pairings prior to the effective date of the SCBA may complete such Trip Pairings even if the Trip Pairings conflict with the terms of Section 12.

### Section 13

Leaves of absence in effect on the effective date of the SCBA shall not be reduced by Section 13; however, any increases in the duration of leaves or benefit improvements under Section 13 shall apply to such Crewmembers.

Regarding insurance while on a leave of absence that commenced prior to the effective date of the SCBA, the Company will apply the new plans and percentages to Crewmembers on a leave of absence when the changes become effective for active Pilots, subject to the open enrollment periods agreed to by the parties.

Pilots on a leave of absence prior to the SCBA will receive the benefit of the improved seniority, Longevity and insurance provisions in the SCBA, if applicable, but no reductions as a result of the SCBA.

After the Company provides the Union with the sick leave balances of all Polar Pilots currently on a leave of absence, including type of leave, the Union will notify the Company whether affected Pilot's sick leave should be converted as set forth in the SCBA or continued in accordance with the Polar CBA.

### Section 14

Section 14 is effective on the first day of the first Bid Month following the effective date of the SCBA.

### Section 20 and 21

Any grievance arising under Section 20 of the Atlas or Polar CBA, whichever is applicable, shall continue to be processed under the applicable CBA, up to and including the System Board of Adjustment established by the applicable CBA.

### Section 24

Crewmembers subject to a seat lock or bidding freeze under the Atlas or Polar CBA shall continue to be subject to the applicable seat lock or bidding freeze, if any; provided, if the duration of the applicable seat lock or bidding freeze under the SCBA is less than applicable seat lock or bidding freeze under the Atlas or Polar CBA, then the affected Crewmember's seat lock or bidding freeze shall expire in accordance with the terms of the SCBA.  If a Crewmember is subject to a seat lock or bidding freeze under the Atlas or Polar

CBA for which there is no seat lock or bidding freeze under the SCBA, then the affected Crewmember shall be released from such seat lock or bidding freeze on the effective date of the SCBA and will be eligible to be awarded a new Position when Position Vacancies are posted for bidding.

**Section 25**

Provisions of Section 25, other than those referenced below, shall become applicable for all Crewmembers on the effective date of the SCBA.

For Atlas Crewmembers, the provisions of sections 25.B through 25.K shall become effective no later than the first day of the second Bid Month following the effective date of the SCBA or bidding for the June Bid Period.   Bidding provisions of the existing CBA shall remain in effect until such time.

Polar Crewmembers who were awarded a sixty (60) day line prior to the effective of the SCBA may complete their line as published even if such line conflicts with terms of Section 25; and

Atlas Crewmembers who were assigned "carry over" Trip Pairings prior to the effective date of the SCBA may complete such Trip Pairings even if the Trip Pairings conflict with the terms of Section 25.

**Section 28**

The Company shall ensure that Polar Air Cargo Crewmember accounts from The Polar Air Cargo Pilots 401(k) Savings & Investment Plan are transferred to the Atlas Air, Inc. Retirement Plan.  The Company shall manage the transition and inform the Polar Air Cargo Crewmembers when completed.

Upon request of the Union, the Company will meet to discuss the process and timing of the transfer.

For purposes of "completed years of service" within the meaning of Section 28.A.2., Crewmembers shall receive credit for all years of service with employment with Polar Air Cargo, Inc. and Atlas Air, Inc.

**Section 31**

Section 31 shall become effective on the first day of the second Bid Month following the effective date of the SCBA.

12. The Check Airmen, Designated Examiner and Instructor list provisions set forth in subsection 3.A.1.d. shall be administered on a certificate-specific basis until an FAA approved MOCTP is fully

implemented. Section 11.(A).A.2.of the 2002 Atlas CBA shall apply to the staffing of the Atlas Training Department until an FAA-approved MOCTP is fully implemented.  Section 11.F of the SCBA shall apply to the Polar Training Department on the first day of the Bid Month following the effective date of the SCBA.

13. If the Arbitrator's decision includes provisions related to partial transactions  (e.g. a transaction(s) resulting in the disposal of and/or transfer of a defined percentage of any aircraft fleet type, operating certificates or an operating component, such as Polar Air Cargo Worldwide, Inc., or a combination thereof) and such provisions require an entity described in the Union's proposals to secure the acquirer's agreement to offer employment to current and qualified Crewmembers covered by the single collective bargaining agreement, or any similar provisions related to Crewmember qualifications, and the Company has not fully implemented a Federal Aviation Administration (FAA)-approved Multiple Operator Certificate Training Program (MOCTP) or its equivalent or a comparable structure, then pending approval and implementation of an FAA-approved MOCTP or its equivalent or a comparable structure:

   a. "current and qualified Crewmembers" or any similar provision related to Crewmember qualifications,  shall be applied without regard to whether a Crewmember is current and qualified under a particular operating certificate.  Instead, "current and qualified," or any similar provisions related to Crewmember qualifications, shall mean the Crewmember is current and qualified on the aircraft fleet type affected by the transaction without regard to operating certificate; and

   b. employment offers with the acquirer shall be offered in system seniority order to Crewmembers who are current and qualified Crewmembers as described in Paragraph 1, above, the number of which shall be in accordance with the provisions of the Arbitrator's decision.

