**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| ATLAS, INC., *et al.*, | ) | Case No.: 1:17-cv-01953-RDM |
| | ) | |
| Plaintiffs, | ) | Hon. Randolph D. Moss |
| v. | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD | ) | |
| OF TEAMSTERS, AIRLINE | ) | |
| DIVISION, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

# Union Exhibit 2:

# Declaration of Robert Kirchner

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATLAS AIR, INC. and POLAR AIR CARGO WORDLWIDE, INC., <br><br> Plaintiffs, <br><br><br> v. <br><br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224, <br><br> Defendants. | Civil Action No. 1:17-CV-01953 RDM |

## <u>DECLARATION OF ROBERT KIRCHNER</u>

I, Robert Kirchner, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

1.      I am employed as a pilot by Atlas Air, Inc. ("Atlas").  I have an airline transport pilot's license from the Federal Aviation Administration (FAA) and work as an Atlas captain flying Boeing 747 aircraft.  I previously worked for Polar Air Cargo, Inc. ("Polar"), also as a B-747 captain.  I was first employed by Polar on January 17, 2000.

2.      Atlas and Polar are air carriers within the meaning of the RLA, 45 U.S.C. § 181 and function as a "single transportation system for representation purposes" under the Railway

Labor Act (RLA) for with respect to their pilot group.  They are commonly owned by a parent

holding company, Atlas Air Worldwide Holdings, Inc. (AAWW).  AAWW owns 100% of Atlas

and 51% of Polar.  Germany's DHL owns the other 49% of Polar.  Atlas and Polar engage in

world-wide air cargo operations from their headquarters in Purchase, NY., although they have

moved various flight operations functions including their flight dispatch operations, to their base

of operations at the Cincinnati/Northern Kentucky International Airport (CVG).

3.      Defendant IBTAD is a labor organization and is the exclusive bargaining

"representative," as such term is defined by Section 1, Sixth of the Railway Labor Act ("RLA"),

45 U.S.C. § 151, Sixth, of the pilots employed by Atlas and Polar.

4.      Atlas and Polar became parties to a single collective bargaining agreement in

September 2011, all of the Polar pilots became employees of Atlas.   Since that time, I have

worked for both Atlas and Polar under a single pilot seniority list.

5.      I was formerly a member of the Air Line Pilots Association ("ALPA"), a labor

organization that separately represented the Atlas and Polar pilots.  When the International

Brotherhood of Teamsters, Airline Division ("IBTAD") replaced ALPA as the Atlas and Polar

pilots' labor representative in December 2008, I was appointed by the IBTAD and the executive

board of the IBTAD'S affiliate, Airline Professionals Association of the International

Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224"), to serve as a member and

Chairman of the Polar Pilots Transition Executive Committee ("Polar TEC") to represent the

interests of the Polar pilots.  (The Atlas pilots also had a transition executive committee to

represent their interests, called the Atlas Pilots Transition Executive Committee ("Atlas TEC").

In my capacity as Chairman of the Polar TEC, and on behalf of the IBTAD and Local 1224, I

directed and personally carried out the daily representative responsibilities for the benefit of the

Polar pilots.  Among many other functions, I participated in the 2009-2011 negotiations and

interest arbitration that resulted in the current single collective bargaining agreement ("SCBA")

covering the Atlas and Polar pilots, all of whom, as noted above, now work under that contract

pursuant to a single, integrated seniority list.  Effective January 1, 2015, I was elected Chairman

of the Atlas Pilots Executive Council, the 5-person board that, upon the imposition of the SCBA

and on behalf of the IBTAD and Local 1224, assumed the daily representative responsibilities

that had been performed by the Polar TEC and Atlas TEC.  As Chairman of the Atlas Pilots

Executive Council, I am also a member Local 1224's governing Executive Board.  In my

capacity as Chairman of the Atlas Pilots Executive, I have also participated in the collective

bargaining negotiations between the IBTAD and Local 1224 (collectively, the "Union") and

Atlas/Polar to amend the current SCBA.

**Overall Collective Bargaining Relationship Between the Union and Atlas and Polar**

6.      On December 22, 2008, the IBTAD replaced ALPA as the NMB-certified

exclusive collective bargaining representative of the Atlas and Polar pilots.  The National

Mediation Board's certification can be found at 36 NMB No. 15, Case No. R-7174.  Despite the

change in labor representatives, the terms of the Atlas and Polar collective bargaining agreements

remained in place, though ALPA's internal policies and procedures, including its merger

procedures, did not.

7.      In February 2009, the Union, Atlas and Polar entered into a letter of agreement

styled "Negotiation Framework for Merged Collective Bargaining Agreement" (the "Framework

Agreement").  The 2009 Framework Agreement laid out the ground rules by which the parties

would negotiate a SCBA covering both the Atlas and Polar pilots, all of whom would work under

a single seniority list while working for two separately certificated air carriers.  While it

contained certain terms similar to the contractual provisions set forth in the then-existing Atlas

and Polar contracts, the February 2009 Framework Agreement was not part of either of those

agreements.  In this regard, it expressly provided that:

> *To the extent a specific provision in this LOA is in conflict with a specific provision contained in the applicable collective bargaining agreements, letters of agreement or other understandings entered into by ALPA when it was exclusive bargaining agent of the Crewmembers, this LOA shall be controlling, provided the parties agree that nothing contained in this LOA diminishes the obligations set forth in Section 1 of the applicable collective bargaining agreements.*

8.     The parties then engaged in direct negotiations pursuant to their framework

agreement for approximately two years, but were unable to reach agreement on all contract

terms.  As a result, they submitted their outstanding issues to interest arbitration in late 2010, in

accordance with the 2009 Framework Agreement.

9.     Throughout the direct negotiations and interest arbitration proceeding, the Union

sought to bind AAWW to contractual terms and conditions relating to the scope of covered work,

job security and labor protections in the event of certain corporate transactions (i.e., so-called

"scope terms").  In so doing, the Union recognized that corporate transactions such as mergers,

acquisitions, and spin-offs, all of which directly and significantly affect the pilots' job

protections, almost always are structured and effectuated at the corporate parent level.  Thus, any

scope terms in a SCBA covering only Atlas and Polar, and binding only Atlas and Polar, were

essentially meaningless.  AAWW, Atlas and Polar clearly recognized this fact too, and vigorously

resisted the Union's efforts to bind AAWW to the contractual scope provisions.  At the

arbitration, and in their brief, Atlas and Polar argued that AAWW was not subject to the jurisdiction of the arbitration and therefore could not be bound to the merged collective bargaining agreement.

10.     In early September 2011, the arbitrator issued his award imposing terms for a SCBA.  In his award, the arbitrator rejected the Union's proposal to bind AAWW to the SCBA's scope provisions.  As a result, AAWW is not a party to the current Atlas/Polar SCBA covering the Union-represented pilots.

11.     As also set forth in the arbitrator's award, the SCBA imposed by the arbitrator became formally amendable under the Railway Labor Act (RLA) on or after September 8, 2016. The SCBA also allowed one or both of the parties to open the SCBA to commence negotiations 270 days prior to formal amendable date.  The Union formally served a written notice on Atlas to commence bargaining to amend the SCBA on February 16, 2016, although by that time the parties had already engaged in three bargaining sessions in the preceding month.

12.     On January 19, 2016, AAWW signed a definitive agreement to acquire Southern Air Holdings, Inc. (SAHI) and its two airline subsidiaries, Southern (Southern) and Florida West (Florida West).  Upon shareholder approval, the acquisition was completed on or about April 7, 2016, at which time both Southern and Florida West became second-tier subsidiaries of AAWW. Upon completion of the transaction, AAWW thus became the corporate parent of the four air carriers, namely, Atlas, Polar, Southern and Florida West, each of which maintained separate airline operations.

13.     After announcing its intent to acquire SAHI and its subsidiary carriers, AAWW announced its intent to merge the operations of Atlas and Southern.  Shortly thereafter, in a

meeting in Washington, DC in late January 2016 between senior executives from AAWW and Atlas Air and Union representatives, the AAWW's Chief Executive Officer, William Flynn, informed the Union that AAWW desired to completely merge Southern's airline operations with Atlas's while keeping Polar's operations separate.  Subsequently, in a letter sent to Local 1224 on April 13, 2016, Atlas's Chief Executive Officer, who is also the Chief Executive Officer of AAWW, also stated that it would operate Florida West separately from the other three carriers.

14.     On March 15, 2016, in collective bargaining negotiations between the Union and Atlas in New York City, Atlas refused to engage in further stand-alone negotiations with the Union to amend the CBA.  It instead insisted the Union was required by the SCBA to stop negotiations for a stand-alone collective bargaining agreement and commence negotiations for a "merged" collective bargaining agreement.  Atlas further stated that, if needed, the Union was also required to engage in binding interest arbitration, to effectuate the completion of the merged collective bargaining agreement.

