## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
ATLAS, INC., *et al.*,             )    Case No.: 1:17-cv-01953-RDM
                         )
         Plaintiffs,     )    Hon. Randolph D. Moss
              v.       )
                         )
INTERNATIONAL BROTHERHOOD )
OF TEAMSTERS, AIRLINE     )
DIVISION, *et al.,*          )
                         )
        Defendants.    )
_____ )

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

# Union Exhibit 4:

# Declaration of Kevin McCabe

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLAS AIR, INC. and POLAR AIR CARGO WORDLWIDE, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224,<br><br>Defendants. | Civil Action No. 1:17-CV-01953 RDM |

## DECLARATION OF KEVIN J. McCABE

I, Kevin J. McCabe, based upon my personal knowledge and review of records maintained in the regular course of business, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

1.       I am employed as a pilot by Atlas Air, Inc. ("Atlas").  I have worked at Atlas since June, 1999.

2.       I am a licensed commercial pilot and hold an Air Transport License issued by the Federal Aviation Administration (FAA).  I am type-rated to fly numerous aircraft as a professional airman, including the Boeing B-747.  I have well over 14,000 hours of international and domestic cargo and passenger flying experience as a licensed commercial pilot, including almost 800 hours in the 747-8F, flying to many diverse locations.  I have a turboprop flight engineer rating from the FAA.   I also have an Airframe and Powerplant Certificate and Inspection Authorization, i.e., an aviation mechanic's license, issued by the FAA.

1

3.      Prior to working at Atlas, I worked as the Chief Pilot, Instructor, and Company Check Airman for. Alaska Air Taxi, LLC is an Alaska-based charter carrier regulated by part 135 of the federal aviation regulations.  My responsibilities while working there included the development of pilot training programs, manuals and reports. I was also authorized by the Federal Aviation Administration (FAA) to conduct FAR Part 135 pilot checkrides, *i.e.*, actual flying training for pilots.  I also previously worked as the Chief Pilot, Check Airman and Ground and Flight Instructor for another Alaska carrier, Island Air Service.  While working at Island Air Service, I also served as the carrier's Director of Maintenance.

3.      In addition to my experience as a commercial airline pilot, flight engineer, aviation mechanic, and a flight operations and maintenance manager, I have twenty years of military aviation experience, having served in the United States Coast Guard, where, among other duties, I worked as C130 Flight Engineer, Flight Engineer training instructor/examiner, Maintenance Control Chief, Mechanic and Maintenance Supervisor, and Quality Assurance Chief.

4.      By way of educational background, I have a Master's Degree in Business Administration from Regis University in Denver CO and a Bachelor of Science Degree in Professional Aeronautics from Embry Riddle Aeronautical University.

5.      I was formerly a member of the Air Line Pilots Association ("ALPA"), a labor organization that separately represented the pilots employed by Atlas and the predecessor of Polar Air Cargo Worldwide, Inc. ("Polar").  When the International Brotherhood of Teamsters, Airline Division ("IBTAD") replaced ALPA as the Atlas and Polar pilots' labor representative in December 2008, and delated its day-to-day representative responsibilities to an affiliated local union, Airline Professionals of the International Brotherhood of Teamsters, Local Union No.

1224 (Local 1224).   In turn, Local 1224, which represents approximately 4,600 pilots employed

by eleven carriers, assigns its the day-to-day representative responsibilities to each of the eleven

pilots groups employed by the eleven contracted carriers to which it is assigned to deal with.

Each of the pilots groups is governed by an elected pilot executive council consisting of pilots

employed by their own pilot group.  Those executive councils are authorized to establish

committees to assist them in carrying out their representative functions.   Upon the IBTAD's

certification as the Atlas pilots' representative, I was elected by the Atlas pilots as a member of

the Atlas Pilots Executive Counsel in 2012 and served in that capacity through 2105.  Since then

I have served on and assisted various labor-management committees on behalf of the Atlas

pilots.  I am a member of Local 1224.

      6.      When the IBTAD became the certified representative of the Atlas and Polar

pilots, the Atlas and Polar pilots continued to work under the terms of separate collective

bargaining agreements that had been negotiated by ALPA.  Over the next three years, the

IBTAD, Atlas and Polar engaged in collective bargaining negotiations to establish a single

collective bargaining agreement covering the Atlas and Polar pilots.  After they were unable to

reach an agreement through negotiations, an arbitrator imposed the terms of a single collective

bargaining agreement in the fall of 2011.  At that time, although Atlas and Polar remained (and

still remain) separately government-certificated air carriers, the Polar pilots were transferred to,

and became employees of, Atlas.  At that time, the Atlas and Polar pilots' seniority lists under

their previous, stand-alone collective bargaining agreements were combined into a single,

integrated seniority list.  Upon the implementation of the arbitrator-imposed single collective

bargaining agreement in 2011 (SCBA), the Atlas and Polar pilots became one combined

workforce working under a single collective contract with a single seniority list while working for two separate air carriers.

7.     Effective January 1, 2012, I was elected by the Atlas pilots to serve as a member of the Atlas Pilots Executive Council, the 5-person board that, upon the imposition of the SCBA and on behalf of the IBTAD and Local 1224, was assigned to provide the daily representative collective bargaining and representative responsibilities of the Atlas pilots.  In my capacity as a member of the Atlas Pilots' Executive Council, I also represented the Atlas pilots with respect to the development and implementation of an FAA-mandated joint labor-management committee called the Fatigue Risk Management Program Committee (FRMC).  After that committee was established, I served as one of the two Atlas-pilot appointed members on the five-person FRMC. Currently, I serve as an advisor to the FRMC and have been afforded full access by Atlas to fatigue risk management records and related Atlas programs and records including its pilot scheduling software program, known as the "AIMS" crew management and scheduling program.

8.     United States commercial airlines are regulated by various laws and regulations, including 14 CFR Part 121 (FAR Part 121).  FAR Part 121 provides various operating rules and limitations for United States air carriers and their aviation workforces, including their pilots. FAR Part 121, for instance, prescribes rules governing the maximum number of hours of flight duty time that pilots may be assigned and work within specified periods.  FAR Part 121 also prescribes rest and fatigue rules that air carriers and every commercial pilot must adhere to.

9.     For many years, the National Transportation Safety Board (NTSB) and the FAA have expressed significant concerns about the airline industry's hours of service and rest rules for commercial airline pilots as set forth in FAR Part 121. In the wake of the highly publicized 2009 Colgan Air crash that killed 50 people,  Congress passed the Airline Safety and Federal Aviation

Administration Extension Act of 2010, requiring the FAA to develop science based pilot rest and duty rules to address problems relating to pilot fatigue.

10.     Following the enactment of the Airline Safety and Federal Aviation Administration Extension Act of 2010, the FAA publicly announced that its then-current regulations did not adequately address the risk of pilot fatigue.   In so doing, the FAA endorsed the NTSB's years-long public concerns that the FAA's hours of service and rest regulations did not account for the impact of circadian rhythms on pilot alertness.  The NTSB had, for many years, recommended that the FAA and the airline industry adopt a comprehensive approach to pilot fatigue with flight duty limits based on fatigue research, circadian rhythms, and sleep and rest requirements.  After a lengthy period of public notice and comment, the FAA published a final rule revising the pilot hours of service and rest rules in early 2012.  That final rule, which was the first major revision to pilot rest and duty limits in more than 60 years, implements a new part 117 to Title 14 of the FAA's regulations (FAR Part 117) and became effective in early 2014.

11.     When it published the final rule referred to as FAR Part 117, the FAA explained that:

> *The FAA believes that its current regulations [i.e., FAR Part 121] do not adequately address the risk of fatigue. The impact of this risk is greater in passenger operations due to the number of persons placed at risk. Presently, flightcrew members are effectively allowed to work up to 16 hours a day (regardless of the time of day), with all of that time spent on tasks directly related to aircraft operations. The regulatory requirement for 9 hours of rest is regularly reduced, with flightcrew members spending rest time traveling to or from hotels and being provided with little to no time to decompress. Additionally, certificate holders regularly exceed the allowable duty periods by conducting flights under part 91 instead of part 121, where the applicable flight, duty and rest requirements are housed. As the National Transportation Safety Board repeatedly notes, the FAA's regulations do not account for the impact of circadian rhythms on alertness. The entire set of regulations is overly complicated, with a different set of regulations for domestic operations, flag operations, and supplemental operations. In addition, these regulations do not consider other factors that can lead to varying degrees of fatigue. Instead, each set of operational rules (i.e. those applicable to domestic, flag, or supplemental*

5

> *operations) sets forth a singular approach toward addressing fatigue, regardless of the operational circumstances that may be more or less fatiguing.*

FAR Part 117 as it was published in the Federal Register, can be found at Fed. Reg., Vol. 2, pg. 330 et seq., Wednesday, January 4, 2012 (Final Rule).   The above-quoted statement from the FAA is in the Final Rule at page 334.   Further explaining that new FAR Part 117 "prohibits the certificate holder from assigning an FDP ["flight duty period"] to a flightcrew member who has informed the certificate holder that he or she is too fatigued to safely perform his or her assigned duties'[,] the FAA announced that it:

> *has decided to make fatigue reporting mandatory because allowing a flightcrew member to accept an assignment to an FDP when that flightcrew member knows that he or she is too tired to fly safely poses an unacceptable safety risk.*

*Final Rule at pg. 349.*  The FAA further explained that through FAR Part 117:

> *Instead of creating a single objective fatigue-measurement standard, the above subsection requires each flightcrew member to utilize the information provided during his or her statutorily-mandated fatigue training to self-assess whether he or she feels well-rested enough to safely complete his or her assigned FDP. The FAA also emphasizes that flightcrew members who feel alert at the beginning of an FDP can immediately terminate the FDP, under subsection (c) of section 117.5, if they feel themselves becoming too fatigued to safely continue their assigned duties.*

*Id.*

The FAA also explained that:

> *"[c]arriers are entitled to investigate the causes for an employee's fatigue.  If a carrier determines that the flightcrew member was responsible for becoming fatigued, it has every right to take steps to address that behavior.*

*Final Rule at pg. 350.*

12.      The FAA further explained in Federal Registrar publication of FAR Part 117 that:

> *The FAA finds that this rulemaking is necessary for safety in air commerce. As discussed in other portions of this preamble, the existing flight, duty, and rest regulations [i.e, FAR part 121] permit flightcrew members to accumulate unsafe amounts of fatigue. This unsafe accumulation of fatigue undermines aviation safety by increasing the risk of an accident.*

*Final Rule at pg. 387.*

13.     The FAR Part 117 rules are based on scientific knowledge of the effects of fatigue, sleep and circadian rhythms on the human body.  One significant and unanticipated complication concerning the new rules however, arose after the airline cargo industry lobbied to carve out and exempt "all cargo" airline operations from the new rules.  I attended one meeting of the FAA rule making committee (FAA ARC) that debated and ultimately acquiesced to the cargo industry's push to obtain an exemption from the new hours of service and rest rules that were being discussed, known as the "cargo carve-out" to the new FAR Part 117 rules.  In this regard, based on my own knowledge following the FAA ARC proceedings and further readings and discussion regarding the development of the FAR Part 117 rules, I understand that cargo pilots were included when the FAA originally proposed the regulations. I further understand that the aviation cargo industry, including Atlas, engaged in an extensive lobbying effort to remove cargo pilots and all cargo airlines from the regulations, and eventually persuaded the White House to order the FAA to remove them from the final regulation.  As a result, there are two sets of hours of service and rest rules governing the commercial aviation industry and its pilots: the original, outdated and highly criticized rules applicable to "all cargo" airline operations; and the new, science-based rules applicable to passenger airline operations.  Important differences between the new FAR Part 117 rules and the old, but still applicable to "all cargo" operations rules relate to, among other things, the number of hours that pilots may remain on duty, depending on the number of pilots in the crew, the length of the trip and the time of the flight's operation.

14.     The differences between the new FAR Part 117 rules and the original, "all cargo" hours of service and rest rules are particularly important and complex as applied to Atlas and

Polar's operations.  At the time of the FAA ARC meetings, Atlas and Polar were conducting

both domestic and worldwide all cargo operations.  Since the effective date of the FAR Part 117

rules, however, they now conduct both all-cargo **and** passenger operations.  Along with a much

smaller carrier called ATI, they are the only carriers that I am aware of that are allowed by the

FAA to operated what are called "mixed operations," i.e., "all cargo" and passenger flights. Only

these two airlines have pilots who are regularly required to fly both "all cargo" and passenger

flights.  Atlas pilots are the **only** pilots that I am aware of within the industry that are required to

fly mixed operations during their same monthly schedules, which consist of very long, 17-day

monthly trips that can extend to as many as twenty days, not counting their time spent

commuting home from the Atlas base airports in and out which trips start and finish.  In other

words, Atlas pilots are required to operate "all cargo" flights for one or more consecutive days of

their monthly trips, during which they are subject to the FAA's old, more exhausting hours of

service and rest rules, and then, operate passenger flights the next night or several nights, during

which they are subject to the new FAR Part 117 rules.  Pilots are themselves required by law to

adhere to all of the hours of service and rest rules, and they are subject to FAA enforcement

actions against their licenses if they violate them.

      15.     In 2013, Atlas set out to develop and implement a pilot fatigue risk management

plan (FRPM). I was tasked by the Atlas Pilots Executive Council to work with Atlas

management to accomplish this combined (IBT/Atlas) program.  In 2013, Atlas and Local 1224,

through the Atlas Pilots Executive Council chairman, established the Atlas FRMC.   The Atlas

FRMC consists of two voting representatives appointed by Atlas, two voting representatives

appointed by the Local 1224 and a fifth member appointed by Atlas to serve as the committee's

program manager.  The FRMC is charged with collecting and analyzing data relating to pilot

fatigue, including pilot fatigue reports, identifying operational issues affecting or contributing to pilot fatigue and recommending solutions to resolve those operational issues.

16.     Prior to the enactment of the Airline Safety and Federal Aviation Administration Extension Act of 2010 and FAR Part 117, pilots in the airline industry often were hesitant and even resistant to self-evaluate and report their degree of fatigue and fitness for duty to operate commercial flights.  Several factors contributed to this, including pilots' mission-oriented personalities that historically and typically have been experienced in the airline industry, as well as their fear of retribution by their employer. This fear was particularly acute at Atlas and Polar, as both carriers had previously disciplined pilots who called in fatigued. In order to change that culture, the IBTAD and Local 1224 insisted that Atlas' FRMP be non-punitive in nature. Additionally, we needed to collect data on Atlas's and Polar's operations and felt that any program which, at its inception, was punitive, would prevent an honest data-set for study and action.  Atlas and the Local 1224 ultimately agreed that the pilots' participation in and reporting under the FRMP would be non-punitive in all but a few narrowly tailored circumstances.  The non-punitive nature of the FRMP has helped to alleviate the concerns of pilots who previously would not self-evaluate and self-report their fatigue, thereby reducing the risks to their own safety and that of their fellow crew members, passengers, Atlas's and Polar's customers, and the public.

17.     Additionally, over the last few years, Atlas and Polar, like the rest of the worldwide aviation industry, have experienced an increasing decline in pilot supply as a result of several structural factors and conditions, including mandatory retirements, retention and recruitment deficits, and operational decisions that place too heavy an emphasis on securing additional flying business without ensuring that they have an available supply of pilots to cover

the additional flying.  Indeed, senior executives at Atlas, Polar and their holding company parent,

Atlas Air Worldwide Holdings, Inc. (AAWW), have openly and very publicly acknowledged

that over the last few years, Atlas's and Polar's operations have grown significantly, both in

scale and scope.  All of these factors have stressed Atlas's and Polar's operations, and have

caused Atlas (as the employer for both Atlas and Polar) to scramble to hire pilots from an

increasingly shrinking pool of available pilots.  This in turn has created a "pilots' market," as air

carriers the world over, and especially in the United States, have engaged in an economic

bidding war to retain and attract pilots from other carriers.  The carriers that offer the best wages

and benefits typically succeed at poaching pilots from carriers that do not place a premium on

pilot wages and benefits.  Here at Atlas, it is no secret that the pilot turn-over rate over the last

few years has been significant, as many senior and mid-seniority pilots have quit and obtained

employment with other carriers while younger, pilots, many with little or no experience in

international operations of the type conducted by Atlas and Polar, have been hired to replace

them.  Although Atlas' executives have told the pilots and the public that they intend to have a

workforce of 2,000 pilots by the end of the year, the Atlas pilot workforce is, today, well short of

that number.  Moreover, today, approximately thirty percent of the Atlas pilot workforce has less

than two years of seniority with Atlas, and approximately 50% of the Atlas plot workforce has a

hire date on and after January 1, 2015.  Many of these new pilots are young, were previously

employed by domestic commuter airlines, and have little or no experience flying international

operations under FAR Part 121 at all, much less flying the complex international operations or

mixed operations under both FAR 121 and FAR 117 as conducted by Atlas and Polar.  As

young, new commuter pilots, however, many of these new hire pilots did not work in the

industry when calling out fatigued was considered and treated unfavorably.  They are more comfortable participating within the industry's new fatigue and passenger hours of service rules.

18.     Also in 2013, Atlas sent the pilots six monthly bulletins informing them of the existence of its newly established FRPM and reminding them that the program was operational. Atlas also emphasized that it was committed to the FAA's mandate to mitigate fatigue, and explained that its program demonstrated the commitment of the company's senior management for measuring, assessing, evaluating and mitigating fatigue.  A true and correct copy of one of those bulletins, dated December 4, 2013, is attached hereto as McCabe Exhibit 1.  In those communications, Atlas also advised the pilots that, "[d]ue to the dynamic nature of our operations the Company intends to mix Crews occasionally between Part 121 and Part 117, even within the same trip."  Aside from touting the existence of the FMRC while advising the pilots that its scheduling program (AIMS) was programed to monitor the separate regulatory hours of rest requirements for its FAR Part 117 flights and "all cargo" hours of rest requirements, however, Atlas gave very little substantive training and guidance on how the pilots themselves should carry out their own legal responsibilities to individually ensure that they would be in compliance with the two separate regulatory hours of service rules.

19.     As it is required by law, Atlas maintains numerous policy manuals that are for reference by both management and its employees.  One such manual is its FRMP.  The FRMP plan document, which I believe was last revised in September, 2016, is attached hereto as McCabe Exhibit 2.  Atlas's FRMP plan document explains that Atlas is a FAR Part 121 air carrier that is wholly owned by AAWW and which operates a mixed fleet of Boeing 747 and 767 aircraft.  *Id.* at § 1.1.  Atlas's FRMP plan document also states that:

> *Safety is a vital component of our mission.  Senior management is committed to safety and making safety excellence an integral part of all flight and ground activities*

11

*through the proper establishment and support of safety policies, procedures and programs.*

*All Atlas employee shall be reminded of their obligation to safety and the competitive advantage an excellent safety record brings to our operation.  Accordingly, we will set goals and regularly review these goals to promote the highest standards.*

*We ask that each employee accept the responsibility to communicate any information that may affect the integrity of safety.  In turn, management will provide resources to ensure immediate action is taken when safety matters are identified, or unacceptable risk is discovered.*

*Id*. at § 1.2.

20.     Atlas's FRMP plan document further states Atlas' commitment to flight

operations safety.  As set forth therein:

***Atlas is committed to managing and mitigating all aspects of Crew fatigue, and utilizes every means available; ensuring Crew members are fully alert for each aspect of their assigned duties.  Atlas supports a safety culture that is non-punitive, non-retaliatory, and is structured to promote the highest level of safety and compliance with all applicable policies, procedures and regulations***.

***From the highest level, the Atlas Management team ensures that employees receive all necessary tools to complete missions safety and efficiently***.  *Atlas maintains **a safety culture as set of enduring values and attitudes regarding the importance of safety, and this culture is shared by every member and at every level of our organization.***  *Safety culture is widely recognized as critical to the success of fatigue prevention and in the continuing education of these goals.*

*Id*. (Emphasis supplied).

21.     Atlas's FRMP plan document further explains that:

*Atlas utilizes Web Based Application Tool (WBAT), a comprehensive aviation safety reporting software developed in partnership with the FAA.  This system design supports submission and analysis of ASAP Reports, Fatigue Reports, and Safety Assurance Reports.  This reporting system, to the greatest extent possible, solicits detailed fatigue information to aid in the follow up investigation and root cause analysis of each fatigue event.  The FRMP Manager working with the Fatigue Review Team (FRT) will be responsible for the initial review of all fatigue reports.*

*The FRMP Manager will coordinate with Flight Operations Management, the Corporate Safety Department, and the Union Safety Representative on a quarterly basis (more frequently if necessary) with the purpose of making several key decisions (e.g.,*

12

*report acceptance, corrective action, and recommendations for fatigue mitigation) and determinations (e.g., root cause analysis, risk assessment) during the report review process.  Although the specifics of the process may vary, this fatigue review will adopt a process that is consistent from one report to the next to help ensure that each fatigue report is reviewed thoroughly.*

*All reports will be evaluated for acceptance by the Corporate Safety Department. Once a report is accepted, the FRMP Manager will then conduct a root cause analysis leading to possible corrective actions, i.e., Company recommendations for fitness for duty.  All Company recommendations will be submitted to the Director of Operations. This additional level of 'safety performance monitoring' this is provided within our Safety Culture generates substantial benefits beyond those provided by simple compliance with flight/duty-time regulations.  For Atlas and its Crew members, the term 'safety performance monitoring' is used to cover the internal reporting mechanisms associated with all safety-related activities.  The benefit this culture has brought to the Company has produced substantial returns many times over, **especially considering the unique and challenging nature of Atlas operations.***

***All employees are encouraged to report safety-related concerns through the available reporting mechanism.** It is of particular note that all reporting systems are non-punitive in nature, subject to the following limitations:*

        ☐     *Must not involve intentional disregard for safety*
        ☐     *Must not involve intentional violation of regulations*
        ☐     *Must not involve criminal activity*
        ☐     *Must not involve substance abuse*
        ☐     *Must not have been intentionally falsified*

*This culture helps align organizational efforts toward the ultimate goal of improved safety.  When employees are consulted throughout the development of the policy and are supportive of the process, we find it more likely they will take a positive, proactive approach to fatigue risk management at the individual as well as organizational levels.*

*Id*.  **(Emphasis supplied)**.

