**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATLAS AIR, INC. and POLAR AIR CARGO WORLDWIDE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224, <br><br> Defendants. | Civil Action No. 1:17-cv-01953-RDM |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

Plaintiffs Atlas Air, Inc. ("Atlas Air") and Polar Air Cargo Worldwide, Inc. ("Polar") (collectively, "Atlas" or the "Company") seek injunctive relief under Section 2, First of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA") against IBT, IBT, Airline Division, and Local 1224 (collectively, the "Union").  Based on the evidence presented, and the legal arguments set forth in the parties' memoranda of law, the Court makes these Findings of Fact.[1]

## I.    THE PARTIES

### A.    Plaintiffs Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc.

1.    Atlas Air and Polar are commercial air carriers headquartered in Purchase, New York, with domestic and international operations.  (PX-122 ¶ 3 (Dkt. No. 5-3).)  Atlas Air and Polar are owned by the same parent corporation, Atlas Air Worldwide Holdings, Inc. ("AAWW").  (*Id.*)  AAWW also owns Southern Air, Inc. ("Southern").  (*Id.*)  Atlas Air and Polar are "common carriers by air" as defined in the Federal Aviation Act of 1958, and each is a "carrier by air" subject to Title II of the RLA, 45 U.S.C. § 181.  (*Id.*)

2.    Atlas offers both outsourced aircraft and aviation operating services and chartered passenger operations.  (*Id.*)  Atlas serves a broad range of customers and locations in nearly twice as many countries as the typical large U.S. passenger carrier.  (PX-124 ¶ 9 (Dkt. No. 5-103).)  Over the last 12 months, Atlas operated flights to 427 different airports in over 100 different countries.  (PX-122 ¶ 7.)

3.    The majority of Atlas' cargo transportation services are provided on a contracted "ACMI" basis whereby Atlas provides the Aircraft, Crew, Maintenance, and Insurance, and customers are responsible for providing the cargo to fill the aircraft.  (PX-122 ¶ 4; Tr. Vol 2

---

[1] The Court held a hearing on Plaintiffs' preliminary injunction motion from October 31 to November 2, 2017.  The October 31, 2017 Hearing Transcript is abbreviated as "Tr. Vol. 1"; the November 1, 2017 Hearing Transcript is abbreviated as "Tr. Vol. 2"; and the November 2, 2017 Hearing Transcript is abbreviated as "Tr. Vol. 3."  Citations to Defendants' exhibits are abbreviated as "DX."

51:5-9.)  Atlas transports time-sensitive products and equipment for customers worldwide, such

as express and e-commerce products, fresh fruit, fish, flowers, and other perishables, drilling and

excavation equipment, pharmaceuticals, and livestock.  (PX-122 ¶ 4.)  Atlas has been the largest

provider of commercial airlift in the wide-body cargo segment for the United States Military Air

Mobility Command for the last seven years.  (*Id*.)  Atlas also specializes in mobilizing and

supporting humanitarian efforts and in transporting college and professional sports teams.  (*Id*.)

4.      Since 2010, Atlas' operations have expanded significantly in both scale and

scope.  (*Id*. ¶ 5.)  Atlas' business, which has historically focused on long-haul intercontinental

flights using B-747 aircraft for a variety of commercial customers, has grown to include a North

American domestic market of highly-scheduled, time-definite network flying on B-767 aircraft

for some of Atlas' most significant customers in their hub and point-to-point operations, such as

DHL, Amazon, UPS, and FedEx.  (PX-122 ¶¶ 5-6; Tr. Vol. 2 52:11-18.)  Over 70% of Atlas'

aircraft now serve the express and e-commerce markets, and express and e-commerce package

flights accounted for approximately half of the Company's flights in 2017.  (PX-122 ¶ 6.)  In

2016, Atlas began flying aircraft for Amazon under the "Prime Air" livery, and Atlas' business

with Amazon is scheduled to grow from seven aircraft currently to 20 by the end of 2018.  (*Id.*)

As a result of Atlas' rapid growth in the express and e-commerce markets, Atlas now effectively

operates two different networks:  (1) Atlas' traditional long-haul, intercontinental network for

customers such as Qantas, Cathay Pacific, and Nippon Cargo Airlines; and (2) a shorter-haul

domestic network centered around Atlas' B-767s, serving Amazon's and DHL's point-to-point

and hub operations.  (*Id.* ¶¶ 5-6; PX-124 ¶ 11.)

5.      In recent years, Atlas has moved towards customers with more predictable

scheduling needs.  (Tr. Vol. 2 53:17-21.)  Atlas' long-haul international business has "added

customers that are bigger, more established" with "scheduled flying versus ad hoc." (*Id.*) The express and e-commerce markets also add predictability to scheduling. (*Id.* 52:23-25.) As Captain Jeffrey Carlson, Atlas' Senior Vice President of Flight Operations, testified, this makes it easier for Atlas to build schedules "that become much more reliable in terms of holding their integrity. You know when they're going to start, you know when they're going to end. So that adds a level of operational reliability when you have that." (*Id.* 54:23-55:3.)

6.      Unlike commercial carriers, where pilots are routed from their hub to a single destination and then back to the hub, the unique nature of Atlas' business and customer base means that Atlas' aircraft and crewmembers are often away from their base for over a week when out flying. (PX-124 ¶ 14.) The decentralized nature of Atlas' operations makes Atlas and its customers more vulnerable to flight disruptions than passenger carriers. (*Id.*) If a pilot cannot fly his scheduled flight, the nearest replacement may be a continent away, and Atlas may need to transport him to the departure location via commercial or charter transportation. (PX-122 ¶ 8.) This can cause substantial disruption and delays in Atlas' operations. (*Id.*)

7.      Atlas' customers depend on cargo arriving at the day, time, and place they requested. (*Id.* ¶ 9.) This is particularly true for Atlas' express and e-commerce customers like DHL and Amazon that require time-definite services to meet the expectations of their own customers. (*Id.*) Packages must be timely delivered so they can be quickly sorted and re-loaded onto other flights transporting them to their final destinations. (*Id.*) Thus, any disruption in Atlas' operations can impact a sequence of other flights, customers, and the public. (*Id.*)

8.      September through December constitutes the peak season for Atlas and its customers. (*Id.* ¶ 10.) During these four months, particularly November and December, imports, new product releases, and holiday deliveries significantly increase the amount, volume, and

time-sensitive nature of Atlas' flying.  (*Id.*)  Atlas expects this peak season to be particularly

busy due to the growing express and e-commerce markets, where customers expect to receive

their orders as quickly as possible.  (PX-125 ¶ 14 (Dkt. No. 26); *see also* Tr. Vol. 3 16:7-16.)

### B. Defendants IBT; IBT, Airline Division; and Local 1224

9.      IBT is the certified collective bargaining representative of the Atlas pilots under

the RLA.  (PX-122 ¶ 11.)  Local 1224 is the local collective bargaining agent designated by IBT

through its Airline Division to represent the Atlas pilots.  (*Id.*)  Local 1224, which oversees day-

to-day pilot labor relations with Atlas, is managed by the Atlas Pilots Executive Council ("Atlas

ExCo").  (PX-122 ¶ 12.)  The current Atlas ExCo Chairman, Captain Robert Kirchner, was

elected in November 2014.  (*Id.*)  He serves as the leader of the Atlas pilot group and represents

that group on the Local 1224 Executive Board.  (*Id.*)  The Atlas ExCo Communications

Chairman is Captain Michael Griffith.  (*Id.*)

10.      The Union communicates with Atlas pilots on a regular basis through a variety of

methods.  (DX-002 ¶ 25.)  When Captain Kirchner took office in January 2015, he emphasized

the need to communicate with crewmembers effectively, and worked with his colleagues to

develop a new communications strategy.  (*Id.*)  The new strategy included a podcast called

"Atlas Teamsters Action Message" ("ATAM"), which is produced and narrated by Captain

Griffith.  (*Id.*)  The Union also hosts "Crew Calls," which are telephone sessions in which Union

representatives report on significant events and take questions from crewmembers, and sends out

emails to the Atlas pilot group, including "Chairman's Updates" from Captain Kirchner.  (*See,

e.g.*, PX-013; PX-020; PX-023.)

## II.      HISTORY OF COLLECTIVE BARGAINING BETWEEN THE PARTIES

11.      Atlas and the Union are parties to a collective bargaining agreement ("CBA") (the

"Atlas CBA") governing the rates of pay, rules, and working conditions of the Atlas pilots.  (PX-122 ¶ 13.)  The Atlas CBA became effective on September 8, 2011, and became amendable on September 8, 2016.  (*Id*.)  Under the RLA, a CBA remains in effect until it is amended by an agreement of the parties.

