# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| ATLAS, INC., *et al.*, | ) | Case No.: 1:17-cv-01953-RDM |
| | ) | |
| Plaintiffs, | ) | Hon. Randolph D. Moss |
| v. | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD | ) | |
| OF TEAMSTERS, AIRLINE | ) | |
| DIVISION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

## **DEFENDANTS' PROPOSED FINDINGS OF FACT**

Edward M. Gleason, Jr.
(D.C. Bar No. 429325)
Chief Counsel, Teamsters Local 1224
Law Office of Edward Gleason, PLLC
910 17th Street, N.W., Suite 800
Washington, DC 20006
Ph: 202-800-0099
egleason@gleasonlawdc.com

James Petroff (Ohio Bar. No. 42476)
Trent R. Taylor (Ohio Bar. No. 91748)
BARKAN MEIZLISH, LLP
250 East Broad Street, 10th Floor
Columbus, Ohio 43215
Ph: (614) 221-4221
Fax: (614) 744-2300
jpetroff@barkanmeizlish.com
ttaylor@barkanmeizlish.com

*(Pro Hac Vice)*

Deirdre Hamilton
(D.C. Bar No. 472334)
Staff Attorney
International Brotherhood of
Teamsters
25 Louisiana Ave., NW
Washington, DC 20001-2198
Phone: (202) 624-6948
Fax: (202) 624-6884
dhamilton@teamster.org

*Counsel for Defendants International Brotherhood of Teamsters and Teamsters Local 1224*

### A.  *The Parties*

1.      Plaintiffs Atlas, Inc. ("Atlas") and Polar Air Worldwide Cargo, Inc. ("Polar;" together with Atlas, the "Company" or "Plaintiffs") are air carriers within the meaning of the RLA, 45 U.S.C. § 181 and function as a "single transportation system" under the RLA for purposes of labor relations involving their pilot group.  Plaintiffs engage in world-wide air cargo operations from their headquarters in Purchase, New York. ECF Doc. 1 ¶¶ 19-24; ECF Doc. 32-1 ¶¶ 2-5.; ECF Doc. 5-3 ¶3.[1]

2.      Defendant International Brotherhood of Teamsters and its Airline Division ("IBT") is a labor organization and is the exclusive bargaining "representative," as such term is defined by Section 1, Sixth of the Railway Labor Act ("RLA"), *45 U.S.C. § 151, Sixth*, of the pilots employed by Defendants. The National Mediation Board ("NMB") certified the IBT as the exclusive representative of the craft or class of Pilots in the employ of the Plaintiffs as a single employer on December 22, 2008.  The IBT has delegated to its local union affiliate Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224;" together with the IBT, the "Union" or "Defendants") the exclusive responsibility of providing day-to-day representation to the IBT-represented pilots employed by Atlas.  Daily representative responsibilities for the Atlas pilots are managed by a five-person board known as the Atlas Pilots Executive Council (the "EXCO"). ECF Doc. 1 ¶ *31*; ECF Doc. 31-2 ¶¶ *5-6*.

### B.  *Collective Bargaining Relationship Between the Parties*

---

[1] References to the documentary record will be to the electronic court filing document number ("ECF Doc."), and then will specify a paragraph (if paragraphs therein are numbered) or the ECF page number.

3.     The Union and Atlas are parties to a single collective bargaining agreement ("CBA") covering the rates of pay, rules and working conditions of Plaintiffs' pilots, which is dated September 2011 and became amendable under the RLA on September 8, 2016. ECF Doc. 31-2 ¶¶ 9-11.   The CBA allowed one or both of the parties to open the CBA to commence negotiations 270 days prior to the amendable date. ECF Doc. 31-2 ¶ 11. The Union served a written notice on Atlas to commence bargaining to amend the CBA (a "Section 6 notice") on February 16, 2016. *Id.*

4.     Atlas abruptly stopped negotiations to amend the CBA in April 2016 following completion of the acquisition of Southern Air Holdings, Inc. (SAHI) and its two air carriers, Southern Air, Inc. ("Southern") and Florida West International Airways by the Plaintiffs' parent, Atlas Air Worldwide Holdings, Inc. ("AAWW"). *Id. ¶¶ 12-14.*  At that time, Plaintiffs demanded that the Union forego its statutory bargaining rights and enter into contractual negotiations pursuant to the CBA to establish a new, "merged" collective bargaining agreement that would cover the pilots of both the Plaintiffs and Southern. *Id. ¶¶ 12-14.*  The Union disagreed with Plaintiffs' position and filed a request for mediation services with the NMB to continue the parties' stand-alone CBA negotiations.   Atlas responded by effectively blocking all NMB mediation and filing a management grievance against the Union, to force IBT to engage in "merger" negotiations on Atlas's terms.  *Id.  ¶ 15. See also, Atlas Air, Inc., et al, v. International Brotherhood of Teamsters, et al., 1:17-cv-00903-KBF* (S.D.N.Y 2017).  In early February, 2017, Atlas filed a lawsuit against the Union in the United States District Court for the Southern District of New York, seeking an order compelling the Union to arbitrate that grievance. *Id.*[2]

---

[2] The case (*Atlas Air, Inc., et al. v. International Brotherhood of Teamsters, et al.,* Case No. 17-cv-00903 (S.D.N.Y 2017)) is pending decision from the court upon Plaintiffs' motion for summary judgment and the Pilot Union's motion to dismiss. ECF Doc. 31-2 ¶ *17.*

5.     In June 2017, fourteen months after Atlas halted the parties' negotiations to amend their stand-alone CBA, the parties entered into a framework agreement to engage in a voluntary process lasting eight months to negotiate a joint contract intended to cover both the Atlas and Southern pilots. Tr. Day 1, Carlson at 101:13-102:12*; Pl. Ex. 128.*[3]

### C.   *Atlas's Operation Has Grown Substantially in Recent Years, Both in Size and Changing Customer Base, Resulting in Significant Operational Change*s.

6.     In recent years, Atlas has experienced what AAWW President and CEO William Flynn describes as "transformational change," as the Company's operations have grown significantly in both scale and scope particularly over the last few years.  Tr. Day 3, Flynn, 18-19; ECF Doc. 5-3, ¶*5*. From 2010 to 2016, the Company's combined air operations have more than doubled to over 35,000 yearly departures. The Company has grown five times faster than any other U.S. long-haul international air cargo carrier in the same period. *See* ECF Doc. 31-3, ¶ III.B. ECF Doc. 5-103, ¶ 10.  The Company has also expanded into the e-commerce market. Notably, the Company announced in May 2016 that it had entered into an agreement with Amazon to operate 20 B-767 aircraft for its e-commerce domestic service.  The Company did not have 20 B-767 aircraft to operate for Amazon at that time, and had to scramble to secure a sufficient number of aircraft to fully comply with Amazon's 2018 full service deadline. ECF Doc. 32-1 ¶ *12*.  Thus, in addition to its traditional long-haul international cargo operations, the Company also engages in e-commerce and both day and night express operations using pilots whose monthly schedules include all such types of flying.  Tr. Day 3, Wells at 58.  The Company now operates—broadly speaking—two different "networks": (1) Atlas' traditional long-haul, intercontinental network, and (2) a shorter-haul domestic network centered around Atlas' B-767s, serving Amazon and

---

[3] Documents not filed via ECF will be referenced by their hearing exhibit designation.

DHL's point-to-point and hub operations, which now accounts for approximately 40% of Atlas' flights, compared to less than 20% a decade ago.  ECF Doc. 5-3, ¶ 6.

      **D.**      **Plaintiffs' Near Exclusive Focus on Customer Flexibility Has Negatively Impacted Their Operational Effectiveness and Disrupted the Pilots' Work and Quality of Life.**

      7.      The extreme and rapid growth and marked change in the Company's customer base and complex operations has introduced a high degree of stress and deterioration throughout the Company's system.  ECF Doc. 31-3, ¶¶ *III.C, III.H*; Tr. Day 3, at 154: 14-20.   As the Company's operation has grown and changed, pilot schedules have become less efficient. *Id.* ¶ III.E.1. I.  Atlas pilots are spending more time away and doing less flying through no fault of their own. *Id.*  The Company's emphasis on providing maximum flexibility for its customers has greatly disrupted the pilots' schedules.  Pilots are not in control of their schedules, and the stress of operational growth and change in the network has undermined the Company's ability to efficiently schedule its hugely expanded networks. *Id.*  The pilots' monthly schedules consist of 17 to as many as 20 days' working somewhere around the globe. Their schedules change constantly, as the Company shuffles its pilots from plane to plane and flight segment to flight segment.  Tr. Day 3, Wells at 133-145.  The Company's claim that its operations provide greater stability and predictability for its new customers/investors is not reflected in flight operations. Its constant scheduling changes have exponentially increased the degree of discontinuity and scheduling chaos for its pilots. *Id.*

      8.      Shortly after the CBA was imposed in 2011, the Union and the Atlas pilots sought to work collaboratively with Plaintiffs' management to help find contractual solutions to Plaintiffs' increasingly complex and expanding flight operations difficulties.  As time went on, Plaintiffs' pilots became increasingly frustrated with management and concluded that was

management more inclined to violate the CBA than work with them.  ECF Doc. 5-3 ¶ 21.  The CBA is not structured for express operations.  It does, however, provide for a process by which the parties are required to negotiate an "Express Carrier LOA." *Id.* at ¶ 14. In 2015, despite the fact that it admittedly had implemented express operations, thereby triggering the CBA's Express LOA process, the Company refused to engage in any discussions with the Union to adopt express carrier scheduling and related provisions to mitigate against the scheduling chaos that had already enveloped the Company's operations.  ECF Doc. 32-1 ¶ *9;* ECF Doc. 31-2. ¶ 14.B.1; Tr. Day 2, Carlson at 130-131.

