# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ATLAS AIR, INC., *et al.*,

        *Plaintiffs*,

    v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, *et al.*,

        *Defendants*.

Civil Action No. 17-1953 (RDM)

## MEMORANDUM OPINION

This matter is currently before the Court on Plaintiffs' motion for a preliminary injunction, Dkt. 5, and Defendants' motion to dismiss, Dkt. 51.

The case grows out of a labor dispute between Plaintiffs Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (collectively "Atlas") and Defendants International Brotherhood of Teamsters; International Brotherhood of Teamsters, Airline Division; and Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 (collectively "the Union"). Atlas is an airline that operates cargo and passenger flights for commercial customers (such as Amazon, DHL, Qantas, Nippon Cargo Airlines, and Hong Kong Air Cargo Carrier) and the U.S. military. It operates both long-haul, international and domestic flights. The Union is the certified exclusive bargaining representative of Atlas's pilots. Atlas and the Union currently operate under a collective bargaining agreement ("CBA") that took effect on September 8, 2011. That agreement became "amendable" on September 8, 2016, and the parties have been engaged in contract negotiations since earlier that year. All agree that those negotiations are governed by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, which

applies to railroad and airline labor relations. The parties disagree, however, about almost everything else in this case, including the relevance of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 *et seq.*

The RLA distinguishes between two types of disputes: "major disputes," which arise "out of efforts to form or change a collective bargaining agreement," and "minor disputes," which relate "to the proper meaning or application of an existing agreement." *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines*, 869 F.2d 1518, 1524 (D.C. Cir. 1989) ("*Eastern Air Lines II*"). This distinction has important ramifications. In the case of a "major dispute," the RLA requires the parties to engage in "a lengthy process of bargaining and mediation," and—most significantly for present purposes—it requires the parties "to maintain the status quo" while that lengthy process plays out. *Consolidated Rail v. Railway Labor Execs.' Ass'n*, 491 U.S. 299, 302 (1989). The "use of economic force" is not permitted during this period, and the federal district courts are empowered "to enjoin a violation of the status quo." *Id.* at 303. In contrast, in the case of a "minor dispute," the RLA requires that the parties confer and, if necessary, submit to compulsory arbitration to resolve disputes involving the interpretation or application of their collective bargaining agreement. *Id.* That process moves considerably faster than the major dispute process and operates against a different background norm: unlike major disputes, the "general"—or categorical—"statutory obligation . . . to maintain the status quo" does not extend to minor disputes. *Id.* at 304.

According to Atlas, it is in the midst of a major dispute with the Union regarding amendment of the CBA, and the Union has violated its statutory obligation to maintain the status quo during the ongoing contract negotiations. Atlas argues, in particular, that the Union has orchestrated a concerted slowdown of flight operations in an effort to generate economic

leverage in the ongoing contract negotiations. It contends, for example, that the Union has encouraged Atlas's pilots to more frequently call in sick on short notice, to more frequently decline to fly because of fatigue, to refuse to volunteer for open flight assignments, and to delay flight departures by "blocking out on time." Although Atlas argues that the RLA does not require proof of irreparable injury to sustain the issuance of a status quo injunction, it also maintains that it will suffer irreparable damage to its reputation and business if the slowdown is allowed to continue during the peak shipping season between Thanksgiving and the end of the year.

The Union, in contrast, contends that the present dispute is governed by the existing CBA and thus constitutes a minor dispute, which does not demand preservation of the status quo. It also argues, however, that Atlas is wrong and that it has not encouraged Union members to engage in a slowdown. Rather, according to the Union, Atlas's woes are the result of the company's rapid growth and poor management, an increased focus on preventing unsafe flying conditions, and the Union's desire to ensure that Atlas abides by its existing contractual obligations. Because the Union, as a result, views the present dispute as no more than a garden-variety disagreement over what is allowed under the CBA, it asserts that the status quo requirement of the RLA is inapplicable and that, for this and other reasons, the NLGA strips the Court of jurisdiction to issue an injunction. Finally, the Union argues that the injunction that Atlas seeks would run afoul of the First Amendment.

As explained below, the Court concludes that it has jurisdiction to consider Atlas's motion for a preliminary injunction. The Court further concludes, moreover, that Atlas has carried its burden of demonstrating that it is likely to succeed on the merits; that, to the extent required to do so, it has established that it will likely suffer irreparable injury in the absence of a

preliminary injunction; that the Union will not suffer any countervailing injury if such an injunction is issued; and that the public interest tips in favor of issuing a preliminary injunction.

The scope of the preliminary injunction, however, presents a more difficult question. All agree that airline pilots should not fly sick or fatigued, that not every flight can or should block out before its scheduled departure time, and that pilots cannot be forced to *volunteer* for open flights. It is difficult, if not impossible, moreover, for the Union, Atlas, or the Court to determine whether a particular pilot could have provided earlier notice before calling in sick, whether a particular pilot is too tired to fly safely, or whether a pilot legitimately wanted to spend more time with her family and thus decided not to volunteer for an open flight for reasons wholly unrelated to a slowdown. What must stop, however, are efforts by the Union to tie activity of this or any similar type to the collective bargaining process and to encourage pilots to change their behavior in light of the ongoing labor dispute.

## I.  STATUTORY BACKGROUND

### A.  Railway Labor Act

Congress has long sought to "minimiz[e] interruptions in the Nation's transportation services by strikes and labor disputes." *Int'l Ass'n of Machinists v. Central Airlines*, 372 U.S. 682, 687 (1963). These efforts have resulted in "successive attempts to establish effective machinery to resolve disputes not only as to wages, hours, and working conditions, . . . but also as to the interpretation and application of existing contracts." *Id*. Congress's first attempt was the Transportation Act of 1920, which soon drew the ire of both labor and management for being toothless and allowing the circumvention of rulings made by the administrative agency the act created. *Id*.

In response, Congress enacted the Railway Labor Act of 1926, and amended it in 1934. *Id*. at 688. This framework was more successful. *Id*. Unlike agreements subject to the National

Labor Relations Act, it made collective bargaining agreements in covered transportation sectors perpetual; absent change through the prescribed statutory mechanisms, a CBA subject to the RLA never expires. *See* Katherine Van Wezel Stone, *Labor Relations on the Airlines: The Railway Labor Act in the Era of Deregulation*, 42 Stan. L. Rev. 1485, 1495–96 (1990) [hereinafter *Labor Relations on the Airlines*]; *see also* 45 U.S.C. § 152, Seventh; *Bhd. of Ry. & S.S. Clerks v. Florida E. Coast Ry.*, 384 U.S. 238, 243 (1966). The RLA, after the 1934 amendments, also created two methods for resolving conflicts between labor and management, and enlisted the courts in enforcing the statutory scheme. *Air Lines Pilots Ass'n, Int'l v. Eastern Air Lines*, 863 F.2d 891, 895 (D.C. Cir. 1988) ("*Eastern Air Lines I*").

The procedure employed to resolve a conflict depends on whether the dispute is "major" or "minor" in nature. For the former, Section 6 of the RLA creates a process "described by the Supreme Court as 'almost interminable.'" *Id.* (quoting *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 148 (1969) ("*Shore Line*")); 45 U.S.C. §§ 181, 182 (applying Section 6 to the airline industry). First, the parties must undertake a period of negotiation. *See Eastern Air Lines I*, 863 F.2d at 895. If that fails, the disagreement proceeds to the National Mediation Board ("NMB"), an administrative agency created by the RLA. *Id.* The NMB attempts mediation, or, if the parties consent, conducts voluntary arbitration. *Id.* In the event arbitration is declined and mediation fails, the dispute "then may be subject to presidential intervention to ensure adjustment." *Id.* During this process of negotiation and mediation, Section 2, First and Section 6 of the RLA prevent either party from altering the "status quo," and "either party is entitled to an injunction prohibiting any changes in 'rates of pay, rules, or working conditions.'" *Id.* (quoting 45 U.S.C. § 156). Only after these steps are exhausted and a mandatory cooling-off period has elapsed may the parties resort to economic self-help, such as a

strike or lockout. *Id.* This dictate to maintain present conditions is commonly known as the "status quo obligation," and an injunction to enforce it as a "status quo injunction."

The procedures governing major disputes are "purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the disputes." *Florida E. Coast Ry.*, 384 U.S. at 246. Importantly, because a CBA governed by the RLA never expires, these procedures apply any time a party seeks to negotiate a new CBA. The party seeking amendment must give notice under Section 6 of the RLA and then follow the procedures described above. *See* 45 U.S.C. § 156. In the airline industry, most CBAs further include a temporal restriction on when Section 6 notice can first be given. *See, e.g.*, *Ass'n of Flight Attendants v. United Airlines*, 71 F.3d 915, 917 (D.C. Cir. 1995); *IBT/HERE Emp. Representatives' Council v. Gate Gourmet Div. Ams.*, 402 F. Supp. 2d 289, 290 (D.D.C. 2005) ("*Gate Gourmet*"). The date on which the parties are allowed to formally initiate renegotiation of the CBA is referred to as the "amendable date."

By contrast, when labor and management cannot resolve a minor dispute through negotiation, the RLA mandates that the parties submit the conflict to a board for binding arbitration. *See Eastern Air Lines I*, 863 F.2d at 895; *see also* 45 U.S.C. § 184 ("The disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . may be referred by petition of the parties or by either party to an appropriate adjustment board."). When Congress extended the RLA to airlines in 1936, it tasked companies and unions with establishing their own arbitration boards until such time as the NMB deemed the establishment of a permanent national board for airlines necessary. *Central Airlines*, 372 U.S. at 685–86; *see also* 45 U.S.C. § 184. The arbitration boards created by labor and

management continue to be employed today, and are known as "system boards," *Central Airlines*, 372 U.S. at 690, or, in the case of Atlas and the Union, a "System Board of Adjustment," Dkt. 51-1 at 6.  Most relevant to the present case, "the arbitration board's jurisdiction over minor disputes is exclusive; the courts do not have jurisdiction to issue status quo injunctions."  *Eastern Air Lines I*, 863 F.2d at 895–96.  As a result, each party "is free to act under its interpretation of the collective bargaining agreement until the arbitrator rules otherwise."[1]  *Eastern Air Lines II*, 869 F.2d at 1520–21.

## B.  Norris-LaGuardia Act

This case also involves a "labor dispute" as defined by the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*  Congress enacted the NLGA to curtail "the growing tendency of federal courts to enjoin strikes by narrowly construing the Clayton Act's labor exemption from the Sherman Act's prohibition against conspiracies to restrain trade."  *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 708 (1982).  Among other things, the NLGA states that in any "controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment," 29 U.S.C. § 113, "[n]o court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction . . . except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in

---

[1]  A "narrow exception to this rule" permits a district court to "exercise equitable power" to issue a minor dispute injunction when "necessary to preserve the arbitrator's ability to decide the dispute."  *Eastern Air Lines II*, 869 F.2d at 1520–21 n.2.  Because unions may not "make a minor dispute the subject of a strike," *Eastern Air Lines I*, 863 F.2d at 896, courts may also enjoin minor dispute strikes and, in doing so, may "condition the granting of [the] strike injunction on a requirement that the employer maintain the status quo pending . . . resolution of" a minor dispute, *Consolidated Rail*, 491 U.S. at 304.

this chapter," 29 U.S.C. § 101.  Section 4 of the NLGA enumerates the specific acts that courts

lack jurisdiction to enjoin, which include "[c]easing or refusing to perform any work."  29 U.S.C.

§ 104.

The NLGA also contains a number of additional jurisdictional restraints on the

judiciary's authority to issue labor injunctions.  Most relevant to the present case are those

contained in Section 8, which states:

> No restraining order or injunctive relief shall be granted to any complainant who
> has failed to comply with any obligation imposed by law which is involved in the
> labor dispute in question, or who has failed to make every reasonable effort to settle
> such dispute either by negotiation or with the aid of any available governmental
> machinery of mediation or voluntary arbitration.

29 U.S.C. § 108.  Section 8 accordingly creates two obligations.  First, the party seeking a labor

injunction must "comply with any obligation imposed by law."  *Id*.  Second, unless the moving

party has "ma[d]e every reasonable effort to settle the dispute, he is forbidden relief."  *Bhd. of*

*R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, P. & W.R. Co.*, 321 U.S. 50, 56–57 (1944).  "The

latter condition is broader than the former" and requires that the moving party "go beyond [his

legal obligations] and make all reasonable effort" to settle the dispute.  *Id*. at 57.

Although sweeping, this obligation has limits because the NLGA "cannot be read alone

in matters dealing with railway labor disputes."  *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R.*,

353 U.S. 30, 40 (1957).  Instead, "[t]here must be an accommodation of [the NLGA] and the

Railway Labor Act so that the obvious purpose in the enactment of each is preserved."  *Id*.  That

accommodation recognizes that the RLA provides "special processes intended to [achieve]

compromise" between companies and unions in railway and airline cases, and that the NLGA

also applies to the extent it is not inconsistent with the RLA.  *Id.* at 41.

## II. FACTUAL BACKGROUND

### A. The Parties

Plaintiffs Atlas Air, Inc. and Polar Air Worldwide Cargo, Inc. are global airlines offering cargo and passenger service. Dkt. 48 at 2. Both are owned by Atlas Air Worldwide Holdings, Inc., a holding company based in Purchase, New York. *Id*. at 2–3. Atlas conducts various types of operations. First, it conducts international, long-haul cargo and passenger flights using primarily B-747s that are typically scheduled on an ad hoc, point-to-point basis. Dkt. 47 at 2–3. These flights took Atlas's pilots and planes to more than 400 airports in 100 different countries in the past year. *Id.* at 2. In addition to transporting time-sensitive products and equipment for customers like Qantas, Cathay Pacific, and Nippon Cargo Airlines, Atlas is the largest provider of commercial, wide-body cargo airlift services for the United States Military Air Mobility Command. *Id.* at 3. Pilots serving these routes often fly multiple legs overseas rather than returning to a base in the United States between operations. *Id.* at 4. Because of the lack of centralized bases, staffing these flights requires coordinating crew schedules across multiple flights and continents. Dkt. 48 at 5. Traditionally, these operations constituted the lion's share of Atlas's business. Dkt. 47 at 3.

In recent years, however, the growth of online shopping has dramatically increased domestic demand for air freight. *Id*. Atlas has responded by increasing its fleet of B-767s, which it uses to operate shorter-haul, domestic cargo flights for customers like Amazon and DHL. *Id*. Unlike Atlas's long-haul operations, these flights are typically scheduled in advance or conducted on a regular schedule, adding predictability to Atlas's operations. *Id.* at 4. The parties agree that these developments have created two separate networks—one international and highly decentralized, the other domestic and more hub-oriented—that operate under a single corporate and union structure using the same pilots. Dkt. 47 at 3; Dkt. 48 at 4–5. In response to

the increased demand for domestic cargo operations, Atlas has hired large numbers of new pilots in recent years. Dkt. 48 at 6. From September 2015 to September 2017, for example, the number of pilots employed by Atlas with less than three years of experience increased from 36% of all pilots to 51% of all pilots. Dkt. 57-12 at 2.