14. If an MOCTP or its equivalent or a comparable structure has not been fully implemented within forty-two (42) months after the effective date of the SCBA, Section 34 of the SCBA shall be amended without further action as follows:  "This Agreement shall become effective [the date the arbitration award is signed by the arbitrator] and shall continue in force and effect until [five (5) years from the date the arbitration award is signed by the arbitrator] and shall renew itself without change thereafter, unless written notice by either party of intended change is served in accordance with Section 6, Title II, of the Railway Labor Act, as amended, no more than three

hundred and sixty five (365) days prior to or any time thereafter."

15. On the effective date of the SCBA, Crewmembers shall be employed by Atlas Air, Inc.

16. Paragraphs 1, 2, 11 and 12 of this LOA shall terminate after the Company performs the obligations set forth therein.   Paragraphs 3, 6, 10 and 15 of this LOA shall remain in effect concurrent with the SCBA.  Paragraphs 4, 5, 7, 8, 9 and 14 of this LOA shall terminate when an FAA-approved MOCTP or its equivalent or a comparable structure is fully implemented.   Paragraph 13 of this LOA shall terminate on the first day of the second Bid Month after an FAA-approved MOCTP or its equivalent or a comparable structure is fully implemented.

17. This LOA shall be enforceable through Section 20 and Section 21 of the SCBA.

**DEFINITIONS:**

"Fully implemented" means every active Crewmember with a type rating in an aircraft type assigned to more than one certificate (e.g., B-747-400) is qualified in his Status to perform flight duties in such aircraft type, regardless of certificate, without additional training (e.g. a Pilot who completed a flight assignment on an Atlas Air certificated aircraft may deplane and operate a Polar Air Cargo certificated aircraft without additional training).

"MOCTP or its equivalent or a comparable structure" means an FAA-approved training program that permits Crewmembers to perform flight duties on any aircraft in the Company's fleet with a common type rating, without regard to the certificate to which the aircraft is assigned, with no additional training.

"Position" as used in Paragraph 8 of this LOA means Status and Aircraft Type without regard to Base.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____        _____
John W. Dietrich,                                      David Bourne,
Executive Vice President and Chief        Director,
Operator Officer                                       Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,
Negotiating Committee

_____
Paul Kvernplassen,
Negotiating Committee

**APPENDIX A: DAY OFF HOURS PAY FOR OCTOBER 2010**

Theoretical Example:

| Position | Active Headcount * | Paragraph "a" Result | Day Off Hours Oct 2010 | Paragraph "b" Result | Paragraph "c" Result (b-a) | Shortfall | Pay Protection Hours ("c" x Total DOH) | Pay Protection Hours Per Individual |
|---|---|---|---|---|---|---|---|---|
| Atlas 744CA | 153 | 64.29% | 1,260 | 70.00% | 5.71% | N/A | | |
| Polar 744CA | 85 | 35.71% | 540 | 30.00% | -5.71% | Yes | (102.78) | 1.21 |
| Total 744CA | 238 | | 1,800 | | | | | |
| | | | | | | | | |
| Atlas 744FO | 262 | 72.78% | 1,496 | 68.00% | -4.78% | Yes | (105.16) | 0.40 |
| Polar 744FO | 98 | 27.22% | 704 | 32.00% | 4.78% | N/A | | |
| Total 744FO | 360 | | 2,200 | | | | | |

\* As reported by Flight Operations Finance Department

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**ATLAS AIR, INC. as represented by**
**International Brotherhood of Teamsters, Airline Division**

## ATLAS LAX CLOSURE LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

## THEREFORE, BE IT RESOLVED:

1. On December 1, 2010 the Company will announce the closure of the Atlas-LAX Base. The Company will on the same date post Position Vacancies at other current Bases. The total number of Position Vacancies at the other current Bases will be equal to or greater than the number of Atlas Crewmembers by Status assigned to the Atlas-LAX Base. All Position Vacancies referred to herein, including Position Vacancies resulting from a Crewmember awarded a Position Vacancy pursuant to this Paragraph 1 that the Company elects to fill, will be filled in accordance with the Atlas Air, Inc. Collective Bargaining Agreement.

2. On 12/1/2010, the Company will offer Gateway rights to all Atlas Crewmembers in accordance with the October 20, 2010 Section 6 single collective bargaining agreement (SCBA) tentative agreement between the parties.

3. The Company will not close a Base after closure of the Atlas-LAX Base unless the need to close the Base is caused, in major part, by an event or circumstance beyond the control of the Company. The term "event or circumstance beyond the control of the Company" means:

   a. a natural disaster;

   b. a labor dispute;

   c. grounding of a substantial number of the Company's aircraft by government agency or voluntary action by the Company for safety reasons in lieu thereof, which in either case could not be avoided or cured by the Company;

d. reduction in flying operations because of a decrease in available fuel supply or suppliers being unable to provide sufficient critical materials for the Company's operations;

e. revocation of the Company's operating certificate(s);

f. war emergency;

g. acts of terrorism;

h. owner's delay in delivery of aircraft scheduled for delivery;

i. manufacturer's delay in delivery of new aircraft.