A.     The Union rejected Atlas's demand to stop the parties' stand-along contract negotiations.  In so doing, the Union pointed out that Atlas had ignored the fact that it was AAWW, a non-party to the SCBA, and not Atlas or Polar, that had acquired Southern as part of the acquisition of SAHI, and that it was AAWW, again, a non-party to the SCBA, and not Atlas or Polar, that had decided to completely merge Southern's operations only into Atlas and to continue to keep Polar's operations separate.  The Union also pointed out that AAWW, a non-party entity that had vigorously opposed and succeeded in avoiding SCBA party status as the "Company" or otherwise, lacked any standing to invoke the Atlas/Polar SCBA's contractual merger provisions.

B.     In rejecting Atlas's demand, the Union did, however, offer Atlas a hybrid extension of the parties' current SCBA until August, 2017 in order to facilitate an orderly process by which AAWW, Atlas and Southern could focus on and satisfy the corporate and regulatory processes necessary to complete an operational merger of the carriers.  The Union's proposed extension agreement required the migration of the Southern pilots into the Atlas SCBA and an accelerated negotiation between the parties covering certain economic and work preservation provisions in the SCBA.

(1)     Among the items included in the accelerated bargaining process proposed by the Union was a "negotiated and agreed upon Express Carrier LOA."  That item pertained to the fact that Atlas's operations had, since the imposition of the SCBA in 2011, aggressively entered the scheduled express carrier side of the airline cargo business.  The SCBA is structured for long-haul international cargo and heavy freight operations, not scheduled service operations.  Prior to the imposition of the SCBA by interest arbitration, the parties had agreed to include in the SCBA a letter of agreement providing or a process by which they would negotiate terms tailored for express carrier operations.  In 2015 I approached the company with the intent to solve issues that the SCBA imposed by the arbitrator did not take into account relating to the Atlas's and Polar's rapidly expanding "express operation."  Atlas management flatly refused to negotiate any changes to accommodate the demands of this new type of business.  By 2016, Atlas had aggressively entered into the express carrier airline cargo market, and it was rapidly and exponentially expanding its presence in that market.   Their express carrier operations had grown so large and so fast by that time that they were significantly stressing Atlas's and Polar's ability to adequately staff their  flight operations or even to comply with the terms of the SCBA.

Atlas and Polar had proposed including a provision in the SCBA that provided for a process by which to negotiate an "Express Carrier LOA." The Union agreed to include this provision into what became the SCBA. That provision, however, only provided a process by which to negotiate the details needed to implement an express carrier type operation. Because the SCBA was not structured to accommodate express carrier type operations that Atlas and Polar had jumped into mid-contract, Atlas and Polar's flight operations started to deteriorate. When I subsequently approached them in 2015 to negotiate the terms and details needed to implement an express carrier type operation, Atlas's and Polar's management refused to negotiate any terms relating to express carrier operations.

(2)     Other items included in the accelerated bargaining process were scheduling related items that, while financial in nature, were intended to motivate and incentivize Atlas to efficiently and properly schedule its flight operations. The Union felt that if AAWW had any hope of successfully merging the Atlas and Southern operations, it had to deal with the already evident operational strains and stresses caused by a multiplicity of factors, including the increasing complexity of Atlas's and Polar's worldwide operations, their success in obtaining FAA approval to operate mixed cargo/passenger operations pursuant to two different parts of the federal aviation regulations affecting their pilots' flight duty and rest limitations, their minimum staffing model for pilots, their failure to adopt a new strategies to protect their operations during what the entire airline industry had already warned would be a decades-or-more environment dominated by a severe shortage in the supply of qualified pilots, and their continued, years-long patterns of disregarding the terms of the SCBA and forcing the Union to play a sort of "cat-and-

mouse game" of having to "chase down" grievances relating to scores of alleged and genuine

flight operations-related grievances occurring through the Atlas and Polar global network.

Atlas categorically rejected the Union's proposal to extend the SCBA and continued to insist on

maintaining the current SCBA while also bargaining for a new, "merged" collective bargaining

agreement with the Union covering the Atlas and Southern operations.

9.       On April 13, 2016, faced with Atlas's refusal to bargain except on its terms, the

Union applied to the National Mediation Board (NMB) for mediation pursuant to Sections 5 and

6 of the RLA.

15.       On the following day, April 14, 2016, Atlas filed a management grievance against

the IBTAD, claiming that the IBTAD's invocation of NMB mediation under the RLA was "in

direct contravention of its obligations under Section 1.F.2.b.iii of the Atlas-IBTAD CBA."

Atlas claimed that the IBTAD was in violation of the "complete operational merger" provisions

set forth in Section 1.F.2.b.iii of that agreement by refusing to negotiate with Atlas and Southern

for a joint, "merged" labor agreement instead of negotiating to amend and improve the current

Atlas/Polar and Southern contracts. Atlas further claimed that the IBTAD was in breach of the

implied covenant of good faith and fair dealing by failing to provide Atlas and Southern with an

integrated pilot seniority list.  In a letter dated April 20, 2016, the IBTAD informed Atlas that the

management grievance was "invalid and not arbitrable."

16.       On April 15, 2016, Atlas requested that the NMB "decline to schedule mediation

sessions due to a pending arbitration before the Atlas-IBTAD System Board of Adjustment."

Atlas further claimed that that NMB mediation was "premature and unwarranted at this time."

The NMB thereafter assigned a mediator to conduct a joint meeting with Atlas and the Union in

Detroit, Michigan, to gather information regarding the dispute.  Since that initial meeting, however, the NMB has not scheduled any mediation sessions, and Atlas used that excuse as a means by which to avoid bargaining with the Union to amend the SCBA.  For the remainder of 2016, therefore, Atlas refused to negotiate with the Union unless the Union agreed to do so pursuant to the SCBA "merger" negotiation provisions set forth in Section 1 of the SCBA.

17.     In early February, 2017, Atlas and Polar filed a lawsuit against the Union in the White Plains divisions of the United States District Court for the Southern District of New York, seeking an order compelling the Union to arbitrate its management grievance that, in turn, seeks to compel the Union to merge its existing, obsolete SCBA contract into a substandard contract covering the Southern pilots that was the product of Southern's 2011-2012 dive into bankruptcy. That case, which is styled, *Atlas Air, Inc., et al. v. International Brotherhood of Teamsters, et a.l*, Case No. 17-cv-00903 (S.D.N.Y), is pending decision from the court upon the carriers' motion for summary judgment and the Union's motion to dismiss.

18.     Atlas's pending lawsuit against the Union in New York is not the only a legal ploy used to try to compel the Union and its pilots to abandon their efforts to directly negotiate an arm's length agreement with Atlas to amend the parties' SCBA.  To be sure, the New York case represents a direct frontal assault against the Union and its pilots to force them to submit to a process in which a third party will once again impose the terms of their next contract on them.  It also again denies the Atlas pilots again the right to vote on their CBA. Atlas also hatched a scheme earlier this year to try to stifle the Union and its members from engaging in protected First Amendment activity to honor the lawful picket lines established by other pilot groups.  In so doing, Atlas sought to force the Atlas pilots to cross legitimate picket lines of other pilot groups

working under other collective bargaining agreements, including picket lines established by their fellow Local 1224 members who work carriers that serve he same network carriers as Atlas does, thereby rendering the Atlas pilots scabs and all but guaranteeing that they would receive no support from their fellow pilots in the industry if they avoid having to suffer another arbitrator-imposed contract but end up having to strike Atlas in the future in order to secure an amended contract.  Atlas's scheme arose after the pilots at another carrier, ABX Air, Inc. (ABX), shortly before Thanksgiving last year (2016) went on strike.  Like Atlas, ABX serves two large, very demanding customers, DHL and Amazon, both of which are express carriers and both of which add many additional flights to its network carriers' schedules during the fourth quarter holiday season.  The ABX pilots, after multiple attempts to resolve the major issues being imposed upon them, went on strike against ABX at is Cincinnati Airport operations hub to protest ABX's violation of the status quo provisions of the Railway Labor Act by, among other things, forcing them to fly on their scheduled days off for days on end in order to accommodate its additional flying.  Pilots from across the airline industry, including the Atlas pilots, refused to cross the ABX pilots' picket line while the line was posted.  The Atlas pilots have protective language in their SCBA that allows them "to refuse to cross lawful strike picket lines established by or on behalf of pilots represented by any union lawfully certified or recognized pursuant to the Railway Labor Act."  That protective language has existed since the first Atlas's contract was negotiated in 2002, *i.e.*, the predecessor the current (2011) SCBA.  In 2011 the arbitrator that imposed the terms of the 2011 SCBA expressly ordered that the language be merged into and incorporated in the 2011 CBA.  And so it was, without complaint by Atlas until more than five years later, when it informed the Union that the protection was mistakenly included in the  2011

arbitration award.  Atlas demanded that the Union agree to strip that protection from the SCBA, and when the Union refused, it forced the 2011 arbitrator to conduct a so-called clarification hearing, seeking an order from him that he had made a mistake by including it in his award.  The parties engaged in the so-called clarification hearing and the arbitrator ruled against the Company.