22.    Atlas's FRMP plan document further instructs that

***No Crewmember should operate a flight if, at any time, the safe outcome of the flight is in question due to fatigue.  Crew members who judge their capability to be impaired by fatigue must immediately notify Crew Scheduling and they will be removed from flying duties without question***.

*Id.* at §1.4.  **(Emphasis supplied)**.

13

23.     In accordance with the Atlas FRMP and FRMC rules, pilots are asked to submit fatigue reports to the FRMP within seventy-two hours of calling out fatigued.  Pilots who do not call out fatigued but who experienced fatigue while operating an aircraft are also encouraged to file fatigue reports with the FRMC.  Pilots who call out fatigued are required to call Atlas's scheduling department and advise that they are unfit to fly due to fatigue.  The calls are recorded. Due to the previous contentious nature of such a call, the Atlas schedulers who take the fatigue calls are required to read from a script prepared by the FRMC.  During the call, the scheduler is required to instruct the pilot that, if he or she needs more than the minimum of ten hours' rest, he or she should let them know while still on the phone or to call the scheduling department as soon as practicable.  The scheduler is also required to arrange for the pilot's transportation to a hotel where he or she must be afforded a minimum of ten hours' rest.  The scheduler is then required to inform the pilot that he or she should check his or her schedule at wake up (this was a ten-hour time period agreed upon by the FRMC), because the carrier may have by that time found another pilot to operate the flight that the pilot had called off from.  The scheduler is further instructed to inform the pilot that once he or she is rested, the pilot should contact his or her chief pilot.

24.     At its meetings, the FRMC reviews the fatigue reports submitted by the pilots. In this regard, the FRMC program manager or a designee is tasked with sorting the reports into various "key word" categories, so that that FRMC can review reports that involve similar issues. Among the categories approved by the FRMC are:

- Hotels

- Transportation;

- Delay for Weather;

- Delay for Maintenance;

14

- Schedule Changes;

- Back Side of the Clock;

- Deadhead to Operate;

- Rest Facility;

- Minimum Rest;

- 24 Hour Rest;

- Sleep Opportunity;

- Window of Circadian Low;

- Cumulative (look back at schedule);

- General Fatigue;

- Reserve R3/R2; and

- One Off

The "Scheduling Changes" category includes fatigue reports involving changes to the involved pilot's seventeen-day schedule, such as adding or removing flights, substituting flights for flights that were not on the pilot's monthly schedule (for example, substituting an west-bound series of flights such as Hong Hong-to-Incheon-to-Anchorage flights for southbound flights such as Hong-Hong to Europe-to the Middle East), adjusting flight times, hotel changes, and crew changes.   Of all of the fatigue reports considered by the FRMC since its first meeting in June, 2013, a great majority of those reports are attributable to scheduling changes.   In fact, they are so frequent, that the FRMC refers to fatigue callouts attributable to scheduling changes as "scheduling chaos."

25.   After discussing and considering each of the fatigue reports that are presented to it, the FRMC votes to accept or reject those reports.   Some are discussed at great length, while

others are simply immediately understood and are categorized, at which point the FRMC moves

on to review the next report.  In this way, Atlas, through its three voting FRMC members and the

senior company managers who attend the FRMC meetings, is given the opportunity to review

each and every fatigue report and to decide whether or not each crewmember's report was an

abuse of the Atlas FRMP.  AAWW's Captain Carlson does not attend the FRMC meetings, but

he is on the distribution list and is notified of each fatigue report when it is entered into the

system by the pilot.  The FRMC has considered approximately 600 filed fatigue reports and

approximately 800 fatigue callouts all told since the committee commenced operations in June,

2013.  To the best of my recollection, the FRMC has unanimously voted to accept all but two of

those fatigue reports.  To the best of my recollection the two reports that were not accepted were

re-labeled as legitimate sick call outs, and neither of them involved the fatigue callouts cited by

and relied upon by Plaintiffs in their complaint and relied upon by Plaintiffs and Captain Carlson

in support of Plaintiffs' motion for a preliminary injunction in this case.

   26.  I have reviewed the complaint filed by Atlas and Polar in this case.  I have also

reviewed the sworn declaration filed by Captain Jeffrey Carlson, AAWW's Senior Vice

President, Flight Operations.  In his declaration, Captain Carlson cites several examples to

support his assertion that "the number and circumstances of fatigue calls, particularly those after

lengthy rest periods in recent months are contrary to the status quo and represent a calculated

campaign to cause long delays and maximum harm."  Those examples and Captain Carlson's

conclusion that they represent a "calculated campaign" by the Union to "cause long delays and

maximum harm" to Atlas and Polar are contained *verbatim* in the complaint.  The examples cited

by Captain Carlson and the complaint are very vague, as they do not identify by aircraft tail

number or flight number, the names of any of the pilots involved (except one), including the

names the pilots who called off fatigued (or, for that matter, sick), or the circumstances that gave rise to those pilots calling off fatigued.  In order to investigate the accusations made against it and the Atlas pilots, the Union published the complaint and Captain Carlson's declaration and asked the Atlas pilots to provide it with any information that they may have regarding the allegations made in those documents, including the fatigue call accusations.  Most of the pilots whose fatigue calls are cited in the complaint and Captain Carlson's declaration have come forward with information and have consented to the Union's identification of their names and description of the events that gave rise to their having called off fatigued.  Based on the information that they provided, including copies of the narratives that submitted to the FRMC or their own records, I can state with full confidence that Atlas's and Polar's allegations in their complaint and motion and Mr. Carlson's statements in his declaration in support of that motion are inaccurate.

27.     The first and second series of fatigue calls cited by Plaintiffs in their complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Plaintiffs and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction state that:

> On April 23-25, 2017 crew actions (including multiple fatigue calls and maintenance write-ups) caused an aircraft flying approximately 120 service members home to their families in the United States to experience 3 consecutive delays of over 60 hours on each leg of a trip from Kuwait to Germany to New Hampshire to Texas.  The primary fatigue call was made, after the pilot had received 14.5 hours of rest, at Hahn Airport in Germany, where the aircraft stopped for cleaning and catering and a crew change that should have taken approximately two hours.  Instead, the aircraft took a more than 14-hour delay as a result of the fatigue call.  Atlas spent more than $56,000 to house and feed the distressed passengers.
>
> On April 24, 2017, the Captain who caused the initial delay from Kuwait to Germany on April 23, 2017 was removed from that route and provided with a commercial business class flight from Kuwait to Germany, with the intent that he would have a restful flight, and fly another mission for the military.  He was assigned a trip from Germany to Kuwait

*to Al Dhafra Air Base in the UAE, where he would pick up 138 military service members to bring them back to their families in Baltimore. The Captain, who had previously received 11.5 hours of rest, placed multiple fatigue calls in Germany, causing a 17.5-hour delay for the flight from Germany to Kuwait. The delay then caused a compound delay of approximately 8 hours for the flight from Kuwait to Al Dhafra. The 138 military service members thus waited for their flight home for an additional 25.5 hours because of this Captain's multiple fatigue calls.*

After investigating these accusations, the Union has learned that the incidents described therein involve two different aircraft delays, and two different pilots, namely, Captain Dan Lennox and Captain Mike Nolting.

  A.  The first incident involved the second leg of Flight No. GT8168 and Captain Lennox. Captain Lennox, who was on his eleventh consecutive duty day, was scheduled to operate Flight No. GT8168 from Hahn, Germany to Kuwait and then deadhead back from Kuwait to Hahn on Aircraft No. 645, for a duty day of seventeen hours and thirty minutes. He called fatigue for the deadhead flight back from Kuwait to Hahn, and was off the aircraft before any passengers had boarded. Significantly, because Captain Lennox was a deadheading pilot, his fatigue call did not delay the flight. As he explained in the narrative of the fatigue report that he submitted to the FRMC:

> *I was scheduled to operate Hahn (HHN) to Kuwait City (KWI), then deadhead back to HHN for a duty day of 17:30. Upon reaching KWI the outbound crew arrived with a deadheading captain. The first officer and I proceeded to the back to our crew rest seats. Upon reaching my crew rest seat, the seat was fully reclined and I was not able to bring the seat up to the upright position. I informed maintenance, and after a few minutes, he was able to fix the seat. I sat down and awaited departure. I spoke with the deadheading captain and asked him about where he was going to sit given there were three of us and only two crew rest seats. He called the company and was removed from the flight and placed on a commercial flight to HHN.*

> *Shortly thereafter I tried to recline the seat, however, it would not move. I again informed maintenance and was informed that he would try to fix it before departure. Approximately one hour prior to departure, I asked maintenance about the seat and was informed that he was not able to fix it and told me that the seat was not deferred. With no crew rest seat available to me, I called crew scheduling and informed them of the situation. I was told that I was legal to do the deadhead without the crew rest seat. We*

*had a short discussion, and I tried to understand why the other captain, who's duty day was only 8:30 was not legal to go without a proper crew rest seat, and yet according to scheduling, I was legal to go without a seat on an almost eighteen hour day. At this point, I was very tired, and informed the scheduler that I was fatigued, and I asked to be removed from the flight. I arrived at the hotel about ninety minutes later, checked in, and contacted crew scheduling to inform them that I was in the hotel and ready to begin rest. I was informed that I would have ten hours and then would commercial back to HHN. Again, a brief discussion ensued, and I informed the scheduler that I may not be adequately rested after ten hours and I would contact him when I was rested and fit for duty. Again I was told to check my schedule in ten hours and we hung up.*

*Before going to bed, I checked my schedule and saw that I was placed on a commercial flight that was departing approximately 11 hours later. I went to bed and woke up about eight hours later. I then again checked my schedule and observed that my commercial flight was changed and my new departure was approximately eight hours later. I spent the remaining time awake, and proceeded to my flight and arrived in HHN as scheduled.*

As Captain Lennox explained in his narrative, he was scheduled to work a seventeen and one-half hour duty day operating a flight from Germany to Kuwait and then deadheading back to Kuwait. The aircraft had only two crew rest seats for three deadheading pilots, and one of the two seats was broken. The third deadheading pilot, *i.e.*, the pilot who would have been the odd-man out even if both of the crew rest seats had been properly functioning, called Atlas's scheduling department to complain about the lack of a crew rest seat for him and the scheduling department removed him from the flight and placed him on a commercial flight back to Hahn that was scheduled to depart later in the day. When Captain Lennox called Atlas's scheduling department to complaint about the lack of a crew seat for him too (because the crew rest seat was broken), the scheduling department told him that he would have to remain on the deadhead flight back and that he was still "legal" to deadhead back to Hahn without a crew rest seat. Captain Lennox then called fatigued. The scheduling department then scheduled the near-minimum amount of rest required by law, even though Captain Lennox had explained that he was extremely fatigued. When Captain Lennox advised the scheduling department that he might

require more than minimum-required rest, the scheduling department instructed him that only ten

hours of rest was being allotted to him and that he had to had to check his schedule at the end of

that ten-hour rest period.  Captain Lennox woke up eight hours later and checked his schedule, at

which point he learned that the scheduling department had scheduled his deadhead flight depart

nearly a half day later, thereby ensuring that Captain Lennox had to wake up earlier than he

otherwise would have had to if the scheduling department had simply arranged to provide him

more rest in the first place.

       B.      Captain Lennox experienced additional fatigue after he arrived back in Hahn from

his deadhead flight from Kuwait.  He therefore submitted a second Fatigue Report to the FRMC

and kept of copy of the narrative that he provided to the FRMC for his records.   As set forth in

his narrative, Captain Lennox explained that:

> *I arrived in Hahn (HHN) after an all night commercial from Kuwait (KWI) and reached the hotel around 1130z where I was scheduled for a rest period of only 11:15. My next assignment consisted of operating from HHN to KWI with a double commercial flight to Bahrain (BAH) for a total duty day of 18:25.*
>
> *After checking into the hotel and arriving to my room, I went down to get breakfast then returned to my room to go to sleep. I was able to sleep for about two hours on my commercial flight, so as a result I was not very tired, but nonetheless, I tried to sleep. Although my curtains were closed, there was a lot of light in my room, and after several hours of tossing and turning, I did fall asleep for about three hours. I woke up very tired and tried to go back to sleep before my wakeup call but was unable. I received my wakeup call, and shortly thereafter, I contacted crew scheduling and informed them that I was very tired, not fit for duty, and therefore fatigued and not able to safely operate the flight. The crew scheduler told me to check my schedule and that I would receive my wakeup call in ten hours. After I hung up I left my room to get some food. About an hour later, I returned to my room and went to bed. I was very restless as I tossed and turned for several hours before I was able to fall asleep for what I think was only a few hours. I woke up sometime around 1:00am and could not get back to sleep. I took a hot shower as I thought it would help relax me, and returned to bed where I lay awake until right before wakeup.*
>
> *Once again, I was not able to get quality, restful sleep, I contacted crew scheduling about forty minutes prior to my scheduled wakeup call and informed them I would need more time to rest. The crew scheduler acknowledged and informed me that he would adjust my*

> *schedule to reflect another ten hours of rest. After hanging up the phone, I went*
> *downstairs for breakfast and returned to my room where I went to bed and promptly fell*
> *asleep until I received my wakeup call approximately 1610z. Finally, after several days*
> *of not being able to get good sleep, I was finally feeling well rested and proceeded to my*
> *scheduled flight without further issues.*
>
> *As a side note, a second FTG code was placed on my schedule on the 25th which I*
> *disagree with. The second event was merely an extension of the first FTG call from the*
> *24th.*

As was the case while he was in Kuwait, Captain Lennox faced a long duty period (eighteen

hours and twenty-five minutes) after arriving back in Hahn from an all-night commercial

deadhead flight.  After having had little rest, as explained in his previous fatigue call discussed

above, Captain Lennox called off fatigued and was allotted ten more hours of rest.  However,

Captain Lennox still was unable to adequately rest and was still fatigued.  He therefore called

Atlas's scheduling department advising that he needed more rest, which he received.  Captain

Lennox awoke from the extended rest period rested and fit for duty and proceeded to carry out

his scheduled assignments.  Fatigue lasting several days following long duty periods and several

nights of little sleep is not unusual and is a byproduct of the type of long international flying that

the Atlas pilots are required to perform.

      C.      The third fatigue call referenced in the complaint and Captain Carlson's

declaration during April 23-25, 2017 involved the flight from Kuwait to Hahn on April 23, 2017

on which Captain Lennox was originally scheduled to deadhead and from which he called off

fatigued.  Based on my review of Atlas's scheduling records kept in the ordinary course of

business, that flight was delayed in Kuwait due to aircraft maintenance problems relating to

engine cowl rivets.  The maintenance delay caused a delayed arrival in Hahn.  This, in turn,

caused the pilots originally assigned to operate the aircraft from Hahn to Portsmouth, New

Hampshire to exceed their regulatory flight duty time limits, thereby resulting in them being

unable to legally operate the flight.  Atlas then assigned two other Atlas pilots to operate the

Hahn-to-Portsmouth Tran-Atlantic flight, including Captain Nolting. Captain Nolting had been

scheduled to deadhead home after seven consecutive days on duty.  He was already outside of

his hotel waiting for an early morning transport from Hahn to the airport in Frankfurt, Germany

to commercial home when Atlas advised him that his schedule had been changed and that he was

required to operate a two-man flight crew carrying military passengers from Hahn to Portsmouth,

New Hampshire that night, i.e., ten or twelve hours later.  After having slept all night so that he

would be rested to fly in the morning, Captain Nolting attempted to sleep or nap during the day

and tried several techniques to tire himself out and force his body to sleep.  None were effective,

however, and Captain Nolting assessed himself and determined that he was not fit for duty to

operate that flight.  He therefore notified the Atlas scheduling department and called off fatigued.

Captain Nolting submitted a Fatigue Report to the FRMC.  As he explained in the narrative of

that fatigue report, Captain Nolting wrote that:

> I operated into HHN the day before this trip was assigned to me. Shortly after block in off
> of flight 8365 or CMB584 in HHN, I looked at my schedule and there were no changes.
> 16 hours later, and non contactable, I was scheduled to limo to Frankfurt at 5AM and
> then commercial home on a Delta flight that left at 11 am on Sunday.
>
> I arrived at the hotel shortly after lunch. I took a couple hour nap and then went out and
> had some lunch. I hung out the rest of the day and started to plan my sleep so that I could
> stay awake for the commercial flight home, and then be back on my normal sleep cycle
> shortly after getting home. This would make it so I would be tired for bed around 10 pm
> at home. I slept all night long and woke up at 0430 am so I could grab the scheduled limo
> ride at 5AM over to FRA.
>
> After 15 minutes of standing in the lobby waiting to check out and waiting on my limo, I
> realized that there was no transportation for me so I called travel to see what  been
> arranged and to notify them of no transportation. They then told me that I was not
> commercializing home, but rather operating to PSM later that night. So they transferred
> me to scheduling to review the changes. I advised scheduling that I slept all night and
> now I was awake and that they would be scheduling me to work when I would be going to
> bed back home.

*So, I tried to sleep later, but I could not. I was wide awake all day. I was just staring at the ceiling trying to sleep but I could not. The bed was hard, and I just couldn't sleep. I tried watching a boring movie and that didn't work. I even exercised to try to wear myself out and that did not help. I am not a machine and I cannot just tell myself to sleep on command. 6:45 pm rolled around and the wakeup alert came. I was now feeling a little tired and I knew that I would be really feeling really tired or fatigued around the time we would be coasting out over the Atlantic.*

*I assessed my flight. It was a 2 man crew on an 8 hour plus passenger flight across the Atlantic in the middle of the night with a fairly new pilot that does not have much time here at Atlas. I definitely knew that I would be tired upon landing in PSM which would have been around midnight. So, in the interest of safety, I felt it was best to call in Fatigued.*

Based on my review of Captain Nolting's narrative that he included in his fatigue report to the

FRMC, my many years as an airman at Atlas and Polar, and my years of industry-experience,

including my years as a representative on the Atlas FRMC, the circumstances that gave rise to

Captain Nolting's fatigue are not unusual at Atlas and Polar.  In my opinion, they are attributable

to the types of scheduling changes that Captain Nolting experienced and the scheduling chaos

that strongly defines Atlas's and Polar's operations. Indeed, this was not the first time that

Captain Nolting experienced fatigue as a result of Atlas's and Polar's chaos.  In October 2016,

Captain Nolting called off fatigued from Flight No. GTI 3403 which was scheduled to fly from

Ontario, California, to Dallas-Fort Worth (DFW), Texas.  Captain Nolting submitted a Fatigue

Report with the FRMC and kept a copy of the narrative that he included in that report for his

records.  As he explained in that narrative:

*So I started this pattern with 6 hours of R-3 (airport standby) 3am-9am at the DHL building in CVG. I tried to sleep at the sort but with very little luck due to the other guy in the adjacent bunk snoring and his passing gas. No other bunks were available due to the very limited number of rooms. This was followed by 11 hrs rest where I adjusted my sleep immediately after arriving to hotel since I was tired. I remember it was just a couple hour nap because I had another reserve period at the hotel (R2) at 8 pm that same night. I went to sleep sometime early evening then woken up the next morning around 2:30 am to operate down to IAH followed by a deadhead up to DFW and arriving at the hotel around 1pm Thursday afternoon. On Friday, I had a 10 am wake up to operate up to Denver followed by a deadhead up to LAX then Limo over to ONT. originating flight*

*delayed due to late pax, then I missed my DH and had to be rebooked on a different flight in a different terminal. I got stuck in a middle seat next to a stinky old overweight man that kept bumping me with his elbow. This combined with the screening babies didn't allow me to get a little cat nap in. Then the 2 hour car ride over to ONT was in stop and go traffic and the driver was not very smooth with the gas or brakes, so no nap there either. I arrived at the hotel around midnight. I tried to stay up since I had a 9pm wake up that night but I was too tired. I then went to bed and slept hard till around 10:30 am Saturday. Now well rested, I couldn't make myself fall back to sleep that afternoon. I may have fallen asleep for a couple hours, but I was woke up by the people above me jumping or something. But I remember looking at the clock and it was around 8-8:30pm. After a nice shower and a few cups of coffee I was good to go. We showed up at the airplane a little early and was able to have some more coffee and I felt pretty good. We departed Sunday morning on time around midnight. Once airborne, I started to fade. I started doing stupid mistakes such as messing up simple math, writing times in the wrong boxes in the logbook, missing some radio calls, and forgetting to turn off the landing lights for a few hours. Prior to descent, I made a strong cup of coffee, sucked on some oxygen, and chewed some gum and I felt more alert. After block in into DFW, we a couple maintenance items for the maintenance guys to work on. I thought we had a crew room to go to while we waited for the 3 hour turn, but we do not. We have to stay on the plane and close the cockpit and turn off the lights and be creative to get in a little cat nap. This was not possible because maintenance was in the cockpit testing stuff and warnings going off and people coming and going constantly. This is when I really started to feel the true effects of fatigue setting in. At 7:15am, I made the decision in the best interest of safety to call scheduling and tell them I was too fatigued to continue. Once released, and hotel and transportation were arranged, and standing outside by the parking lot, a female station rep approached me and informed me that dispatch needed to talk with me. It was actually the manager on duty up in New York and he informed me that the chief pilot would like to talk to me. Around 7:40am I spoke with Scott Welty briefly. He wanted to know the situation and I told him my reasons why I was fatigued. He however did not believe me and told me that this was all because of the union and contract negotiations and he knows what I am up to because he has seen this before. He made this very clear to me as he repeated it at least twice. I told him that this was not the case and I was truly fatigued and was too tired to safely fly the plane up to ABE which would have been another 3 hour flight. In the best interest of safety, this was the best decision. It was not an easy decision. There is a lot of pressure from our managers to move the planes as we are approaching a busy flying season and the airline has staffing problems. I surely did not appreciate this chief pilot speaking to me in this manor. And I feel he paid no regard to the rules of the Atlas FRMP as he called me when I was fatigued and was supposed to be in legal rest. It also took 2 hours and 45 minutes from the time I called to the time we checked into the hotel. This needs to be improved. The mechanic ended up taking us to the hotel since transportation couldn't find the building. I feel if you were to break up the trip and change crews in DFW it would be better. Also if you avoided sequence of night, day, night flights it would be less fatiguing. There are many hotels right across the street from the warehouse that would be an option so the crews can go relax in a day room for a couple of hours while the plane is serviced. The break room couch is unacceptable. See photo.*

The circumstances related to Captain Nolting's October 2016 fatigue callout very aptly demonstrate the scheduling and logistical chaos that Atlas pilots experience. In addition, there have been multiple fatigue reports concerning this layover in DFW.  A night time layover of three hours is not uncommon in the freight industry. However, in this case, as experienced by Captain Nolting, the layover must be accomplished in the cockpit, as there is nowhere else to go. The FRMC has discussed these types of fatigue callouts (especially in DFW) many times but Atlas does not, or cannot, do much about them.  Having attended and participated in these conversations, Atlas's intransigence has appeared to be driven by a desire not refuse its customers' schedule demands, even though those demands physically can and do wear our pilots out.  This type of behavior seems to be emblematic of Atlas's attitude towards safety. It publishes a great many things that exhort pilots to be safe and fit for duty; but when a pilot actually says he or she is fatigued, as demonstrated by Captain Welty's unprofessional conduct in badgering and harassing of Captain Nolting, it confirms the true, cavalier attitude of senior Atlas and Polar executives towards safety and fitness for duty when it interferes with their corporate bottom lines.  Atlas and Polar have not taken steps to alleviate the chaos that has plagued their operations long before the parties formally commenced bargaining for a new collective bargaining agreement; and they appear to have accepted this system-wide disorder as a cost of doing business. Moreover, in a blatant effort to avoid criticism for its chaotic operations, they are now unfairly attempting to cast blame on the very pilots who suffer the physiological and possibly even possibly disastrous consequences of those policies.