12.     On December 5, 2014, shortly after he was elected the new Chairman of the Atlas ExCo, Captain Kirchner made a proposal to Atlas on behalf of the Union to re-open the Atlas CBA earlier than the amendable date for the purpose of implementing pay and benefit increases for the pilots.  (*See* PX-127; Tr. Vol. 2 59:24-60:6, 60:13.)  Captain Kirchner testified that he was "watching the trends in the industry" and "felt that with the large gap in compensation and retirement -- in all the areas between this low level Atlas contract, it was going to [be] a great exodus from the airline."  (Tr. Vol. 3 54:16-21.)  Captain Kirchner acknowledged that when he presented his proposal to the Company, "Mr. Dietrich [Atlas' COO] took it as a contract opener." (*Id*. 55:12-13; *see also* Tr. Vol. 2 59:4-60:4, 60:15-21)  Atlas was not required to reopen the contract early, however, and declined to do so at that time.  (Tr. Vol. 2 60:15-21.)

13.     After Captain Kirchner took office and presented Atlas with a bargaining proposal to open negotiations for a new CBA in December 2014, the Union issued communications to its members in which it tied success in achieving a better CBA to strict compliance with the current CBA.  For example, on December 10, 2014, Captain Kirchner told pilots in a Chairman's Message:  "What can the pilot group do to help us better our lives and careers?  The answer is simple; follow the CBA and enforce it strictly . . . We cannot expect a better CBA if we can't live up to and enforce this one."  (DX-038.)  Captain Kirchner further stated that "unless everyone is 100 percent onboard we all will fall short."  (*Id.*; Tr. Vol. 2 61:23-62:23.)

14.     Similarly, in the inaugural ATAM released on January 15, 2015, Captain Kirchner

told pilots: "all of us will need to band together to achieve what is long overdue here." (PX-137 4:20-22.) Captain Griffith also said: "And only you, the membership -- working in solidarity with the EXCO -- will create the unstoppable leverage we need to demand the industry-leading CBA we deserve." (*Id.* 6:17-20.) The Union issued other similar messages in 2015. (*See, e.g.*, DX-039-DX-041.)

15.     While Captain Kirchner testified that he advocated strict CBA compliance during a dinner conversation with Captain Carlson in October or November 2014 (DX-002 ¶ 22), Captain Kirchner did not tell Captain Carlson this would result in a Union directive to change pilots' behavior under the CBA on a concerted basis so as to disrupt operations and impose leverage in collective bargaining. (Tr. Vol. 2 56:9-58:14.)

16.     In January 2016, the parties began direct negotiations for an amended CBA. (PX-122 ¶ 13.) Under the RLA, either party to a CBA may initiate bargaining for an amended CBA by issuing a written notice to the other party pursuant to Section 6 of the RLA, 45 U.S.C. § 156. The Union did so on February 16, 2016. (PX-122 ¶ 13.)

17.     Shortly before the Union sent Atlas its Section 6 notice, on January 19, 2016, AAWW announced its agreement to acquire Southern Air Holdings, Inc., the corporate parent of Worldwide Air Logistics Group, Inc., which in turn owned two subsidiary air carriers, including Southern. (*Id.* ¶ 14.) The acquisition was completed on April 7, 2016, and Atlas and Southern are in the process of being integrated. (*Id.*; Tr. Vol. 2 100:5-7.)

18.     The crewmembers of Southern are also represented by the Union. (PX-122 ¶ 14.) Southern and the Union are parties to a CBA (the "Southern CBA") governing the rates of pay, rules, and working conditions of the Southern pilots. (*Id.*) The Southern CBA became effective on November 6, 2012, and became amendable on November 6, 2016. (*Id.*) The Union sent

Southern a Section 6 notice in February 2016 as well, formally indicating its desire to negotiate a new CBA applicable to Southern pilots.  (*Id*.)

19.    In or around March 2016, Atlas and Southern informed the Union that the carriers wished to bargain for a joint CBA applicable to a combined group of both the Atlas and the Southern pilots.  (PX-122 ¶ 15; DX-002 ¶ 14.)  Atlas and Southern asserted that, pursuant to the merger provisions of the CBAs, the parties were required to commence negotiations for a joint CBA and any issues unresolved would be submitted to binding interest arbitration.  (Tr. Vol. 2 100:8-21.)  The Union disagreed with this interpretation of the CBAs' merger provisions, and contended that negotiations for separate CBAs for the Atlas and Southern pilots should continue without use of the interest arbitration procedure specified in the CBAs' merger provisions.  (DX-002 ¶ 14A; Tr. Vol. 2 100:22-101:5.)

20.    After the Union refused to engage in negotiations for a joint CBA according to the merger provisions in the CBAs, Atlas and Southern each filed management grievances, seeking arbitration before an RLA board of adjustment regarding the question of whether the CBAs' merger provisions applied.  (Tr. Vol. 2 100:8-21.)  The Union refused to submit these grievances to arbitration.  (Tr. Vol. 2 100:11-21.)  Accordingly, Atlas and Southern filed an action in the United States District Court for the S.D.N.Y. seeking to compel the Union to arbitrate the question of whether the CBAs' merger provisions applied in the current circumstances.  (Tr. Vol. 2 100:8-21.)  That litigation is currently ongoing.  (*Id*. 24:1-4.)

21.    Although Captain Kirchner testified that Atlas has been attempting "to avoid arms-length negotiations with its pilots and the Union" (DX-002 ¶ 19), the evidence indicates otherwise and this testimony cannot be credited.  Notwithstanding the ongoing dispute over the management grievances, since October 2016, Atlas and the Union bargained over the process the

parties would follow to negotiate a post-merger joint CBA.  (Tr. Vol. 3 13:10-15.)  In June 2017, the parties agreed to the Negotiation Process to Facilitate Completion of Collective Bargaining Negotiations (the "Protocol Agreement"), in which the parties agreed to "conduct all negotiations based on mutual respect and trust."  (PX-122 ¶¶ 15, 189.)

22.     After the parties agreed to the Protocol Agreement, the Union issued a communication to pilots describing negotiation of the Protocol Agreement as "a positive step" that "enables the parties to move forward with direct negotiations in a manner that is fair for all and that protects everyone's interests."  (PX-128; Tr. Vol. 2 101:6-102:12).  The Union told its members that "the negotiation process now in place greatly enhances the likelihood that we will indeed succeed in reaching an agreement through direct negotiations."  (PX-128.)  Pursuant to the Protocol Agreement, negotiations for a joint CBA began on July 6, 2017, and have continued to the present time.  (PX-122 ¶ 15.)

## III.     THE UNION'S SLOWDOWN CAMPAIGN

### A.     Direct Encouragements By The Union To Pilots To Slow Down The Operation In Order to Exert Leverage In The Parties' Collective Bargaining Negotiations

**The Union Has Communicated To Pilots To Change Their Status Quo Behavior**

23.     Building on its communications from December 2014 and over the course of 2015, shortly after the Union served its RLA Section 6 notice on Atlas in February 2016, the Union's communications campaign intensified.  The Union's publications for the first time included references to "BOOT," or "block out on time," and "SHOP," or "stop helping out Purchase" (where Atlas is based).  (*See* Tr. Vol. 2 63:18-64:2; PX-009 22:6-7; PX-102 23:15-19.)  The BOOT campaign encouraged pilots not to depart early, but to wait until departure time, even if the aircraft is loaded and ready.  (PX-122 ¶ 28.)  The "SHOP" campaign encouraged pilots to strictly enforce the CBA and not help Atlas in any way not required by the Atlas CBA.

(PX-009 21:22-22:18.)  In many of these communications, the Union expressed how crewmembers following these directives and others, and acting in a concerted manner, would give the Union leverage in collective bargaining negotiations.  For example, during a February 2, 2016 Crew Call, Captain Kirchner said:  "Remember, everybody.  When you're out there doing your job, you're also at the negotiating table . . . Every time you up hold the CBA and every time you make them do their job and deliver for you, you won."  (PX-099 10:15-11:1.)

24.      Indeed, Captain Kirchner and others from the Union made similar statements in Union communications throughout 2016 and 2017 explicitly telling pilots to "stop" their status quo behaviors on a concerted basis to give the negotiating committee "leverage."  For example:

- During the February 15, 2016 ATAM, Captain Griffith said, "[a]re you going to continue to sell your talents for a quick buck, or are you going to stop doing the Company favors and follow the CBA to the letter and give your EXCO and Negotiation Committee the leverage and power they need today?"  (PX-008 1:17-21.)

- In his June 2, 2016 Chairman's Message, Captain Kirchner wrote, "[i]t will be a long struggle that will not be won overnight.  I call on each and every one of you to commit to a long battle.  Our time is now!  If you decide to be a spectator, you will regret it for the rest of your career.  Let's back up our recent 99.6% strike vote with a solid 100% proactive participation to get our rightful CBA.  It is long overdue here at Atlas Air, and even more so at Southern Air.  Strict, strict, strict contract compliance is the first step."  (PX-017.)