9.    The extreme growth and changing customer base of the Company's combined operation over the last few years is occurring during a period in which the demographics of its pilot workforce has dramatically changed and while the industry is entering an era of unprecedented industry-wide constrained pilot supply.  ECF Doc. 31-3 ¶ III.F; ECF Doc. 31-3 App. B; Def. Ex. 50*;* Tr., Day 3, Akins, pp. 110-112; Tr. Day 3, Wells, pp. 133-36. Atlas has experienced a large influx of new hire pilots. From 2011 through 2014, the percentage of Atlas pilots with less than three years' experience at the Company ranged from 22% to 33%. Def. Ex. 50.  In September 2015, 36% of the Company's pilots had less than three years' experience.  In September 2016 that number had grown to 46%, and in September 2017, it reached 51%. *Id.* Additionally, during that period 2011-2014, it took first officers at least 8 years to achieve the upgraded status of Captain. *Id.*  By September 2017, it takes only 3 years for first officers to reach the upgraded status of Captain. *Id*; *see also* Tr. Day 3, Akins at 110-112.  Furthermore, many of Plaintiffs' newly hired pilots are young and have had little or no prior experience flying international cargo operations and were not aware of the stresses associated with such flying, let alone the additional stress associated with flying Atlas's and Polar's highly complex operations

consisting of mix operations flying wide-body aircraft, back-of-the-clock day-and-night flying, with constantly changing schedules.  ECF Doc. 31-2 ¶ *24;* Tr. Day 3, Wells at 58:5-8.

10.    The Company's aggressive expansion in e-commerce express operations has also impacted its other customers, including the United States military.  While scrambling to find B-767 aircraft to place into its new operations, it continues to use old, frequently broken, aircraft to transport military troops and supplies.   Capt. Kirchner noted that the aircraft used by the Company for military flying are refurbished and nearing the end of their useful lives.  Tr. Day 3, Kirchner, p. 81.  He described one instance where he had to wait seven or eight hours in Hahn, Germany to pick up an aircraft carrying troops from the Middle East because the aircraft was grounded due to maintenance problems.  *Id.*  He also explained that two of the Company's aircraft used for military flying are between 25 and 27 years old, require a lot of maintenance and are so old that at least two countries, Saudi Arabia and Indonesia, have stopped granting deferments to the Company to fly pilgrims home for the Hajj.  Capt. Kirchner's experiences and testimony regarding the Company's problems serving the United States military are far more credible and probative than the Company's undetailed, unsubstantiated, and hearsay-riddled claims of pilot-induced delays.  While the Company and its senior executives wrap themselves round the American flag, they earn a handsome profit repeatedly sending their pilots into war zones and other hostile areas flying decrepit aircraft.  Tr., Day 3, Kirchner at 80-82; ECF Doc. 31-2 ¶ *27.F.*

### E.  The Union's Campaign to Educate its Members and Enforce the CBA Predates RLA Section 6 Negotiations.

11.    By mid-2014, many Atlas pilots grew so frustrated with the Company that they began to leave in large numbers to secure better employment opportunities with other carriers, including UPS, FedEx, legacy passenger carriers, and even foreign carriers that were offering top

dollar premiums for qualified pilots.  At the same time, those Atlas pilots who remained began to clamor for more effective contract enforcement by the Union. ECF Doc. 31-2, ¶ 21.  Likewise, the many newly hired Atlas pilots were not well versed in the existing CBA and therefore were not well-informed about their rights and responsibilities working under it. *Id.;* Tr. Day 3, Kirchner at 58:16-59:17. Even many of the "incumbent" pilots did not know the current contract. *Id.* at 59:14-15.

12.     In mid-2014, Local 1224 conducted its election of officers.  Kirchner ran for the chairmanship of the Atlas Pilots Executive Counsel ("Atlas EXCO") on a platform of strict bi-contract compliance by the Company, the Union and the pilots.  He explained that the pilots' growing frustration and complaints against Pilots were attributable not only to the Company's violations and disregard of the existing CBA, but also because the then-incumbent Atlas EXCO and the Atlas pilots had not held management accountable for their actions, including CBA violations.  He argued that unless the Atlas EXCO and the Atlas pilots uphold the CBA and hold Atlas management accountable to the terms of the CBA, they would not have any realistic ability to secure a better contract when the CBA eventually became amendable, for the simple reason that if management is allowed to bend and violate the terms of the CBA whenever it so desires, the Company will have no reason to negotiate changes to it. ECF Doc. 31-2 ¶¶ 22, 24, 25.

13.     In the fall of 2014, Capt. Carlson invited Capt. Kirchner to dinner, at which he asked Kirchner what would be required for Plaintiffs and the incoming Atlas EXCO to have a good working relationship.  Kirchner responded to Carlson that a good working relationship would be built on the basis of strict contract compliance by both sides, and that enforcing strict contract compliance would be his top priority if he became chairman of the Atlas EXCO. Carlson said that that "should not be a problem."  ECF Doc. 31-2 ¶ *22.*

14.     In December 2014, incoming Atlas EXCO Chairman Capt. Kirchner, Capt. Wells and outgoing EXCO Chairman Capt. Ulrich met with Atlas's Carlson and Dietrich and AAWW's Flynn. *Tr. at 52:18-53:10*.  During that meeting, Capt. Kirchner presented a document outlining steps he believed Atlas could take to mitigate harm from the looming pilot shortage, particularly to mitigate the loss of experienced pilots. Tr. Day 3, Kirchner at 53:12-54:12; Pl. Ex. 127. At that meeting, Kirchner explained that this proposal was not intended to commence early negotiations. Tr. Day 3, Kirchner, at 54:25-55:6.  Atlas ignored the proposal.  *Id.*

15.     Kirchner was elected chairman of the Atlas EXCO in November, 2014 and assumed office on January 1, 2015.  ECF Doc. 31-2 ¶ *24*.  Immediately upon assuming office, Capt. Kirchner and the Atlas EXCO informed Plaintiffs that the Union expected both sides to comply with the terms of the CBA. ECF Doc. 32-1, ¶ 11.

16.     Upon taking office in January 2015, Capt. Kirchner also recognized that the Union needed to have an education campaign "top to bottom," and he therefore began to revamp the Atlas pilots' communications program  recognizing that due to the decentralized worldwide nature of Plaintiffs' operations, there is little opportunity to communicate with pilots at any given locale. ECF Doc. 31-2 ¶ 25; Tr. Day 3, Kirchner at 59:15-60:16.  Capt. Kirchner made it a top priority within the Atlas Pilots EXCO to educate the Atlas pilots about the terms of their CBA and to provide them with the knowledge to know when Atlas is violating the contract and what to do when that occurs.  ECF Doc. 31-2, ¶ 25. *See also* ECF Doc. 31-35, ¶¶ 8-9 (describing the Union's communications program and noting that the Company's allegations rely heavily on communications formats not controlled by the Union.)

17.     Kirchner gave an inaugural message on a new podcast produced by the Atlas Pilot EXCO called the Atlas Teamsters Action Message ("ATAM"), broadcast on January 15, 2015.