Defendants International Brotherhood of Teamsters and its Airline Division represent the Atlas pilots. Dkt. 31-2 at 3. The Teamsters were certified as the exclusive bargaining representative of the pilots under the RLA on December 22, 2008. *Id.* at 4. A local affiliate of the Teamsters—Local Union No. 1224, the third Defendant in this case—has responsibility for day-to-day representation of Atlas pilots. *Id.* at 3–4. Local 1224, in turn, manages the representation of Atlas pilots through a five-person, elected board called the Atlas Pilots' Executive Committee. *Id.*

## B. The Existing Collective Bargaining Agreement

After several years of negotiations, the current collective bargaining agreement between Atlas and the Union took effect on September 8, 2011. Dkt. 47 at 6. Although this opinion refers to the Plaintiffs collectively as "Atlas," as previously noted, they are in fact two separate airlines (Atlas Air and Polar) owned by a holding company (Atlas Air Worldwide Holdings). In early 2009, the Union, Atlas Air, and Polar agreed to negotiate a merged contract that would cover both Atlas Air and Polar pilots, despite the fact that the two companies are separate legal entities. Dkt. 31-2 at 4–5. That agreement to negotiate provided that, in the event a contract could not be reached, the parties would submit to binding arbitration. *Id.* at 5. The negotiations over the CBA were fraught, and, by late 2010, the parties concluded they could not reach an agreement and thus submitted the matter to arbitration. *Id.* The existing CBA was then fashioned by the arbitration board. *Id.*

That CBA contains several provisions arguably bearing on the present dispute. First, it prohibited both parties from seeking to amend or otherwise to change the agreement for five years from its effective date. Dkt. 31-1 at 282. Under this provision, the agreement became amendable on September 8, 2016, although either party could serve notice on the other of intent to seek a change in the agreement up to 270 days beforehand. *Id*. Consistent with the RLA, if no party served such notice, the CBA was to remain in effect. *Id*.

Second, the CBA restricts the Union's ability to employ economic self-help until authorized to do so under the RLA. Section 26.X states, in full:

> The Union, through its Atlas Air, Inc. Executive Council, agrees that during the term of the Agreement there will not be any complete or partial strikes, picketing, slowdowns, unfair labor practice strikes, refusals to cross picket lines, sympathy strikes, work stoppages, secondary boycotts, withholding of services in whole or in part, concerted refusal to work normal overtime, or other cessation of work of disturbances economic or otherwise unless and until the parties' rights to self-help mature under the Railway Labor Act, provided, however, that nothing herein shall be construed to limit the Union's right to engage in otherwise lawful informational picketing. This paragraph shall not alter or limit the Company's right, if any, to obtain a court order enjoining such conduct by the Union and[/]or the Crewmembers both collectively and individually. Nothing in this paragraph shall be construed, however, to limit the rights of the Union or the Atlas Crewmembers to refuse to cross lawful strike picket lines established by or on behalf of pilots represented by any union lawfully certified or recognized pursuant to the Railway Labor Act.

*Id.* at 204.

Third, the CBA provides a mechanism for addressing asserted violations by the Union of Section 26.X. Section 20.D provides:

> In the case of a grievance initiated by the Company (a "Company grievance"), the Company shall submit the Grievance to the Union in writing or by electronic mail. The Company grievance shall conform with the timeliness and formal requirements set forth in subsection 20.B.1.a, above. The Company may file a grievance only over the interpretation or application of the Agreement. Within thirty (30) days of submission of a Company grievance, a Union official designated by the Union will meet with the Company's Vice President of Flight Operations and the Company's senior official responsible for Crewmember labor relations, or their designees, to discuss the matter. If the grievance cannot be resolved as a result of this meeting

then within thirty (30) days following such meeting, the grievance may be appealed by the Company to the Board by filing a notice of appeal to the Board on or before the thirty-first (31) day following the meeting. Such appeals shall conform to the requirements set forth in 20.B.3.a., above, except the notice of appeal shall be filed with a Union official designated by the Union.

*Id.* at 126–27.

Finally, the Board to which Section 20.D refers is the System Board of Adjustment established in Section 21 of the CBA. *Id.* at 130. That section describes in detail the process and timeline for proceeding with arbitration and limits the jurisdiction of the Board. With respect to the Board's jurisdiction, the CBA states that it "shall not extend to any proposed changes in rates of pay, rules or working conditions" and that "[t]he Board shall not have any jurisdiction to add to, subtract from, modify or amend any of the terms of this Agreement." *Id.* The CBA envisions a process for resolving grievances that takes several months. Once the parties conclude they are unable to resolve the grievance among themselves, they may appeal to the Board. *Id.* at 130–31. At that point, ten days must elapse before the selection of an arbitrator may begin. *Id.* at 132. The arbitrator sits as the Board's third member, and is chosen after the Union and Atlas each select one Board member. *Id.* Upon selection, the arbitrator must propose dates for a hearing, and those dates must be within sixty days. *Id.* After the hearing, the Board must issue its decision within sixty days. *Id.* at 133.

**C. Negotiations to Amend the Collective Bargaining Agreement**

In late 2014, Local 1224 held elections for its Atlas Pilots' Executive Committee. Dkt. 48 at 8–9. Captain Robert Kirchner, an employee of Atlas or its predecessor companies since January 2000, ran for chairman. *Id.* at 9; Dkt. 31-2 at 2. At some point during the fall of 2014, he had dinner with Captain Jeffrey Carlson, the Senior Vice President of Flight Operations at Atlas since October 2008. Dkt. 48 at 8; Dkt. 5-3 at 1. At the dinner, Captain Kirchner indicated that he was running on a platform of what he termed "strict contract compliance." Dkt. 31-2 at

15.  Captain Kirchner alleges that Captain Carlson agreed that such compliance was the proper way forward for the parties, *id.*, and Captain Carlson testified that "contract compliance was the message he sent me.  And he asked me how the company felt about that.  And like I reflected before, we absolutely support honoring the contract."  Hearing Tr. Day 2 (57:15–17).

Captain Kirchner was elected chairman of the Atlas Pilots' Executive Committee in November 2014.  Dkt. 48 at 9.  Before taking office, he prepared a bullet point proposal for Atlas's upper management to "mitigate the loss of experienced pilots" in light of what he regarded to be a "large gap in compensation and retirement" benefits provided under the Atlas contract and "the trends in the industry."  Hearing Tr. Day 3 (54:10–55:6); Dkt. 58-1 at 2. According to Captain Kirchner, although Atlas's management "took" the proposal "as a contract opener," he explained that he was not seeking to open negotiations prior to the amendable date, which was still over a year and a half away.  Hearing Tr. Day 3 (55:10–56:4).  In any event, all agree that Atlas was not required to engage in contract negotiations at the time and that it declined to do so.  Hearing Tr. Day 2 (60:15–21).

On January 1, 2015, Captain Kirchner took office as chairman of the Atlas Pilots' Executive Committee.  Dkt. 31-2 at 4.  On January 19, 2016, the holding company that owns Atlas and Polar announced its agreement to acquire two additional airlines, Southern and Florida West.  *Id.* at 6.  The holding company soon announced its intention to merge Atlas and Southern, while keeping Florida West and Polar as separate entities.  *Id.* at 7.  The holding company has since "wound down" Florida West.  Dkt. 5-3 at 6.  The crewmembers of Southern are also represented by the Union and are parties to a collective bargaining agreement that became amendable on November 6, 2016.  *Id.*

On February 16, 2016, the Union served written notice under Section 6 of the RLA on Atlas that it would seek to modify the collective bargaining agreement that had been imposed by the arbitration board. Dkt. 31-2 at 6. Although the amendable date was still months away, the notice was not premature under the terms of the existing CBA, which allowed a party to serve notice of an intent to seek changes as early as 270 days before the amendable date. *Id*. Around the same time, the Union also sent a Section 6 notice to Southern. Dkt. 5-3 at 6. According to the Union, at a March 15, 2016 negotiating session, Atlas announced that it would no longer engage in standalone negotiations with the Union to amend the Atlas CBA; instead, it would negotiate only a "merged" collective bargaining agreement that would cover both Atlas and Southern pilots. Dkt. 31-2 at 7. Atlas took the position that such a merged agreement was required by the existing CBA, while the Union argued that the holding company, rather than Atlas, had acquired Southern. *Id*. To the Union, that meant that only the holding company could seek a merged agreement. *Id.* Because the holding company had refused to be made a party to the CBA during the negotiations that led to the arbitration that created the existing CBA, the Union argued that it could not then invoke that agreement. *Id*. The Union instead offered to extend the existing CBA while Southern and Atlas formally merged, to integrate the Southern pilots into the existing CBA, and to sign a separate agreement that would address concerns the Union had regarding the application of the present CBA to the companies' growing domestic cargo operation. *Id*. at 8. Atlas and Southern refused the Union's offer. Dkt. 5-3 at 7; Dkt 31-2 at 10.

On April 13, 2016, the Union applied to the NMB for mediation. Dkt. 31-2 at 10. The next day, Atlas filed a grievance under the existing CBA alleging that the Union had failed to follow procedures for negotiating a post-merger CBA as required by the contract. *Id.* The Union

declined to follow the arbitration procedure set out by the CBA, alleging that that the contract provisions could not properly be invoked given the structure of the acquisition of Southern and the fact that Atlas, rather than the holding company, was a party to the existing CBA. *Id*.; Hearing Tr. Day 2 (133:18–134:21). NMB mediation began but was never completed. Dkt. 31-2 at 10–11. After nearly a year of impasse, Atlas Air and Southern sued the Union in the Southern District of New York to compel arbitration under each company's existing CBA, which set out a mechanism for creating a merged contract. *Id.* at 11. The Union contends that Atlas's goal is to force the creation a new CBA through arbitration rather than the major dispute process set forth in the RLA. *Id*. The latter process would require NMB mediation, and, if such mediation failed, would eventually permit the parties to use economic self-help. *Id*. at 11–12.

## D. The Alleged Slowdown

The Union actions that Atlas alleges constitute an illegal slowdown in violation of the RLA's status quo requirement will be discussed in more detail below. A brief introduction to the Union communications and pilot actions at issue, however, is helpful to set the stage.

After taking office in January 2015, Captain Kirchner launched an effort to revamp the Union's program for communicating with its member pilots. He made it a top priority within the Atlas Pilots' Executive Committee "to better educate the Atlas pilots." *Id.* at 19. Among other steps, he instituted periodic Atlas Teamsters Action Messages ("ATAMs"), which take the style of a radio talk show or podcast, and "Atlas Pilots Crew Calls," which provide an unscripted forum for rank-and-file pilots to call in to ask Captain Kirchner and others questions. *Id*. at 19–21.

A major theme of the ATAMs and Crew Calls has been to encourage pilots to "Stop Helping Out Purchase," or "SHOP"—Purchase, New York, being the headquarters of Atlas. *Id.* at 20. Captain Kirchner and Captain Mike Griffith, the Executive Committee Communications

Chairman, have urged pilots to "honor the CBA every day and on every flight" and to "hold management accountable." Dkt. 5-3 at 11 (quoting June 23, 2017 Chairman's Update & August 31, 2017 ATAM). When a rank and file member of the Union noted during a February 2016 Crew Call, for example, that a new contract that treats pilots "fairly" would provide an incentive for them "to go above and beyond to get the job done," Captain Kirchner responded, "that's a great point," and "[r]emember, everybody . . . [w]hen you're there doing your job, you're also at the negotiating table. And every time they out-negotiate you by getting you to violate the CBA and [by] getting you to do their job for them, they win at the negotiating table." Dkt. 28-3 at 11–12. As the Union's communication's director put it during an ATAM, "the leverage" the Union "needs to go up against" Atlas management will come from members acting together—in "solidarity"—to strictly comply with the CBA. Dkt. 5-53 at 20–21. Or, in the words of yet another ATAM, "[f]ollow the CBA[, a]nd SHOP every chance you get when you're at work, because[] it's working." Dkt. 5-18 at 7 (22:22–23:2).

One specific aspect of the Union's SHOP campaign has urged pilots to "block out on time," or "BOOT." "Blocking out" refers to the process of releasing the aircraft's brake and pushing back to taxi. Dkt. 5-3 at 17. According to Atlas, the estimated departure time for a flight represents the *latest* time the "flight is expected to block out." *Id*. But, if "an aircraft is loaded and otherwise ready to depart," the pilot may—and hopefully will—block out before the estimated departure time in order to improve airline efficiency and to provide a "buffer that helps to ensure" timeliness. *Id.* at 17–18. Although a pilot needs to obtain authorization from Atlas to block out more than fifteen minutes before the estimated departure time, that is not required for the final fifteen-minute window. Dkt. 31-2 at 47. Under the BOOT campaign, however, the Union has encouraged Atlas pilots to exercise their "right" to wait until the last possible minute

to block out.  As explained by the Union in an April 12, 2016 CBA Chat:  "BOOT stands for Block Out on Time.  And we are not doing this.  We are going early, left right, and center. . . . So now, we're asking everybody—your [Executive Committee] is asking you to not block out early, ever, period.  Period, ever."  Dkt. 5-17 at 6 (18:19–20:21).

According to Atlas, the Union's SHOP campaign and other Union-led efforts have placed significant financial pressure on the company and have upset the status quo required by the RLA. Using statistical analyses to support many of its contentions, Atlas points to the following changes in pilot behavior, which it attributes to the Union's efforts to exert pressure on the company in the ongoing contract negotiations:

First, Atlas argues that pilots are calling in sick on short notice at a higher rate than they did prior to the Section 6 notice.  Dkt. 5-3 at 7.  According to the company, the Union has instigated this change in pilot behavior in order to exert influence on the ongoing CBA negotiations.

Second, Atlas alleges that pilots are now calling in fatigued more often.  *Id*. at 11–15. Indeed, according to the company, since February 2016, when the Union notified Atlas of its intent to negotiate, the average rate of fatigue calls has nearly tripled.  Dkt. 5-103 at 28.

Third, Atlas contends that pilots are now less likely to volunteer for what is called "open time flying."  Dkt. 5-3 at 15–16.  Open time flying is the practice of picking up flights that are scheduled without an assigned crew, analogous in many ways to overtime and common in the international, long-haul cargo scheduling scheme long utilized by Atlas.  *Id*. at 15–16.  The CBA does not require pilots to volunteer for open time, but Atlas says it has had more and more trouble filling the spots.  *Id*. at 16.  In support of this contention, the company points to statistical

evidence that the proportion of unfilled open time trips each month has—at least on average—increased dramatically since February 2016. Dkt. 5-103 at 32.

Fourth, Atlas argues that the Union's BOOT campaign has resulted in far fewer departures at the time aircraft are actually loaded and ready to push back, with pilots instead waiting at the gate until the scheduled departure time. Dkt. 5-3 at 16–20. Atlas argues that leaving closer to the scheduled departure time has reduced its margin for error with respect to later, unexpected delays, especially when done in concert with slower taxiing (something Atlas also alleges it has observed). *Id*. at 19–20. In support of its contention that the Union is to blame, Atlas points to statistical evidence that the percentage of flights leaving before the estimated departure time fell dramatically after February 2016, while the number of flights departing at exactly the estimated departure time rose at a corresponding rate. Dkt. 5-103 at 38.

Fifth, the company asserts that pilots have increased the number of maintenance write-ups they are making, including demanding that minor issues be corrected prior to departure rather than flying with open maintenance issues that do not affect the safety of the aircraft. Dkt. 5-3 at 20–21.

Finally, Atlas contends that pilots have begun refusing to fly because of noncompliance with the CBA's crew meal provisions, whereas they previously accepted vouchers or other compensation in exchange for waiving compliance. *Id*. at 21–22.