In addition to the above, if a customer of the Company or the Company requires flying assigned to a particular Base be assigned to another Base as a result of entering into a new contract or similar business agreement or maintaining a current contract or similar business agreement, the Company may close the Base utilizing the provisions of Section 24 of the Atlas Collective Bargaining Agreement. The Company will provide the Union with information necessary to verify the customer or Company requirement referred to herein.

4. Prior to the effective date of the SCBA, the Company may open a new Base with the concurrence of the Union. The Union shall not unreasonably withhold its concurrence.

5. On December 1, 2010, the Company will post eight (8) Captain 747-400 Position Vacancies at the HSV Base. Such Position Vacancies will be filled in accordance with Section 24 of the Atlas Air Inc. Collective Bargaining Agreement.

6. On December 1, 2010, the Company will post four (4) Captain 747-400 Position Vacancies at one or more current Bases. Such Position Vacancies will be filled in accordance with Section 24 of the Atlas Air Inc. Collective Bargaining Agreement.

7. Unless the parties agree otherwise, this LOA will become null and void on the effective date of the SCBA; *provided*, the Company has performed the obligations contained herein.

8. This LOA shall be enforceable through Section 20 and Section 21 of the Agreement.

For Atlas Air, Inc.:

For International Brotherhood Of Teamsters, Airline Division:

December 3, 2010

**LETTER OF AGREEMENT**
**between**
**POLAR AIR CARGO WORLDWIDE, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**POLAR AIR CARGO, INC. as represented by**
**International Brotherhood of Teamsters, Airline Division**

### POLAR ANC CLOSURE LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Polar Air Cargo Worldwide, Inc., their successors and assigns ("Company") and the Pilots in the service of Polar Air Cargo Worldwide, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

### THEREFORE, BE IT RESOLVED:

1. On February 1, 2011 the Company will announce the closure of the Polar-ANC Base.  The Company will on the same date post Position Vacancies at the Polar-CVG and Polar-LAX Bases.   The total number of Position Vacancies at the Polar-CVG and Polar-LAX Bases will be equal to or greater than the number of Polar Crewmembers by Status assigned to the Polar-ANC Base.   All Position Vacancies referred to herein, including Position Vacancies resulting from a Crewmember being awarded a Position Vacancy pursuant to this Paragraph 1 that the Company elects to fill, will be filled in accordance with the Polar Air Cargo Collective Bargaining Agreement.

2. On February 1, 2011, the Company will offer Gateway rights to all Polar Crewmembers in accordance with the October 20, 2011 Section 6 SCBA tentative agreement between the parties.

3. The Company will not close a Base after closure of the Polar-ANC Base unless the need to close the Base is caused, in major part, by an event or circumstance beyond the control of the Company.  The term "event or circumstance beyond the control of the Company" means:

   a.  a natural disaster;

   b.  a labor dispute;

   c.  grounding of a substantial number of the Company's aircraft by government agency or voluntary action by the Company for

safety reasons in lieu thereof, which in either case could not be avoided or cured by the Company;

d.   reduction in flying operations because of a decrease in available fuel supply or suppliers being unable to provide sufficient critical materials for the Company's operations;

e.   revocation of the Company's operating certificate(s);

f.   war emergency;

g.   acts of terrorism;

h.   owner's delay in delivery of aircraft scheduled for delivery;

i.   manufacturer's delay in delivery of new aircraft.

In addition to the above, if a customer of the Company or the Company requires flying assigned to a particular Base be assigned to another Base as a result of entering into a new contract or similar business agreement or maintaining a current contract or similar business agreement, the Company may close the Base utilizing the provisions of Section 24 of the Polar Air Cargo Collective Bargaining Agreement.   The Company will provide the Union with information necessary to verify the customer or Company requirement referred to herein.

4.   Prior to the effective date of the SCBA, the Company may open a new Base with the concurrence of the Union.  The Union shall not unreasonably withhold its concurrence.

5.   Unless the parties agree otherwise, this LOA will become null and void on the effective date of the SCBA; provided, the Company has performed the obligations contained herein.

6.   This LOA shall be enforceable through Section 20 and Section 21 of the Agreement.


For Polar Air Cargo Worldwide, Inc:

December 3, 2010

For International Brotherhood Of Teamsters, Airline Division:
Dan C. Wells
December 23, 2010

**LETTER OF AGREEMENT
between
POLAR AIR CARGO, INC.
and
THE CREWMEMBERS
in the service of
POLAR AIR CARGO, INC. as represented by
THE AIRLNE PILOTS ASSOCIATION, INTERNATIONAL**

**FLIGHT ENGINEER REINSTATEMENT SETTLEMENT AGREEMENT LOA**

THIS LETTER OF AGREEMENT is made and entered into by and between POLAR AIR CARGO, INC. (hereinafter referred to as "Polar" or "the Company") and the CREWMEMBERS in the service of POLAR AIR CARGO, INC., as represented by the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter referred to as "the Association").