19.     The current lawsuit by Atlas and Polar must be viewed in the context of their continuing effort to avoid arms-length negotiations with its pilots and the Union and to secure contractual cover through an arbitration proceeding, where they believe they once again will prevail in securing better terms for themselves than through direct negotiations with the Union. Having failed to hedge their bet against the possibility that they will not prevail in their federal court action in New York when they lost the so-called clarification arbitration, Atlas and Polar now are inventing a Union-sponsored pilot slowdown based Atlas's and Polar's faltering flight operations in order to secure a broad injunction against the Union and the Atlas pilots.  If they secure such an injunction here, Atlas and Polar will then wield it against the Union and the pilots, in the form of civil contempt proceedings in order to muzzle the Union and its pilots' constitutionally protected right to advertise the existence of their dispute to the public, and to blunt any opportunity by the Union to engage in hard bargaining if they are forced to bargain directly with it rather than hide behind an arbitration proceeding.

20.     Based just on a relative macro-level description of the contentious dealings between AAWW and its subsidiary carriers on the one side and the Union and the Atlas pilots on the other, it is readily apparent that the labor-management relationship between the two sides is extremely poor to say the least.  The management side prefers litigation in multiple forums and

in multiple jurisdictions over negotiation.  Atlas has relied on the legal proceedings, both in court and before arbitration tribunals to obtain more favorable terms for it than it could secure through honest, arms-length negotiations with the Union and the pilots.  The Union and the Atlas pilots want to be treated fairly, professionally and with the respect they all deserve.

21.     The bargaining relationship between the parties since the imposition of the SCBA in 2011 has been one in which Atlas incessantly ignores, bends and even violates the SCBA whenever it considers that it is in its interests to do so.  Shortly after the SCBA was imposed in 2011, the Union and the Atlas pilots sought to work collaboratively with Atlas management to help find contractual solutions to Atlas's increasingly complex and expanding flight operations issues.  As time went on, however, the Atlas pilots became increasingly frustrated with Atlas management and concluded that Atlas was more inclined to violate the SCBA than work with them.  By mid-2014, as the industry-wide pilot supply problem grew into a looming crisis, many Atlas pilots grew so frustrated with Atlas that they began to leave in large numbers to secure better employment opportunities with other carriers, including UPS, FedEx, legacy passenger carriers, and even foreign carriers that were offering top dollar premiums for qualified pilots.  At the same time those Atlas pilots that remained began to clamor for more effective contract enforcement by the Union.

### Bargaining Relationship Since Late 2014

22.     Entering into the summer and fall of 2014, Local 1224 conducted its three-year election of officers.  I ran for the chairmanship of the Atlas Pilots Executive Counsel (Atlas EXCO) against an incumbent candidate and a third candidate. Throughout my campaign in 2014, I ran on a platform of contract compliance.  I explained that the Atlas pilots' growing frustration

and complaints against Atlas were not attributable only to Atlas management's cavalier violations

and disregard of the existing SCBA but also to the fact that the incumbent Atlas EXCO and the

Atlas pilots had been lulled into complacency by Atlas management and had not held

management accountable for their actions, including their transgressions relating to the SCBA.  I

also explained that unless the Atlas EXCO and the Atlas pilots uphold the SCBA and hold Atlas

management accountable to the terms of the SCBA, we would not have any realistic ability to

secure a better contract with better compensation and more humane scheduling rules two years

from then, when the SCBA became amendable.  I explained that that was for the simple reason

that if management is allowed to bend and violate the terms of the SCBA when it suits them,

they will have no reason to negotiate changes to the SCBA.  In October or November, 2014,

Captain Jeffrey Carlson, a senior executive for Atlas and AAWW at the time, invited me to

dinner at Legal Sea Foods in Crystal City, Virginia. At that dinner, Captain Carlson told me that

he felt that I would be elected as the next chairman of the Atlas EXCO and that he wanted to

know how he and I and the Union and Atlas could work together.  To the best of my recollection,

Captain Carlson stated, "I want to know what the world is going to be like according to Bob."  In

response, I told Captain Carlson that the recipe for a cooperative and professional relationship

between ourselves and between the Union and Atlas was simple.  I would insist on strict contract

compliance by both sides, meaning by both Atlas and the Union.  I also told him that strict

contract compliance was my top priority.  I also told him that I recognized that strict contract

compliance was a two-way street and that it works both ways.  I told him that I fully understood

that on occasion strict contract compliance could actually work against the individual needs of

certain Atlas pilots in any particular instance.  I also made it clear that we all have to live by the

terms of the SCBA.  We also discussed the context of my response, including in particular the

growing frustration and resentment by the pilots towards Atlas because of Atlas's failure to honor

the SCBA, especially with the increasingly chaotic scheduling changes that were disrupting the

pilots' lives.  After his "World according to Bob" question, Captain Carlson told me that strict,

bi-lateral, contract compliance "should be no problem."   By his response, I understood that

Captain Carlson was indeed committing to ensuring that a cooperative and mutually beneficial

relationship between Atlas and the Union and Atlas pilots Union would be based on strict

bilateral contract compliance.

23.     Unfortunately, Captain Carlson did not take long to break his word to me

regarding what I had understood was his commitment on behalf of Atlas to strict, bilateral

contract compliance.  In that regard, shortly after I was elected chairman of the Atlas EXCO in

November, 2014 but before I assumed office on January 1, 2015, Atlas published illegal position

vacancy bid awards.  Position vacancy bids are notifications from Atlas management to the pilots

identifying whether any vacancies exist for particular positions (such as first officer on the

Boeing 747).  The SCBA contains a "seat lock" provision that prohibit first officers who are

flying on one type of equipment (for example the B-767) to bid for a first officer vacancy in

another type of equipment (for example the B-747) for three years.  The SCBA also contains a

"seat-lock" provision that prohibits captains working one type of equipment (for example, the

B-767) to bid for a position vacancy for any status on a different equipment type (for example,

the B-747), or to change status on his current aircraft type (for example, bidding to change is

status from captain of a B-747 to first officer of a B0747), for a period of three (3) years.  On or

about December 17, 2014, Atlas posted its position vacancy award and, in so doing, ignored the

contractual procedures for filling position vacancies and unilaterally adopted and applied its

own, extra-contractual, method to fill those vacancies by unilaterally deciding to lock B-767

crewmembers into their seats beyond the contractual 3-year limitation.   I also understand that

Mr. Carlson told the outgoing chairman of the EXCO that Atlas recognized that the position

vacancy award violated the SCBA but that the Company was going to go forward with the illegal

vacancy award anyway and that it would try to provide those crewmembers their awarded

training related to the position award at some unspecified time after April or May, 2015.  I

further understand that Mr. Carlson informed the outgoing chairman of the Atlas EXCO that

Atlas intended to hire new crew members to fill the B-747 vacancies that contractually should

have been filled by existing B-767 crewmembers.  In a letter dated December 18, 2014, Local

1224 president Daniel Wells informed Atlas's senior executives, including Captain Carlson,

AAWW's chief executive officer William Flynn and Atlas's chief execute officer John Dietrich

that Atlas's actions regarding the position vacancy award were unacceptable and constituted a

blatant disregard of our contract.  President Wells told Atlas that the Union would "not stand for

it" and demanded that Atlas rescind the award by December 19, 2014 or defend itself in federal

court.  A true and correct copy of President Well's December 18, 2014 letter, on which I was

copied, is attached hereto as Kirchner Exhibit "1."  As Captain Carlson confirmed in a December

19, 2014 letter to Local 1224's President Well, Atlas rescinded the position vacancy award on

December 19, 2014.  A true and correct copy of that latte is attached hereto as Kirchner Exhibit

"2."

24.     As noted above, I was elected chairman of the Atlas EXCO in November, 2014

and assumed office on January 1, 2015.  When I took office I had to deal with a very important

demographic reality concerning the Atlas pilots.  Specifically, I had to deal with the fact that there was large influx of new hire pilots. Atlas had hired and retained approximately 120 pilots in 2014, which, at the time represented approximately 15% of the Atlas pilots on the seniority list. Atlas hired and retained an even larger number of pilots throughout 2015.  Based on the most recent (September 2017) Atlas pilots' seniority list, Atlas hired and retained approximately 320 pilots in 2015.  By the end of my first year in office, more than 30% of the Atlas pilots on the seniority list had been employed by Atlas for two years of less.  Many of these newly hired pilots had little or no experience flying international cargo operations and were not aware of the stresses associated with such flying, let alone the additional stress associated with flying Atlas's and Polar's flights.  They were also not well versed in the existing SCBA and its terms and were therefore not well informed about what rights and protections and responsibilities they had under the SCBA.  It is important to note that, by the nature of their operations, Atlas and Polar do not operate predominantly hub-and-spoke systems where large groups of pilots are able to congregate in pilot lounges between busy operational pushes discussion union business and educating each other on contract issues.  Unlike many of their counterparts who work at other major airlines, Atlas pilots fly schedules that keep them out and away from their homes and families for a minimum of 17 days per month and sometimes upwards of 19 or more days a month.  When our pilots get home, they are often exhausted and take days to recover from jet lag, and many of them are so tired they do not want to think about work at all.  Even while working and flying their lines, Atlas crews are rarely paired together for more than a single leg, as their schedules and constant subsequent schedule changes fracture crew unity upon landing at their first destination.  Thus, there is little opportunity to communicate with pilots at any given

locale.  As the operations tempo has dramatically increased at Atlas and Polar, and as younger, newly hired domestic carrier pilots who are used to more traditional and personal means of union communications have joined the Atlas ranks, they have complained about not having enough information particularly when they are working around the globe.