28.     The third fatigue call-out cited by Plaintiffs in their complaint in support of their accusation that the Union is engaged in a "calculated campaign to cause long delays and

maximum harm" to Atlas and by Captain Carlson in his declaration in support of Plaintiffs'

motion for preliminary injunction states that:

> On June 22, 2017, a First Officer, who had previously received more than 17 hours of
> rest, waited to call out fatigued until his 10 hours of additional rest would push the
> flight's delayed departure time into the airport's curfew period.  The timing of this
> fatigue call caused a flight carrying cargo for Nippon Cargo Airlines from Narita, Japan
> to Anchorage to incur a nearly 16-hour delay.

After investigating this accusation, the Union has learned that the pilot who called off fatigued

was First Officer Gerard Riester and the flight from which he called off was Polar Flight No.

7134, an all-cargo flight which was scheduled to fly from Narita, Japan to Anchorage Alaska on

June 22, 2017.  First Officer Riester submitted a Fatigue Report to the FRMC.  He kept a copy of

the narrative that he included with that report for his records.   In his narrative, First Officer

Riester wrote that:

> While at home during days off, I spent a majority of my time dealing with a family issue.
> This also contributed to poor sleep over the preceding 3-4 days prior to my trip. Upon
> arriving at the hotel in CVG, I ate and then went to sleep. Sleep quality was poor. Though
> not a primary contributing factor, the location of the hotel was at play. Police sirens and
> late night shouting in the street woke me up in a couple of occasions.
>
> I felt sufficiently rested when I got up to operate the flight, and expecting a long rest in
> NRT, I figured I could recover from the cumulative fatigue accrued over the last few
> days. I was pilot flying that day. Take off and cruise were normal. Just before I was going
> to go back to the bunk, an ACARS message came in telling me I had schedule changes
> and would now have a short rest in NRT. I found this extremely distracting as it negated
> my plan to catch up on sleep at the next layover. I spent most of my rest period on the
> plane worrying how I was going to get enough sleep once on the ground. I was afraid if I
> slept too much on the plane, I wouldn't be able to get to sleep quickly when I got to the
> hotel. I did manage to get a short nap in, however, and felt well enough to fly the
> approach and landing. Approach and landing were good and we departed the aircraft
> without incident. Once reaching the hotel, I was still worried about getting to sleep. I felt
> exhausted, but felt like I couldn't relax and switch "gears" mentally into rest mode. I
> opted to grab something to eat thinking it might help me relax and settle down. One of the
> other first officers recommended a place nearby and we preceded to that location. The
> process of getting food and getting back to the hotel took longer than expected and I was
> starting to get concerned about my ability to get good rest at this point. I got in bed with
> less than 7 hours remaining prior to wake-up and though I closed my eyes and felt very
> tired, could not sleep. I think I may have been "trying" to fall asleep, because I knew I

26

*didn't have much time left. I laid there periodically checking the clock and becoming increasingly concerned. Finally, with just over 5 hours prior to wakeup, I realized that I was not going to be able to get enough rest to safely operate the upcoming flight. I felt extremely fatigued (run down) at this point, and mentally exhausted. I felt that there was no way that I would have been capable of safely operating a flight in that condition. I debated whether to wait until wakeup or call at that point, but ultimately decided to make the call at that time as I was sure that the situation wasn't going to get any better.*

*One small note on the situation. In my opinion/experience, 10 hours CAN be enough time to rest for a subsequent duty if all goes perfectly and one has not had an overly fatiguing schedule up to that point. However, it is often not sufficient if anything happens to delay the moment that one actually gets in bed and/or an individual is already fatigued from previous events.*

I believe this first officer demonstrates his concern for the safety of the flight by calling off fatigued regardless of the status of the curfew. Just because an airport has a curfew, are pilots somehow supposed to be less fatigued?  This First Officer describes a bad, exhausting week.  He had to deal with the loss of his father and was not able to rest well while he was still home. When he arrived at his hotel in CVG for pre-duty rest, he did not get good sleep there either, due to loud noises on the street due to the location of the hotel. Even then, First Officer Reister says he felt "sufficiently rested" for the flight and determined that he could mitigate any chronic or cumulative fatigue during the longer rest he had coming up in Narita. Due to the length of this flight, he was also looking forward to some inflight rest in the bunk. However, just before he headed to the bunk to rest he was given an ACARS (inflight text message from the company) notifying him of a schedule change in NRT that would limit his expected rest severely. This distracted him enough that he also did not get good inflight rest - thus adding to his cumulative fatigue. A good inflight rest may have prevented him from sleeping right away once he arrived in Narita. The schedule change in Narita, however, took away his longer rest so he knew he would have to get right to sleep once he landed. This is one of the problems with transmitting a schedule change while the crewmember is operating a flight. It is a distraction and the

repercussions are amply demonstrated by this crewmembers fatigue report.  Rather than any intent of the crewmember to harm the company, this is a classic case of an ill-trained scheduler not taking a crewmember's possible fatigue into account. Crewmembers program their rest, even planning inflight rest so as to arrive at the destination rested or arrive ready to sleep. Changing of a schedule, in flight, and shortening recuperative rest is always a bad idea. This was 100% a company driven fatigue call. He called when he was fatigued. There was no intent here to "wait" to call fatigued.  Atlas's and Polar's bald accusation that First Officer Riester's June 22, 2017 fatigue call-out was due instead to some nefarious plot to cause a long delay and maximum harm to Atlas and Polar's operations is simply not true.  My conclusion in this regard is based on my review of First Officer Riester's fatigue report narrative, my many years as an airman at Atlas and Polar, and my years of industry-experience, including my years as a representative on the Atlas FRMC.  My conclusion is also supported by the fact that the Atlas FRMC considered and discussed First Officer Riester's fatigue report voted unanimously to accept it.

29.     The fourth fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

> On July 1, 2017, a Captain, who had previously received more than 25 hours of rest, called out fatigued on a flight carrying 340 military members from Pope Field in North Carolina to Hanh, Germany delaying the flight for over nine hours.  All 340 military members were through passengers, scheduled to travel on from Hahn to Kuwait.  As a result of the fatigue call, their second flight was delayed over nine hours as well.

After investigating this accusation, the Union has learned that the pilot who called off fatigued was Captain Kris Lang and the flight from which he called off fatigued was Flight No. 8662, a passenger flight that was scheduled to carry military passengers from Pope Field, near

28

Fayetteville North Carolina, to Hahn, Germany on July 1, 2017.  Captain Lang submitted a fatigue report with the FRMC and kept a copy of the narrative that he submitted with the report for his records.  In his narrative, Captain Lang wrote that:

> On Saturday, July 1, 2017 I was scheduled to operate a PAX flight from POB to HHN. The flight was scheduled to depart POB at 0425Z, but actual departure time was 1330Z due to my fatigue call. The flight was originally scheduled as a 3 person flight crew.

> I arrived in POB via gateway about 24 hours prior to scheduled departure time. As stated in Jeff Carlson's document, I definitely had the opportunity to receive adequate rest. However, as I teach in my Human Factors classes, (and Jeff Carlson attended one in February as part of his own recurrent training ), adequate rest does not necessarily mean actual rest.

> Many factors affect actual rest, including circadian rhythms, shifting day/night cycles and amount of manageable sleep one can obtain in a 24 hour window.

> After arriving in POB, I had dinner and went to bed, managing about 8 hours of sleep. I had set my alarm for 0600L in order to give myself plenty of wakeful hours during the day, to attempt another rest period prior to operating the flight. I had lunch with one of the FOs after which I returned to the hotel and went to bed.

> I did not get any useful rest, as my room was located next to the pool, where a large group of guests was playing, splashing and listening to loud music.

> As time went on, I realized that I would not be adequately rested to operate. I did check my schedule several times, wondering if with 2 other crewmembers I would be able to get sufficient rest periods during the flight to manage a safe operation.

> Several hours before wakeup, I noticed that one of the FOs had been removed from the schedule – leaving a 2 person crew to operate a nearly 8 hour red-eye flight with 340 passengers on board. At this time, without any rest possible on the flight, in the interest of safety, I decided to call in fatigued.

> Here are the major contributing factors from the company:

> •      none of the flight attendants were made aware of the new/adjusted departure time, resulting in the entire group ready to go in the lobby at original departure time. During my call to scheduling, I had stressed that the FAs be notified to prevent this situation from arising.

> •      The FO that was taken off the schedule arrived in POB late and was not able to receive adequate rest. Here the company failed to follow their own guidance, as the

> *station guide clearly states NOT to commercial into RDU when transitioning to POB.*
> *Because of added travel time via Limo, the FO arrived at the hotel late..*

As set forth in Captain Lang's Fatigue Report, Captain Lang arrived in Fayetteville, North

Carolina on June 29, 2017.  He rested and woke up early on June 30, so that he could get more

sleep later in the day prior to his late night flight assignment.  He went back to bed in the

afternoon local time, but could not get any sleep because his room was noisy due to children

playing in the hotel pool as well as music and general commotion outside out room.  When he

was deciding whether to call off fatigued, Captain Lang checked his schedule and noticed that

one of the two first officers assigned to his Flight No. 8662 had been removed from the flight,

thereby reducing the flight crew from three to two operating pilots.  When he saw that

management had reduced the flight crew from three to two operating pilots to fly an nearly eight

hour overnight flight, Captain Lang determined that he would not be fit to fly that flight under

those circumstances because he would be fatigued.  He then called the scheduling department

and called out fatigued.  Captain Lang's fatigue report narrative and the circumstances giving

rise to his fatigue callout are not unusual.  People who work fixed days and hours in a fixed

location within the same time zone may think that six-to ten-hours of sleep every day is

sufficient rest to function in his or her job, but that is not the case – especially for a pilot who

operates an aircraft on long-haul flights around the world at all hours of the day, rapidly crossing

multiple time zones, with little or no opportunity to rest while operating the flight, as was the

case with Captain Lang, whose nearly eight-hour, overnight trans-Atlantic flight operation was

reduced from three to two pilots.  Atlas has readily acknowledged that its worldwide operations

are challenging, and those challenges have a direct physiological impact on Atlas's pilots.

Captain Lang's fatigue call and the circumstances giving rise to that call regarding Flight No.

8662 are not unusual; they are a consequence of the challenging nature of Atlas's and Polar's

operations.  My conclusion in this regard is based on my review of Captain Lang's narrative

from his fatigue report, my many years as an airman at Atlas and Polar, and my years of

industry-experience, including my years as a representative on the Atlas FRMC and my

knowledge that the FRMC voted unanimously to accept his fatigue report.   Finally, in his

declaration, Captain Carlson mentions the harm to the 340 military service members who were

passengers on the flight.  Atlas pilots are among the most professional in the world.  As pilots,

we are responsible for safety and lives of the crew members and passengers on our flights, and

all Atlas pilots take this responsibility very seriously.  Captain Lang was presented with a

situation in which he had been unable to sleep effectively, for whatever reason. In addition, the

"safety net," namely, his third crew member, had been removed due to Atlas's fluid scheduling.

Had I been in that situation, even though I may have been "legal" to fly, I would have done the

same thing as Captain Lang did.  I would have done so not to harm Atlas or disrupt its operations

and passengers, but knowing that as the pilot, I am the final link in the safety chain that ensures

the safe arrival of our flight, the safety of our crew members, and the safety and protection of our

cargo and passengers, including our service members.

      30.     The fifth fatigue call-out cited by Atlas in its complaint in support of its

accusation that the Union is engaged in a "calculated campaign to cause long delays and

maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion

for preliminary injunction states that:

> *On July 30, 2017, a flight carrying military supplies from Dover Air Force Base in Dover, Delaware to Hahn was delayed approximately 13 hours due to two sequential fatigue calls by the Captain.  The aircraft flew from Miami to Dover after maintenance and was expected to be on the ground in Dover just long enough to be loaded.  But the Captain, after receiving over 54 hours of rest, called in fatigued, and then called in fatigued a second time after receiving his additional rest, such that he cumulatively received approximately 67 hours of rest.  Atlas was unable to assign a replacement Captain in order to expedite the departure.*

After investigating this accusation, the Union has learned that the pilot who called off fatigued

was Captain Mitch Simon, and the flight from which he called off fatigued was Flight No. 6760,

which as a cargo flight scheduled to carry military supplies from Dover Airforce Base to Hahn,

Germany, on July 30, 2017.  Captain Simon submitted a fatigue report to the FRMC and kept a

copy of the narrative contained in that report for his records. As set forth in his narrative, Captain

Simon explained that:

> I became exhausted after 4-days of training in Miami.  My PC warmup had a 0400 show.
> My PC for the next day was scheduled for a 0800 show but was pushed up to 0400.
> I did not get good rest before my PC WU, so I took a nap when I returned to my room.
> When I got up from the nap I noticed my PC time was moved up; I could not fall back to
> sleep.  When the ride was complete I was scheduled to return to my base, JFK, and 24
> hours later travel to DOV for a short rest period.  I negotiated to go right from JFK to
> DOV because I would receive more rest.  If I'd gone home I would receive minimum rest
> even though I was scheduled for 24/7 because of travel time to and from the airport.
> I slept twice - two nights - in DOV and when I got up after the second night I was fully
> rested.  At this time I discovered the flight slid 12 hours.  I called CS to let them know I
> would be fatigued in 12 hours, that they should activate a reserve crew-member.
> I was told I could not call in fatigue unless I was fatigued.  I told them I would call them
> 5 minutes before wakeup time which I did.  I was so upset by all of this that I could not
> fall asleep for several hours, so 4 hours into my fatigued rest period I had them reset my
> sleep.  The flight was from DOV to HHN.  It was Basic crew.  The FO I was to/operated
> the flight was very new and he had never crossed on a NAT track.

Captain Simon's narrative from his fatigue report is a typical example of scheduling chaos

regarding Atlas' and Polar's operations.  The FRMC has attributed hundreds of the fatigue

reports it has received and accepted to scheduling changes, which it refers to as "scheduling

chaos."  In Captain Simon's case, his fatigue was attributable to numerous rolling scheduling

changes.  I reviewed Captain Simon's final schedule for the month and saw that it showed 28

pages of scheduling changes, with five of those pages coming prior to even leaving on his first

leg.  After a week-long training event, he started out at Atlas's training center in Miami, Florida

and was scheduled to deadhead to JFK Airport in New York.  His commercial flight deadheading

from Miami to JFK changed repeatedly.  A review of the changes to his schedule shows he

called out fatigued on the fifth page of those changes.  He was deadheading from Atlas's training

center in Miami, Florida to JFK Airport in New York. Atlas then removed that deadhead flight

from Miami to JFK and directed him to deadhead to Philadelphia and take a limousine from

Philadelphia to Dover Air Force Base, where he was assigned to operate a trans-Atlantic flight to

Hahn Germany.  Subsequently, Captain Simon's flight from Dover to Hahn was delayed or

otherwise un-finalized.  The flight was further delayed by another 6 hours and 25 minutes, from

1835Z to 0100Z. The flight was delayed for yet another eight hours and 30 minutes after that for

a delay then totaling 14 hours and 55 minutes.  After having incurred repeated, rolling delays and

thereby having to effectively "chase" rest that would have had to be timed to enable him to be fit

and rested to fly a long, trans-Atlantic flight, Captain Simon called in fatigued. The FRMC, Atlas

and Polar management and the Union have all recognized that the Atlas and Polar scheduling

departments' many changes to the pilots' schedules, including rolling delays and changes to the

entire pattern of the pilots' schedules themselves (such as changing a flight assignment from

Asia to North American to a new flight assignment from Asia to the Middle East) are an

important cause of pilot fatigue at Atlas and Polar.  In Captain Simon's case, he incurred a

classic rolling delay.  Captain Simon went to sleep to obtain his required ten-hour pre-duty rest

and then woke up to find that his already delayed flight had been delayed for several more hours

and then was delayed for another several hours after that.  Having woken up from a restful sleep,

he, like many pilots, simply could not go back to sleep.  The result was that he was awake during

the hours which he had planned  to be flying, and then had to be awake – and fit for flight duty –

to fly the delayed flight, eight-plus hours later, for a nearly eight hour flight across the Atlantic

Ocean to Hahn, Germany.  This added considerable time to his effective duty day.    Under those

circumstances, therefore, just about the time the pilot can actually go back to sleep, he is expected to be wide awake, alert and fit to fly. That is not always physiologically possible, and Captain Simon properly determined that he would not be fit to fly the flight. Captain Simon's fatigue call out under the circumstances he faced was neither unusual nor in any way improper. My conclusion in this regard is based on my review of Captain Simon's Fatigue Report, my many years as an airman at Atlas and Polar, and my years of industry-experience, including my years as a representative on the Atlas FRMC, and my knowledge that the FRMC considered and discussed Captain Simon's fatigue reported and voted unanimously to accept it.

31.     The sixth fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

> On August 1, 2017, a flight carrying cargo for Qantas experienced disruptions on two separate legs due to a fatigue call after a long rest. The Captain flew from Narita to Honolulu, and then had about 50 hours of rest. He then flew from Honolulu to Sydney, Australia, and had about 20 hours of rest. He then called in fatigued for his next flight from Sydney to Bangkok, Thailand. Fatigue calls in Sydney are especially challenging for Atlas because it generally takes a day and a half to two days to obtain a replacement crew member since the crew member must first fly all the way to Sydney and then get the required pre-duty rest. Due to Sydney curfew rules regulating when Atlas may fly in and out of the airport, and Atlas' inability to replace the Captain, the Captain was given over 15 hours of additional rest before finally flying the Sydney to Bangkok leg, causing a delay of approx. 14.5 hours. As a result of this delay the crew was required to rest in Bangkok, and, as a result, the second leg from Bangkok to Shanghai was also delayed by over 6 hours.