- During the September 15, 2016 Crew Call, Captain Kirchner said, "no excuses anymore . . . for not abiding by what we have set up for you.  None.  Zero . . . This could get done in a real hurry if everybody starts marching lockstep and stops doing everybody's job for them, like hotels, like scheduling, like maintenance and just pretending that—that, oh, they didn't know or this excuse or that excuse . . . Everybody knows what our stance is, and everybody knows what's going on here . . . So the more in line you are, the better and the faster this is going to happen.  It all comes down to brass knuckles pressure."  (PX-104 5:18-7:4.)

- During the March 15, 2017 ATAM, Captain Griffith told pilots, "[t]hat's where you, choosing as an individual to act as a group of individuals moving as one to create solidarity that gives your Union, our Union, the leverage it needs to go up against these people to either force their hand to do the right things, or to negotiate the right thing if they ever get in the mood to negotiate.  So it's time to redouble our efforts as individuals . . . By following your contract, by doing what you're scheduled to do these things will make us successful and bring us victory at the end of this road."  (PX-050 19:11-19, 20:3-6.)

- During the May 15, 2017 ATAM, Captain Griffith said:  "I'm not even going to go into the

favors some of you out there continue to do to make a buck now instead of pulling on the rope with the rest of us to make even better money tomorrow via a new and industry standard CBA . . . The group that votes to follow the CBA and not their individual wallets is a good one." (PX-058 17:15-19, 18:4-5.)

25.     The Union's intent to gain leverage in collective bargaining negotiations by encouraging pilots to strictly comply with the CBA and otherwise stop helping out Purchase is evidenced by the Union's repeated claims that the slowdown campaign is effective.  For example, in the August 15, 2016 ATAM, Captain Griffith told pilots to "[b]e all in.  Follow the CBA.  And shop every chance you get when you're at work because, it's working."  (PX-015 22:22-23:2.)  On the December 15, 2016 Crew Call, Captain Kirchner stated:  "Keep up the good work, keep up the pressure.  Strict contract compliance.  All In.  All of that stuff is having a big effect, and we have got to keep the train rolling."  (PX-106 24:3-6.)  Similarly, during the June 8, 2017 Crew Call, Captain Kirchner said, "the leverage we have is that the airline is falling apart . . . They can't run their business without giving us an industry standard contract.  It's simple . . . The PR campaign, they don't like that.  The fact that the crew members are shopping and just doing their job and so on and so forth, it's all coming to bear."  (PX-112 2:1-21.)

26.     While the Union contends that it has instructed pilots not to engage in illegal activities (DX-002 ¶ 25), these scattered statements were dwarfed by the more than 100 communications instructing pilots to engage in a concerted slowdown, in the form of ATAMs, Crew Calls, CBA Chats, Chairman's Updates and other Union emails, and tweets from Captain Griffith and Giant Comms, a handle run by "a group of professional Pilots at Atlas & Southern Air."  (*See* PX-122 ¶¶ 45-152; PX-126 ¶¶ 4-32 (Dkt. No. 27-2).)  The Union's instructions through slogans such as "strict contract compliance," "follow the CBA," "be safe," and "all in" were intended by the Union and understood by pilots to signal that pilots should engage in conduct that would disrupt operations and cause flight delays.

27.     Indeed, Atlas' pilots have recognized the Union's communications as a call to arms and have expressly encouraged a concerted slowdown in various pilot online forums.  For example, in February 2016, right when the slowdown campaign intensified, one pilot wrote: "However we need to be realistic here.  Plenty of other ways to frustrate the company during negotiations that don't set the union up for a work action lawsuit . . . Key word that everyone has been saying is fly the contract, nothing more nothing less."  (PX-006 at 003.)

**Retaliation Against Non-Compliant Pilots**

28.     The communications demonstrate that the Union has directed pilots to change their behavior on a concerted basis with no tolerance for individual pilot choice.  For example, on the September 15, 2016 Crew Call, Captain Kirchner said:  "As far as getting some of these bad apples . . . Some of these people identified for CBA transgressions and stuff like that, we are looking at several proposals right now to start putting people's names out who are constant contract violators and so on and so forth . . . The most important part of that is for everybody to know who these people are if and when we do and not have dinner with them, not socialize with them, and basically ostracize them.  Peer pressure is a powerful tool."  (PX-104 12:16-13:9.)

29.     One month later, on a November 2016 Crew Call, Captain Kirchner said:  "When you see a bad apple, call them out, call him or her out.  Peer pressure is the greatest, greatest way to keep people in line."  (PX-105 17:1-3.)  Captain Kirchner also said the Union was "looking at some disciplinary measures against a couple of the bad apples."  (*Id*. 19:12-14.)  During an April 14, 2017 Crew Call, Captain Kirchner referred to scab lists, stating:  "There probably eventually will be a certified list, okay, of some kind.  Whether it's a don't go out to dinner with these guys list or a full-fledged scab list, we will see as we proceed."  (PX-109 2:15-20.)  Captain Kirchner then told pilots:  "There will be an accounting at the end of this of everybody and where they

stood, whether they were fence sitters, whether they were sympathizers for the enemy, if you will, or whether they were good, solid union members." (*Id.* 3:4-8.)

30.     Crewmembers have complained to Atlas that threats and intimidation from other Union members are preventing them from doing their jobs effectively.  (*See, e.g.*, PX-080 ("I am not sure if you are aware of the 'BOOT' program that is being promoted by the union . . . We are being told that we should not release the brakes until scheduled block out time even if we are ready to leave before . . . it is keeping me from getting my ship, crew and freight on the way as soon as I can.").)  Several of the pilot complaints included scab lists, which identify pilots who take on additional flying.  (*See, e.g.*, PX-081.)

**Threats By The Union To Atlas' Fourth Quarter**

31.     The Union has expressly communicated that it intends to increase its slowdown efforts during Atlas' busy peak season this year.  For example, in the June 23, 2017 Chairman's Update, Captain Kirchner said:  "YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire.  We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY.  YOU must not only honor the CBA every day and on every flight, but also hold management accountable."  (PX-063.)  Captain Griffith used the exact same rhetoric in the June 30, 2017 ATAM.  (PX-064 4:4-9.)  And during the August 31, 2017 ATAM, Captain Griffith said that if Atlas did not put "real money" into the CBA during upcoming contract negotiations, it "will not be good for their fourth quarter."  (PX-075.)

**B.     Concerted Changes In Pilot Behavior**

**Increased Short Notice Sick Calls**

32.     At the direction of the Union, pilots are calling out sick on short notice.  For example, during the February 9, 2016 Crew Call, Captain Kirchner told pilots:  "The dangers of

having crew members fly sick are unbelievable." (PX-100 31:6-13.) In a September 17, 2017 email, the Union said: "As we find ourselves in the midst of a period of increased friction and hostility, we remind everyone to make absolutely certain that you are fit for duty each and every time you report to work. Please, do not fly sick or fatigued. All In, Every Day." (PX-076)

33.     Atlas has experienced a statistically significant increase in short notice sick calls since the fall of last year, as confirmed by the analysis of Dr. Darin N. Lee, Ph.D., Atlas' expert witness. Between January 2013 and February 2016, on average 14.4% of pilot sick calls occurred on short notice. (PX-124 ¶ 17, Ex. 5.) The highest monthly proportion during that time was 20.7% in November 2014. (*Id*.) Between October 1, 2016 and September 20, 2017, however, the proportion of pilot sick calls occurring on short notice increased to 23.8%. (*Id*.) Moreover, since February 2016, there have been 10 months with at least 20.7% of sick calls occurring on short notice. (*Id*.) The probability of there being 10 such months with this "outlier" rate of short notice sick calls occurring randomly is ***less than one-in-one billion***. (*Id*. ¶ 19; *see also* Tr. Vol. 1 121:9-122:11.) Furthermore, when comparing short notice sick calls year-over-year, the percentage of sick calls made on short notice has increased 10 percentage points, from 13.8% to 23.8%, while the percentage of sick calls occurring at least two days in advance has declined 12.9 percentage points, from 44.5% to 31.6%. (PX-124 ¶ 18, Ex. 6.)

34.     The Union's expert, Daniel W. Akins, did not credibly undermine any of Dr. Lee's statistical analyses regarding short notice sick calls or any other metric. Mr. Akins did not perform a statistical analysis to determine whether there has been *a change* in any measure tested by Dr. Lee since the Union sent its RLA Section 6 notice. And when Dr. Lee controlled for the specific concerns raised by Mr. Akins, Dr. Lee's conclusions across the board were strengthened. (PX-136 ¶ 16, Ex. 4; Tr. Vol. 1 117:15-118:7, 141:20-25.)