He explained that the new Atlas Pilots EXCO believed that enforcing the CBA was the path forward to getting what they needed, and that the pilots all must dedicate themselves to "enforcing" and being "guardians" of the CBA.  ECF Doc. 31-2, ¶ 25*.; Pl Ex 137.*  The purpose of the education-by-entertainment ATAMs as well as other Union-sponsored communications such as the Atlas Pilots Crew Calls, has never been to encourage Atlas pilots to engage in activity in violation of the CBA but, quite the opposite, to learn their rights and responsibilities under the CBA and to adhere to them. ECF Doc. 31-2 ¶ 25.  Indeed, during the live, unscripted Crew Calls since January 2015, union leadership has repeatedly instructed pilots who call in to ask questions that the Union does not want and is not asking the pilots to engage in illegal activities such as job slowdowns. *Id.*  Atlas pilots occasionally ask union officials why the Union cannot take more aggressive measures such as late block-outs and sick calls to pressure Atlas. ECF Doc. 32-1. ¶ 13. The Union has explained "that, under our laws, the union cannot and will not - to avoid litigation just like this - undertake any activities that could even be remotely perceived as illegal." *Id.*

### F.  Plaintiffs Have Not Shown a Change in Pilot Behavior.

18.     "The Union and Atlas pilots are not engaged in any slowdown." ECF Doc. 32-1 ¶ 15.

### 1.  Pilots have not increased short notice sick calls as part of a concerted slowdown, but rather have exercised appropriate professional judgment with regard to assessing their own fitness to fly safely.

19.     At the hearing, Plaintiffs conceded that they had failed to provide any examples of sick leave abuse by the pilots.  In his Declaration, however, Capt. Carlson testified that, "the sick leave system is subject to abuse—and it is clear that the abuse here is concerted," and that the number of "short-notice sick calls" (defined as same day or within 24 hours) are "strategically

designed to cause maximum disruption." ECF Doc. 5-3 ¶¶ 17, 18; Tr. Day 2, Carlson at 63:6-8.

He characterized two pages of examples[4] as "abuse of sick leave." *Id.* ¶ *19.* Atlas repeated such

language in its Complaint (at ¶¶ 41, 44, 45) and Memorandum in Support of its Motion for a

Preliminary Injunction (at pp. 23, 25). At the hearing, however, Carlson backpedaled from these

claims, describing them as mere "examples of what a short term sick call would look like." Tr.

Day 2, Carlson at 65:10-11. He said his examples were not intended as reflections on

individuals, and he would not pass judgment on them, as he could not know if the involved pilots

were actually sick or not. Tr. Day 2, Carlson at 65:11-13, 66:11-13, 172:17-19, 181:7-11.

20.      Atlas could initiate counseling or disciplinary proceedings against any of the

pilots cited in Carlson's Declaration if it believed that they had falsely called out sick, but it did

not do so in a single instance. Tr. Day 2, Carlson 214:23-216:13; *see also* ECF Doc. 31-29 ¶ 5;

ECF Doc. 31-28 ¶ 5; ECF Doc. 31-30 ¶ 5; ECF Doc. 31-26 ¶ 5; ECF Doc. 31-25 ¶ 5; ECF Doc.

31-27 ¶ 5. ECF Doc. 31-31 ¶ 5; Def. Ex. 1, § 14.D.5. Until the filing of this lawsuit, Plaintiffs

had never accused any of these pilots of faking illness or falsely calling in sick. *Id.* None of

these pilots called out sick to cause flight delays or disrupt the company's operations; nor did

they call out sick on account of peer pressure, as part of a plan or plot by Atlas pilots, or from

instructions or pressure from the Union. *See* ECF Doc. 31-29 ¶ 6-7; ECF Doc. 31-28 ¶  6-7;

ECF Doc. 31-30 ¶  6-7; ECF Doc. 31-26 ¶  6-7; ECF Doc. 31-23 ¶  3; ECF Doc. 31-25 ¶  6-7;

ECF Doc. 31-27 ¶ 6; ECF Doc. 31-31 ¶ 6-7.

---

[4] The incidents described in Atlas' filings (as outlined in the Declaration of Jeffrey Carlson),
none of which are consistent with the Company's allegations, are described more fully in
Declarations submitted by Defendants as Exhibits. See ECF Doc. 31-2, ¶ 27.A; and ECF Docs.
31-23, 31-24, 31-25, 31-26, 31-27, 31-28, 31-29, 31-30, and 31-31.

21.     None of the examples of sick call abuse cited by Plaintiffs involved unlawful concerted action by the Union or the pilots. With respect to Plaintiffs' sick call claims, a particularly memorable incident is described by an Atlas First Officer, who explains that Plaintiffs incorrectly claimed that the captain of the flight in question called off sick "at the absolute last possible time." *See* ECF Doc. 31-26. First Officer Molloy explains that he is the one actually described in the Complaint. *Id.* ¶ 4. He became nauseous while performing his pre-check duties in an un-air-conditioned cockpit in which the temperature had risen to well over 100 degrees. *Id.*  He became violently sick and projectile vomited until the Captain ensured that he was removed from the plane and received proper attention. *Id.* This was in fact a legitimate short sick call, having nothing to do with concerted union action.  The captain was wrongly accused by Plaintiffs in the Complaint and was "treated" the next day with the responsibility of operating the same aircraft even though Plaintiffs had not even bothered to clean up the mess.  ECF Doc. 31-27.

22.     Other short sick calls cited by Plaintiffs involve pilots who were abroad and ill with diarrhea. *See* ECF Doc. 31-25*,* ECF Doc. 31-31.  Another example cited by Plaintiffs involved a pilot who called off sick because he was distraught over recent news concerning his wife's medical condition. *See* ECF Doc. 31-30.

23.     Other incidents cited by the Plaintiffs did not involve sick calls, but rather were scheduling errors or incorrect notations. *See* ECF Doc. 31-23; ECF Doc. 31-24 ¶ *4-7.*  Carlson also noted that some of his examples were incorrect. Tr. Day 2, Carlson at 66:22-68:11. Carlson also admitted that one of his examples of a 'short-notice" sick call involved a pilot who called out sick 25 hours prior to his show time, which did not fit his definition of "short-notice." *Id.* at 68:19-21.  As the Union noted in its pre-hearing papers, this pilot called out sick 25 hours prior

to show time due to an acute attack of gout that left him hardly able to walk, let along operate the controls of an aircraft. ECF Doc. 31-29. Finally, Atlas cited a pilot who was supposed to fly a trip on July 15, 2017 from Houston to Norfolk who allegedly called out sick at his scheduled wake up time. Tr. Day 2, Carlson at 68:22-69:5. As the Union noted in its pre-hearing papers, this pilot was supposed to travel on a commercial carrier from Cincinnati to Houston and then rest until his July 15 flight; but Atlas's scheduling records did not show that a hotel room had been booked for this pilot and no travel arrangements were made for this pilot. *See* ECF Doc. 31-24 ¶ *5*. Although Carlson testified that such travel arrangements were made, as reflected in the company's system known as "SABRE" (Tr. Day 2, Carlson at 68:22-70:21), he admitted that such information was not included in the "AMES" scheduling program *(*Tr. Day 2, Carlson at 177:2-178:8). The AMES system did not list the pilot on the crew transport list, nor did it list a hotel for him. Tr. Day 2, Carlson at 177:18-178:8. It instead listed the pilot as a "no show." *Pl Ex. 138*. Atlas's scheduling department appears to have played a critical role in this incident, and it likely involves a situation whereby a scheduler mischaracterized a pilot's mistake in not following his schedule as a "sick call."

24.     Dr. Lee failed to show a significant and dramatic increase in sick calls by Atlas pilots since February 2016. ECF Doc. 31-3*; 29-36;* Tr. Day 3, Akins p. 113. Akins' testimony demonstrates that the fluctuation in sick calls falls within normal range and remained at 7% per departure **before and after the February 16, 2016 Section 6 notice**. In Dr. Lee's other cases, the level of sick calls significantly and dramatically increased, as the courts found in the United, USAPA, and Spirit cases. (Tr. Day 3, Akins, pp. 113-114). Additionally, as demonstrated above, the short notice sick calls Plaintiffs relied on to show abuse of sick leave occurred in almost every instance because the sicknesses actually and in fact occurred suddenly and unexpectedly.

**2. Pilots have not made fatigue calls as part of a concerted slowdown, but rather have exercised appropriate professional judgment with regard to assessing their own fitness to fly safely.**

25.     Pilots' obligation to monitor their own fatigue and alertness is a serious exercise of professional judgment and responsibility.   Tr., Day 2, Carlson at 76.   Fatigue may be described as "reduced mental and physical state resulting from insufficient or poor quality restorative sleep" that can impair judgment and the ability to think clearly, with effects including poor decision making, reduced skills performance, poor hand-eye coordination, increased reaction time, lapses in judgment, and reduced motivation all of which can increase risk and potential for an accident *See* ECF Doc. 31-33, p. 10.   Fatigue has long been an issue in aviation, in part due to the 24-hour nature of aviation operations around the globe, particularly in the cargo industry as most operations are performed overnight. *Id.* at 8.   Thus, pilots are legally required to self-assess whether they feel sufficiently well-rested to safely complete the flight duty period. ECF Doc. 1, ¶ *50;* Def. Ex. 4, ECF Doc. 31-4 ¶ 11. Effective 2015, moreover, Atlas requires pilots to initial the flight plan to certify that they are fit for duty.   Tr. Day 2, Carlson at 196:20-25, Tr. Day 2, Lee, 35:24.