To the extent the CBA arguably permits some of these behaviors, Atlas takes issue with changes in pilot behavior over the life of the CBA. *See id.*

The Union, for its part, disputes virtually all of these allegations. Its more specific rejoinders are discussed below, but its counterarguments take three general tacks. First, it disputes the statistical analysis offered by Atlas, and it offers its own expert who reaches

different conclusions. *See* Dkt. 31-3. Second, it argues that any changes revealed by the data are the result of other causes unrelated to the ongoing CBA negotiations. It argues, for example, that changing regulations, safety awareness, and crew compositions have led to the increase in fatigue calls, and it offers declarations from pilots contesting Atlas's account of their decisions to call in sick or fatigued. *Id.*; *see also* Dkt. 31-2. Similarly, it contends the BOOT campaign is intended to prevent pilots from violating various rules, including Federal Aviation Administration ("FAA") "regulatory flight duty time limits and rest requirements." Dkt. 31-2 at 28. Third, it suggests that any changes that can actually be traced to the Union's communications are affirmatively permitted by the CBA, and thus cannot constitute a violation of the status quo. That is, the Union is merely requiring that Atlas abide by the existing contract; the SHOP campaign has not sought to shift the playing field, but only to ensure that future negotiations take as their starting point the playing field that was agreed to in the 2011 CBA.

## E. Resumption of Negotiations and the Present Suit

Despite disputes along the way, the parties concluded an agreement in June 2017 on a negotiating protocol called the "Negotiation Process to Facilitate Completion of Collective Bargaining Negotiations," which led to a resumption of formal negotiations on July 6, 2017. Dkt. 5-3 at 6–7. The lawsuit in the Southern District of New York seeking to compel the Union to accept binding arbitration as to the contents of the new CBA remains pending, however.

On September 25, 2017, Atlas filed the present suit, Dkt. 1, and simultaneously moved for a preliminary injunction, Dkt. 5. The Court held a scheduling conference on September 29, 2017, and set an expedited schedule for discovery and briefing. Minute Entry (Sept. 29, 2017). The Court held an evidentiary hearing on October 31, November 1, and November 2, 2017. Minute Entry (Oct. 31, 2017); Minute Entry (Nov. 1, 2017); Minute Entry (Nov. 2, 2017). The parties agreed to offer their direct testimony in declarations, which the witnesses summarized

and affirmed on the stand. *See* Dkt. 39 (Rough Tr. at 2:12–4:20). The opposing party was then allowed to cross-examine the witnesses regarding both their live testimony and their declarations. Where the opposing party waived cross-examination, the witnesses were permitted to rest on the written declarations alone.

Following the evidentiary hearing, the parties submitted post-hearing briefs, Dkt. 49; Dkt. 50, and proposed findings of fact, Dkt. 47; Dkt. 48. The Union concurrently filed a motion to dismiss for lack of subject matter jurisdiction. Dkt. 51. Atlas responded on November 14, 2017, Dkt. 52, and the Union filed its reply on November 17, 2017, Dkt. 56. All told, although the case remains at a preliminary stage, the record occupies over 5,000 pages.

## III. ANALYSIS

### A. Subject Matter Jurisdiction

The Court begins, as it must, with the question whether it has subject matter jurisdiction to grant Atlas the relief that it seeks—that is, an injunction barring the Union from encouraging its members to engage in a slowdown designed to influence the ongoing contract negotiations. The answer to that question turns on the meaning and application of both the NLGA and the RLA. As noted above, the NLGA was enacted to curtail the jurisdiction of federal courts to issue injunctions against labor unions. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 741, 772 (1961). Section 1 of the Act declares that "[n]o court of the United States . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of" the NLGA. 29 U.S.C. § 101. Section 4, then, "enumerates specific acts that shall not be subject to any restraining order or injunction," including "'[c]easing or refusing to perform any work or to remain in any relation of employment'" and "'[g]iving publicity to the existence of, or the facts involved in, any labor dispute . . . by any method not involving fraud or violence.'"

*Burlington N. R.R. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 437 (1987) (quoting 29 U.S.C. §§ 104(a), 104(e)).

At the same time, however, the RLA authorizes federal courts to enjoin unions and employers from engaging in practices that violate the RLA's status quo obligation. *See Consolidated Rail*, 491 U.S. at 302–03. As the Supreme Court has explained, "[t]he obligation of both parties during a period [for which] the[] status quo provision[] is properly invoked is to preserve and [to] maintain unchanged those actual, objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." *Shore Line*, 396 U.S. at 153. This obligation lies at the "heart" of the RLA, *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78 (1969), and it is "enforceable by whatever appropriate means might be developed on a case-by-case basis," including injunctive relief, *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 577 (1971).

The evident tension between the sweeping anti-injunction provisions of the NLGA and the need for injunctive relief as a means of enforcing the RLA has long since been resolved. Over sixty years ago, the Supreme Court declared that "the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes" and that "[t]here must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved." *Bhd. of R.R. Trainmen*, 353 U.S. at 40. That accommodation, the Court observed, can be found in the distinct purposes of the NLGA and the RLA: the NLGA was enacted to preserve the ability of unions to employ the type of "economic power" that "is vital to collective bargaining," while the RLA established alternative processes for reaching compromises in the railroad and airline industries. *Id.* at 40–41. As a result, when the provisions

of the NLGA and the RLA conflict, "the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act," and federal district courts have jurisdiction to issue those injunctive decrees that are necessary to enforce the requirements of the RLA. *Id.* at 42; *accord Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 490, 513 (1989); *Delaware & H. Ry. v. United Transp. Union*, 450 F.2d 603, 611 (D.C. Cir. 1971).

The Union does not contest this settled law but, rather, argues that the Court is without jurisdiction for two reasons specific to the present conflict. First, it argues that the dispute is a minor one within the meaning of the RLA and that, as result, the status quo obligation does not apply. Because self-help is generally permissible in minor disputes, and Atlas, in any event, has not initiated an arbitration regarding the parties' dispute, the Union contends that nothing in the RLA conflicts with—or displaces—the NLGA's restriction on the Court's jurisdiction. Indeed, the Union continues, because the present dispute is a minor one, the RLA itself specifies that arbitration is Atlas's *exclusive* remedy, thereby divesting the Court of jurisdiction. Second, the Union argues that Atlas has failed to comply with various procedural requirements contained in the NLGA; that those procedural requirements do not conflict with the RLA; and that the company's lack of strict compliance with those requirements divests the Court of jurisdiction. The Court will consider each of these contentions in turn.

1.     *The Parties are Engaged in a Major Dispute*

The Union devotes much of its argument to the contention that the parties are not engaged in a major dispute and that, as a result, the status quo obligation does not apply. A major dispute is one that "arises out of efforts to form or change a collective bargaining agreement." *Eastern Air Lines II*, 869 F.2d at 1524. It "concerns changes in 'rates of pay, rules, or working conditions,' 45 U.S.C. § 151a(4), and relates to 'the formation of [a] collective

bargaining agreement[] or efforts to secure [one].'" *Nat'l R.R. Passenger Corp. v. Transp. Workers Union of Am.*, 373 F.3d 121, 123 (D.C. Cir. 2004) ("*Amtrak*") (quoting *Hawaiian Airlines v. Norris*, 512 U.S. 246, 252 (1994)). A minor dispute, in contrast, turns on "the proper meaning or application of an existing [collective bargaining] agreement." *Eastern Air Lines II*, 869 F.3d at 1524. It "contemplates the existence of a collective bargaining agreement," *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 723 (1945), and "may be conclusively resolved by interpreting the existing agreement," *Consolidated Rail*, 491 U.S. at 305. In short, "major disputes seek to create contractual rights, minor disputes to enforcement them." *Id.* at 302.

As the plaintiff in this action, Atlas is entitled to some leeway in how it defines the dispute that it brings to the Court; the starting point is the wrong that Atlas contends it is suffering. That wrong, as Atlas describes it, is the Union's concerted effort to change pilot behavior—to SHOP, BOOT and the like—in order to bring economic pressure to bear on the company in the current CBA negotiations. Because those ongoing contract negotiations indisputably constitute a major dispute, Atlas posits that the alleged slowdown grows out of a major dispute and is, therefore, subject to the RLA's status quo obligation. The company, moreover, builds on this starting point by disavowing any dispute with the Union—at least for purposes of this case—about the meaning or application of the existing CBA. Dkt. 49 at 21 (quoting *Elgin*, 325 U.S. at 723). It does not, for example, premise its claim on an allegation that the Union is acting in violation of the CBA or that the CBA authorizes the relief that it seeks. Rather, according to Atlas, its claim is based exclusively on the status quo obligation contained in the RLA and the contention that the Union seeks to alter the status quo for purposes of affecting an ongoing major dispute.

As the Supreme Court has emphasized, there is, of course, "a danger in leaving the characterization of [a] dispute solely in the hands of one party." *Consolidated Rail*, 491 U.S. at 306. If that party's theory of the case is "insincere" or "founded upon . . . insubstantial grounds, . . . honoring [its] characterization" could "undercut" the "the proper functioning of the [RLA]." *Id.* (citation omitted). Here, however, Atlas backs up its characterization of the dispute with substantial evidence that the Union has encouraged its pilots to alter the status quo in order to exert economic leverage in the ongoing contract negotiations. Three examples are sufficient to make the point.

First, during a call with members on February 2, 2016, days before the Union served its Section 6 notice and after preliminary negotiations had begun, Captain Kirchner and other members of the Atlas Pilots' Executive Committee unambiguously tied the Union's alleged slowdown to the CBA negotiations. In the words of one member of the Executive Committee, "the only way we're going to get to the next contract is if we stop helping the Company and start helping the Negotiating Committee." Dkt. 29-1 at 3 (1:12–15). The same member of the Executive Committee also told the member pilots: "The most important [thing] we can advise everybody on the call today is stop helping the Company. You're not a travel agent. You're not a hotel clerk. You're not a transportation service. The minute we start doing our job and our job only, that will bring more pressure on the Company to stop their behavior, hold them accountable, and help our Negotiating Committee." *Id.* at 4 (2:8–16). To this, he added: "Everything we are asking you to do moving forward is counterintuitive to operating our business. But it's the only way that our negotiators are going to have the leverage as we keep the pressure on, stopping . . . helping the Company." *Id*. at 10 (8:3–8). Captain Kirchner echoed this point, telling members: "When you're out there doing your job, you're also at the

negotiating table. And every time they out-negotiate you by getting you to violate the CBA and getting you to do their job for them, they win at the negotiating table." *Id.* at 12 (10:15–20).

Second, in late June 2016, a Union leader began an ATAM by informing members that the Union was approaching "the most critical time yet for our group. That time is the approach of the amendable date of our current Collective Bargaining Agreement, or the CBA. And while the vast majority of you have shown our particular giant how we can SHOP and BOOT and even buckle down and say, first you pay me, there are still some others who just don't seem to get it." Dkt. 5-24 at 2 (1:20–2:6). During that same ATAM, he added:

> As of the recording of this ATAM, there are no future meetings scheduled with the management in Purchase for continued negotiation of our next CBA. Time will tell, but we are in for a long fight for a fair contract. But believe me, it will be worth it. Very worth it, indeed. Your [Executive Committee] also wishes to remind you that your adherence to the [existing] CBA and all the things each and every one of you are doing daily are having a tremendous affect and it's working.

*Id.* at 3 (7:3–13).

Third, taking a more recent example, a June 23, 2017 Chairman's Update once again tied the Union activity that Atlas seeks to enjoin to the ongoing contract negotiations. In that communication, Captain Kirchner wrote:

> Finally, let me talk about the company's strategy of trying to wear you out. Atlas Executives believe that if they delay a new CBA long enough, you will lose your interest and your resolve and start violating the CBA, cutting corners and resign yourselves to the status quo and abandon our quest for an industry-leading CBA. This cannot be the case! YOU must SHOP, BOOT and push back on their tactics harder than ever as we are starting to get the movement we desire. We are getting into the busy season during the second half of the year and it is now more important than ever to stay strong with your SOLIDARITY. YOU must not only honor the CBA every day and on every flight, but also hold management accountable.

Dkt. 5-66 at 4.

Many other communications in the record sound the same theme: Union members should strictly apply the existing CBA, should not do anything more than is required, should stop

25

helping the company, and should not block out early—all for the purpose of providing Union negotiators with added leverage in the ongoing contract negotiations. The Court, accordingly, finds that the Union and Atlas are involved in what is undeniably a major dispute—that is, negotiations over changing the CBA; that Atlas is not seeking to enforce any provision of the existing CBA in this case; and that the actions that Atlas does challenge are directed at the ongoing CBA negotiations. Although the mere fact that a collective bargaining agreement has expired and the parties are engaged in contract negotiations does not "automatically" render every dispute between the company and the union a major one, *Eastern Air Lines I*, 863 F.2d at 899, the status quo obligation does extend to strikes, slowdowns, and similar tactics employed to exert economic pressure on any such major-dispute negotiations, *Amtrak*, 373 F.3d at 126. Atlas, accordingly, is on firm ground in characterizing the present dispute as a major one.

The Union disagrees. In its view, this case is controlled by the Supreme Court's decision in *Consolidated Rail*, and, in particular, by the Court's admonition that "[t]he distinguishing feature of" a minor dispute "is that the dispute may be conclusively resolved by interpreting the existing agreement." 491 U.S. at 305. Indeed, according to the Union, all that is required to avoid characterization of a dispute as major is a "claim [that] is neither obviously insubstantial or frivolous, nor made in bad faith" that the activity at issue is "justified by the terms of the parties' agreement." *Id*. at 310. Here, according to the Union, that condition is satisfied for two reasons: First, the CBA itself bars the Union from engaging in slowdowns and permits the company to file a grievance if confronted with such Union action. Second, the CBA can be plausibly construed to authorize the conduct that Atlas challenges. Either of these reasons, the Union argues, make the dispute a minor one, divesting the Court of subject matter jurisdiction under Section 204 of the RLA. *See Oakey v. Airways Pilots Disability Income Plan*, 723 F.3d 227,

234, 237 (D.C. Cir. 2013) ("Section 204 refers to arbitration of . . . those 'disputes . . . growing . . . out of the interpretation or application of [existing] agreements;'" and "[t]he statutory language 'clearly states' that the arbitration requirement is jurisdictional."). The Court is unconvinced.

As an initial matter, the Court is unpersuaded by the Union's reading of *Consolidated Rail*. That case dealt with a very different question from the one presented here. In *Consolidated Rail*, Conrail announced a unilateral change in its drug testing practices; while it had previously included drug testing in *some* periodic and return-from-leave physical examinations, Conrail decided to include the test in *all* periodic and return-from-leave examinations. 491 U.S. at 300. In that context, the Court grappled with the "close" question whether the change in practice constituted a minor dispute—that is, a dispute about the meaning and application the existing agreement—or a major dispute—that is, a dispute over what was, in effect, an alteration or amendment to the agreement. *Id.* at 301–02. Neither party contested that the dispute was about the meaning of the CBA's terms; the union's argument that the dispute was major relied instead on the position that the company's interpretation was "simply not plausible." *Id.* at 315–16.[2] Ultimately, the Court held that Conrail's contention that its new practice was supported by the existing contract was not "frivolous" or "obviously insubstantial" and that, as a result, the dispute was best characterized as a minor one over which the Court lacked jurisdiction. *Id.* at 320.