**WHEREAS**, on July 10, 2006, Polar terminated the employment of the fifty-seven (57) flight engineers whose names appear on Attachment A to this Flight Engineer Reinstatement Settlement Agreement (the "FEs" or "Grievants"), effective 2359z on June 30, 2006; and

**WHEREAS**, ALPA filed or caused to be filed individual grievances challenging those terminations; and

**WHEREAS**, those grievances have progressed to the Polar Air Cargo Pilots' System Board of Adjustment (the "Board") for a consolidated hearing; and

**WHEREAS**, the Company has offered reinstatement to the FEs and has commenced the steps necessary to accomplish the reinstatement of the FEs; and

**WHEREAS**, the Company, ALPA and the FEs (collectively, the "Parties") wish, under the unique facts presented, to fully and finally resolve the fifty-seven (57) consolidated grievances now pending before the Board;

**WHEREAS**, the Company and ALPA have agreed to provide the FEs three options, to include reinstatement, resignation (retirement), and Recall Leave of Absence;

**WHEREFORE, FOR AND IN CONSIDERATION** of the mutual promises contained herein, the sufficiency of which are hereby acknowledged, Polar, ALPA, and ALPA on behalf of the FEs agree as follows:

A. Make Whole Provisions (Back Pay, Benefit Expenses, other)

    1. Back pay shall be paid to each FE for the period of July 1, 2006 until October 31, 2006, inclusive. An individual FE's back pay entitlement shall be based on his applicable hourly rate

(including any longevity increase during this time period) times 65 hours per month, subject to the following:

a. Backpay will be reduced by the amount of any compensation received from interim employment and unemployment benefits.

b. Backpay will not be reduced by the amount of any compensation earned as a result of employment that existed prior to July 1, 2006 and that continued during the period of discharge.

c. FEs shall be not be eligible for backpay during any period in which he or she was, absent discharge, otherwise ineligible for active service (e.g., on a medical or military leave of absence, etc.).

d. There shall be no entitlement to per diem.

e. Standard deductions shall be taken from backpay, including, without limitation, state and federal taxes, Social Security, Medicare, dues check-off, premiums that otherwise would have been paid for insurance, 401(k) deferrals, etc. [Note: 401(k) deductions cannot include loan payments.]

f. Receipt of backpay is contingent upon the FE's completion and submission of Attachment B to this Settlement Agreement.

2. Each FE shall be made whole for his benefit expenses for the period of July 1, 2006 until October 31, 2006, inclusive, as follows:

a. FEs who elected COBRA shall receive reimbursement of COBRA payments, minus the amount of the applicable employee contribution;

b. FEs who did not elect COBRA but purchased private health insurance shall receive reimbursement up to the amount of the COBRA payments they otherwise would have made, minus the amount of the applicable employee contribution; or

c. FEs who did not elect COBRA or purchase private health insurance shall receive reimbursement, up to the amount of the COBRA payments they would have made, minus the amount of the applicable employee contribution, for out-of-pocket medical expenses.

   d. Receipt of benefits expenses listed covered above is contingent upon the FE's completion and submission of Attachment B to this Settlement Agreement.

   e. Notwithstanding paragraphs 2.a. through 2.d., above, an FE who was not covered by Company-sponsored insurance at the time of his discharge shall not be entitled to reimbursement under paragraphs 2.a. through 2.d., above.

3. Each FE shall be credited for the vacation that would have been accrued during any period during which the FE is eligible for backpay.

4. Each FE shall receive the Company matching contribution to any 401(k) monies he directs be withheld from his back pay.

5. The Company will undertake the normal procedures reasonably necessary to request that the IRS re-characterize any FE 401(k) loan defaults that occurred during the back pay period through the Voluntary Correction Program. If the IRS declines to re-characterize the loan defaults, the Company will make payment of the l0% penalties arising from such defaults to the affected FEs.

6. Each FE who was a participant in the Company's health care plan and/or Cash Plan as of 1200 on June 30, 2006, shall be retroactively reinstated to such plan as if there had been no interruption to his employment caused by termination; provided, however, that no claims shall be paid on the Company's health care plan for the period July 1, 2006, until October 31, 2006, inclusive, except as provided in paragraph 2. above.

B. Certification of Intent to Return to Work, Resign, or Accept a Recall Leave of Absence (Attachment C).

   1. Each FE is required to complete and submit to the Company Attachment C to this Settlement Agreement indicating whether he intends to return to work, resign (or retire), or accept a Recall Leave of Absence as provided for in paragraph E, below.

   2. In order to be effective, Attachment C must be received by the Company by 1800 EST, November 17, 2006. If the Company has not received a fully completed Attachment C by this date and time the FE irrevocably shall be considered to have declined reinstatement, and shall be treated in accordance with the provisions of paragraph D, below.

   3. Attachment C may be delivered to the Company by:

      a. Personal delivery to the office of Polar's Chief Pilot.

      b. Electronic transmission (email) to Polar's Chief Pilot of a "pdf" file of Attachment C signed by the FE, followed by a signed original delivered by U.S. Mail to Polar's Chief Pilot.

      c. A facsimile transmission of Attachment C, signed by the FE, sent to (914) 701-8867, followed by a signed original delivered by U.S. Mail to Polar's Chief Pilot.

      d. It is agreed and understood that ALPA may complete, sign and submit Attachment C on an FE's behalf.