25.     Shortly after taking office on January 1, 2015, I directed that the Atlas pilots' communications committee to prepare several new methods of communication with our crewmembers.  One of these methods of communication which was developed is a podcast called the Atlas Teamsters Action Message (ATAM).  The ATAMs were part of the new Atlas EXCO's commitment to better educate the Atlas pilots.  The ATAM is produced and narrated by Captain Michael Griffith.  The ATAM is an audio-broadcast parodying radio talk radio shows. Its purpose is to educate and entertain the Atlas pilots, many of whom, as I have previously noted, were very new pilots at Atlas, about their rights and responsibilities under the SCBA.  The first ATAM was broadcast on January 15, 2015. I gave an inaugural message on that ATAM, explaining that the new Atlas Pilots EXCO believed that enforcing the SCBA was the path forward to getting us what we needed.  I told the pilots in that inaugural message that we all had to dedicate ourselves to the enforcing and being guardians of our SCBA, and that we had to defend our SCBA and fight back against a management that was abusing our contractual rights and thereby making our working conditions miserable.  From that point on, I have made it a top priority within the Atlas Pilots EXCO to educate the Atlas pilots about the terms of the SCBA and to provide them with the knowledge to know when Atlas is violating the contract and what to do about it when Atlas does violate the contract.  I have made no secret about this, and have on numerous occasions since formally taking office on January 1, 2015 advised Atlas management

that we would not tolerate Atlas's deliberate violations of the SCBA.  Indeed, the Union's

commitment to strict contract compliance, announced in the beginning of 2015, does not and

cannot end because we are in negotiations over a new contract.  Holding management to the

terms of the existing contract – a right recognized by the RLA itself – is the only hope pilots

have, indeed, the only leverage pilots have, during the long negotiation process for a new

contract.  Labor negotiations are no different than other negotiations in this respect: if one party

can breach an existing agreement to suit its purposes, there is no reason to expect that party to

commit to good faith negotiations over changes to the contract.  For the same reason, if Atlas and

Polar can ignore, twist, circumvent and violate the existing SCBA, they will have no reason to

negotiate a new one with the pilot group.   Hence, the purpose of the ATAMs and other Union-

sponsored communications such as the Atlas Pilots Crew Calls, has never been to encourage

Atlas pilots to engage in activity in violation of the SCBA but, quite the opposite, to learn their

rights and responsibilities under the SCBA and to adhere to them. When the Union and pilots

talk about "SHOP," which is an acronym for "Stop Helping Out Purchase," or "shopping," what

we mean is simple and consistent with my earliest conversations with Captain Carlson regarding

strict contract compliance by both parties to the SCBA : we will not "help out" Atlas and Polar

by permitting them to get away with contract violations and we will oppose secretive, informal

agreements between individual pilots and management based on terms and conditions of

employment the fall outside of  or in violation of  the SCBA, regardless of the benefit to the

individuals involved, such as awarding junior pilots open time in violation of the contractual

rights of more senior pilots.   Indeed, during the live, unscripted Atlas Pilots Crew Calls since

January 2015 I have repeatedly instructed the pilots who call in to ask questions that the Union

does not want and is not asking the pilots to engage in illegal activities such as job slowdowns. For example, in a recent (July 17, 2017) Crew Call, rank and file pilots asked whether the Union was advocating or instructing the pilots not to accept overtime flying.  My answer was that if pilots wanted to fly overtime, they should go ahead and do it, but that if they did not want to, then that was their personal choice to make also.  On that same Crew Call, a rank and file pilot expressed concern that the Union was advocating or encouraging pilots to fly open time.  I explained that regardless of how they personally chose to make Atlas accountable for their repeated violations of the SCBA, the key point was that the pilots need to understand what the SCBA says and how it helps protect them from management abuse.  I told the pilots that my personal approach since the day I was hired at Polar has always been to follow the contract just as I expect my employer to adhere to the contract, and that includes refraining from granting out of seniority open time awards that "help" the airline but undermine pilots rights and violate the terms of SCBA that Atlas, Polar and the Union are duty bound to follow.  At Atlas, I explained that the company was lying, cheating and stealing and violating the SCBA virtually every day.  I explained that pilots are getting stranded at contractually non-compliant hotels, probationary employees are being pressured violate the CBA during the length of their probationary periods, and that the company is continuing to play the "catch-me-if-you-can" game, thus forcing the Union to constantly chase down contract violations.  I explained that the pilots needed to know what their rights are under the contract and that they should not the company trample on them. Captain Griffith also chimed in and explained that the SCBA is not just an ax, but a protection against management violations and pressure.  He concluded by noting that while he personally

chose not to fly overtime, the decision whether to do such things is a personal decision that each

pilot had to make themselves.

### Additional Facts Relating to Plaintiffs' Claims in Their Complaint and Motion

26.     Plaintiffs' claims that the Union is orchestrating a concerted slowdown by, for

example, instructing or encouraging them to falsely call out fatigued, falsely call out sick and to

refuse open time (overtime flying) are false.  The Plaintiffs clearly do not like having a well-

informed pilot workforce knowledgeable about their – and Atlas's – contractual rights and

obligations.  Atlas clearly prefers to prevent the Union from exercising its statutory duty to

educate and inform the pilots of their rights at least during years-long, formal RLA Section 6

negotiating process.  Atlas rightly has recognized that an uneducated and ill-informed pilot

workforce enables it to run roughshod over the pilots, their Union, and the SCBA. Its effort to

censure the Union's ability to lawfully educate and communicate with its members is wholly

inappropriate. Atlas is asking this Court to stop the Union and the Atlas pilots from strictly

enforcing the SCBA, something that they have been doing as a matter of course since the

beginning of 2015, thereby depriving the Union and the pilots of their statutory rights and

obtaining an unfair advantage for itself in contract negotiations.

27.     Shortly after Atlas and Polar filed the present lawsuit against the Union, Local

1224 sent a notice to the Atlas pilots asking them to read the complaint and to contact the Union

and provide it with details if they recognized that they were being involved in any of the

examples cited by Atlas and Polar as evidence of an illegal slowdown by the pilots.  Based on the

many responses that we received from the pilots, the Union was able to research and determine

what had actually happened with respect to those examples of alleged illegal activity cited by

Atlas and Polar in support of their claims.

A.      With respect to Atlas's and Polar's claim that the Union has advocated and

encouraged the Atlas pilots to falsely call out sick, those claims are not true and the examples

that Atlas and Polar have cited to support them actually belie them.  Many of the pilots involved

in the incidents are outraged by Captain Carlson's sick call claims and are providing declarations

explaining the reasons for their sick calls.  One pilot, Captain Jennifer Metzler, was accused of

calling out sick at departure time of a specialized B-747 flight from JFK International Airport to

Charleston, South Carolina.  As Captain Metzler explains, she did not call out sick at departure.

She explains that her first officer Robert Molloy got violently sick at departure time and was

projectile vomiting.  First Officer Molloy is also submitting a declaration explaining that he had

become nauseous and violently sick after performing his pre-departure checks in the aircraft's

cockpit, which did not have any air conditioning on account of aircraft maintenance and which

had reached temperatures of well over 100 degrees on a hot July day on an airport apron.  Had