After investigating this accusation, the Union has learned that the pilot who called off fatigued was Captain Robert Bellman, and the flight from which he called off fatigued was Flight No. QF7581. Captain Bellman did not file a fatigue report with the FRMC. He did, however, send

34

me a copy of his narrative explaining why he called out fatigued.   In that narrative, Captain

Bellman wrote:

> *Arrived in SYD at 10:39z. Which was evening time in SYD.  Went with the crew for dinner.  Was out approximately 1 1/2 hours.  Returned to the hotel.  I went to bed shortly thereafter. I was very tired, but sleep just eluded me.  I tossed and turned all night.  I finally gave up on trying to sleep.  So went for a walk, had a bite to eat and returned to my room. I tried to sleep but didn't fall asleep right away. Eventually I did.  When the wakeup call came, I was very groggy and could not really think or be coherent. I believe that I only slept for 2 or maybe 3 hours. Either way I was not fit for duty.  I called Scheduling and was on hold for roughly 20 minutes.  I hung up and called Atlas Dispatch and told them it was urgent that I speak with someone in scheduling. They sent me over and I notified them that I wasn't fit for duty and calling in fatigue. The scheduler read through the script that they're required to read and ask.  Scheduler set a new departure time, I stated that I would call them fit for duty.  I didn't realize that scheduling was supposed to set a new departure time. So we had a discussion about the new time of departure.  After the call I slept for a couple of hours and woke up. Feeling a little better. I was up for a short time and was ready to sleep again. Confident that I required more time for sleep than the new report time would allow I called Scheduling and we agreed on a new report time. I rested very well. Felt 100% again and reported for duty as agreed.*

After reviewing Captain Bellman's narrative report, I believe that he acted responsibly and the

best interest of safety.  Atlas and Polar have readily acknowledged that fatigue calls in Sydney

Australia are especially challenging.  And, due to the rapid shift in time zones and due to the

circadian rhythm, fatigue calls in Sydney are not new: Atlas and Polar have been confronted with

them for a considerably long time.  Yet they have not done nearly enough to mitigate the

situations that cause fatigue calls that happen there.  For instance, despite recommendations that

they place a compliment of reserve pilots there in order to protect flights that will otherwise get

delayed on account of fatigue calls or other reasons, Atlas and Polar have refused to do so. As a

result, when pilots fly across multiple time zones into Sydney and then face layovers ranging

from 18-30 hours, they are at great risk of being fatigued when it is time for them to operate their

next flights.  This is especially the case for pilots who travel in to Sydney from long distance

flights, as Captain Bellman did, who flew approximately ten hours from Honolulu to Sydney.

Regardless of the leading rest he had in Honolulu, two days and multiple time zones previous, Captain Bellman recognized that he was not fit to fly and he appropriate called off fatigued.  In so doing, he did what the entire FRMC (including the chief pilots and Atlas's Director of Operations, Chris, Agnini), have advised the pilots to do. The FRMC determined, during our meetings, that 10 hours may not be enough time to rest. The FRMC has repeatedly told crewmembers that if they need more time, within reason, they should request more time.  The FRMC recognized that the ten-hour rest mentioned in the script read by schedulers to pilots who call off fatigued is only a starting point, and is referenced in order to ensure compliance with the current (2011) collective bargaining agreement, which requires that a pilot cannot enter rest until he or she knows his next report time. The FRMC added the statement "if you need more rest, please let us know as soon as possible" to the script because it recognized that the vagaries of individual sleep cycles, acclimatization problems, and the current situation with regard to flying assignments may require greater than ten hours of rest.  Long haul pilots can and do get fatigued, and there is nothing about the circumstances described by Captain Bellman in his report concerning his August 1,2017 fatigue call-out that shows that his call-out was for any reason other than the fact that he was exhausted.

32.     The seventh fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

> On August 11, 2017, after receiving nearly 28.5 hours of rest, a First Officer called out fatigued from San Juan to Campbell Army Airfield in Hopkinsville, Kentucky, carrying military service members.  Accordingly, the flight flew with a reduced crew.  Due that that reduced crew size, FAA regulations required the crew to rest in between the first and second legs of the trip, causing an approximately 11-hour delay to the second leg of the trip, which was to Seattle for significant deferred maintenance.

After investigating this accusation, the Union has learned that the pilot who called off fatigued

was First Officer Amanda Kolaric, and the flight from which she called off fatigued was Flight

No. 8673, which was scheduled to carry military passengers from San Juan, Puerto Rico to

Hopkinsville, Kentucky on August 11, 2017.  First Officer Kolaric submitted a fatigue report

with the FRMC and kept a copy of the narrative from her report for her records.  As set forth in

that narrative, First Officer Kolaric explained that:

> *At first when I arrived at the hotel in sju I was given a room on the 4th floor. I checked in around 1pm local on 8/9. As soon as I got to my room I heard the noise of construction. Constant hammering and machinery. I went back to lobby and told front desk that I would need a quieter room as I would be day sleeping the following day to prepare for my 0235 L wake up. She told me she would move to a higher floor and on a different side. I was moved to the 5th floor.  When I arrived to that room the construction noise was very faint so I was satisfied with the room. That night i slept well and there were no disturbances. The next day 8/10 I went about my normal day typical layover. I woke up early, around 0530L and explored the area/hotel to keep busy and so I would be able to go to sleep in the late afternoon. At around 1600 local I returned to my room and attempted to sleep. There was loud music playing somewhere outside but I tried to tune it out. I kept drifting off but was woken numerous times by the music. At around 2030 local after I think I had slept for a little while, I was woken by yelling in the hall. I attempted to go back to sleep but tossed and turned. Then around 2200 to 2300 all the motorcycles started driving on the street below. After that I am not sure when I fell asleep again but when the 0235 wake up call came I did not feel at all rested. There were too many interruptions and I was not fit to fly. The hotel is comfortable but the location Is not good for a good nights rest on certain days of the week.*

The circumstances giving rise to First Officer Kolaric's fatigue call out are not unusual with

respect to Atlas's and Polar's operations.  In fact, I believe First Officer Kolaric's actions in

changing hotel rooms are demonstrative of her respect for the Atlas and Polar operations and her

professional concern for safety.  Based upon her report, First Officer Kolaric was deprived of

adequate rest during a most fatigue inducting layover period covering 18-33 hours. She was

repeatedly woken up by loud noises outside her room and as a result, she was not fit for duty to

fly her next assigned flight.  Based on my review of First Officer Kolaric's Fatigue Report, my

37

many years as an airman at Atlas and Polar, and my years of industry-experience, including my

years as a representative on the Atlas FRMC, First Officer Kolaric's fatigue callout was the

result of exhaustion due to an inability to secure adequate rest.  My conclusion is also supported

by the fact the FRMC unanimously voted to accept First Officer Kolaric's fatigue report.

33.     The eighth fatigue call-out cited by Atlas in its complaint in support of its

accusation that the Union is engaged in a "calculated campaign to cause long delays and

maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion

for preliminary injunction states that:

> *On August 25, 2017, the Captain who caused multiple lengthy delays in April 2017 (as described above) caused yet another delay be calling in fatigued and other actions.  He was supposed to operate a flight from Greenville-Spartanburg International Airport in Greer, South Carolina to Biggs Arm Airfield in El Paso, Texas to position an aircraft for a military mission (that he was not flying).  Once the aircraft was at Biggs, another pilot would fly 256 members of the military to transport them to Kuwait (via Portsmouth, New Hampshire and Hahn).  The Captain arrived late to Greenville-Spartanburg for a 5 a.m. departure and so the airport manager told him that he must have his engines up and running by 5:15 a.m. because the airfield would be closing.  The First Officer had already performed the pre-flight check, but the Captain insisted that they re-do it again together, even though nothing so requires.  As a result, by the time the Captain was in his seat, the airport had closed.  Since the airport was re-opening at 9 a.m., the Captain and First Officer were told to remain on board, at which point the Captain called out fatigued, despite the fact that he previously had 13 hours of rest.  As a result, the fight was delayed 16 hours, and a return flight of the aircraft transporting an additional 230 service members home to their families was delayed 12 hours.*

Captain Lennox submitted a fatigue report concerning his fatigue call from Flight No. 8885 with

the FRMC, and he kept a copy of the narrative that he included in the report for his records.  In

his narrative, Captain Lennox wrote that:

> *On August 25, 2017, I reported for my scheduled R3 assignment in CVG beginning at 0530z and ending at 1130z. At approximately 0925z, I was contacted by crew scheduling at was advised that I was being activated to commercial CVG-ORD-GSP where I would be put into min rest and then ferry N645GT from GSP-BIF. My commercial flight was to depart at 1010z, exactly 45 minutes from when I was initially contacted. I proceeded out of the DHL sort facility and waited in the lobby for transportation. Several Executive Limo vans arrived, so I went outside and asked the drivers where they were going, but*

*none were there to pick me up, so I went back inside to wait for transportation. At approximately 0950z, I called the travel department to inquire about my transportation to the terminal. On my first and second call, I was placed on hold for 20 minutes each before I hung up. On the third call, I was placed on hold and finally got through to a travel at approximately 1115z. Since I missed my flight, I was rebooked on a later flight. Transportation arrived and I proceeded to GSP via CLT without further incident.*

*I arrived in my hotel room in GSP at 1630z and I immediately contacted scheduling to advise them when to begin my 10-hour pre-duty rest period. Again, I was on hold for over an hour before a scheduler finally picked up at approximately 1727z. I advised him that I wanted to begin my rest period at 1727z. He noted the time down and we ended the call. At this point, I was hungry because the last meal I had was dinner the night before. The bistro restaurant at the hotel was closed, so I contacted the front desk where I was given a few choices of nearby restaurants that delivered to the hotel. A short while later, my food was delivered, I ate, then went to bed.*

*I received my wake-up call on schedule at 0230z and was downstairs at 0330z. I waited in the lobby for approximately 30 minutes and again, tried to contact travel. Again, I was on hold for about 20 minutes before I gave up and ended the call. About ten minutes later, I did get a call from Lorraine in JND asking where I was. I told Lorraine I was still in the hotel lobby waiting for a pickup, she chuckled a little, then said she would get on it. At approximately 1445z, the transportation arrived and I proceeded to the aircraft without further incident. Upon arrival at the aircraft, I was met by several people waiting for me at the stairs. The first gentlemen asked me if I would accompany him to customs to sign a permit to proceed to allow the airplane to continue to BIF without being cleaned (international trash). I agreed and we left, and I was back at the airplane about 15 minutes later. As I started up the stairs, a second gentlemen introduced himself as an airport maintenance representative and he advised me that the airport was going to close in 5 minutes, however, he was going to keep it open so we can depart. I thanked him and proceeded upstairs. When I walked into the flight deck, the first officer was sitting in his seat waiting for me. We made our brief introductions, and I sat down to get the jet ready. While conducting my preflight, we had a brief conversation and he had told me that this was his first trip off of OE, and that he'd been at the airplane for almost 90 minutes. I continued my preflight while we talked.*

*Since the first officer was brand new, he was a bit slower, so I also slowed down a bit and took some time to help him with putting the route in the FMC as well as entering the performance data. At this time, the airport maintenance representative came into the flight deck and asked if we could be on our way in about 10 minutes. I told him that we could do that and he left. It was going to by my leg, so I did the takeoff brief, and handed the paperwork to the PSR and advised her she could shut the door. She took the paperwork and walked out of the flight deck.*

*I had just asked for the checklist when the airport maintenance representative came back into the flight deck and advised me that he needed to close the runway so they could start their work. He advised me the airport would reopen in 3-4 hours. I thanked him for his*

*patience and consideration, and then he left. I had a brief discussion with the first officer about the situation and asked him how he was feeling. He said he was a little tired but he was okay at the moment. I was also a little tired but I was okay to get the airplane to BIF, however, given that I had only had about 3 hours of meaningful sleep at the hotel combined with a new departure time of 3-4 hours later, I knew it wouldn't work. I picked up the phone and contacted MOD who then transferred me to Scheduling. I advised scheduling that at this point I was tired and was not safe to operate the trip with the later departure time. I advised scheduling that I was fatigued and we proceeded with the script. Scheduling advised me to stand by as they worked to coordinate transportation and hotels for the crew. Upon check-in at the hotel I asked the first officer where he stayed the previous night, and his answer was at the hotel we were in. The same hotel that I was also in. This is when I put everything together what Lorraine from JND as laughing about. The first officer's wakeup/show time was never adjusted to reflect my updated wakeup/show time. He was woken up at the normally scheduled time and took the transportation that was set up. This is why there was no transportation for me when I came down about an hour or so later.*

*Ten hours later, we left the hotel, proceeded to the airplane, and operated the ferry flight to BIF well rested and without further complications.*

Based on my experience as a professional airman and many years of experience working at Atlas, when read Captain Lennox's report, I was concerned that Atlas management had jeopardized the safety of that flight by virtue of having the First Officer single-handedly perform the pre-flight check rather than performing that task together with Captain Lennox.  Captain Lennox arrived late the airplane because Atlas management failed to make adjusted transportation arrangements from his hotel to the airport based on his late arrival to the hotel. Atlas management also failed to adjust the first officer's transport time from the hotel and did not tell him that Captain Lennox would be late arriving at the aircraft due to his late arrival at the hotel.  With the large turnover of crew members at Atlas, the experience level of the first officers is steadily decreasing. This requires careful monitoring and cross-checking of the first officers (and likewise the captains who are being upgraded with far fewer years of Atlas flying experience than historically seen at Atlas). As a result, the FRMC has discussed, agreed, and many times thereafter reaffirmed its agreement that the preflight check procedures must be, and

40

will be, accomplished by both crew members. In fact, our Atlas operational procedures require a

verification (by other pilots) of virtually everything we do in the cockpit.  The first officer who

was assigned to operate was "brand new," and was operating his first Atlas flight after

completing initial training. It is easy for an experienced pilot working alone to make critical

mistakes during pre-flight checks, and it is far easier for a brand new pilot to make such

mistakes.  If I had been Captain Lennox's shoes, I, too, would have redone the preflight check.

The fact that the airport was nearing curfew time should never have, and would not have, made

me change my mind, as I would have been thinking about the safety of the flight, the crew and

the passengers.  In fact, several recent briefings from the Atlas Director of Training have

repeatedly and expressly instructed the pilots not to hurry and to do their work correctly.  A true

and correct copy of an Atlas Operations bulletin dated September, 26, 2017, the day after this

case was filed in court, is an example.  In that bulletin, which was issued in response to "a

number of high profile events at Hong Kong on Arrival and Departure," including a near miss

crash into the mountain when approaching the Hong Kong airport, Atlas instructed:

> *DON'T HURRY*
> *There are many factors that contribute to errors. In many of the events that have*
> *occurred recently (and not just in HKG), ATC contributed to the sense of urgency felt by*
> *the crewmembers in changing and complying with assigned clearances.*
>
> *When in doubt, slow down and make the changes methodically, ensuring **both***
> ***crewmembers verify** that the changes were made correctly. [Emphasis in original]*

Thus, with respect to Captain Lennox, the fact that the airport closed before the flight could leave

was not Captain Lennox's fault but was entirely the result of Atlas's inability to run its

operations.  Moreover, Captain Lennox mentions repeatedly his attempts to contact Atlas's flight

operations, travel and scheduling departments.  The Atlas and Polar operations have grown

significantly and have gotten busier with more flights, more aircraft, more commercial travel,

different (new) city pairs, and different hotels and limousine transport services.  Pilot retention

and attrition challenges, coupled with the increased operations tempo has increased the

scheduling chaos.  This has created a need for a larger and better trained scheduling and travel

department, which Atlas seems to be unable, or unwilling, to generate.  The result of the shortage

in travel and scheduling personal is an increase in the time an Atlas pilot is kept on hold when

attempting to talk with company representatives regarding any of a myriad of problems

associated with just doing his or her job.  In short, Captain Lennox's fatigue was caused by

Atlas's scheduling chaos and nothing else.  My conclusion in this regard is also supported by the

fact that the FRMC voted unanimously to accept Captain Lennox's fatigue report.

34.     The ninth fatigue call-out cited by Atlas in its complaint in support of its

accusation that the Union is engaged in a "calculated campaign to cause long delays and

maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion

for preliminary injunction states that:

> On August 27, 2017, a flight carrying cargo from Sydney to Shanghai was delayed 18.5 hours due to crew actions.  The crew was standing by while maintenance was repairing the aircraft.  When the aircraft was fully loaded and ready, the crew said it would need time to do its checks.  Approx. 40 minutes later, the crew, which had previously received over 40 hours of rest, called fatigued while they were within their legal duty day.  Indeed, had they operated the flight, they still would have had 5 hours of legal duty time left in their day.  After 12.5 hours of rest, the crew was informed of a new departure time outside of the Sydney curfew, but they said they were still fatigued, resulting in an additional 6-hour delay, causing Atlas' schedule for this customer to run late for several days thereafter.  The customer requested that the crew no longer operate flights for the customer, complaining that "the lack of customer focus provided by this operating crew to the [customer] Freight operation is exasperating and more than disappointing," noting that "there are many questions being asked here in relation to how this could have occurred."  Days later, the customer complained that this incident and several other fatigue delays in the same week "resulted in one of our lines of flying now being delated by 47 hours with no ability to operate on time until mind-next week (i.e., a week and a half later).

After investigating this accusation, the Union has learned that the pilots who called off fatigued from Sydney to Shanghai Flight No. QF7589 on August 27, 2017 were Captain Barenko, First Officer Shaw and First Officer Viertel.  Each of them submitted fatigue reports with the FRMC and kept copies of the narratives that they included in their reports for their records.  In his narrative, Captain Barenko wrote:

| | |
|---|---|
| *1517z -* | *Received wake-up* |
| *1615z -* | *Pickup on time* |
| *1700z –* | *Arrived at A/C* |
| | *1700z - MX was working multiple issues, including hydraulics and aircraft was going to be Substantially delayed precluding all cockpit preflight duties* |
| *0133z -* | *Received the MX logbook, and review multiple items with MX, including sign offs etc.* |
| *0205z -* | *Called Fatigue, Crew duty would have exceeded the maximum of 16 hours for a crew of 3 and we were unsafe to accept any extension beyond the maximum.* |
| *0215z -* | *requested ground transport and hotel arrangements* |
| *0230z -* | *advised no hotel transport* |
| *0330z -* | *Hotel transport finally arrived, Hotel desk does not have any ability to arrange transport in Sydney, according to the company transportation desk all transport is handled locally.* |
| *0406z -* | *arrived at hotel and contacted the company to start rest.* |
| *1416z -* | *Contacted the company as required, They informed new departure time was going to be at 2000Z* |
| *1420z -* | *Explained that I was unable to accept a 2000z departure since Pre-Duty rest is required per 12.F.3.1.A* |
| *1421z -* | *Scheduler (Levon) informs me thats not correct and we were notified of the new departure time when we called fatigue, and again when we checked in at the hotel... We certainly were not!* |
| *1425z -* | *Scheduler (Levon) comes back on the phone, and informs me yes, the flight will have to depart now at 0200z after getting our required pre-duty rest.* |
| *1425z -* | *Inform the scheduler to contact the other crew with the changes, and to email me back with the time of those notifications.* |
| *1435z* | *received email confirming other crew was notified of changes, resumed rest.* |

In his Fatigue Report, Captain Beranko further wrote:

*Never send a crew to a broken airplane, 16 hours is the limit for a duty day*

43

*18 hours seems to be treated as the GOAL in cases like this, so why have 16 hours even mentioned? 16 hour duty day can be extended, yet there was NO CONTACT with the crew to determine if a 2 hour extension was safe? 16 hour duty day is the maximum, yet there was no contact with the crew to notify them of the extension, it seems the company relies on the 18 hours and completely ignores the 16hour actual limit! Burning a crew duty day at an aircraft with a maintenance issue with no known release time. No accounting for circadian rhythm as would be the case with passenger operations. My circadian rhythm is completely out of phase, adding a mx delay of 6 hours compounded the fatigue even more. Travel does not have any idea how to set up transport in Sydney, and relies solely on a third party increasing the delays incurred by transport not being ready when the third party is unavailable to set it up. Hotels did a great job and had our hotel ready for us. Scheduling does not seem to understand the CBA application of rest periods, Schedule change notifications and there appears to be a reliance on emails for notifications where actual contact is not only beneficial but perhaps even mandatory. It seems that a Fatigue call results in treating it as a regular rest period by scheduling, and a presumption that the crew will be ready for immediate departure after contacting the company after the 10 hours of rest despite the script being very clear to the intent that is read to the crew when making the call.*

First Officers Shaw and Viertel's reports, respectively, state as follows:

<div align="center">First Officer Shaw</div>

| | |
|---|---|
| *1615z* | *pickup from hotel* |
| *1700z* | *Arrived at aircraft under heavy MX could not access cockpit with limited space in rear because of MX work going on.  Waited over 8 hrs on aircraft for MX to finish before getting into work stations for flight preparation.* |
| *0133z* | *logbook was cleared and released from MX.* |
| *0200z* | *Final fuel and loading finished.* |

*Original flight time was scheduled for 9+56 minutes.*

<div align="center">First Officer Viertel:</div>

*Woke up on own at 12:45z after 6 hours sleep*

| | |
|---|---|
| *1515z -* | *Received wake-up* |
| *1615z -* | *Pickup on time* |
| *1700z -* | *Arrived at A/C* |
| *1700z -* | *MX was working multiple issues, including hydraulics and aircraft was going to be substantially delayed precluding all cockpit preflight duties* |
| *0135z* | *Capt Received the MX logbook, and review multiple items with MX, including sign offs etc.* |
| *0205z -* | *Called Fatigue, Crew duty would have exceeded the maximum of 16 hours scheduled for a crew of 3 and we were unsafe to accept any extension beyond the maximum.* |
| *0215z -* | *requested ground transport and hotel arrangements* |

<div align="center">44</div>

| | |
|---|---|
| *0230z -* | *advised no hotel transport* |
| *0330z -* | *Hotel transport finally arrived, Hotel desk does not have any ability to arrange transport in Sydney, according to the company transportation desk all transport is handled locally.* |
| *0406z -* | *arrived at hotel and contacted the company to start rest* |
| *1433z* | *I was contacted by crew sched vie hotel phone* |
| *1433z -* | *Explained that I was unable to accept a 2000z departure since Pre-Duty rest is required per 12.F.3.1.A* |
| *1433z -* | *scheduler (Levon) calls my room to inform me of the changes, and the Times of new wake up and departure.* |
| *1435z -* | *received email confirming other crew was notified of changes, resumed rest.* |

Flight No. QF7589 and the fatigue callouts by all three of the operating pilots is a classic case of Atlas's and Polar's scheduling chaos, disregard for crew safety, and the pilots' federal regulatory and detailed, contractually-guaranteed, flight duty and rest protections. When Atlas requires pilots to sit for many hours on an aircraft that is delayed for maintenance, often in the heat or cold, it jeopardizes the pilots' safety and is completely inappropriate. The fatigue callouts by the three pilots are completely understandable and the legitimacy of those callouts is beyond question. My conclusion in this regard is also supported by the fact that FRMC voted unanimously to accept all three of the pilots' fatigue reports.