35.     The Union argued that Dr. Lee did not account for all of the possible causes of the rise in short notice sick calls because he did not show a statistically significant increase in overall pilot sick calls.  (DX-003 at 29-30; Tr. Vol. 3 112:25-113:21.)  But Atlas is not claiming that there has been an increase in overall pilot sick calls, and Dr. Lee clearly showed that the proportion of sick calls occurring on short notice has dramatically increased, while the percentage of sick calls occurring at least two days in advance has proportionally declined.  (PX-124 ¶ 18, Ex. 6; PX-136 ¶ 19; Tr. Vol. 2 181:25-182:9.)  Dr. Lee demonstrated that, regardless of whether there has been an overall increase in sick calls, there has been a statistically significant change in *when* pilots are calling in sick that has negatively impacted Atlas' operations.  (PX-124 ¶ 18, Ex. 6; PX-136 ¶¶ 19-20; Tr. Vol. 2 181:25-182:9.)

36.     Given the decentralized nature of Atlas' network, "the way in which pilots . . . call in sick can dramatically affect whether or not that particular sick call is going to cause an operational disruption," even if the overall levels of pilot sick calls are not statistically elevated. (Tr. Vol. 1 121:6-8.)  As Captain Carlson testified, short notice sick calls, where a pilot calls in sick on the same day he is scheduled to fly, are particularly damaging to Atlas because there is less time for the Company to find an available substitute pilot and the flight is more likely to take a delay.  (Tr. Vol. 2 64:19-65:6.)  There can then be successive or "knock on" delays that "could extend that flight into a delay status for several days until it catches up."  (Tr. Vol. 2 65:24-66:5.)

37.     Mr. Akins also testified that Dr. Lee's conclusions, including as to short notice sick calls, were unreliable because he failed to account for Atlas' growth, the increased complexity of its operations, and other stressors such as increasing number of departures or increased time away from base that could reasonably affect pilot behavior.  (DX-003 at 17, 30-32.)  Not only did Dr. Lee demonstrate that Mr. Akins' analysis of time away from base was

highly misleading because of the artificially compressed vertical axis (PX-136, Ex. 2), he also showed that when Mr. Akins' "simple" regression is corrected for flaws (such as measuring the absolute number of short notice sick calls rather than as a rate), the proportion of short notice sick calls is statistically significant since the Union sent its RLA Section 6 notice—even after controlling for the average number of flights per day flown by Atlas' pilots (a factor Mr. Akins specifically identified as being a potential cause for the increased rate of short notice sick calls). (PX-136 ¶ 20, Ex. 6.)

**Increased Fatigue Calls**

38.     Under Atlas' policies, as well as FAA regulations, a pilot is obligated to advise the Company if, in his honest opinion, safety will be compromised due to fatigue if he flies as scheduled.  (*See* Tr. Vol. 2 76:20-22; PX-122 ¶ 22.)  But the Union has expressly encouraged pilots to call out fatigued in order to disrupt Atlas' operations even if not legitimately fatigued. On February 2, 2016, for example, a member of the Atlas ExCo said during a Crew Call, "if you are fatigued, call in fatigued.  Do not worry about the consequences.  You will be pay protected for those . . . funds that you're out.  You're not going to lose the money."  (PX-099 7:18-21.) Similarly, on November 23, 2016, during a CBA Chat, the Union instructed pilots scheduled for reserve flying to "[t]ake your time because that's your time for you to be safe . . . . [d]o not be afraid to call fatigued . . . . As always, it is safety first."  (PX-033 7:5-6, 8:12-16.)

39.     Between July 2014 and January 2016, Atlas averaged only 5.7 fatigue calls per 1,000 active pilots on a monthly basis.  (PX-124 ¶ 21, Ex. 7; Tr. Vol. 1 124:4-9.)  Since the Union sent its Section 6 notice, the rate of fatigue calls nearly tripled to 16.3 fatigue calls per month per 1,000 active pilots.  (PX-124 ¶ 21, Ex. 7.)  Prior to early 2016, the highest observed monthly fatigue rate was 17.8 calls per 1,000 pilots.  (*Id.*)  The monthly fatigue rate has exceeded

17.8 in eight of the last 18 months.  (*Id.*)  The probability of there being eight or more outlier

months since the Union sent its Section 6 notice is ***less than one-in-600,000***.  (*Id.*)

40.     None of Dr. Lee's conclusions with respect to fatigue were credibly disputed by

Mr. Akins.  For example, Mr. Akins testified that pilot fatigue calls have been increasing since

early 2015 and there was "an obvious and well established trend in pilot behavior" that predated

the Union's Section 6 notice.  (DX-003 at 35-36.)  Thus, according to Mr. Akins, there was no

relationship between the alleged pilot actions and Atlas' poor operational performance.  (*Id.*)  Dr.

Lee credibly explained, however, that none of Mr. Akins' calculations (including his analysis of

fatigue) involved any statistical analysis of whether there had been *a change* in pilot behavior.

(Tr. Vol. 2 25:2-18.)

41.     Dr. Lee also credibly indicated that Mr. Akins used a single variable regression

model in reaching his conclusions about pilot fatigue that did not allow Mr. Akins to account for

multiple potential causes behind the increase in the number of fatigue calls.  (Tr. Vol. 1 140:5-

20.)  Mr. Akins looked only at the relationship between *the number of* pilot fatigue calls and *the*

*number of* Atlas departures.  (DX-003 at 39.)  As a result, the only conclusion that can be drawn

from Mr. Akins' analysis is that as Atlas' operations have grown, the number of fatigue calls

have increased, but that says nothing about whether *the rate* of those fatigue calls has changed.

(Tr. Vol. 1 140:21-141:11; PX-136 ¶ 21.)  In Ex. 7 of his rebuttal report, Dr. Lee corrected Mr.

Akins' calculation and analyzed the fatigue calls on a standardized rate basis in order to account

for Atlas' growth.  (Tr. Vol. 1 123:17-124:4; PX-136 ¶ 21, Ex. 7.)  Dr. Lee credibly testified that

the analysis "reinforces the proposition . . . that after the Section 6 notice was sent fatigue calls

went up in a statistically significant manner."  (Tr. Vol. 1 142:4-13; PX-136 ¶ 21, Ex. 7.)

42.     Furthermore, contrary to Mr. Akins' speculation that fatigue began trending

upward in 2015 for reasons unrelated to pilot behavior (DX-003 at 35-36), Dr. Lee performed an additional regression analysis that confirmed that the increase in fatigue calls from 2014 to 2015 was the result of increased flying by pilots.  (*See* PX-140, showing that the variable measuring whether fatigue calls in 2015 were statistically elevated after controlling for the amount pilots were flying (*i.e.*, D(2015)) was *statistically insignificant*.)  This conclusion is consistent with Captain Carlson's testimony that Atlas used a significant amount of open time in the summer of 2015.  (Tr. Vol. 2 82:20-24.)

43.     Mr. Akins also posited that pilots may be calling in fatigued at higher rates because they are away from base during "days on" more often than the historical practice at Atlas.  (DX-003 at 22.)  But as Dr. Lee demonstrated, Mr. Akins artificially compressed the vertical axis of his chart and failed to show any trend before 2015.  (PX-136 ¶ 13; Tr. Vol. 1 137:8-22.)  When the chart is corrected by starting the vertical access at zero and expanding the time frame in accordance with standard practices, there is no evidence to support Mr. Akins' contention, and it becomes clear that the "change" he referenced was, in fact, an extremely common fluctuation in the data.  (PX-136 ¶ 13; Tr. Vol. 1 138:11-139:6.)

44.     Dr. Lee testified that monthly block hours per pilot is a standard measure used to determine pilot utilization, and that the average amount of block hours per pilot is "a little bit lower since the Section 6 notice than the historical base period."  (*Id.* 125:1-4, 125:16-19.)  He credibly added that "regardless of whether one measures Atlas's pilot utilization by the average number of pilot block hours per month, the number of days worked per pilot per month or the number of flights per pilot per month, there is no evidence to support Mr. Akins' assertion that 'Pilots Are Flying Less But Working More.'"  (PX-136 at 11.)

45.     The Union also argued that Atlas is suffering from a pilot shortage that explains

the increase in fatigue calls and other operational disruptions.  (DX-003 at 25.)  But as Dr. Lee

credibly showed, there is no evidence Atlas has too few pilots to perform their duties.  (PX-136 ¶

12.)  Dr. Lee testified that "because Atlas is a growing company, if they haven't been able to hire

enough pilots to fly the schedule as they expand their business, one would expect to see the

average amount of block hours flown by the pilots that they do have be increasing over time."

(Tr. Vol. 1 125:23-126:9.)  But what the data actually shows is that "the average block hours per

pilot has been flat if not a little bit down since the union sent its Section 6 notice which means

that they're able to hire and train enough pilots to fly their operations."  (*Id.* 126:10-14.)