**a. Atlas pilots have not increased fatigue calls as part of a concerted slowdown.**

26.     Atlas admittedly failed to provide any examples of illegitimate fatigue calls.   In his Declaration, Capt. Carlson testified that "fatigue calls are subject to abuse," and, listing several pages of fatigue calls, stated that that the number and circumstances of fatigue calls "represent a calculated campaign to cause long delays and maximum harm." ECF Doc. 5-3 ¶¶ 22, 23.   Plaintiffs repeated this language in its Complaint, adding that "pilots are now using their right to call in fatigued as a weapon." ECF Doc. 1 ¶ 50.   They repeated this language again in their Memorandum in Support of its Motion for a Preliminary Injunction. ECF Doc. 5-2*, at 27.

As in the case of the sick calls, Carlson backpedaled from these claims at the hearing, asserting they were cited merely as examples of the impact on the operation and because they contained what he considered adequate rest opportunity. Tr. Day 2, Carlson at 73:15-74:4. Carlson admitted that he could not tell if a pilot was truly fatigued or not. Tr. Day 2, Carlson at 73:23-25.[5]

27.     The Fatigue Risk Management Plan ("FRMP) addresses how abuse of the fatigue policy will be handled. *See* ECF Doc. 31-4, Ex. 2, p 22. Atlas had the contractual right to initiate counseling or disciplinary proceedings against these pilots if it believed that they had intentionally falsified a fatigue callout, but did not do so. *See* ECF Docs. 31-6 – 31-19; 31-37. No one from Plaintiffs has ever questioned the legitimacy of these fatigue callouts prior to the filing of this lawsuit. *Id.* In fact, they were all accepted by the joint labor-management FRMC. ECF Doc. 31-5. ¶ 8. None of these pilots made these fatigue calls to cause flight delays or disrupt the company's operations; nor did they call out fatigued on account of peer pressure, as part of a plan or plot by Atlas pilots, or from instructions or pressure from the Union. ECF Docs. 31-6 – 31-19; 31-37.

28.     The fatigue reports cited by Atlas are not unusual *vis-à-vis* other fatigue reports that have been filed throughout the FRMC's existence. ECF Doc. 31-5 ¶ *9*. As explained more fully in their Declarations, the pilots were fatigued for the following reasons:

29.     Some pilots were fatigued because they were unable to sleep due to noise in the hotel. ECF Doc. 31-9 ¶ *5;* ECF Doc. 31-10 ¶ *5;* ECF Doc. 31-4. ¶¶ *32, 29.*

---

[5] The incidents described in Plaintiffs' filings (as outlined in the Declaration of Jeffrey Carlson), none of which are consistent with the Company's allegations, are described more fully in Declarations submitted by Defendants as Exhibits. See ECF Doc. 31-2, ¶ 27.B; and ECF Docs. 31-4, 31-5, 31-6, 31-7, 31-8, 31-9, 31-10, 31-11, 31-12, 31-13, 31-14, 31-15, 31-16, 31-17, 31-18, 31-19, and 34-2.

30.     Some pilots were fatigued after being unable to sleep after flying to Sydney, Australia, by which they experienced significant and rapid shifts in times zones and issues due to circadian rhythm. ECF Doc. 31-8 ¶ *5;* ECF Doc. 31-7 ¶ *5;* ECF Doc. 31-4. ¶¶ 31, 38.

31.     One incident cited by Atlas involved an eight-hour maintenance delay before a ten-hour flight from Sydney, Australia to Shanghai, China, which would have resulted in 24 hours without rest. ECF Doc. 31-6 ¶ *5;* ECF Doc. 31-19 ¶ *5;* ECF Doc. 31-17. ¶ *5;* ECF Doc. 31-4 ¶ *34*. Rest and rescheduling was further complicated by difficulties with transportation back to the crew hotel. *Id.* Capt. McCabe described this incident as "a classic case of Atlas's and Polar's scheduling chaos, disregard for crew safety, and the pilots' federal regulatory and detailed, contractually-guaranteed, flight duty and rest protections." ECF Doc. 31-4 ¶ 34.

32.     Some pilots were fatigued due to scheduling changes resulting in a pre-duty rest period beginning soon after wake-up from sleep. ECF Doc. 31-16. ¶ 5; ECF Doc. 31-18 ¶ 5; ECF Doc. 31-15 ¶ 5; ECF Doc. 31-13 ¶ 5; ECF Doc. 31-12 ¶ 5; ECF Doc. 31-4 ¶¶ 30, 35, 36, 27. Having woken up from a restful sleep, the pilot could not go back to sleep, with the result that he was awake during the hours which he had planned to be flying, and then had to be awake – and fit for flight duty – to fly the delayed flight when he had planned to sleep. ECF Doc. 31-4  ¶ 30. Tr. Day 3, Wells 139-140.

33.     The joint labor-management FRMC has attributed hundreds of the fatigue reports it has received and accepted to the kinds of scheduling changes noted above, and it refers to them as examples of "scheduling chaos" and poor planning.  ECF Doc. 31-4 ¶¶ 30, 35.

34.     Additionally, pilots' decisions to call off fatigued sometimes also took into account the fact that they would be operating as part of a two-person crew with no in-flight break, particularly with very new pilots, thereby creating increased pressure on the more

15

experienced pilot to remain hyper-alert to correct any mistakes made by the less experienced

pilot.  ECF Doc. 31-14 ¶ 5; ECF Doc. 31-10 ¶ 5; ECF Doc. 31-13 Dec. ¶ 5.

35.    In another example of alleged dishonest fatigue callouts, Plaintiffs cited a flight

on July 22, 2017 for which a First Officer called out fatigued. ECF Doc. 1 ¶ 54.  Scheduling

asked another First Officer who was scheduled to ride as a passenger on that flight to pilot it

instead. *Id.*  The First Officer initially agreed, but then called back explaining that he had spoken

to the Union who told him to say  he "needed 10 hours of pre-duty rest prior to [the] schedule

change per the contract." *Id.*   The pilots working that flight dispute that allegation. *See* ECF Doc.

20*;* ECF Doc. 21. Capt. DePledge explains that he was concerned that "the company had

improperly coerced a young and inexperienced pilot to take a very foolish risk of changing his

schedule from a deadheading passenger on a flight to an operating pilot on that same flight, with

no pre-duty rest... a potentially dangerous and unsafe thing to do." ECF Doc. 20 ¶ 3.  First

Officer French observed that the young pilot in question "acted in a manner indicative of a

person suffering from fatigue." ECF Doc. 21 ¶ *3.*  Capt. DePledge and First Officer French

advised the young pilot to call a union steward to clarify his contractual rights. ECF Doc. 20 ¶ 4;

ECF Doc. 21 ¶ 4.  The pilot ultimately made the personal choice not to fly. *Id.*  Unbeknownst to

Capt. DePledge until mid-flight, Scheduling assigned yet another First Officer who himself, had

been scheduled to deadhead to the flight. *Id.*; *see also* ECF Doc. 22.

36.    Atlas's statistics do not show that Atlas pilots have increased fatigue calls since

February 16, 2016.  While fatigue calls have increased, this increase began in early 2015 as

evidenced by Dr. Lee's own exhibit 7. *See* ECF Doc. 31-3 ¶ IV.C.6. Dr. Lee's counterfactual

conclusion that fatigue calls have increased because of a slowdown commencing after Section 6

negotiations in February 2016 ignores the impact of the Company's growth on pilot fatigue. In

fact, Atlas' evidence shows a **decrease** in fatigue calls in May and June 2016. Tr., Day 3 at 108-109, Def. Ex.16; ECF Doc. 31-3, Exh.16.

37.     Atlas's evidence fails to account for the mix of part 117 in the Atlas passenger flying with part 121 all-cargo flying, the new training regarding fatigue, the FRMC, the dramatic growth at Atlas, the Company's failure to keep to a pilot's awarded, scheduled line of flying intact, and the fact that every flight has a 100% chance of having a copilot with less than 2 1/2 years of Atlas flying. The most recent seniority list demonstrates that more than one half of the pilot workforce was not on the seniority list since 2014. Tr. Day 2, Carlson p. 112; Def. Ex. 50; ECF Doc 32-1, at 19-41. Moreover, as Capt. Wells testified, the constant change of schedules results in pilots being unable to plan the appropriate rest required to safely operate aircraft. Capt. Wells characterized it as an "unstable" operation.