This case, in contrast, is not about whether Union members may—*in the abstract*—SHOP, BOOT, or call in sick on short notice; whether the CBA permits such conduct; or whether

---

[2]  The union's primary argument, which advocated for the creation of a third category of disputes, was rejected by the Court. *Consolidated Rail*, 491 U.S. at 310.

the Union's efforts might implicitly effect an amendment to the CBA. Rather, it is about whether the Union may engage in a concerted campaign to alter the status quo (by SHOP-ing, BOOT-ing and the like) in the midst of what is unmistakably a major dispute (the negotiation of a new CBA) in order to apply economic pressure on the company in those negotiations. Significantly, the Union has failed to identify any case holding that concerted union activity that alters the status quo for the purpose of exerting economic pressure on a company engaged in collective bargaining negotiations constitutes a minor dispute.

Those cases that have considered the question, moreover, are uniform in holding that strikes, slowdowns, and similar conduct targeted at an ongoing, major dispute violates the status quo obligation contained in the RLA. In a discussion cited with approval by the D.C. Circuit, the Seventh Circuit explained that "[t]here is no question that the RLA's status quo requirement is intended to prevent a strike during the cooling-off period" and that this principle extends to other conduct that "has the consequences of a strike." *Air Line Pilots Ass'n, Int'l v. United Air Lines*, 802 F.2d 886, 906 (7th Cir. 1986) (cited with approval in *Amtrak*, 373 F.3d at 126). Thus, as the Seventh Circuit further explained, the RLA's status quo obligation prevents "[t]he concerted refusal of overtime, slow[]downs, sit-ins, strikes and other harassments by [the union and its members]." *Id.* (citation omitted). Other courts have extended this same logic to concerted refusals to fly overtime or to volunteer for unscheduled open time, *Delta Air Lines v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1307–08 (11th Cir. 2001); safety campaigns, *United Air Lines v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349, 362 (7th Cir. 2001); abusive use of sick leave, *Air Line Pilots Ass'n, Int'l*, 802 F.2d at 905; increases in pilot fatigue calls, *US Airways v. U.S. Airline Pilots Ass'n*, 813 F. Supp. 2d 710, 731 (W.D.N.C. 2011); longer taxi times, *id.*; increased write-ups of maintenance problems, *id.*; and programs "to follow the rules

strictly," *Long Island R.R. Co. v. Sys. Fed. No. 156*, 368 F.2d 50, 52 (2d Cir. 1966); *see also United Air Lines*, 243 F.3d at 366. Under this view of the RLA, the relevant question is whether the Union is orchestrating a slowdown or similar campaign that "grows out of the major dispute," *Amtrak*, 373 F.3d at 126, and that "is designed to put economic pressure on the carrier," *US Airways*, 813 F. Supp. 2d at 730. If so, a court may enjoin the campaign.

The Union suggests that this case is distinguishable from this line of authority because Section 26.X of the Atlas pilots' current CBA contains an express prohibition on strikes, slowdowns, and concerted refusal to work normal overtime, and Section 20.D of the CBA allows the company to file a grievance over the interpretation or application of the existing CBA. Dkt. 51-1 at 6–10. According to the Union, these provisions show that "the parties clearly intended to arbitrate 'slowdown' disputes and disputes over alleged 'concerted refusals to work normal overtime'" and, thus, the present dispute is at least arguably covered by the parties' contract. *Id.* at 7. Because the dispute can therefore be resolved by applying the existing CBA, the Union continues, the dispute is a minor one.

That contention, however, is unconvincing. As an initial matter, it once again ignores the substance of Atlas's claim. Atlas's claim is not that the Union is violating the CBA, but rather that it is violating the RLA by engaging in a concerted campaign to alter the status quo— regardless of whether the CBA allows or prohibits that conduct. Nor is this a case in which "the conduct giving rise to an alleged status quo violation is arguably permitted by the CBA" or which requires interpretation of the CBA. *Delta Air Lines*, 238 F.3d at 1307 n.17. To the contrary, neither Atlas nor the Union contends that the CBA permits slowdowns. What the Union does argue is that, even if a slowdown is unlawful under the CBA and the RLA, Atlas can—and therefore must—bring its challenge under the CBA grievance procedure.

29

That argument, however, conflates the question whether the dispute is a major or minor one within the meaning of the RLA with the question whether Atlas has made "every reasonable effort to settle [the] dispute" within the meaning of the NLGA. *See* 29 U.S.C. § 108. But, as explained in greater detail below, regardless of how the argument is framed, it cannot be reconciled with the considered balance that Congress struck in the status quo provisions of the RLA. Those provisions were enacted to "to avoid any interruption[s] to commerce or to the operation of any carrier engaged therein," 45 U.S.C. § 151a(1); "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes," *Hawaiian Airlines*, 512 U.S. at 252; and "to compel dialogue and concessions" in major disputes, Van Wezel Stone, *Labor Relations on the Airlines* at 1497–98. Yet, taking the Union's theory to its logical conclusion, as long as a union can make a plausible argument that, as alleged by the employer, its conduct *violates* the existing CBA, it can avoid the RLA's status quo obligation and force the company to pursue its claims of misconduct through the grievance and arbitration process. That would mean, for example, that if the Union were to respond to the company's latest offer regarding wages and terms of employment with a strike, the dispute would be a minor one given the no-strike clause in the CBA. Indeed, under the Union's theory, the same would be true of any slowdown or similar, concerted action. That, however, proves too much. Even if the RLA "allows parties to follow their own contractually negotiated procedures for amending their collective bargaining agreements in lieu of the lengthy procedures set forth in the statute," *Air Line Pilots Ass'n v. Alaska Airlines, Inc*., No. C05-0897L, 2005 WL 2898140, at *1 (W.D. Wash. Oct. 28, 2005), it does not permit the parties to jettison the statute entirely and to engage in precisely the type of conduct that Congress intended to avoid, *see United Air Lines,* 243 F.3d at 364.

Finally, in a variation of its minor dispute argument, the Union makes glancing reference to provisions of the existing CBA that, in its view, permit or authorize the conduct that Atlas seeks to enjoin. It argues, for example, that the existing CBA bars pilots from refusing to work "'normal' overtime," giving rise to an inference that pilots may refuse to work "unusual overtime." Dkt. 56 at 10. But that position, once again, misunderstands the nature of Atlas's claim. Atlas is not arguing that certain pilots were required to work overtime, or to volunteer for open time, under the existing CBA. Nor is it arguing that certain pilots violated the CBA by blocking out at the last minute or by calling in sick or fatigued. Rather, it is claiming that the *Union* is violating the *RLA* by encouraging its members to engage in a concerted effort to do less—to stop helping out Purchase—in order to obtain leverage in the ongoing contract negotiations. That claim is not dependent on whether the underlying conduct is prohibited by the existing CBA but, rather, turns on whether the Union has orchestrated a concerted change in the status quo to influence the negotiations. *See Delta Air Lines*, 238 F.3d at 1307–08; *cf. Elevator Mfrs.' Ass'n of New York, Inc. v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (2d Cir. 1982) ("That the overtime was designated as voluntary in the contract does not . . . render the concerted refusal to perform it any less a strike.") (citation omitted).

The line between major and minor disputes is not always crystal clear. *See* Van Wezel Stone, *Labor Relations on the Airlines* at 1506. Ultimately, however, the Court must make a practical assessment of the nature of the dispute and must evaluate how it fits within the "integrated, harmonious scheme" that Congress enacted. *Shore Line*, 396 U.S. at 152. Applying that approach here, the answer is—in fact—clear. We know that major disputes arise "out of efforts to form or change . . . collective bargaining agreement[s]," *Eastern Air Lines II*, 869 F.2d at 1524, while minor disputes "involve[] a controversy over the interpretation or application of

[an existing] agreement[]," *Amtrak*, 373 F.3d at 124 (internal quotation marks omitted). We know that Atlas and the Union are in the midst of negotiating a new CBA and that the Union's STOP, BOOT, and other efforts are intended to improve the Union's position in those negotiations. We know that Atlas is not seeking to enforce any right found in the existing CBA, but, rather, contends that the Union is acting in violation of the RLA. And, we know that that Union (quite obviously) does not contend that the CBA prohibits any of the conduct at issue but, rather, merely contends that it provides a mechanism that Atlas *could* invoke to seek redress. Under these circumstances, the Court must conclude that the alleged slowdown "grows out of the major dispute between" the parties, *Amtrak*, 373 F.3d at 126, and is, therefore, subject to the RLA's status quo obligation.

2. *Plaintiff Has Met the Requirements of the Norris-LaGuardia Act*

Alternatively, the Union argues that, even if the present dispute is a major one, the Court still lacks jurisdiction because Atlas has failed to comply with the procedural requirements contained in Sections 8 and 7(e) of the NLGA. The Court will address each provision in turn.

a. Section 8

Section 8 of the Norris-LaGuardia Act provides:

No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108. Actions to enjoin violations of the RLA are "subject to Section 8" of the NLGA because the requirements of that section "further the effectuation of" the RLA. *Bhd. of R.R. Trainmen v. Akron & Barberton Belt R.R. Co.*, 385 F.2d 581, 613–14 (D.C. Cir. 1967). Section 8 promotes compliance with the RLA by ensuring that a party "cannot seek an injunction until and unless it has discharged the obligations imposed by the Railway Labor Act." *Id*. at 614.

Section 8 creates two distinct hurdles to seeking injunctive relief. The first hurdle, known as the "clean hands" requirement, *see id.* at 613–14, divests the federal district courts of jurisdiction to grant injunctive relief "to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question," 29 U.S.C. § 108. The Union only gestures at the "clean hands" requirement in its presentation of the evidence, *see, e.g.*, Dkt. 31-2 at 16–17, 19–21, 32–33 (describing alleged company violations of CBA), and it does not advance the point in its briefs. The Court, accordingly, has no basis to find that Atlas has failed to "comply with all . . . legal obligations relevant to the dispute," *Rutland Ry. v. Bhd. of Locomotive Eng'rs*, 307 F.2d 21, 39 (2d Cir. 1962), and thus cannot conclude that the company's "unclean hands" divest the Court of jurisdiction to issue a status quo injunction.

The argument that the Union actually advances implicates Section 8's second hurdle to granting injunctive relief—that, prior to seeking an injunction, the movant must make "every reasonable effort" to resolve the dispute by negotiation, mediation, or voluntary arbitration. 29 U.S.C. § 108. That requirement echoes the duty found in the RLA that "both parties . . . make every reasonable effort to settle a dispute, whether it be major or minor." *Rutland Ry.*, 307 F.2d at 38. Atlas, for its part, does not dispute that it was required to make reasonable efforts to resolve the present dispute before applying for an injunction, and it contends that it has done all that is required. Dkt. 52 at 18–20. The Union disagrees, arguing that Atlas has fallen short in a number of ways: it has failed to take advantage of the CBA's grievance and arbitration procedures to raise its slowdown and concerted refusal to work overtime claims; it has failed to seek to discipline any pilots for allegedly abusing the sick leave and fatigue rules or ordered that the pilots block out early; it has "never shared any evidence substantiating" its claims with the

Union; and it has not sought the assistance of mediators provided by the NMB. Dkt. 51-1 at 15–17.

In applying the NLGA's "every reasonable effort" requirement, the Court must once again consider how the NLGA applies to cases brought under the RLA. Here, however, the tension between the two statutes is less evident, and, indeed, both statutes—at least at times—share a common goal of "encourag[ing] use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes." *Bhd. of R.R. Trainmen*, 321 U.S. at 58–59. The D.C. Circuit has recognized that, in most cases, strict enforcement of the NLGA's "every reasonable effort" requirement does "not trammel, but . . . rather further[s] the effectuation of the Railway Labor Act, for it ensures compliance by complainant carrier[s] or union[s,] which cannot seek an injunction until and unless [they have] discharged the obligations imposed by the Railway Labor Act." *Bhd. of R.R. Trainmen*, 385 F.2d at 614. In some cases, however, "the imperatives of the Railway Labor Act [might] override Section 8" and courts must balance competing interests, "particularly where . . . the public interest [is] involved." *Id.*

Although "the precise requirements of" the Section 8 obligation "vary from case to case, there are 'certain minimum steps' that are usually required." *Aircraft Serv. Int'l v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1077 (9th Cir. 2015). In particular:

> Unfair surprise should be avoided whenever possible. The representatives of management should meet with those of labor. Each side should listen to the contentions of the other side and each side should explain its position clearly and honestly, but not for as long a time is customary in full-scale bargaining. In short, men of good faith must in good faith get together in a sincere effort to resolve their differences.

*Id.* (quoting *Rutland Ry.*, 307 F.2d at 41). This means that, before going to court, a party must do more than "discharge his legal obligations." *Bhd. of R.R. Trainmen*, 321 U.S. at 57. "He must also go beyond [those legal obligations] and make all reasonable effort, at the least by the

methods specified if they are available, though none may involve complying with any legal duty." *Id.* This includes "the normal" modes "for settlement of labor disputes by the efforts of the parties themselves and the aid of agencies adapted specially for the purpose," including "the aid of governmental machinery" provided in the RLA for "mediation and arbitration." *Id.* at 57–58.

In pressing their respective arguments, Atlas and the Union characterize the relevant "dispute" for purposes of Section 8 in very different terms. According to the Atlas, the dispute that it was required to make reasonable efforts to settle before bringing this suit was (and is) the dispute over whether and how to amend the existing CBA. Dkt. 49 at 25–26. It then argues—persuasively—that it has made reasonable efforts to settle that dispute. Most notably, all agree that Atlas and the Union reached a "Protocol Agreement" in June of this year, setting forth a process for direct negotiations on a new CBA. Dkt. 5-3 at 6–7; Dkt. 48 at 4. The evidence also shows that those direct negotiations are ongoing, Dkt. 48 at 4, and that the Protocol Agreement was greeted by the Union as a step forward in the negotiations, Dkt. 28-13 at 4–5 (2:4–3:4).

Rather than take on this showing of reasonable efforts, the Union contends that the relevant dispute can be found in Atlas's claim that the Union has orchestrated a slowdown, and it contends that the company could have done more to settle or to avoid that dispute. Dkt. 51-1 at 15–17. It could have filed a grievance under the existing CBA, possibly leading to arbitration of the dispute. *Id.* It could have taken disciplinary action against the pilots allegedly involved in the slowdown. *Id.* It could have ordered pilots to block out early, if possible. *Id.* And, it could have provided the Union with more detail to back up its claim that the Union is orchestrating a slowdown. *Id.* Although for different reasons, the Court is unpersuaded by each of these contentions.

As an initial matter, the Court concludes that Atlas's characterization of the relevant dispute is more apt. A similar issue arose in *United Air Lines, Inc. v. International Ass'n of Machinists and Aerospace Workers*, 243 F.3d 349 (7th Cir. 2001). In that case, the parties were engaged in a major dispute involving the negotiation of a new collective bargaining agreement, and the airline accused the union of staging a slowdown to affect the ongoing negotiations. *Id.* at 353. Invoking Section 8, the union argued that the district court lacked jurisdiction because the airline had "made no virtually no attempt to resolve the slowdown through negotiations . . . before it filed suit." *Id.* at 364. The Seventh Circuit disagreed, explaining:

> Section 8 requires a party to a labor dispute to "exert every reasonable effort" to *settle the labor dispute* in question (through negotiation, mediation or arbitration) before seeking to enjoin an action by the other party which relates to the dispute. It does not require a party who is already engaging in good-faith effort to settle the labor dispute through negotiation, mediation, or arbitration to "exert every reasonable effort" to prevent or end an unlawful strike or work action before seeking judicial relief. Indeed, requiring a carrier to seek a negotiated solution before moving to enjoin an illegal work action would enable unions to use such actions to extort concessions from the carrier during the negotiation process. Such a result would render the union's duty under 45 U.S.C. § 152, First a nullity, and would run directly contrary to the policy rationales of the RLA's status quo provisions.