C. Reinstatement

   1. Reinstatement of an FE who timely submits Attachment C shall be effective November 1, 2006 and his initially assigned base shall be ORD.

   2. Each reinstated FE shall have his sick bank restored to the level existing at 2359z on June 30, 2006, increased by the sick bank days that would have accrued during any period during which the FE is eligible for backpay herein.

   3. A reinstated FE shall have his travel bank restored to the level existing at 2359z on June 30, 2006.

   4. Each reinstated FE shall be entitled to unpaid vacation for use in 2007 equal to the difference between their accrued vacation as provided in paragraph A.3, above, and the number of vacation days to which they would have been entitled had they not sold their accrued vacation back to Polar upon his termination. Such vacation shall be subject to the normal vacation bidding procedures.

   5. Each reinstated FE shall retain his position on the Polar Crewmembers' System Seniority List, and shall be credited with accrued longevity for July 1, 2006 until October 31, 2006 consistent with the terms of the Polar/ALPA collective bargaining agreement, as if there had been no interruption to his employment caused by his termination.

   6. Reinstated FEs who choose to return to the Company's health insurance plan shall not be treated as new entrants and thus shall not be subject to preexisting condition exclusions because of their termination(s) and reinstatement(s).

   7. Life and AD&D insurance coverage as of November 1, 2006, will be available to FEs who elect reinstatement without evidence of insurability.  Supplemental Life and Supplemental AD&D

insurance coverages that had been elected as of June 30, 2006 may be reinstated as of July 1, 2006 without evidence of insurability.

D. Resignation and Retirement

1. An FE who declines reinstatement by indicating such on Attachment C, or by failing to timely submit Attachment C, shall be considered to have irrevocably resigned his employment effective 2359z, on October 31, 2006.

2. An FE who has declined reinstatement but who has reached age sixty (60) and has five (5) years of Company service as of October 31,2006 shall have his sick bank restored to the level existing at 2359z on June 30, 2006, increased by the number of sick bank days that would have accrued during any period during which the FE is eligible for backpay herein, and shall be eligible for the retirement "sick leave pay-out" provided for in Section 14.C.7 of the Polar/ALPA Collective Bargaining Agreement.. FEs who elect to retire as of October 31, 2006 will be offered COBRA with an October 31, 2006 qualifying date. This retirement election is a new COBRA qualifying event and is separate from any previously occurring COBRA event.

E. Recall Leave of Absence.

If an FE elects a "Recall Leave of Absence" on Attachment C, the following will apply:

1. Effective 2359z, on October 31, 2006, the FE will be placed on an indefinite leave of absence.

2. While on a Recall Leave of Absence the FE shall retain and continue to accrue seniority.

3. While on a Recall Leave of Absence the FE shall retain but will not accrue longevity.

4. A Recall Leave of Absence shall be unpaid.

5. An FE on Recall Leave of Absence shall have no uni1atera1 right to return to work, but shall be treated for this purpose as if on furlough, and any and all rights to return to work shall be as provided in Section 23.B or any successor language thereto.

6. An FE's right to recall while on Recall Leave of Absence shall expire after five (5) years, or if the provisions of Section 23.B.3 become effective, at which time the FE's name will be removed from the seniority list.

F. General

1. All records of the Section 19 proceedings in this matter shall be removed from each FE's personnel file.

2. ALPA, and ALPA on behalf of the FEs, shall withdraw the fifty-seven (57) consolidated grievances now pending before the Board. Those fifty-seven (57) consolidated grievances shall be considered to be, and are, null and void and shall not be refiled or otherwise pursued.

3. The Company, ALPA and ALPA behalf of the FEs agree that this Settlement Agreement is in resolution of disputed claims and shall not be deemed or otherwise construed as an admission by Polar that the FEs were terminated without just cause or that Polar otherwise violated the Polar/ALPA collective bargaining agreement.

4. This Settlement Agreement shall not constitute a precedent for use in any other matter, nor shall it be deemed to establish a practice. Neither Polar, ALPA nor any Polar crewmember (including, without limitation, any or all of the FEs) will raise or otherwise make reference to, or cause or allow any reference to be made to, this Settlement Agreement, the terms thereof, the underlying facts, or the results of this Settlement Agreement in any litigation, administrative proceeding, grievance proceeding, hearing, System Board of Adjustment hearing, or other adjudication except as necessary to enforce the terms of this Settlement Agreement.

5. Notwithstanding paragraph F.4, the parties are not precluded from introducing this Settlement Agreement into the proceedings of Grievance 07-06GG so long as the sole purpose of such introduction is to show that every FE has received a full remedy for the termination of his employment, effective 2359z on June 30, 2006. The parties likewise are not precluded from introducing this Settlement Agreement into the proceedings of the Atlas/Polar crewmember seniority integration arbitration hearings before Arbitrator R.O. Harris.

6. The Association specifically stipulates and warrants that it has authority to settle these consolidated grievances on behalf of the FEs.

7. The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties. Should any

provision of this Settlement Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms, or provisions shall not be affected thereby, and said illegal or invalid part, term, or provision shall be deemed not to be a part of this Settlement Agreement.