Atlas and Polar checked their facts before accusing the Union and the pilots involved in this

incident they would have learned what actually happened.  In my opinion, Atlas and Polar and

their executives and lawyers ought to apologize to both pilots for fabricating the claim they have

made against them, and they ought to also apologize for not even cleaning up the mess a day

later, thus subjecting the pilots of this aircraft to disgusting working conditions.  Another pilot

called out sick because he suffered a bad case of gout and could barely even walk let alone be fit

to manipulate the controls of an aircraft.  That pilot is also submitting a declaration.  Another

pilot was accused of calling out sick despite the fact that he had actually told the Atlas

scheduling department then that he had made a mistake reading his schedule and apologized for it.  Atlas's scheduling department then marked him off as sick without telling him.  That pilot is also submitting a declaration, despite the fact that he is still a first year pilot still on probation and therefore not even subject even to the full protections of the SCBA. Yet another pilot is accused of falsely calling out sick to disrupt Atlas's and Polar's operations, but he actually called off sick because he was distraught over just recently learning that his wife's cancer had reoccurred.   He too is filing a declaration.  Other sick call claims by Atlas and Polar are not even supported by their own scheduling records, and we are submitting a declaration pointing those out also.  The examples cited by Atlas and Polar to support their baseless claim that the Union is advocating and encouraging a sick call slowdown and that the pilots are falsely calling out sick clearly do not evidence illegal concerted activity.  They instead are evidence that pilots are human beings and that they too are subject to the vagaries of life.  Atlas has advised pilots that it will not tolerate what it considers to be excessive absenteeism.  Attached hereto as Kirchner Exhibits "3"and "4" are two letters to two different pilots explaining Atlas's position.  In both letters, Atlas's Chief Pilot expressly "does not question the reasons" why the pilots were absent, but nevertheless stated that their "excessive absenteeism is nonetheless unacceptable."  Chief Pilot Welty then demanded that both pilots provide medical notes to confirm any future absences. In so doing, Chief Pilot Welty ignored the SCBA's Sick Leave rules, as set forth in Section 14.D of the SCBA, which allow Atlas to demand a medical statement from a licensed medical professional only if it has a "reasonable basis to believe that a Crewmember may be misusing or has misused sick leave."  Chief Pilot Welty's express warning to the pilots that "Your further absenteeism, even if for legitimate reasons . . . may result in discipline up to an including

termination" is even more disturbing and against FAA regulations.  Chief Pilot Welty, on behalf

of Atlas and Polar, is warning the pilots that even if they are legitimately sick and are not fit for

flight duty, they can be fired.  I have never worked for an air carrier other than Atlas and Polar

that demands its pilots to fly sick and are unfit for flight duty.  That is a dangerous policy which

makes a mockery of the FAA's fitness for flight duty rules and prioritizes profits over safety.

  B.  With respect to Atlas's and Polar's claim that the Union has advocated and

encouraged the Atlas pilots to falsely call out fatigued, those claims are also not true and the

examples that Atlas and Polar have cited to support them actually belie them.  The pilots who are

cited by Atlas and Polar for having falsely callout out fatigued are submitting declarations

explaining the circumstances for having done so.  Two union representatives from the joint labor-

management Atlas Fatigue Risk Management Committee (FRMC) are also submitting

declarations.  As set forth in those declarations, the fatigue calls cited as improper were not

improper at all; they were prudent decisions by pilots who rightly recognized that they were not

fit for flight duty due to scheduling delays, reassignments, load hotels, and other scheduling-

related chaotic happenings.  The joint labor-management FRMC accepted each and every one of

the accused pilots' fatigue reports as legitimate.  Now, however, Atlas and Polar have changed

course and are accusing those pilots of improper activity.  The facts not only do not support

them, but also demonstrate that Atlas and Polar have a very cavalier attitude with respect to pilot

fatigue and FAA regulations intended to prevent fatigue-related disasters.  Pilot fatigue has been

identified by the FAA and many industry experts as a serious and dangerous risk to flight safety.

Pilot Fatigue is a risk that is specifically prevalent in carriers like Atlas that operate across many

time zones and alternate crew members routinely between day and night alternately flying day to

night cycles with little or no time to acclimate themselves.  Indeed, Atlas management's policy of not recognizing the severity of fatigue puts not only our pilots in danger, but also is clearly not in the public interest.

C.      With respect to Atlas's and Polar's claims that the Union has advocated and encouraged the Atlas pilots to concertedly refuse to accept open time (overtime) flying assignments, those claims are again not true.  As Atlas and Polar have noted in their complaint, the Atlas pilots are not required to volunteer for or accept open time flying.  Some pilots do not want to volunteer for or accept open time flying for any number of reasons: they may be too tired to fly any more trips after return to off days from their 17-plus day schedules; they might not feel well enough to fly; they may want to spend with the families; they may not need the money and just don't want to fly any more trips; and they may be just not willing to fly additional flights on their days off for a company that they do not like and that they feel is not treating them fairly. Whatever the reason, these decisions are individual decisions that the pilots themselves make. I have told that the pilots that I rarely fly open time trips but that the choice whether to take an open time trip is theirs, not mine or the Union's.  Indeed, Captain Carlson has told me on numerous occasions that his business model is one that has no open time flying, other than in extenuating circumstances, due to the fact that, with the premium pay that comes with open time flying, it is much more expensive for the company to have large amounts of this type of flying. Moreover, Atlas and Polar have published numerous open time trips on a monthly basis over the last few years.  For example, in September of 2017, Atlas published more than 160 open time flights.   These open time trips often are comprised of multiple pilots for multiple-leg trips.  I estimate that this amounts to close to 500 uncovered pilot positions in a month like this.  This

amount of open time trips is reflective of the significant pilot shortage Atlas and Pilot are facing due to their inability to retain pilots.  Yet, even with shortage of trip coverage, the Atlas pilots to my knowledge have covered most of these trips.  Taking into account that many of these trips are marked as "ASAP" (i.e., "as soon as possible") due to Atlas' business model of staffing very few reserve pilots, the performance of the Atlas pilots is not only not a job action, but quite to the contrary remarkable.  In short, I am not aware that any open time trips have gone unfilled.  This month, as of the early part of the week of October 16, Atlas and Polar had published 53 open time trips for B-747 alone.  To my knowledge all 53 of those trips were also covered and October is looking like another near record month for open time flying.  These facts therefore show that there is no concerted effort by the Union or the Atlas pilots to refuse open time flying, and even if the Union had encouraged pilots concertedly not to accept open time trips (which is has not), the pilots clearly did not listen.

D.    With respect to the "BOOT" "campaign," Atlas's and Polar's claims are ridiculous.  Atlas's Flight Operations Manual prohibits pilots from blocking out for departure greater than fifteen minutes before scheduled departure without specific permission from the GCC (Global Command Center).  If an early departure is authorized, the pilots are required to annotate flight plan with a new departure time and secure the time and initials of the dispatcher or operations manager involved.  A true and correct copy of the relevant page from the Flight Operations Manual is attached hereto as Kirchner Exhibit "6."  Contrary to the claims set forth in the Complaint, pilots do have the carte blanche discretion to block out early.  Atlas's and Polar's claim that blocking out promptly, regardless of estimated departure time, when the aircraft is loaded and ready, is significant. It is so ridiculous that the claim made was either made in bad

faith or made by someone who does not know what they are talking about.  First of all, there is

no rule that permits pilots to block out when the aircraft is "loaded and ready," "regardless of the

estimated departure time." Pilots are subject to FAA regulatory flight duty time limits and rest

requirements.  Second, Atlas pilots have long flight duty days that often push up to the regulatory

maximum restrictions.   Those restrictions are measured by the time an aircraft blocks in and out.

That is how their flight duty times are measured from.  Blocking out whenever an aircraft is

"loaded and ready" could trigger a flight duty regulatory violation or SCBA violation.  Third,

there are not any significant benefits associated with pilots willy-nilly blocking out whenever the

aircraft is "loaded and ready." Aircraft departures are choreographed by company dispatchers and

schedulers and other company ground-side personnel as well as the air traffic controllers (ATC)

who have to manage many dozens of flights departing and arriving at the airport while also

ensuring that there is adequate space in the air to prevent collisions around the airport.  When an

aircraft is flying, it is required to fly within specified air lanes to ensure that it does not interfere

with or collide with another aircraft above or below it or ahead or behind it in the same lane;

these are called slot times.  If airlines or their pilots simply departed when they were ready to go,

chaos would ensue and deadly accidents could happen.  I personally have been called by two

separate Directors of Operation at this airline and counseled about leaving early.  They both

explained the problems leaving early imposes on company operations.  Also, when an aircraft

departs early and arrives ready to land early the other end of the flight, the receiving airport's

ATC may not allow the aircraft to land because of airspace restrictions or other operational

reasons.  When an aircraft arrives at its destination early, a station may not have space or ground

crews available to service the flight.  This is not an exhaustive explanation, but it shows that,

aside from the bizarre, Orwellian concept of claiming that leaving "on time" translates to and means "a delayed departure," pilots have little or no discretion to block out early and little or no incentive to do so anyway because of their regulatory hours-of-service restrictions.  Finally, the notion that a pithy reminder to the Atlas pilots to "block out on time" (BOOT is merely an acronym for the same) is somehow illegal is all-the more absurd when one recognizes that Atlas and Polar set the departure times, not the pilots.  If Atlas and Polar want to adjust scheduled departures of aircraft because they want the aircraft to arrive or leave at a different time, then they can do so.  And they do, as they themselves have acknowledged in their Complaint, when they explain that they have adjusted Amazon flight departures by fifteen minutes.