35.    The tenth fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

> *On September 1 and 2, 2017, three pilots called in fatigued for their Hong Kong-Delhi-Hong Kong turn. On September 1, a First Officer, who had previously received over 17 hours of rest, called in fatigued for the Hong Kong-Delhi-Hong Kong flight, causing a 7-hour and 35-minute delay in the initial leg of that flight. The next day, Captain Griffith, who had previously received 36.5 hours of rest, called in fatigued for that day's Hong Kong-Delhi-Hong Kong flight. Captain Griffith refused to accept an additional 10 hours of rest that would have allowed Atlas to set a new departure time, in accordance with Company-Union agreed standard operating procedure, insisting instead that he would call in and fly when fit, leaving the flight schedule in flux. Ultimately, Atlas found a*

45

*replacement Captain and scheduled the flight for a two-hour delay.  After both of the First Officers scheduled for the flight were notified of that 2-hour delay, one of the flight's First Officers called in fatigued.  As a result, Atlas operated the flight with one less First Officer, which limited the crew's legal duty time and required an unscheduled crew rest in Delhi before the Delhi-Hong Kong leg could fly.*

After investigating this accusation, the Union has learned that the First Officer who called off fatigued from Hong Kong-to-Delhi Flight No. 8137 on September 1, 2017 was First Officer Antonio Santos.  The pilot who called off fatigued on the return Delhi-to-Hong Kong flight on September 2, 2017 was First Officer Maria Montgomery.  Both pilots submitted fatigue reports with the FRMC and kept copies of their narratives for their records.  I have reviewed their narratives.  Captain Griffith also called off fatigued on September 2, 2017.  Captain Griffith did not file a fatigue report, but he did prepare a narrative explaining why he called off fatigued and I have reviewed that narrative.   These fatigue calls described by Atlas and Captain Carlson are examples of rolling delays caused by poor crew scheduling.  Hong Kong is a high volume Atlas city where Atlas should have reserve pilots.  It does not have reserves there and none were readily available at the time of the fatigue calls and resulting rolling delays.   Unlike other air carriers, Atlas and Polar do not attempt to avoid rolling fatigue calls that happen when one pilot calls off fatigued.  When one pilots calls out fatigued, he must be afforded a minimum of thereby ten hours of rest.  To the extent the carrier does not reassign an available pilot to replace the fatigued pilot, he flight will be delayed for a minimum of ten hours.  In the meantime, the other pilot(s) scheduled to operate the same flight who had received rest in anticipation of the originally scheduled departure, now have to try to go back into rest during that delay period.  If they cannot go into rest and remain awake during the delay period, he/they will have to commence operating a long international flight for many hours just when he/they is/are beginning to feel tired again.  That is what happened on September 1, 2017.  First Officer

Santos's flight from Hong Kong to Delhi was delayed by seven hours.  He was advised by Atlas's scheduling department not to leave his rest hotel.  The flight was delayed another two hours.  At that time, First Officer Santos would have been ready for sleep again based on his originally scheduled departure time and his sleep pattern.  He therefore called off unfit for duty due to fatigue.  The next day, back in Hong Kong, Captain Griffith also called in fatigued from the Hong Kong-to-Delhi flight because the flight was delayed eight hours and he, like First Officer Santos, was rested for the original time and would have been fatigued to operate the delayed flight.  First Officer Montgomery similarly called out fatigued from that flight because she too had planned her rest for the original departure time and would have had to operate the flight while she was otherwise ready for rest again.  These rolling delays are not unusual at Atlas and Polar and they are attributable not to gamesmanship by the pilots, but by poor staffing and scheduling and a lack of understanding of how to staff and use reserves.  This conclusion is also supported by the fact that the FRMC voted unanimously to accept First Officer Santos's and First Officer Montgomery's fatigue reports.

36.     The eleventh fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

> On September 2, 2017, a Captain, who had previously received more than 10 hours of rest following a hotel reserve assignment, called in fatigued at 2:10 a.m. for a 6:30 a.m. departure, which caused an 8-hour and 40-minute delay of a Boeing flight from Paine Field in Washington State to Chubu Centrair International Airport in Japan.

After investigating this accusation, the Union has learned that the pilot who called off fatigued from Paine Field to Chubu Flight No. 4512 on September 2, 2017 was Captain Gregory Samson. Captain Samson filed a Fatigue Report with the FRMC and kept a copy of the narrative that he

submitted with the report for his records.  Captain Sampson's fatigue callout is the direct result of another longstanding scheduling deficiency of Atlas's and Polar's operations, namely, their poor use of reserve pilots.  This issue has also been highlighted many times during our FRMC meetings. The company insists on adding flights (in reality "schedule changes") to a reserve. This leaves the crewmember in a situation where he or she must decide whether to be rested for the "reserve" duty or for the schedule change after the reserve.  The schedulers/planners incessantly put flights onto a reserve line holder which has the possible repercussions of a fatigue call - depending on which choice the crewmember makes - rest for reserve, or rest for the flight. Captain Sampson was faced with this choice on September 2, 2017.  As he wrote in his narrative:

> *I prepped for R2 to begin on Friday, 01SEP17, 0400L—1800L.  At 0627L, I was notified of a schedule change consisting of a shortened R2 (ending at 0900L). New Duty was to begin at 1955L (w/u at 1825L). I accepted that change with the forethought of a number of variables: That I would be able to be rested for the evening departure. That another change could occur that would result in my being called out during the amended R2 period (ending at 0900L). That there could be another change in the meantime that would affect the evening trip.*
>
> *Additionally, less than a year ago, there was a fatigue situation wherein I was advised that the Chief Pilots' position on 'foreseeing' a fatigue situation was that Fatigue was to be determined at the time Fatigue was being declared. (IOW, wait to see if fatigue is an actual issue at, for example, report time.) All of this was considered in my judgement and condition that resulted in my Fatigue call.*
>
> *At approx 1820L (five minutes prior to the scheduled wakeup time), the PCD indicated a change. I checked AIMS to see new report time was 2200L (w/u at 2030L). I did much thinking on the situation where I was supposed to begin a new Duty period at the opposite side of my sleep cycle (IOW, I was being asked to begin duty at the very time that I would naturally be going to bed after being R2 notified at 0627L). The earlier departure time would have at least allowed me to handle a preflight at the very end of my awake cycle and hope that the other cm's were rested enough to allow me the first break in flight. With the delay, that possibility withered significantly as it was (let alone the real possibility of further delay that is common for this customer).*
> *At 1907L, I called Fatigue. I was told that the new Report time will be 1340Z (0640L) with a departure time of 1510Z (0810L).*

Captain Samson further wrote in his Fatigue Report that he experienced:

48

*Radical change of duty period. Right after wakened for R2 callout, was notified that the Duty period was going to begin roughly 12-14 hours later. The result was being expected to be fully rested for 0400L duty and then be fully rested for 1800L duty*

*Suggestions*
*Narrative:*

*Contemplate and consider sleep cycles. This was a case of the worst possible chance for rest. To be sleep-prepared for duty only to then be woken and told to repeat that same amount of sleep again almost immediately for duty period that could not have been placed more squarely at odds with any sleep cycle.*

Based on my review of Captain Samson's narrative, my many years as an airman at Atlas and Polar, and my years of industry-experience, including my years as a representative on the Atlas FRMC, Captain Samson's fatigue callout was the result of Atlas's poor scheduling of reserves, not by Captain Sampson's desire to cause "long delays and maximum hurt to Atlas's and Polar's operations." My conclusion in this regard is supported by the fact that the FRMC voted unanimously to accept Captain Samson's fatigue report.

37.    The twelfth fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas and by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

*On September 9, 2017, a First Officer, who had previously received nearly 45 hours of rest, called in fatigued at his scheduled wakeup time, delaying a flight from Kuwait to Hong Kong by 8 hours. The aircraft was scheduled to fly from Hong Kong to Cincinnati transporting express cargo. As a result of the pilot's fatigue call, the aircraft, which was already delayed due to maintenance and other issues, missed the customer's sort in Cincinnati, and the customer experienced a full service failure. Had the pilot not called in fatigued at his scheduled wakeup time, even with the maintenance and other delays, the aircraft would have arrived in Cincinnati in time for the customer's sort.*

After investigating this accusation, the Union has learned that the pilot who called off fatigued from Hong-Kong-to-Cincinnati Flight No. flight 8084/8084A on September 9, 2017 was a first officer who contacted the Union, including me and my colleague, Laurie Ruiz de Castillo and

49

confirmed that he is the individual who descried above.  The First Officer asked us not to

disclose his name out of fear of retaliation by Atlas and Polar but he has authorized us to use the

narrative that he had included in the fatigue report that he filed with the FRMC and kept for his

records. The First Officer wrote:

> *The bottom line is I was chronically fatigued due to being gone 24 days with different schedule changes 15 out of the last 16 days. Upon arriving in KWI for a roughly 1.5 day layover I felt a cold coming on with sore throat and congestion. I slept 5-6 hours the first night and didn't leave the hotel room that day trying to not overdo it and prevent a full on cold. The next night I slept well and woke up at 830AM still with a bit of a sore throat but feeling decent enough to work the flight to HKG leaving at 1PM. Not too long after waking up my PCD went off delaying the departure 14 hours to 3AM the next night. AT 4 PM I layed down and tried to go back to sleep so I could be rested for the delayed departure. I could not sleep firstly because I had only been up for eight hours and also because despite requesting a lobby room I was given a street one which was very loud at that time of day. I packed up my stuff and went to the lobby and told them I had to switch. This time they gave me a lobby room which was much quieter. Unfortunately by this point I was wide awake and could not fall back to sleep. At 11PM I started to feel tired but my wakeup would be in 1 hour. If I was to take the flight I would have started it after being awake for 18.5 hours. The final determining factor was knowing that If I pushed myself to stay up 27 - 30 hours straight I would surely have a full blown cold and likely not be able to complete the next seven days of my pattern. I called in fatigued took the min rest and we ended up going out about 8 hours late. I slept pretty decent that night and my cold had not gotten any worse. I definitely made the right decision and am thankful we have this fatigue policy.*

The First Officer further wrote:

> *I understand multiple schedule changes are normal for the type of operation we have and often times find they can make the pairings more exciting... With enough advanced notice most of the time sleep schedules can be adjusted accordingly. The big problem is with rolling delays and especially with changes that occur after the crewmember has gone to sleep preparing for the next day. Regardless of whether I am sick or not. If I start a trip after being up for 18 hours or more I am going to be fatigued by the end of it. I know this because at the end of last month I was supposed to have 4-5 days off. Instead I was extended 3 days of which I just sat in the hotel in ICN. The last day I again sleep well and woke up to found out the departure had been pushed back 12 hours and reduced from 3 man to 2 man crew (block 7:50). I started the trip after being up 16 hours and was exhausted by the end. On top of that It took me about 3 days to feel somewhat rested at which point I was well into my next 17 day trip.... As much as I would like to say there is something I can do differently in the future to prevent this type of fatigue call To me the only real solution lies in the hands of the schedulers. I thinks it would make a difference if For flight times over 7 hours: Delays occurring within 10 hours of departure (the time*

*when a crewmember should be sleeping) should be limited to no more than 10 hours past the originally scheduled time. Otherwise delay it more than 24 hours allowing the crewmember to get another night of rest. Another easier less restrictive and more operationally efficient solution would be to allow the crewmember to notify scheduling immediately upon receiving the change whether or not they will likely be rested enough for the 10 + hours delays. I've tried this before but as of now they just say try to get a nap let us know later if you are fatigued. This leads to last minute fatigue calls which can really mess up the operation.... Thanks for your time and I apologize about the grammar...this foreign keyboard does not have commas :)*

The First Officer's narrative describing his schedule changes in 15 of his last 16 days of work, rolling delays, and his battle to avoid getting sick speaks volumes about the scheduling chaos that has existed at Atlas and Polar for many years; and which Atlas's and Polar's management readily acknowledge contribute significantly to the number of fatigue calls made by the pilots. The First Officer's fatigue, as described in his narrative, is palpable and entirely understandable. His fatigue callout can be directly attributed to Atlas's and Polar's scheduling chaos and not to some plot conveniently hatched by management to avoid responsibility and accountability to its customers on account of their scheduling and staffing problems.  In fact, the First Officer demonstrates his concern for the operation and his professionalism by "packing up" and going to the hotel lobby to request a quieter room.  Pilots hate to "drag bags" once settled in a room.  We only want to pack up once – to leave.  Packing his stuff and going to the hotel lobby to request a quieter room shows that his concern is not to harm Atlas but for the safety of the flight – in fact, therefore, to protect Atlas.  My conclusion in this regard is supported by the fact that the FRMC voted unanimously to accept the First Officer's fatigue report.

38.     The thirteenth fatigue call-out cited by Atlas in its complaint in support of its accusation that the Union is engaged in a "calculated campaign to cause long delays and maximum harm" to Atlas but **not** referenced by Captain Carlson in his declaration in support of Atlas's motion for preliminary injunction states that:

51

> *On September 24, 2017, a First Officer called out fatigued "mid-pattern" for a DHL flight.  Upon arrival from Sydney to Melbourne, Australia, where the aircraft was making a scheduled stop of less than 2 hours, the First Officer advised that he was too fatigued to fly the next leg of the trip from Melbourne to Shenzhen, China.  Prior to the trip, the First Officer had over 36 hours of rest, including a full 24 hours when he was free-from-duty, and he would have received an inflight rest on the trip from Australia as well.  The Melbourne to Shenzhen flight took a delay of over 10 hours as a result of the fatigue call.*

After investigating this accusation, the Union has learned that the pilot who called off fatigued from Melbourne-to-Shenzhen Flight No. PO257 on September 24, 2017 was First Officer Samuel Hoffman.  First Officer Hoffman filed a Fatigue Report with the FRMC and kept a copy of his narrative from the report for his records.  In his narrative, First Officer Hoffman wrote:

> *The layover in SYD was scheduled to be 36 hours after the delay departing HNL. It should be enough. I planned to implement my rest similarly to the same flight a week prior, as it worked well for me. The morning prior to the flight I awoke at around 0230 local and occupied myself until the hotel began serving breakfast. After a good meal with my crew we decided to go for a walk together. After the walk I ate a small lunch and returned to my room to rest. However, even with the room quiet and dark I found myself feeling fully awake. I tried reading, as that usually helps, but no luck. I only started feeling tired after our wake up call. After we taxied to the gate in MEL, fatigue really set in as I was approaching nearly 24 hours awake. I knew another leg to SZX was out of the question.*

I do not know First Officer Hoffman but have no reason to doubt that he was fatigued he called off from Flight PO257.  His plan to enter into rest did not work even though it had worked the prior week.  I am not surprised by that, however, as pilots are not yet robots and are subject to the same human conditions, including fatigue, as everyone else.  If I had been in First Officer Hoffman's shoes after having been awake nearly 24 hours and facing a long haul flight to China, I would also have called out fatigued.  First Officer Hoffman's decision to call out fatigued due to legitimate reasons is also supported by the fact that the FRMC voted unanimously to accept his fatigue report.  Finally, the FRMC would have categorized First Officer Hoffman's report a "one off," meaning that there were no causal factors but that pilot simply could not sleep.  Contrary to the implication of Captain Carlson's declaration, this does not mean that First

Officer Hoffman was trying to harm Atlas.  Rather, he is trying, to the best of his ability, to

ensure that he is fit for duty and, in a word, safe, so that the very long flight from Melbourne to

Shenzhen is conducted safely.  Pilots are the last link in the safety chain and I believe a

declaration such as the one reference in this document, from their boss Captain Carlson, the Vice

President of Operations, chills their willingness to comply with the FARs and FAA guidance

requiring them to declare they are not fit for duty due to fatigue.

39.     The fourteenth and last fatigue call-out cited by Atlas in its complaint in support

of its accusation that the Union is engaged in a "calculated campaign to cause long delays and

maximum harm" to Atlas and which is cited by Captain Carlson in his declaration in support of

Atlas's motion for preliminary injunction states that:

> *Defendants have encouraged pilots to call out fatigued, even if they are not in fact*
> *fatigued, as one pilot expressly told Atlas on July 22, 2017.  On that date, after a First*
> *Officer called out fatigued for a flight, Atlas' crew scheduling dept. called another First*
> *Officer who was scheduled to ride as a passenger on that flight to see if he would be able*
> *to pilot it instead.  At first the pilot agreed to fly the route, but later called back and said*
> *"I was talking to the union and they wanted me to call and tell you that I needed 10 hours*
> *of pre-duty rest prior to my schedule change per the contract, and just to check if you*
> *guys are aware of that."  Sections 12.E.1 and 12.F.3 of the CBA, however, do not require*
> *10 hours of rest and permit pilots to choose to accept less than 10 hours of rest.  As a*
> *result of this fatigue call, Atlas ultimately was forced to assign another pilot to fly the*
> *route and took a delay instead.*

I am not aware of any activity by the Union encouraging pilots to call off fatigued even if they

are not fatigued.  Moreover, after investigating the Plaintiffs' and Captain Carlson's accusation

regarding a July 22, 2017 flight, the Union has learned that the pilot whom they claim told them

that the Union had expressly instructed him to call out fatigued was a young, new hire, First

Officer who was still on probationary status.  The new hire first officer met Captain Ian

DePledge and another First Officer in the lobby of the Cordis Hotel in Hong Kong and told

Captain DePledge that he "guessed" he had just been assigned to operate the flight from Hong

Kong to Seoul to Anchorage with him and the other First Officer, Ben French. He further stated

that the Atlas scheduling department had recently (at, or close to, wakeup) changed his schedule

to reflect that he would operate the flight as a flying pilot rather than deadhead on the flight, as

he had originally been scheduled.  Captain DePledge and First Officer French were concerned

that the Atlas scheduling department had bullied the new hire First Officer to agree to this

change to his schedule, from a deadheading status to an operating status, without the safety of the

contractually required pre-duty rest.  This is because a pilot assigned to deadhead on a flight is

not necessarily (nor required to be) sufficiently rested to actually operate the aircraft. He or she

may well have gone out to a later dinner or engaged other personal activities with the expectation

that he or she would be able to rest as a passenger in the back of the aircraft.  In my experience,

the re-assignment of deadheading pilots to operating status without pre-duty rest is dangerous

and unsafe.  While Section 12 of the current (2011) collective bargaining agreement does allow

less than 10 hours of minimum rest in some circumstances, there is nothing in that section that

allows pre-duty rest to be shortened unilaterally by the Atlas scheduling department. Pre-duty

rest can only be shortened by a prospective agreement between the Union and the company, with

crewmember concurrence, to 8 hours.  Based on my inquiry regarding the July 22, 2017, flight,

the Union steward who spoke with the new hire First Officer was correct in his interpretation of

the Section 12 of the collective bargaining agreement. Further, Captain DePledge and First

Officer French were both rightly concerned that the Atlas scheduling department was trying to

take advantage of a new pilot on probation and coerce him to change his scheduled status from

deadheading passenger to operating pilot and in so doing, place himself and his fellow crew

members at potential risk.  The actions of the Union and Captain DePledge and First Officer

French do not evidence some kind of scheme to encourage pilots to call off fatigued even when

they are not, but instead evidence a conscientious adherence to safety.  And, in fact, the actions

of the union steward demonstrate exactly what a union and a collective bargaining agreement is

for – to ensure the safety of the worker. Once again, the crew is often the last link in the safety

chain.  It is significant that after the first new hire first officer asked to be removed from Captain

DePledge's Hong Kong-to-Seoul-to-Anchorage flight, the scheduler called yet another new first

officer, who was deadheading on the Hong Kong-to-Bahrain flight and coerced him into

dragging his bags from one airplane to the other.  This is dangerous and unsafe.  Here is what

that that First Officer, Edward Ojeda, has explained:

> *Here is what happened on July 22, 2017 (Z date).*
> *I was sitting in the back of an Atlas 744 in Hong Kong, ready to deadhead to Bahrain.  I*
> *was given a cell phone and it was Amir from Scheduling.  He said he needed me to now*
> *operate a flight from Hong Kong (HKG) to Seoul, S. Korea (INC) to Anchorage.  I was*
> *caught off guard and later realized that they were supposed to give me at least 10 hr pre-*
> *departure crew rest.  I was driven over to the 748 (N958GT) and operated the trips with*
> *Capt. DePledge and FO Ben French.*

To me, this highlights the day-to-day schedulers' lack of concern, or lack of training, with

respect to fatigue-inducing trip changes.  It again highlights why it is necessary for the Captains

and crewmembers to be highly cognizant of their fitness for duty with respect to rest.  Contrary

to the insinuations and accusations contained in Captain Carlson's declaration, this event,

including Captain DePledge's conversation with the new hire first officer who declined the trip,

was not some nefarious act by someone trying to harm Atlas' operations, but a genuine concern

for the safety of the operation as well as the individual.