46.     The Union also attempted to explain the increase in fatigue calls by pointing to an

alleged increase in Atlas' hiring from regional carriers.  According to the Union, many of Atlas'

new pilots have never worked for a cargo carrier and thus are more likely to become fatigued

because they are not familiar with the rest requirements applicable to cargo carriers.  (Tr. Vol. 3

147:13-148:14.)  The Union, however, did not present any statistical evidence supporting this

conclusion, and Atlas presented direct evidence to the contrary.  For the six months ending

August 2017 (a period when there were at least 15 fatigue calls per 1,000 pilots each month), the

proportion of fatigue calls by pilots hired after January 1, 2015 was 41.8%, even though this

cohort accounted for approximately 50% of Atlas pilots according to the Union.  (PX-141.)

47.     Furthermore, there is no evidence that cargo flying operations make pilots more

likely to become fatigued.  Indeed, in deciding that cargo carriers should remain subject to the

rules in 14 C.F.R. Part 121, rather than new rules imposed in 2014 in 14 C.F.R. Part 117, the

FAA determined that the fatigue issues for Part 121 cargo carriers did not warrant the heightened

regulation of Part 117.  *See* Preamble to Flightcrew Member Duty and Rest Requirements, 77

Fed. Reg. 330 (Jan. 4, 2012).  The FAA relied on comments from entities in the cargo airline

industry that "all-cargo carriers regularly operate around the world in all directions with extended overseas routings, not with quick overnight turns at foreign destinations.  This results in a lower aircraft utilization rate than domestic passenger operations.  According to the industry commenters, these types of nighttime and around-the-world operations are the norm for all-cargo carriers."  *Id.* at 336.  The FAA found that Part 117 "would create far smaller benefits for all-cargo operations than it does for passenger operations.  Consequently, the FAA is unable to justify imposing the cost of this rule on all-cargo operations."  *Id.*

48.     Atlas also demonstrated that it has not made any material changes to its fatigue training program since early 2014, when the program took effect, and it has been training pilots in fatigue matters since approximately October 2010—both outside the slowdown period.  (Tr. Vol. 1 159:14-160:4; Tr. Vol. 2 81:7-14.)  As Dr. Lee testified, he did not consider changes to the fatigue program in his regression analysis because "the FAA's fatigue mitigation and the company's fatigue program had been in place well before the start of the base period used in [his] regression analysis" and "one only needs to control for changes."  (Tr. Vol. 1 159:15-18.)

49.     The Union did not offer any evidence regarding what changes were made to the fatigue program, how those changes would lead to an increase in fatigue calls, or why the fatigue calls would have spiked in 2016 and not at some other point in response to changes in the training program.  While Captain Kristofer Lang testified that the fatigue training program was made more robust in 2017 (Tr. Vol. 3 96:14-17), such changes would not explain the 2016 spike, and Captain Carlson testified that the changes involved mitigation of fatigue, which would not increase the number of fatigue calls.  (Tr. Vol. 2 80:2-12, 159:20-160:2.)

50.     Finally, the report from Dr. Terry von Thaden submitted by the Union is not relevant.  Dr. von Thaden states that "[d]etermining whether a fatigue call is or is not legitimate

requires an analysis of factors currently beyond the scope of the most highly recognized fatigue

scientists in the world" (DX-033 at 22-23), but Dr. Lee's report analyzed the number of fatigue

calls *in the aggregate*, not individually, and the idiosyncratic factors pointed to by Dr. von

Thaden average out when analyzing aggregate data.  (PX-136 ¶ 22 n.58.)

**Increased Refusals To Accept Open Time**

51.     Pilots have further disrupted Atlas' operations by not accepting, on a concerted

basis, "open time" flying.  (*See* PX-124 ¶ 6; Tr. Vol. 1 118:15-119:20.)  The majority of Atlas'

flights are staffed through a bidding process that occurs each month where pilots bid on flights

based on seniority.  (PX-122 ¶ 25.)  In addition to these regularly-awarded trips, Atlas also has a

number of open time flights each month, which arise when, for example, new flights are added to

the schedule, or a previously scheduled flight requires a replacement crew.  (*Id*.; Tr. Vol. 2 82:4-

14.)  Under status quo conditions, many Atlas pilots volunteer for open time assignments at a

rate that has allowed Atlas to cover its scheduled flying because open time trips pay a premium.

(*Id.* 82:20-83:2, 202:9-17; PX-122 ¶ 26.)

52.     The Union has encouraged pilots to stop accepting open time.  (*See* Tr. Vol. 2

203:7-21; PX-122 ¶¶ 51, 76.)  For example, in the July 10, 2017 Crew Call, Captain Kirchner

said, "if you look at Atlas right now and the open time coming up and the service failures, it's

literally a house of cards ready to come crashing in."  (PX-113 3:22-4:3.)  He then said, "[w]e're

watching some trips cancel[led], some trips delayed.  You are all watching a huge amount of

open time.  There's -- unfortunately some of our pilots are falling over backwards to help them

out of a jam so on and so forth.  But I don't think it's a large amount."  (*Id*. 6:8-14.)

53.     Between January 2015 and February 2016, fewer than 5% of open time trips were

left unfilled in any given month.  (PX-124 ¶ 24.)  By comparison, since February 2016, there

have been 11 months where more than 5% of open time trips have gone unfilled.  (*Id*.)  In

December 2016, 42% of open time trips were unfilled.  (*Id*.)  Further, the percentage of Atlas

pilots who have placed themselves on the volunteer list for open time flying or elected to pick up

open time flying on their days off started decreasing in February 2016 and reached its lowest

level in several years between "Black Friday" and Christmas 2016.  (*Id.* ¶ 69.)  While crew

schedulers made on average 1.5 calls per open time trip in 2015, since September 2016 it has

taken on average three calls per open time trip to find a volunteer.  (*Id.* ¶ 23.)

54.     The Union argued, unpersuasively, that the increase in the number of open time

trips is reflective of the pilot shortage Atlas is allegedly facing and not related to any concerted

activity by the pilots.  (DX-002 ¶ 27C.)  Dr. Lee, however, presented evidence showing that the

number of open time trips Atlas has been offering is well below what it offered in 2015 (when

Atlas was a smaller airline).  (PX-136 ¶ 33, Ex. 8.)  Moreover, Dr. Lee showed that Atlas' pilot

headcount has increased at a faster pace than its fleet growth.  (PX-124 ¶¶ 24, 26.)  As a result, in

all but one month since February 2016, pilots' average block hours have been below the average

from January 2013 - January 2016.  (*Id*. ¶ 27.)  In general, pilots are flying less now than they

have in the past.  (PX-136, Ex. 1; *see also* Tr. Vol. 1 145:21-146:9.)  In addition, there is no

sound basis for the Union's contention that less available open time would result in a lower

proportion of such premium pay trips being picked-up.  (PX-136 ¶ 32.)

**Increase In Pilots Blocking Out On Time (BOOT)**

55.     As part of its slowdown campaign, the Union has encouraged pilots to block out

on time.  (PX-122 ¶ 28.)  For example, during the November 16, 2016 Crew Call, Captain

Kirchner told pilots: "First of all the Block Out On Time program that's a safety program.  With

all of these long duty days and the way they are bending and pushing the FARs blocking out on

time is the only way you can make sure that you are legal in a lot of cases.  And it is very effective in many ways but primarily making sure all of our people are legal." (PX-105 7:21-8:6.)  Similarly, during the March 22, 2016 Crew Call, Captain Griffith said: "And remember, we are out there shopping.  We are Shopping.  Stop helping out Purchase.  Do your Job.  Follow the CBA, and don't block out early.  Block out on time.  That's what kind of airline we are." (PX-102 23:15-19.)  In the April 12, 2016 CBA Chat, the Union said:  "And this is all about shopping . . . we're asking everybody—your EXCO is asking you to not block out early, ever, period.  Period, ever." (PX-014 18:19-22, 20:19-21.)

56.     Every flight has what is known as an estimated time of departure ("ETD"), which is the time that is communicated by Atlas to pilots as the latest time a flight is expected to block out.  (PX-122 ¶ 29.)  Atlas' Flight Operations Manual allows a pilot to depart 15 minutes or less ahead of schedule without seeking permission and more than 15 minutes ahead of schedule if the pilot obtains permission from the Global Command Center following a legality check.  (Tr. Vol. 2 84:4-17, 85:8-18.)  Prior to February 2016, Atlas pilots regularly exercised their authority and discretion to leave early or seek permission to do so when the cargo was loaded and all safety checks had been performed.  (PX-124 ¶¶ 30, 32; Tr. Vol. 1 127:24-128:3; Tr. Vol. 2 84:25-85:3.)