38.     Atlas conceded that with its growth there is more chance of having mixed crews coming in from different parts of the globe. Tr, Day 3, Carlson at 86-188.  Such changes in operation may be unmeasurable but nevertheless contribute to fatigue. Tr. Day 3, Wells at110. None of these factors were taken into account by Dr. Lee in his analysis.  Capt. Wells testified that he can fly with a different first officer on each leg, each of them coming from different places on the globe due to schedule changes.  Many of these pilots are from regional carriers operating under the stricter Part 117 rules and will not or cannot tolerate the level of the fatigue that the "freight dogs" or the old "geezers" were used to in days past. Capt. Wells admitted that there were probably missions flown in the past that arguably were unsafe. Finally, over the last years, Atlas moved its operations center from Purchase, NY to Kentucky, thus having to hire and train operations personnel, including schedulers.  Tr. Day 3, Wells at 154-55.  As a result,

numerous mistakes and schedule changes occur, in what the pilots and FRMC refer to as "scheduling chaos".

39.     Proper statistical regression analysis based upon the vast increase in the number of departures shows that the increase in fatigue calls is in line with what should be expected, given the growth of the Carrier. Dr. Lee's statistical analysis by contrast, once again uses an improper statistical binomial trial and draws a totally unsupported conclusion. ECF 31-3 ¶ IV.C.7-8.     Moreover, "no objective or subjective measures (biometric, physiological, psychometric) have been taken at the company to study or assess crewmember fatigue," and thus Lee's analysis could not "accurately determine occurrences of fatigue experienced by flight crews at the airline." ECF Doc. 31-33. at  2.

> **b.   The increase in fatigue calls is best explained by changes in the law and changes in the safety culture at Altas.**

40.     There has been a steady increase in the number of fatigue calls. ECF Doc. 31-5 ¶ 7.  The increase in the number of fatigue calls, however, is not attributable to a Union-directed concerted work slowdown by the Atlas pilots.  In addition to the operational factors discussed above, the increase is instead attributable to legitimate factors relating to Plaintiffs' legally-required and enhanced efforts to stop pilots from flying fatigued, as on the risks of flying fatigued.  In this regard, there have been significant changes in the law and federal regulations governing pilot fatigue in recent years.  United States commercial airlines are regulated by various laws and regulations-- 14 CFR Part 117 ("Part 117") and 14 CFR Part 121 ("FAR Part 121") -- which govern the maximum number of hours of flight duty time and prescribe rest and fatigue rules for commercial pilots. ECF Doc. 31-4. ¶ 8.  Part 121 applied to all commercial pilots until 2014, and continues to apply to cargo operations. *Id.* ¶¶ 9-14.  *Part 117*, which revised the pilot hours of service and rest rules, was published in early 2012 and became

effective in early 2014. *Id.* ¶ 10.  It was enacted following the highly publicized 2009 Colgan Air

crash, which prompted Congress to pass the Airline Safety and Federal Aviation Administration

Extension Act of 2010, requiring the FAA to develop science based pilot rest and duty rules to

address problems relating to pilot fatigue. *Id.* ¶ 9.  The FAA subsequently announced that its

then-current regulations did not adequately address the risk of pilot fatigue, because they did not

account for the impact of circadian rhythms on pilot alertness. *Id.* ¶ 10.  The new Part 117 rules

are based on scientific knowledge of the effects of fatigue, sleep and circadian rhythms on the

human body.  *Id.* ¶ 13.

41.     The new Part 117 "prohibits the certificate holder from assigning an FDP ["flight

duty period"] to a flightcrew member who has informed the certificate holder that he or she is

too fatigued to safely perform his or her assigned duties'." ECF Doc. 31-4. ¶ 11.  The FAA also

made "fatigue reporting mandatory." *Id.*  Through Part 117, "each flightcrew member is required

to utilize the information provided during his or her statutorily-mandated fatigue training to self-

assess whether he or she feels well-rested enough to safely complete his or her assigned FDP."

*Id.*  Pilots are required by law to adhere to all of the hours of service and rest rules, and they are

subject to FAA enforcement actions against their licenses if they violate them. *Id.* ¶ 14.

42.     The airline cargo industry lobbied to carve out and exempt "all cargo" airline

operations from the new rules, known as the "cargo carve-out" to the new FAR Part 117 rules.

ECF Doc. 31-4 ¶ 13.  As a result, there are two sets of hours of service and rest rules governing

the commercial aviation industry and its pilots: the original Part 121 rules applicable to "all

cargo" airline operations and the new Part 117, science-based rules applicable to passenger

airline operations. *Id.*  The differences between the new FAR Part 117 rules and the original, "all

cargo" hours of service and rest rules are particularly important and complex as applied to

Atlas's operations because Atlas conducts both cargo and passenger operations. *Id.* ¶ 14.  Thus Atlas pilots are unusual in the industry in that they are required to fly mixed operations during their same monthly schedules, which consist of very long, 17-day monthly trips. *Id.*

43.    In 2013, Atlas and Local 1224 began the process of establishing the Atlas Fatigue Risk Management Plan ("FRMP") and related Fatigue Risk Management Committee ("FRMC"). ECF Doc. 31-4 ¶ 15; ECF Doc. 31-5. ¶ 3.   The Atlas FRMC-- consisting of two voting representatives appointed by Atlas, two voting representatives appointed by the Local 1224 and a fifth member appointed by Atlas to serve as the committee's program manager-- is charged with collecting and analyzing data relating to pilot fatigue, including pilot fatigue reports, identifying operational issues affecting or contributing to pilot fatigue and recommending solutions to resolve those operational issues. *Id.*  In accordance with the Atlas FRMP and FRMC rules, pilots are asked to submit fatigue reports to the FRMP within seventy-two hours of calling out fatigued, and pilots who do not call out fatigued but who experienced fatigue while operating an aircraft are also encouraged to file fatigue reports with the FRMC.  ECF Doc. 31-5 ¶ 4; ECF Doc. 31-4 ¶ 21.   The system is non-punitive in nature, but the report "must not have been intentionally falsified." *Id.*  The FRMC reviews all reports with the purpose of making several key decisions including report acceptance, corrective action, and recommendations for fatigue mitigation, and determinations such as root cause analysis and risk assessment. *Id.* at ¶ 21.

44.    The FRMC believes that the number of fatigue reports have steadily increased because the Atlas pilots have become more aware of and comfortable with using the FRMP. ECF Doc. 31-5, ¶ 7; ECF Doc. 31-4, ¶ 16; ECF Doc. 31-33, at 3.  The slight increase in the number of fatigue reports in the past year can largely be attributed to the total increase in the number of pilots employed by Atlas

45.     Atlas has regularly communicated to the pilots about the danger of fatigue.  For example, the current Atlas fatigue risk management plan is at revision five, dated 13 September, 2016. Tr. Day 2, Carlson at 153:18-154:17.  Since 2015, Atlas requires pilots to initial the flight plan to certify that they are fit for duty.  Tr. 196:20-25, Tr. 35:24.  Plaintiffs have also expanded the training pilots receive concerning fatigue risk management significantly in the past two years. Pilots must take recurrent training to maintain their license. Tr. Day 2, Carlson at 159:2-7. Plaintiffs' recurrent training includes a class called "Human Factors" that includes a module on fatigue risk management. Tr. Day 2, Carlson at 158:18-159:18. Capt. Kris Lang (an Atlas pilot and check airman) serves as a ground school instructor teaching the Human Factors class, including the module on fatigue. Tr. Day 3, Lang at 95:1-22.  He testified, "Over the last four years we've constantly developed the program and increased the training on—the awareness training on fatigue. Particularly since February of this year, we increased the training quite a bit, both in class and on the computer training modules that we offer." Tr. Day 3, at 96:12-17.  With regard to the computer-based home study program, Capt. Lang explained that the fatigue module was added to the training program this year and probably part of last year, and that is when it was first placed into the home based program. Tr. Day 3, at 97:4-14.  After his most recent recurrent training this past February, Capt. Carlson told Capt. Lang that the fatigue risk management component should be improved and directed Director of Flight Operations and fatigue risk management program director Chris Agnini to meet with Capt. Lang to improve the fatigue risk management curriculum. Tr. Day 2, Carlson at 159:15-160:24.  At a check airman's meeting this past August, Capt. Agnini encouraged attendees to call in fatigued more often to improve flight safety. Tr. Day 3, Lang at 98:18-99:12.

46.     Members of the FRMC have also observed that many of Plaintiffs' growing staff of new pilots from commuter airlines are more accustomed to participating within the industry's new fatigue and passenger hours of service rules.  ECF Doc. 31-4, ¶ 17.