*Id.* at 364–65 (emphasis in original). The same holds true here. All concede that Atlas and the Union are engaged in contract negotiations that are protected by the RLA's status quo obligation. To the extent the Union is engaged in a slowdown that is targeted at those negotiations, it is acting in violation of the RLA, and requiring that Atlas negotiate with the Union about that violation of federal law runs counter to the terms and purposes of the RLA.

More generally, the Court is also unconvinced that Atlas's failure to file a grievance under Section 26.X of the existing CBA bars the company from seeking a status quo injunction. As noted above, the D.C. Circuit has recognized that Section 8's "every reasonable effort" requirement is not absolute and that, at times, "the imperatives of the" RLA and the public

interest may counsel against strict application of Section 8.  *Bhd. of R.R. Trainmen*, 385 F.2d at 614.  Other courts share that assessment.  In the words of the Seventh Circuit, "[t]he Norris-LaGuardia Act has never been construed to bar an injunctive remedy when such relief is necessary to reach important objectives of federal labor law."  *Air Line Pilots Ass'n*, 802 F.2d at 901.  Rather, the Court must "weigh the competing equities to determine whether applying [S]ection 8's bar to injunctive relief would serve to further underlying purposes of both the RLA and the Norris-LaGuardia Act."  *Id.*

Here, it is difficult to comprehend how the purposes of the federal labor laws would be served by precluding Atlas from seeking judicial intervention until after it files a grievance and starts the process of arbitrating its contention that the Union is engaged in an unlawful slowdown.  Simply putting Atlas to that task—and the attendant delay and uncertainty—would add pressure on the company in the ongoing contract negotiations in contravention of the purpose of the RLA's status quo obligation.  Moreover, one of two results would likely follow: either the Union would be permitted to continue to engage in a slowdown while that process unfolded, which would undermine an important protection contained in the RLA, or Atlas would be able to obtain an injunction in aid of arbitration, which would run counter to the NLGA's aversion to judicial intervention in ongoing labor disputes.[3]  In short, requiring that Atlas jump through additional hoops before obtaining relief from a status quo violation would run counter to the purposes of the RLA and would, at best, raise the same type of concern under the NLGA raised by the present dispute.

_____

[3]  It is uncertain whether Atlas would be able to obtain an injunction in aid of arbitration under the governing D.C. Circuit precedent, which authorizes minor dispute injunctions "only when . . . necessary to preserve the arbitrator's ability to decide the dispute."  *Eastern Air Lines II*, 869 F.2d at 1520 n.2.

Finally, to the extent the Court is required to balance the purposes of Section 8 and the status quo obligation contained in the RLA, the Court concludes that Atlas has made efforts to resolve the slowdown short of litigation. It contacted Union officers in December 2016 and May 2017 to request that the slowdown be stopped, and counsel for Atlas made the same request of counsel for the Union in June 2017. Dkt. 49 at 27. Requiring that Atlas take steps beyond this to discipline pilots for engaging in the alleged slowdown would render the status quo obligation illusory, because "in virtually every case an employer presumably could take some such measures." *United Air Lines, Inc.*, 243 F.3d at 363–64. And, requiring that Atlas present the Union with its evidence that the Union is engaged in a slowdown or order its pilots to block out early would do nothing to promote settlement. The Union is presumably aware of what it is and is not doing, and the BOOT campaign is just one element of the alleged slowdown. *Id.* at 417.

The Court, accordingly, concludes that Section 8 of the NLGA does not present a jurisdictional bar to the present suit.

      b.   <u>Section 7(e)</u>

The Union also briefly argues that Atlas has failed to comply with Section 7(e) of the NLGA because it has not demonstrated "[t]hat the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection."[4] 29 U.S.C. § 107(e). The plain language of that provision, however, makes clear that it applies only in cases involving a potential threat to the complainant's person or property. Decisions

---

[4] The Union also contends that Atlas has not complied with Section 7(a) of the NLGA. That provision requires, prior to the issuance of a labor injunction, proof that "unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained." 29 U.S.C. § 107(a). It is unclear whether Section 7(a) applies at all to the present dispute given the problems attendant with applying 7(e), but even assuming it does, the Court's ultimate conclusion that a preliminary injunction is proper would decide the issue. *See* Dkt. 51-1 at 13.

confronting the meaning and scope of Section 7(e) support this conclusion. *See ABX Air, Inc. v. Int'l Bhd. of Teamsters*, No. 16-CV-1096, 2016 WL 7117388, at *3 (S.D. Ohio Dec. 7, 2016) ("Section 107(e) only applies to cases where there is a threat of physical violence."); *Illinois Cent. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 79 F. Supp. 3d 846, 854 (N.D. Ill. 2015) (finding Section 7(e) "inapplicable" in a case not presenting the threat of violence); *cf. Green v. Obergfell*, 121 F.2d 46, 53–54 (D.C. Cir. 1941) (holding that Section 7(e) barred issuance of an injunction where plaintiff failed to show officers were unable to furnish "adequate protection" against "violence and destruction of property"). As a result, Section 7(e) does not pose an independent bar to injunctive relief in this case.

*   *   *

The Court, accordingly, concludes that it has jurisdiction to consider Atlas's motion for a preliminary injunction, Dkt. 5, and will deny the Union's motion to dismiss for lack of jurisdiction, Dkt. 51.

## B. Atlas's Motion for a Preliminary Injunction

In the ordinary course, a party seeking a preliminary injunction bears the burden of showing that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts, moreover, have "frequently . . . observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (D.C. Cir. 1997) (emphasis omitted) (quoting 11A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2948 (2d ed. 1995)). The NLGA and RLA, however, introduce two twists on the usual rules. First, Section 6 of the NLGA provides that "[n]o officer or member of any association or

organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon *clear proof* of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106 (emphasis added).  This standard applies to the Court's consideration of whether the Union is responsible for the actions of its members.  *See Ramsey v. United Mine Workers of Am.*, 401 U.S. 302, 309 (1971).  Section 6 "is not addressed to the quantum of evidence required to prove the occurrence of the alleged 'unlawful acts.'  It is concerned only with requiring 'clear proof' that the person or organization charged actually participated in, authorized, or ratified 'such acts.'"  *Id.*; *see also United Air Lines*, 243 F.3d at 366.

Second, an injunction under the RLA does not require evidence of irreparable injury.  *See Consolidated Rail*, 491 U.S. at 303 ("The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury."); *see also S. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 337 F.2d 127, 133–34 (D.C. Cir. 1964) (holding irreparable injury showing unnecessary for preliminary injunction under RLA status quo provision); *Gate Gourmet*, 377 F. Supp. 2d at 59–60 (same).  As other courts have done, however, the Court will nonetheless briefly address the irreparable injury prong out of an abundance of caution.  *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 367 (D.C. Cir. 1999) (evaluating existence of irreparable injury); *Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 883 F. Supp. 755, 765 (D.D.C. 1995) (same).

1.  *Likelihood of Success on the Merits*

As a first and indispensable step, Atlas must demonstrate that it is likely to succeed on the merits of its claim that the Union has violated the RLA's status quo requirement.  *See* 45

U.S.C. §§ 152, 156.  In order to satisfy the further requirements of the NLGA, moreover, Atlas must also demonstrate with "clear proof" that any likely status quo violations are traceable to the Union's actions.  29 U.S.C. § 106.  The Court addresses in turn each of the alleged violations that Atlas has proffered.

a.  <u>Short-Notice Sick Calls</u>

Atlas asserts that, since late 2016, a pattern has emerged of Union members calling in sick at the last moment with far greater frequency than during the preceding three years, Dkt. 5-103 at 23, and it posits that they have done so at the instigation of the Union, Dkt. 5-2 at 25. Calling in sick on short notice—that is, on the day the pilot is scheduled to fly—is more likely to disrupt company operations than calling in one or more days ahead of time, because a replacement crew member is often not immediately available.  Dkt. 5-3 at 7–8; Hearing Tr. Day 1 (121:6–8); Hearing Tr. Day 2 (64:19–65:6).  According to Atlas, the resulting delays have led to missed shipping deadlines, have left passengers stranded, and have prompted customer complaints, thus causing Atlas both economic and reputational harm.  Dkt. 5-3 at 8–10.  The parties generally agree that short-notice sick calls are disruptive.  They disagree, however, about whether they have materially increased since the CBA negotiations commenced and, if so, whether the Union's SHOP campaign is to blame.  Accordingly, to meet its burden on this aspect of its claim, Atlas must first demonstrate that it is likely to succeed at trial in showing by a preponderance of the evidence that the rate of short-notice sick calls has deviated from the historical rate—that is, that there has been a change in the status quo—and must then show by clear proof that the Union is responsible for that change.

Atlas initially offered both anecdotal and statistical evidence to support its contention that short-notice sick calls have (1) disrupted operations; (2) occurred more often; and (3) increased because of Union action in violation of the status quo.  *See, e.g.*, *id.* (anecdotal evidence); Dkt. 5-

103 at 22–26 (statistical evidence). The Union responded with evidence that legitimate explanations existed for most, if not all, of the calls offered as examples by Atlas. *See* Dkt. 31-23 (declaration of crew member referenced in complaint describing incorrectly coded sick call); Dkt. 31-24 (declaration of crew member involved in scheduling rebutting several of the claimed examples through reference to scheduling data); Dkt. 31-25 (declaration of crew member referenced in complaint describing sickness); Dkt. 31-26 (same); Dkt. 31-28 (same); Dkt. 31-29 (same); Dkt. 31-30 (same); Dkt. 31-31 (same). In light of the Union's rebuttal of the specific examples offered by Atlas, the company conceded at the hearing that it has not, in fact, produced any specific examples of abuse. Hearing Tr. Day 1 (34:25–35:20).

Atlas's principal argument, however, does not turn on its anecdotal accounts of short-notice sick calls, but rather focuses on statistical evidence of a material deviation from the historical status quo starting on October 1, 2016. That statistical evidence shows that between October 1, 2015 and September 20, 2016, only 13.8% of sick calls occurred on the same day the crew member was scheduled to fly. Dkt. 5-103 at 25. Notably, the highest monthly percentage of sick calls occurring on short notice during that time period was 18%. *Id*. at 24, Ex. 5. From October 1, 2016 to September 20, 2017, in contrast, the average percentage of sick calls occurring on the day of duty increased to 23.8%. *Id*. at 24–25 & Ex. 6. During that time span, moreover, the monthly percentage of sick calls occurring with short notice never dropped below 18%, and in all but one month was 20% or higher. *Id*. at 24, Ex. 5. Based on his analysis of this data, Atlas's expert, Dr. Darin Lee, concluded that the increased percentage of same-day sick calls beginning on October 1, 2016, was "not the result of random statistical variation, but rather, a concerted change in behavior by Atlas's pilots aimed at disrupting the Company's operations." *Id.* at 26. The latter half of that statement, which addresses the subjective motivation of the

pilots, extends beyond the scope of what Dr. Lee's analysis could have revealed. The Court finds, however, that the data and Dr. Lee's conclusion regarding the statistical significance of the change show that Atlas is likely to succeed in proving that Atlas pilots have called in sick on short notice more frequently since late 2016 than they did in the preceding three-and-a-half years.

The Union, for its part, does not challenge Atlas's showing that short-notice sick calls have increased in frequency since late 2016 and, instead, argues that the total number of sick calls has remained constant; that the increase in short-notice calls does not coincide with the timing of the Union's Section 6 notice; and that the increase in short-notice calls can be better explained as the result of an increase in the total number of Atlas flights. Dkt. 31-3 at 5–6, 33–36. Much of the Union's response, however, misses the point of Atlas's evidence. Through its expert, Daniel Akins, the Union suggests that "[p]erhaps it would be more appropriate to measure total pilot sick calls per departure to get a better sense of changes in pilot behavior." Dkt. 31-3 at 31. That, however, simply side steps Atlas's claim that there has been a marked increase in the *percentage* of *short-notice* sick calls—as opposed to an increase in *total sick calls*. Mr. Akins's analysis does demonstrate that the number of sick calls per departure remained relatively constant, even though the proportion of sick calls made at the last minute substantially increased. *Compare* Dkt. 31-3 at 31, Ex. 13, *with id.* at 32–34 & Ex. 15. But that point, if anything, raises reasonable suspicions of abuse; that is, the Court is left to wonder why the *rate of last-minute* sick calls would increase while the *overall rate of sick calls* remained relatively constant.

Mr. Akins also criticizes Dr. Lee's use of October 2016 to mark the onset of the change in behavior instead of February 2016, which is when the Union served its Section 6 notice. Dkt. 31-3 at 35. He explains:

> [T]his time-line does not correspond with Dr. Lee's narrative of Union[-] orchestrated behavioral changes beginning in February 2016. As can be seen, the number of pilot short-notice sick calls drop[ped] during the first seven months after February 2016 below the level experienced in the year prior, and was generally increasing in the time prior to February 2016.

*Id.* That contention, however, does not disprove Dr. Lee's assertion that the Atlas pilots have engaged in a statistically significant change in the status quo—it just raises a question about whether the Union prompted the change in order to exert pressure on the ongoing negotiations. And, as discussed below, there is substantial evidence that the Union intentionally implemented a don't-fly-sick campaign to correspond with the 2016 holiday season to maximize its disruption.

Having found that Atlas has demonstrated a statistically significant increase in the percentage of sick calls made on short notice, the next question is whether Atlas has met its burden of providing "clear proof" that the change occurred at the Union's instigation. Although a close question, the Court concludes that Atlas has also met this burden.

Atlas's most direct evidence can be found in several statements by Union officials urging Atlas pilots not to fly sick. *See* Dkt. 27-4 at 33 (31:6–13); Dkt. 5-79 at 2; Dkt. 44-14 at 13 (12:1–14); Dkt. 5-10 at 2. Standing alone, those exhortations might not carry the day. But, when read carefully and in light of the overall context—especially the SHOP campaign—it is evident that at least some of the Union's exhortations were tied to the ongoing labor dispute. One example of the Union discussing flying sick comes in a message sent to "Atlas Crew Members" from "The Stewards of Atlas, APA Teamsters Local 1224" on September 7, 2017. That message told crew members: "As we find ourselves in the midst of a period of increased friction and hostility, we remind everyone to make absolutely certain that you are fit for duty each and every

time you report to work.  Please, do not fly sick or fatigued."  Dkt. 5-79 at 2.  This is not a mere

safety message.  It is an attempt to link the decision whether to call in sick to the ongoing

relationship between labor and management.

Another example can be found in an August 17, 2017 "negotiations update and leadership

webinar," in which both Captain Kirchner and Chris Knox, the Union's "negotiations chair"

appeared.  Dkt. 44-14 at 2 (1:6–14).  The Union's Communications Chairman, Captain Griffith,

started the conversation by noting that "[t]he hot topic, obviously, today is negotiations and the

updates that we may have from those negotiations."  *Id.* at 3 (2:11–14).  One pilot posed the

following question:  "[A]ny chance we could have a contract by the fourth quarter?  I hear a

rumor that the fourth quarter *Flynn flu* could be really bad," referencing William Flynn, Atlas's

CEO.  *Id.* at 12–13 (11:20–12:2) (emphasis added).  The remark is followed by laughter, and

Captain Kirchner then responds:

> Yeah, we would certainly think that's what we all want.  There's nothing better that
> this Company could do than have all of its pilots pulling in the same direction
> during a critical fourth quarter.  Amazon, DHL, all these other companies are taking
> notice, and it certainly would make good business sense to be able to perform at the
> top level for these customers in the fourth quarter.  But in order to do that, they are
> going to have to do what they should have done by September 14 of 2016.