8. The parties agree to work cooperatively to resolve any disputes that may arise under this agreement, with the understanding that its back pay, benefit expense reimbursement and other provisions arc intended only to restore the affected FEs to the same pay and benefits as if they had not been terminated, and specifically not to cover or make them whole for any consequential, incidental or other losses. If the parties are unable to resolve any disputes arising under this Settlement Agreement's remedial provisions within ninety (90) days after its execution, Arbitrator David Beckman shall have continuing jurisdiction only over such remedial disputes.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this 10th day of November, 2006.

FOR ATLAS AIR, INC.: Chris Agnini, System Chief Pilot
FOR THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL:
Robert Henderson, Chairman, Polar Air Cargo MEC

## ATTACHMENT A

| Name | | Name | |
|---|---|---|---|
| 1. | Angel, Mike | 31 | Hunt, Dwayne |
| 2 | Baldridge, Doug | 32 | Jackson, Dave |
| 3 | Beall, Jack | 33 | Jaureguy, Mike |
| 4 | Becker, Max | 34 | Johansen, Dave |
| 5 | Belmont, Bill | 35 | Krause, Ralph |
| 6 | Bermingham, Jim | 36 | Kuns, Dean |
| 7 | Berry, Tom | 37 | Lynch, Jim |
| 8 | Blackett, Bill | 38 | Martin, Frank |
| 9 | Brown, Tom | 39 | Mathers, Jim |
| 10 | Burnette, Bill | 40 | McKittrick, Mike |
| 11 | Callaham, Richard | 41 | Morris, Brian |
| 12 | Cannegan, Errol | 42 | Ogden, John |
| 13 | Carter, Rick | 43 | Pace, Walt |
| 14 | Close, Terry | 44 | Poorman, Dave |
| 15 | Cocchi, Dino | 45 | Rafifar, Ahmad |
| 16 | Colon, Bob | 46 | Ramaker, Ron |
| 17 | Craig, Leonard | 47 | Redmond, Mike |
| 18 | Davis, Scott | 48 | Renfrow, Jim |
| 19 | Del Villar, Bob | 49 | Ruiz, Sergio |
| 20 | Dimoff, Greg | 50 | Russo, Ralph |
| 21 | Ellis, Jerry | 51 | Sieb, Joe |
| 22 | Ennis, Scotty | 52 | Squires, Del |
| 23 | Farrell, Tom | 53 | Szarko, Brian |
| 24 | Ford, Don | 54 | Thurston, Bill |
| 25 | Garcia, Gil | 55 | Walden, Mel |
| 26 | Goodwin, Rich | 56 | Wood, Don |
| 27 | Grandone, Tony | 57 | Workman, Bill |
| 28 | Hanna, Mery | | |
| 29 | Hayden, JP | | |
| 30 | Hudson, Wally | | |

**LETTER OF AGREEMENT**
**between**
**ATLAS AIR, INC.**
**and**
**AIR LINE PILOTS**
**in the service of**
**THE AIR LNE PILOTS ASSOCIATION, INTERNATIONAL**

### RECALL FROM FURLOUGH LOA

THIS LETTER OF AGREEMENT is made and entered into by and between ATLAS AIR, INC. (hereinafter referred to as the "Company") and the Air Line Pilots in the service of ATLAS AIR, INC., as represented by the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (hereinafter referred to as the "Association").

It is mutually agreed between the Company and the Association that notwithstanding the provisions of Section 23.C.3, the Company may, in its sole discretion, extend the number of days beyond the twenty-one (21) days currently provided in which a Crewmember must be able to report for duty or training, as appropriate, after he has been notified of his recall. Generally, such an extension shall be granted only for compelling reasons, and normally for no more than sixty (60) days.

This letter of Agreement shall be effective as of the date of its signing and unless otherwise amended shall remain in full force and effect concurrent with the duration of the Collective Bargaining Agreement between the parties.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this 7 day of September, 2002.

FOR ATLAS AIR, INC.:
James R. Cato, Vice President, Labor Relations

FOR THE AIRLINE PILOTS ASSOCIATION, INTERNATIONAL:
David P. Bourne, Chairman, Atlas Air, Inc., MEC

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

### SECTION 11 LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the parties bargained and reached certain understandings regarding the administration of Section 11 of the Collective Bargaining Agreement ("Agreement");

### THEREFORE, BE IT RESOLVED:

1. The following individuals shall be grandfathered in their current instructor positions as described below and shall not be displaced by operation of subsection 11.F of the Agreement:

   **B747 – 400:**

   *Permanent Instructors*

   - Haigney, Frank – Simulator Check Airman
   - Bensimon, Patrick – Simulator Check Airman
   - Chancellor, Ian – Simulator Instructor
   - Miranda, Carlos – Simulator Instructor

   *Contract Instructors*

   - Doherty, Jack – Simulator Check Airmen
   - Morgan, John – Simulator Instructor
   - Nevin, Paul (Mike) – Simulator Instructor
   - Curtis, James – Simulator Instructor
   - Rankin, Bruce – Simulator Instructor

   **B747 Classic:**

   - *Permanent Instructors*
   - Mulkey, David – Simulator Check Airman
   - Zellmer, Ken – Simulator Check Airman

- Vaziri, Ali – Simulator Check Airmen
- Giordano, Mike – Simulator Check Airman (FE)
- Browning, Mike – Simulator Check Airman (FE)

### *Contract Instructors*

- Safdar, Nana – Simulator Instructor

2. Individuals referred in Paragraph A, above, do not count toward the fifty percent (50%) Crewmember Training Instructor requirement in subsection 11.F.1.b of the Agreement.