E.     Atlas's and Polar's claim that the Atlas pilots have, since February 2016, "dramatically" changed their response to catering issues also is not true.  Catering has long been a problem at Atlas and Polar and it is a never-ending source of aggravation for the pilots.  Atlas and Polar contract with local catering companies at the airports they operate from.  The SCBA and the FARS require that Atlas provide different and prescribed meals to the pilots.  Meals are not an inconsequential or trivial matter for pilots who fly long haul flights or to pilots who wake up after sleeping and have no opportunity for nourishment before flight.  Food is a safety issue, especially for pilots.  Pilots need to eat just like everyone else, and inadequate or just plain bad catering can and affects a pilot's fitness for flight duty.  I have myself felt light headed when I have not had the opportunity to eat for long periods of time.  Last year, I recall a pilot who complained that that his meal contained a machine screw in it.  I also remember another pilot who complained about bugs on and in his meal, another pilot who complained about hairs in his meal, and yet another pilot who complained that his meal was delivered on the lavatory truck.

The pilot complaints regarding bad or inadequate catering have been constant and unresolved for a long time prior to February 2016.  In fact in 2015 the company and the union met to discuss many items, catering problems amongst them, and at the end of those discussions the company indicated that they were "comfortable" with the current requirements. When the Union tells pilots to make certain that they receive SCBA compliant catering prior to departure, we do so for very serious and practical reasons.  If the proper catering is not provided on the ground, it will not be available once the jet and crews are airborne.  By then, it is too late.  For the same reason, it obviously does the pilot behind the controls little good to wait for the Union to file and pursue a grievance on his behalf (a process which can take weeks, months or even years to see a resolution) over improper crew food.   A lack of food can lead to pilot error in the cockpit errors can result in catastrophes.

F.     Atlas's and Polar's claims regarding maintenance write-ups are not true.  First, pilots, like aircraft mechanics, have a regulatory responsibility under their licenses to inspect aircraft equipment, parts and systems and to identify and log mechanical defects concerning them.  Blaming the pilots for performing their regulatory duty in this regard is as improper as blaming the mechanics.  Atlas and Polar's claim that an alleged 43.4% increase in pilot write-ups relating to the B-767s "cannot be explained by other factors that would typically be expected to affect the rate at which pilots submit mechanical write-ups" is nonsense.  When they were included on the Atlas/Polar certificates a few years ago, the B-767s had numerous mechanical problems that caused numerous flight delays. Due to the rapid addition of older B-767s that are being retired from passenger airlines it is quite understandable that maintenance write ups are increasing given the company's reliance on these older, converted aircraft.  It's like an older car:

it requires more and more maintenance as it gets older.  Two of the oldest B-747s are passenger

aircraft that fly military passengers, namely, aircraft N464MC, N465MC.  Both of those aircraft

have had continuous, significant mechanical problems.  I would be more than reluctant to have

my family fly on either of them.  In fact, I recall that N464MC was delayed for nearly 2 months

on a recent check due to corrosion and serious cracks in the tail section of the aircraft.  These are

not new aircraft, but aircraft that were "moth balled" by other airlines and are at the end of their

useful lives.  Due to their age some countries will not even allow contracts to be signed using

passenger aircraft that are this old.  I often worry about our brave soldiers and their families

being transported in these tired and worn out airframes.  It is in fact ironic that Atlas and Polar

have, through this case, attempted to wrap themselves tightly around the Flag and impugn the

integrity of the Atlas pilots by accusing them of disrupting military flights and military families.

AAWW, Atlas's and Polar's corporate parent AAWW has received billions of dollars in revenue

from military operations.  The company received an Export-Import Bank guaranteed loan of

$865 million 2011, and continues to earn untold millions from a United States Air Force contract

to train pilots to fly Air Force One.  Against this heavy influx of government monies, AAWW

pays no federal income tax, and expects to pay no such federal tax until 2020 or later.  In effect,

AAWW has designed its entire corporate structure to avoid federal taxation, in spite of the

benefits it derives from military flying and other support. Atlas pilots are continually putting

themselves in harm's way in hostile areas while operating flights for the United States military.

In these operations, safety is imperative, and flexibility is key to that safety.  Not on time?  In

hostile area environments, "on time departures" are hardly a reasonable measurement.  The

operating environment is simply not the same as "normal" airline operations in safe and secure

locations.  It's ridiculous for Atlas to assert that pilots aren't pulling their weight in these situations.  In fact, Atlas is flying into more hostile areas than ever before, and flying older aircraft with incessant and recurring mechanical problems.  The aspersions cast on the Atlas pilots by AAWW, Atlas and Polar executives falsely accusing the pilots of disrupting military flights is shameless and completely and utterly false.  A good many of our pilots are ex-military flight officers, and all of us are proud to be Americans.  We would never tolerate any actions by anyone or any organization against our brave soldiers and their families as Captain Carlson so falsely and selfishly claims.   This pilot groups' history is loaded with examples of putting the military first.  In fact, just recently during contract negotiations, Captain Carlson and the Atlas management negotiating team demanded the right to directly contact the United States military to request a deferment of a pilot's military service and to seek a deferment or cancellation of a pilot's military training.  The Union refused Atlas's demand, telling Atlas that it was not only offensive and insulting, but also foolish for a military contractor to make such a demand.  Atlas eventually dropped its military-interference proposal.

28.    Atlas's claim that its staffing level is at or above historical norms is not credible in any sense.  Atlas's and Polar's operations have expanded significantly over the last few years, as they have secured new business opportunities around the globe and found more aircraft to carry that business.  Their pilot staffing, however, has not kept up with their exceptional business growth. As a result, their operations have become increasingly strained.  They have responded by bouncing their pilots from one schedule change to another, extending their duty days, harassing pilots who are sick or fatigued and consequently wearing them out.  They have also continued to ignore and blatantly violate the SCBA whenever they feel they have to do it.  That, in turn,

coupled with the Union's 2015 admonition to management that pilots and the Union expected strict, bilateral compliance with the SCBA has generated a mountain of grievances and created an ever increasing safety problem.  Indeed, Atlas' pilot shortage, due to its inability to attract and retain pilots, along with the decreasing level of experienced pilots has led to numerous incidents and near catastrophic accidents.  In the 2012 and 2013 "honeymoon" period, during which the Union focused more on accommodating Atlas and Polar to find "work-arounds" to contract violations, there were only six and then 12 formal grievances filed by the Atlas pilots in those years, respectively.  In 2014, when the Atlas pilot seniority list was approximately one-half the size that it is today, the number of formal grievances filed by the Atlas pilots nearly tripled, to 35. In 2015, after the Union informed the Union that it would no longer tolerate Atlas's and Polar's cavalier disregard of the SCBA, the number of formal grievances nearly tripled again, to 93.  In 2016, the number of formal grievances declined slightly to approximately 77.  The number of grievances formally filed this years, as of mid-October, is approximately 70.  Bearing in mind that the union estimates that less than 10% of contract violations are actually written up and filed, these numbers of grievances are disturbing to say the least.  Compounding Atlas's problems is that, due to the overall treatment of our pilots by this management group, the attrition rate at Atlas is at record levels, and the number of pilots hired who wash out of training is predictably higher as incoming pilots' experience levels decline.  Atlas and Polar have not only skirted the SCBA rules but also federal regulatory rules.  For example, they violated FAA regulations concerning the number of hours of operating experience required of newly hired pilots as provided in 14 C.FR.§  121.434(c)(3) and (4).  In this regard, they allowed and counted toward certification all of the time a pilot spent "airborne, including rest time, to satisfy the

operating experience requirements set forth in the regulations." The regulations, however, specify that a pilot may only log flight time when he/she is seated at the controls of the airplane and actually performing the piloting duties required for purposes of meeting the their operating experience requirements.  They violated this rule in order to increase the number of new hire pilots that they could churn out of training and use for revenue service flights.  They have also flown unqualified pilots on multiple occasions knowingly and have openly told pilots to fly, even though they knew they were unqualified for the aircraft they were assigned to, just to keep the schedule moving. This is yet another example of Atlas's and Polar's business instinct to avoid or attempt to work around problems rather than fix them.   It is this same mindset that caused Atlas executives' refusal to sit down with the Union to negotiate mid-term letters of agreement, such as the Express LOA, that would have avoided or greatly alleviated the frantic scheduling decisions that they have been making and which are causing so much of their operational problems they now blame on the Union.  And it is this same mindset that prevents Atlas management from trying to fix a myriad of known problems caused by their scheduling practices, such as placing reserve pilots overseas in locations such as Hong Kong and Australia where they repeatedly experience delays, and in securing commercial scheduling software to avoid pairing pilots with different regulatory rest limitations that can and do trigger fatigue delays just to name a few.  The impact of Atlas's and Polar's chaotic, mismanaged operations exacts a heavy toll on its pilots. They get worn out, sick and become frustrated with a management team that they perceive does not care about their safety or welfare.  All of this has led to a pilot group with a very low morale. Given this degraded environment, therefore, it is no wonder that Atlas and Polar claim that they are experiencing a higher incidence of fatigue and sick calls.  It is understandable that Atlas

schedulers may have to make more calls to find a pilot who is willing to cover an open time trip

on his or her day off.  The operational problems that Atlas and Polar are experiencing developed

long before February 16, 2016, and they are entirely of their own making.