   40.  The fatigue call outs cited by the Plaintiffs and Captain Carlson in support of the

Plaintiffs' motion for a preliminary injunction as examples or evidence of the Union engaging in

such conduct do **not** evidence any such activity by the Union.  As discussed above, Atlas and

Polar have been experiencing stressed and greatly challenged operational difficulties long before

the Union filed notice to amend the pilots' collective bargaining agreement.  Those difficulties

are attributable to a number of operational shortcomings related to Atlas' and Polar's tremendous

expansion of aircraft and business while not having a sufficient number of pilots to staff its fast-

growing operations, coupled with significant pilot turnover, training delays and an overall

reduction in the experience levels of its pilot workforce.  I have been discussing with senior

Atlas officials the rising curve of fatigue reports and fatigue incidents with respect to Atlas's and

Polar's global schedules. I have discussed, for instance, that there are more fatigue reports at the

end of the month as well as during the transition into following month. I also have pointed out

there also seems to be a correlation between number of open time trips offered (an indicator of

greater chaos in the operation) and fatigue reports. All of this has caused what Atlas's and

Polar's senior management have recognized and characterized as "scheduling chaos."  Rather

than tackle their operational difficulties and scheduling chaos directly and honestly, Atlas and

Polar appear determined to deflect the responsibility for their own deficiencies on their pilots and

the Union. That is no way to run an airline.

   I declare under penalty of perjury under the laws of the United States that the foregoing

statements are true and correct.

Dated:

10/24/17

Signed

**Effective: 04 DEC2013**

# Fatigue Risk Management (6/6)

**Bulletin Purpose:** Inform Crewmembers about the new rules addressing Pilot Fatigue and their future implications.

This is the final of a six part, monthly informational bulletin series.

Part 117 is just over the horizon and the Company is ready for implementation on January 4th, 2014.

- Company Fatigue Risk Management Plans (FRMP) are in place which show Company senior management commitment; scope, policies and procedures for measuring, assessing, mitigating and evaluating fatigue.
- All employees providing management and/or directly involved in operational control have received the necessary training.
- Fatigue Education and Awareness training has been incorporated into Company training curriculums and is on-going for initial and recurrent training.
- Crew rest facilities have been identified on all Company aircraft.
- OpSpecs are signed.

Due to the dynamic nature of our operations the Company intends to mix Crews occasionally between Part 121 and Part 117, even within the same trip. Crew Resources is in the final stages of implementing Part 117 in conjunction with part 121 rules in Airline Information Management System (AIMS).

The Company has worked extensively with AIMS to ensure the system properly applies Part 117 to passenger operations and Part 121 to Cargo operations. Legalities will be applied to the each flight as follows:

- Cargo - Part 121 block time and limits will apply.
- Passenger - Part 117 block, Flight Duty Period (FDP), and Cumulative FDP/block times will apply.

How FDP or block hours are accumulated is not relevant; i.e., 32 in 7 is applied to a cargo flight, however the source of those 32 block hours (passenger or cargo) is not considered. Hours may be a result of only cargo, only passenger, or both.

Similarly, Cumulative FDP limits for passenger flights will be based upon the combination of Passenger and Cargo FDP to determine whether a Crewmember is legal or not legal for the upcoming passenger flight.

### Effective: 04 DEC 2013

Crewmembers will see several changes coming to eCrew in the coming weeks to improve your visibility to the new regulations. Below are some highlights of the new functionality that you will see in eCrew:



**Black "down arrow"** points to the "**Allowable FDP"** field required for Part 117 passenger flying.

Black "horizontal arrow" points to a **"black rectangle"** containing no "Allowable FDP" information. As Cargo Operations and associated cargo deadheading are regulated under Part 121, this field remains blank.

**Blue rectangle** contains **"Allowable FDP" information for Part 117 passenger operations**.

**Green circles** indicate an **"acclimated"** pilot for Flight Duty Period (FDP) departure. Note "**19:00 Allowable FDP"** and **"IAH"** circled as **departure point** and **"location of acclimation."**

**Red circles** indicate an **"unacclimated"** pilot for Flight Duty Period (FDP) departure. Note **"Allowable FDP of 1800U".** The **"U"(red up arrow)** after the **"1800"** indicates that the pilot is **"unacclimated"** for the departure at **"LAD". "IAH"** (red circle) is the **"location of acclimation"** for this pilot. Local IAH times are used for entry into the Flight Duty Period Table to determine the maximum **"Allowable FDP."**

It is important that Crewmembers increase knowledge and awareness of Fatigue Risk Management and the soon to be implemented flight duty limitations and rest requirements (Part 117).

Recommended reading:

- Advisory Circular, 117-2; Advisory Circular 120-130A.
- FAR 117
- InFO 10017
- Atlas Fatigue Risk Management Plan



## Fatigue Risk Management Plan

**Revision 5**
**13 SEP 16**

Copyright Information

Copyright Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. 2014. This document is not to be released under the Freedom of Information Act. PROPRIETARY DATA. Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. reserve all proprietary rights in the data furnished herein. Use of this document is restricted to conveyance of information to government agencies and customers or vendors of Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. This information shall not be released, disclosed, used, or duplicated for any purposes without the written permission of Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. By accepting receipt and possession of this document, you acknowledge and agree to these regulations.

**Authority and Responsibility**

The Senior Director, Flight Operations, as the Content Authority, is responsible for the accuracy of all content, as well as ensuring content meets with all regulatory requirements. The Senior Director, Flight Operations, as the Content Owner, is responsible for the creation of manual content.

## Fatigue Risk Management Plan

### Table of Contents

| | |
|---|---|
| General | 0.1.2 |
| Revision Highlights | 0.1.2 |
| General | 0.2.1 |
|     Active Bulletins | 0.2.1 |
| Introduction | 1.1.2 |
| FRMP Structure | 1.1.2 |
| Commitment statement | 1.2.1 |
|     Company Safety Commitment | 1.2.1 |
|     Flight Operations Safety Commitment | 1.2.2 |
|     Fatigue Program Review | 1.2.3 |
|     Safety Culture | 1.2.3 |
| FRMP Scope and Fatigue Management Policy | 1.3.1 |
|     FRMP Scope and Objectives | 1.3.1 |
|     Fatigue Mitigation | 1.3.1 |
|     Safety Objectives | 1.3.2 |
| Organization's Fatigue Call Policy | 1.4.1 |
|     General | 1.4.1 |
|     Fatigue Call Policy | 1.4.1 |
|     Fatigue and Training | 1.4.2 |
| Organization's Fatigue Reporting Policy | 1.5.1 |
|     Fatigue Reporting Policy | 1.5.1 |
|     Fatigue Reporting Process | 1.5.1 |
|     Abuse of Fatigue Policy | 1.5.2 |
| Flight Time and Duty Limits | 1.6.1 |
|     Atlas Flight and Duty Limitations | 1.6.1 |
|     Intermixing of Part 121 and Part 117 Operations | 1.6.2 |
|     Flight Time Limitation | 1.6.4 |
|     Flight Duty Period: Unaugmented Crew | 1.6.4 |
|     Flight Duty Period: Augmented Crew | 1.6.5 |
|     Domestic Operation | 1.6.5 |
|     Two Pilot Crew | 1.6.6 |
|     Two Pilots and One Additional Crewmember | 1.6.6 |
|     Three or More Pilots and an Additional Flight Crewmember | 1.6.7 |
|     Pilots not regularly assigned | 1.6.7 |
|     Supplemental Operations | 1.6.7 |
| Organization's Rest Scheme | 1.7.1 |
|     Rest Scheme | 1.7.1 |
|     Hotel accommodations | 1.7.1 |
|     Duty Day and Rest Requirements (Passenger Operations.) | 1.7.2 |
|     Duty Day and Rest Requirements (Cargo Operations Only) | 1.7.3 |
| Organization's Fatigue Reporting | 1.8.1 |
|     Fatigue Reporting System | 1.8.1 |
|     Data Collection | 1.8.1 |
|     Fatigue Management | 1.8.2 |

  Education and Awareness training Program................................................1.9.1
    Fatigue Training Program ........................................................................1.9.1
  Fatigue Incident Reporting Process.............................................................1.10.1
    Incident Reporting .................................................................................1.10.1
    Data Collection Sources.........................................................................1.10.1
  System for Monitoring Flight Crew Fatigue.................................................1.11.1
    Fatigue Event Reviews ..........................................................................1.11.1
    Privacy Report Policy ............................................................................1.11.1
    Fatigue Event Review ............................................................................1.11.2
    Fatigue Operational Procedures ............................................................1.11.2
  Organization's FRMP Evaluation Program .................................................1.12.1
    Evaluation Process ................................................................................1.12.1

## Preface
### List of Effective Pages

**FRMP TOC**

TOC.1.1 ........................ 13 SEP 16

TOC.1.2 ........................ 13 SEP 16

**Revision Record**

0.1.1 .............................. 13 SEP 16

0.1.2 .............................. 13 SEP 16

**Bulletin Record**

0.2.1 ..............................23 AUG 13

0.2.2 ..............................23 AUG 13

**Introduction**

1.1.1 .............................. 13 SEP 16

1.1.2 .............................. 13 SEP 16

**Senior Management Commitment**

1.2.1 ..............................23 AUG 13

1.2.2 .............................. 13 SEP 16

1.2.3 .............................. 13 SEP 16

1.2.4 .............................. 13 SEP 16

**Fatigue Management Policy and Procedures**

1.3.1 .............................. 13 SEP 16

1.3.2 .............................. 13 SEP 16

**Organization's Fatigue Call Policy**

1.4.1 .............................. 13 SEP 16

1.4.2 .............................. 13 SEP 16

**Organization's Fatigue Reporting Policy**

1.5.1 .............................. 13 SEP 16

1.5.2 .............................. 13 SEP 16

**Flight Time and Duty Period Limitations**

1.6.1 .............................. 13 SEP 16

1.6.2 .............................. 28 SEP 14

1.6.3 .............................. 28 SEP 14

1.6.4 .............................. 13 SEP 16

1.6.5 .............................. 28 SEP 14

1.6.6 .............................. 28 SEP 14

1.6.7 .............................. 13 SEP 16

1.6.8 .............................. 28 SEP 14

**Rest Scheme**

1.7.1 .............................. 13 SEP 16

1.7.2 .............................. 28 SEP 14

1.7.3 .............................. 13 SEP 16

1.7.4 .............................. 13 SEP 16

**Fatigue Reporting**

1.8.1 .............................. 13 SEP 16

1.8.2 .............................. 13 SEP 16

**Fatigue Education and Awareness**

1.9.1 .............................. 13 SEP 16

1.9.2 .............................. 13 SEP 16

**Fatigue Incident Reporting**

1.10.1 ............................ 13 SEP 16

1.10.2 ............................23 AUG 13

**Fatigue Monitoring**

1.11.1 ............................23 AUG 13

1.11.2 ............................23 AUG 13

**FRMP Evaluation**

1.12.1 ............................23 AUG 13

1.12.2 ............................23 AUG 13

**McCabe Exhibit No. "2"**
**Page 6 of 44**

Intentionally
Blank

## Preface

### Revision Record

| No. | Revision Date | | |
|------|---------------|---|---|
| 0rig | 15 OCT 10 | | |
| Rev 1 | 13 OCT 11 | | |
| Rev 2 | 31 MAY 12 | | |
| Rev 3 | 23 AUG 13 | | |
| Rev 4 | 28 SEP 14 | | |
| Rev 5 | 13 SEP 16 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## *GENERAL*

Revisions provide new or revised procedures and information. Flight Operations uses the revisions as a basis for updating this manuals. Revisions also incorporate appropriate information from previously issued bulletins, when applicable.

Revisions include a Transmittal Letter, Revision Highlights, a Revision Record and a current List of Effective Pages. Use the information on the List of Effective Pages to verify the operations manual content.

## *REVISION HIGHLIGHTS*

Pages containing revised material have revision bars associated with the changed text or illustration. Editorial revisions (for example, spelling corrections) may have revision bars with no associated highlight. Because of changes to document spacing, pages may be reprinted with no change to content and without change bars or highlights.

- 14 CFR Part 117 language has been added throughout this manual in compliance with 117 passenger operations.
- 1.1.1 - Updated language and grammar.
- 1.1.2 - Updated language and grammar. Added Fatigue Call Policy to FRMP elements.
- 1.2.2 - Updated language and grammar.
- 1.2.3 - Updated language and grammar. Content shifts from 1.2.3 to 1.2.4.
- 1.2.4 - Updated language and grammar. Content of 1.2.5 shifts up to 1.2.4 after deletion of Fatigue Reporting System from 1.2.5.
- 1.2.4 - Removed "Fatigue Reporting Policy" and relocated to 1.5.1 under "Fatigue Reporting Process".
- 1.3.1 - Updated language and grammar.
- 1.3.2 - 1.3.3 - Removed "FRMP Element Review".
- 1.4 - Added Fatigue Call Policy. Previous content shifts to 1.5.
- 1.5 - Added Fatigue Report Policy. Previous content shifts to1.6.
- 1.6.7 - Updated language.
- 1.7.3 - Updated language under "Duty Day and Rest Requirements".
- 1.8.1 - Updated language and grammar. Added Fatigue Risk Management System (FRMS) language.
- 1.8.2 - Removed Fatigue Reporting Process. Relocated to 1.5.1 - Fatigue Report Policy.
- 1.9.1 - 1.9.2 - Updated language.
- 1.10.1 - Updated language. Deleted language.

**Preface**

**Bulletin Record**

## *GENERAL*

Bulletins to provide important information to Flight crews. Bulletins are dated and numbered sequentially. Each bulletin identifies areas affected by the bulletin. Bulletins not listed in the record should be removed.

When a bulletin includes replacement pages, the included pages should be filed.

Bulletin status is defined as follows:

- In Effect (IE) – the bulletin contains pertinent information that may not be covered in the FCOM. The bulletin remains active and should be retained in the manual.

- Incorporated (INC) – the bulletin operating information has been incorporated into the FCOM. The bulletin remains active and should be retained in the manual.

### Active Bulletins

| Number | Subject | Date | Status |
|--------|---------|------|--------|
|        |         |      |        |
|        |         |      |        |
|        |         |      |        |
|        |         |      |        |

Intentionally
Blank

**Fatigue Risk Management Plan**
**Introduction** 1.1

## *INTRODUCTION*

Atlas Air, Inc. (Atlas), a Part 121 air carrier, is wholly owned by Atlas Worldwide
Holdings, Inc. Atlas operates a mixed fleet of Boeing 747 and 767 aircraft.

Atlas offers a wide range of air cargo and aircraft operating solutions that include:

- ACMI, where customers receive a dedicated aircraft, crew, maintenance and
  insurance on a long- term lease basis.
- CMI Service, for customers that provide their own aircraft (e.g., SonAir, on
  behalf of the U.S. - Africa Energy Association, and the Boeing LCF
  program).
- Express Network and Scheduled Air Cargo Service.
- Military Charters, for both cargo and its passenger service
- Commercial Airlift Review Board (CARB) approval.
- Commercial Cargo Charters.
- Passenger Charters.

The SonAir aircraft operate private charter passenger operations on a Houston –
Luanda – Houston route structure; the Department of Defense passenger service
operate under the AMC bid award system which includes a majority of the world
wide Military route structure. Flight segments are primarily long haul operations to
international airports.

Atlas operations are authorized and conducted in accordance with specific
authorizations, limitations, and procedures in the approved Operations
Specifications (OpSpec A001) and all appropriate parts of the Code of Federal
Regulations (CFR). Atlas is an air carrier operating:

- Domestic operations in common carriage pursuant to 14 CFR Part
  119.21(a)(1)
- Flag operations in common carriage pursuant to 14 CFR Part 119.21(a)(2)
- Supplemental operations in common carriage pursuant to 14 CFR Part
  119.21(a)(3)

**13 SEP 16** **1.1.1**

## *FRMP STRUCTURE*

This Fatigue Risk Management Plan (FRMP) is authorized by Operations Specifications A317 and is compliant with the requirements of FAA INFO 10017. This FRMP consists of the following elements:

1. Senior Level Management Commitment to Reducing Fatigue and Improving Flight crew Member Alertness
2. Organization's Scope and Fatigue Management Policies and Procedures
3. Fatigue Call Policy
4. Fatigue Reporting Policy
5. Flight Time and Duty Period Limitations
6. Rest Scheme
7. Fatigue Reporting System
8. Fatigue Education and Awareness Training
9. Fatigue Incident Reporting
10. System for Monitoring Flight Crew Fatigue
11. FRMP Evaluation

**Fatigue Risk Management Plan**
**Commitment to Managing and Mitigating Fatigue** 1.2

## *COMMITMENT STATEMENT*

### Company Safety Commitment

Safety is a vital component of our mission. Senior management is committed to safety and making safety excellence an integral part of all flight and ground activities through the proper establishment and support of safety policies, procedures, and programs.

All Atlas employees shall be reminded of their obligation to safety and the competitive advantage an excellent safety record brings to our operation. Accordingly, we will set safety goals and regularly review these goals to promote the highest standards.

We ask that each employee accept the responsibility to communicate any information that may affect the integrity of safety. In return, management will provide resources to ensure immediate action is taken when safety matters are identified, or unacceptable risk is discovered.

The Company and Union (IBT) agree, through the Memorandum of Understanding (MOU), that no punitive action will be taken against any employee for reporting a safety concern or event. Employees who are involved in intentional violations of regulations / policies / procedures, intentional disregard for safety, involve criminal activity, substance abuse, or who intentionally falsify, will be subjected to disciplinary action up to and including discharge.

The Fatigue Risk Management Plan (FRMP) as described in this document is an essential building block to increasing safety in our operation. As such, Atlas and its management are committed to implementing this FRMP and its processes in a timely manner.

John W. Dietrich

**Executive Vice President and Chief Operating Officer**
**Atlas Air, Inc.**

**McCabe Exhibit No. "2"**

Case Fatigue Risk Management Plan Document 31-4 Filed 10/24/17 Page 73 of 10
Commitment to Managing and Page 14 of 44
Mitigating Fatigue

## Flight Operations Safety Commitment

Atlas is committed to managing and mitigating all aspects of Crew fatigue, and utilizes every means available; ensuring Crew members are fully alert for each aspect of their assigned duties. Atlas supports a safety culture that is non-punitive, non-retaliatory, and is structured to promote the highest level of safety and compliance with all applicable policies, procedures, and regulations.

From the highest level, the Atlas Management team ensures that employees receive all necessary tools to complete missions safely and efficiently. Atlas maintains a safety culture as a set of enduring values and attitudes regarding the importance of safety, and this culture is shared by every member at every level of our organization. Safety culture is widely recognized as critical to the success of fatigue prevention and in the continuing education of these goals.

Atlas features a risk-based approach to safety management, which requires all stakeholders share responsibility for minimizing risk and increasing safety. This approach works particularly well for managing fatigue. Atlas Management has a responsibility to create a work environment that minimizes fatigue-related risk, and all employees have an obligation to ensure that time away from work is used appropriately. Spreading responsibility for fatigue risk management across the entire organization represents a significant shift in thinking. Managers and supervisors at all levels are responsible for taking prompt, consistent, and appropriate action whenever they believe an employee is not fit for duty. The action(s) to be taken are contained clearly and consistently in all documentation, including policies and procedures. The aim of all actions should be to maintain and promote the highest level of safety.

The Atlas Director of Operations is accountable for the Atlas Flight Crew Fatigue Risk Management Plan. The Atlas Fatigue Risk Management Plan (FRMP) Manager has responsibility for the oversight of the day-to-day FRMP process. **The Corporate Safety Department is responsible for risk management, corrective action follow up, quality control, compliance, and internal evaluation of the plan.**

Atlas Flight Operations is committed to establishing and promoting an open safety reporting process that allows all Crew members to report any condition, action, or process which adversely affects flight crew fatigue.

James S. Ridgway

**Senior Director, Flight Operations, Atlas Air, Inc.**
**Atlas Air, Inc.**

**McCabe Exhibit No. "2"**
Case 1:17-cv-01953-RDM   Document 31-4   Filed 10/24/17   Page 15 of 10
**Page 15 of 44**

Fatigue Risk Management Plan
Commitment to Managing and
Mitigating Fatigue

### Fatigue Program Review

Atlas utilizes Web Based Application Tool (WBAT), a comprehensive aviation safety reporting software developed in partnership with the FAA. This system design supports submission and analysis of ASAP Reports, Fatigue Reports, and Safety Assurance Reports. This reporting system, to the greatest extent possible, solicits detailed fatigue information to aid in the follow up investigation and root cause analysis of each fatigue event. The FRMP Manager working with the Fatigue Review Team (FRT) will be responsible for the initial review of all fatigue reports.

The FRMP Manager will coordinate with Flight Operations Management, the Corporate Safety Department, and the Union Safety Representative on a quarterly basis (more frequently if necessary) with the purpose of making several key decisions (e.g., report acceptance, corrective action, and recommendations for fatigue mitigation) and determinations (e.g., root cause analysis, risk assessment) during the report review process. Although the specifics of the process may vary, this fatigue review will adopt a process that is consistent from one report to the next to help ensure that each fatigue report is reviewed thoroughly.