57.     Indeed, before February 2016, nearly 80% of Atlas' flights blocked out prior to their ETD.  (PX-124 ¶ 30, Ex. 12; Tr. Vol. 1 174:24-175:4.)  After February 2016, however, only approximately 34% of flights blocked out when loaded and ready prior to ETD.  (PX-124 ¶ 30, Ex. 12; Tr. Vol. 1 128:9-13.)  Further, Dr. Lee showed that, after controlling for other factors, such as weather, pilot utilization, and fleet age, the proportion of flights departing *exactly* at ETD has increased by 31.9 percentage points since February 16, 2016, while the proportion of flights departing after ETD has increased by only 3.1 percentage points.  (PX-124 ¶ 39, Ex. 14; Tr. Vol.

1 120:13-19, 128:13-19, 129:13-20.)  Dr. Lee determined that the proportion of daily flights that blocked out exactly at the ETD has been well above the upper 99% confidence threshold on 93% of days since February 16, 2016 (*i.e.*, 543 of 582 days), and every day since April 9, 2016.  (PX-124 ¶ 41, Ex. 15.)  Dr. Lee credibly concluded that the likelihood of these changes occurring randomly "is a virtual impossibility (*i.e.*, **far less than one-in-one billion**)."  (*Id.* ¶ 41.)

58.     Because the BOOT campaign is directly aimed at changing pilots' behavior *at departure*, "the relevant measure to be looking at to assess the BOOT campaign isn't its arrival time," as the Union contends, but the time pilots are blocking out.  (Tr. Vol. 1 166:4-9.) Therefore, Dr. Lee correctly examined the impact of this change in behavior by measuring the proportion of Atlas' flight that *depart* before, exactly at, and after their ETD.  (*Id.*)

59.     As a result of the BOOT campaign, Atlas has experienced a widespread and pervasive increase of 6.3 minutes in the **average** delays for flights across its entire fleet.  (PX-124 ¶ 58, Ex. 23.)  These delay increases, in the aggregate, have a significant impact on Atlas' operations, and were statistically significant at the 99% confidence level.  (*Id.*)  With respect to BOOT, Dr. Lee testified that in his "20 years of experience analyzing changes in behavior by pilots," he had "never seen anything that is as obvious and as statistically demonstrable in terms of a change of behavior that is almost like a light switch being turned on."  (Tr. Vol. 1 176:6-10.)

60.     BOOT deprives Atlas of significant operational benefits.  (PX-122 ¶ 30; Tr. Vol. 2 85:21-86:21.)  Prompt departures prior to ETD provide a buffer that helps to ensure a timely, smooth operation and make it more likely that a flight will arrive at its destination early or on time even if it experiences unexpected delays due to weather, maintenance needs, or air- or ground-based congestion.  (PX-122 ¶ 31; Tr. Vol. 2 86:2-14.)  In addition, the faster the aircraft gets off the ground, the more time Atlas has to address any maintenance items that may arise

upon arrival at the next station, and prompt departures reduce airport and hub congestion for

Atlas' customers.  (PX-122 ¶ 31.)  These benefits are particularly important for customers who

base their package sort operations on a hub philosophy in which banks of aircraft fly in to unload

at one location (up to 120 at a time), and then the same aircraft wait for the outbound freight to

be loaded before departing back out to their respective spokes.  (*Id.* ¶ 32.)

61.     The Union failed to explain the pilots' dramatic change in behavior in February

2016 with respect to blocking out, despite repeated attempts to do so.  (*See* Tr. Vol. 3 76:2-15,

153:24-155:3; DX-002 ¶ 27D.)  First, the Union was unable to point to any legitimate reason for

it to encourage pilots to block out on time.  While Captain Kirchner and Captain Daniel Wells,

President of Local 1224, each tried to explain the BOOT campaign as a safety measure, they

were unable to point to any safety issue tied to blocking out early.  (*See* DX-002 ¶ 27D; Tr. Vol.

3 76:2-79:1, 152:8-159:24.)  Captain Wells claimed in response to a question from the Court that

flights were not leaving early because Atlas was hiring many new pilots who took longer to

prepare an aircraft for departure.  (Tr. Vol. 3 155:15-156:3.)  Not only is this not supported by

any evidence, but this explanation cannot be credited and is belied by the many Union

communications promoting BOOT as a method by which to disrupt the operation in an effort to

influence collective bargaining.

62.     Second, the Union's contention that the BOOT campaign has no impact on Atlas'

operations cannot be credited.  (DX-002 ¶ 27D.)  The Union would not spend so much time

promoting the BOOT campaign unless the Union expected it to have an impact on Atlas'

operations.  (Tr. Vol. 3 28:15-20.)  Third, Captain Kirchner's contention that Atlas could simply

change an aircraft's ETD if it wanted a flight to depart at a different time (DX-002 ¶27D) is

irrelevant to the question of why pilots are changing their behavior.  (*See* Tr. Vol. 1 175:10-

176:5.)  Atlas is not required to change its departure times due to a change in pilot behavior that is motivated by a desire to slow down Atlas' operations.  (*See also* Tr. Vol. 2 87:22-88:3.)

**Increased Maintenance Write Ups**

63.     The Union has encouraged pilots to increase the frequency at which they write up maintenance issues.  (PX-122 ¶ 38; Tr. Vol. 2 209:2-7.)  On July 28, 2017, in the Chairman's Update, for example, Captain Kirchner wrote:  "On the maintenance front a very serious situation maybe occurring which I want all of you to recognize.  The union is trying to verify reports we have received of multiple maintenance problems including poorly done repairs and mechanics at outstations asking pilots not to write up items in essence 'carrying maintenance items' from leg to leg.  These actions, if true, are very dangerous and are not to be condoned.  Please do not engage in this unsafe behavior."  (PX-069.)  Captain Griffith echoed this message in the August 31, 2017 ATAM when he told pilots: "Do not accept shoddy maintenance.  Do not carry write-ups from station to station.  Be safe.  Don't fly with inadequate or ill prepared equipment.  And hold the line."  (PX-075 18:12-15.)

64.     The rate of pilot maintenance write ups has increased since February 2016.  (PX-124 ¶¶ 45-46.)  The pilot write-up rate for maintenance issues has increased by 43.4% on Atlas' 767 fleet and by 10.3% on its 747 fleet after controlling for other factors systematically correlated with maintenance discrepancies.  (PX-124 ¶ 46, Ex. 17.)  Atlas' expert analysis accounted for the average age of Atlas' fleet, so the increase in maintenance write-ups cannot be attributed to the fact that Atlas is allegedly flying older aircraft.  (PX-124 ¶ 45.)  In addition, while Mr. Akins speculates that "the number of mechanical write-ups by pilots increased in 2016" and "it is plausible that mechanical write-ups normally reported by mechanics got reported instead by Atlas pilots" (DX-003 at 63), he provides no evidence for this assertion, and

the change in pilot behavior is consistent with unyielding directives from the Union throughout 2016 and 2017 to take all actions to exert pressure on Atlas.  (PX-136 ¶ 34.)

**Increased Actions To Stop Helping Out Purchase (SHOP) And Refusals To Fly Due To Catering Issues**

65.     The Union has also more generally encouraged pilots to "SHOP."  By telling pilots to "Stop Helping Out Purchase," the Union is directly telling pilots to change their status quo behavior by *stopping* their previous efforts to "help out" Atlas.  For example, during the March 31, 2016 ATAM, Captain Griffith told crewmembers, "we're going to be focusing on crews and individuals who rise above the daily incompetence of headquarters and score a win for the crew force by SHOPing.  What is SHOPing, you say?  Well, it stands for Stop Helping Out Purchase.  And when we do this one thing, requiring some judgment on your part, and strictly following the CBA, it emphasizes to management how important and valuable a well-compensated and highly motivated crew force can be to enhancing their operations and customer satisfaction."  (PX-012 10:9-19.)

66.     This general admonition to not go above-and-beyond in any manner—even though pilots normally did so during the status quo period—is evidenced in part by the refusal to fly aircraft with catering issues.  (PX-122 ¶¶ 39-42; Tr. Vol. 2 89:3-13.)  The Union has prompted such behavior with communications such as a February 7, 2017 publication called "Catering Reminders," in which it told pilots:  "As airline crew members YOU have the obligation per the FAA to be fit for duty.  PRIOR TO BLOCKING OUT, ensure that the meals are contract compliant.  Those who operate long legs and long duty days without proper nourishment or sufficient caloric intake, are potentially subject to low blood sugar levels, a recognized cause of pilot fatigue . . ."  (PX-043.)  Similarly, in the August 31, 2017 ATAM, Captain Griffith told pilots:  "Catering is continuing to deteriorate.  Reject it if it's inadequate.

26

Reject it if it's not fresh.  Reject it if it's not enough.  Order more. The Union and Bob Kirchner

personally has your back on this." (PX-075 19:13-17.)

68.     Historically, when a crewmember encountered a catering issue, he would file a

report to alert Atlas and potentially file a grievance regarding the issue, but would rarely take a

delay.  (PX-122 ¶ 40; Tr. Vol. 2 89:3-17.)  Since February 2016, however, there has been a spike

in the number of pilots refusing to fly due to catering complaints, even though Atlas has

maintained the same guidance and requirements for its catering vendors.  (PX-122 ¶ 41; Tr. Vol.