### 1. Atlas pilots are not declining to volunteer for open time flying as part of a concerted slowdown.

47.     "Open time" trips are opportunities for pilots to fly additional trips on their days off. ECF Doc. 31-2, ¶ 27.C.  It is a tool Atlas uses to cover vacancies. Tr. Day 2, Carlson at 197:8-13.  Atlas pilots are not required to volunteer for or accept open time flying. ECF Doc. 1, ¶ 56.  Some pilots do not want to volunteer for or accept open time flying for any number of reasons: they may be too tired to fly any more trips after return to off days from their 17-plus day schedules; they might not feel well enough to fly; they may want to spend with the families; they may not need the money and just don't want to fly any more trips; and they may be just not willing to fly additional flights on their days off for a company that they do not like and that they feel is not treating them fairly. ECF Doc. 31-2, ¶ 27.C.  Whatever the reason, these decisions are individual decisions that the pilots themselves make. *Id.*

### a.     Atlas has not shown that pilots are accepting less open time.

48.     Atlas relied entirely on statistics to support its claim that pilot are accepting less open time—statistics that do not show that Atlas pilots have been declining to volunteer for open time since February 2016 in service of a concerted slowdown.   ECF Doc. 31-3, ¶ IV.D.  First, as admitted by Capt. Carlson, and as provided in the CBA, the Company controls whether trips are characterized as open time or whether they just assign them to pilots as additional flight segments on their schedules.  Tr. Day 2, Carlson at 198.  Second, as the number of desirable trips decreases, the volume of calls to pilots by the company to fill them has increased. ECF Doc. 31-3, ¶ IV.D.6.  Moreover, Dr. Lee's statistical analysis fails to take into account the relationship

between the decrease in the amount of Company-controlled available open time trips and Plaintiffs' dramatic and rapid operational changes. ECF Doc. 31-3, ¶ IV.D.4. Tr. Day 3, Akins at 114-116.  Mr. Akins further explained that the decrease in pilot willingness to fly open time trips has no correlation to the filing of the Section 6 Notice.  In this regard, there was no decrease in flying open time for seven months after the notice. ECF Doc. 31-3, Ex. 22 at 45.  Furthermore, the decrease in open time flying reflects the smaller pool of desirable trips, degradation of travel on such trips from commercial deadheading to Carrier deadheading (leaving the pilot stranded and waiting to airline back on a Carrier aircraft), all in the context of pilots working many more days on the road away from base. ECF Doc. 31-3, at 42. Tr. Day 2, Akins at 114-116.  Dr. Lee failed to account for any of these factors in his skewed analysis.  *Id.*  For example, in 2015 the Company began "deadheading," or flying back pilots, on Carrier equipment rather than the more comfortable and immediately available commercial airlines flight to get home, which made open time flying more onerous. ECF Doc. 31-3, ¶ IV.B.7; Tr, Day 2, Akins at 114-116.  Finally, the less than 0.5 percent of flights identified by Plaintiffs as unfilled, when measured as a percentage of total departures, has a negligible impact on delays and "customer goodwill," considering that historically fifty percent of departures have been delayed at Atlas. ECF Doc. 31-3, ¶ IV.D.8.

### b.    The Union statements about open time were cherry picked entirely out of context.

49.    Open time is attractive to pilots because it has premium pay and it has been a bone of contention that open time has been awarded out of seniority order, in violation of the CBA. *Tr. Day 2, Carlson at 198:22-199:8; 199:5-25; and 202:13-14.* Capt. Kirchner described special deals between pilots and schedulers, or private communications resulting in a lot of animosity and division in the pilot group. *Tr. Day 3, at 64:3-19.* Capt. Carlson, either

misunderstanding or intentionally mischaracterizing some of the Union's communications, testified that the Union endorsed ostracizing pilots who pick up open time in violation of the alleged slowdown. *Tr. Day 2, at 205:18-25*. This is not correct. *Tr. Day 3, Kirchner at 70:23-71:4*. These messages are about pilots cheating and cutting deals with scheduling, so they can pick up open time out of seniority. *Tr. Day 3, Kirchner at 71:5-16*. For example, Atlas focused on a discussion in pilot crew calls of "outing" pilots who pick up open time. ECF Doc. 27-2, ¶ 9. However, when Capt. Kirchner spoke of ostracizing "bad apples" he was speaking of "people identified for CBA transgressions." *ECF Doc. 44-5, at 12:16-18*. In that same call, a caller asked if there was any intention of outing people who pick up open time, to which Capt. Kirchner responded "open time is a personal decision… I'm not legally allowed to comment on open time, so, I won't." *ECF Doc. 44-5, at 12:1-15*. He summarized, "while I can't comment on open time, I will comment on CBA violators. And we are looking at a way to publicize their names… The most important part of that is for everybody to know who these people are if and when we do and not have dinner with them, not socialize with them, and basically ostracize them. Peer pressure is a powerful tool." *Id. at 13:1-9 and 14:15-22; ECF Doc. 44-15, at 6:4-10 and 10:18-11:7*. The Union is well within its rights to enforce its contract and to ensure that its members adhere to the terms of the contract. To the extent that Plaintiffs complain about any internal union disciplinary procedures under the Union's constitution involving members who cheat their fellow members by entering into side deals with management, that is neither Plaintiffs' business nor relevant to this dispute.

## 2. Atlas pilots are not intentionally delaying departures as part of a concerted slowdown.

### a. Atlas's statistical evidence is flawed.

50.     Dr. Lee's report is fatally flawed in its efforts to show a decline in early departures to support a claim that the pilots are engaged in a concerted slowdown. In his report, Dr. Lee fails to account for operational issues at Plaintiffs that predate the Union's RLA Section 6 notice, including admitted "transformational growth" and change in the very business of their operation. There is no reason to believe that operational issues at Plaintiffs have been caused by pilot behavior or orchestrated in any way by the Union. Plaintiffs' poor on-time performance predates the Union's Section 6 notice, as do nearly all other behaviors "identified" by Dr. Lee. Dr. Lee thus fails to establish a causal link between alleged pilot behavior and operational impacts or customer goodwill.  In reality, the vast majority of operational problems at Atlas are the result of rapid growth, a changing route structure and operational profile, combined with a management failure to properly invest in adequate capacity to service customer requirements." ECF Doc. 31-3, ¶ II.D.  Dr. Lee's failure to adequately define a causal relationship between observed behaviors and observed effects wholly undermines his voluminous statistical work.

51.     Capt. Wells explained that one of the most significant changes in recent years is the large number of new crew members. Tr. Day 3, at 153:18-154:4.  Now 50 percent of Atlas's crew members have been there less than three years. *Id.*  Capt. Wells explain that

> a lot of training takes place in the airplane. So when we're sitting on ramp ready to go, I'll be sitting in the left seat and the new guy here. Instead of getting things done quickly, I have to step through things piece by piece by piece and so forth. I have to let them make mistakes and correct them. That level of training alone could explain  [six minute less early departure time].

Tr. Day 3, at 154:7-13.  The new pilots are often going to new airports, where they are rightly taking longer to prepare properly. *Id.* at 155:15-20.  Following recent incidents on Arrival and Departure in Hong Kong Atlas issued a Bulletin instructing that both pilots must verify certain data ("SID or STAR, Transition and Runway selection").  Tr. Day 3, at 155:20-24, and 160:6-

163:23; See Bulletin title "Recent High Profile RNAV Departure/ Arrival Events" found at ECF Doc. 31-2, at 44-45.  That bulletin expressly instructed pilots to "**slow down and make changes methodically**." See ECF Doc. 31-2, at 45 (emphasis supplied).  Capt. Wells also noted that every other department, including maintenance, dispatch, and crew scheduling, has experienced stress and deterioration in the past few years. Tr. Day 3, at 154: 14-20.  Capt. Wells further noted that over the last year, Plaintiffs moved their operation center from Purchase, New York to Florence, Kentucky, resulting in a degradation of the performance of the operation staff. *Id.* at 154:21-155:7.

52.     Additionally, while Dr. Lee opines that "…taxi-out times for Atlas's flights have increased by an average of 0.62 minutes, while taxi-in times have increased by an average of 0.60 minutes…," Mr. Akins opined that "in a global operation of Atlas size there is surely no operational impact Dr. Lee could point to related to taxi times. Any number of factors could affect the operation far greater than the claimed increase in ground taxi times, which in itself could be the result of changes in Atlas operation to a much more domestically oriented, scheduled operation." ECF Doc. 31-3, at 66.  Indeed, Dr. Lee's analysis that pilots have slowed down "taxi out" times by 37 seconds, while "taxi in" times have increased by 36 seconds is equally remarkable. This miniscule change in taxi times for this global enterprise has had no operational impact and moreover can be explained by a host of unconsidered variables such as the growth of the Carrier into a domestically-oriented, scheduled operation. ECF Doc. 31-3, ¶ IV.H.1-2.  Having failed to account for these factors, Dr. Lee's conclusion concerning this de minimus change does not support Plaintiffs' claim of a pilot slowdown.