*Id*. at 13 (12:3–14).  Significantly, Captain Kirchner does not take issue with the pilot's

statement—made to all members who participated in the conversation—that "the fourth quarter

Flynn flu could be really bad."

A final example of this kind of direct reference to not flying sick comes in a series of

videos that began in February 2016.  These videos occasionally referenced flying sick within

discussions of fatigue, SHOP, and BOOT more generally.  Dkt. 5-3 at 25.  The first of these

began with the host saying that he called in sick last night for a flight from Huntsville to

Luxembourg.  Dkt. 5-10 at 2 (1:7–8).  He then pulls what appears to be a thermometer from the

corner of his mouth and says in a spoofing tone: "Oh no. It's 105. Is that bad?" *Id.* (1:10–11). Later in the same video, the host—again in a parodic tone—says that he is getting hot, and he pulls a large rubber hot water bottle out of his shirt. *Id.* (1:15–16). Although arguably merely intended to entertain, the message concludes with the slogan common in the Union's communications discussing SHOP and the creation of leverage: "It's your CBA. They signed it. You use it." *Id.* (4:3–4).

To be sure, the Union has not expressly told its members that they should abuse their right to take sick leave. But, it is clear that the Union understood the risks of delivering such an explicit message. *See, e.g.*, Dkt. 27-4 at 44 (42:3–19) (describing sick-out orchestrated by a different union against a different airline, resulting in a $40 million fine). And, it is equally clear that more explicit language was unnecessary. "An employer may meet the clear proof standard with statistical evidence in combination with evidence of the union's coded [or less than explicit] communications to its members to engage in an unlawful job action." *United Air Lines v. Air Pilots Ass'n, Int'l*, 563 F.3d 257, 272 (7th Cir. 2009). Thus, phrases like "work safe," "work by the book," and "fly the contract" may be sufficient when combined with statistical evidence. *Id*. The Court, moreover, must consider the "content and tone" of the communications "in relation to all of the other evidence about the job actions." *Id.* at 273. Here, the "content and tone" of the Union's communications, the statistics, and the overall context satisfy the clear proof standard.

Finally, the references to not flying sick must be placed in the context of prior Union actions and the SHOP campaign. To take a notable example, from December 16 to December 24, 2016, Atlas experienced a sharp increase in the percentage of B-767 pilots calling in sick. Dkt. 5-3 at 10. During this period, the proportion of B-767 pilots calling in sick averaged five percent, double the average proportion calling in sick for the remainder of 2016, and over fifty-

percent higher than the rate in the corresponding periods in 2015 and 2014. Dkt. 5-103 at 71–72. The 2016 holiday sick-out, moreover, took place at the same time that the Union was picketing Amazon and running an online advertising campaign questioning whether Amazon could deliver on time because "there may not be enough pilots to deliver for Amazon around the holidays." Dkt. 5-3 at 10. Atlas uses its B-767 fleet to fly for Amazon. *Id.* Leaving little doubt about the connection between the sick-out, the online advertising campaign noted that Amazon "Prime Air will operate with 40 planes leased from" Atlas and another company, and it urged consumers to "[g]ive one star for Amazon Prime Air and tell Amazon executives to make sure its contracted pilots have a fair contract to ensure stability and that there are enough qualified pilots to get the job done." Dkt. 5-70 at 2–3. Although the 2016 sick-out ended with the holiday season, the Union's ongoing communications telling pilots not to fly sick—and the evidence of a significant increase in short-notice sick calls—must be understood in light of this history.

Those communications must also be placed in the context of the Union's SHOP campaign, which is clearly tied to the ongoing contract negotiations. It does not require a giant leap to infer from the Union's appeals that its members stop helping the company in order to aid in the ongoing negotiations that its often contemporaneous pleas that members not fly sick are also been intended to apply pressure on the company in those negotiations. And, when the Union's statements are considered in light of the otherwise-unexplained significant increase in the rate at which Atlas pilots have called in sick on short notice, the Court is left with little doubt that the Union has encouraged the change in the status quo.

      b.  <u>Fatigue Calls</u>

Atlas also alleges that, at the Union's urging, pilots have called in fatigued—and thus unable to fly—with greater frequency since the Union served its Section 6 notice. *See*, *e.g.*, Dkt. 5-103 at 27. According to Dr. Lee, Atlas averaged only 5.7 fatigue calls per 1,000 active pilots

on a monthly basis between July 2014 and January 2016.  *Id.*  That average, however, increased

to 16.3 fatigue calls per 1,000 pilots between February 16, 2016 (the date of the Section 6 notice)

and August 2017.  *Id.*  Dr. Lee further attests that in eight of the last eighteen months, the

monthly rate has exceeded 17.8 fatigue calls per 1,000 pilots and that "the probability of

observing eight or more months since the Union sent its Section 6 notice with 'outlier' rates of

pilot fatigue is less than one-in-600,000."  *Id.*  And, finally, Dr. Lee posits that the increased rate

of fatigue calls cannot be attributed to the company's expansion, to changes in the FAA rules

governing fatigue, or to higher rates of pilot utilization.  *Id.* at 27–28.  He notes, for example, that

the FAA "began requiring commercial airlines to have FAA[-]approved Fatigue Risk

Management Plans" more than five years before the Union served its Section 6 notice.  *Id.* at 28

n.42.

The Union does not dispute Dr. Lee's assertion that the rate at which Atlas pilots have

declined to fly due to fatigue has increased since February 2016, but it contends that the upward

trend in fatigue calls began in early 2015—well before the Union served its Section 6 notice—

and that the increase can be explained by reasons unrelated to the current labor dispute.  Dkt. 31

at 61–62; Dkt. 31-3 at 36–41.  In the Union's view, the factual backdrop is more complicated

than Atlas suggests.  The Union argues that the increase has been far from steady—and, indeed,

that there was a dramatic drop in fatigue calls in May and June 2016, Dkt. 48 at 18; that a joint

labor-management Fatigue Risk Management Committee "accepted" all of the fatigue calls at

issue, *id.* at 15; that each of the fatigue calls that Atlas questioned in its opening brief were, in

fact, legitimate, Dkt. 50 at 18; that the increased percentage of new pilots working for Atlas has

contributed to the increase in fatigue calls, *id.* at 20; that scheduling problems and other

management failings also contributed to the increase, Dkt. 31-2 at 25–26; and, finally, that

changes in the law governing pilot fatigue and implementation of a complicated regulatory regime better explains the increase, *id.*; 31-4 at 5–10. Because the Court concludes that the Union's final point casts significant doubt on Atlas's fatigue argument, the Court will limit its discussion to that issue.

As the Union notes, in the wake of a 2009 crash of a regional aircraft that killed fifty people, Congress enacted the Airline Safety and Federal Aviation Administrative Extension Act of 2010, Pub. L. No. 111–216, 124 Stat. 2348 (codified in scattered sections of I.R.C. and 49 U.S.C.). Among other safety measures, that law required the FAA to issue enhanced regulations "to address problems relating to pilot fatigue," § 212(a)(1), and required air carriers to "submit to the [FAA] for review and acceptance a fatigue risk management plan for the carrier's pilots," § 212(b). In response, the FAA issued a final rule on January 4, 2012, adding a new regulation relating to pilot fatigue on commercial flights, *see* 77 Fed. Reg. 330-01 (Jan. 4, 2012), while leaving the old rule—14 C.F.R. § 121—in place for cargo flights. The new, more demanding regulation—14 C.F.R. § 117—requires that airlines adopt fatigue risk management plans and provide their pilots with fatigue training, and it imposes a mandatory duty on pilots to report when they are too fatigued to fly. 77 Fed. Reg. at 349.

Under the new "fitness for duty" regulation, "[e]ach flightcrew member" is required to "report for any flight duty period rested and prepared to perform his or her duties," and no airline "may assign and no flightcrew member may accept assignment to a flight duty period if the flightcrew member has reported for a flight duty period too fatigued to safely perform his or her assigned duties." 14 C.F.R. § 117.5. The FAA, moreover, declined to limit the determination of "fitness for duty" to a series of objective standards, such as hours between flights, *see*, *e.g.*, 14 C.F.R. § 117.25, but instead required that each pilot "utilize the information provided during his

or her statutorily-mandated fatigue training to self-assess whether he or she feels well-rested enough to safely complete his or her assigned" flight duty period. 77 Fed. Reg. at 349–50. Determination of "fitness for duty" is, accordingly, an inherently individual, subjective inquiry.

The Union suggests that the increase in fatigue calls is most likely attributable to the new regulations for two reasons. First, Atlas is one of only two airlines that regularly flies both cargo and passenger flights subject to the divergent fatigue rules. Dkt. 31-4 at 9. As a result, Atlas pilots face the difficult task of applying distinct fatigue-mitigation requirements depending on whether each particular flight is subject to the Part 121 rules governing cargo flights or the Part 117 rules governing passenger flights. That task is complicated, moreover, by the fact that— unlike any other airline—Atlas pilots "are required to fly mixed operations during [a single] monthly schedule[]." Dkt. 31-4 at 9. "In other words, Atlas pilots are required to operate 'all cargo' flights for one or more consecutive days of their monthly trips, during which they are subject to the FAA's old, more exhausting hours of service and rest rules, and then, operate passenger flights the next night or several nights, during which they are subject to the new . . . Part 117 rules." *Id.* Second, the new rules did not take effect until January 2014, and, since then, Atlas pilots have become more aware of and comfortable with the new rules and Atlas's Fatigue Risk Management Plan ("FRMP"). *See*, *e.g*., Dkt. 31-5 at 6.

Although it is possible that the increase in fatigue calls over the past few years is attributable to a Union-sponsored slowdown, the Court finds that the Union has offered an alternative explanation that is both equally plausible and consistent with the strong public interest in preventing pilots from flying while fatigued. As an initial matter, it is clear from Dr. Lee's own graph that the monthly rate of fatigue calls has been on an upward trend since early 2015.



EXHIBIT 7: ATLAS MONTHLY FATIGUE CALLS PER 1,000 ACTIVE PILOTS

Dkt. 5-103 at 28, Ex. 7. Although the diagonal line, which the Court has added to Dr. Lee's graph, is not based on a statistical analysis and does not represent the "best fit" for the data, it nonetheless captures the self-evident upward trend. And, Dr. Lee's conclusion that the post-February 2016 rate exceeds the pre-February 2016 rate would be true for any upward trend, and would be true for a variety of other cutoff dates that Dr. Lee might have chosen.

More importantly, a reasonable argument can be made that the upward trend tracks the implementation and acceptance of the new FAA fatigue rules and Atlas's FRMP. The FAA issued its final pilot fatigue rule in 2012, *see* 77 Fed. Reg. 330-01 (Jan. 4, 2012); Atlas, then, developed and implemented its FRMP in 2013, *see* Dkt. 31-4 at 9; and the FAA rule took effect in 2014, *see* 14 C.F.R. § 117. As Captain Carlson acknowledged, however, efforts to educate Atlas pilots about recognizing and mitigating pilot fatigue have continued from 2013 to 2017. Hearing Tr. Day 2 (79:21–80:12). In 2015, moreover, Atlas implemented a requirement that when pilots "sign off on their flight plans," they also "sign off and . . . initial that they are fit for

duty." *Id*. (196:20–197:7). In addition, according to Captain Christopher Lang, one of Atlas's FRMP instructors, the company and its pilots have "constantly developed the program and increased the training on—the awareness training on fatigue." Hearing Tr. Day 3 (96:8–17). Captain Lang further testified that, "[p]articularly since February of this year, [they have] increased the [in-class] training," and that they added a "fatigue module" to the mandatory, quarterly computer training "this year" and "probably" for "part of last year as well." *Id.* (96:8–98:4). And, finally, Captain Lang testified that Atlas's program director for the FRMP appeared at a check airmen's meeting in August of this year and, after about half of the pilots present conceded that they had flown fatigued, he "encouraged [those present] to call in fatigued more often; to improve flight safety and not [to] fly when . . . fatigued." *Id*. (98:7–99:12).

Nor is it surprising that it has taken time and an ongoing effort to address the problem of pilot fatigue. As a number of witnesses testified, the industry had a "mission-oriented" culture under which pilots, at times, flew fatigued. Dkt. 31-4 at 10; *see also* Hearing Tr. Day 2 (137:13–138:12); Hearing Tr. Day 3 (87:7–88:7). The fact that the assessment of pilot fatigue under Part 117 is subjective and requires a degree of self-awareness further supports the Union's contention that change was not immediate, but, rather, required time and a shift in culture.

The Union, moreover, also reasonably attributes the increase in fatigue calls on a change in the demographics of the Atlas pilot workforce. As Captain Kevin McCabe testified, "approximately 50% of the [current] Atlas pilot workforce was hired on or after January 1, 2015, and 30% of the workforce has less than two years seniority with Atlas." Dkt. 31-4 at 11. "Many of these new pilots are young" and "were previously employed by domestic commuter airlines." *Id.* As a result, according to Captain McCabe, "many of these new[-]hire pilots did not work in the industry when calling out fatigue was considered and treated unfavorably," and they "are

more comfortable participating within the industry's new fatigue and passenger hours of service rules." *Id.* at 11–12.

The Court recognizes that the increase in fatigue calls—particularly when considered in light of the SHOP campaign and similar efforts—may be, at least in part, a product of the Union's effort to apply pressure on the company. On the current record, however, the Court cannot find that Atlas has met its burden.

### c. Open Time Flying

Atlas next alleges that the Union has violated the RLA by encouraging pilots to decline to volunteer for open time flying assignments. Open time flying is a common feature of airline operations, *see Delta Air Lines*, 238 F.3d at 1302, and begins with a flight that lacks a crew. This can occur for a variety of reasons, such as sick calls, fatigue calls, delays due to maintenance issues, last-minute customer requests, or lack of sufficient staff. Dkt. 5-3 at 15–16. Regardless of the cause, Atlas attempts to fill open space in two ways. First, it has a supply of reserve crew members available each day. Dkt. 5-3 at 15–16. These pilots are required to be available to fly, but will not necessarily be close enough to cover a particular flight. Dkt. 5-3 at 16. In addition, there are occasions when the reserve is already fully utilized. *Id.* That leads to the second method of staffing open time: volunteers. Atlas sends out requests for volunteers for a given flight, and available pilots, who are offered premium pay to cover the open time, are then given the opportunity to bid on the available flight. Dkt. 5-3 at 16. When multiple pilots bid on the same flight, the open time trip is given (or, at least, should be given) to the pilot with greatest seniority. *Id.* It goes without saying that unfilled open time damages the company, which cannot complete the flight as scheduled.

Atlas has presented convincing evidence that, since the Union served its Section 6 notice, (1) the company has faced greater difficult in filling open time trips, and (2) it has been unable to

fill a greater proportion of its open time trips. Dr. Lee measured the difficulty in filling open time trips by comparing the number of calls needed to fill each open time trip over time. Dkt. 5-103 at 30. As explained in his declaration, in 2015, Atlas's schedulers made an average of one and a half calls to fill each open time trip. *Id*. at 29. Over the course of that year, moreover, the number of calls needed to fill each trip was relatively constant from month to month, never dropping to one or rising to two. *Id.* at 29–30. Over the first eight months of 2016, however, that number increased to two, and over the following year, the number increased to three. *Id.* at 30.