3. Frank Haigney, Jack Doherty, David Mulkey, Ken Zellmer, Ali Vaziri, Mike Gordano and Mike Browning may continue to conduct checkrides in the aircraft in which they are currently performing checkrides.

4. This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____

Daniel Wells,
Negotiating Committee


_____

William Holcomb,
Negotiating Committee


_____

Paul Kvernplassen,
Negotiating Committee

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

### SECTION 14 LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc., their successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the parties bargained and reached certain understandings regarding the administration of Section 14 of the Collective Bargaining Agreement ("Agreement");

### THEREFORE, BE IT RESOLVED:

1. The full-time employment requirement (30 hours of work per week) contained in the Long Term Disability Plan (LTD Plan) shall not apply to Crewmembers if the result is to render a Crewmember ineligible for LTD Plan coverage or benefits.

2. All Crewmembers shall be enrolled by the Company in LTD Basic Coverage within thirty (30) days of the effective date of collective bargaining agreement (Agreement). Crewmembers hired after the effective date of the Agreement shall be enrolled by the Company in LTD Basic Coverage in accordance with the LTD Plan.   All Crewmembers may elect Optional LTD Coverage at any time in accordance with the LTD Plan.  Crewmembers on the seniority list on the effective date of the Agreement are not required to undergo a medical exam or prove good health as condition of enrollment in LTD Basic Coverage.  Crewmembers on the seniority list on the effective date of the Agreement are not subject to pre-existing condition limitations applicable to LTD Basic Coverage.  Medical examination, proof of good health and pre-existing condition limitations set forth in the LTD Plan apply to Optional LTD Coverage.

3. A Crewmember who becomes disabled within the meaning of the LTD Plan must file an application for LTD benefits in accordance with

the LTD Plan. During the one hundred and twenty (120) day LTD Plan waiting period, a Crewmember shall use accrued, unused sick days under Section 14 of the Agreement. When a Crewmember is receiving LTD benefits, the Crewmember may not use accrued, unused sick days under Section 14 of the Agreement, including under subsection 14.D.9; provided, there shall be no reduction in LTD benefits as a result thereof. If a Crewmember does not qualify for LTD benefits, exhausts LTD benefits or later becomes ineligible to receive LTD benefits, the Crewmember may use accrued, unused sick days under Section 14, including subsection 14.D.9.

4. The Return to Work Incentive/Transitional Work/Light Duty requirements in the LTD Plan shall not apply to Crewmembers.

5. The Company may change LTD Plan insurance carriers, self-insure, and change plan administrators, but no change shall result in lesser benefits than those in effect on August 31, 2010, conflict with the Agreement or the terms of this LOA. The Company will provide the Union with advance notice and an opportunity to discuss changes to the LTD Plan that conform to the requirements of this Paragraph.

6. On the effective date of the Agreement, Polar Crewmember's accrued, unused sick leave balance shall be allocated between the short term and catastrophic banks referred in Section 14 of the Agreement according to the following procedure: Allocate the first twenty-four (24) days to the short term bank. Multiply the remainder of days by two (2) (because Polar sick days are paid at 100%) and allocate the product to the catastrophic bank. (e.g., If a Polar Crewmember has sixty (60) days of accrued, unused sick days, deposit twenty-four (24) days in the short term bank. Multiply thirty-six (36) by two (2) and deposit seventy-two (72) days in the catastrophic bank).

7. Polar Crewmembers who are age sixty (60) or older with five (5) or more years of Longevity on the effective date of the Agreement who (1) retire at age sixty-five (65) or (2) who retire as a result of losing their Airman's Medical Certificate, regardless of age, shall receive fifty percent (50%) of accrued but unused sick leave pay at retirement up to a maximum of forty-five (45) days. Payment shall be in one (1) lump sum.

8. The amount of sick days contained in the Sick Leave Donation Bank referenced in subsection 14.D.9 of the Agreement on the day prior to the effective date of the Agreement shall be available for use only by Crewmembers who were employed by Polar Air Cargo on the day prior to the effective date of the Agreement. Administration shall be

as follows:

A. Donation Provisions

   i. N/A.

B. Pay Out Provisions

   i. Paid at 50% transferee's salary

C. Reduction of Bank Balance

   i. Reduce Bank Balance by one-half (½) day for every day transferred to a Crewmember

D. Cap

   i. Absent extraordinary circumstances, a Crewmember shall not receive more than forty-eight (48) sick days from the Sick Leave Donation Bank. The Union shall inform the Company when the forty-eight (48) day cap will be exceeded and provide the name of the affected pilot.