29.     Atlas's and Polar's management's insistence on clinging to a failed flight

operations business model that worked for a much smaller and relatively non-scheduled airline

no longer works for an airline whose parent company CEO openly boasts is moving towards a

more demanding scheduled, on-time, E-Commerce model and that has roughly doubled in size

over the past few years.  Atlas' and Polar's rapid business expansion into new markets and their

equally rapid expansion in the scale of their operations are the real culprits in all their flight

operations problems.  The problems are not the fault of the pilots or the Union.   Their "bury

their heads in the sand" and knee-jerk reactions to their self-made problems -- falsely blaming

their pilots and the Union -- is, to say the least, disappointing, detrimental to the enterprise and

its shareholders and stakeholders, and does not serve the public interest.

30.     The Union is not engaged in a slowdown or any other unlawful activity as

alleged in the Complaint.  The Union and its members are doing no more than attempting to

enforce the rights they currently have under their SCBA, attempting to comply with existing

company policies and attempting to satisfy their obligations under the Federal Aviation

Regulations.  To prohibit the Union from educating its membership on the importance of

exercising their rights and meeting their obligations before, during or after contract negotiations,

and interfering with the ability of pilots to engage in these protected activities without fear

violating a court order, as Atlas and Polar seek to do, places the operation and pilots at serious

risk. No doubt, Atlas and Polar view the Union and its members' efforts to strictly enforce the contract as "pressure" during contract negotiations, and it is pressure, but it is lawful pressure. Anything less during contract negotiations compared to other times removes any incentive for Atlas and Polar to negotiate a new contract in the same way permitting pilots to grant themselves wage increases or change their schedule types would lessen eliminate the need for the Union to negotiate improvements on their behalf. The RLA recognizes the right of unions and members to strictly enforce their collective bargaining agreements. As I have explained above, I told Atlas and Polar in the fall of 2014 that when I took office on January 1, 2015, the Union expected strict contract compliance and, as discussed above, Captain Carlson, on behalf of the Plaintiffs, told me that "should be no problem." What Atlas and Polar describe as a dramatic change in Atlas pilot and Union behavior since the Union formally filed its RLA notice to amend the SCBA on February 16, 2016, therefore, is not simply not accurate. The reality is that our strict contract compliance position was adopted in 2015 and it has continued to the present date. Nothing "dramatic" or even "unusual" happened February 16, 2016 when the Union filed its RLA notice to amend the SCBA; the Union continued the same policy of strict contract compliance it had adopted more than a year earlier and which Atlas/Polar said "should not be a problem." Through this lawsuit, however, Atlas and Polar are now attempting to have their way with our current SCBA in contract negotiations while preventing the Union and the Atlas pilots from doing anything about it. Atlas and Polar are, in other words, trying to exploit their self-made operational problems by attempting to cut off the Union's strict, bilateral contract compliance policy - one that has been in place since January 2015 – simply because we are now in contract negotiations. And they seek an injunction and the threat of contempt to hold over the Union's

and the Atlas pilots' heads throughout those negotiations. In that way, they Atlas and Polar now seek to stifle the Union's legally protected pilot education program and its legal duty of fair representation to enforce the SCBA. That, in my opinion, does not even remotely resemble good faith on the part of the Plaintiffs.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

10/24/2017
Dated:

Signed

# INTERNATIONAL BROTHERHOOD OF TEAMSTERS



December 18, 2014

Atlas Air, Inc.
2000 Westchester Blvd.,
Purchase, NY 10577

Messrs. Flynn, Dietrich, Lindsay, and Carlson:

Yesterday the Company posted its position vacancy award. In issuing the award the Company has ignored the contractual procedures for filling position vacancies and has unilaterally adopted and applied its own, extra-contractual, method to fill vacancies. In so doing, and as reflected in the award, the Company has decided, by fait, to lock B-767 crewmembers into their seats beyond the contractual 3-year limitation. I also understand that Mr. Carlson has informed Capt. Bob Ulrich that the Company is not going to honor awarded training dates for the B767 crewmembers awarded B767 slots and that it will try instead to provide those crewmembers their awarded training at some unspecified time after April or May, 2015. I further understand that Mr. Carlson informed Capt. Bob Ulrich that the Company intends to hire new crewmembers to fill the B747 vacancies that should be filled by existing B767 crewmembers. Mr. Carlson recognized that the Company does not have the right to take these steps under the contract when he advised that the Company intends to pay protect affected crewmembers once the newly hired, i.e., junior crewmembers complete their operational experience training.

The Company's actions as described above are unacceptable and constitute a blatant disregard of our contract. We will not stand for it. Through these unilateral and extra-contractual actions, the Company is deliberately disrupting the schedules, expectations and lives of our members. The Company's unilateral and extra-contractual actions will irreparably harm our members. They will, for example, be deprived of the opportunity to bid from the B767 equipment to the B-747 equipment until some uncertain date that may stretch far into the future. Indeed, to the extent that the new hires occupy the B747 slots and therefore cut off any opportunities to fill vacancies in those aircraft, the existing B767 pilots could be deprived of such an opportunity for many years. These would be only a few of the consequences of the company's illegal action. Simply acknowledging that it does not have the right to do what it is doing and then attempting to placate the affected pilots by stating that it will pay them money is not a solution to the harm the Company is causing; it is an insult and it is illegal.

We demand, therefore, that the Company immediately, and by no later than 12:00pm, EST, tomorrow, December 19, 2014, rescind the January, 2015 position vacancy award. If it does not do so, then please be advised that we will take all appropriate steps to resolve what has become a very serious and pressing problem that is entirely, and exclusively, of the Company's own making.

Sincerely,

Daniel C. Wells, President
APA Teamsters Local 1224

cc:     Capt. Bob Ulrich
        Capt. David Bourne
        Capt. Bob Kirchner
        Chief Counsel Edward Gleason

**Airline Professionals Association | Teamsters Local Union No. 1224**
2754 Old State Route 73, Wilmington, OH 45177  |  ph: 937.383.2500  |  fx: 937.383.0902  |  www.apa1224.org
*Affiliated with the International Brotherhood of Teamsters*

**Subject:** Re: Carlson to Ulrich response to Dietrich to Wells letter

**Date:** Friday, December 19, 2014 at 15:16:28 000PST

**From:** Daniel C. Wells

**To:** JEFF CARLSON

**CC:** BOB ULRICH, JOHN DIETRICH, ED GLEASON, Bob Kirchner

Received and accepted.

A formal letter to initial demand letter forthcoming…

Regards,

DCW

Daniel C. Wells

President, APA Teamsters Local 1224


On Dec 19, 2014, at 15:09 , Carlson, Jeff <Jeff.Carlson@atlasair.com> wrote:

Dear Captain Ulrich

To reiterate the intent of the letter to Captain Wells from John Dietrich, first and foremost we will amend and reissue the position bid consistent with the CBA and section 24 and any applicable paragraphs.

We will first amend the bid to put the unlocked 767 FOs into their preference positions on the 747. We will also (concurrently) invite new hire pilots into the vacated seats on the 767. This is anticipated to commence in the beginning of January.

We will need to fill more 747 FO positions after we have exhausted the available unlocked 767 FOs. Once we no longer have availability of unlocked 767 FOs who are preferencing the 747, we will assign new hires into the remaining vacancies.

The remaining effort is to schedule the planned Captain upgrades. This plan is being assembled now. I anticipate these positions to be rescheduled in the second quarter of 2015. I recognize letters have been sent to Captain upgrades, however they will need to have their class dates amended to the rescheduled time and will send a revised letter to affected crewmembers.

To reiterate, all vacancy bid awards will be in compliance with the collective bargaining agreement.

January schedule bids will be processed in a way that allows all eligible bidders to have the opportunity to bid for schedules in accordance with the CBA. With discussion and approval of the ExCo, the closing date may be extended from the CBA required date due to the major change.

Finally, the company will cover all FPL that is required for the ExCo and/or the scheduling committee to monitor compliance with the correction of the vacancy bid award and/or the resultant schedule bids associated with the December 17 position bid and January/February line bid.

Regards,

Jeff Carlson



VIA FED EX AIRBILL NO. 775469578425

January 21, 2016

Daniel Lennox
3560 Flint Dr.
Plainfield, Indiana
46168

Re:    December 31, 2015 Counseling Session

Captain Lennox;

This letter memorializes the counseling session you and I had on December 31,
2015 ("Counseling Session") and is issued pursuant to Section 19.D.10 of the Atlas Air,
Inc. ("Atlas" or the "Company") Collective Bargaining Agreement.  As provided in the
CBA, neither the counseling session nor this letter constitutes the assessment of
discipline.  However, this letter will be retained as part of your work record.

As of the date of this letter, the Company's records indicated that you have been absent
from work eight (8) times over the last 12 months including your most recent call January
20, 2016.  Such absenteeism is excessive and is a failure to meet your fundamental
obligations as an employee to regularly show up for work, on time and ready to work. At
the time of your previous sick call on December 29, 2015, I left a voicemail message for
you asking that you provide a doctor's note for your absenteeism. You returned my phone
call on December 30, 2015 explaining you were unable to comply due to
your doctor's schedule, however stated you were fit to fly and we agreed the note would
not be required. I also discussed your history of absenteeism and instructed you to obtain
a doctors description (note) should you call in sick in the future.  I note that since our
counseling session, you again have called out sick and I have not received a doctor's
note.