**All reports will be evaluated for acceptance by the Corporate Safety Department.** Once a report is accepted, the FRMP Manager will then conduct a root cause analysis leading to possible corrective actions, i.e., Company recommendations or fitness for duty. All Company recommendations will be submitted to the Director of Operations.

### Safety Culture

Safety Culture or "Just Culture" is the set of enduring values and attitudes regarding safety, shared by every member of every level of an organization. It allows for all employees to openly convey any actual, potential, or perceived safety risk to a manager, supervisor, or, in the case of flight operations, the pilot in command, in a non-punitive, non-retaliatory manner. Atlas supports and strives to maintain an environment that supports a just culture. Effective safety programs are based in a company culture that integrates safety and risk management tools into every facet of the operation. Within a Company, culture shapes attitudes, beliefs and behaviors. A non-punitive reporting program for all employees is essential to the success of our "Safety Culture".

Reports are thoroughly reviewed and, if necessary, actions are taken to correct identifiable deficiencies. Atlas employees will not be exposed to discipline or enforcement for submitting "voluntary" safety reports. Communication and trust are essential elements of this culture so that our employees will continue to report perceived deficiencies and problems. The organization, to the greatest extent possible, communicates with employees about issues and corrective actions.

**McCabe Exhibit No. "2"**

Case Fatigue Risk Management Plan- Document 31-4 Filed 10/24/17 Page 75 of 10

**Page 16 of 44**

Fatigue Risk Management Plan-
Commitment to Managing and
Mitigating Fatigue

This additional level of "safety performance monitoring" that is provided within our Safety Culture generates substantial benefits beyond those provided by simple compliance with flight/duty-time regulations. For Atlas and it's Crew members, the term "safety performance monitoring" is used to cover the internal reporting mechanisms associated with all safety-related activities, including the monitoring of fatigue. The benefit this culture has brought to the Company has produced substantial returns many times over, especially considering the unique and challenging nature of Atlas operations.

All employees are encouraged to report safety-related concerns through the available reporting mechanisms. It is of particular note that all reporting systems are non-punitive in nature, subject to the following limitations:

- Must not involve intentional disregard for safety
- Must not involve intentional violation of regulations
- Must not involve criminal activity
- Must not involve substance abuse
- Must not have been intentionally falsified

This culture helps align organizational efforts toward the ultimate goal of improved safety. When employees are consulted throughout the development of the policy and are supportive of the process, we find it more likely they will take a positive, proactive approach to fatigue risk management at the individual as well as organizational levels.

Atlas management support comes from the highest level. Non-punitive employee reporting is highly encouraged, reports are thoroughly reviewed, and support and resources for appropriate corrective action(s) related to the reports must be provided. Even beyond employee reporting, this culture must be subject to constant scrutiny and adjustments by those within management responsible for oversight.

**Fatigue Risk Management Plan**
**Fatigue Management Policy and Procedures** 1.3

## *FRMP SCOPE AND FATIGUE MANAGEMENT POLICY*

### FRMP Scope and Objectives

The FRMP will utilize safety monitoring programs to detect and resolve all fatigue risk associated with flight operations. These programs will include the events as reported, operational observations, and crew input to ensure the principles of an effective Safety Program are applied to fatigue risk mitigation.

This fatigue-related data will be analyzed by the FRMP Manager / FRMC. Once data has been effectively reviewed and a decision to implement change is made, then the final step will be to implement a comprehensive fix.

The Company recognizes the shared responsibility of Management and Crew members in fatigue management. Atlas will include assessments on each fatigue-related event to ensure the true nature of the fatigue is determined and both parties are upholding their responsibilities in reducing fatigue risks.

The objectives of the FRMP are to outline Atlas's management policies and procedures for reducing the risks of flight crew member fatigue and to improve flight crew member alertness.

The goal of the FRMP is to enhance the safety of the flying operation at Atlas through flight crew fatigue awareness education/training and mitigating flight crew fatigue risk to an acceptable level.

The FRMP is applicable to all Atlas pilots and Atlas Flight Operations Management pilots.

### Fatigue Mitigation

All related Flight Operations manuals and documentation adopt the methodologies of a robust safety program that will identify and mitigate factors contributing to fatigue within our operations. The Fatigue Risk Management Plan (FRMP) will contain all required information. It will be accessible for all Company employees through the Company's web site (GlobalNet).

Fatigue process measurements as described in the applicable FAA Guidance and FRMP are used to measure and assess processes, to identify and correct problems, and to make improvements. Process measurements will be implemented where risk analysis has indicated that the likelihood and severity of a fatigue hazard resulting from failure to comply with a particular policy, procedure, or instructional/informational requirement are determined to warrant the application of a process measurement.

Risk assessment and analysis for fatigue risk will be the responsibility of the FRMP Manager and the FRMC. If at any time the likelihood and severity of a risk is identified as unacceptable, findings will be identified and listed in the safety database along with recommended corrective actions and assigned a follow-up action to ensure the findings are corrected. In addition, an analysis will be accomplished in order to identify the "root cause" of the problem while maintaining the "Just Culture" environment. If needed, the process will be modified to ensure that the root cause of the problem is corrected. Process measurements are conducted by the Corporate Safety and Internal Evaluation department, *Ref FRMP Evaluation Program.*

- Fatigue-related data sources will be evaluated for overall trends by the FRMP Manager and FRMC utilizing existing and future risk mitigation strategies.
- Fatigue will be evaluated at the same level as flight safety risk in all other operational aspects.
- All reports will be monitored by each Flight Operations Manager to ensure applicable resolutions are being implemented to satisfy the specific event.

Trends that point toward systemic fatigue risks will be immediately reviewed and evaluated using existing and future management safety practices.

## Safety Objectives

Atlas FRMP contains safety objectives and provides a definition of the fundamental approach Atlas has adopted for managing fatigue within our organization that includes:

- A fatigue policy that clearly defines our philosophical approach to safety and the performance goals currently established.
- FAA System Safety attributes and constructs.
- Safety performance measurement.
- Non-punitive disciplinary policy (within a "just culture").
- A written description of the fatigue management system elements.
- Motivate safe actions through the establishment of a dynamic corporate Safety Culture; identify fatigue hazards; monitor fatigue data feeds to validate effectiveness; and communicate the results throughout all applicable departments.

The Corporate Safety Department is tasked to fulfill the following strategic objectives and policies:

- Verify that all departments are tailored to current operations and future plans.
- Determine whether all departments have adequate resources for current operations.
- Evaluate the effectiveness of ongoing audit structures within all departments.

Atlas Flight Operations Management will enhance awareness and education regarding each crew member's responsibility to report rested and fit for duty.

**Fatigue Risk Management Plan**
**Fatigue Call Policy** 1.4

## *ORGANIZATION'S FATIGUE CALL POLICY*

### General

No Crewmember should operate a flight if, at any time, the safe outcome of the flight is in question due to fatigue. Crew members who judge their capability to be impaired by fatigue must immediately notify Crew Scheduling and they will be removed from flying duties without question.

Anticipated fatigue calls are calls in which a pilot is predicting he or she will be fatigued for a future operation. Anticipated fatigued calls are not legitimate fatigued calls. As standard, the Duty Pilot will give the pilot the choice of either being removed from his pairing and offered an adequate rest break or continuing his pairing and calling in when he or she is actually fatigued.

Crew input is essential for the growth and effectiveness of this safety program. Crew members are encouraged to call Crew Scheduling and advise when the potential for fatigue is identified. Each call will be examined closely by the Fatigue Manager to determine fatigue potential and crewing implications.

*Note: Crew members are encouraged to submit a Fatigue Report via WBAT as a supplement to each call related to fatigue.*

Upon receipt of each fatigue call, the Fatigue Review Team (FRT) and Fatigue Risk Management Committee (FRMC) will review the facts surrounding each fatigue call to determine the root cause of the problem and develop preventive actions.

### Fatigue Call Policy

When a Crew member is or becomes fatigued close-in to, during, or after a trip or training event, that Crew member must call Crew Scheduling fatigued and advise that he or she is unable to start or complete the assigned flight duty. Each fatigue call is accepted without question; Crew Scheduling will not discuss the implications to the operation or attempt to pressure the pilot to continue.

Upon completion of 10 hours of assigned rest, each Crew member will receive an email requesting he/she contact the Chief Pilot's Office for the purpose of assisting and applying corrective actions.

"Group" fatigue calls shall not be accepted. Each Crew member who is part of a Crew compliment must affirm to Crew Scheduling that he or she is unfit for duty as a result of fatigue.

### Fatigue and Training

When a Crew member is or becomes fatigued close-in or after a training event, that Crew member must call Crew Scheduling fatigued and advise that he or she is unable to start or complete the assigned training period.

---

Crew Scheduling will work with Training Scheduling to update the Crew pattern.

*Note:* *Fatigue calls days prior to a training activity (anticipated fatigue calls) are not legitimate fatigued calls.*

Each fatigue call will be accepted without question. Fatigue information will be communicated to Training Scheduling by Crew Scheduling. Training Scheduling will update the fatigued Crew member's training status.

**Fatigue Risk Management Plan**
**Fatigue Reporting Policy** 1.5

## *ORGANIZATION'S FATIGUE REPORTING POLICY*

### Fatigue Reporting Policy

After each fatigue call, the Crew member calling in fatigued shall receive an automated report requesting submission of a fatigue report. The Company requests that each Crew member calling in fatigued assist the Fatigue Review Team (FRT) and Fatigue Risk Management Committee (FRMC) in mitigating fatigue by submitting a report within 72 hours (3 days).

All reports, regardless of when they are submitted, will be accepted and reviewed by the FRMC.

### Fatigue Reporting Process

The Web-Based Analysis Tool (WBAT) is used by the Company to maintain an open communications policy for reporting fatigue and other safety-related issues. The Safety department has established a program that provides employees with a confidential safety reporting program.

All Crew members are encouraged to report fatigue occurrences via WBAT. The form can be completed by accessing the Fatigue Reporting System via Crew Corner on GlobalNet.



When submitting reports, employees can choose to either use their names or file anonymously.

The program is designed to encourage an open exchange of information in identifying hazardous situations and developing corrective actions. All fatigue reports will be received by the FRMP Manager / Fatigue Risk Management Committee (FRMC) for review and action.

## Abuse of Fatigue Policy

Fatigue calls which are determined to be in abuse of the Company Fatigue Policy shall be forwarded to the FRT. The FRT, comprised of representatives from the International Brotherhood of Teamsters (IBT), Chief Pilot's Office and Company management shall review each report and reach out to the pilot if necessary for understanding and corrective action. Fatigue report information shall be forwarded the Pilot Fatigue Program Director.

It is of particular note that all fatigue reporting systems are non-punitive in nature, subject to the following limitations:

- Must not involve intentional disregard for safety
- Must not involve intentional violation of regulations
- Must not involve criminal activity
- Must not involve substance abuse
- Must not have been intentionally falsified

**Fatigue Risk Management Plan**
**Flight Time and Duty Period Limitations** 1.6

## *FLIGHT TIME AND DUTY LIMITS*

### Atlas Flight and Duty Limitations

| Collective Bargaining Agreement (CBA) Rules | | | | | |
|---|---|---|---|---|---|
| **Atlas Flight and Duty Limitations (Part 121)** | | | | | |
| | **Duty day operating - or - Deadhead followed by operating** | **Operating followed by Deadhead** | **Duty day Deadhead only** | **Minimum Rest (release to report)** | |
| **Two Person Crew** | 14 hrs extendable to 16 hrs | 18 hrs | 20 hrs extendable 22 hrs | 10 hrs | **Duty <18 hrs** |
| **Three Person Crew** | 16 hrs extendable to 18 hrs | 20 hrs | | 12 hrs | **Duty 18 - 20 hrs** |
| **Four Person Crew** | 20 hrs extendadble to 22 hrs | 20 hrs | | 14 hrs | **Duty > 20 hrs** |
| *Note:   Trip pairing consisting solely of domestic segments shall follow minimum rest in accordance with applicable FARs.* | | | | | |

The Company will not schedule, and Crewmembers may not accept, an assignment for flight time that exceeds flight time duty period limitations of the Federal Aviation Regulations. The Company will not schedule, and a Crewmember may not accept, a rest period in violation of the Federal Aviation Regulations. Crewmembers are responsible for compliance with all Federal Aviation Regulations pertaining to flight limitations and rest requirements. Reference FAR Part 121 Subpart Q and R for cargo operations; FAR Part 117 for passenger operations.

For passenger operations Duty means any task that a Flight Crewmember performs as required by the certificate holder, including but not limited to flight duty period, flight duty, pre- and post-flight duties, administrative work, training, deadhead transportation, aircraft positioning on the ground, aircraft loading, and aircraft servicing.

For passenger operations Flight Duty Period (FDP) means a period that begins when a Flight Crewmember is required to report for duty with the intention of conducting a flight, a series of flights, or positioning or ferrying flights, and ends when the aircraft is parked after the last flight and there is no intention for further aircraft movement by the same Flightcrew. A flight duty period includes the duties performed by the Flight Crewmember on behalf of the certificate holder that occur before a flight segment or between flight segments without a required intervening rest period.

McCabe Exhibit No. "2"
Page 24 of 44

Case 1:17-cv-00955-RDM   Document 31-4   Filed 10/24/17   Page 83 of 10

Fatigue Risk Management Plan
Flight Time and Duty Period
Limitations

## Intermixing of Part 121 and Part 117 Operations

Due to the dynamic nature of our operations the Company will mix Crews occasionally between Part 121 and Part 117, even within the same trip.

The Company has worked extensively with Airline Information Management System (AIMS) to ensure the system properly applies Part 117 to passenger operations and Part 121 to cargo operations. Legalities will be applied to the each flight as follows:

- Cargo - Part 121 block time and limits will apply.
- Passenger - Part 117 block, Flight Duty Period (FDP), and Cumulative FDP/block times will apply.

Crew Scheduling will perform validations against the type of flight each Crewmember is scheduled to fly; i.e., passenger validates under Part 117 and cargo validates under Part 121. Look back limitations will be cross-applied:

- Cargo and passenger FDPs will be combined to validate the legality of passenger FDPs (cumulative limits).
- Passenger and cargo block times will be combined to validate cargo flights ("30 in 7", "32 in 7").

### Mixed Rest Rules

| | | CARGO | PASSENGER | MIXED |
|---|---|---|---|---|
| **Last Duty Away From Base** | | | | |
| **Next Duty Period(s)** | **CARGO** | Earned 121 Rest | Greater of Earned 117 Rest or Would Have Earned 121 Rest | Greater of Earned 117 Rest or Earned 121 Rest |
| | **PASSENGER** | Greater of Earned 121 Rest or Would Have Earned 117 Rest | Earned 117 Rest | Greater of Earned 117 Rest or Earned 121 Rest |
| | **MIXED** | Greater of Earned 117 Rest or Would Have Earned 121 Rest | Greater of Earned 117 Rest or Would Have Earned 121 Rest | Greater of Earned 117 Rest or Earned 121 Rest |
| | **GROUND DUTY** | Earned 121 Rest | Earned 117 | Greater of Earned 117 Rest or Earned 121 Rest |

How FDP or block hours are accumulated is not relevant; i.e., 32 in 7 is applied to a cargo flight, however the source of those 32 block hours (passenger or cargo) is not considered. Hours may be a result of only cargo, only passenger, or both.

Similarly, Cumulative FDP limits for passenger flights will be based upon the combination of Passenger and Cargo FDP to determine whether a Crewmember is legal or not legal for the upcoming passenger flight.

**McCabe Exhibit No. "2"**
Case 1:17-cv-01953-RDM   Document 31-4   Filed 10/24/18   Page 84 of 10

**Page 25 of 44**

Fatigue Risk Management Plan
Flight Time and Duty Period
Limitations

Several changes to e-Crew have been made to improve Crewmember's visibility to the new regulations. Below are some highlights of the new functionality in e-Crew:



**Black "down arrow"** points to the "**Allowable FDP**" field required for Part 117 passenger flying.

Black "horizontal arrow" points to a **"black rectangle"** containing no "Allowable FDP" information. As Cargo Operations and associated cargo deadheading are regulated under Part 121, this field remains blank.

**Blue rectangle** contains **"Allowable FDP" information for Part 117 passenger operations**.

**Green circles** indicate an **"acclimated"** pilot for Flight Duty Period (FDP) departure. Note "**19:00 Allowable FDP**" and "**IAH**" circled as **departure point** and **"location of acclimation."**

**Red circles** indicate an **"unacclimated"** pilot for Flight Duty Period (FDP) departure. Note **"Allowable FDP of 1800U."** The **"U"(red up arrow)** after the **"1800"** indicates that the pilot is **"unacclimated"** for the departure at **"LAD". "IAH"** (red circle) is the **"location of acclimation"** for this pilot. Local IAH times are used for entry into the Flight Duty Period Table to determine the maximum **"Allowable FDP."**

Case 1:16-cv-03595-JSR Document 31-4 Filed 10/24/17 Page 85 of 10

McCabe Exhibit No. "2"
Page 26 of 44

Flight Risk Management Plan
Flight Time and Duty Period
Limitations

## Flight Time Limitation

### FAR117.11

The certificate holder may not schedule and no Flight Crewmember may accept an assignment or continue an assigned flight duty period if the total time:

- Will exceed the limits specified in Table A of Part 117 if the operation is conducted with the minimum required Flightcrew.
- Will exceed 13 hours if the operation is conducted with a 3-pilot Flightcrew.
- Will exceed 17 hours if the operation is conducted with a 4-pilot Flightcrew.

If unforeseen operational circumstances arise after takeoff that are beyond the certificate holder's control, a Flight Crewmember may exceed the maximum flight time specified in paragraph (a) of this section and the cumulative flight time limits of 117.23(b) to the extent necessary to safely land the aircraft at the next destination airport or alternate, as appropriate.

Each certificate holder must report to the Administrator within 10 days any flight time that exceeded the maximum flight time limits permitted by this section. The report must contain:

- A description of the extended flight time limitation and the circumstances surrounding the need for the extension; and
- If the circumstances giving rise to the extension were within the certificate holder's control, the corrective action(s) that the certificate holder intends to take to minimize the need for future extensions.

Each certificate holder must implement the corrective action(s) reported in paragraph (c)(2) of this section within 30 days from the date of the extended flight time limitation.

## Flight Duty Period: Unaugmented Crew

### FAR 117.13

Scheduled revenue passenger flights that remain solely within the contiguous 48 states of the United States and the District of Columbia are considered to be Domestic operations and the regulations contained in Part 117 apply with regard to Flight Duty Period.

The certificate holder shall not assign and no Flight Crewmember may accept an assignment for an unaugmented flight operation if the scheduled flight duty period will exceed the limits of Table B of Part 117.

If the Flight Crewmember is not acclimated:

- The maximum flight duty period in Table B of Part 117 shall be reduced by 30 minutes.
- The applicable flight duty period is based on the local time at the theater in which the Flight Crewmember was last acclimated.

McCabe Exhibit No. "2"
Case 1:17-cv-01953-RDM   Document 31-4   Filed 10/24/17   Page 86 of 10
Page 27 of 44

Fatigue Risk Management
Flight Time and Duty Period
Limitations

## Flight Duty Period: Augmented Crew
### FAR 117.17

For flight operations conducted with an acclimated augmented Flightcrew, no certificate holder may assign and no Flight Crewmember may accept an assignment if the scheduled flight duty period will exceed the limits specified in Table C of Part 117.

If the Flight Crewmember is not acclimated:

- The maximum flight duty period in Table C of Part 117 is reduced by 30 minutes.
- The applicable flight duty period is based on the local time at the theater in which the Flight Crewmember was last acclimated.

No certificate holder may assign and no Flight Crewmember may accept an assignment under this section unless during the flight duty period:

- Two consecutive hours in the second half of the flight duty period are available for in-flight rest for the pilot flying the aircraft during landing.
- Ninety consecutive minutes are available for in-flight rest for the pilot performing monitoring duties during landing.

No certificate holder may assign and no Flight Crewmember may accept an assignment involving more than three flight segments under this section.

## Domestic Operation
### FAR 121.471

Scheduled revenue flights that remain solely within the contiguous 48 states of the United States and the District of Columbia are considered to be Domestic operations and the regulations contained in Part 121, Subpart Q, apply with regard to flight time limitations.

No Crewmember will fly more than:

- 1,000 hours in any calendar year
- 100 hours in any calendar month
- 30 hours during any 7 consecutive days
- 8 hours between required rest periods

Crewmembers will not accept a flight assignment if, during the 24 hours preceding the scheduled completion of the flight, he/she has not received at least:

- 9 consecutive hours of rest for less than 8 hours of scheduled flight time.
- 10 consecutive hours of rest for scheduled flight time over 8 hours, but less than 9 hours.
- 11 consecutive hours of rest for 9 or more hours of scheduled flight time.

These rest periods may be reduced under the following conditions:

- A 9 hour rest period may be reduced to a minimum of 8 hours if the Crewmember is given a rest period of at least 10 hours that must begin no later than 24 hours after commencement of the required rest period.

Case 1:17-cv-01953-RDM   Document 31-4   Filed 10/24/17   Page 87 of 10

McCabe Exhibit No. "2"
Page 28 of 44

Fatigue Risk Management
Flight Time and Duty Period
Limitations

- A 10 hour rest period may be reduced to a minimum of 8 hours if the Crewmember is given a rest period of at least 11 hours that must begin no later than 24 hours after commencement of the required rest period.
- An 11 hour rest period may be reduced to a minimum of 9 hours if the Crewmember is given a rest period of at least 12 hours that must begin no later than 24 hours after commencement of the required rest period.