2 88:24-89:6.)  The Union's contention that pilots changed their behavior because an Atlas Chief

Pilot told the Union that pilots could no longer file grievances regarding catering (DX-034 ¶ 4) is

contradicted by the evidence.  Indeed, not only did Captain Carlson credibly testify that there is

no such policy, nor could there be because the right to file a grievance is provided by the Atlas

CBA, but pilots have in fact filed grievances regarding catering in 2016 and 2017 that have been

processed by Atlas.  (Tr. Vol. 2 89:24-94:1; PX-129 - PX-135.)  Thus, the Union's slowdown

campaign is the only viable explanation for this behavioral change.

**Increased Prolonged Delays Due To Crew Actions**

68.     As a result of the pilot slowdown, Atlas has experienced an increase in prolonged

delays in excess of six hours.  (PX-124 ¶ 52, Ex. 20; Tr. Vol. 1 131:8-132:2.)  These delays have

resulted in "a statistically significant erosion in the company's operations that can't be explained

by other potential explanations or random statistic variation."  (Tr. Vol. 1 119:18-20; PX-124 ¶

52.)  Since December 2016, the proportion of Atlas' flights experiencing prolonged delays of at

least six hours has increased by over 70% from 1.4% to 2.4% compared to the period before the

Union sent its Section 6 notice.  (PX-124 ¶ 52; Tr. Vol. 1 131:8-22.)  While there was no

noticeable increase in the months immediately following the Section 6 notice, prolonged delays

began to rise during Atlas' busy fourth quarter.  (Tr. Vol. 1 131:12-19.)  The increase in prolonged delays was even more pronounced in Atlas' military operation, where the rate of prolonged delays increased from 1.5% to 4%.  (PX-124 ¶¶ 53, 56; Tr. Vol. 1 133:13-22.)  Atlas' statistical analysis shows that the changes in pilot behavior have resulted in approximately 380 prolonged delays over and above what would have been expected if the status quo was maintained.  (PX-124 ¶ 56.)

69.     Although the Union attempted to argue that Dr. Lee overstated the effect of the slowdown on prolonged delays by measuring the change in prolonged delays since December 2016, rather than including all months since the February 2016 Section 6 notice, Dr. Lee credibly explained that the December dummy variable captures the effect of more recent changes in fatigue calls, short notice sick calls, and an unwillingness to pick up open time that started to rise more prominently towards the end of 2016 during Atlas' peak season.  (PX-136 ¶ 30.)  Indeed, the salient point is that Atlas is *currently* experiencing prolonged delays at a rate that is estimated to be 70% higher (one percentage point) than it otherwise would be experiencing, which is causing considerable operational disruptions and harm.  (PX-124 ¶ 52, Ex. 20.)  Averaging the current effect, which is clearly visible in Dr. Lee's Ex. 20 and corroborated by his regressions in Ex. 22, with the effect after the Section 6 notice but before the December 2016 intensification of the changes in behavior, would improperly understate the current levels of disruption faced by Atlas.  (PX-124 ¶¶ 52-56; Tr. Vol. 1 131:8-133:22; PX-136 ¶ 17 n.47.)

70.     While Mr. Akins also criticized Dr. Lee for evaluating departure delays rather than arrival delays (DX-003 at 9-10), Dr. Lee credibly explained that evaluating departure delays allowed him to "weed out the flights that experience a customer driven delay, an ATC driven delay, a government driven delay" to give him a cleaner analysis of delays (Tr. Vol. 1 165:15-

20), and credibly confirmed that he did, in fact, conduct an analysis regarding arrival delays, and his initial conclusions were confirmed.  (*Id.* 165:4-166:9.)  He explained:  "If a flight is departing at least six hours late, I can pretty much guarantee -- and I've done the analysis to internally confirm, that it's going to be arriving very late as well.  You simply can't make up six hours of lost departure time."  (*Id.*)  Moreover, while Mr. Akins criticized Dr. Lee's use of the six-hour threshold (Tr. Vol. 3 105: 3-11), Dr. Lee's report demonstrates that his prolonged delay results are robust to a variety of other delay thresholds.  (PX-124, Appendix D; Tr. Vol. 1 154:20 -25, 155:1-4.)

71.     Furthermore, Mr. Akins' testimony that Atlas' operational issues pre-dated the Union's Section 6 notice because Atlas normally has a high percentage of delayed arrivals does not withstand scrutiny.  Mr. Akins ignores that there is a noticeable change in late arrivals starting in early 2016 (Tr. Vol. 2 20:15-21:10), and his analysis merely examines "whether or not a flight arrives at least one minute later than its scheduled arrival time," which is "not a particularly informative measure" in light of the fact that, according to Dr. Lee, Mr. Akins made no attempt to control for weather, ATC, customer, or other delays.  (Tr. Vol. 1 168:17-25.)

72.     In stark contrast, Dr. Lee explained that he used a statistical regression-based model in his analysis that allowed him to "control for alternative factors or alternative hypotheses or explanations as to why we may be seeing what we're going to see."  (*Id.* 116:24-117:6.)  Dr. Lee accounted for multiple alternate explanations for the observed changes by conducting additional robustness tests to control for the explanations specifically raised by Mr. Akins (*e.g.*, increased complexity and size of Atlas' operations), and determined that they were statistically insignificant, and therefore, had no impact whatsoever on his conclusions.  (*Id.* 117:15-118:1; PX-136 ¶ 16, Ex. 4.)  Contrary to Mr. Akins' claim that if "pilot behavior is truly

the reason for some variation in the Atlas operation, [Dr. Lee] could have shown the relationship on its own, without the additive effect of multiple other variables" (DX-003 at 11), multiple control variables are crucial to isolate the effect of changes in pilot behavior from other factors and allow Dr. Lee to "have a high degree of confidence that a statistically significant change can be attributed to outside factors (*e.g.*, efforts by pilots to disrupt Atlas' operations)."  (PX-136 ¶¶ 22, 29.)  Therefore, Dr. Lee's analysis convincingly shows that there has been a statistically significant change in the Atlas pilots' behavior.

73.     Mr. Akins' broader claim that Atlas' growth by itself is straining its business operations is unfounded.  (*See* DX-003 at 18.)  As Dr. Lee and Captain Carlson explained, Atlas' operations have been growing consistently since 2010 without issue, and its recent growth focused on scheduled, predictable flight operations that were unlikely to cause operational disruption.  (PX-136 ¶¶ 15, 17; Tr. Vol. 2 138:18-25.)  Mr. Akins "provides no credible reason as to why a more highly scheduled network should result in 'increased complexity' for the Company."  (PX-136 ¶ 10.)  In contrast, Dr. Lee credibly demonstrated that controlling for the growth of Atlas' operations does not change his conclusions.  (*Id.* ¶ 16; Tr. Vol. 1 117:15-118:7.)  Further, Dr. Lee credibly testified that some of the changes the Union identified, such as the nature of Atlas' operations as both a passenger and cargo carrier, had been present throughout the complete period of his analysis, and thus could not account for the changes observed and were not necessary to include in the analysis.  (*Id.* 163:1-6.)

## IV.     IRREPARABLE HARM TO ATLAS, ITS CUSTOMERS, AND THE PUBLIC

### Harm To Atlas

74.     The pilots' concerted changes in behavior directly translate into irreparable harm in the form of operational disruptions that tarnish Atlas' reputation in the marketplace and create lost customer goodwill as well as significant financial costs for the Company.  (PX-122 ¶ 158;

Tr. Vol. 3 7:22-9:3.)  Atlas' entire business is dependent on its reputation for strong performance and reliability.  (PX-122 ¶ 159; Tr. Vol. 3 5:13-19.)  William Flynn, Atlas' CEO, testified that "the Atlas brand and the product that we provide to our customers is one of exceptionally high, reliable service quality; time-definite performance," calling it "the hallmark of our brand and what's defined the relationship with our customers."  (*Id.* 5:13-19.)

75.     As a result of the prolonged flight delays and other operational issues caused by the slowdown, Atlas' customers have become dissatisfied with its operational performance. (PX-122 ¶ 33; Tr. Vol. 3 5:23-7:1.)  Atlas can lose customer goodwill from several different customers as the result of any single flight delay.  (PX-122 ¶ 161; Tr. Vol. 3 11:1-16.)  This is because not only does a significant extended delay result in missed customer deadlines for the delayed flight, the ripple effect of a single extended delay can, and often does, last for days and negatively impacts multiple customers' flights and cargo.  (PX-122 ¶ 161; Tr. Vol. 3 11:1-16.)