53.     Dr. Lee also invented a data point or metric from which he "measures" alleged pilot departure delays - a point in time he calls "loaded and ready." This is not a term that exists

at Atlas; as Atlas flight dispatcher Dennis Gerber explains, "'loaded and ready' is a term I have never heard referenced in my [nineteen years] with Atlas." ECF Doc. 31-32, ¶ 4. "Dispatch does not track when an aircraft is loaded and fueled" and Gerber is not aware of any operational department that tracks such information. *Id.* The only time a dispatcher is aware that an aircraft is ready to go early is if the flight crew calls stating such and requests an early departure. *Id.* Kirchner agrees that there is no rule that permits pilots to block out when the aircraft is "loaded and ready," "regardless of the estimated departure time." ECF Doc. 31-2, ¶ 27.D. Dr. Lee's analysis of departure delay is thus fundamentally flawed because while he purports to measure increased delays from when an aircraft is "loaded and ready," no such data exists on an aircraft's "loaded and ready" status, a measure which he has created out of whole cloth. ECF Doc. 31-3, ¶ IV.F.2; see also ECF Doc. 31-2, ¶ 27.D (discussing lack of any significant benefits associated with blocking out whenever an aircraft is "loaded and ready").

54.    Dr. Lee's conclusion that extended delay departures have "skyrocketed" seventy percent by virtue of a pilot slowdown is a gross mischaracterization, as the evidence shows at most there has been a one percent decrease in flights without extended delay. ECF Doc. 31-3, ¶ IV.E.3. Dr. Lee's analysis of Atlas flights with delayed departures of six-hours or more is flawed. ECF Doc. 31-3, Ex. 24 at 50; Tr. Day 3, Akins at 118-23. He analyzed data concerning departures when customers care about arrivals. He chose a unique yard stick, never used before, raising a suspicion that it was contrived to force the data to support his preconceived conclusions. And, to create added doubts on the same point, he bi-furcated the statistics for the period he deemed significant for his other analyses – one that supported his conclusions and the other that undermined them. Thus, for the first nine months after the start of Section 6 bargaining, Dr. Lee found that these delayed departures occurred 0.2% less often than in the

prior four years, while in the following nine months they were 1.0% more likely, on average. Averaging these two periods shows that only 0.4% of the flights in the post-Section 6 period incurred such delayed departures. [(1.2% + 2.4%)/2 = 1.8% and 1.8% - 1.4% = 0.4%]. That is the equivalent of only four flights out of one thousand. Furthermore, given the fact that Dr. Lee's own data reveal that Atlas arrival delays over the last ten years range from 50-80%, a 0.4% increase in one, highly skewed period of eighteen months carries little weight. ECF Doc. 31-3, Ex. 26 at 60.

55.     Given that fifty to eighty percent of Atlas departures have historically been delayed since 2005, Dr. Lee's attribution of concerted delay to the pilot group is implausible. Indeed, delays have been steadily increasing for years before the Section 6 notice was sent along with the growth of the Carrier. And, critically, on time arrivals have steadily increased even after the Section 6 notice. ECF Doc. 31-3, ¶ IV.F.3-13.

56.     This lack of probative value of Dr. Lee's statistics with regard to his conclusion that the Union caused the small increase in the most recent departures identified by Dr. Lee becomes even clearer when viewed in the perspective of the many explanatory changes that have taken place during this period of time, including such factors as the increasing complexity and size of the Atlas operations, their increasing exposure to domestic U.S. operations, the heightened juniority of the pilots on the Atlas seniority list, the improved emphasis on fatigue training and awareness and the increasing age of the Atlas fleet.  ECF Doc. 31-3, at 51-56.

### b.     The BOOT and SHOP campaigns are not an illegal slowdown.

57.     The BOOT campaign is designed to ensure pilots are in compliance with numerous federal regulations.  Atlas pilots have a scheduled departure time. Tr. Day 3, Wells at 152:1-7.  That is important because as an FAA certified carrier, Atlas has a myriad of regulations

to follow, many of which are time dependent to the minute. *Id.* at 152:9-19.   Atlas must put together a schedule that works in accordance with all the regulations. *Id.* at 156:19-22.   A flight crew may be a group of pilots who have just come together that day, each with different schedules and their own backstory of duty and rest. *Id.* at 157:11-14. So, for example, if a flight takes off early, it might be cutting short a rest period. *Id.* at 157:14-158:2.   Pilots can be personally held responsible if they violate the flight regulations. *Id.* at 159:3-4.   Given that the calculations of rest periods may be very complicated and time is calculated retrospectively and prospectively (*Id.* at 157:14-24), the schedule may be the only thing pilots can rely on (*Id.* at 159:14-19).

58.   The claim that pilots should block out earlier than scheduled is not consistent with Company practice or instructions. See Tr. Day 3, Wells at 151-159.   Pilots do not have the *carte blanche* discretion to block out early; rather pilots have been instructed not to leave early, because early arrivals downline may cause operational complications. ECF Doc. 31-2, ¶ 27.D.   Atlas's Flight Operations Manual prohibits pilots from blocking out for departure greater than fifteen minutes before scheduled departure without specific permission from the GCC (Global Command Center). *Id.*; see also ECF doc 31-2, at 47. When Dispatch receives a request for an early departure, they must confirm that the release would be valid for the early departure. ECF Doc. 31-32, ¶ 4.   They then "consult Operations Control who checks with Crew Scheduling to confirm the crew is legal for the early departure and the downline station to be sure the station can handle the early arrival." *Id.*   If an early departure is authorized, the pilots are required to annotate flight plan with a new departure time and secure the time and initials of the dispatcher or operations manager involved. *Id.*

59.   The SHOP campaign is not a "campaign" but instead a Union encouraged reminder encouraging its members to stop doing the work of other departments (like travel or loading) and to make management do its own job. As Capt. Kirchner testified,

> Well, we wanted them to stop doing travel's job, doing loading's job. We wanted them to focus on just doing their job. Cutting corners on the contract, those sort of things. So that's where SHOP came from. It was just do your job. We had a number of pilots get into trouble attempting to go the extra mile, and it actually backfired and cost the company more money. And we had some disciplinary problems, so we were trying to keep everybody into their sphere and area of responsibility if you will.

Tr. Day 3, Kirchner at 75.  The Union's use of the acronym "SHOP" is not being used as a code word or a message to the pilots that they should engage in slowdown activity.  *Id.*

### 3.   Atlas pilots have not increased maintenance write-ups as part of a concerted slowdown.

60.   Atlas failed to show that maintenance write-ups increased after February 2016. ECF Doc. 31-3, ¶¶ G.1-3. and Ex. 29 at 65; Tr. Day 3, Akins at 116-18.  Atlas's only evidence of increased maintenance write ups is Dr. Lee's statistical report, which opines that "... since February 16, 2016, there has been a 43.4 percentage point increase in pilot write-ups per flight on the 767 fleet and a 10.3 percent increase in pilot write-ups on the 747 fleet." ECF Doc. 5-103, at 10.  In fact, total maintenance write-ups have dropped in that period, by 28 fewer per month. ECF Doc. 31-3, Ex. 30 at 66; Tr. Day 3, Akins at 117-18. Mechanic write-ups dropped from an average of 200 per month per aircraft for the two-year period January 2014 through December 2015 to an average of 159 aircraft from January 2016 through August 2017. ECF Doc. 31-3, at 64.  Within that overall drop, mechanics' write-ups decreased and pilots' increased, leading the IBT's expert Mr. Akins to state that "there appears to be a substitution effect occurring in Atlas's mechanical write-ups between its pilots and mechanics." ECF Doc. 31-3, at 65.  Thus, as Mr.

Akins concluded, "the impact on the company is actually fewer write ups overall." Tr. Day 3, at 118; ECF Doc. 31-3, at 65.

61.     Notably, Plaintiffs provided no examples of incidents where pilots delayed a flight for a maintenance item that Plaintiffs believed could have been deferred. ECF Doc. 5-2, 39-40.  Nor did Atlas provide example of write-ups it believed were unnecessary or false. *Id.*  In fact, Atlas provided zero examples on this subject whatsoever. *Id.*   Instead, Capt. Carlson admitted that he did not claim these write-ups by pilots were false. Tr. Day 2, at 209:10-12.