Dr. Lee also found an increase in the percentage of open time trips that have gone unfilled. According to this analysis, the percentage of unfilled open time trips between January 2015 and February 2016, when the Union served its Section 6 notice, never rose above 5%. *Id.* at 31. In contrast, there have been eleven months since February 2016 when the percentage of unfilled open time trips has exceeded 5%. *Id.* As reflected in the graph reproduced below, moreover, the percentage of unfilled open time trips surged to 30% in October 2016, 42% in December 2016, and 23% in March 2017.

EXHIBIT 9: PROPORTION OF OPEN TIME TRIPS THAT WERE NOT FILLED (JANUARY 2015-AUGUST 2017)

Source: Analysis of Atlas data.
Note: Excludes trips offered for less than an hour.

*Id.* at 32, Ex. 9. Not only does this graph depict a significant increase in unfilled flights, but, as Atlas stresses, this increase is all the more dramatic in light of the fact that the number of available open time trips dropped from an average of 132 per month between January 2015 and February 2016 to an average of only 73 per month from March 2016 to August 2017. *Id.* at 31.

The Union contends that the data reflected in Exhibit 9 does not establish a status quo violation because the spike in unfilled trips did not occur until September 2016, seven months after the Union served its Section 6 notice. As explained above, however, the type of precise temporal correspondence that the Union demands is neither required nor what one would reasonably expect to occur; there is no reason to believe that a union would organize and apply all possible pressure on the day the Section 6 notice is served—it is not surprising to see tensions ebb and flow over time. To be sure, Atlas bears the burden of demonstrating that the Union is

responsible for the changes that have occurred, but that is a separate inquiry that is addressed below.

The Union's expert, Mr. Akins, suggests a number of alternative theories for the dramatic increase in the percentage of unfilled trips. He posits, for example, that the increase corresponds to a decrease in the number of open time trips. Dkt. 31-3 at 45–46. The theory that a drop in supply explains why the remaining available slots went unfilled is difficult to fathom. Dkt. 35 at 38. Mr. Akins, however, make an effort to do so, suggesting that it is "possible" that "the number or proportion of desirable trips" decreased or that pilot interest in open time trips diminished because Atlas adopted a policy of ferrying pilots to and from these flights on Atlas aircraft, rather than on more comfortable commercial flights. Dkt. 31-3 at 47. But, both of these theories are more supposition than evidence; even beyond the qualifiers that Mr. Akins himself includes ("it is *possible*," "[t]his change *may* make it more difficult," *id.*), the Union offers no evidence that either of these possibilities has had any effect on pilot behavior. Given the force of Dr. Lee's testimony and the Union's failure to present evidence of alternative explanations for the increased difficulty in filling open time and the larger percentage of open time flights that have gone unfilled, the Court finds that a change in the status quo has occurred.[5]

That leaves the question whether Atlas has offered clear proof of the Union's involvement in these changes. Once again, it is necessary to consider this issue in light of the Union's more general SHOP campaign, which has urged Atlas pilots to turn down the "quick buck" and "to stop doing the Company favors" in order to give the Executive Committee and Negotiation Committee "the leverage and power they need." Dkt. 5-11 at 2 (1:17–21). Picking

---

[5] In its post-hearing brief, the Union acknowledges "increased . . . reluctance to pick up additional flying from open time." Dkt. 50 at 19. It focuses its argument instead on the role of the Union in fomenting that reluctance, discussed below.

up on this theme during an October 14, 2016 ATAM, Captain Griffith provided pilots with "a short list of some of" the things that they are not required to do under the CBA. Dkt. 5-33 at 6 (19:4). First on this list was "bid[ding] or accept[ing] open time flying." *Id.* (19:6–7). Captain Griffith then explained:

> We have learned we have choices [and that] following the CBA is a simple and extremely [e]ffective way to give our Union all the leverage it needs to score points during talks and negotiations with Purchase. But perhaps we could agree, we have learned what you are not required to do as well and still comply fully with our woeful and much maligned CBA. Understanding is but the first step in the successful execution of any plan. And our plan is to negotiate and bring home an industry leading CBA to our pilots and their families. Our execution and doing the very simple things our Union asks of us is the key. The very key to our solidarity and our eventual success. . . . Now is not the time to let up, ladies and gentlemen. Keep the pressure on them, and we will triumph.

*Id.* at 6–7 (20:1–21:2).

Other communications make the same point. During a May 11, 2017 conference call, for example, a pilot asked about "solidarity" and, in particular, whether the Union calls pilots who pick up open time trips to tell them "to get on the program." Dkt. 28-13 at 10 (8:4–11). Captain Kirchner replied that the Union is not allowed to reprimand pilots for accepting open time trips, but added, "I think there's enough peer pressure going on here and enough people eating dinner by themselves and not having anybody to talk to on long flights that I think that's getting done in that manner." *Id.* (8:12–17). He then added: "We do have great solidarity. And like you point out, the vast majority of our crewmembers are onboard, and they understand that small sacrifices . . . here now will lead to large rewards down the line. The vise is tightening here every day as we move towards the fourth quarter." *Id.* at 10–11 (8:21–9:5). Captain Griffith echoes this point later in the same call. After explaining that the decision whether to bid for or to accept open time trips was "a personal choice," Captain Griffith explained:

> However, when you look at it from the point of view of trying to put pressure on the company—not to hurt the company, but put pressure on them to get them back

to the table—to deny them virtual extra crewmembers—because, remember, every time you outbase or every time you [volunteer], you are virtually becoming more than one crewmember for them in a bid cycle. You know, you got to think about that.

*Id*. at 17 (15:1–9). The following month, Captain Kirchner once again reinforced this point during a Crew Call. Dkt. 28-14 at 3–5. There, a panelist asked whether "picking up open time flying harm[s] . . . our ability to negotiate," and Captain Kirchner responded, "when you go the extra mile for them, that just solidifies and helps them in what they are trying to do to us. Okay?" *Id*. at 5–6 (3:13–4:3).

A final example suffices to make the point. During a July 10, 2017 Crew Call, Captain Kirchner and the Chairman of the Union's Negotiation Committee were asked what the pilots should do to help with the negotiations. Dkt. 28-15 at 5 (3:1). They responded:

> You need to follow the CBA, and, you know, look at your job from a standpoint of do you enthusiastically show up for work and go above and beyond what's required to help Atlas out, or *are you doing just the bare minimum of what's required for you at work every day and nothing more*? Those are the kind of things, if you ask yourself that with every little thing that you have a decision to make on that topic, it makes a huge difference on a large scale. A lot of people don't believe they make a difference, but they really do. Each and every one of you helps us tremendously. (Captain Knox).

> And *if you look at Atlas right now and the open time coming up* and the service failures, it's literally a house of cards ready to come crashing in. They are putting this together with scotch tape and baling wire. (Captain Kirchner).

*Id*. at 5–6 (3:9–21, 3:22–4:5) (emphasis added). Later in the same call, Captain Kirchner further explained: "We're watching some trips cancel, some trips delayed;" "You are all watching a huge amount of open time;" and "unfortunately some of our pilots are falling over backwards to help [the company] out of a jam." *Id*. at 8 (6:12–13). And, although once again noting that the decision whether to fly open time is a personal one, Captain Kirchner told the pilots that "[i]t certainly is helpful when you don't," *id*. at 9 (7:10–11), and that if you decide you want to spend

time with family and "you don't want to help . . . out, that's a great personal decision," *id*. at 13 (11:2–9). The Executive Committee's Communications Chairman followed up Captain Kirchner's comments with his own statement that he "personally [has chosen] not to fly overtime" and "not to help [the] company." *Id.* at 16 (14:20–22).

Reviewing these statements in the context of the overall record and in light of the Union's recognition of the risk of making more explicit assertions, the Court is left with little doubt that the increased difficulty that Atlas has had in filling open time trips is a product of the Union's campaign to apply pressure on Atlas in the ongoing CBA negotiations.

d. <u>Blocking Out</u>

In the airline industry, "blocking out" refers to the time at which a pilot releases the parking brake and begins taxiing. Dkt. 5-2 at 35. The issue before the Court revolves around when blocking out occurs relative to a flight's estimated departure time ("ETD"). Atlas argues that the Union has encouraged pilots to "Block Out On Time" (or, to use the Union's shorthand, to "BOOT") and that this campaign has altered the status quo in violation of the RLA. The company states that the ETD represents "*the latest* a flight is expected to block out" and that, in the past, pilots frequently blocked out as soon as their aircraft were "loaded and ready." Dkt. 5-2 at 34 (emphasis added). The Union disagrees with this characterization and argues that the ETD is *the* time a flight is expected to block out. Dkt. 31-2 at 27–28.

Atlas must first demonstrate that it is likely to prevail on its contention that, since the Union proffered its Section 6 notice, pilots have changed their blocking out practices and that they now more frequently wait until the ETD before blocking out.[6] The Court finds that Atlas

---

[6] Atlas suggests that the Union's pronouncements to its members that the BOOT campaign is working (that is, creating leverage in negotiations) constitutes prima facie evidence of a status quo violation. Dkt. 47 at 25. Because Atlas bears the burden of proof and because it is possible

has carried this burden.  The company has offered credible statistical evidence showing a dramatic increase in the number of flights blocking out exactly at the ETD, and a corresponding decrease in flights blocking out early.  As Dr. Lee testified, from January 1, 2012 to February 15, 2016 (that is, just prior to the Union's Section 6 notice), the percentage of flights not delayed for other reasons that blocked out prior to the ETD hovered around 80%, with the number of flights blocking out exactly at the ETD fluctuating between roughly 10% and 20%.  Dkt. 5-103 at 38 & Ex. 12.  By contrast, after the Union served its Section 6 notice, the average percentage of flights blocking out exactly at the ETD rose to 53%.  *Id*. at 39.  Dr. Lee captured the striking results of his statistical analysis in the exhibit reproduced below.



EXHIBIT 12:  SEVEN DAY MOVING AVERAGE OF THE PROPORTION OF ATLAS FLIGHTS WITH NEITHER UNCONTROLLABLE DELAYS NOR SECONDARY DELAYS LEAVING BEFORE, AFTER AND EXACTLY AT THE ETD

*Id.* at 38, Ex. 12.

---

that the Union has engaged in puffery, the Court will accord only minimal weight to those assertions in determining whether the pilots have, in fact, altered their behavior in response to the campaign.

Dr. Lee also testified regarding a significant shift in the distribution of departure times relative to the ETD, again showing a dramatic increase in the percentage of flights blocking out closer to or at the ETD, and presented evidence of how the distribution of blocking out times has shifted. *Id.* at 40 & Ex. 13. These results are presented in the exhibit below.



**EXHIBIT 13: DISTRIBUTION OF ATLAS DEPARTURES TIMES RELATIVE TO ETD FOR FLIGHTS WITH NEITHER UNCONTROLLABLE DELAYS NOR SECONDARY DELAYS BEFORE AND AFTER THE UNION SENT ITS SECTION 6 NOTICE**

Source: Analysis of Atlas data.
Notes: Data through September 19, 2017. Delay minutes relative to ETD. Flights with neither uncontrollable delays nor secondary delays.

*Id.* at 40, Ex. 13. Among other significant variations, the percentage of flights blocking out twenty-five or more minutes before the EDT dropped from 12.1% to 3.3% after February 16, 2016. *Id.* Overall, flights unaffected by other delays have blocked out an average of six minutes less early since February 2016. *Id.* at 9–10.

Much of the Union's response focuses on the fact that Dr. Lee measured changes in average *departure* times relative to the ETD rather than *arrival* times, which it asserts is a more typical measure of airline performance. Mr. Akins suggests that Dr. Lee's use of departure time

raises a red flag and may signal that Dr. Lee chose this measure because an analysis of arrival times did not produce results supportive of Atlas's claim. *See* Dkt. 31-3 at 59–61; Hearing Tr. Day 3 (105:3–11). The Court is unconvinced. There was a compelling reason to use departure times relative to ETD: the Union's BOOT campaign is focused on departure times. Dr. Lee measured whether the Union's campaign, which urged pilots to wait until the EDT to block out, has had the effect of delaying the time when pilots block out. There is nothing suspect about that approach.

The Union also contends that the measure of departure times relative to ETD is meaningless because Atlas's customers do not care about when a flight departs, they care about when it arrives. Dkt. 31-3 at 59. The premise of that contention is itself suspect. As Captain Carlson testified, unlike commercial passenger flights, "there is no need for a cargo flight . . . to wait once loaded and ready," and "[p]rompt departures reduce airport and hub congestion for Atlas'[s] customers." Dkt. 5-3 at 17–18. But, more importantly, it is implausible to suggest, as the Union must, that the Atlas pilots have engaged in the BOOT campaign—significantly delaying average blocking out times—only to make up for lost time by taxiing or flying faster. Nor is it plausible to suggest that waiting ten, fifteen, or twenty-five minutes longer to block out would not—at least on average—affect the time of arrival of those same flights. And, in any event, Atlas has credibly rebutted the Union's suggestion that the BOOT campaign is inconsequential (or, to put it in terms of the RLA, ineffective in exerting economic pressure on the ongoing CBA negotiations). As Captain Carlson has attested, "[t]he benefits from blocking out promptly, regardless of estimated departure time, and instead when the aircraft is loaded and ready, are significant." Dkt. 5-3 at 18. The benefits include additional time to address any maintenance issues that may arise, a buffer to ensure a timely arrival even in the face of

unexpected delays due to weather, congestion, and other issues, and early arrivals that provide crew members additional time to make connections and to prepare for their next assignment. *Id.*

The Union raises the possibility that Atlas could avoid any disruption caused by the BOOT campaign by simply setting an ETD fifteen minutes earlier. Dkt. 31-2 at 29. In fact, Atlas has apparently done just this to better serve Amazon. Hearing Tr. Day 2 (87:22–24). But, as Captain Carlson explained, that crutch does not entirely diminish the harm caused by the BOOT program. First, when a flight is scheduled fifteen minutes earlier, the company loses the benefits, discussed above, of a departure prior to the ETD, replacing a buffer prior to the scheduled arrival with dead time at the departure gate. Second, Captain Carlson testified that the staffing costs of such an arrangement would be greater than those incurred under the departure model common prior to the BOOT campaign. *Id.* (87:25–88:3). Third, Atlas's customers set their own schedules, requiring the company to request any such changes—presumably explaining in the process the labor strife–related reasons for the request—rather than make them unilaterally. *Id.* (87:4–10). That means that requiring Atlas to combat the change in pilot behavior through such a maneuver would contribute to the very reputational harms it seeks to avoid. Finally, even if it were possible entirely to obviate the effects of the BOOT campaign without additional costs of any kind, Atlas does not have an obligation to do so on its own, in lieu of seeking judicial relief. *See United Air Lines*, 243 F.3d at 363. "Whether [an employer] can diminish or even stop the work slowdown through its own actions has nothing to do with the [union's] enforceable duty to do everything reasonable to end it," and "[t]o hold otherwise would be to deny the union's independent obligations under the RLA." *Id.* The duty at issue here is that of the Union, not Atlas. The Court, accordingly, finds that a change in the status quo in violation of the RLA has occurred.