9. Sick days donated to the Sick Leave Donation Bank referenced in subsection 14.D.9 beginning on the effective date of the Agreement shall be available to all Crewmembers.   Administration shall be as follows:

A. Donation Provisions

   i. Days deducted from transferor's catastrophic bank

B. Pay Out Provisions

   i. Paid at 50% of transferee's salary

C. Reduction of Bank Balance

   i. Reduce Bank Balance by one (1) day for every day transferred to a Crewmember

D. Cap

   i. Absent extraordinary circumstances, a Crewmember shall not receive more than forty-eight (48) sick days from the Sick Leave Donation Bank. The Union shall inform the Company when the forty-eight (48) day cap will be exceeded and provide the name of the affected pilot.

10. This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this _____ day of _____, 20_____.

**FOR ATLAS AIR, INC.:**

**FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,
Negotiating Committee

_____
Paul Kvernplassen,
Negotiating Committee

**ATLAS AIR, INC.**
**and**
**THE FLIGHT DECK CREWMEMBERS**
**in the service of**
**Atlas Air, Inc.**
**as represented by**
**INTERNATIONAL BROTHERHOOD OF TEAMSTERS,**
**AIRLINE DIVISION**

## SIGNING BONUS LOA

This Letter of Agreement ("LOA") is made and entered into in accordance with the provisions of Title II of the Railway Labor Act, as amended, by and between Atlas Air, Inc.,  its successors and assigns ("Company") and the Pilots in the service of Atlas Air, Inc., as represented by the International Brotherhood of Teamsters, Airline Division ("Teamsters," "IBT" or "Union").

**WHEREAS,** the parties bargained for and reached agreement on a $10.5 million signing bonus in connection with the Single Collective Bargaining Agreement ("Agreement"); and

**WHEREAS,** the parties desire to set forth the procedure for allocating the signing bonus among Crewmembers;

## NOW THEREFORE, BE IT RESOLVED:

1. Crewmembers who are on the integrated Pilot System Seniority List or integrated Flight Engineer System Seniority List on the effective date of the Agreement shall be eligible for payment of a signing bonus in accordance with this LOA and the parties' Agreement on a signing bonus; *provided*, that Crewmembers on a System Seniority List who are not part of the craft or class of Pilots or Flight Engineers ( i.e., Management Crewmembers Letter of Agreement Dated October 20, 2009 and all other managers identified by the parties) are not eligible for payment of a signing bonus nor shall their longevity be recognized in determining allocation of the signing bonus.

2. The $10.5 million signing bonus shall be allocated as follows:

    A. Each Crewmember eligible for payment of a signing bonus shall have his longevity calculated based upon his Accrued Months of Longevity. "Accrued Months of Longevity" means the sum of all months of longevity on the seniority lists.  The Company shall provide the Union with an updated longevity accrual list within seven (7) days of the effective date of this LOA.  The Company will send an email to all eligible, active

crewmembers and a letter to all eligible, inactive crewmembers setting forth the procedures for protesting accumulated months of longevity. The procedures set forth in the aforementioned email/letter have been agreed to by the parties and appear in Appendix A of this LOA.

B. Once each Crewmember's longevity has been determined at the end of the above-mentioned protest period, then the aggregate months of longevity for all eligible Crewmembers shall be determined. The determination shall be final and binding for purposes of this LOA

C. To determine the amount that each month of a Crewmembers' accrued longevity is worth with respect to allocating the signing bonus, $10.5 million shall then be divided by the aggregate of months of longevity for all Crewmembers combined, as determined in subparagraph B. above.

D. Each eligible Crewmember shall then be paid a signing bonus equal to his months of longevity, as determined in subparagraph A. above, multiplied by the amount that each month of Crewmember longevity is worth, as determined in subparagraph C. above.  The end date for calculating each Crewmembers signing bonus will be September 7, 2011.

3. Signing bonuses will be paid on the second pay period following the effective date of the Agreement.  Payment shall not be made in the same check or deposit as normal wages, but shall be made by separate check or deposit.   Signing bonuses are subject to all applicable taxes and withholdings.

4. If Crewmembers are entitled to payment of $1.5 million (or any portion thereof) under Paragraph 8(h) of the Implementation LOA, the procedures set forth in this LOA shall govern payment.

5. This LOA is enforceable through Section 20 and Section 21 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have signed this Letter of Agreement on this 17 day of September, 2011.


**FOR ATLAS AIR, INC.:**          **FOR INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION:**

_____
John W. Dietrich,
Executive Vice President and Chief
Operator Officer

_____
David Bourne,
Director,
Teamsters Airline Division

_____
Jeffrey D. Carlson,
Vice President of Flight Operations

_____
Joe Muckle, President,
APA Teamsters Local 1224

_____
Scott K. Lindsay,
Senior Director, Crew Resources &
Contract Administration

_____
Robert Kirchner,
TEC Co-Chairman

_____
Stephen Richards,
TEC Co-Chairman

_____
Robert Ulrich,
Negotiating Committee Chairman

_____
Daniel Wells,
Negotiating Committee

_____
William Holcomb,
Negotiating Committee

_____
Paul Kvernplassen,
Negotiating Committee