While the Company does not question the reasons you have offered for your absences,
your excessive absenteeism is nonetheless unacceptable. I am directing you to provide a
medical statement from a licensed medical professional confirming that you unable to
perform the duties due to fitness or injury in accordance with Section 14.D.2 of the CBA
for the most recent sick call you made on January 20, 2016.

Atlas Air's success depends on all of us carefully following the Company's rules and polices. Your further absenteeism, even if for legitimate reasons, or your failure to comply with all Company policies, practices and procedures may result in discipline up to and including termination.

Respectfully,

Scott Welty
Chief Pilot

cc:     Jeff Carlson, Atlas SR. V.P., Flight Operations

**Kirchner Exhibit No. "4"**
**Page 1 of 1**



**VIA FED EX AIRBILL NO.** 7752 6212 8897

December 21, 2015

Roman Miazga
209 DeBaptiste Lane
West Chester, PA
19382

      Re:    December 14, 2015 Counseling Session

First Officer Miazga;

This letter memorializes the counseling session you and I had on December 14, 2015 ("Counseling Session") and is issued pursuant to Section 19.D.10 of the Atlas Air, Inc. ("Atlas" or the "Company") Collective Bargaining Agreement. As provided in the CBA, neither the counseling session nor this letter constitutes the assessment of discipline. However, this letter will be retained as part of your work record.

As of the date of this letter, the Company's records (which you did not dispute during our Counseling Session), indicated that you had been absent from work eight (8) times over the last twelve (12) months, for a total of 67 absentee days. Such absenteeism is excessive and is a failure to meet your fundamental obligations as an employee to regularly show up for work, on time and ready to work.

While the Company does not question the reasons you have offered for your absences, your excessive absenteeism is nonetheless unacceptable. Going forward, should you be absent from work I am directing you to provide a medical statement from a licensed medical professional confirming that you unable to perform the duties due to fitness or injury in accordance with Section 14.D.2 of the CBA.

Atlas Air's success depends on all of us carefully following the Company's rules and polices. Your further absenteeism, even if for legitimate reasons, or your failure to comply with all Company policies, practices and procedures may result in discipline up to and including termination.

Respectfully,

Scott Welty

Scott Welty
Chief Pilot

cc:    Jeff Carlson, Atlas SR. V.P., Flight Operations

**Effective: 26 SEP 2017**                    **Expires: 31 DEC 2017**

# Recent High Profile RNAV Departure/ Arrival Events

**Bulletin Purpose:** Address recent high profile events at Hong Kong International Airport (VHHH/HKG).

___

## General

We have recently experienced a number of high profile events at Hong Kong on Arrival and Departure. These events have occurred on both the 747 and 767 Fleets.

These events are highlighted at Hong Kong, but can occur anywhere.

Many of these events were experienced after changes were received by ATC to RNAV Arrivals and Departures and the crews incorrectly programmed the FMS. They occurred prior to taxi, during taxi out and in flight.

## FOM (10.1.39) RNAV SIDs

RNAV SID operations are based largely on flight path predictability. It is imperative to maintain track accuracy when flying RNAV SIDs, especially when operating from closely spaced parallel runways. Track accuracy can be degraded by *incorrect FMC data entry*, inaccurate FMC position at takeoff, or inappropriate bank angle limits/settings.

## RNAV SIDs and STARs - Verification

With the increase in RNAV operations, many departures and arrivals are "runway specific". It is essential that **both pilots** verify the correct **SID** or **STAR, Transition** and **Runway selection** (if applicable, Approach/ Runway) via a detailed comparison of the clearance. ***This is especially important when a change is made***. This should include reference to:

- Jeppesen pages
- HSI/ND display
- DEPARTURE/ARRIVALS page
- LEGS pages
- Terrain awareness

## Runway/SID/STAR Changes

Changes to SIDs/STARs (RNAV or otherwise) should be executed using the DEPARTURE/ARRIVALS page and should include as a minimum:

- DEPARTURE/ARRIVALS page
- Runway
- SID/STAR
- Transition

**Effective: 26 SEP 2017**                          **Expires: 31 DEC 2017**

---

### 747-400/-8 &767 FCOM Limitations
#### RNAV and RNP Operations

Pilots are not authorized to fly a published RNAV or RNP procedure (instrument approach, departure, or arrival procedure) unless it is retrievable by the procedure name from the current aircraft navigation database and conforms to the charted procedure. The system must be able to retrieve the procedure by name from the aircraft navigation database.

*\*\*The above limitation prohibits the modification of an RNAV procedure.*

### Takeoff Runway/SID Confirmation

It is especially important for both pilots (especially with a Runway/SID change) to verify the following:

- Runway
- Departure
- First Fix
- Terrain avoidance (including climb performance)

### Autopilot

All VHHH/HKG RNAV Departures *require the use of the autopilot as soon as practical after takeoff.*

For all other stations, use of the autopilot for RNAV departures is STRONGLY RECOMMENDED, and should be engaged as soon as practical after takeoff. This enhances situational awareness for both pilots, particularly in areas where terrain is a factor.

### Don't Hurry

There are many factors that contribute to errors. In many of the events that have occurred recently (and not just in HKG), ATC contributed to the sense of urgency felt by the crewmembers in changing and complying with assigned clearances.

When in doubt, slow down and make the changes methodically, ensuring *both crewmembers verify* that the changes were made correctly.

### Situational Awareness

Regardless of the operational tempo, distractions, or any other factors, the importance of Crewmembers maintaining situational awareness cannot be overstated. The use of an autopilot aids in situational awareness.



# Flight Operations Manual

**Version 14**
09 MAY 17

NOTE

This manual incorporates and obsoletes the Atlas FOM Version 13 and Bulletin 77.

PROPRIETARY INFORMATION

© Copyright Atlas Air, Inc. 2017. This document is not to be released under the Freedom of Information Act. PROPRIETARY DATA. Atlas Air, Inc. reserves all proprietary rights in the data furnished herein. Use of this document is restricted to conveyance of information to government agencies and customers or vendors of Atlas Air, Inc. This information shall not be released, disclosed, used, or duplicated for any purposes without the written permission of Atlas Air, Inc. By accepting receipt and possession of this document, you acknowledge and agree to these regulations.

Atlas-Southern Flight Operations Manual

---

**Flight Operations**

---

6.    Prior to crossing a runway, or taxiing into position for takeoff, the Pilot Flying will confirm with all other crewmembers that clearance has in fact been received.

If any crewmember is in doubt, the aircraft should be stopped and clearance confirmed.

Example: Pilot Flying: "Confirm cleared to cross RWY 01".

Pilot Monitoring: "Confirmed"

Additional Flight Crewmember: This callout will be backed up and challenged if not accomplished.

## Early or Delayed Departures

Flights will not block-out greater than fifteen (15) minutes before scheduled time (ETD on the OFP) without specific permission from the GCC. If an early departure is authorized annotate the flight plan with the new ETD and the time and initials of the Dispatcher/Operations Manager.

## Engine Start

In order to prevent injury to personnel or damage to equipment, engines shall not be started until a clear to start signal is received from ground personnel. If there is any doubt about what is desired, delay the start until the situation can be clarified with ground personnel.

## Delayed Engine Start

Delayed engine start should be used when operationally feasible in order to conserve fuel and reduce carbon emissions. During delayed engine start taxi operations, the crew's attention should be focused on taxiing the airplane. Distractions should be kept to a minimum. Avoid high thrust settings. Any potential fuel savings are negated if high sustained thrust settings are used. Follow applicable, FCOM guidance regarding delayed engine start.

Plan engine start during a time of low-workload (e.g. a long straightaway). At no time should engine start be performed while crossing a runway.

Start the engine(s) early enough prior to takeoff to ensure reaching proper operating temperature (warm-up time), fuel from all tanks to be used for takeoff is adequately sampled, and most importantly, ample time exists to complete the appropriate checklists in an unhurried and methodical manner.

## Low Visibility Taxi (Below 1200 RVR)

| WARNING |
|---|
| DO NOT CONTINUE TO TAXI IF YOU BECOME UNSURE OF YOUR POSITION. STOP THE AIRCRAFT AND IMMEDIATELY INFORM GROUND CONTROL THAT YOU ARE UNSURE OF YOUR POSITION. IMMEDIATELY RESPOND TO ATC INSTRUCTIONS EVEN IF IT MEANS TAXIING OFF OF THE PREPARED SURFACE. |

### *General*

The flight crew must have the airport diagram or SMGCS Low Visibility Taxi Routes (if applicable) in view for reference during taxi.

---

Please refer to GlobalNet for current manual revisions.  Printed or downloaded copies are considered uncontrolled and are for reference only.