In any case, Crewmembers will receive at least 24 consecutive hours of rest during any 7 consecutive days.

## Two Pilot Crew
### FAR 121.481

No Pilot will fly as a Crewmember more than:

- 1,000 hours during any 12-calendar-month period
- 100 hours during any one calendar month
- 32 hours during any 7 consecutive days

Crewmembers may be scheduled for 8 hours or less during any 24 consecutive hours without a rest period during these 8 hours. If a Crewmember is scheduled to fly more than 8 hours during any 24 consecutive hours, he will be given an intervening rest period at or before the end of 8 scheduled hours of flight duty. The rest period must be at least twice the number of hours flown since the last rest period, but not less than 8 hours.

If a Crewmember has flown 8 or more hours during any 24 consecutive hours, he will be given at least 18 hours of rest. In any case, Crewmembers will receive at least 24 consecutive hours of rest during any 7 consecutive days of operating.

## Two Pilots and One Additional Crewmember
### FAR 121.483

No Pilot will fly as a Crewmember more than:

- 1,000 hours during any 12 calendar month period
- 300 hours during any 90 consecutive days
- 120 hours during any 30 consecutive days

Crewmembers will not be scheduled for a total of more than 12 hours in any 24 consecutive hours. If a Crewmember has flown 20 or more hours during any 48 consecutive hours, or 24 or more hours during any 72 consecutive hours, he will be given at least 18 hours of rest. In any case, Crewmembers will receive at least 24 consecutive hours of rest during any 7 consecutive days.

McCabe Exhibit No. "2"
Page 29 of 44
Case 1:17-cv-01953-RDM   Document 31-4   Filed 10/24/17   Page 88 of 10

Flight Management Program
Flight Time and Duty Period
Limitations

## Three or More Pilots and an Additional Flight Crewmember
### FAR 121.485

No Pilot will fly as a Crewmember more than:

- 1,000 hours during any 12 calendar month period
- 350 hours during any 90 consecutive days

The Company shall schedule its flight hours to provide adequate rest periods on the ground for each pilot who is away from his base and who is a pilot on an airplane that has a crew of three or more pilots and an additional flight Crewmember. It shall also provide adequate sleeping quarters on the airplane whenever a pilot is scheduled to fly more than 12 hours during any 24 consecutive hours. Upon return to his base from any four man flight over 12 hour block time or series of flights, Crewmembers will be given a rest period that is at least twice the total number of hours he flew since the last rest period at his base. During this rest period he will not be required to perform any duties.This rule does not apply for flights scheduled for 12 hours or less (see OpSpec A005 exemption 9825).

If the required rest period is more than 7 days that portion of the rest period in excess of 7 days may be given at any time before the Crewmember is again scheduled to fly.

## Pilots not regularly assigned
### FAR 121.487

Pilots who is not regularly assigned as a Flight Crewmember for an entire calendar month under §121.483 or 121.485 may not fly more than 100 hours in any 30 consecutive days. Pilots not regularly assigned conducting passenger operations must comply with Part 117 flight duty and rest requirements as applicable.

## Supplemental Operations
### FAR 121.503-525

All cargo operations conducted under Supplemental rules of FAR Part 121 are conducted using flight and duty rest rules of FAR Part 121 as appropriate under subpart 119. Pilots conducting passenger operations shall comply with Part 117 flight duty and rest requirements as applicable.

Case 1:17-cv-00358-RDM Document 31-4 Filed 10/24/17 Page 89 of 103

Fatigue Risk Management Plan -
Flight Time and Duty Period
Limitations

**McCabe Exhibit No. "2"**
**Page 30 of 44**

Intentionally
Blank

**Fatigue Risk Management Plan**
**Rest Scheme** 1.7

## *ORGANIZATION'S REST SCHEME*

### Rest Scheme

Rest is the time a Crewmember is free from actual work or the present responsibility for work should the occasion arise. Crewmembers rest period is the time between release from the last duty period until the report for the next duty period.

A Crewmember on reserve or standby is not in rest if he has a present responsibility for work in that he has to be readily available for flight notification. Time spent in deadhead transportation to or from a duty assignment is not considered rest.

Transportation to and from lodging is included in the rest period provided the lodging is local in character. Time spent in transportation not local in character that the Company requires and provides, to and from flight assignments is not considered part of a rest period.

It is the Crewmember's responsibility to notify the Company of any circumstances that have adversely affected receiving minimum rest (e.g., excessive time clearing customs, lost luggage, transportation, lodging problems, etc). The Company will not assign, and Crewmembers will not accept, any duty during a required rest period.

- Required rest for operations under 121.471, 121.481, 121.483, 121.485, 117.13, 11715, 117.17. In accordance with Subpart 119 and applicable FARs, all Crewmembers operating Supplemental flights will rest as per Part 121, Subpart Q and R, for cargo operations.
- Crewmembers operating passenger flights will rest as specified in Part 117.25.
- Atlas provides hotel rooms for all Crew members on layover at domicile and away from domicile and all Short Call Reserve duty. CBA language dictates quality, security, and amenities for each hotel
- The Company provides Class 1 rest facilities on 747-400P, -400F, and -8 aircraft, providing maximum rest opportunities for operating crew.
- The Company provides Class 2/3 rest facilities on 767-300P and -200P aircraft, providing maximum rest opportunities for operating crew.
- Atlas provides sleep facilities at many of the major operating stations
- Hotel accommodations will be provided by the Company for all layovers and scheduled rest periods of six and a half hours or more (measured from release to report) that occur away from a Crewmember's base.

### Hotel accommodations

Hotel accommodations provided to Atlas Crewmemebers are:

- Provided on a single occupancy basis, with a private bath.

**13 SEP 16** **1.7.1**

- In a Collective Bargaining Agreement (CBA) compliant hotel where Crewmembers may obtain adequate rest.
- Located within 30 minutes travel time from the airport unless the layover time is scheduled for 24 hours or more, or no suitable hotel is reasonably available within 30 minutes.
- In an area considered safe with adequate security and fire protection.
- Within areas of general entertainment and shopping.
- Atlas provides hotel rooms for all crew members on layover at domicile and away from domicile. CBA language dictates quality, security, and amenities for each hotel.

## Duty Day and Rest Requirements (Passenger Operations.)
### Rest for Flight Crew assigned or scheduled for reserve

Hotel accommodations provided to reserve Crewmembers are provided with a CBA-compliant hotel room, including an 1:45 notification for report time.

### FAR 117.21

All reserve is considered long-call reserve unless specifically designated by the Company as airport/standby or short-call reserve. All time spent in reserve status is part of the flight duty period.

For short call reserve, the reserve availability period may not exceed 14 hours.

For a Flight Crewmember who has completed a reserve availability period, the certificate holder may not scheduled and no Flight Crewmember may accept an assignment for a reserve availability period unless the Flight Crewmember receives the required rest in Part 117.25.

For an unaugmented operation, the total number of hours a Flight Crewmember may spend in a flight duty period and a reserve availability period may not exceed the lesser of the maximum applicable flight duty period in Table B of this part plus 4 hours, or 16 hours, as measured form the beginning of the reserve availability period.

For an augmented operations, the total number of hours a Flight Crewmember may spend in a flight duty period and a reserve availability period may not exceed the flight duty period in Table C of this part plus 4 hours, as measured from the beginning of the reserve availability period.

For long call reserve, if a certificate holder contacts a Flight Crewmember to assign him or a her to a flight duty period that will begin before and operate into the Flight Crewmember's window of circadian low, the Flight Crewmember must receive a 12 hour notice of report time from the certificate holder.

A certificate holder may shift a reserve Flight Crewmember's reserve status from long call to short-call only if the Flight Crewmember receives a rest period as provided in Part 117.25.

### FAR 117.25

No certificate holder may assign and no Flight Crewmember may accept assignment to any reserve or duty with the certificate holding during any required rest period.

Before beginning any reserve or flight duty period a Flight Crewmember must be give at lease 30 consecutive hours free from all duty within the past 168 consecutive hour period.

If a Flight Crewmember operating in a new theater has received 36 consecutive hours of rest, that Flight Crewmember is acclimated and the rest period meets the requirements of paragraph (b) of this section.

If a Flight Crewmember travels more than 60° longitude during a flight duty period or a series of flight duty periods that require him or her to be away from home base for more than 168 consecutive hours, the Flight Crewmember must be given a minimum of 56 consecutive hours of rest upon return to home base. This rest must encompass three physiological nights rest based on local time.

No certificate holder may schedule and no Flight Crewmember may accept an assignment for any reserve of flight duty period unless the Flight Crewmember is give a rest period of at least 10 consecutive hours immediately before beginning the reserve or flight duty period measured from the time the Flight Crewmember is released from duty. The 10 hour rest period must provide the Flight Crewmember with a minimum of 8 uninterrupted hours of sleep opportunity.

If a Flight Crewmember determines that a rest period under paragraph (e) of this section will not provide eight uninterrupted hours of sleep opportunity, the Flight Crewmember must notify the certificate holder. The Flight Crewmember cannot report for the assigned flight duty period until he or she receives a rest period specified in paragraph (e) of this section.

If a Flight Crewmember engaged in deadhead transportation exceeds the applicable flight duty period in Table B of Part 117, the Flight Crewmember must be given a rest period equal to the length of the deadhead transportation but not less than the required rest in paragraph (e) of this section before beginning a flight duty period.

### Duty Day and Rest Requirements (Cargo Operations Only)

CBA Section 12 and FARs govern all Atlas duty day and rest requirements for passenger and cargo operations. Atlas CBA duty day and rest limitations are as follows:

- Day/Night, Domestic or International (2-Man) – 14 extendable 16 hours
- Day/Night, International (3-Man) – 16 extendable 18 hours
- Day/Night, International (4-Man) – 20 extendable 22 hours
- Domestic Rest as per 121.471
- International Rest – 12 hours block to block (10:00 release to report)

- Minimum Rest Period shall be extended by one (1) hour; if any duty period is extended by sixty-one (61) minutes, the Minimum Rest Period shall be extended by two (2) hours).
- Scheduling of flight crews, ensures each flight crew member is relieved from all duty for at least 24 consecutive hours during any seven consecutive days
- Atlas provides sleep facilities at many of the major operating stations and the CBA language requires a hotel room for any ground time greater than 6:30.
- Atlas Maximum monthly duty days – 17

**Rest for Flight Crew assigned or scheduled for reserve**

Hotel accommodations provided to reserve Crewmemebers are provided with a CBA-compliant hotel room, including an 1:45 notification for report time. A 24-Hour free from duty is given for more than six consecutive days on reserve.

A Crewmember shall not be assigned to more than sixteen (16) consecutive hours of R-2 status.

Short Call Reserves are given defined schedules of reserve periods with at least 8 hours rest every 24 hours.

**Rest for augmented Flight Crew**

- Atlas requires a relief pilot on all flights over eight hours block time.
- Atlas requires two relief pilots on all flights over 12 hours block time.
- Class 1 rest facilities exist on 747-400P, -400F, and -8F aircraft, providing maximum rest opportunities for operating crew.
- Class 2/3 rest facilities exist on 767-300P and -200P aircraft, providing maximum rest opportunities for operating crew.

**Fatigue Risk Management Plan**
**Fatigue Reporting** 1.8

## *ORGANIZATION'S FATIGUE REPORTING*

### Fatigue Reporting System

Incorporating fatigue related data from current programs such as ASAP, ASRS, and the WBAT system will enable the Crew members to have full reporting capability. We plan to utilize the WBAT for the purpose of data collection tools to process and categorize all fatigue-related reports.

Data Collection will include but not be limited to:

- Physical symptoms
- Fatigue symptoms
- Rest/Sleep information
- Job performance
- Time zones crossed
- Geographical considerations
- Commuting
- Diet

### Data Collection

Data collected from the FRMP process will be stored/archived and used to pursue an Fatigue Risk Management System (FRMS) when needed.

Data will be used in the fatigue process measurements to measure and assess processes, to identify and correct problems, and to make improvements. Process measurements will be implemented where risk analysis has indicated that the likelihood and severity of a fatigue hazard resulting from failure to comply with a particular policy, procedure, or instructional/informational requirement are determined to warrant the application of a process measurement.

Atlas will provide a separate fatigue event report that will be made available to the crew members to report instances of fatigue.

- Administration of these events will utilize the same methodology supported by the WBAT Fatigue Reporting system.
- The Atlas FRMP Manager / FRMC will be tasked with evaluating each report and determining an appropriate comprehensive fix and resolution.
- Instances of fatigue resulting from lack of responsibility by a Crewmember to report rested for duty will be reviewed by the FRMC.

All Crew members reporting fatigue will be required to complete an event fatigue report. This will allow Corporate Safety personnel and the FRMP Manager / FRMC to capture all factors relating to flight crew fatigue.

## Fatigue Management

The data from the fatigue reporting system is used to evaluate the effectiveness of the program and develop policies and/or procedures to amend fatigue mitigation strategies as necessary. The systematic process of the Fatigue Risk Management Program conducts detailed analysis of fatigue-related events to determine the root cause. The Atlas FRMP Manager / FRMC shall oversee all fatigue event reviews and shall have primary responsibility for the making root-cause determinations.

**Fatigue Risk Management Plan**
**Fatigue Education and Awareness Training** 1.9

## *EDUCATION AND AWARENESS TRAINING PROGRAM*

### Fatigue Training Program

The Atlas Fatigue Education and Awareness Program should be a comprehensive educational program administered to all Company employees responsible for administering the provisions of Part 117.9 including:

- Flight Crewmembers
- Dispatchers
- Individuals directly involved in the scheduling of Flight Crewmembers
- Individuals directly involved in operational control
- Employees providing direct management oversight of those areas

For Crewmembers, frequency of training will be provided during initial, transition, and upgrade training and annually thereafter within the Flight Operations Training Manual (FOTM) and other applicable Company manuals. These fatigue-training modules will be presented in ground school using the Company's Distance Learning System (CPaT) and delivered on an annual basis.

Training for ground employees is provided annually via CPaT.

The education and awareness-training program should include the following subject areas:

- Review of FAA flight, duty, and rest regulatory requirements.
- Awareness of fatigue
- Atlas Air's Fatigue Management Program and the FRMP program itself, including fatigue-related policies and procedures, and the responsibilities of management and employees to mitigate or manage the effects of fatigue and improve flight crew member flight deck alertness.
- The basics of fatigue, including sleep fundamentals and circadian rhythms.
- Causes of fatigue.
- Fatigue awareness.
- The effects of fatigue relative to pilot performance.
- Fatigue countermeasures, prevention, and mitigation.
- The influence of lifestyle, including nutrition, exercise, and family life, on fatigue.
- Familiarity with sleep disorders.
- The effects of fatigue as a result of commuting.
- Pilot responsibility for ensuring adequate rest and fitness for duty.
- The effects of operating through multiple time zones.
- Operational procedures to follow when one identifies or suspects fatigue risk in oneself or others.

McCabe Exhibit No. "2"
Case Fatigue Risk Management RDM Document 31-4 Filed 10/24/17 Page 97 of 10
Page 38 of 44

Fatigue Risk Management
Fatigue Education and
Awareness Training

- Incorporate lessons learned regarding the effects of fatigue and mitigation initiatives relative to Atlas operations.

- Use a methodology that continually assesses the effectiveness of the training program.

Fatigue awareness and education training is updated every two years and submitted to the Administrator for approval and acceptance.

The goal of the Atlas fatigue program is to enhance the safety of flight operations through Flight Crew fatigue awareness education and training, thereby mitigating Flight Crew fatigue risk to an acceptable level. Management at all levels is committed to safety and making safety excellence an integral part of all flight operations.

**Fatigue Risk Management Plan**
**Fatigue Incident Reporting** 1.10

## *FATIGUE INCIDENT REPORTING PROCESS*

### Incident Reporting

The FRMP Manager will input the report information into the applicable database and task the responsible department(s) to address the issue(s), usually within a 15-day time period of the FRMC. This can be accomplished either by a corrective action taken to correct the issue, or by initiating a corrective action plan with a time line indicating when the issue will be corrected. However, depending on the nature of the problem (and with the approval of the department head), more time can be allotted. If a corrective action plan is provided and the issues are not time critical, the follow-up date will normally be adjusted to reflect the completion date of the corrective action plan.

When received, the FRMP Manager will input all corrective actions into the database and will close the report. The FRMP Manager will notify the individual who submitted the report, primarily by WBAT, regarding the report status if the follow-up date is changed and the corrective action taken when the report is closed.

### Data Collection Sources

Atlas will utilize all available reporting systems to identify fatigue. ASAP, ASRS, and the WBAT system will be used to monitor and forward fatigue-relevant data to the FRMP Manager / FRMC for evaluation.

The Corporate Safety Department will ensure safety concerns are addressed, corrective actions are implemented, and education of appropriate parties is accomplished to prevent a re-occurrence of the same type of event.

The Corporate Safety Department will review all events and disseminate the pertinent data to the applicable departments as required.

Intentionally
Blank

**Fatigue Risk Management Plan**
**Fatigue Monitoring** 1.11

## *SYSTEM FOR MONITORING FLIGHT CREW FATIGUE*

### Fatigue Event Reviews

The Atlas fatigue investigation process collects relevant information such as the schedule leading up to the fatigue report, the actions of the employee to obtain rest, subjective and objective evidence of fatigue, environmental conditions that may have exaggerated or contributed to fatigue, relevant health or medical conditions, specific actions related to the incident, and communications prior to and during the event.

The data from this reporting system is used to evaluate the effectiveness of the program and develop policies and/or procedures to amend fatigue mitigation strategies as necessary. The systematic process of the Fatigue Risk Management Program conducts detailed analysis of fatigue related events to determine the root cause. The FRMP Manager / FRMC shall oversee all fatigue investigations and shall have primary responsibility for making root cause determinations.

### Privacy Report Policy

Atlas's Fatigue Management Program has internal protection as to the privacy and methods of protecting the employee from adverse action from the company. The systematic process of the Fatigue Management Program is designed to collect relevant information such as the schedule leading up to the fatigue report, the actions of the employee to obtain rest, subjective and objective evidence of fatigue, environmental conditions that may have exaggerated or contributed to fatigue, relevant health or medical conditions present, specific actions related to the incident, and communications prior to or during the event.

The identity, or information revealing the identity, of any Crewmember who reports a fatigue event to the FRMP Manager, FRMC or Corporate Safety will not be disclosed unless agreed to by the employee, or required by law.

The Corporate Safety Department retains all appropriate records electronically. Records are typically identified by unique control numbers; however, records may also be identified by other means such as by date, crew member name, issue, etc. Care will be taken to ensure all information entered into the electronic database will be legible and easy to understand. An individual will be identified, typically the Director of Safety, who has the over responsibility to maintain the record database as appropriate to ensure appropriate procedures are followed and ensure accuracy of content. Retrieval of information is easily accomplished using typical database retrieval procedures; however, to ensure proper protection and security of records, only safety employees have access to the record database.

## Fatigue Event Review

### Root Cause Analysis

It is necessary for the FRMP Manager to explore the root cause of a fatigue report or incident. Root cause analysis helps identify what, how, and why an event occurred, thus preventing recurrence. The FRMP Manager shall consider the four basic characteristics of the root cause that forms the basis for the root cause analysis process:

- Root causes are specific underlying causes.
- Root causes are those that can reasonably be identified.
- Root causes are those management has the ability to fix.
- Root causes are those for which effective recommendations for preventing recurrences can be generated.

If, at any time, a fatigue event review results in the discovery of negative findings, the findings will be identified and listed along with recommended corrective actions in the audit database and assigned a follow-up to ensure the findings are corrected. The FRMP Manager shall use the Atlas root cause analysis process to identify, fix, and prevent re-occurrences.

## Fatigue Operational Procedures

Current Atlas accountability practices within the Flight Operations Manual (FOM) “Duties and Responsibilities” paragraphs, SIEM, CBA, and FARs will be used to identify and resolve fatigue-related risk factors from Atlas operations.

**Fatigue Risk Management Plan**
**FRMP Evaluation** 1.12

## *ORGANIZATION'S FRMP EVALUATION PROGRAM*

### Evaluation Process

The Corporate Safety Department has the operational responsibility for safety programs and internal evaluation of those programs for effectiveness. The Internal Evaluation program includes the following principles:

- A continual process incorporating the techniques of inspections, audits, and evaluations to assess managerial controls in key programs and systems.
- A review that extends beyond regulatory compliance to determine deficiencies and detect needed improvements to company operating practices before deficiencies occur.
- An ongoing function that identifies deficiencies, develops corrective actions, and performs follow-up evaluations.
- An independent function that has straight-line reporting responsibility to top management.

The Corporate Safety Department, in conjunction with the ongoing evaluations performed by each technical department and the involvement of all company employees, will fulfill these principles.

The FRMP Manager / FRMC, working with the Corporate Safety Department, is ultimately responsible for ensuring that risk factors detected by the FRMP are remedied. Both have the responsibility to ensure that any areas perceived as ineffective within the FRMP are highlighted and corrected.

By regulation, the FRMP must be reviewed and re-submitted every 24 months.Prior to that re-submittal, a complete review by the Corporate Safety Department will be conducted to ensure that the FRMP is operating effectively. Any changes to the FRMP will be handled through the revision process, and all stakeholders will be provided an opportunity to review those changes as the program is implemented.

Intentionally
Blank