76.     This lost customer goodwill is difficult if not impossible to replace or rectify with monetary compensation and is evident from the near-daily complaints that Atlas receives from its myriad of customers regarding the decline in operational performance resulting from pilots' change in behavior.  (*Id.* ¶ 163; Tr. Vol. 3 6:7-7:1.)  Mr. Flynn testified that his conversations with customers have changed since February 2016, and "the conversations I've had really since that period of time have been about deteriorating service quality, concerns that customers have raised to me."  (Tr. Vol. 3 6:7-16.)  Atlas produced credible evidence regarding complaints from customers regarding flight delays related to crew reliability issues.  (*See, e.g.*, PX-088, PX-093.)

77.     In the highly competitive market in which Atlas operates, Atlas must meet its customers' expectations with regards to reliability, or those customers will replace Atlas with carriers able to offer more reliable and dependable services.  (PX-124 ¶¶ 6, 72.)  Atlas is also at

risk of losing new and existing business opportunities.  (*Id*. ¶ 6; Tr. Vol. 3 7:15-8:7.)  Mr. Flynn

testified that Atlas' "existing business is at risk, and certainly future business opportunities more

likely than not are going to go elsewhere." (*Id.* 8:5-7.)  These business losses are irreparable—

once a customer contracts with another carrier, it is highly unlikely that Atlas could retain that

customer or that business in the future.  (PX-125 ¶ 19; Tr. Vol. 3 8:11-9:3.)  Indeed, because

Atlas is "highly integrated" into its customers, "there are real costs to switching service

providers." (*Id.* 8:11-8:18.)

78.     Atlas' relationship with the military is at particular risk because of the structure of

Atlas' contract.  (PX-122 ¶ 172; Tr. Vol. 3 9:7-15.)  Atlas is committed to the Civil Reserve Air

Fleet, a military program through which airlines contractually pledge aircraft for activation when

needed in times of war.  (PX-122 ¶ 172; Tr. Vol. 3 39:5-12.)  In exchange, the government

makes peacetime Department of Defense airlift business available to Atlas and other airlines.

(PX-122 ¶ 172.)  But if Atlas performs below a certain threshold, it could lose its entitlement to

such peacetime work until its performance improves, and that work will be given to competitors.

(*Id.*)  Furthermore, military family members impacted by delays have complained to Congress,

asking that it cancel Atlas' contract.  (Tr. Vol. 3 10:2-5; PX-122 ¶ 180; PX-097.)

79.     The slowdown is also causing direct financial harm to Atlas through increases in

costs for items such as pilot transportation and hiring and recruiting.  (PX-122 ¶ 173; PX-126.)

Atlas has also had to compensate its customers for their own operational disruptions due to pilot

behavior and has foregone incentive payments due to operational unreliability.  (PX-122 ¶¶ 176-

178, 181; Tr. Vol. 3 43:4-11.)

**Harm to Atlas' Customers**

80.     Because Atlas is the largest provider of cargo and passenger lift for the military,

when flights carrying troops and urgently needed provisions into military zones are delayed it

disrupts military operations, places the lives of troops at risk, and is contrary to national interests.

(PX-122 ¶ 179; Tr. Vol. 3 9:16-24.)  Moreover, as Mr. Flynn testified, "troops coming home

after long deployments anxious to get home and see their families have experienced what I'd call

unconscionable delays.  Not only inconveniencing them and causing anxiety to them, but also to

their families.  And their families have complained to me."  (Tr. Vol. 3 9:20-10:2; PX-097.)

81.     Atlas' customers, particularly its express customers such as Amazon and DHL

that run scheduled services and rely on cargo arriving to a requested location at a specific time,

have been injured by delays resulting from the slowdown.  (PX-125 ¶ 13; Tr. Vol. 3 7:22-8:4.)

Because of how the express market works, a late arrival by Atlas into a "sort" location may

mean that thousands of packages are delayed by an entire day, inconveniencing Atlas'

customers and their customers who paid a premium for time-sensitive delivery.  ((PX-125 ¶ 13.)

Thus, the decline in Atlas' performance has harmed the brands and reputations of Atlas'

customers, which are also in the business of providing reliable delivery services to their own

customers.  (PX-122 ¶¶ 182-184; Tr. Vol. 3 7:22-8:4.)

**Harm To The Public**

82.     Atlas transports many time-sensitive items, including medications,

pharmaceutical and medical supplies, lab shipments, human organs, emergency equipment, legal

documents, and items necessary for scheduled events, such as conferences, weddings, and

funerals.  (PX-122 ¶ 185.)  As Mr. Flynn testified, "[t]hat's why customers use air freight.  It

costs more than any other mode, but time is important, and time-definite delivery is what the

customer expects.  And that is being impaired."  (Tr. Vol. 3 11:1-16.)  Indeed, as a result of the

slowdown, potentially hundreds of thousands of these end-use customers—members of the

general public—have been damaged because, unlike at a passenger carrier, the delay from even a

single strategically-placed sick or fatigue call can impact a substantial portion of Atlas' network

and thousands of end-customers who rely on express shipments—and not just the several

hundred passengers whose flight is delayed or who need to be re-routed when a pilot calls out on

a passenger carrier.  (PX-122 ¶ 185.)

## V.      ATLAS' ATTEMPTS TO RESOLVE THE SLOWDOWN

83.      Atlas has made numerous attempts to get the Union to stop the slowdown, but the

Union did not act and the slowdown continued unabated.  (PX-122 ¶¶ 187-188; Tr. Vol. 2 71:22-

72:19; Tr. Vol. 3 11:20-12:12; PX-123.)  On December 17, 2016, Captain Carlson, wrote a letter

to the Union informing it that pilot sick leave usage had increased and pilots were refusing to

volunteer for or accept open time flying in violation of the status quo.  (PX-036; Tr. Vol. 2

71:22-72:19.)  Captain Carlson specifically requested that the Union "comply with its statutory

obligations and immediately instruct its members not to call in sick for the purpose of disrupting

the Company's operations, to return to normal practices of volunteering for and accepting open

time flying, and to not otherwise disturb the status quo in any other way."  (PX-036.)  In a letter

dated December 21, 2016, the Union called Atlas' claims "posturing, bombast and bluster" and

demanded that the Company substantiate its allegations that a slowdown was occurring.  (PX-

037; Tr. Vol. 2 72:20-73:7.)  It is clear from the Union's communications, however, that it was

well-aware of the slowdown activities and their effect on Atlas.  (Tr. Vol. 3 15:22-16:24.)

84.      Mr. Flynn made a second attempt to stop the slowdown activity on May 31, 2017,

when he told Captain David Bourne, Director of the IBT, Airline Division, that the Atlas pilots

were engaged in a slowdown that was disrupting the Company's operations, particularly military

missions, and asked the Union to stop the slowdown.  (PX-125 ¶ 22; Tr. Vol. 3 11:20-12:2.)

Captain Bourne responded that it was not right that pilots were engaging in those activities and

expressed that it should stop.  (PX-125 ¶ 22; Tr. Vol. 3 12:3-5.)  Following the meeting, in response to Captain Bourne's request that Atlas provide him with examples of crew actions delaying military flights, on June 9, 2017, Atlas sent him a compilation of sick and fatigue calls that affected military missions since the end of May 2017.  (PX-098; PX-122 ¶ 188.)  But the slowdown activity continued unabated and the Union made no attempt to stop the pilots' activities.  (PX-125 ¶ 23-25; Tr. Vol. 3 12:6-19.)

85.     On June 9, 2017, in a third attempt to stop the slowdown, Atlas' counsel told the Union's counsel that the Company was aware pilots were engaged in a status quo violation and Atlas expected it to stop.  (PX-123 ¶¶ 5-6 (Dkt. No. 5-102).)  Atlas' counsel asked the Union's counsel to inform their clients and the Union's counsel said they would do so.  (PX-123 ¶ 5.)  The slowdown, however, continued.  (*See* PX-125 ¶ 24.)

86.     The Union's contention that it asked Atlas to substantiate its slowdown claims, and Atlas denied the request, has no merit in light of the Union's communications.  (*See* DX-035 ¶ 17A-D.)  The Union had been publicizing and promoting the slowdown for months, knew what was going on, and even bragged in its communications that the slowdown was working.  (*See* PX-122 ¶ 58, PX-015.)  Atlas made every reasonable effort to end the slowdown activity, but it has continued and the Union has told pilots that they should increase their activities going into the fourth quarter, which is Atlas'—and its customers'—busiest season.

Dated: November 10, 2017
      Washington, D.C.

1625 Eye Street, NW
Washington, D.C. 20006
Telephone:  (202) 383-5300
rsiegel@omm.com

*Attorneys for Plaintiffs*

Respectfully submitted,

O'MELVENY & MYERS LLP

By:  _____/s/ Robert A. Siegel_____
Robert A. Siegel (D.C. Bar #1004474)
Michael G. McGuinness (*pro hac vice*)
Rachel S. Janger (D.C. Bar #467142)
Sloane Ackerman (*pro hac vice*)