62.     Airline pilots and mechanics are not simply "permitted" to write up maintenance items, but have significant legal and professional responsibilities with regard to ensuring that an aircraft is airworthy and safe to fly, obligations imposed by federal regulations, under which they may lose their licenses if they fail to properly discharge these duties. Tr. Day 2, Carlson at 208:7-24; ECF Doc.31-2, ¶ 27.F.  Capt. Wells explained:

> [W]hen they [Plaintiffs] talk about write up [of] maintenance items, other than those that affect air worthiness. That's a bit of an FAA term. I would say in plain language that would be something that would make the airplane not fly, a window being missing or something like that versus some other item in the cockpit. There's no discretion for pilots to make that determination. We're not trained for that, we are not licensed for that.… [O]ur job is to notice that something's broken, put it in the logbook an        d hand it to the mechanic. Their job is to make that very determination they're asking for, is it air worth[y] or not. And they most likely can allow the aircraft to fly anyway, but they have to do work to make that happen.

Tr. Day 3, at 165.  Capt. Kirchner, moreover, also testified that Atlas's fleet is aging, which could result in a greater number of maintenance issues. ECF Doc.31-2, ¶ 27.F; Tr. Day 3, Kirchner at 81-81. Atlas acquired a number of older B-767s that were retired from passenger airlines. *Id.*  Two of the oldest B-747s are passenger aircraft that fly military passengers, both of which have had continuous, significant mechanical problems.  *Id.*

**4. Atlas pilots have not been delaying flights due to rejected crew meals as part of a concerted slowdown.**

63.     Appropriate crew meals are an important part of a pilot's health and wellness needs, and have been an issue for years. ECF Doc. 31-2, ¶ 27.E; ¶ 3. The CBA and the FARS require that Atlas provide different and prescribed meals to the pilots, with the number and type of crew meals (e.g., sandwich, snack, fruit, hot breakfast, hot lunch, hot dinner) required based on the number of block hours per flight and the time of day the pilots are flying. ECF Doc. 31-34, ¶ 3.

64.     The pilot complaints regarding bad or inadequate catering have been constant and unresolved, including: the Capt. of a flight from Cincinnati to Incheon, South Korea discovered a sheet metal screw baked into his meal; on a 9.5 hour B-747 flight departing from Hong Kong, the crew were provided catering consisting of ½ of a waffle and a single slice of ham; an Atlas crew flying out of Amsterdam was provided a meal infested with bugs; on a flight in January 2016, a hair was baked into a turkey sandwich; and on another flight, dirt was caked onto the bread of an Atlas pilot's meal. ECF Doc. 31-34, ¶ 5. Yet another pilot complained that his meal was delivered on the lavatory truck. ECF Doc. 31-2, ¶ 27.E.  A number of pilots have become seriously ill from food poisoning from company catered food. ECF Doc. 31-34, ¶ 6.

65.     The Union's policy that an aircraft should not depart unless properly catered dates back to March 2015.  ECF Doc. 31-34, ¶ 4.  In March 2015, a flight to Baltimore, Maryland (BWI) had an unscheduled layover in Aruba due to the failure by Atlas's flight operations department to notify U.S. Immigration and Customs Enforcement at BWI of the flight's scheduled arrival. *Id.* The catering the next day consisted of turkey and ham sandwiches, rather than the contractually required hot meals. *Id.* The pilots learned that Atlas had not ordered hot meals as required by the CBA. *Id.* The Union filed a grievance on behalf of the pilots on March

29, 2015. *Id.* The Union and Company met to discuss the grievance shortly thereafter, and the parties ultimately resolved the grievance in the Union's favor. *Id.* In resolving the grievance, Atlas Chief Pilot DuFour stated that from that point on, if the aircraft moved (blocked out) with improper catering, Atlas would not consider any complaints about the catering on that flight to be a grievance under the parties' collective bargaining agreement. *Id.*; see also Tr. Day 3, Kirchner at 72:12-21. At that meeting, the Union made it clear that in light of DuFour's positon, the Union considered such incidents CBA violations and that in the future, if such an infraction arose, the airplane will not be moved until all required catering was on board. *Id.*

66.     When the Union tells pilots to make certain that they receive CBA compliant catering prior to departure, they do so for very serious and practical reasons - if the proper catering is not provided on the ground, it will not be available once the jet and crews are airborne. ECF Doc. 31-2, ¶ 27.E. It obviously does the pilot little good to wait for the Union to file and pursue a grievance on his behalf (a process which can take weeks, months or even years to see a resolution) over improper crew food. *Id.*; Tr. Day 3, Kirchner at 73:15-20.

67.     Finally, Dr. Lee has not shown that Atlas' pilots have increased flight delays due to rejected crew meals since February 2016 in service of a concerted slowdown. Indeed, Dr. Lee's general assertion that pilots have intentionally delayed aircraft is, as aforesaid, unsupported. ECF Doc. 31-3, ¶¶ IV.E and F.

### G. Plaintiffs Made No Effort to Resolve This Dispute Before Filing for an Injunction.

68.     Capt. Carlson sent President Wells and Capt. Kirchner a letter dated December 17, 2016 letter in which he accused the Atlas pilots of "calling in sick at a rate significantly higher than normal past practice" and "refusing to volunteer for and accept 'open time' flying in contravention of past practice," claiming that the pilots' alleged behavior violated the status quo

obligations under the RLA and requesting that the Union "…immediately instruct its members not to call in sick for the purpose of disrupting the Company's operation, to return to normal practices of volunteering for and accepting open time flying and not to otherwise disturb the status quo in any other way." Tr. Day 2, Carlson at 209:15-210:7; ECF Doc. 5-39.

69.     Capt. Kirchner and President Wells responded to Capt. Carlson in a letter dated December 19, 2016, pointing out that the accusations made against the Atlas pilots were devoid of any substantiating facts and that Capt. Carlson had failed to identify the "past practices" that he was referring to in his letter. Tr. Day 2, Carlson at 210:8-22; ECF Doc. 5-40.   That letter noted that Capt. Kirchner held a follow-up telephone discussion with Capt. Carlson, during which Capt. Kirchner again asked Capt. Carlson to provide him with details to substantiate his claims against the pilot and his claims regarding the existence of past practices. Tr. Day 2, Carlson at 210:23-211:6; ECF Doc. 5-40. Capt. Carlson refused to provide any facts, and simply expressed management's anger concerning recent media coverage mentioning Atlas and one of its customers, Amazon.  *Id.*   That letter also noted that President Wells spoke with Atlas president John Dietrich regarding Capt. Carlson's December 17, 2016 letter, and asked Mr. Dietrich "to provide us a factual explanation substantiating the claims raised in [the December 17, 2016] letter so that [they] could discuss the situation, determine whether any problems exist and resolve them if there are any." Tr. Day 2, Carlson at 211:7-22; ECF Doc. 5-40.   Like Capt. Carlson, Mr. Dietrich "refused to provide any facts to substantiate the claims raised in your letter. He instead stated that Atlas would provide details at some later time and in an "appropriate forum." *Id.*   Capt. Carlson admitted that he did not provide any details to substantiate the Company's claims. Tr. Day 2, Carlson at 212:14-16.   He also admitted that by this time, Atlas had already retained Dr. Lee and his company to monitor data to substantiate such claims. Tr.

34

Day 2, Carlson at 212:17-20; Tr. Day 1, Lee at 148.   Carlson also acknowledged that the Company's accusations of improper conduct by the Union were triggered by management's anger regarding unfavorable media attention directed against it and its customers, including Amazon, focusing on the Union's dispute with the Company and questioning whether the Company's pilot staffing problems would negatively impact Amazon's operations. Tr. Day 2, Carlson at 218:8-220:10.

70.     Atlas' CEO William Flynn spoke with IBT Airline Division Director Capt. David Bourne on May 31, 2017. Tr. Day 3, at 11:20-12:2.   Flynn testified that he conveyed his "concern" that Atlas was "a target of a concerted slowdown campaign." Tr. Day 3, at 11:22-24. He initially testified that Capt. Bourne responded, "That's not right, it should stop." Tr. Day 3, at 12:5.   Upon cross examination, Flynn admitted that he did not provide details at that meeting. Tr. Day 3, at 28:9-10.   He claimed that the union knew that details were readily available. *Id.*   On cross he also backtracked from his direct testimony and acknowledged that Capt. Bourne did not agree that concerted action was going on. Tr. Day 3, at 28:4-5.

71.     Atlas' negotiator, Jerrold Glass, describes a June 9, 2017 telephone conversation between himself and the Union's attorney's during which he stated that Atlas "knew that the Atlas pilots were engaged in a status quo violation disrupting Atlas's operations," that "Atlas expected the slowdown to stop," that "Atlas reserved all of its legal rights," and asking that Local 1224's attorneys "inform their clients about what he sa*Id.*" ECF Doc. 5-102, ¶¶ 5-6.   Again, Glass did not claim to have provided any details to substantiate Atlas' claims. *Id.* Glass did not testify at the hearing.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with the Clerk of this Court this 10th day of November, 2017, and was served on all parties, electronically through the Court's ECF system.

_/s/ James Petroff_
James Petroff