The Court also finds that Atlas has carried it burden of showing by clear proof that the Union bears responsibility for this change in the status quo. The Union does not dispute that it has enthusiastically encouraged pilots to block out exactly at the ETD—nor could it. *See, e.g.*, Dkt. 31-2 at 27–28; Hearing Tr. Day 3 (76:1–15); Dkt. 29-3 at 25 (23:16–19) (March 22, 2016 Crew Call) ("Stop helping out Purchase. Do your job. Follow the CBA, and don't block out early. Block out on time. That's what kind of airline we are."); Dkt 29-15 at 28–29 (26:10–27:19) (August 30, 2017 Crew Call) ("And this goes right up to the argument of follow the CBA. This is what gives our Negotiating Committee, our EXCOs, and our stewards the leverage that they need. And leverage is the only power that they have. . . . Blocking out on time is not only advantageous to us by giving leverage to our Negotiating Committee and our EXCO and our stewards, it is also protective of your fellow crewmembers."); Dkt. 5-17 at 7 (21:11–22:13) (April 12, 2016 CBA Chat) (discussing how BOOT-ing may impact Atlas's performance bonuses on its contracts); Dkt. 5-22 at 2 (2:4–6) (June 20, 2016 CBA Chat) ("By blocking out on time, you are a shopper."). The Union's continued and unequivocal acknowledgment that it has encouraged BOOT-ing leaves clear proof of Union involvement.

Rather than contest this premise, the Union suggests (or at least seems to suggest) that the BOOT campaign was not designed to exert economic pressure on the company in the ongoing CBA negotiations, but was intended to serve other ends. The Union notes, for example, that a pilot might run afoul of the flight duty regulations by blocking out early and that Atlas itself requires that pilots obtain authorization to block-out more than fifteen minutes before the ETD. Hearing Tr. Day 3 (76:1–79:1). When considered in light of the Union's many statements encouraging pilots to BOOT in order to give its negotiators leverage, however, that contention is not credible. And, finally, the Union suggests that it has done nothing wrong by encouraging its

pilots to BOOT because nothing in the existing CBA requires that pilots block out before the ETD—the pilots may not be helping Atlas; they may be SHOP-ing; but they are not violating the CBA. That contention, however, misunderstands the RLA's status quo duty, which does not turn on whether Union members are acting in violation of the CBA, but whether they have altered the status quo in the midst of negotiating a new CBA and whether they have done so in manner that exerts economic pressure on the company. *See Delta Air Lines*, 238 F.3d at 1309. That is precisely what the BOOT campaign does, and, accordingly, Atlas has demonstrated a likelihood of success on the merits with respect to this aspect of its claim.

        e.   <u>Pilot Maintenance Write-Ups</u>

FAA regulations permit aircraft to operate with open maintenance items that do not affect airworthiness. Dkt. 5-3 at 20. These "Minimum Equipment List" or "MEL" items may include "minor items, such as worn seat cushions, missing linens, or inoperable coffer makers." *Id.* Although Atlas provides its captains with discretion to require that an MEL repair be made before a flight departs, Atlas "pilots ordinarily and historically exercise[d] their authority to defer the maintenance of MEL items until such time as the maintenance would not cause a delay." *Id.* at 21. According to Atlas, the rate at which pilots write up maintenance issues has increased since February 16, 2016. Dkt. 5-103 at 50–51. It contends that this increase constitutes yet another example of the Union's SHOP campaign.

In response, the Union does not dispute that the rate of pilot-initiated write-ups has increased, but it submits that the average number of mechanic-initiated write-ups has, at the same time, decreased. Dkt. 31-3 at 65. Thus, for example, mechanic-initiated write-ups fell from an average of 200 per month per aircraft for the two year period from January 2014 through December 2015 to an average of 159 per aircraft from January 2016 through August 2017. *Id.* During this same period, moreover, the number of pilot-initiated write-ups increased from 22 per

month per aircraft to 34 per month per aircraft.  *Id.*  As a result, Mr. Akins posits that a "substitution" has occurred:  "Pilot write-ups increased perhaps as a result of either covering write-ups previously filed by mechanics, or mechanics write-ups decreased as a result of increased pilot write-ups."  *Id*. at 65–66.  Either way, the total rate of write-ups actually fell after the Union served its Section 6 notice.  *Id*. at 66.

Dr. Lee, in turn, does not dispute that the total rate of write-ups has fallen, but merely asserts that Mr. Akins's contention that a substitution has occurred is speculative.  Dkt. 35 at 40.  The Court is not prepared to so quickly discount Mr. Akins's findings.  It is true that Mr. Akins can only speculate that a substitution has occurred, but it is Atlas, and not the Union, that bears the burden of proof, and it has failed to offer evidence suggesting that the increase in pilot-initiated write-ups has had any material effect on the company.  Absent evidence showing that it is more likely than not that a change has occurred *and* that the change is likely to exert pressure on the company in the ongoing contract negotiations, the Court cannot conclude that Atlas has shown a likelihood of success on this aspect of its claim that the Union has violated the RLA's status quo obligation.

### f.  Crew Meals

Not surprisingly, Atlas must provide crew members with meals during flights.  Dkt. 31-34 at 3.  The CBA sets out various rules for the number and type of these meals based on the time of day and length of the relevant flight.  *Id*.  These rules, both parties agree, are not always followed.  Atlas argues that since February 2017, however, "[t]he pilots' response to catering issues has changed dramatically."  Dkt. 5-3 at 21.  In the past, pilots would typically respond to meal deficiencies by filing a report and requesting meal vouchers to purchase their own food in the future.  *Id*.  Pilots would "very rarely—if ever—t[ake] a delay as a result of catering issues."  *Id.*  In February 2017, however, the Union "issued a 'reminder' to Atlas pilots that they have 'the

right to insist upon a contractually-compliant crew meal, including, if necessary, requesting that the company delay the departure of the flight until the crew meal arrives." *Id.* Since then, according to Atlas, it "has seen a noticeable increase in the number of crew meal-related flight delays beyond normal pilot behavior." *Id.* at 21–22.

In response, the Union provides evidence that the catering dispute began months before contract negotiations commenced. The Union's witness, a member of the Executive Committee, explained that a pilot filed a grievance in March 2015 regarding the company's failure to provide hot meals on a long flight. Dkt. 31-34 at 3–4. Although that grievance was allegedly resolved in the Union's favor, the witness attests that Atlas's Chief Pilot informed the Union that, "from that point on, if the aircraft moved (blocked out) with improper catering, Atlas would not consider any complaints about the catering on that flight to be a grievance under the parties' collective bargaining agreement." *Id.* at 4. It was this confrontation, according to the witness, that has prompted pilots to decline to depart before the catering issue is resolved. *Id.* at 4–5.

Atlas, in turn, does not offer the same kind of statistical evidence it has offered in support of other aspects of its claim. In light of the lack of objective, statistical evidence or other evidence that the meal issue has caused material, economic disruption, and in light of the parties' conflicting accounts of the relevant circumstances, the Court finds that Atlas has not carried its burden of demonstrating a likelihood of success on this aspect of its claim.

2. *Irreparable Injury*

As noted above, a showing of irreparable injury is not required to obtain injunctive relief under the RLA. *See Consolidated Rail*, 491 U.S. at 303. Nonetheless, out of an abundance of caution, the Court will consider Atlas's contention that, in the absence of an injunction, it will suffer irreparable injury.

Although Atlas identifies various injuries that it says it will sustain, its most compelling contention is that a further slowdown in the middle of the busiest portion of the year for express shipping would cause the company irreparable reputational harm. Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction. *See Trudeau v. FTC*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006) (citing *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("Moreover, plaintiffs have demonstrated irreparable harm in damage to their business reputation.")); Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). To satisfy this standard, however, the plaintiff must make a showing that is "concrete and corroborated, not merely speculative." *Trudeau*, 384 F. Supp. 2d at 297 (citing *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996)).

Atlas has done so here. Both William Flynn, the President and CEO of Atlas, Dkt. 26, and Captain Carlson, Dkt. 5-3, testified regarding the damage to client satisfaction posed by the slowdown, *see, e.g.*, Dkt. 5-3 at 71, and they substantiated this testimony with examples of complaints from customers and family members of military personnel whose flights have been delayed, *see, e.g.*, Dkt. 5-87, Dkt. 5-95, Dkt. 5-96, Dkt. 5-97. The company's customers are aware of the delays created by the Union's campaign, and, indeed, the Union has made an effort to bring the delays to their attention. *See, e.g.*, Dkt. 5-3 at 10–11 (describing Union public relations campaign during winter 2016 targeting Amazon, which included a website asking Amazon customers to email the company regarding Atlas's CBA).

Most significantly, the nature of Atlas's and its customers' businesses—with their focus on *express* cargo delivery—turns on both speed and dependability. Dkt. 5-3 at 4. As Captain

Carlson testified, Atlas's customers—and its customers' customers—pay extra for air delivery because they place a premium on speed. Dkt. 5-3 at 78. It is not difficult to imagine that companies like DHL and Amazon are not inclined to tolerate even occasional lapses in promised delivery times. Guaranteed next day delivery is not the same thing as almost always next day delivery.

Atlas has also carried its burden of showing that the damage to its reputation that will likely result from a slowdown during the upcoming busy season is irreparable. As the company's witnesses explained, a large portion of Atlas's business is attributable to a few customers, including DHL, the U.S. Military, and Amazon. Hearing Tr. Day 3 (5:23–6:16). If those customers conclude that they cannot rely on Atlas for on-time delivery, they are likely to switch contractors or at least to reduce the routes covered by Atlas. *Id.* (8:11–9:3). And, because of the high cost of the initial integration of a transportation provider into a customer's supply chain, once a switch has been made, the customer is unlikely to return its business to Atlas, even if Atlas's reliability problems are resolved. *Id.*

The Court, accordingly, finds that the testimony and exhibits offered into evidence demonstrate that Atlas will likely to suffer "harm to [its] reputation as a result of the" union's actions, and "that such harm is certain to continue if the court does not impose an injunction." *See Trudeau*, 384 F. Supp. 2d at 297.

    3. *Balance of Equities*

The Court also concludes that Atlas has demonstrated that the balance of equities tips in its favor. *See Winter*, 555 U.S. at 20. Atlas asserts that, in the absence of an injunction requiring maintenance of the status quo, it will continue to suffer economic and reputational losses during the busiest time of the year for its industry. Dkt. 5-2 at 92–94. The Union argues in response

that an injunction will chill speech protected by the First Amendment, including safety and educational communications that it says are vital to the operation of the airline.  Dkt. 50 at 26.

The courts have long recognized that "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution," *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940), and the Union plausibly characterizes many of the challenged actions in this case as involving such facts, Dkt. 50 at 29. As the Union recognizes, however, "the First Amendment does not protect advocacy of unlawful conduct."  *Id*.  Indeed, the Supreme Court has clearly held that injunctions are, at times, the "appropriate means" to enforce the RLA's status quo obligations, despite the First Amendment rights involved in the enjoined labor action.  *Chicago & N.W. Ry.*, 402 U.S. at 577 (upholding the use of strike injunctions to enforce Section 2, First of the RLA); *Street*, 367 U.S. at 774–75 (upholding in face of First Amendment objections injunction enforcing Section 2, Eleventh of the RLA).  Courts have taken a similar approach to violations of other labor laws, enjoining communications and conduct with significant expressive elements that nevertheless violated statutory mandates.  *See, e.g.*, *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 226 (1982) (upholding injunction against secondary picketing by labor unions that violated the National Labor Relations Act); *Miller v. United Food & Commercial Workers Union*, 708 F.2d 467, 471 (9th Cir. 1983) ("Because of the government's strong interest in regulating the economic relationship between labor and management, Congress may constitutionally enact measures which impact on the speech element of picketing.").  The Court, accordingly, concludes that the First Amendment does not prohibit it from enjoining communications and conduct that violates the status quo provisions of the RLA.

On the other side of the balance, the likely harm to the company in the absence of an injunction would be severe. Atlas risks losing existing business and future business opportunities, and, once gone, those opportunities would likely prove exceedingly difficult to regain. Moreover, in the absence of an injunction, Atlas would lose the benefit that the RLA status quo obligation confers upon it, and it would be required to negotiate with the Union under conditions that Congress deemed improper. *See Chicago & N.W. Ry.*, 402 U.S. at 582. Given these interests, the Court concludes that the balance of hardships tips in Atlas's favor.

The Court agrees with the Union, however, that when unlawful conduct that may properly be enjoined "occurs in the context of constitutionally protected activity," such as ATAMs and Crew Calls, "precision of regulation is demanded." Dkt. 50 at 29 (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) (internal quotations omitted)). Interpreting another provision of the RLA that potentially restricted a union's political activities, the Supreme Court cautioned district courts that First Amendment interests provide "an additional reason for reluctance" to issue "blanket injunctive remed[ies]" under the RLA. *Street*, 367 U.S. at 773. The Court will therefore consider the chilling effect on *lawful* speech in setting the scope of its injunction.

4. *Public Interest*

Finally, the Court concludes that Atlas has shown that the public interest weighs in favor of granting a preliminary injunction. *See Winter*, 555 U.S. at 20. As explained above, the NLGA and the RLA embody distinct and, at times, competing public policies. The NLGA embodies a strong public policy against the intervention of courts in labor disputes to avoid "upsetting the natural interplay of the competing economic forces of labor and capital." *Bhd. of R.R. Trainmen*, 353 U.S. at 40. By contrast, the status quo provisions of the RLA represent the judgment of Congress that the rights of labor and management to freely alter their relations

should be restricted so as to avoid the interruption of interstate commerce. *Id.*; *Erie Lackawanna Ry. v. United Transp. Union,* No. 817-71, 1971 WL 721, at *3 (D.D.C. May 21, 1971). Because, in cases involving major disputes, the general mandates of the NLGA must be accommodated to the specific requirements of the RLA, *Bhd. of R.R. Trainmen*, 353 U.S. at 40–41, these competing public policies must follow a similar path, and the public policy against the issuance of labor injunctions must give way to the public interest in avoiding disruptions of the airline and railroad industries. Indeed, that interest is acute in the present posture, where the Union's activities, if allowed, would likely interfere with interstate commerce during the busiest season of the year. The public interest, accordingly, weighs in favor of granting an injunction.

*   *   *

For all of these reasons, the Court concludes that it has jurisdiction over this dispute and that Atlas has carried its burden of demonstrating that it is entitled to a preliminary injunction preserving the status quo while the parties engage in the process mandated by the RLA for resolving major disputes.

## C. Bond

One final issue merits brief discussion. Section 7 of the NLGA requires the posting of a bond:

> No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107. Setting an appropriate bond is necessary because "a party injured by an erroneous injunction has no action for damages in the absence of a bond and is limited to

recovering the amount of a bond." *Alton & S. Ry. v. Bhd. of Maint. of Way Emps.*, 899 F. Supp. 646, 650 (D.D.C. 1995) (citing *Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines*, 925 F.2d 6, 10 (1st Cir. 1991)). In this district, the exact boundaries of when an action for attorney's fees under the NLGA may be brought are unclear, but courts have imposed a bond sufficient to cover the costs of litigating the motion and any appeal. *Id.* at 651. Because the parties have not offered proof of the appropriate bond, the Court will order that Atlas post a bond in the amount of $200,000, but the Court invites the parties to file further briefs and supporting evidence should either seek to modify this amount.

## CONCLUSION

For the reasons expressed above, the Court will **GRANT** Plaintiffs' Motion for Preliminary Injunction, Dkt. 5, and **DENY** Defendants' Motion to Dismiss, Dkt. 51. A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  November 30, 2017